## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE MAJESTIC STAR CASINO, LLC, et al.,[1] | Case No. 09-14136 ( ) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF JON S. BENNETT, SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, IN SUPPORT OF FIRST DAY MOTIONS

I, Jon S. Bennett, hereby declare under penalty of perjury:

1.    I am over the age of 18 and am competent to testify.  I am the Senior Vice President, Chief Financial Officer and Treasurer of The Majestic Star Casino, LLC, ("Majestic"), an Indiana limited liability company and a debtor and debtor in possession in the above-captioned cases; a position which I have held since October 21, 2002.  I am also the Senior Vice President and Chief Financial Officer for each of the other debtors and debtors in possession in the above-captioned cases (collectively with Majestic, the "Debtors").  As such, I am familiar with the day-to-day operations, businesses, and financial affairs of the Debtors.

2.    Prior to my appointment as Senior Vice President and Chief Financial Officer for each of the Debtors, I was Vice President of Finance and Administration for Barden Mississippi ("Barden Mississippi") from its acquisition by Majestic in December 2001 through October 2002.    Before joining the Debtors, I held various positions with Fitzgeralds Gaming

---

[1]    The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number, include:  The Majestic Star Casino, LLC (4986); The Majestic Star Casino II, Inc. (0927); The Majestic Star Casino Capital Corp. (0872); Majestic Star Casino Capital Corp. II (9309); Barden Mississippi Gaming, LLC (8783); Barden Colorado Gaming, LLC (8674); Majestic Holdco, LLC (4648); and Majestic Star Holdco, Inc. (9415).  The corporate address for the Debtors is 301 Freemont Street, 12th Floor, Las Vegas, Nevada 89101.

Corporation, including Vice President of Finance and Administration for Fitzgeralds Tunica from April 1997 to December 2001 and Director of Finance for three Fitzgeralds properties located in Reno, Nevada.

3.     Concurrently with the filing of this declaration (the "Declaration"), each Debtor filed with the Court a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code," 11 U.S.C. §§ 101–1532). To enable the Debtors to operate effectively and to avoid certain adverse effects of commencing cases under chapter 11 of the Bankruptcy Code, the Debtors concurrently filed several motions and applications requesting various types of immediate relief (collectively, the "First Day Motions"). I believe that the relief sought in the First Day Motions is critical to stabilizing the Debtors' businesses and ensuring a smooth transition into chapter 11, which will preserve the value of the Debtors' estates and facilitate a successful reorganization.

4.     I am authorized by the Debtors to submit this Declaration in support of the First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' finances and operations, information supplied to me or verified by personnel in departments within the various divisions of the Debtors (including legal, operations, marketing, human resources, risk management, payroll, finance, and accounting), information supplied to me by the Debtors' third-party advisors, and/or my review of relevant documents. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.     Part I of this Declaration describes the Debtors' businesses, operations, and organizational and capital structure. Part II describes the circumstances and events leading to the Debtors' commencement of these cases. Part III summarizes the First Day Motions.

2

Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the applicable First Day Motion.

## PRELIMINARY STATEMENT

6.     The Debtors commenced these cases to preserve their businesses, operations and going concern value while they continue to negotiate a consensual balance sheet restructuring with their principal creditor constituencies.  Notwithstanding challenges posed by the recent economic downturn and increased competition in the markets in which they compete, the Debtors' businesses and operations continue to perform well and, excluding debt service, produce cash flow sufficient to support their ongoing operations.  The Debtors are confident that they will be able to reach consensus with a majority of their creditors regarding a new capital structure and debt service load that more appropriately reflect the Debtors' revenues, and which will position the Debtors to emerge from these cases as a financially healthy and stable organization.

7.     The Debtors collectively constitute a multi-jurisdictional gaming company that owns and operates four casino properties:  (a) Majestic Star and Majestic Star II - riverboat casinos located at Buffington Harbor in Gary, Indiana that are connected to a dockside entertainment pavilion and are adjacent to the Majestic Star Hotel, and which together serve the northern Indiana and Chicagoland markets; (b) Fitzgeralds Tunica - a Fitzgeralds-brand casino and hotel located in Tunica County, Mississippi that serves the Memphis, Tennessee, northern Mississippi, Little Rock, Arkansas, southern Missouri, Birmingham and Hunstville, Alabama areas, as well as regional travelers flying into Memphis; and (c) Fitzgeralds Black Hawk - a Fitzgeralds-brand casino located in Black Hawk, Colorado that serves the Denver-metro and surrounding areas.  Each of Majestic's casino properties has been in operation for over ten years.  The Debtors collectively employ approximately 2,600 people, and as of October 31,

3

2009 their gaming properties operated 4,160 slot machines, 116 table games, 21 poker tables and 777 hotel rooms.

8.     The Debtors operate in markets that have become increasingly competitive in recent years, with other gaming organizations investing significant amounts in new or upgraded facilities that directly compete with the Debtors' properties.  Accordingly, the Debtors are required to make substantial capital investments in their operations on a regular basis to continue attracting customers.  At the same time weakening national and regional economies, rising unemployment and increased instability in the housing market have negatively impacted casino customers' spending and visitation habits in the markets in which the Debtors operate. The net result of this increased competition and reduction in customer spending has been to restrict the Debtors' liquidity, which has reduced the Debtors' ability to continue making both the substantial capital expenditures required to maintain their properties' competitiveness and the required interest payments on their principal debt facilities.

9.     Accordingly, and to ensure access to the liquidity necessary to operate their businesses, on or about October 7, 2008 the Debtors drew substantially all of the remaining availability under their Senior Secured Credit Facility (as defined below), and determined not to make the $24 million interest payment due to holders of their Senior Secured Notes (as defined below) and Senior Notes (as defined below) on October 15, 2008.  As a result, on November 14, 2008, an event of default occurred under the Debtors' Senior Secured Credit Facility, Senior Secured Notes, Senior Notes and Discount Notes (as defined below).

10.     The Debtors retained financial and legal advisors to assist them in evaluating a broad range of financial and strategic alternatives aimed at addressing their operational and financial position.  Additionally, the Debtors engaged the agent under the Senior Secured Credit

4

Facility, the holder of the majority (by principal) of the Senior Secured Notes and an ad hoc group that collectively hold the majority (by principal) of the Senior Notes in discussions regarding a consensual restructuring of the Debtors' principal debt facilities. After months of negotiations among these constituencies, however, and as a result of certain actions taken by the Senior Secured Notes Trustee (as defined below) that have made continuing such negotiations outside of a chapter 11 case difficult, the Debtors have determined that commencing these cases is necessary to protect their operations and assets and preserve the going concern value of their businesses while they continue to work towards a consensual restructuring of their balance sheet.

**PART I**

**THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE AND OPERATIONS**

**A.      The Debtors' History and Organizational Structure**

> **i.      Corporate History of Majestic**

11.     Majestic was formed by Don H. Barden in December 1993 to pursue a license to operate a gaming facility at Buffington Harbor in Gary, Indiana. In 1996, Majestic and Trump Indiana, Inc. (which was not affiliated with the Debtors at that time) ("Trump Indiana") each opened a dockside gaming facility at Buffington Harbor.

12.     In December 2001, Majestic purchased Fitzgeralds-brand properties in Las Vegas, Nevada, Tunica, Mississippi (30 miles south of Memphis) and Black Hawk, Colorado (35 miles west of Denver), which it owns through its wholly-owned subsidiaries Barden Nevada Gaming, LLC ("Barden Nevada," not a Debtor in these cases), Barden Mississippi (a Debtor in these cases), and Barden Colorado Gaming, LLC ("Barden Colorado," a Debtor in these cases), respectively. This purchase significantly expanded Majestic's geographic reach and the scope of its gaming and hospitality operations. It also gave Majestic proprietary rights in registered

5

and common law trade names, trademarks and service marks used in connection with these operations, certain of which Majestic licenses to other Fitzgeralds-brand properties.

13. On December 31, 2003, Majestic spun off ownership of Barden Nevada to Barden Development Inc. ("BDI"), Majestic's indirect parent (not a Debtor in these cases). As part of that transaction, Majestic and Barden Nevada entered into a series of licensing, expense sharing and other agreements, which are described in greater detail below.

14. On December 21, 2005, Majestic acquired Trump Indiana (renamed The Majestic Star Casino II, Inc. ("Majestic II"), a Debtor in these cases), including its dockside gaming facility at Buffington Harbor, which Majestic rebranded "Majestic Star II," and its 300 room hotel, which was renamed the "Majestic Star Hotel." As part of this transaction, Majestic also acquired complete ownership of two other subsidiaries: Buffington Harbor Riverboats, LLC ("Buffington Riverboats"), a joint venture between Majestic and Trump Indiana established to acquire, manage, and develop a dock, pavilion and parking facilities for gaming operations; and Buffington Harbor Parking Associates, LLC ("Buffington Parking"), a joint venture between Trump Indiana and AMB Parking, LLC (an entity owned by BDI) established to own and operate parking facilities for gaming operations.[2] Accordingly, the Debtors' Buffington Harbor operations now include both the Majestic Star and Majestic Star II casino operations, the Majestic Star Hotel, an entertainment pavilion housing restaurants, retail outlets, an entertainment venue, a lounge and boarding access to the two casinos, and a 2,000 space

---

[2] On or about August 4, 2006, Buffington Parking was merged into Majestic pursuant to Articles of Merger filed with the Secretaries of State for the States of Indiana and Delaware. On or about December 31, 2006, Buffington Riverboats withdrew from existence as an entity with the Secretary of State of the State of Delaware.

parking garage. Majestic also has 228 acres of undeveloped land at the site that is available for future expansion.

### ii. Current Organizational Structure

15.     Majestic, which owns and operates the Majestic Star riverboat casino and the other properties described above, is a wholly-owned subsidiary of Majestic Holdco, LLC ("Majestic Holdco," a Debtor in these cases), a non-operating holding company that has no assets other than the equity interests of Majestic and Majestic Star Holdco, Inc. ("Majestic Star Holdco," a Debtor in these cases). Majestic Holdco is a wholly-owned subsidiary of BDI. Mr. Barden serves as the Chairman, President, and Chief Executive Officer of Majestic - and in a similar capacity for each of the other Debtors - and is the sole shareholder of BDI.

16.     Majestic has five subsidiaries, two of which were formed for the purpose of facilitating financing transactions and three of which own and operate gaming properties (and all of which are Debtors in these cases). Specifically, Majestic's wholly-owned subsidiaries are (a) The Majestic Star Casino Capital Corp. ("MSCC"), an Indiana corporation without assets or operations that was formed to facilitate the offering and act as co-issuer with Majestic of the Senior Secured Notes; (b) Majestic Star Casino Capital Corp. II ("MSCC II"), an Indiana corporation without assets or operations that was formed to facilitate the offering and act as co-issuer with Majestic of the Senior Notes; (c) Barden Mississippi, a Mississippi limited liability company that owns and operates the Fitzgeralds Tunica gaming property; (d) Barden Colorado, a Colorado limited liability company that owns and operates the Fitzgeralds Black Hawk gaming property; and (e) Majestic II, a Delaware corporation that owns and operates the

7

Majestic Star II riverboat casino and Majestic Star Hotel at Buffington Harbor in Gary, Indiana.[3] Majestic's affiliate, Majestic Star Holdco, is an Indiana corporation without assets or operations formed to act as co-issuer with Majestic Holdco of the Discount Notes.

17.     The following chart illustrates the Debtors' current organizational and ownership structure (non-debtors are shaded):



## B.     The Debtors' Operations

18.     The Debtors collectively own and operate four casino properties, which, as of October 31, 2009, offer 4,160 slot machines, 116 table games, 21 poker tables, and 806 hotel

---

3     Prior to March 2006, Majestic did not directly own Barden Mississippi and Barden Colorado. Rather, Majestic had an additional subsidiary named Majestic Investor, LLC ("Majestic Investor"), which in turn owned Majestic Investor Holdings, LLC ("Investor Holdings"). Investor Holdings owned Barden Mississippi, Barden Colorado, and Majestic Investor Capital Corp. ("Investor Capital"). Majestic Investor and Investor Holdings were holding entities without assets or operations, while Investor Capital was an entity formed to facilitate the offering of certain notes that have since been redeemed by Majestic. On or about March 6, 2006, Investor Capital ceased to exist pursuant to a Certificate of Amendment of Certificate of Incorporation filed with the Secretary of State for the State of Delaware. On or about March 21, 2006, Majestic Investor was merged into Majestic pursuant to Articles of Merger filed with the Secretaries of State for the States of Indiana and Delaware. Finally, on or about March 22, 2006, Investor Holdings was merged into Majestic, making Barden Mississippi and Barden Colorado direct subsidiaries of Majestic, pursuant to Articles of Merger filed with the Secretaries of State for the States of Indiana and Delaware.

8

rooms (29 rooms at the Majestic Star Hotel are used for administrative offices). The Debtors' businesses focus on attracting mid-level gaming customers by providing outstanding customer service and a quality gaming and entertainment experience at an affordable price. The Debtors have tailored their business strategy through their properties' strong drive-in market locations, emphasis on property branding and slot play, a focus on affordable quality and service, and strong ownership and experienced management.

19. For the ten months ended October 31, 2009, the Debtors generated approximately $255,366,589 in net operating revenues. As of October 31, 2009, the Debtors had assets totaling approximately $402,110,866 (book value) and liabilities totaling approximately $771,106,354 (book value).

20. Majestic and Majestic II together own and operate a gaming complex located at Buffington Harbor in Gary, Indiana, approximately 23 miles southeast of downtown Chicago, Illinois. These properties primarily draw customers from the northwest Indiana and Chicago metropolitan market, which constitutes the third-largest gaming market in the United States, as well as other areas in Illinois, Indiana, and Michigan. The Majestic Star riverboat casino, opened in June 1996, is a four-story, 360-foot long vessel that accommodates approximately 3,000 customers and employees and offers 40,800 square feet of gaming space, with 1,033 slot machines, 59 table games, live entertainment, a private high-limit area, and a baccarat room. The Majestic Star II riverboat casino is a four-story, 280-foot long vessel that accommodates approximately 2,740 customers and employees and offers 43,000 square feet of gaming space, with 1,125 slot machines, 12 table games, a 21-table poker room, and live entertainment. The Majestic Star Hotel contains 300 rooms (29 rooms are used as administrative offices) with eight suites and a restaurant, and is adjacent to a two-level, 85,410 square foot entertainment pavilion

9

containing restaurants, gift shops, lounges, and banquet and entertainment facilities. The Buffington Harbor facilities also include a 2,000-space covered parking structure and 2,600 surface parking spaces, with valet parking and dedicated bus facilities.

21. Fitzgeralds Tunica hotel and casino opened in June 1994, and is located in north Tunica County, Mississippi, approximately 30 miles from Memphis, Tennessee. Fitzgeralds Tunica primarily draws its patrons from the Memphis area, as well as from markets in Mississippi, Arkansas, Missouri, and Alabama. The facility includes 38,088 square feet of gaming space, with 1,246 slot machines, 36 table games, and live entertainment. It also includes a 506-room hotel with 68 suites, an indoor special events center, an indoor swimming pool, two bars, three restaurants, and a gift shop. The casino and hotel are complemented by a 411-space covered parking structure and 1,264 surface parking spaces with valet parking and dedicated bus facilities.

22. Fitzgeralds Black Hawk opened in May 1995, and is located in Black Hawk, Colorado, approximately 30 miles from Denver, Colorado. Fitzgeralds Black Hawk primarily draws patrons from Denver, Boulder, Colorado Springs, and Fort Collins, Colorado, as well as Cheyenne, Wyoming. Fitzgeralds Black Hawk includes 17,179 square feet of gaming space, with 756 slot machines, nine table games, two restaurants, three bars, and a 392-space, all-valet parking garage. In June 2008, the Debtors completed an expansion of Fitzgeralds Black Hawk, which materially increased the size of its gaming floor and the number of slot machines it can make available to customers.

C. The Debtors' Prepetition Indebtedness

23. The Debtors' capital structure consists of four principal facilities: (a) an $80 million Senior Secured Credit Facility (the "Senior Secured Credit Facility") funded by a syndicate led by Wells Fargo Foothill, Inc. (the "Agent"), which matures on April 15, 2010;

10

(b) $300 million in principal amount of 9½% Senior Secured Notes (the "Senior Secured Notes"), which mature October 15, 2010; (c) $200 million in principal amount of 9¾% Senior Notes (the "Senior Notes"), which mature January 15, 2011; and (d) $63.5 million in principal amount at maturity of 12½% original issue discount notes (the "Discount Notes"), which mature October 15, 2011.

### i.    Senior Secured Credit Facility

24.    On October 7, 2003, Majestic, Barden Mississippi and Barden Colorado entered into a Loan and Security Agreement (as amended, the "Loan and Security Agreement") with the Agent, as arranger and administrative agent for the lenders from time to time party thereto.[4]   The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

25.    The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matures on April 15, 2010.  As of November 17, 2009, the Debtors owed approximately $79,333,987.13 under the Senior Secured Credit Facility, exclusive of any accrued but unpaid interest, costs, fees or expenses (if any).  Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%.  In each case the rate is determined based on the Debtors' EBITDA (defined as earnings before interest, taxes, depreciation and amortization).  The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default.  As noted above,

---

[4]    The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Agent at the default rate.

26.     Pursuant to certain mortgages, security agreements and related agreements, outstanding amounts under the Senior Secured Credit Facility are secured by substantially all of the assets of Majestic, Majestic II, Barden Colorado and Barden Mississippi, including all real property and other assets of the Debtors' casinos, all furniture, fixtures and equipment belonging to those entities, those entities' rights to the service marks "Majestic Star Casino" and "Fitzgeralds" and other related trademarks, and the proceeds and products of any of the foregoing, as well as by a pledge by Majestic of its equity interests in Majestic II, Barden Colorado and Barden Mississippi (collectively, the "Collateral"). Majestic Holdco has also guaranteed outstanding obligations under the Senior Secured Credit Facility, although its liability is limited to its pledge of the equity of Majestic. The Collateral does not include certain "Excluded Assets," including, among other things, cage cash (cash held at the casino properties themselves) and the Debtors' gaming licenses and other licenses that may not be encumbered under applicable law or contract.

### ii.     Senior Secured Notes

27.     The Senior Secured Notes are $300 million in principal amount outstanding of obligations issued by Majestic and MSCC, a non-operating, wholly-owned subsidiary of Majestic that has no assets. The Senior Secured Notes are governed by an Indenture dated October 7, 2003, and two Supplemental Indentures each dated December 21, 2005 (collectively, the "Senior Secured Notes Indenture"), with The Bank of New York Trust Company, N.A., as trustee under each indenture (the "Senior Secured Notes Trustee"). The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in

12

connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes mature on October 15, 2010.

28. Outstanding obligations under the Senior Secured Notes are secured by liens in favor of the Trustee on the Collateral, which are junior to the liens granted to the Agent under the Loan and Security Agreement pursuant to the Intercreditor Agreement (as defined below). Additionally, Majestic II, Barden Colorado and Barden Mississippi have each guarantied the Debtors' obligations under the Senior Secured Notes. Majestic Holdco has also guarantied those obligations, but its guaranty is limited to a pledged of its equity interests in Majestic.

### iii. Intercreditor Agreement

29. In connection with the issuance of the Senior Secured Notes, the Agent, the Senior Secured Notes Trustee, and certain of the Debtors[5] entered into that certain Intercreditor and Lien Subordination Agreement dated as of October 7, 2003 (the "Intercreditor Agreement"). The Intercreditor Agreement, among other things, subordinates the liens and security interests granted to the Senior Secured Notes Trustee to secure the Debtors' obligations under the Senior Secured Notes to the liens and security interests granted to the Agent to secure the Debtors' obligations under the Senior Secured Credit Facility, up to a maximum principal amount outstanding under the Senior Secured Credit Facility of $80 million, plus premiums, interest, fees and all other amounts payable under the Senior Secured Credit Facility (including all

---

[5] The Debtors party to the Intercreditor Agreement are: (a) Majestic, Majestic II, Barden Mississippi, and Barden Colorado, as borrowers under the Senior Secured Credit Facility, and Majestic Holdco, as guarantor under the Senior Secured Credit Facility; and (b) Majestic and MSCC, as issuers of, Majestic II, Barden Mississippi, and Barden Colorado, as guarantors under, and Majestic Holdco, as pledgor under, the Senior Secured Notes Indenture.

13

amounts accruing after the Debtors commence a chapter 11 case).[6]  Additionally, the Intercreditor Agreement imposes up to a 180-day standstill period within which holders of the Senior Secured Notes and the Senior Secured Notes Trustee may not enforce remedies against the Debtors based on an event of default under the Senior Secured Notes Indenture, which period is extended indefinitely with respect to Collateral against which the Agent is pursuing rights or remedies under the Senior Secured Credit Facility.

30.     The Intercreditor Agreement also restricts the Senior Secured Notes Trustee and Senior Secured Notes holders from seeking adequate protection and taking certain other actions in any chapter 11 case commenced by the Debtors.  Specifically, the Intercreditor Agreement provides that, until the senior obligations under the Senior Secured Credit Facility have been satisfied, the Senior Secured Notes Trustee and the Senior Secured Notes holders (a) will not object to any use of cash collateral or postpetition financing secured by the Debtors' assets that is consented to by the Agent, and will not seek adequate protection or any other relief based on their respective interests in the Debtors' assets;[7] (b) will subordinate the Senior Secured Notes Trustee's liens to any liens securing such postpetition financing that are senior to or *pari passu* with the Agent's liens; (c) will not contest any request by the Agent for adequate protection (or support an objection to such request); and (d) will not seek relief from the automatic stay to pursue rights or remedies with respect to its liens and security interests.  The Intercreditor Agreement expressly provides that the "provisions of this Agreement are intended to be and

---

[6]     The liens and security interests granted to the Senior Secured Notes Trustee are senior and prior to the liens and security interests granted to the Agent to the extent the latter secure an amount greater than this amount.

[7]     The Intercreditor Agreement does provide that, if the Agent is granted adequate protection in the form of liens on additional assets of the Debtors, then the Senior Secured Notes Trustee may seek a junior lien on such additional assets.

14

shall be enforceable under section 510 of [the Bankruptcy Code]." Intercreditor Agreement, § 6.04.

31.     Furthermore, the Agent, the Senior Secured Notes Trustee and the applicable Debtors have entered into other agreements subordinating the Senior Secured Notes Trustee's interests in the Debtors' property to those of the Agent.

### iv.     Senior Notes

32.     The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic and MSCC II, a non-operating, wholly owned subsidiary of Majestic that has no assets. The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi. The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debentures Trust Company as successor trustee. The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005. The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year. The notes mature on January 15, 2011.

### v.     Discount Notes

33.     The Discount Notes are $63,500,000 principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Holdco that has no assets. The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic or any of its subsidiaries. The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee. The Discount Notes accrue interest at 12½% per annum, with payments due April 15 and

15

October 15 of each year. Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011.

**PART II**

**EVENTS LEADING TO THESE CHAPTER 11 CASES**

**A.      The Debtors' Financial and Liquidity Concerns**

34.      The recent global and financial market crisis has caused, among other things, a general tightening in the credit markets, lower levels of liquidity, lower consumer and business spending, and lower consumer net worth, all of which have had and will continue to have a negative impact on the Debtors' businesses, results of operation, financial condition and liquidity. Gaming and other leisure activities comprise discretionary spending, and participation in such activities tend to decline in economic downturns. The current recession has been no exception.

35.      At the same time that the Debtors are confronting a decline in customer visits and spending due to economic factors, competition has increased in each of the markets in which they compete. Importantly, in Indiana a number of new and renovated gaming properties are materially impacting the Debtors' Buffington Harbor operations. Specifically, in August 2007, the Four Winds Casino Resort opened with approximately 3,000 slot machines and 100 table games. This casino facility is located approximately 48 miles east of the Debtors' Buffington Harbor operations. In July 2008, Harrah's Entertainment completed a $500 million renovation and expansion of its Horseshoe Casino in Hammond, Indiana, doubling the size of its existing facility and making it the largest gaming establishment in the greater Chicago area. Also in 2008, Ameristar Casinos finished the remodeling and rebranding of a riverboat and land-based facilities, remodeling casino floors, restaurants and new slot machines. Boyd Gaming has also

16

recently completed a $130 million expansion of its Blue Chip Casino facility, which includes new and improved amenities.

36.     Similar competitive pressures have been brought to bear on the Debtors' Mississippi and Colorado operations.  In Tunica, Mississippi, a competitor recently completed an extensive remodeling and re-branding of its property, and in Colorado a competitor recently completed construction of a 536-room hotel (attached to its existing casino) that has drawn patrons away from Fitzgeralds Black Hawk.  In addition, the Black Hawk casino market continues to suffer the negative impacts of a smoking ban to all public areas within a casino including the casino floor.  The smoking ban went into effect on January 1, 2008.

37.     The Debtors' declining operating results and weakening financial position due to increasing competition and adverse economic conditions, together with their significant debt service obligations, have curtailed the Debtors' ability to make the substantial and ongoing capital investments in their operations required to maintain competitiveness and the going concern value of their businesses.  Accordingly, to preserve the liquidity necessary to ensure the continued competitiveness of their operations, in October 2008 the Debtors drew substantially all of the remaining availability under their Senior Secured Credit Facility and determined not to make the $24 million interest payment due to holders of their Senior Secured Notes and Senior Notes on October 15, 2008.  As a result, as of November 14, 2008 the Debtors were in default under the Senior Secured Notes and Senior Notes, which in turn triggered cross-defaults under the Senior Secured Credit Facility[8] and the Discount Notes.  The Debtors have continued to pay interest on the Senior Secured Credit Facility (at the default rate), but have not made any interest

---

[8]     The Agent asserts that other defaults exist under the Senior Secured Credit Facility as well.

payments on the Senior Secured Notes or Senior Notes since April 2008, and did not make the scheduled interest payment on the Discount Notes due April 15, 2009.[9]

## B.    Negotiations with Creditors

38.    The Debtors recognize that, although their operations continue to produce positive cash flow (exclusive of debt service), their existing capital structure and debt service obligations are depriving their businesses of the funds needed to make the substantial and ongoing capital investments required to succeed in the increasingly competitive markets in which they operate. Accordingly, the Debtors engaged XRoads Solutions Group, LLC ("XRoads") on or about August 7, 2008, and Goldman, Sachs & Co. ("Goldman Sachs") on or about November 14, 2008, to assist the Debtors in evaluating a broad range of financial and strategic alternatives aimed at addressing trends in the Debtors' operating results and financial condition.

39.    The Debtors and their financial advisors pursued a number of financial and operational restructuring alternatives, including reaching out to their principal creditor constituencies. To that end, in November 2008 the Debtors agreed to pay the reasonable professional fees and expenses for advisors to the holder of a majority (by principal) of the Senior Secured Notes (the "Senior Secured Notes Committee"), and in December 2008 the Debtors commenced similar agreements with an ad hoc group holding a majority of the Senior Notes (the "Senior Notes Committee") and the Agent, respectively. The Debtors also established a data room to provide access to detailed information regarding their operations, assets and finances, and attempted to foster negotiations with these constituencies regarding a consensual restructuring and delevering of the Debtors' balance sheet.

---

[9]    Interest accruing on the Discount Notes through October 2008 was paid in-kind.

40. Concurrently, the Debtors and their advisors investigated other potential restructuring solutions, including new money investments and sales of certain of the Debtors' businesses and assets. Although the Debtors identified several potential investors, to date these discussions have not progressed beyond expressions of interest.

41. Throughout the first half of 2009, discussions among the Debtors and their principal creditor groups failed to make identifiable progress towards a consensual deal. In July 2009, however, the Senior Secured Notes Committee and Senior Notes Committee appeared to reach a breakthrough on terms that could constitute the framework for a consensual restructuring of the Debtors' long-term debt obligations. Over the next three months, the Debtors and their advisors facilitated extensive discussions amongst the Debtors, the Senior Secured Notes Committee and the Senior Notes Committee in the hopes of reaching a deal that all parties could agree to. Notwithstanding the significant amount of progress the parties made towards agreeing on terms for a consensual restructuring of the Debtors' balance sheet, in October 2009 the Senior Secured Notes Committee and Senior Notes Committee reached an impasse with respect to the few remaining issues.

C.    **Exercise of Remedies**

42. On December 3, 2008, after the Debtors failed to make the October 15, 2008 interest payment to holders of the Senior Secured Notes and Senior Notes, the Senior Secured Notes Trustee notified the Agent that one or more events of default had occurred under the Senior Secured Notes Indenture. The Agent responded by sending the Senior Secured Notes Trustee a "standstill notice" on December 11, 2008, which, under the Intercreditor Agreement, triggered a 180 day "standstill period" in which the Senior Secured Notes holders and Senior Secured Notes Trustee were prohibited from exercising remedies against the Debtors' assets. The Agent and the Senior Secured Notes Trustee subsequently entered into agreements on June

19

10, 2009 and July 10, 2009 consensually extending the standstill period through August 10, 2009 to allow the Senior Secured Notes Committee, the Senior Notes Committee and the Debtors to continue discussing a consensual restructuring. Upon expiration of the second extension of the standstill period however, the Senior Secured Notes Trustee declined to further extend the standstill period beyond August 10, 2009.

43. Notwithstanding the expiration of the standstill period under the Intercreditor Agreement, the parties continued to have constructive discussions regarding a consensual restructuring of the Debtors' debt obligations. In October 2009, however, the Senior Secured Notes Trustee sent the Agent a notice of its intent to exercise remedies against the Debtors' assets, which triggered another standstill period under the Intercreditor Agreement, this time of 10 days. The Debtors, the Agent and the Senior Notes Committee each engaged in discussions with the Senior Secured Notes Committee in an attempt to have the notice withdrawn so that negotiations regarding a consensual restructuring could continue, however the Senior Secured Notes Committee refused to withdraw the notice, and on October 30, 2009 the Senior Secured Notes Trustee and Senior Secured Notes holders became entitled under the Intercreditor Agreement to seek to enforce remedies against the Debtors' assets.

44. On October 30, 2009, the date the Senior Secured Notes holders' standstill period expired, the Agent sent to the Debtors a notice, among other things, terminating the Debtors' ability to borrow under the Senior Secured Credit Facility and declaring all amounts outstanding under that facility to be immediately due and payable. The notice stated that, as a result of the expiration of the standstill periods under the Intercreditor Agreement and the resulting right of the Senior Secured Notes Trustee and Senior Secured Notes holders to seek to enforce remedies against any of the Collateral that the Agent was not actively enforcing remedies against, the

20

Agent and the lenders under the Senior Secured Credit Facility "had no choice" but to commence the exercise of their rights and remedies against all of the Collateral to protect their ability to control any foreclosure or similar process with respect to the Collateral.

**D.     Determination to Commence These Cases**

45.     The Debtors continue to believe that a consensual restructuring of their long-term debt obligations is possible and is in the best interests of all parties; and in fact discussions among the Senior Secured Notes Committee and certain Senior Notes holders have continued even after the Agent accelerated the Debtors' obligations under the Senior Secured Credit Facility. After consultation with the Debtors' advisors and their gaming regulators regarding the risk that certain creditors may exercise remedies against the Debtors' assets, and in light of the significant harm such actions would cause to the Debtors' brands, goodwill with customers and employees, reputation with gaming regulators, and operations generally, the Debtors have determined that commencing these cases is necessary to preserve the Debtors' going concern value and to protect the Debtors' operations and assets from any improvident actions by creditors. Further, the Debtors believe the chapter 11 process will provide them with the tools needed to effectuate an efficient and effective balance sheet restructuring, and to emerge as a financially healthy and vibrant gaming organization.

**PART III**

**SUMMARY OF FIRST DAY MOTIONS**

46.     In this section, I will describe the relief the Debtors intend to request at the outset of these cases. Several of the First Day Motions request authority to pay certain prepetition claims. Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides, in pertinent part, that "except to the extent relief is necessary to avoid immediate and irreparable harm," the Court shall not consider motions to pay prepetition claims during the first

21

20 days after the filing of the Debtors' petitions. As set forth in more detail below, the Debtors have narrowly tailored their requests for authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to their estates.

## A.    Joint Administration

47.    As described above, Majestic and Majestic Star Holdco are each wholly-owned subsidiaries of Majestic Holdco, and each of the remaining Debtors is a wholly-owned subsidiary of Majestic. Accordingly, Majestic and Majestic Star Holdco are both "affiliates" of Majestic Holdco, as that term is defined in the Bankruptcy Code, and each of the remaining Debtors is an affiliate of Majestic.

48.    The Debtors' cash management system and corporate functions are highly integrated, and I believe that a restructuring of the Debtors' debt obligations likely will be based on their collective operations and going concern value. Accordingly, many of the motions, hearings, and orders that will arise in these cases likely will affect all of the Debtors. By jointly administering these cases, I believe that the Debtors will be able to reduce fees and costs by avoiding duplicative filings and objections. In addition, the ability of parties in interest to monitor these cases will be facilitated by having all pleadings grouped together on one docket. To the best of my knowledge, the joint administration of these cases will not adversely affect the Debtors' respective constituencies and will not harm parties in interest. Rather, all parties in interest will benefit from the cost reductions and administrative conveniences associated with the joint administration of these cases.

## B.    Customer Programs

49.    In the ordinary course of business, the Debtors offer Customer Programs that fall into one of two categories: (a) issuing and honoring Gaming Currency such as chips and tokens,

22

which is fundamental to the Debtors' gaming operations; and (b) promotional and other Customer Programs that are designed to develop and maintain customer loyalty, encourage repeat business, and ensure customer satisfaction, thereby enhancing the Debtors' ability to retain their existing customers, attract new customers and, ultimately, increase revenue.

50. Specifically, the Customer Programs include:

- Gaming Currency. The Debtors routinely issue chips, tokens, vouchers and other Gaming Currency to customers for use at gaming tables and slot machines. The Debtors are unable to ascertain the exact value of Outstanding Gaming Currency as of the Petition Date. However, I estimate that, as of the Petition Date, customers were in possession of between $600,000 and $650,000 in Outstanding Gaming Currency. In addition, the Debtors routinely issue Jackpot Checks to customers for game winnings and jackpots in excess of $1,000. As of the Petition Date, the Debtors owe approximately $85,000 on account of Outstanding Jackpot Checks.

- Progressive Gaming. Progressive gaming machines accrue value over a period of time based upon the amount of customer play. Multi-progressive gaming machines accrue value in the same manner, but do so at a more rapid rate on account of the fact that multiple progressive machines are "linked" together to form one "pot." Given the nature of progressive gaming machines, it is inevitable that Progressive Gaming Obligations consisting of both prepetition and postpetition amounts will become due and owing to customers postpetition. As of the Petition Date, prepetition Progressive Gaming Obligations totaled between $3,000,000 and $3,500,000.

- Safekeeping and Front Money. The Debtors hold certain customer winnings in "safekeeping" until the customer claims those winnings. As of the Petition Date, between $125,000 and $150,000 of funds are held by the Debtors in Safekeeping. In addition, in the ordinary course of business the Debtors permit customers to deposit funds with the casino "cage," and later withdraw this "fronted" money while at a gaming table. Given that customers are constantly depositing Front Money with the Debtors and making withdrawals at the gaming tables, the amount of Front Money held by the Debtors at any given time fluctuates dramatically. However, I estimate that the Debtors held between $70,000 and $80,000 in Front Money as of the Petition Date.

- Customer Deposits. Customers deposit money with the Debtors in connection with hotel stay and banquet room reservations. While some Customer Deposits are non-refundable, others are partially or fully refundable to the customer. As of the Petition Date, the Debtors held between $25,000 and $30,000 in refundable Customer Deposits.

23

- Customer Comps, Discounts and Marketing Programs. The Debtors offer several ongoing programs aimed at increasing customer loyalty and patronage, including various players clubs that award customers points that may be used towards hotel stays, dining, entertainment, and casino merchandise. The Debtors also engage in direct mailing programs and other promotional marketing operations that may provide coupons or similar incentives for customers to use the Debtors' services. As of the Petition Date, the Debtors' prepetition Customer Comps, Discounts, and Marketing Programs obligations totaled between approximately $7,000,000 and $7,500,000.

- Transportation Services. The Debtors provide limited charter bus Transportation Services to and from their gaming facilities, which offer an affordable method of transportation, encourage repeat business, and provide an opportunity for large groups to travel together to the Debtors' facilities. For certain high value customers, the Debtors may provide additional Transportation Services, including air travel and other amenities, and may use travel agents or other third parties in identifying and attracting these customers and reserving and providing these services. Finally, the Debtors offer promotional programs in connection with the Transportation Services, including discounts at their properties and related services. In 2008, the Debtors spent approximately $3,450,000 on Transportation Services. As of the Petition Date, the Debtors owed approximately $54,000 in Transportation Services obligations.

- Property Damage Claims. From time to time, customers assert various minor Property Damage Claims against the Debtors for damage caused to customers' personal property while at the Debtors' facilities. As of the Petition Date, many of the Property Damage Claims remained unresolved. I estimate that the Debtors' total potential liability on all outstanding Property Damage Claims, as of the Petition Date, was between $16,000 and $16,500.

51.     The importance of the Debtors' customers to their businesses cannot be overstated. The Debtors' Customer Programs have generated valuable goodwill and repeat business and have contributed to the Debtors' overall revenue. Moreover, if the Debtors do not honor their outstanding obligations under the Customer Programs, they risk alienating their customers and encouraging loyal customers to defect to the Debtors' competition, which would severely diminish the going concern value of the Debtors' businesses. In fact, given that the Debtors' principal business, gambling, requires that the Debtors' customers believe they will be paid when their wagers are successful, any act by the Debtors that challenges that belief will be catastrophic to the Debtors' ability to continue to attract customers going forward.

24

52.     I believe that the uninterrupted continuation of the Customer Programs is essential to the successful reorganization of the Debtors' businesses. The Debtors operate in a highly regulated and highly competitive market. Similar customer programs are offered by casinos throughout the gaming industry, including in each of the markets in which the Debtors compete, and as such customers expect the Debtors to provide such programs. Any inability of the Debtors to promptly honor their obligations under the Customer Programs would result in a rapid erosion of goodwill and a loss of customers, and a concomitant destruction in the going concern value of the Debtors' estates.

## C.     Wages and Benefits

53.     As of the Petition Date, the Debtors employed approximately 2,600 Employees,[10] of whom approximately 180 are Part-Time Employees[11] and 2,420 are Full-Time Employees.[12] Approximately 400 of the Employees are members of various unions, including (a) I.U.O.E., Local 399, (b) American Maritime Officers, (c) Unite Here, Local 1, AFL-CIO, (d) Seafarers Entertainment and Allied Trade Union, (e) United Steel, Paper and International Union, Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, AFL-CIO, and (f) International Union of Operating Engineers.

---

[10]  The vast majority of the Debtors' employees are employed by Majestic, Majestic II, Barden Mississippi, and Barden Colorado.

[11]  A Part-Time Employee is an Employee who works less than 32 hours per week. Part-Time Employees are not eligible for most benefits, other than participation in the 401(k) Plan (described below) and, in certain instances, Vacation Time.

[12]  A Full-Time Employee is an Employee who works an average of at least 32 hours per week on a regularly-scheduled basis. In certain instances, Full-Time Employees are entitled to receive benefits from the Debtors only after the successful completion of a 90-day introductory period.

DOCS_DE:155098.1

54.     The Employees perform a variety of critical functions for the Debtors, including sales, customer service, accounting, finance, management and other tasks. The Employees' skills and their knowledge and understanding of the Debtors' operations, customer relations and infrastructure, are essential to continuing the Debtors' operations and to the effective reorganization of the Debtors' businesses.

### i.     Employee Wage Obligations

55.     Each of the Debtors that has employees, other than Barden Colorado, pays Employees on a weekly basis. The Debtors' Employee Payroll Obligations generally include base wages and salaries, and overtime compensation if applicable.[13] On average, the Debtors' weekly payroll is approximately $1.6 million, and average monthly payroll is approximately $7 million.[14] Additionally, at certain of the Debtors' properties the Debtors pool Employee Tips, and pay those amounts through the Debtors' payroll in order to comply with applicable local, state and federal tax requirements. Approximately $222,000 of the Debtors' weekly payroll is comprised of Employee Tips.

56.     The Debtors' payroll for the period ending November 14, 2009 (and, in the instance of the Corporate division of Majestic, November 15, 2009), has already been paid by check or direct deposit, as applicable to each Employee. Nonetheless, certain limited

---

[13]   In addition to the Employee Payroll Obligations described herein, Majestic compensates two members of its Board of Directors on a monthly basis in the form of cash payments totaling an average of approximately $171,000 per year (or an average of $14,250 per month). As of the Petition Date, the Debtors owe approximately $17,000 to these two Board members.

[14]   In some instances, the Employee Payroll Obligations include a temporary Workload Component increase for certain Employees' base salary that was effectuated in connection with the implementation of the Debtors' Executive Incentive Plan, which ranges between approximately $215 and $1,200 per Employee per paycheck, and is paid as an Employee Payroll Obligation (i.e., as base salary). None of the Employees who receive payment on account of the Workload Component are owed amounts above $10,950. Because the Workload Component is essentially a form of base pay, the amounts set forth above include amounts with respect to the Workload Component.

DOCS_DE:155098.1

prepetition payroll amounts for this period may remain unpaid as of the Petition Date because, among other things, wire transfers may not have been completed or various checks may not have cleared before the Petition Date, or because certain Employees may be owed payments in arrears for, for example, overtime work in the days preceding the Petition Date. Additionally, the Debtors owe Employees prepetition amounts that accrued since the end of the last pay period, but had not yet been paid by the Debtors as of the Petition Date. Approximately $1.5 million in Employee Payroll Obligations, net of Employee Tips, was outstanding as of the Petition Date. Although it is difficult to identify with specificity whether Unpaid Compensation was outstanding to any individual Employee in an amount greater than $10,950 as of the Petition Date, based on historical payroll amounts, I believe that no more than three to four Employees may be owed amounts above $10,950 (including accrued but unused vacation time and paid time off).[15] Additionally, approximately $192,000 in Employee Tips had been collected but not yet remitted to Employees as of the Petition Date.

57.     In connection with their Employee Payroll Obligations, certain of the Debtors outsource their payroll to a third-party service provider, ADP, which is responsible for paying certain of the Debtors' withholding and payroll taxes to applicable third parties. The Debtors incur approximately $12,000 per year in ADP Service Fees. As of the Petition Date, the Debtors owed approximately $800 in Unpaid ADP Service Fees.

58.     In addition to paying salaries and hourly wages, in order to offer appropriate incentives to encourage their Employees and thereby maximize the value of their businesses, the

---

[15]   The Debtors generally do not allow employees to "cash out" accrued but unused vacation time and paid time off. Based on the Debtors' historical payroll amounts, the Debtors believe that only one employee may be owed Unpaid Compensation in excess of $10,950 exclusive of accrued but unused paid time off.

27

Debtors offer a number of Employee Incentive Programs, which are an important component of the Debtors' compensation structure for the Employees and are designed to encourage Employees to achieve performance goals and maintain the Debtors' competitive status with industry peers.

59. The Debtors' Rank-and-File Incentive Plans include:

- Approximately 210 non-management level Employees who have been employed for more than 6 months by Barden Colorado are eligible to receive discretionary bonuses payable in December. The annual cost associated with this program is approximately $18,000.

- Approximately 130 supervisor-level Employees at Barden Mississippi are eligible to receive bonuses payable in December. The annual cost associated with this program is approximately $33,000.

- Approximately 10 Employees at the "Casino Host" level at Majestic and Majestic II are eligible to participate in an "actual player development plan," which makes bonus payments in January based on pre-determined goals. The annual cost associated with this program is approximately $50,000 if plan targets are met.

- Approximately 50 Union Employees are eligible to participate in various wellness bonus programs that provide them with one day of pay for every 60 days worked without an absence, (paid in the Employee's next pay check). The annual cost associated with these programs is approximately $25,000, and approximately $20,000 in potential liabilities had accrued under this program as of the Petition Date.[16]

60. The Debtors also maintain a Management Incentive Plan that is available to approximately 150 Employees. Some of the individuals covered by the MIP are also eligible to participate in the Debtors' Executive Incentive Plan. Currently, all Employees who are eligible to participate in both programs participate only in the EIP; accordingly, participants in the MIP for the 2009 plan year do *not* include "insiders," as that term is defined in the Bankruptcy Code.

---

[16] This $18,000 amount is contingent on the applicable employees completing their 60 day periods without an absence.

61. The MIP is based on aggressive financial targets that are set at the property (i.e., individual casino) level at the beginning of each year, and which are tied to budgeted EBITDA, as approved by the Debtors' Board of Directors.[17] In addition to the targets based on pre-determined EBITDA levels, at the beginning of each plan year each eligible Employee, together with his or her manager, establishes non-financial performance goals that are reviewed at the end of each year in order to evaluate the Employee's success in obtaining his or her individual targets. Bonus awards are based on a percentage of each Employee's base salary actually earned during the plan year, and are determined by each Employee's position, as follows:

| Salary Band | Bonus Target (of base salary) | Financial Performance | Individual Accomplishments |
|---|---|---|---|
| Executive Vice President | 40% | 70% | 30% |
| Senior Vice President | 30% | 70% | 30% |
| Vice President | 30% | 60% | 40% |
| Director | 20% | 60% | 40% |
| Manager | 5% | 50% | 50% |

62. Bonuses under the MIP are paid in one distribution in March following the fiscal year ending December 31; however if a property reaches 90% of its budgeted EBITDA using actual amounts through November and budgeted numbers for December, one-half of the portion of the Employee's bonus attributable to reaching financial performance targets may be paid in December of the plan year, with the balance (based on actual results) paid the following March. Because payments under the MIP are only earned at year-end after an Employee's performance has been measured according to the terms of the MIP, the Debtors do not owe any prepetition amounts on account of the MIP. The cost of the MIP, if paid out fully at target after the Petition

---

[17] With respect to Employees who are eligible under the MIP at the Debtors' corporate level, financial targets are based on the Debtors' collective EBITDA, less restructuring costs incurred by the Debtors.

DOCS_DE:155098.1

Date, will be approximately $1.5 million at year end (or an average of $10,000 per eligible Employee).

63.     The Debtors routinely make certain Deductions from their Employees' gross pay, including, without limitation: (a) garnishments, child support, and similar deductions; and (b) other pre-tax and after tax deductions payable pursuant to the Employee benefit plans discussed below (e.g., contributions relating to health care benefits, insurance premiums and flexible spending programs,). On a monthly basis, the Debtors deduct and remit to appropriate third-party recipients approximately $656,000 from their Employees' paychecks for the Deductions. The Debtors, however, may not have forwarded certain of the Deductions to the appropriate third party recipients before to the Petition Date. As of the Petition Date, the Debtors owed approximately $147,000 on account of Unremitted Deductions.

64.     In addition to the Deductions, the Debtors are required by law to withhold Payroll Taxes related to federal, state, and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate taxing authority. The Debtors are also required to pay additional Payroll Taxes for federal and state unemployment insurance. On a monthly basis, the Debtors remit approximately $1.2 million in Payroll Taxes. As of the Petition Date, the Debtors owed approximately $360,000 on account of Unremitted Payroll Taxes.

### ii.     Reimbursable Expenses

65.     In the ordinary course of business, the Debtors reimburse approximately 25 Employees for certain Reimbursable Expenses incurred on behalf of the Debtors or while traveling on business, including, among other things, meals, hotels, flight and car rentals. Reimbursable Expenses must be (a) reasonable in amount and (b) necessary to the performance of the business involved.

30

66. The majority of Reimbursable Expenses are paid with an American Express credit card issued through the Debtors' Credit Card Program, and the invoices for which are sent directly to the Debtors. Historically, the Debtors paid approximately $23,000 per month under the Credit Card Program. I believe that less than $10,000 may have been owed under that program as of the Petition Date.

67. Additionally, a small portion of Reimbursable Expenses are paid directly by Employees, who then seek reimbursement from the Debtors. Specifically, the Debtors reimburse Employees for approximately $3,000 to $5,000 in Reimbursable Expenses each month, with spikes in certain months based on specific events or business activities. Due to one such event occurring this month, approximately $22,000 in Reimbursable Expenses were outstanding as of the Petition Date.

### iii. Union Expenses

68. The Debtors withhold certain amounts from their Union Employees' compensation to pay monthly Union Expenses such as union dues and, for certain Union Employees, voluntary health coverage provided to eligible Union Employees and their dependents. On average, the Debtors withhold and transfer an aggregate of approximately $237,000 per month in Union Expenses. The Debtors may owe approximately $222,000 on account of Unpaid Union Expenses that were withheld from Union Employees' pay, but not yet paid to the appropriate third parties, as of the Petition Date.

### iv. Employee Benefit Plans

69. The Debtors provide Medical, Dental and Vision Plans, including health care coverage, prescription drug coverage, dental care and vision care to approximately 3,100 Employees and their dependents (including coverage under COBRA for approximately 33 individuals) under various self-funded benefit plans, as follows:

31

- *Medical and Dental Plans.* Eligible Employees are permitted to choose between two medical and dental plans administered by CIGNA, which cover, among other things, prescription drugs and doctor visits. These are Employee-funded plans, with the cost paid through pre-tax deductions from Employees' paychecks.[18]

- *Supplemental Medical Plan.* The Debtors maintain a supplemental medical plan, which is fully-insured through CIGNA and is available to approximately 52 Employees. Under this plan, the Debtors pay monthly premiums of between $300 to $400 per Employee. Approximately $58,000, including retroactive premium costs, was outstanding on account of the supplemental medical plan as of the Petition Date.

- *Vision Plan.* The Debtors also offer vision coverage to eligible Full-Time Employees through an Employee-funded vision service plan operated and administered by VSP. Employees who elect to participate in the vision plan pay the cost of their vision benefits through pre-tax deductions from their paychecks.

70. The Debtors pay a total of approximately $1.6 million in monthly premiums, administrative costs and self-funded costs associated with the Medical, Dental and Vision Plans described above. As of the Petition Date, the Debtors owed approximately $1.7 million on account of Unpaid Medical, Dental and Vision Expenses, net of premiums collected directly from Employees, and including certain costs associated with administering these programs.

71. The Debtors provide approximately 2,100 Employees with Insurance and Disability Benefits, including life insurance, accidental death and dismemberment and short-term disability coverage, through Mutual of Omaha. The Debtors pay combined monthly premiums for these benefits of approximately $40,000. As of the Petition Date, the Debtors owed a nominal amount (less than $10,000) on account of Unpaid Insurance and Disability Benefits.

---

[18] Additionally, certain eligible Union Employees participate in several voluntary medical plans, the entire cost of which is borne by participating Union Employees and is deducted from their paychecks Approximately 140 Union Employees participate in the voluntary medical plans; amounts relating to these programs are included in the amount related to Union Expenses described above.

32

72. The Debtors also provide Supplemental Insurance Benefits to certain eligible Employees, the premiums for which are satisfied solely by participating Employees. The Debtors withhold from participating Employees' paychecks amounts sufficient to pay these premiums, but the Debtors pay certain costs related to the Supplemental Insurance Benefits themselves. Approximately 460 Employees receive Supplemental Insurance Benefits, and the Debtors remit a total of approximately $38,000 per month in premiums for those benefits. As of the Petition Date, the Debtors may have withheld but not yet remitted a portion of the next monthly premiums due under the Supplemental Insurance Benefits, and may have incurred, but not yet paid, certain minimal costs associated with those benefits.

73. The Debtors provide workers' compensation insurance for their Employees at the statutorily-required level through Zurich American Insurance Company. Claims under the Workers' Compensation Program are handled by a third-party administrator and are paid as they are incurred. The annual premium for the Workers' Compensation Program for the period August 3, 2009 through August 3, 2010 is approximately $217,000, and is allocated to those Debtors with Employees based on their percentage of the Debtors' payroll as a whole. The Debtors paid 40% of the premium in August 2009 and 30% in October 2009, with the remaining 30% (approximately $65,000) due in February 2010. The Debtors spend a total of approximately $59,000 per month on account of workers' compensation claims asserted under the Workers' Compensation Program.

74. Based on historical activity, it is likely that certain of the benefits under the Workers' Compensation Program have been incurred prepetition but have yet to be fully paid, certain other claims were filed prepetition but have yet to be resolved and certain claims may have accrued prepetition but have not been submitted.

33

75. The Debtors provide certain Employees (including certain Union Employees) with annual paid Vacation Time. Generally, Employees earn Vacation Time based on the number of years of continuous service since their most recent date of hire. Employees accrue Vacation Time on a yearly basis, and generally Vacation Time must be used during the year after it is earned by an Employee or it is lost; however, in the event the Debtors request that an Employee forgo his or her vacation to meet the Debtors' business needs, the Employee may request to carry-over his or her Vacation Time to the following year. If the Debtors terminate an Employee, the Employee's final paycheck will include earned and unused Vacation Time. Additionally, certain Employees are entitled to a pay-out of earned and unused Vacation Time depending on the amount of earned Vacation Time and their length of service with the Debtors. As of the Petition Date, approximately $2.7 million of Vacation Time had been accrued by, and had not yet been used by or paid to, approximately 2,370 Employees (or an average of approximately $1,100 per eligible Employee).

76. In addition to Vacation Time, the Debtors offer certain Employees holiday pay for pre-determined holidays (e.g., New Year's Day) and personal days. Paid Time Off varies for each of the Debtors, and in some instances eligible Employees may be entitled to cash payments for accrued Paid Time Off. Generally, Paid Time Off that is not used within the next year after it is earned is forfeited. Additionally, Employees who are terminated are not paid for any unused Paid Time Off.

77. The Debtors also provide Employees with certain other Leaves of Absence as required by law, including family medical leave, pregnancy, adoption and foster care leave, military leave, jury duty, voting leave, personal leave and bereavement leave. The Debtors do

34

not accrue Leaves of Absence obligations, and Leaves of Absence are not reflected as a liability on the Debtors' balance sheet.

78.    The Debtors maintain an Employee 401(k) Plan administered through various third parties for the benefit of eligible Employees, which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of, section 401(k) and other applicable sections of the Internal Revenue Code.    There are approximately 2,300 participants in the 401(k) Plan, and the Debtors withhold a total of approximately $213,000 in Employee 401(k) Contributions each month.    The 401(k) Plan also includes an employer matching component, pursuant to which the Debtors match Employee 401(k) Contributions dollar-for-dollar up to three percent of each Employee's base salary.    The Debtors pay a total of approximately $110,000 per month on account of Employer 401(k) Contributions.    As of the Petition Date, the Debtors owed approximately $14,000 on account of Unpaid Employer 401(k) Contributions and held approximately $23,000 in Unremitted Employee 401(k) Contributions.

79.    The Debtors provide eligible Full-Time Employees with access to an Employee Assistance Program, which includes services such as counseling and legal and financial assistance.    The Employee Assistance Program is provided through CIGNA, and eligible employees are provided up to five sessions at no cost.    The Debtors pay an aggregate of approximately $50,000 per year on account of the Employee Assistance Program.    As of the Petition Date, there was less than $5,000 outstanding for costs related to the Employee Assistance Program.

80.    The Debtors provide Full-Time Employees who have successfully complete their 90-day introductory period with tuition reimbursement for courses related directly to the Employee's current job with the Debtors.    Courses of study must be at approved and accredited

35

colleges, universities or business schools, and the level of reimbursement depends upon an Employee's final course grade. Participation in the Education Assistance Program is limited to six units per semester and a maximum reimbursement cap of between $500 and $2,000 (depending on the Debtor) in any given school year. As of the Petition Date, the Debtors owed approximately $12,000 in Unpaid Education Assistance Expenses.

81.     The Debtors are obligated to make severance payments and provide related benefits to approximately 35 current Employees pursuant to prepetition contracts, in the event such Employees' employment is terminated under specific circumstances. Some of these Employees may qualify as "insiders" as that term is defined in the Bankruptcy Code. The Contracted Severance Obligations are typically negotiated with the individual Employee and apply only if an Employee is terminated without "cause" (as such term is defined in the respective individual agreement). Generally, the Contracted Severance Obligations include the following components: (a) an option for the applicable Debtor to make a payment in lieu of notice, equal to 30 to 90 days of an Employee's base salary; (b) continued payment of the Employee's base salary for between three and six months; (c) continuing medical coverage during the period in which payments are being made (with applicable deductions made from such payments); (d) reimbursement for accrued but unpaid Reimbursable Expenses; and (e) payment of earned, but unpaid, bonus compensation, if any.

82.     Additionally, the Debtors provide, in their sole discretion, severance payments and benefits for "at will" Employees whose jobs are eliminated or who are terminated without cause, often in exchange for a release and waiver of all potential claims against the Debtors. The Non-Contracted Severance Obligations generally consist of a lump sum payment or series of payments, the amount of which depends on an Employee's title and length of service with the

36

Debtors. The Severance Obligations include the Debtors' obligations – pursuant to the separate agreements and applicable law – to provide medical insurance in accordance with the requirements of the Consolidated Budget Reconciliation Act of 1985 at the then-applicable premium rate for active employees. In 2008 the Debtors paid a total of approximately $212,000 on account of the Severance Obligations. As of the Petition Date, the Debtors owed approximately $13,000 in Unpaid Severance Obligations, with no former Employee being owed more than $10,950.

83.     In order to assist certain of their Employees with access to and from their properties, the Debtors subsidize between 50-70% of the cost of certain Employees' bus expenses, and certain of the Debtors also pay parking fees for some Employees. The Debtors spend approximately $170,000 per year in Transportation Subsidies. Approximately $1,000 in Unpaid Transportation Subsidies was outstanding as of the Petition Date.

84.     In the ordinary course of business, the Debtors reimburse certain Employees for required licensing fees if they stay with the Debtors for at least six months, and, in some cases, certain Debtors directly pay such costs on behalf of the Employees. The Debtors spend approximately $98,000 per year for amounts relating to gaming license fees for their Employees under the Gaming Licenses Program, and as of the Petition Date approximately $29,000 in Unpaid Gaming License Fees remained outstanding.

85.     The Debtors make available certain Relocation Benefits to eligible Employees who are required to relocate to a new job location including, but not limited to, closing costs on new homes, costs associated with the sale of existing homes, moving costs, costs of living adjustments, temporary housing costs, reimbursement of travel expenses, the costs of shipping Employees' vehicles to a new location, home-finding costs and certain tax allowances.

37

Relocation Benefits are determined on a case-by-case basis, depending on the needs of the individual Employee and his or her circumstances. Three current Employees are receiving or will receive Relocation Benefits, and approximately $30,000 in Unpaid Relocation Benefits remained outstanding as of the Petition Date. Although the cost of the Relocation Benefits vary, I estimate that the Debtors pay an average of approximately $20,000 per Employee that is provided Relocation Benefits.

86.     The Debtors maintain a small benefits program known as the "Rainbow Fund," which is designed to provide monetary assistance to Employees in need due to certain events or crises. The Rainbow Fund Program is funded through a combination of donations made by the Debtors and participating Employees throughout the year (for example, amounts are contributed by Employees who participate by making a contribution in exchange for wearing jeans to work on a particular day). The Debtors contributed an initial deposit of $1,000 to begin the Rainbow Fund Program, with the remainder contributed by Employees. The amount associated with the Rainbow Fund Program at any given time varies, but the average balance is approximately $3,000. Because of the small size of the amounts associated with the Rainbow Fund Program, the Program's funds are held with the Debtors' operating cash (with the Debtors reflecting a corresponding liability in their books and records). The Debtors do not owe amounts associated with the Rainbow Fund Program as of the Petition Date.

87.     The Debtors' Employees are the lifeblood of their businesses, and it is imperative to the Debtors' successful restructuring that the Employees continue to provide vital services without interruption. The Employees perform a variety of critical functions for the Debtors, including sales, customer service, accounting, finance, management and other tasks. The Employees' skills and their knowledge and understanding of the Debtors' operations, customer

38

relations and infrastructure, are essential to continuing the Debtors' operations and to the effective reorganization of the Debtors' businesses. Without the Employees' hard work and dedication, the Debtors do not believe they can accomplish a successful restructuring in these cases in a manner that maximizes value for creditors. The incentive payments contemplated under the Rank-and-File Plans and the MIP reward Employees for performance tied directly to critical, value-relevant goals for the purpose of enhancing the Debtors' assets that will be distributable to their creditors.

88.    Further, just as the Debtors depend on the Employees for their day-to-day operations, the Employees depend on the Debtors. The vast majority of the Debtors' Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor prepetition obligations for unpaid compensation, benefits and reimbursable expenses. The loss of health care coverage also would result in considerable hardship and anxiety for Employees (and likely attrition) at a time when the Debtors need Employees to focus and perform their jobs at peak efficiency.

89.    If the Debtors cannot fully honor their Employee Obligations, their Employees may seek alternative employment opportunities. Such a development would deplete the Debtors' workforce and hinder their ability to provide top-quality service to their customers. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtors should be focusing on their restructuring. Because of the highly competitive nature of the Debtors' industry, finding and attracting qualified talent to replace existing Employees should they leave would be extremely difficult, and most likely would require higher salaries,

39

guaranteed bonuses and overall higher-cost compensation packages than are currently provided to the Debtors' Employees.

## D.     Cash Management System

90.     In the ordinary course of business, the Debtors utilize an integrated, centralized Cash Management System that allows them to collect, transfer, and disburse funds generated by their operations seamlessly across their properties and in accordance with applicable regulations. The Cash Management System facilitates the Debtors' cash forecasting and reporting, monitoring of the collection and disbursement of funds, and administration of their numerous Bank Accounts.

91.     The Debtors' Cash Management System consists of several subsystems of Bank Accounts, each centralized around one of the Debtors' Casino Properties. Each of these subsystems was put in place to manage the cash needs for the daily operations of the casino, food and beverage, hotel and merchandising operations of a Casino Property. Such cash is physically located both in the Bank Accounts and in the casino "cage," slot machine hoppers, slot ticket redemption machines, currency exchange machines, table games, slot floor banks, and food and beverage, hotel and gift shop banks. These subsystems, in turn, each interact with the finance department at the Debtors' corporate office ("Corporate") and the Bank Accounts maintained by Corporate.

92.     Specifically, the Cash Management System includes the following operations:

- Receipts. After daily receipts have been collected, accounted for and turned in to the casino cage, a series of daily deposits are prepared, comprised of checks and excess cash not needed for daily operations. In each case, these deposits are made to accounts at a local depository bank. Additionally, any credit card charges are transmitted daily to the credit card processor, and funds net of credit card processor fees are sent via ACH Payment to an appropriate depository Bank Account maintained by the casino property.

40

- <u>Types of Accounts</u>. Each Casino Property generally maintains a set of accounts including:[19]

  - <u>Operating Account</u>. The Operating Account is the central account for each Casino Property's cash management system. Non-gaming receipts (e.g., food, hotel and gift shop receipts) are deposited directly, and funds from other accounts are transferred as needed, into the Operating Account, and then used to pay obligations or transferred from the Operating Account to zero-balance accounts as needed to satisfy transactions clearing those accounts.

  - <u>Toke Account</u>. The Toke Accounts are used to segregate the receipt of employee tokes (i.e., tips) from other receipts at certain casino properties before transmitting those other receipts to the Operating Account.

  - <u>Parent/Gaming Account</u>. Receipts from casino operations (i.e., gaming receipts) are first deposited into the Parent or Gaming account and, if and when necessary, are transferred from the Parent/Gaming Account to the Operating Account to fund operations.

  - <u>Credit Card Account</u>. All ACH Payments are made to the Credit Card Account, including deposits related to the settlement of credit card charges. After processing the credit card customer drafts through the applicable merchant account, the proceeds are deposited into the Credit Card Accounts. Amounts on deposit in the Fitzgeralds Black Hawk Credit Card Account are transferred to the Operating Account as needed to fund the casino property's operations; Credit Card Accounts at the other casino properties are zero-balance accounts.

  - <u>Development Agreement Account</u>. This account was established at the Buffington Harbor casino properties to receive funds pursuant to a development agreement with the City of Gary, Indiana. Use of funds in the account are governed by the development agreement. The Debtors also maintain a separate, segregated account to hold certain amounts that are the subject of a dispute between the Debtors and the City of Gary, Indiana.

  - <u>Payroll Account</u>. This account is used to process payroll checks and (except with respect to Fitzgeralds Black Hawk) direct deposit payments and, in some cases, payroll taxes. Payroll is issued from this account on a weekly or bi-

---

[19] Charts describing cash flow among the Debtors' Bank Accounts are annexed as <u>Exhibit C</u> to the Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105, 345, and 363 (I) Authorizing (A) Continued Use of the Debtors' Existing Cash Management System, and (B) Maintenance of the Debtors' Existing Bank Accounts and Business Forms, (II) Granting Administrative Priority Status to Postpetition Intercompany Claims, and (III) Authorizing Continued Performance under Intercompany Arrangements and Historical Practices, filed contemporaneously herewith.

41

weekly basis. As checks clear the Payroll Account, the Operating Account funds the Payroll Account in an amount sufficient to cover the clearing checks (except for Fitzgerald Black Hawk, at which payroll is pre-funded into the Payroll Account). At Fitzgeralds Black Hawk, direct deposit payments to employees are funded from the Operating Account; at the other casino properties direct deposits are funded out of the property's Payroll Account.

- Jackpot Account. The Jackpot Account is used by each casino property to pay large gaming winnings directly to customers. Generally, this is a zero-balance account, which is funded through the Operating Account as described above. The Jackpot Account at Fitzgeralds Black Hawk, however, is funded directly through receipts deposited in the account.

- AP Account. The AP Account is used by the casino properties to pay trade accounts payable. Generally, this is a zero-balance account, which is funded through the Operating Account. Fitzgeralds Black Hawk does not maintain an AP Account, however; accounts payable disbursements are made directly from the Operating Account.

- Medical Coverage Account. This account is used to pay self-insured medical coverage claims or health benefits.

- Risk Management Account. This account is used to pay claims related to workers' compensation and customer accidents and injuries.

- Check Cashing Accounts. This account is used to deposit checks cashed by customers at the casino cage.

- Marker Accounts. This account is used to deposit markers granted to gaming customers.

- Centralization of Funds. Other than at Fitzgeralds Black Hawk, the majority of each casino property's accounts are zero-balance accounts, with amounts transferred from the applicable Operating Account as and when necessary to fund payments made from these other accounts, and receipts received in any of these other accounts transferred to the applicable Operating Account. In addition, from time to time, each of the casino properties will transfer funds from its Operating Account into Corporate's Operating Account at the request of Corporate. Since the Corporate does not generate significant cash flow independent of the Casino Properties, Corporate needs these transfers from the Casino Properties to fund its operations and pay certain of the Debtors' obligations, such as insurance and professional fees.

- Gaming Receipts. Each casino property manages its cash inflows in order to segregate gaming receipts from non-gaming receipts. Parent/Gaming Accounts are the depository accounts for gaming receipts. When necessary, funds deposited in the Parent/Gaming Accounts are transferred to Corporate's Operating

Account or a Casino Property Operating Account to fund the Debtors' operations. The Parent/Gaming Accounts were established to avoid the commingling of gaming and non-gaming receipts in the properties' Operating Accounts. Non-gaming receipts are deposited directly in the Operating Account and used to fund the Debtors' operations; gaming receipts deposited in the Parent/Gaming Account are transferred to the Operating Account only to the extent other amounts deposited in the Operating Account are not sufficient to cover the Casino Property's operations.

- <u>Disbursements</u>. Generally, vendor invoices are approved, processed, and paid at each property. Depending on the amount of an invoice, certain additional corporate-level approvals may also be required before an invoice may be paid. The applicable property accounts payable department enters approved invoices for payment by check, wire, or ACH Payment.

- <u>Excess Cash</u>. Excess cash collects in the Operating Accounts and Parent/Gaming Accounts at each of the casino properties. The Operating Accounts and Parent/Gaming Accounts are non-interest bearing accounts. Each of the casino properties must maintain a minimum level of cash to satisfy the requirements of the gaming regulations in the jurisdictions in which the Debtors operate.

- <u>Legacy Accounts</u>. Certain of the Debtors are in the process of winding down activities in their accounts at Harris Bank. The Debtors estimate that it will take several weeks to responsibly close the Legacy Accounts, as outstanding checks drawn on the Legacy Accounts are still being cleared and vendors are still being notified of the transition to the new accounts with Citizens Bank.

93.  The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in economic scope and geographic reach. Indeed, large, multiple-entity businesses use such systems because of the numerous benefits they offer, including the ability to quickly and easily locate and track funds, which allows the Debtors' management to control corporate funds, ensure cash availability to each of the Debtors, and reduce administrative expenses by facilitating the movement of funds. Any disruption of the Cash Management System would be extremely detrimental to the Debtors' operations, as their businesses require prompt access to cash to operate. I believe that the continuation of the Debtors' Cash Management System in the ordinary course of business is key to prosecuting these cases in an efficient and cost-effective manner.

43

94.     Further, I believe that, if the Debtors were required to replace their existing Bank Accounts with new accounts as of the Petition Date pursuant to the UST Guidelines, such requirement would unnecessarily disrupt the Debtors' businesses and impair their efforts to preserve the value of their estates and reorganize in an efficient manner.  On the other hand, the Debtors' sophisticated Cash Management and related financial systems allow the Debtors to clearly identify and segregate prepetition and postpetition transactions and obligations, and the Debtors have taken appropriate steps to ensure that prepetition obligations are not accidentally paid postpetition.  Accordingly, the Debtors can continue their existing Bank Accounts (thus avoiding the cost to the estates and the disruption to the Debtors' businesses of closing the Bank Accounts and opening new bank accounts) while providing a clear demarcation between prepetition and postpetition transactions and operations, and preventing inadvertent payment of prepetition claims.

### i.     Business Forms; Books and Records

95.     As part of their Cash Management System, the Debtors utilize numerous preprinted Business Forms in the ordinary course of their business.  For example, some of the Debtors' local accounts may have preprinted check stock.  The Debtors also maintain Books and Records to document, among other things, their profits and expenses.

96.     I believe that parties in interest will benefit if the Debtors are authorized to continue to use their Books and Records and Business Forms substantially in the forms existing immediately prior to the Petition Date.  Because the commencement of these cases likely will be reported in both industry-specific publications and media serving the jurisdictions in which the Debtors operate, and because the Debtors will take steps to make parties doing business with them aware of their status as debtors in possession (including, among other things, providing notice of the commencement of these cases, as appropriate), changing Business Forms is

44

unnecessary and unduly burdensome. Further, as described above, the Debtors' Cash Management System and their ability to identify and segregate prepetition and postpetition obligations makes unnecessary the closing and replacing of their Books and Records generally required by the UST Guidelines.

### ii. Intercompany Claims and Arrangements; Affiliate Arrangements

97. From time to time, in the ordinary course of business, one of the Debtors may pay invoices or expenses which include amounts allocable to one or more of the other Debtors, or a Debtor may provide services to one or more of the other Debtors and charge the Debtor(s) (at cost) for the service. Additionally, certain of the other Debtors provide corporate and administrative services to Majestic Holdco, LLC (collectively, "Intercompany Arrangements") and/or have paid accounting and other professional fees on behalf of Majestic Holdco, LLC. As of the Petition Date, Majestic Holdco, LLC owes the other Debtors approximately $131,000 under the applicable Intercompany Arrangements. As a result of transactions conducted pursuant to these Intercompany Arrangements, a receivable is created on the balance sheet of the Debtor paying the invoices or providing the services, and a corresponding liability is posted to the balance sheet of the Debtor to which the invoices are allocable or which received the services (the "Intercompany Claims"). These balances net to zero (i.e., the amount of the receivable recorded by one Debtor equals the corresponding liability recorded by the other Debtor). Generally, a Debtor will not immediately repay its obligations to other Debtors. Rather, funds are periodically transferred between the Debtors as needed to fund operations, make capital improvements, etc., and such transfers include amounts sufficient to satisfy applicable inter-Debtor obligations.

98. Additionally, due to certain business relationships between the Debtors and non-debtor affiliates ("Affiliate Arrangements"), certain of the Debtors have claims against certain

non-debtor affiliates for services provided and amounts paid on the non-debtor affiliates' behalf. Specifically, BDI owes the Debtors approximately $143,000 for, among other things, expenses related to travel and services provided to BDI by Majestic employees, and insurance and other employee benefits allocable to BDI. Additionally, Barden Nevada, an affiliate of the Debtors that is directly owned by BDI, owes the Debtors approximately $902,000, which is primarily comprised of certain management- and overhead-related costs charged by the Debtors to Barden Nevada, related to the following agreements:

- Barden Nevada Expense Sharing Agreement. Majestic has entered into an expense sharing agreement dated October 7, 2003 with Barden Nevada. The expense sharing agreement provides for payment of a fee from Barden Nevada to Majestic in the amount of the greater of (a) $0.5 million per year and (b) the actual amount of certain specified expenses incurred by Majestic in connection with providing services to Barden Nevada.

- Barden Nevada Revolving Promissory Note. On October 7, 2007, Barden Nevada entered into a revolving promissory note with Majestic, whereby Barden Nevada may request advances from time to time from Majestic not to exceed $5.0 million. The note evidences amounts outstanding under the expense sharing agreement. Interest is calculated based on prime plus the margin spread paid by Majestic on prime rate borrowings under the Senior Secured Credit Facility. Interest is paid quarterly, in arrears. Any costs that are funded by Majestic and not repaid by Barden Nevada within 30 days are added to the principal amount outstanding under the promissory note. All amounts outstanding under the promissory note are due and payable on April 15, 2010, along with accrued and unpaid interest.

99. The operations of the Debtors are separate and apart from those of their non-debtor affiliates. Prior to the Petition Date, the Debtors maintained accurate records of all amounts owed by each Debtor to each other Debtor, and by non-debtors to each Debtor. The Debtors will continue to maintain records related to transactions among the Debtors and between Debtors and non-debtor affiliates so that such transactions can be ascertained, traced, and accounted for properly on applicable intercompany accounts. Accordingly, I believe that continuation of the Intercompany Arrangements and relationships with Barden Nevada will not

46

prejudice any party, and will allow the Debtors to continue beneficial cost sharing arrangements between the Debtors and with their non-Debtor affiliates.

**E.     Sales, Use and Tax**

100.     In the ordinary course of business the Debtors:  (a) collect sales, use and hotel Taxes from their customers for ultimate remittance to taxing Authorities; (b) incur Taxes, including gross receipts, franchise, real and personal property, gaming, income, entertainment, and other Taxes in operating their business; (c) charge Fees and other similar charges and assessments on behalf of various taxing, licensing, and other Authorities; and (d) pay Fees to such Authorities for licenses and permits required to conduct the Debtors' business in the ordinary course.  The Debtors pay the Taxes and Fees daily, weekly, monthly, quarterly, semi-annually, or annually to the respective Authorities, in each case as required by applicable laws and regulations.  While I have used best efforts to calculate the outstanding amounts with respect to Taxes and Fees owed by the Debtors as of the Petition Date, this calculation is difficult to make with complete certainty because the Debtors' books have not yet been closed for the month of November.  Accordingly, the amounts set forth herein are estimates and may be subject to change.  Additionally, in certain states, as well as with the federal government, the Debtors must estimate the total of Taxes and Fees they owe to certain Authorities before payment is due.  As a result, the Debtors often seek prompt refund of overpaid Taxes and Fees once a final accounting has been made by the Authorities and, further, sometimes challenge an Authority's final accounting of the Taxes and Fees the Debtors owe.  Accordingly, nothing contained herein should be construed as an admission by the Debtors regarding the amount of any Tax or Fee owed to any Authority.

47

### i. Sales and Use Taxes

101.     The Debtors incur or collect from customers an assortment of state and local sales Taxes in connection with the sale of various products and services to their customers. Sales Taxes are essentially general consumption Taxes charged at the point of purchase for certain goods and services, which are usually set by the applicable taxing Authority as a percentage of the retail price of the good or service purchased. The Debtors remit approximately $97,000 per month in sales Taxes to the applicable Authorities.

102.     Additionally, the Debtors purchase various materials and supplies necessary for the operation of their business on a day-to-day basis from out-of-state vendors which—because they are not located in-state—do not charge the Debtors sales Tax in connection with such purchases. As a result, the Debtors remit approximately $38,000 in use Taxes per month to certain of the Authorities—an amount equal to the sales Taxes that they otherwise would have paid had they purchased the goods in-state. The Debtors are current with respect to their payment of sales and use Taxes, however, as of the Petition Date, the Debtors owed between $125,000 and $150,000 in prepetition sales and use Taxes that had accrued but had not yet become due and payable.

### ii. Franchise and Income Taxes

103.     The Debtors pay franchise Taxes to certain of the Authorities to operate their business in the applicable taxing jurisdiction. Some states assess a flat franchise Tax on all businesses, while others assess a franchise Tax based on net operating income, and yet others assess a franchise Tax on capital employed in the business. As a result, the Debtors remit approximately $35,000 per month in franchise Taxes to certain of the Authorities. As of the Petition Date, the Debtors did not owe any amounts with respect to franchise Taxes.

104. Additionally, certain states, as well as the federal government, require that the Debtors pay income or corporate Taxes—generally calculated as a percentage of a corporation's net income (the difference between gross receipts and expenses, after accounting for additional write-offs). As a result of projected net operating losses for the current year, I believe that, as of the Petition Date, they do not owe any taxing Authority income Taxes. If circumstances change, however, including if the Debtors recognize gain as a result of a sale of property in the current tax year, the Debtors may be required to pay federal and state income Taxes.[20]

### iii. Real and Personal Property Taxes

105. State and local laws in jurisdictions where the Debtors operate generally grant taxing Authorities the authority to levy property Taxes against the Debtors' real and personal property. To avoid the imposition of statutory liens on their property, the Debtors remit approximately $17 million in real and personal property Taxes to the applicable taxing Authorities annually in the ordinary course of business. While real and personal property Taxes generally are remitted on a semi-annual basis in each of the jurisdictions in which the Debtors operate, because the states in which the Debtors operate collect these Taxes on different schedules, the Debtors pay property Taxes a number of times throughout the year. Although I believe the Debtors are current with respect to their payment of real and personal property Taxes, as of the Petition Date the Debtors owed approximately $9,379,614 on account of real and personal property Taxes that had accrued, but had not yet become due and payable.

---

[20] Debtors with operating activities are limited liability companies or an S corporation. As such, taxable income and expense from these entities pass through these entities and are consolidated with BDI for federal income tax purposes, and generally distribute sufficient funds to BDI to cover their proportionate share of any income taxes owed for a given year. In addition, taxable income and expenses from certain of the Debtors pass through to BDI for state income tax purposes. Again the Debtors distribute sufficient funds to BDI to cover any income taxes owed for a given year.

### iv. Gaming Taxes and Fees

106. In the ordinary course of business, the Debtors are required to pay certain gaming-related Taxes and Fees to federal Authorities, as well as to the respective state and local taxing Authorities in each Gaming Jurisdiction.

107. Gaming license Fees and Taxes, which are computed in different ways depending upon the Gaming Jurisdiction in which the Debtors operate their casino properties, are payable to the states, counties, and cities in which the Debtors' respective operations are conducted. Depending upon the particular Fee or Tax involved, these Fees and Taxes may be payable daily, monthly, quarterly, or annually, and are based upon (a) a percentage of gross gaming revenues received, (b) the number of gaming devices operated, or (c) the number of table games operated.

108. Specifically, the gaming Taxes and Fees include, without limitation:

- Withholdings From Patron Winnings. The Internal Revenue Service, as well as some state departments of revenue, requires the Debtors to withhold certain amounts from customer winnings in the ordinary course of business.

- Supplemental Gaming Revenue Taxes. In addition to generally applicable revenue Taxes, several state and local governmental Authorities impose flat and/or graduated Taxes on gaming receipts.

- Additional Miscellaneous Taxes and Fees. Several state and local governmental Authorities impose additional miscellaneous Taxes and Fees on the Debtors' facilities. Also, the Debtors have, from time to time, incurred fines and stipulated penalties imposed by regulatory agencies in each Gaming Jurisdiction based on the Debtors' business operations.

109. Although the Debtors are current with respect to their payment of gaming Taxes and Fees, as of the Petition Date they owed approximately $8,235,928 on account of gaming Taxes and Fees that had accrued, but had not yet become due and payable. Additionally, as set forth above, because certain states require daily remittances, the Debtors will almost certainly have payments due on account of gaming Taxes and Fees immediately after the Petition Date.

50

### v. Business License and Other Fees; and Annual Report and Other Taxes

110. State and local laws also require the Debtors to pay Fees for a wide range of necessary business licenses—e.g., operating, casino, gaming, restaurant, and liquor licenses— and permits from a number of local, state, and federal regulatory agencies. The method for calculating Fees due under these licenses and permits, and the deadlines for paying the amounts due, varies by license/permit and by Gaming Jurisdiction. Further, certain states require the Debtors to pay annual reporting Fees to state governments to remain in good standing and to continue conducting business within the state. Certain states also require the Debtors to pay various other business Taxes (collectively, the "Other Taxes and Fees").

111. Although the Debtors are current with respect to their payment of the Other Taxes and Fees, as of the Petition Date they owed approximately $58,706 in the aggregate on account of Other Taxes and Fees that had accrued, but had not yet become due and payable.

112. It is critical to the Debtors' ongoing operations and reorganization efforts that they be permitted to pay Taxes and Fees to the appropriate gaming Authorities to avoid significant conflict with those Authorities. The Debtors' continued good relations with the gaming Authorities are important to their ability to continue to operate and grow their businesses. The Debtors' failure to pay the Taxes and Fees could adversely impact their business operations because, among other things: (a) the Authorities could attempt to initiate audits of the Debtors or prevent the Debtors from continuing their businesses, which would unnecessarily divert the Debtors' management's attention away from the reorganization process; (b) the Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (c) certain directors and officers might be subject to personal liability—even if the Debtors' failure to pay the Taxes

51

and Fees was not a result of malfeasance on their part—which would undoubtedly distract those key employees from their duties related to the Debtors' restructuring.

113.    Further, given that certain of the Taxes and Fees are payable on a daily or weekly basis, it is imperative that the Debtors be authorized to pay the Taxes and Fees without delay. Otherwise, the Debtors and their estates may suffer immediate and irreparable harm in the form of disputes with Authorities regarding the continued effectiveness of their gaming licenses, additional liens placed on their assets, and the accrual of interest and fees on claims related to the Taxes and Fees.

## F.    Insurance

114.    In the ordinary course of business the Debtors maintain a number of insurance Policies that collectively comprise a comprehensive risk management program for their operations and assets. The Debtors' risk management program is customary for enterprises of a size, scope, and nature similar to the Debtors' businesses. The Debtors maintain Polices with respect to, among other things, potential liability arising from general tort, automobile, property, fiduciary, crime, employee, marine and pollution, as well as directors' and officers' and total umbrella liability policies. The Policies are essential to preserving and protecting the value of the Debtors' businesses, properties, and assets. In many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities.

115.    The annual premiums for the Debtors' Policies total approximately $3.3 million. As of the Petition Date, approximately $653,000 (including premiums with respect to the Zurich Policies, described below) in premium payments on the Policies relating to the prepetition period was, or may become, due and payable. None of this amount is currently past due.

116. The Debtors employ an insurance broker, Aon, to assist with their procurement and negotiation of the Policies. In connection with these services, the Debtors' insurance providers pay Aon certain Broker's Fees, which are included in the premiums for the Policies charged to the Debtors.

117. In the ordinary course of business, the Debtors arrange to amortize over the applicable coverage period payment of the premiums due on policies provided by Zurich, which include general liability, property, inland marine, crime, equipment breakdown, automobile, protection and indemnity / hull and machinery, and workers' compensation policies. This Payment Arrangement benefits the Debtors by spreading out the cost of the Zurich Policies over the applicable coverage period, thus reducing the impact on the Debtors' liquidity at the beginning of each coverage period (when the full amount of the premium for the coverage period would otherwise be due).

118. The Payment Arrangement allows the Debtors to defer 60% of the total premium for the Zurich Policies until months four and seven of the applicable coverage period. Specifically, the terms of the Payment Arrangement provide that the Debtors will pay to Zurich 40% of the total premium at the beginning of the policy period, followed by installments of 30% of the total premium made before months four and seven of the policy period, as follows:

| Total Premium | August Payment (40%) | November Payment (30%) | February Payment (30%) |
|---|---|---|---|
| $2,175,067.67 | $871,329.71 | $651,868.98 | $651,868.98 |

The Debtors' next scheduled payment under the Payment Arrangement, in the amount of approximately $653,000 (including miscellaneous fees and charges), is due by February 3, 2010.

119. Failure to pay premiums and related expenses (including the Broker's Fees) when due may harm the Debtors' estates in several ways. First, the Debtors' insurance companies or

53

its broker, Aon, may refuse to renew (or, with respect to Aon, assist in renewing) the Debtors' Policies, which will require the Debtors to obtain replacement policies, if available, and possibly to reconfigure their risk management program; which, in turn, will require significant managerial resources at a time when the Debtors' focus should be on the successful prosecution of these cases and may result in the Debtors obtaining less favorable coverage or terms from their insurers than they currently enjoy. This concern is particularly acute with respect to the Zurich Policies, as the Debtors' failure to make all scheduled payments under the Payment Arrangement would have a severe and adverse effect on the Debtors' ability to negotiate similar premium payment schedules for future policies.

120.    Second, the Debtors' insurers may attempt to terminate the Debtors' existing policies or dispute the Debtors' continued right to make claims under those policies, which may create uncertainty as to the Debtors' ability to continue operating their businesses given the myriad regulatory and contractual requirements imposed on the Debtors to maintain specific amounts and types of insurance coverage. Any purported termination of the Policies, and any material change in their terms, may also place additional strain on the Debtors' relationships with key employees, who benefit from the Debtors' insurance coverage.

121.    Third, the Policies are essential to the preservation of the value of the Debtors' businesses, properties, and assets, and the Debtors' ability to successfully prosecute these cases. The Policies protect the Debtors and other parties in interest from loss in value caused by casualty, natural disaster, fraud or another unforeseen event.

122.    If the Debtors are unable to continue their prepetition risk management program without interruption, the Debtors and their estates may suffer immediate and irreparable harm in the form of disputes with insurers regarding the continued effectiveness of the Policies and

related issues with regulatory and licensing bodies. Further, a number of the Debtors' policies expire, and must be renewed, less than 20 days after the Petition Date, to ensure that the Debtors' assets and estates continue to be protected by appropriate insurance coverage.

## G. Utilities

123.     In the ordinary course of business, and in connection with the operation of their businesses and management of their properties, the Debtors obtain gas, water, sewer, electric, waste removal, local and long distance telephone, cellular telephone, pager and personal digital assistant (PDA), internet, television, music and other similar utility services from more than 25 different providers under approximately 90 different accounts. On average, the Debtors spend approximately $500,000 per month on utilities. I do not believe the Debtors were past due on any amounts owed to utilities as of the Petition Date.

124.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, and would seriously jeopardize the Debtors' reorganization efforts and, ultimately, value maximization and creditor recoveries. It is therefore critical that utility services continue uninterrupted during these cases.

## H. Notice and Claims Agent Retention

125.     The Debtors may have as many as 7,500 potential creditors in these cases. Accordingly, the Debtors propose to engage Epiq Bankruptcy Solutions, LLC to act as their notice, claims and balloting agent. I believe Epiq has developed efficient and cost-effective methods to properly handle the voluminous mailings associated with the noticing, claims processing, and balloting portions of large chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all other parties in interest.

55

## PART IV

## CONCLUSION

126.    To minimize unnecessary disruptions to their businesses and operations, the Debtors are seeking the relief requested in the First Day Motions and described above. This relief will substantially enhance the Debtors' ability to transition to operating under chapter 11 while maintaining the maximum possible going concern value of their estates, to the benefit of creditors and all other parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 23, 2009

Jon S. Bennett
Senior Vice President, Chief Financial Officer, and Treasurer