## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE MAJESTIC STAR CASINO, LLC, <u>et al.</u>,[1] | ) Case No. 09-14136 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

### DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION
### OF THE MAJESTIC STAR CASINO, LLC AND ITS DEBTOR AFFILIATES
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

| | |
|---|---|
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS LLP** |
| Laura Davis Jones (DE Bar No. 2436) | James H.M. Sprayregen |
| James E. O'Neill (DE Bar No. 4042) | Edward O. Sassower |
| Timothy P. Cairns (DE Bar No. 4228) | Stephen E. Hessler |
| 919 North Market Street, 17th Floor | 601 Lexington Avenue |
| Wilmington, Delaware 198999-8705 | New York, New York 10022–4611 |
| Telephone: (302) 652-4100 | Telephone: (212) 446–4800 |
| Facsimile: (302) 652-4400 | Facsimile: (212) 446–4900 |

Co-Counsel for the Debtors and Debtors in Possession

Dated: September 17, 2010

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: The Majestic Star Casino, LLC (4986); The Majestic Star Casino II, Inc. (0927); The Majestic Star Casino Capital Corp. (0872); Majestic Star Casino Capital Corp. II (9309); Barden Mississippi Gaming, LLC (8783); Barden Colorado Gaming, LLC (8674); Majestic Holdco, LLC (4648); and Majestic Star Holdco, Inc. (9415). The corporate address for the debtors is 301 Fremont Street, 12th Floor, Las Vegas, Nevada 89101.

# TABLE OF CONTENTS

Page

Important Information About this Disclosure Statement ..................................................................................1

Questions and Answers Regarding this Disclosure Statement and the Plan ...................................................3

The Debtors' History and Chapter 11 Cases.................................................................................................9

Plan Overview ...........................................................................................................................................18

Treatment of Claims Against and Equity Interests in the Debtors ...............................................................18

Settlements Contemplated Pursuant to the Plan ........................................................................................36

Management of the Company.....................................................................................................................42

Composition of New Board of Managers....................................................................................................43

Reorganized Debtors' Corporate Organizational and Ownership Structure ..................................................44

The Reorganized Debtors' Business Upon Emergence ...............................................................................44

Description of New Membership Interests ..................................................................................................46

Limitations on Liability and Indemnification of Managers and Officers of The Reorganized Debtors ...........47

Summary of Gaming Regulations ...............................................................................................................48

Summary of Legal Proceedings..................................................................................................................58

Projected Financial Information ..................................................................................................................62

Risk Factors ..............................................................................................................................................63

Confirmation of the Plan.............................................................................................................................68

Effect of Confirmation of the Plan ..............................................................................................................73

Important Securities Law Disclosure...........................................................................................................76

Voting Instructions .....................................................................................................................................77

Certain U.S. Federal Income Tax Consequences of the Plan.......................................................................78

Recommendation .......................................................................................................................................84

## EXHIBITS

EXHIBIT A      Joint Plan of Reorganization

EXHIBIT B      Disclosure Statement Order

EXHIBIT C      Reorganized Debtors' Financial Projections

EXHIBIT D      Reorganized Debtors' Valuation Analysis

EXHIBIT E      Liquidation Analysis

EXHIBIT F      Reconciliation of Non-GAAP Measures

**Important Information About this Disclosure Statement**

This Disclosure Statement provides information regarding the Joint Plan of Reorganization that the Debtors referenced on the cover of this Disclosure Statement (collectively, the "Debtors") are seeking to have confirmed by the Bankruptcy Court. The Debtors believe the Plan is in the best interests of all creditors and urge all creditors entitled to vote on the Plan to vote in favor of the Plan.

**References to the "Plan" and the "Plan of Reorganization" are to the Joint Plan of Reorganization attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.**

**References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the District of Delaware, the court in which the Debtors filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code. References to the "Petition Date" are to November 23, 2009.**

**Unless the context requires otherwise, references to the "Company," "Majestic," "our," and "us" are to the Debtors.**

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if the Plan is confirmed, that such conditions precedent will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as Exhibit A hereto, and the section herein entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement, and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for the purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe the summaries of certain provisions of the Plan and certain other documents and the financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, including, but not limited to, the Plan and the Plan documents, are qualified in their entirety by reference to those documents. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any creditor entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign regulatory agency, nor has the

SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The New Membership Interests described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. To the extent exemptions from registration other than section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or on registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;
- financing plans;
- projected dividends;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs;

- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing products and services;
- projected general market conditions; and
- effects of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. These risks, uncertainties, and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;
- the Debtors' ability to reduce their overall financial leverage;
- the potentially adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;
- customer response to the Chapter 11 Cases;
- inability to have claims discharged/settled during the chapter 11 proceedings;
- general economic, business and market conditions;
- interest rate fluctuations;

- a decline in the Debtors' market share due to competition;
- ability to implement cost reduction initiatives in a timely manner;
- financial conditions of the Debtors' customers;
- adverse tax changes;
- limited access to capital resources;
- changes in domestic laws and regulations;
- general market conditions;
- natural disasters; and
- geopolitical instability.

**Questions and Answers Regarding this Disclosure Statement and the Plan**

**Why are the Debtors sending me this Disclosure Statement?**

        The Debtors are seeking to obtain Bankruptcy Court approval for their Plan. Prior to soliciting acceptances of the proposed Plan, the Debtors are required by section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

        Your ability to vote and your distribution, if any, depend on what kind of Claim or Interest you hold. The Classes of Claims and Interests and their respective voting statuses and anticipated recoveries are as follows:

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| **Claims against and Interests in Majestic Holdco, LLC** | | | | | |
| A-1 | Senior Secured Credit Facility Guarantee Claims | Impaired | Entitled to Vote | | |
| A-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| A-3 | Discount Notes Indenture Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| A-4 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in Majestic Star Holdco, Inc.** | | | | | |
| B-1 | Discount Notes Indenture Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| B-2 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in The Majestic Star Casino, LLC** | | | | | |
| C-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | | |
| C-2 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | | |
| C-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| C-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| C-5 | Senior Notes Indenture Claims, General Unsecured Claims, and Rejection Damages Claims | Impaired | Entitled to Vote | | |
| C-6 | Convenience Claims | Impaired | Entitled to Vote | | |
| C-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | | |

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| C-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | | |
| **Claims against and Interests in The Majestic Star Casino II, Inc.** | | | | | |
| D-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | | |
| D-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| D-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| D-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| D-5 | Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and Rejection Damages Claims | Impaired | Entitled to Vote | | |
| D-6 | Convenience Claims | Impaired | Entitled to Vote | | |
| D-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | | |
| D-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | | |
| **Claims against and Interests in The Majestic Star Casino Capital Corp.** | | | | | |
| E-1 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | | |
| E-2 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in Majestic Star Casino Capital Corp. II** | | | | | |
| F-1 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | | |
| F-2 | Senior Notes Indenture Claims | Impaired | Entitled to Vote | | |
| F-3 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in Barden Mississippi Gaming, LLC** | | | | | |
| G-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | | |
| G-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| G-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| G-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| G-5 | Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and Rejection Damages Claims | Impaired | Entitled to Vote | | |
| G-6 | Convenience Claims | Impaired | Entitled to Vote | | |
| G-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | | |
| G-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | | |
| **Claims against and Interests in Barden Colorado Gaming, LLC** | | | | | |
| H-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | | |
| H-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| H-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| H-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| H-5 | Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and Rejection Damages Claims | Impaired | Entitled to Vote | | |
| H-6 | Convenience Claims | Impaired | Entitled to Vote | | |
| H-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | | |
| H-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | | |

For more information about the treatment of Claims and Interests see the section herein entitled "Treatment of Claims Against and Equity Interests in the Debtors," which begins on page 18.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance the Debtors will be able to reorganize their businesses. If the Plan is not confirmed or does not go effective in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. Alternatives to Confirmation and consummation of the Plan may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. Moreover, failure to confirm or consummate the Plan may result in an extended chapter 11 proceeding. For a more detailed description of the consequences of a liquidation scenario, see the section herein entitled "Confirmation of the Plan—Best Interests of Creditors/Liquidation Analysis," which begins on page 69 and the Liquidation Analysis attached as Exhibit E hereto.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "consummation?"**

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the "Effective Date" mean the date on which the Plan has been fully consummated and all conditions to the Plan have been satisfied or waived. Distributions will be made only after consummation of the Plan. See the section herein entitled "Confirmation of the Plan," which begins on page 68, for a discussion of the conditions to consummation.

**Where is the cash required to fund the Plan coming from?**

The cash distributions under the Plan shall be funded from the Reorganized Debtors' cash balances and/or cash from business operations. See the section herein entitled "Plan Overview," which begins on page 18.

**Are there risks to owning an interest in the Debtors upon emergence from bankruptcy?**

Yes, please see the section herein entitled "Risk Factors," which begins on page 63.

**Is there potential litigation related to the Plan?**

Yes, in the event it becomes necessary to confirm the Plan over the objection of certain Classes of Claims or Interests, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

In accordance with the terms of the Bankruptcy Court order approving this Disclosure Statement, all parties in interest will receive notice of the hearing on the Confirmation of the Plan. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party at: http://chap11.epiqsystems.com/MSC.

**Will the Debtors be filing reports with the SEC?**

The Debtors will not file reports with the SEC upon emergence as they will not be subject to the public reporting requirements of the Securities Exchange Act of 1934, as amended, or the regulations promulgated thereunder.

**What rights will the Debtors' new equity holders have?**

On the Effective Date, the Debtors shall authorize and issue units of New Membership Interests sufficient to satisfy its obligations under the Plan. The voting rights, restrictions on transferability, and other rights of the New Membership Interests will be set forth in the Amended and Restated Operating Agreement of Majestic Holdco.

**Will there be releases granted to parties in interest as part of the Plan?**

Yes, see the section herein entitled "Releases," which begins on page 75.

**What is the deadline to vote on the Plan?**

5:00 p.m. (prevailing Eastern Time) on December 6, 2010.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests entitled to vote on the Plan. If you are a Holder of Claims or Interests in the following Classes, you may vote for or against the Plan by completing the ballot and timely returning it in the envelope provided to you: Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8.

The Debtors have retained Epiq Bankruptcy Solutions, LLC ("Epiq") to serve as their notice, claims, and solicitation agent (the "Solicitation Agent") to oversee the voting process, provide additional copies of all materials, and answer questions. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on December 6, 2010.

The table on the following page provides basic instructions on how to vote on the Plan:

| BALLOTS |
| --- |
| Ballots must be actually received by the Solicitation Agent by the voting deadline of 5:00 p.m. (prevailing Eastern Time) on December 6, 2010 at the following address:<br><br>**If by mail:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.:  The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**FDR Station PO Box 5014**<br>**New York, New York 10150**<br><br>**If by hand delivery or overnight courier:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.:  The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**757 Third Avenue, 3rd Floor**<br>**New York, New York 10017**<br><br>If you have any questions on the procedure for voting on the Plan, please call the Solicitation Agent at the following telephone number:<br><br>(646) 282-2400 |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed, and received by 5:00 p.m. (prevailing Eastern Time), on December 6, 2010.

Any ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one ballot with respect to each such Claim held. By signing and returning a ballot, each Holder of a Claim or Interest in Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim and/or Equity Interest have been cast or, if any other ballots have been cast with respect to such Class of Claims and/or Equity Interests, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot.

**Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**When is the Confirmation Hearing scheduled to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for December 16, 2010 to take place at 10:00 a.m. (prevailing Eastern Time) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than December 9, 2010 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The Wall Street Journal* (national edition), *The Post-Tribune of Northwest Indiana*, *The Denver Post*, and *The Tunica Times* to provide notification to those persons who may not receive notice by mail.

**What is the purpose of the Confirmation Hearing?**

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The Confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any liability that arose prior to the Confirmation of the plan of reorganization and provides for the treatment of such liability in accordance with the terms of the confirmed plan of reorganization.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including disputes over any Claims or Interests arising in the Chapter 11 Cases. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure

distributions to Holders of Claims against the Debtors are accomplished pursuant to the Plan. See the section herein entitled "Retention of Jurisdiction by the Bankruptcy Court," which begins on page 73, for a further description of the matters over which the Bankruptcy Court will retain jurisdiction following the Confirmation of the Plan.

**What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. See the section herein entitled "The Debtors' Business Upon Emergence," beginning on page 44, for a further description of the effect of the Plan on the Debtors' ongoing business operations.

**Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

Yes. Under the Plan, the Senior Secured Noteholders will collectively own a majority of the New Membership Interests in the Reorganized Debtors, and individual Senior Secured Noteholders will own substantial ownership stakes in the Reorganized Debtors. Consequently, the Senior Secured Noteholders as a Class, and certain Senior Secured Noteholders individually or acting in concert, will be able to significantly influence the management and affairs of the Reorganized Debtors, and all matters requiring the vote or approval of holders of the New Membership Interests. Further information regarding the composition of the Board of Managers of the Reorganized Debtors will be set forth in the Plan Supplement.

**Does the Company recommend voting in favor of the Plan?**

Yes. In the opinion of the Debtors, the Plan is preferable to the liquidation alternatives described in this Disclosure Statement because the Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. Confirmation of the Plan will also allow the Debtors to continue to operate as a going concern, which will have the effect of preserving jobs at the Debtors' gaming facilities. Accordingly, the Debtors recommend that Holders of Claims who are entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

**The Debtors' History and Chapter 11 Cases**

**The Debtors' Business—Overview and History**

The Majestic Star Casino, LLC ("Majestic I") was formed by Don H. Barden in December 1993 to pursue a license to operate a gaming facility at Buffington Harbor in Gary, Indiana (the "Majestic Star I"). In 1996, Majestic I and Trump Indiana, Inc. (which was not affiliated with the Debtors at that time) ("Trump Indiana") each opened a dockside gaming facility at Buffington Harbor.

In December 2001, Majestic I purchased Fitzgeralds-brand properties in Las Vegas, Nevada, Tunica, Mississippi (30 miles south of Memphis) and Black Hawk, Colorado (35 miles west of Denver), which it owns through its wholly-owned subsidiaries Barden Nevada Gaming, LLC ("Barden Nevada," not a Debtor in these cases), Barden Mississippi Gaming, LLC ("Barden Mississippi," a Debtor in these cases), and Barden Colorado Gaming, LLC ("Barden Colorado," a Debtor in these cases), respectively. This purchase significantly expanded Majestic I's geographic reach and the scope of its gaming and hospitality operations. It also gave Majestic I proprietary rights in registered and common law trade names, trademarks and service marks used in connection with these operations, certain of which Majestic I licenses to other Fitzgeralds-brand properties.

On December 31, 2003, Majestic I spun off ownership of Barden Nevada to Barden Development Inc. ("BDI"), Majestic I's indirect parent (not a Debtor in these cases). As part of that transaction, Majestic I and Barden Nevada entered into a series of licensing, expense sharing, and other agreements.

On December 21, 2005, Majestic I acquired Trump Indiana (renamed The Majestic Star Casino II, Inc. ("Majestic II"), a Debtor in these cases), which Majestic I rebranded "Majestic Star II," and its 300 room hotel,

which was renamed the "Majestic Star Hotel." As part of this transaction, Majestic I also acquired complete ownership of two other subsidiaries: Buffington Harbor Riverboats, LLC ("Buffington Riverboats"), a joint venture between Majestic I and Trump Indiana established to acquire, manage, and develop a dock, pavilion and parking facilities for gaming operations; and Buffington Harbor Parking Associates, LLC ("Buffington Parking"), a joint venture between Trump Indiana and AMB Parking, LLC (an entity owned by BDI) established to own and operate parking facilities for gaming operations.[2] Accordingly, the Debtors' Buffington Harbor operations now include both the Majestic Star I and Majestic Star II casino operations, the Majestic Star Hotel, an entertainment pavilion housing restaurants, retail outlets, an entertainment venue, a lounge and boarding access to the two casinos, and a 2,000 space parking garage. Majestic I also has 266 acres of excess and surplus land at the site, much of which is available for future expansion.[3]

**The Debtors' Organizational Structure**

The chart on the following page depicts the Debtors' current organizational and ownership structure (non-debtors are shaded):

**The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors' total funded debt was approximately $733.8 million, which primarily consists of the amounts outstanding under four Prepetition facilities: (a) an $80 million Senior Secured Credit Facility (the "Senior Secured Credit Facility") funded by a syndicate led by Wells Fargo Capital Finance, Inc. (f/k/a Wells Fargo Foothill, Inc.) (the "Senior Secured Credit Facility Agent"), which matured on April 15, 2010; (b) $300 million in principal amount of 9½% Senior Secured Notes (the "Senior Secured Notes"), which mature on October 15, 2010; (c) $200 million in principal amount of 9¾% Senior Notes (the "Senior Notes"), which mature on January 15, 2011; and (d) $63.5 million in principal amount at maturity of 12½% original issue discount notes (the "Discount Notes"), which mature on October 15, 2011. Each of these facilities is described in further detail below.

Senior Secured Credit Facility

On October 7, 2003, Majestic I, Barden Mississippi, and Barden Colorado entered into a Loan and Security Agreement (as amended, the "Loan and Security Agreement") with certain financial institutions party thereto as lenders and the Senior Secured Credit Facility Agent, as arranger and administrative agent for such lenders.[4] The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matured on April 15, 2010. As of August 31, 2010, the Debtors owed approximately $65.3 million under the Senior Secured Credit Facility in principal and accrued unpaid interest. Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Senior Secured Credit Facility Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%. In each case the rate is

---

[2]     On or about August 4, 2006, Buffington Parking was merged into Majestic pursuant to Articles of Merger filed with the Secretaries of State for the States of Indiana and Delaware. On or about December 31, 2006, Buffington Riverboats withdrew from existence as an entity with the Secretary of State of the State of Delaware.

[3]     Non-debtor Gary New Century, LLC ("GNC"), which is controlled by Don H. Barden, owns approximately six acres of land at this site. GNC also holds rights to certain improvements in the harbor and an ownership interest in those improvements. The Debtors are owners of various easements and other rights in the GNC property that permit the Debtors to perpetually operate their business at the Buffington Harbor location, subject to certain reservations, restrictions, and limitations contained in various recorded and unrecorded instruments.

[4]     The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and to modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

determined based on the Debtors' trailing twelve month EBITDA (defined as earnings before interest, taxes, depreciation and amortization). The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default. As noted above, the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Senior Secured Credit Facility Agent at the default rate on a current basis.

Pursuant to certain mortgages, security agreements, and other related collateral documents, outstanding amounts under the Senior Secured Credit Facility are secured by substantially all of the assets of Majestic I, Majestic II, Barden Colorado, and Barden Mississippi, including all real property and other assets of the Debtors' casinos, all furniture, fixtures and equipment belonging to those entities, those entities' rights to the service marks "Majestic Star" and "Fitzgeralds" and other related trademarks, and the proceeds and products of each of the foregoing, as well as by a pledge by Majestic of its equity interests in Majestic II, Barden Colorado, and Barden Mississippi (collectively, the "Collateral"). Majestic Holdco, LLC ("Majestic Holdco") has also guarantied the outstanding obligations under the Senior Secured Credit Facility, although its liability is limited to its pledge of 100% of the equity of Majestic I. The Collateral does not include certain "Excluded Assets," including, among other things, cage cash (cash held at the casino properties themselves) and the Debtors' gaming licenses and other licenses that may not be encumbered under applicable law or contract.

<u>Senior Secured Notes</u>

The Senior Secured Notes are $300 million in principal amount of obligations issued by Majestic I and The Majestic Star Casino Capital Corp. ("MSCC"), a non-operating, wholly-owned subsidiary of Majestic I that has no assets. The Senior Secured Notes are governed by an Indenture dated October 7, 2003, and two Supplemental Indentures each dated December 21, 2005 (collectively, the "Senior Secured Notes Indenture"), with The Bank of New York Mellon Trust Company, N.A., as trustee under each indenture (the "Senior Secured Notes Trustee"). The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes mature on October 15, 2010. As of August 31, 2010, the Debtors owed approximately $348.4 million on account of the Senior Secured Notes in principal and accrued unpaid interest.

Outstanding obligations under the Senior Secured Notes are secured by liens in favor of the Trustee on the Collateral, which are junior to the liens granted to the Senior Secured Credit Facility Agent under the Loan and Security Agreement pursuant to the Intercreditor Agreement (as defined below). Additionally, Majestic II, Barden Colorado and Barden Mississippi have each guarantied the Debtors' obligations under the Senior Secured Notes. Majestic Holdco has also guarantied those obligations, but its guaranty is limited to a pledge of its 100% equity interests in Majestic I.

<u>Intercreditor Agreement</u>

In connection with the issuance of the Senior Secured Notes, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and certain of the Debtors[5] entered into an Intercreditor and Lien Subordination Agreement, dated as of October 7, 2003 (as amended, the "Intercreditor Agreement"). The Intercreditor Agreement, among other things, subordinates the liens and security interests granted to the Senior Secured Notes Trustee to secure the Debtors' obligations under the Senior Secured Notes to the liens and security interests granted to the Senior Secured Credit Facility Agent to secure the Debtors' obligations under the Senior Secured Credit Facility, up to a maximum principal amount outstanding under the Senior Secured Credit Facility of $80 million, plus premiums, interest, fees and all other amounts payable under the Senior Secured Credit Facility (including all amounts accruing

---

[5]    The Debtors party to the Intercreditor Agreement are: (a) Majestic I, Majestic II, Barden Mississippi, and Barden Colorado, as borrowers under the Senior Secured Credit Facility, and Majestic Holdco, as guarantor under the Senior Secured Credit Facility; and (b) Majestic I and MSCC, as issuers of, Majestic II, Barden Mississippi, Barden Colorado, and MSCC II as guarantors under, and Majestic Holdco, as pledgor under, the Senior Secured Notes Indenture.

after the Debtors commence a chapter 11 case).[6]  Additionally, the Intercreditor Agreement imposes up to a 180-day standstill period within which holders of the Senior Secured Notes and the Senior Secured Notes Trustee may not take enforcement action against the Collateral based on an event of default under the Senior Secured Notes Indenture, which period is extended indefinitely with respect to Collateral against which the Senior Secured Credit Facility Agent is pursuing rights or remedies under the Senior Secured Credit Facility.

The Intercreditor Agreement also limits the Senior Secured Notes Trustee and Senior Secured Noteholders from seeking adequate protection and taking certain other actions in any chapter 11 case commenced by the Debtors. Specifically, the Intercreditor Agreement provides that, until the senior obligations under the Senior Secured Credit Facility have been satisfied, the Senior Secured Notes Trustee and the Senior Secured Noteholders (a) will not object to any use of cash collateral or Postpetition financing secured by the Debtors' assets that is consented to by the Senior Secured Credit Facility Agent, and will not seek adequate protection or any other relief based on their respective interests in the Debtors' assets;[7] (b) will subordinate the Senior Secured Notes Trustee's liens to any liens securing such Postpetition financing that are senior to or *pari passu* with the Senior Secured Credit Facility Agent's liens; (c) will not contest any request by the Senior Secured Credit Facility Agent for adequate protection (or support an objection to such request); and (d) will not seek relief from the automatic stay to pursue rights or remedies with respect to its liens and security interests.  The Intercreditor Agreement expressly provides in Section 6.04 that the "provisions of this Agreement are intended to be and shall be enforceable under section 510 of [the Bankruptcy Code]."

### Senior Notes

The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic I and Majestic Star Casino Capital Corp. II ("MSCC II"), a non-operating, wholly owned subsidiary of Majestic I that has no assets.  The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi.  The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debenture Trust Company as successor trustee.  The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005.  The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year.  The notes mature on January 15, 2011.  As of August 31, 2010, the Debtors owed approximately $233.1 million on account of the Senior Notes in principal and accrued unpaid interest.

### Discount Notes

The Discount Notes are $63.5 million principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Holdco that has no assets.  The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic I or any of its subsidiaries.  The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee.  The Discount Notes accrue interest at 12½% per annum, with payments due on April 15 and October 15 of each year.  Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011.  As of August 31, 2010, the Debtors owed approximately $72.6 million on account of the Discount Notes in principal and accrued unpaid interest.

---

[6]     The liens and security interests granted to the Senior Secured Notes Trustee are senior and prior to the liens and security interests granted to the Senior Secured Credit Facility Agent to the extent the latter secure an amount greater than this amount.

[7]     The Intercreditor Agreement does provide that, if the Senior Secured Credit Facility Agent is granted adequate protection in the form of liens on additional assets of the Debtors, then the Senior Secured Notes Trustee may seek adequate protection in the form of a junior lien on such additional assets.

**Events That Led to Bankruptcy**

   The Debtors' Financial and Liquidity Concerns

   The recent global and financial markets crisis has caused, among other things, a general tightening in the credit markets, lower levels of liquidity, lower consumer and business spending, and lower consumer net worth, all of which have had and will continue to have a negative impact on the Debtors' businesses, results of operation, financial condition and liquidity.   Gaming and other leisure activities comprise discretionary spending, and participation in such activities tend to decline in economic downturns.  The current recession has been no exception.

   At the same time that the Debtors have confronted a decline in customer visits and spending due to economic factors, competition has increased in each of the markets in which they compete.  Importantly, in Indiana a number of new and renovated gaming properties have materially impacted the Debtors' Buffington Harbor operations.  Specifically, in August 2007, the Four Winds Casino Resort opened with approximately 3,000 slot machines and 100 table games.   This casino facility is located approximately 48 miles east of the Debtors' Buffington Harbor operations.  In July 2008, Harrah's Entertainment completed a $500 million renovation and expansion of its Horseshoe Casino in Hammond, Indiana, doubling the size of its existing facility and making it the largest gaming establishment in the greater Chicago area.  Also in 2008, Ameristar Casinos finished the remodeling and rebranding of its riverboat and land-based facilities located in East Chicago, Indiana, which included remodeling casino floors and restaurants and the addition of new slot machines.  Boyd Gaming also recently completed a $130 million expansion of its Blue Chip Casino facility located in Michigan City, Indiana, which includes new and improved amenities.

   Similar competitive pressures have been brought to bear on the Debtors' Mississippi and Colorado operations.  In Tunica, Mississippi, a competitor recently completed an extensive remodeling and re-branding of its property, and in Colorado a competitor recently completed construction of a 536-room hotel (attached to its existing casino) that has drawn patrons away from Fitzgeralds Black Hawk.  In addition, the Black Hawk casino market continues to suffer the negative impacts of a smoking ban to all public areas within a casino, including the casino floor.  The smoking ban went into effect on January 1, 2008.

   The Debtors' declining operating results and weakening financial position due to increasing competition and adverse economic conditions, together with their significant debt service obligations, have curtailed the Debtors' ability to make the substantial and ongoing capital investments in their operations required to maintain competitiveness and the going concern value of their businesses.  Accordingly, to preserve the liquidity necessary to ensure the continued competitiveness of their operations, in October 2008 the Debtors drew substantially all of the remaining availability under their Senior Secured Credit Facility and determined not to make the $24 million interest payment due to holders of their Senior Secured Notes and Senior Notes on October 15, 2008.  As a result, as of November 14, 2008, the Debtors were in default under the Senior Secured Notes and Senior Notes, which in turn triggered cross-defaults under the Senior Secured Credit Facility[8] and the Discount Notes.  The Debtors have continued to pay interest on the Senior Secured Credit Facility (at the default rate), but have not made any interest payments on the Senior Secured Notes or Senior Notes since April 2008, and did not make the scheduled interest payment on the Discount Notes due April 15, 2009.[9]

   Prepetition Negotiations with Creditors

   Although the Debtors' operations continued to produce positive cash flow (exclusive of debt service) prior to the defaults under their various debt facilities, the Debtors recognized that their existing capital structure and debt service obligations were depriving their businesses of the funds needed to make the substantial and ongoing capital investments required to succeed in the increasingly competitive markets in which they operate.  Accordingly, the Debtors engaged XRoads Solutions Group, LLC ("XRoads") on or about August 7, 2008, and Goldman, Sachs &

---

[8]    The Senior Secured Credit Facility Agent asserts that other defaults exist under the Senior Secured Credit Facility as well.

[9]    Interest accruing on the Discount Notes through October 2008 was paid in-kind.

Co. ("Goldman Sachs") on or about November 14, 2008, to assist the Debtors in evaluating a broad range of financial and strategic alternatives aimed at addressing trends in the Debtors' operating results and financial condition.

The Debtors and their financial advisors pursued a number of financial and operational restructuring alternatives in the year leading up to the commencement of the Chapter 11 Cases, including reaching out to their principal creditor constituencies. To that end, in November 2008, the Debtors agreed to pay the reasonable professional fees and expenses for advisors to an ad hoc group holding a majority of the Senior Secured Notes (the "Senior Secured Notes Committee"), and in December 2008, the Debtors commenced similar agreements with an ad hoc group holding a majority of the Senior Notes (the "Senior Notes Committee") and the Senior Secured Credit Facility Agent, respectively. The Debtors also established a data room to provide access to detailed information regarding their operations, assets and finances, and attempted to foster negotiations with these constituencies regarding a consensual restructuring and deleveraging of the Debtors' balance sheet. Concurrently, the Debtors and their advisors investigated other potential restructuring solutions, including new money investments and sales of certain of the Debtors' businesses and assets. Although the Debtors identified several potential investors, these discussions did not progress beyond expressions of interest.

Despite the substantial efforts of the Debtors, the Senior Secured Notes Committee, and the Senior Notes Committee to reach agreement on a consensual restructuring, by October 2009, the negotiations had reached an impasse.

Exercise of Creditor Remedies

On December 3, 2008, after the Debtors failed to make the October 15, 2008 interest payment to holders of the Senior Secured Notes and Senior Notes, the Senior Secured Notes Trustee notified the Senior Secured Credit Facility Agent that one or more events of default had occurred under the Senior Secured Notes Indenture. The Senior Secured Credit Facility responded by sending the Senior Secured Notes Trustee a "standstill notice" on December 11, 2008, which, under the Intercreditor Agreement, triggered a 180-day "standstill period" in which the Senior Secured Noteholders and Senior Secured Notes Trustee were prohibited from exercising remedies against the Debtors' assets. The Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee subsequently entered into agreements on June 10, 2009 and July 10, 2009 consensually extending the standstill period through August 10, 2009 to allow the Senior Secured Notes Committee, the Senior Notes Committee and the Debtors to continue discussing a consensual restructuring. Upon expiration of the second extension of the standstill period however, the Senior Secured Notes Trustee declined to further extend the standstill period beyond August 10, 2009.

Notwithstanding the expiration of the standstill period under the Intercreditor Agreement, the parties continued to have constructive discussions regarding a consensual restructuring of the Debtors' debt obligations. In October 2009, however, the Senior Secured Notes Trustee sent the Senior Secured Credit Facility Agent a notice of its intent to exercise remedies against the Debtors' assets, which triggered another standstill period under the Intercreditor Agreement, this time of 10 days. Upon the expiration of such 10 day period on October 30, 2009, the Senior Secured Notes Trustee and Senior Secured Noteholders became entitled under the Intercreditor Agreement to seek to enforce remedies against the Debtors' assets.

On October 30, 2009, the date the Senior Secured Noteholders' standstill period expired, the Senior Secured Credit Facility Agent sent to the Debtors a notice, among other things, terminating the Debtors' ability to borrow under the Senior Secured Credit Facility and declaring all amounts outstanding under that facility to be immediately due and payable. The notice stated that, as a result of the expiration of the applicable standstill periods under the Intercreditor Agreement and the resulting right of the Senior Secured Notes Trustee and Senior Secured Noteholders to enforce remedies against any of the Collateral that the Senior Secured Credit Facility Agent was not actively enforcing remedies against, the Senior Secured Credit Facility Agent and the lenders under the Senior Secured Credit Facility indicated they were commencing the exercise of their rights and remedies against all of the Collateral to protect their ability to control any foreclosure or similar process with respect to the Collateral.

**The Commencement of the Chapter 11 Cases**

On November 23, 2009, the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code.

The Chapter 11 Cases are being jointly administered under the caption In re The Majestic Star Casino, LLC, et al., Case No. 09-14136 (KG). The Debtors continue to operate their businesses and manage their property as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

**Events During Bankruptcy**

<u>First Day Relief</u>

Through a careful review of their business operations and cash requirements, and following detailed preparations by management and their advisors, the Debtors entered bankruptcy with minimal impact on their day-to-day business operations. To facilitate, among other things, noticing, claims-processing and voting-related matters, the Debtors requested that the Bankruptcy Court enter an order granting certain relief including authorization for the joint administration of the Chapter 11 Cases.

On the Petition Date, the Debtors also sought and obtained several orders authorizing them to pay various Prepetition Claims. These orders were designed to ease the strain on the Debtors' relationships with employees, vendors, customers, and taxing authorities as a consequence of the commencement of the Chapter 11 Cases. Among other things, these orders authorized the Debtors to: (a) honor customer obligations and continue customer programs; (b) pay certain Prepetition employee wages and benefits; (c) maintain cash management systems; (d) use Prepetition bank accounts, checks, and other business forms; (e) make tax payments to federal, local, and state taxing authorities; (e) maintain Prepetition insurance policies and enter into new insurance policies; and (f) prohibit utility companies from discontinuing services. In addition, the Debtors engaged in an extensive communication program with vendors and customers assuring them that the transition into bankruptcy would be smooth and would not result in a discernible interruption in operations.

The Debtors have been funding their operations during the Chapter 11 Cases by using cash on hand and cash flow from operations, which the Debtors believe to be sufficient to meet projected cash needs, including the payment of normal operating costs and expenses, as they proceed with their financial restructuring. Therefore, the Debtors have not sought debtor-in-possession financing.

On the Petition Date, the Debtors sought authority to use cash collateral of their secured creditors to permit, among other things, the orderly continuation of the operation of the Debtors' businesses and to satisfy their working capital and operational needs. The final cash collateral order was entered by the Bankruptcy Court on December 17, 2009 and provides adequate protection to those secured creditors, including: (a) adequate protection payments to the Senior Secured Credit Facility lenders; (b) a section 507(b) superpriority claim to the Senior Secured Credit Facility lenders; (c) adequate protection liens to the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee; and (d) payment of reasonable professional fees to the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee.

<u>Retention of Restructuring and Other Professionals</u>

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors retained, as of the Petition Date, with authorization from the Bankruptcy Court, the law firms of Kirkland & Ellis LLP and Pachulski Stang Ziehl & Jones as their restructuring counsel. Additionally, pursuant to the Bankruptcy Court's approval, the Debtors retained XRoads Solutions Group LLC ("XRoads") as financial and restructuring advisors, Epiq as Solicitation Agent, Ernst & Young LLP as auditors, Deloitte Financial Advisory Services LLP as accounting services providers, and Realty Consultants, USA, Inc. d/b/a Integra Realty Resources - Chicago Metro as appraisers.

In addition to paying the fees of their own advisors, the Debtors are required to pay fees incurred by various other constituencies and their respective advisors related to the Chapter 11 Cases. On December 4, 2009, the United States Trustee appointed the official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases to represent the interests of all general unsecured creditors of the Debtors. Since the formation of the Creditors' Committee, the Debtors have kept the Creditors' Committee informed about the Debtors' business operations. Additionally, as appropriate, the Debtors have sought the concurrence of the Creditors' Committee in connection with certain actions and transactions taken by the Debtors outside of the ordinary course of business.

### Power of Attorney Agreement

Indiana law requires all riverboat casino licensees (including Majestic I and Majestic II) to enter into a power of attorney agreement ("POA") that provides, in the event of revocation or nonrenewal of a casino's license or in other similar circumstances, for the temporary operation of such casino by a designated trustee. All licensees must submit an executed POA to the Indiana Gaming Commission (the "IGC"), the regulator with authority over the licensing and operation of riverboat casinos in Indiana. Failure to comply with the statutory POA requirement could lead to the nonrenewal of a casino operator's license. Accordingly, on February 24, 2010, the Debtors filed a motion seeking authority to execute a POA for submission to the IGC. The Court granted the Debtors' motion on March 1, 2010, and the Debtors executed and submitted a POA shortly thereafter.

### Unsecured Creditors' Committee's Standing Motion

On March 4, 2010, the Creditors' Committee filed a motion (the "Standing Motion") seeking standing to pursue, and if appropriate, settle certain claims against the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee. In the Standing Motion, the Creditors' Committee requested authority to bring an adversary proceeding for (a) a declaratory judgment holding that the security interests of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee in the Debtors' Indiana riverboat casinos (the "Majestic Star Casinos") are unperfected, (b) an order avoiding these security interests, and (c) disallowance of the claims of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee to the extent their claims are secured by the allegedly unperfected security interests in the Majestic Star Casinos. The Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed objections to the Standing Motion, and the Debtors filed a limited response to the motion requesting that the Court defer consideration of the motion and allow the Debtors to propose a settlement of the claims raised therein as part of their Plan. As of the date of filing of this Disclosure Statement, the Court has not held a hearing on the Standing Motion, and the Debtors have proposed a settlement of the claims raised therein in the Plan.

### Adversary Proceeding Against the City of Gary, Indiana

In 1996, Gary entered into local development agreements with Trump Indiana and Majestic I (each, a "Local Development Agreement"). In 2005, when Majestic II, a Debtor in these Chapter 11 Cases, acquired and began operating the riverboat casino formerly owned and operated by Trump Indiana, the Majestic I Local Development Agreement and certain other agreements related to the development of Buffington Harbor area were amended (collectively, the "Amended Local Development Agreement"), and the Trump Indiana Local Development Agreement was terminated. Under the Amended Local Development Agreement, Majestic I and Majestic II were to make monthly payments of three percent (3%) of the adjusted gross gaming receipts of their respective casinos ("Economic Incentive Payments"), and Gary agreed to make local infrastructure improvements, including construction of access roads and freeway interchange, and to conduct environmental remediation on certain property owned by Majestic I and Majestic II. In 2008, a dispute between the Debtors and Gary developed over Gary's failure to perform its development obligations, and the Debtors began depositing Economic Incentive Payments in a segregated bank account pending resolution of the dispute.

On February 11, 2008, the Debtors commenced an arbitration proceeding (the "Gary Arbitration") and a lawsuit in the Superior Court of Marion County, Indiana (the "Marion County Lawsuit") against Gary to resolve the parties' dispute over the Amended Local Development Agreement, or, if the Amended Local Development Agreement were found to be invalid, the Local Development Agreements. On December 14, 2009, upon being notified of the Debtors' chapter 11 cases, the Superior Court of Marion County stayed further proceedings in the

Marion County Lawsuit. The Gary Arbitration has not been formally stayed, but the Debtors are not actively prosecuting the Gary Arbitration at this time.

On March 11, 2010, Gary filed a lawsuit in the Superior Court of Lake County, Indiana (the "Lake County Lawsuit") against eight current and former directors, officers, and employees of Majestic I and its affiliates (the "Lake County Defendants") alleging these individuals converted funds owed by the Debtors to Gary under the Amended Local Development Agreement. In response to the Lake County Lawsuit, on March 29, 2010, the Debtors instituted an adversary proceeding in this Court seeking to extend the automatic stay imposed by section 362 of the Bankruptcy Code to the Lake County Defendants, or in the alternative, requesting a preliminary injunction pursuant to section 105 of the Bankruptcy Code prohibiting Gary from prosecuting the Lake County Lawsuit. On April 15, 2010, a Joint Notice of Removal was filed with the United State District Court for the Northern District of Indiana, Hammond Division, removing the Lake County Lawsuit from the Superior Court of Lake County, Indiana to the United States District Court for the Northern District of Indiana, Hammond Division. By memorandum order dated April 28, 2010, the Court granted the Debtors' motion seeking to extend the automatic stay to the Lake County Defendants.

Gary filed a notice of appeal of the Court's grant of the Debtors' stay extension motion on May 12, 2010, designated the record and issues on appeal on May 26, 2010, and docketed its appeal in the United States District Court for the District of Delaware on June 20, 2010. Pursuant to a standing order of the United States District Court for the District of Delaware, all such appeals are referred to mediation, and the mediation of Gary's appeal is currently pending.

As of the date of the filing of this Disclosure Statement, the Debtors and Gary are engaged in ongoing settlement negotiations.

Key Employee Incentive Plan

Recognizing the myriad of increasingly difficult challenges facing the Debtors' thinly-staffed senior management team and the importance of the performance of the senior management team to the success of these Chapter 11 Cases, the Debtors determined it was necessary to implement a series of measures to properly incentivize the senior management team to continue to operate the Debtors' businesses as efficiently and effectively as possible to maximize the value of the Debtors' estates. To that end, on May 14, 2010, the Debtors' filed a motion (the "KEIP Motion") seeking authority to: (a) make certain outstanding payments due under The Majestic Star Casino, LLC 2009 Executive Incentive Plan (the "2009 EIP"); (b) implement The Majestic Star Casino, LLC 2010 Key Employee Incentive Plan (the "2010 KEIP"); and (c) enter into certain employment agreements. The Creditors' Committee fully supported the Debtors' KEIP Motion.

After the Debtors filed the KEIP Motion, representatives of Holders of the Senior Secured Notes suggested several revisions to the 2010 KEIP and the employment agreements submitted with the KEIP Motion, which resulted in productive discussions, and, ultimately, a revised 2010 KEIP and revised employment agreements acceptable to representatives of Holders of the Senior Secured Notes. On May 28, 2010, the Court entered an order authorizing (a) payments under the 2009 EIP, (b) implementation of the revised 2010 KEIP, and (c) execution of the revised employment agreements. The Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and the Creditors' Committee each consented to entry of the order.

In addition to the foregoing, the Board of Directors of the Debtors may develop, adopt, and implement the Pre-Effective Date Key Employee Incentive Program, subject to the consent of the Senior Secured Notes Trustee and the Senior Secured Credit Facility Agent (which consents shall not be withheld unreasonably), the terms of which shall be described on Exhibit 6 to the Plan Supplement.

**Plan Overview**

On September 17, 2010, the Debtors filed their Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code. The Plan contemplates that the Debtors will retain and operate their gaming properties in the

ordinary course of business after emerging from chapter 11. The most significant components of the Plan are as follows:

- The Debtors will retain and reorganize around their casino gaming properties in Gary, Indiana, Tunica, Mississippi, and Black Hawk, Colorado, subject, in the case of the Black Hawk, Colorado gaming property, to obtaining all governmental licenses, suitability determinations, and other approvals required for such property on or prior to 240 days following the Confirmation Date (as further described in Article XII of the Plan);

- Each Holder of an Allowed Senior Secured Credit Facility Claim will receive its Pro Rata share of (i) the New Senior Secured Credit Facility Paydown Amount and (ii) the New Senior Secured Credit Facility;

- Each Holder of an Allowed Senior Secured Notes Indenture Claim will receive its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests; and

- Each Holder of an Allowed Senior Notes Indenture Claim will receive its Pro Rata share of 35 percent of the New Membership Interests.

**Treatment of Claims Against and Equity Interests in the Debtors**

**Administrative and Priority Claims**

<u>Administrative Expense Claims</u>

Except with respect to Administrative Expense Claims that are Professional Compensation and Reimbursement Claims and except to the extent that a Holder of an allowed Administrative Expense Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an allowed Administrative Expense Claim shall be paid in full in cash on the later of the distribution date under the Plan, the date such Administrative Expense Claim is allowed, and the date such allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

<u>Professional Compensation and Reimbursement Claims</u>

Except as provided in Article II.A of the Plan, all Entities seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code (excluding, for avoidance of doubt, the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee, and their respective advisors, the Senior Notes Trustee, and the Discount Notes Trustee) shall (1) File, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay reasonable compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

<u>Priority Tax Claims</u>

Each Holder of an allowed Priority Tax Claim shall receive, on the distribution date or such later date as such allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, one of the following treatments on account of such claim: (1) cash in an amount equal to the amount of such allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under

applicable nonbankruptcy law; (2) such other treatment as may be agreed to by such holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court; or (3) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**Classification and Treatment of Classified Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Pursuant to the terms of the Plan, except for Claims that are (a) expressly exempted from the discharge provisions of the Bankruptcy Code, or (b) specifically identified as being reinstated, all Claims that arose prior to the Confirmation of the Plan will be discharged.

To the extent a Class contains allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.

A.      Majestic Holdco

    **1.**      **Class A-1:  Senior Secured Credit Facility Guarantee Claims against Majestic Holdco**

        (a)      Classification.  Class A-1 consists of all Senior Secured Credit Facility Guarantee Claims against Majestic Holdco.

        (b)      Impairment and Voting.  Class A-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

        (c)      Distributions.  Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, guarantees substantially similar to the terms of the Senior Secured Facility Guarantee.

        (d)      Estimated Allowed Amount of Claims:  $65,330,042

        (e)      Projected Percentage of Recovery:  [  ]%

    **2.**      **Class A-2:  Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco**

        (a)      Classification.  Class A-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco.

        (b)      Impairment and Voting.  Class A-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

        (c)      Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests.

        (d)      Estimated Allowed Amount of Claims:  $348,384,885

(e)    <u>Projected Percentage of Recovery</u>:  [  ]%

**3.    Class A-3:  Discount Notes Indenture Claims against Majestic Holdco**

(a)    <u>Classification</u>.  Class A-3 consists of all Discount Notes Indenture Claims against Majestic Holdco.

(b)    <u>Impairment and Voting</u>.  Class A-3 is Impaired by the Plan.  Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no distribution under the Plan on account of such Claims.

(d)    <u>Estimated Allowed Amount of Claims</u>:  $72,631,322

(e)    <u>Projected Percentage of Recovery</u>:  [  ]%

**4.    Class A-4:  Interests in Majestic Holdco**

(a)    <u>Classification</u>.  Class A-4 consists of all Interests in Majestic Holdco.

(b)    <u>Impairment and Voting</u>.  Class A-4 is Impaired by the Plan.  Each Holder of an Interest in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Interests in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

(d)    <u>Estimated Allowed Amount of Interests</u>:  $0

(e)    <u>Projected Percentage of Recovery</u>:  [  ]%

B.    <u>Majestic Star Holdco</u>

**1.    Class B-1:  Discount Notes Indenture Claims against Majestic Star Holdco**

(a)    <u>Classification</u>.  Class B-1 consists of all Discount Notes Indenture Claims against Majestic Star Holdco.

(b)    <u>Impairment and Voting</u>.  Class B-1 is Impaired by the Plan.  Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Discount Notes Indenture Claims against Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Star Holdco shall receive no distribution under the Plan on account of such Claims.

(d)    <u>Estimated Allowed Amount of Claims</u>:  $72,631,322

(e)    <u>Projected Percentage of Recovery</u>:  [  ]%

**2. Class B-2: Intercompany Interests in Majestic Star Holdco**

      (a)    <u>Classification</u>.  Class B-2 consists of all Intercompany Interests in Majestic Star Holdco.

      (b)    <u>Impairment and Voting</u>.  Class B-2 is Impaired by the Plan.  Each Holder of an Interest in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

      (c)    <u>Distributions</u>.  Intercompany Interests in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

      (d)    <u>Estimated Allowed Amount of Interests</u>:  $0

      (e)    <u>Projected Percentage of Recovery</u>:  [  ]%

C.    <u>Majestic I</u>

**1. Class C-1: Senior Secured Credit Facility Claims against Majestic I**

      (a)    <u>Classification</u>.  Class C-1 consists of all Senior Secured Credit Facility Claims against Majestic I.

      (b)    <u>Impairment and Voting</u>.  Class C-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I is entitled to vote to accept or reject the Plan.

      (c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Credit Facility Paydown Amount and (ii) the New Senior Secured Credit Facility.

      (d)    <u>Estimated Allowed Amount of Claims</u>:  $65,330,042

      (e)    <u>Projected Percentage of Recovery</u>:  [  ]%

**2. Class C-2: Senior Secured Notes Indenture Claims against Majestic I**

      (a)    <u>Classification</u>.  Class C-2 consists of all Senior Secured Notes Indenture Claims against Majestic I.

      (b)    <u>Impairment and Voting</u>.  Class C-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

      (c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests.

      (d)    <u>Estimated Allowed Amount of Claims</u>:  $348,384,885

      (e)    <u>Projected Percentage of Recovery</u>:  [  ]%

**3. Class C-3: Priority Non-Tax Claims against Majestic I**

      (a)    <u>Classification</u>.  Class C-3 consists of all Priority Non-Tax Claims that may exist against Majestic I.

(b)    Impairment and Voting.   Class C-3 is Unimpaired by the Plan.   Each Holder of an Allowed Priority Non-Tax Claim against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.   Each Holder of an Allowed Priority Non-Tax Claim against Majestic I shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)    Estimated Allowed Amount of Claims:  $52,247

(e)    Projected Percentage of Recovery:  [  ]%

4.    **Class C-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I**

(a)    Classification.   Class C-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I.

(b)    Impairment and Voting.   Class C-4 is Unimpaired by the Plan.   Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.   Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I and the Debtors agree to less favorable treatment to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I, with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan.   The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d)    Estimated Allowed Amount of Claims:  $7,633,860

(e)    Projected Percentage of Recovery:  [  ]%

5.    **Class C-5:  Senior Notes Indenture Claims, General Unsecured Claims, and Rejection Damages Claims against Majestic I**

(a)    Classification.   Class C-5 consists of all Senior Notes Indenture Claims, General Unsecured Claims, and/or Rejection Damages Claims against Majestic I.   As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims and Senior Secured Notes Guarantee Claims shall not participate in distributions made to this Class on account of their general unsecured deficiency Claims; provided, however, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors

or the Senior Secured Notes Trustee to classify such deficiency Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)  *Impairment and Voting*.  Class C-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Claim, General Unsecured Claim, and/or Rejection Damages Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c)  *Distributions*.  Except to the extent that a Holder of an Allowed Senior Notes Indenture Claim against Majestic I and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed Senior Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 35 percent of the New Membership Interests.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, Cash in an amount equal to 22.5 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I.

(d)  *Convenience Claim Election Rights*.  Each Holder of an Allowed Class C-5 Claim may elect to be treated as a Holder of a Convenience Claim in Class C-6 by electing to reduce its Class C-5 Claim to the amount of $15,000 in full and final satisfaction, release, and discharge of such Allowed Class C-5 Claim.  Except as may be agreed to by the Debtors or the Reorganized Debtors, any election must be made on the Ballot and no Holder of a Class C-5 Claim can elect the treatment as a Convenience Claim after the Voting Deadline.  Upon any such valid election, the Class C-5 Claim of such Holder shall be automatically reduced to $15,000 and shall no longer be entitled to any other distribution as contemplated by this Plan.

(e)  *Estimated Allowed Amount of Claims*:  $243,058,998

(f)  *Projected Percentage of Recovery*:  [  ]%

**6.  Class C-6:  Convenience Claims against Majestic I**

(a)  *Classification*.  Class C-6 consists of all Convenience Claims that may exist against Majestic I.

(b)  *Impairment and Voting*.  Class C-6 is Impaired by the Plan.  Each Holder of a Convenience Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c)  *Distributions*.  Each Holder of a Convenience Claim against Majestic I shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)  *Estimated Allowed Amount of Claims*:  $151,757

(e)  *Projected Percentage of Recovery*:  [  ]%

**7.  Class C-7:  Intercompany Claims against Majestic I**

(a)  *Classification*.  Class C-7 consists of all Intercompany Claims that may exist against Majestic I.

(b)  *Impairment and Voting*.  Class C-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic I is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Allowed Intercompany Claims against Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic I will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Indenture Trustee (which consent shall not be withheld unreasonably).

(d)     <u>Estimated Allowed Amount of Claims</u>:  $4,111,461

(e)     <u>Projected Percentage of Recovery</u>:  [  ]%

**8.**     **Class C-8:  Intercompany Interests in Majestic I**

(a)     <u>Classification</u>.  Class C-8 consists of all Intercompany Interests in Majestic I.

(b)     <u>Impairment and Voting</u>.  Class C-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Majestic I is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     <u>Distributions</u>.  Intercompany Interests in Majestic I, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Indenture Trustee (which consent shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic I, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d)     <u>Estimated Allowed Amount of Interests</u>:  $91,211,476

(e)     <u>Projected Percentage of Recovery</u>:  [  ]%

D.     <u>Majestic II</u>

**1.**     **Class D-1:  Senior Secured Credit Facility Claims against Majestic II**

(a)     <u>Classification</u>.  Class D-1 consists of all Senior Secured Credit Facility Claims against Majestic II.

(b)     <u>Impairment and Voting</u>.  Class D-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Credit Facility Paydown Amount and (ii) the New Senior Secured Credit Facility.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $65,330,042

(e)     <u>Projected Percentage of Recovery</u>:  [  ]%

**2.**     **Class D-2:  Senior Secured Notes Indenture Guarantee Claims against Majestic II**

(a)     <u>Classification</u>.  Class D-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic II.

(b)     <u>Impairment and Voting</u>.  Class D-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests.

(d)    Estimated Allowed Amount of Claims:  $348,384,885

(e)    Projected Percentage of Recovery:  [  ]%

**3.    Class D-3:  Priority Non-Tax Claims against Majestic II**

(a)    Classification.  Class D-3 consists of all Priority Non-Tax Claims that may exist against Majestic II.

(b)    Impairment and Voting.  Class D-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic II shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)    Estimated Allowed Amount of Claims:  $0

(e)    Projected Percentage of Recovery:  [  ]%

**4.    Class D-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II**

(a)    Classification.  Class D-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II.

(b)    Impairment and Voting.  Class D-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II and the Debtors agree to less favorable treatment to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II, with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $3,385,529

(e)      <u>Projected Percentage of Recovery</u>:  [  ]%

**5.      Class D-5:  Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and Rejection Damages Claims against Majestic II**

(a)      <u>Classification</u>.  Class D-5 consists of all Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and/or Rejection Damages Claims against Majestic II.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Guarantee Claims shall not participate in distributions made to this Class on account of their general unsecured deficiency Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors or the Senior Secured Notes Trustee to classify such deficiency Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)      <u>Impairment and Voting</u>.  Class D-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim, General Unsecured Claim, and/or Rejection Damages Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 35 percent of the New Membership Interests.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, Cash in an amount equal to 22.5 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II.

(d)      <u>Convenience Claim Election Rights</u>.  Each Holder of an Allowed Class D-5 Claim may elect to be treated as a Holder of a Convenience Claim in Class D-6 by electing to reduce its Class D-5 Claim to the amount of $15,000 in full and final satisfaction, release, and discharge of such Allowed Class D-5 Claim.  Except as may be agreed to by the Debtors or the Reorganized Debtors, any election must be made on the Ballot and no Holder of a Class D-5 Claim can elect the treatment as a Convenience Claim after the Voting Deadline.  Upon any such valid election, the Class D-5 Claim of such Holder shall be automatically reduced to $15,000 and shall no longer be entitled to any other distribution as contemplated by this Plan.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $233,529,791

(e)      <u>Projected Percentage of Recovery</u>:  [  ]%

**6.      Class D-6:  Convenience Claims against Majestic II**

(a)      <u>Classification</u>.  Class D-6 consists of all Convenience Claims that may exist against Majestic II.

(b)      <u>Impairment and Voting</u>.  Class D-6 is Impaired by the Plan.  Each Holder of a Convenience Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each Holder of a Convenience Claim against Majestic II shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $19,883

(e)       Projected Percentage of Recovery:  [  ]%

**7.       Class D-7:  Intercompany Claims against Majestic II**

(a)       <u>Classification</u>.  Class D-7 consists of all Intercompany Claims that may exist against Majestic II.

(b)       <u>Impairment and Voting</u>.  Class D-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic II is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)       <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic II will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Indenture Trustee (which consent shall not be withheld unreasonably).

(d)       <u>Estimated Allowed Amount of Claims</u>:  $118,290,830

(e)       <u>Projected Percentage of Recovery</u>:  [  ]%

**8.       Class D-8:  Intercompany Interests in Majestic II**

(a)       <u>Classification</u>.  Class D-8 consists of all Intercompany Interests in Majestic II.

(b)       <u>Impairment and Voting</u>.  Class D-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Majestic II is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)       <u>Distributions</u>.  Intercompany Interests in Majestic II, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Indenture Trustee (which consent shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic II, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d)       <u>Estimated Allowed Amount of Interests</u>:  $0

(e)       <u>Projected Percentage of Recovery</u>:  [  ]%

E.       <u>MSCC</u>

**1.       Class E-1:  Senior Secured Notes Indenture Claims against MSCC**

(a)       <u>Classification</u>.  Class E-1 consists of all Senior Secured Notes Indenture Claims against MSCC.

(b)       <u>Impairment and Voting</u>.  Class E-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC is entitled to vote to accept or reject the Plan.

(c)       <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests.

(d)     <u>Estimated Allowed Amount of Claims</u>: $348,384,885

(e)     <u>Projected Percentage of Recovery</u>:  [  ]%

**2.     Class E-2:  Intercompany Interests in MSCC**

(a)     <u>Classification</u>.  Class E-2 consists of all Intercompany Interests in MSCC.

(b)     <u>Impairment and Voting</u>.  Class E-2 is Impaired by the Plan.  Each Holder of an Interest in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     <u>Distributions</u>.  Intercompany Interests in MSCC shall be cancelled, released, and extinguished and the Holders of such Intercompany Interests shall receive no distribution under the Plan on account thereof.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $0

(e)     <u>Projected Percentage of Recovery</u>:  [  ]%

F.     <u>MSCC II</u>

**1.     Class F-1:  Senior Secured Notes Indenture Guarantee Claims against MSCC II**

(a)     <u>Classification</u>.  Class F-1 consists of all Senior Secured Notes Indenture Guarantee Claims against MSCC II.

(b)     <u>Impairment and Voting</u>.  Class F-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $348,384,885

(e)     <u>Projected Percentage of Recovery</u>:  [  ]%

**2.     Class F-2:  Senior Notes Indenture Claims against MSCC II**

(a)     <u>Classification</u>.  Class F-2 consists of all Senior Notes Indenture Claims against MSCC II. As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims and Senior Secured Notes Guarantee Claims shall not participate in distributions made to this Class on account of their general unsecured deficiency Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors or the Senior Secured Notes Trustee to classify such deficiency Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)     <u>Impairment and Voting</u>.  Class F-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Senior Notes Indenture Claim against MSCC II and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed Senior Notes Indenture Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 35 percent of the New Membership Interests.

(d)    Estimated Allowed Amount of Claims:  $233,149,526

(e)    Projected Percentage of Recovery:  [  ]%

**3.    Class F-3:  Intercompany Interests in MSCC II**

(a)    Classification.  Class F-3 consists of all Intercompany Interests in MSCC II.

(b)    Impairment and Voting.  Class F-3 is Impaired by the Plan.  Each Holder of an Interest in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions.  Intercompany Interests in MSCC II shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

(d)    Estimated Allowed Amount of Claims:  $0

(e)    Projected Percentage of Recovery:  [  ]%

G.    Barden Mississippi

**1.    Class G-1: Senior Secured Credit Facility Claims against Barden Mississippi**

(a)    Classification.  Class G-1 consists of all Senior Secured Credit Facility Claims against Barden Mississippi.

(b)    Impairment and Voting.  Class G-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Credit Facility Paydown Amount and (ii) the New Senior Secured Credit Facility.

(d)    Estimated Allowed Amount of Claims:  $65,330,042

(e)    Projected Percentage of Recovery:  [  ]%

**2.    Class G-2:  Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi**

(a)    Classification.  Class G-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi.

(b)    Impairment and Voting.  Class G-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests.

(d)    Estimated Allowed Amount of Claims:  $348,384,885

(e)    Projected Percentage of Recovery:  [  ]%

**3. Class G-3: Priority Non-Tax Claims against Barden Mississippi**

(a) <u>Classification</u>. Class G-3 consists of all Priority Non-Tax Claims that may exist against Barden Mississippi.

(b) <u>Impairment and Voting</u>. Class G-3 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d) <u>Estimated Allowed Amount of Claims</u>: $10,950

(e) <u>Projected Percentage of Recovery</u>: [ ]%

**4. Class G-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi**

(a) <u>Classification</u>. Class G-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi.

(b) <u>Impairment and Voting</u>. Class G-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi and the Debtors agree to less favorable treatment to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi, with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d) <u>Estimated Allowed Amount of Claims</u>: $46,897

(e) <u>Projected Percentage of Recovery</u>: [ ]%

5. **Class G-5: Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and Rejection Damages Claims against Barden Mississippi**

(a) <u>Classification</u>. Class G-5 consists of all Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and/or Rejection Damages Claims that may exist against Barden Mississippi. As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims and Senior Secured Notes Guarantee Claims shall not participate in distributions made to this Class on account of their general unsecured deficiency Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors or the Senior Secured Notes Trustee to classify such deficiency Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b) <u>Impairment and Voting</u>. Class G-5 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim, General Unsecured Claim, and/or Rejection Damages Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 35 percent of the New Membership Interests. Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, Cash in an amount equal to 22.5 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi.

(d) <u>Convenience Claim Election Rights</u>. Each Holder of an Allowed Class G-5 Claim may elect to be treated as a Holder of a Convenience Claim in Class G-6 by electing to reduce its Class G-5 Claim to the amount of $15,000 in full and final satisfaction, release, and discharge of such Allowed Class G-5 Claim. Except as may be agreed to by the Debtors or the Reorganized Debtors, any election must be made on the Ballot and no Holder of a Class G-5 Claim can elect the treatment as a Convenience Claim after the Voting Deadline. Upon any such valid election, the Class G-5 Claim of such Holder shall be automatically reduced to $15,000 and shall no longer be entitled to any other distribution as contemplated by this Plan.

(d) <u>Estimated Allowed Amount of Claims</u>: $235,715,852

(e) <u>Projected Percentage of Recovery</u>: [ ]%

6. **Class G-6: Convenience Claims against Barden Mississippi**

(a) <u>Classification</u>. Class G-6 consists of all Convenience Claims that may exist against Barden Mississippi.

(b) <u>Impairment and Voting</u>. Class G-6 is Impaired by the Plan. Each Holder of a Convenience Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of a Convenience Claim against Barden Mississippi shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d) <u>Estimated Allowed Amount of Claims</u>: $134,827

(e) <u>Projected Percentage of Recovery</u>: [ ]%

7. **Class G-7: Intercompany Claims against Barden Mississippi**

      (a)    <u>Classification</u>.  Class G-7 consists of all Intercompany Claims that may exist against Barden Mississippi.

      (b)    <u>Impairment and Voting</u>.  Class G-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

      (c)    <u>Distributions</u>. Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Mississippi will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Indenture Trustee (which consent shall not be withheld unreasonably).

      (d)    <u>Estimated Allowed Amount of Claims</u>: $60,155

      (e)    <u>Projected Percentage of Recovery</u>:  [  ]%

8. **Class G-8: Intercompany Interests in Barden Mississippi**

      (a)    <u>Classification</u>.  Class G-8 consists of all Intercompany Interests in Barden Mississippi.

      (b)    <u>Impairment and Voting</u>.  Class G-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

      (c)    <u>Distributions</u>.  Intercompany Interests in Barden Mississippi, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Indenture Trustee (which consent shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Mississippi, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

      (d)    <u>Estimated Allowed Amount of Interests</u>:  $0

      (e)    <u>Projected Percentage of Recovery</u>:  [  ]%

H.    <u>Barden Colorado</u>

1. **Class H-1: Senior Secured Credit Facility Claims against Barden Colorado**

      (a)    <u>Classification</u>.  Class H-1 consists of all Senior Secured Credit Facility Claims against Barden Colorado.

      (b)    <u>Impairment and Voting</u>.  Class H-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

      (c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Credit Facility Paydown Amount and (ii) the New Senior Secured Credit Facility.

      (d)    <u>Estimated Allowed Amount of Claims</u>:  $65,330,042

(e)        Projected Percentage of Recovery:  [  ]%

**2.        Class H-2:  Senior Secured Notes Indenture Guarantee Claims against Barden Colorado**

(a)        Classification.    Class H-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Colorado.

(b)        Impairment and Voting.    Class H-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)        Distributions.    Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests.

(d)        Estimated Allowed Amount of Claims:  $348,384,885

(e)        Projected Percentage of Recovery:  [  ]%

**3.        Class H-3:  Priority Non-Tax Claims against Barden Colorado**

(a)        Classification.    Class H-3 consists of all Priority Non-Tax Claims that may exist against Barden Colorado.

(b)        Impairment and Voting.    Class H-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)        Distributions.    Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)        Estimated Allowed Amount of Claims:  $0

(e)        Projected Percentage of Recovery:  [  ]%

**4.        Class H-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado**

(a)        Classification.    Class H-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado.

(b)        Impairment and Voting.    Class H-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)        Distributions.    Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado and the Debtors agree to less favorable treatment to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado, with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured

Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d)     Estimated Allowed Amount of Claims:  $59,131

(e)     Projected Percentage of Recovery:  [  ]%

**5.     Class H-5:  Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and Rejection Damages Claims against Barden Colorado**

(a)     Classification.  Class H-5 consists of all Senior Notes Indenture Guarantee Claims, General Unsecured Claims, and/or Rejection Damages Claims that may exist against Barden Colorado.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims and Senior Secured Notes Guarantee Claims shall not participate in distributions made to this Class on account of their general unsecured deficiency Claims; provided, however, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors or the Senior Secured Notes Trustee to classify such deficiency Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)     Impairment and Voting.  Class H-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim, General Unsecured Claim, and/or Rejection Damages Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 35 percent of the New Membership Interests.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, Cash in an amount equal to 22.5 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado.

(d)     Convenience Claim Election Rights.  Each Holder of an Allowed Class H-5 Claim may elect to be treated as a Holder of a Convenience Claim in Class H-6 by electing to reduce its Class H-5 Claim to the amount of $15,000 in full and final satisfaction, release, and discharge of such Allowed Class H-5 Claim.  Except as may be agreed to by the Debtors or the Reorganized Debtors, any election must be made on the Ballot and no Holder of a Class H-5 Claim can elect the treatment as a Convenience Claim after the Voting Deadline.  Upon any such valid election, the Class H-5 Claim of such Holder shall be automatically reduced to $15,000 and shall no longer be entitled to any other distribution as contemplated by this Plan.

(d)     Estimated Allowed Amount of Claims:  $233,211,835

(e)     Projected Percentage of Recovery:  [  ]%

6.    **Class H-6:  Convenience Claims against Barden Colorado**

(a)    <u>Classification</u>.    Class H-6 consists of all Convenience Claims that may exist against Barden Colorado.

(b)    <u>Impairment and Voting</u>.    Class H-6 is Impaired by the Plan.  Each Holder of a Convenience Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of a Convenience Claim against Barden Colorado shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)    <u>Estimated Allowed Amount of Claims</u>:  $32,384

(e)    <u>Projected Percentage of Recovery</u>:  [  ]%

7.    **Class H-7:  Intercompany Claims against Barden Colorado**

(a)    <u>Classification</u>.    Class H-7 consists of all Intercompany Claims that may exist against Barden Colorado.

(b)    <u>Impairment and Voting</u>.  Class H-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Allowed Intercompany Claims against Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)    <u>Distributions</u>.    Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Colorado will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Indenture Trustee (which consent shall not be withheld unreasonably).

(d)    <u>Estimated Allowed Amount of Claims</u>:  $11,561,993

(e)    <u>Projected Percentage of Recovery</u>:  [  ]%

8.    **Class H-8:  Intercompany Interests in Barden Colorado**

(a)    <u>Classification</u>.  Class H-8 consists of all Intercompany Interests in Barden Colorado.

(b)    <u>Impairment and Voting</u>.    Class H-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)    <u>Distributions</u>.  Intercompany Interests in Barden Colorado, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Indenture Trustee (which consent shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Colorado, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d)    <u>Estimated Allowed Amount of Interests</u>:  $0

(e)    <u>Projected Percentage of Recovery</u>:  [  ]%

**Settlements Contemplated Pursuant to the Plan**

Overview

As discussed in this Disclosure Statement, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders. In light of the complexity and contentiousness of the issues presented by the Chapter 11 Cases, the Debtors engaged with the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, representatives of Holders of the Senior Secured Notes, and the Creditors' Committee in negotiations to reach an agreement resolving certain threshold issues discussed below, among others. These negotiations included many meetings, the exchange of multiple term sheets or related settlement proposals, and regular correspondence and conference calls among the parties and their advisors. The Debtors were able to reach a global settlement on a range of issues with the Senior Secured Notes Trustee and Senior Secured Noteholders holding a substantial majority of the outstanding Senior Secured Notes (the "Settling Parties"). The Debtors, their estates, and the Settling Parties reached an agreement on key threshold items, including the Reorganized Debtors' capital structure at emergence as reflected in the Plan, and compromised numerous other contested issues. The settlements agreed to among the Debtors, their estates, and the Settling Parties include the Gaming License Settlement, the Cash Collateral Settlement, and the Standing Motion Settlement (all as defined below).

The Debtors believe the Plan is in the best interests of all of the Debtors' creditors and provides the Debtors the best opportunity to restructure their debt obligations in a manner that maximizes their ability to compete effectively post-emergence. Absent the support of the Settling Parties for the Plan and the expeditious implementation of the compromises set forth therein, the Debtors believe they would face a longer, costlier, and more uncertain chapter 11 process mired with contentious litigation, which could materially delay the Debtors' emergence from chapter 11 and ultimately reduce distributions to creditors. Accordingly, in the exercise of their business judgment, the Debtors determined the benefits of a compromised resolution of all disputed issues as part of a global settlement, including timely emergence from chapter 11, outweighed the costs of expensive and time-consuming litigation. Further detail regarding the global settlement embodied in the Plan is provided below.

Although this Disclosure Statement addresses the key disputes being compromised as part of the global settlement individually for purposes of providing analysis and detail, it is important to note the Plan represents a global settlement of all disputed issues, each of which is a necessary component of the overall global settlement. Failure by the Court to approve any of the settlements described herein, the treatment of any Class set forth in the Plan, or any other material term of the Plan may result in the Plan not being confirmable.

Governing Law

The Plan constitutes a good faith compromise and settlement of all Claims and controversies resolved therein pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases, and other benefits provided under the Plan.

Compromises and settlements are "a normal part of the process of reorganization."[10] The Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"[11] Bankruptcy Rule 9019(a) provides in pertinent part that on "motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."[12] The Debtors' right

---

[10]   *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

[11]   *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).

[12]   Fed. R. Bankr. P. 9019(a).

to settle Claims in the Plan pursuant to Bankruptcy Rule 9019 extends to causes of action brought by other constituents on behalf of the Debtors' estates.[13]

Under Bankruptcy Rule 9019, a bankruptcy court may approve a compromise or settlement if it is in the best interests of the debtor's estate.[14] When determining whether a compromise is in the best interests of the estate, courts in the Third Circuit must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."[15] To strike the proper balance, the Third Circuit has adopted a balancing test, under which a bankruptcy court should consider four factors to determine whether to approve a particular compromise or settlement: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors.[16] Ultimately, a proposed settlement need not be the best result that the debtor could have achieved, but only must fall within the "reasonable range of litigation possibilities."[17]

For the reasons discussed herein and based on an analysis by the Debtors and their advisors of the arguments asserted to date by the secured creditors and the Creditors' Committee, the Debtors believe the global settlement embodied in the Plan is in the best interests of the Debtors' estates and is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. Because of the large number of disputed issues being compromised pursuant to the Plan and the wide range of potential outcomes of each such issue if litigated to conclusion, it is practically impossible for the Debtors to describe in detail all of the possible settlement and litigation scenarios. However, based on the investigation and analysis of the disputed issues completed by the Debtors and their advisors to date, the Debtors believe that if all of the arguments made to date with respect to the issues compromised by the Gaming License Settlement and the Cash Collateral Settlement are resolved against the Settling Parties, the probable recovery on the Senior Notes Indenture Claims, General Unsecured Claims, Rejection Damages Claims, and Convenience Claims (i.e., Classes C-5, C-6, D-5, D-6, F-2, G-5, G-6, H-5, and H-6 under the Plan) (collectively, the "Unsecured Claims") with respect to such issues would fall within an approximate range of 29% to 30%. Conversely, if all such issues are resolved in favor of the Settling Parties, the probable recovery on the Unsecured Claims with respect to such issues would be at or near 0%. Pursuant to the global compromise embodied by the Plan, the Debtors are providing a recovery for the Unsecured Claims with respect to the issues compromised by the Gaming License Settlement and Cash Collateral Settlement that falls within an approximate range of 22% to 23%, which is approximately 76% to 77% of the recovery holders of Unsecured Claims would hypothetically realize if the Gaming License Settlement and Cash Collateral Settlement were <u>both</u> resolved against the Settling Parties. The foregoing estimates assume no further diminution in the value of the Debtors' estates as a result of the extensive litigation that would be required to fully adjudicate the disputes and the attendant delay in the Debtors' emergence from bankruptcy; however, the Debtors believe that such diminution in value would be material and increase over time. Based on the forgoing range of potential recoveries on the Unsecured Claims, the Debtors believe that the Plan's recoveries on the Unsecured

---

[13]  *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003) (concluding that the Bankruptcy Code "authorizes the Debtor to propose a settlement of the Creditors Committee's Adversary Proceeding in its plan"); *Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 371 B.R. 660, 669–671 (S.D.N.Y. 2007) ("A debtor-in-possession may assert control over an adversary proceeding notwithstanding a committee's derivative standing, where that standing was granted for reasons other than debtor misconduct.").

[14]  *See TMT Trailer Ferry*, 390 U.S. at 424; *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del 2005) ("Under Rule 9019(a), the bankruptcy court has a duty to make an informed, independent, judgment that the compromise is fair and equitable."); *In re Northwestern Corp.*, No. 03-12872 (KJC), 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("In exercising [its] discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[15]  *Martin*, 91 F.3d at 393; *see also Key3Media Group, Inc.*, 336 B.R. at 93.

[16]  *Martin*, 91 F.3d at 393; *see also Nutraquest, Inc.*, 434 F.3d at 645.

[17]  *In re Energy Corp.*, 886 F.2d 921, 929 (7th Cir. 1989); *In re Sea Containers Ltd.*, No. 06-11156 (KJC), 2008 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008).

Claims are in the best interests of all of the Debtors' estates and creditors and are well within the range of reasonableness required under Bankruptcy Rule 9019 and section 112 of the Bankruptcy Code.

For the reasons discussed herein and based on an analysis by the Debtors and their advisors of the arguments asserted to date by the secured creditors and the Creditors' Committee, the Debtors believe the global settlement embodied in the Plan is in the best interests of the Debtors' estates and is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. Because of the large number of disputed issues being compromised pursuant to the Plan and the wide range of potential outcomes of each such issue if litigated to conclusion, it is practically impossible for the Debtors to describe in detail all of the possible settlement and litigation scenarios. However, based on the investigation and analysis of the disputed issues completed by the Debtors and their advisors to date, the Debtors believe that if all of the arguments made to date with respect to the issues compromised by the Gaming License Settlement and the Cash Collateral Settlement are resolved against the Settling Parties, the probable recovery on the Senior Notes Indenture Claims, General Unsecured Claims, and Rejection Damages Claims (i.e., Classes C-5, D-5, F-2, G-5, and H-5 under the Plan) (collectively, the "Unsecured Claims") with respect to such issues would be at or around $60.5 million.[18] Conversely, if all such issues are resolved in favor of the Settling Parties, the probable recovery on the Unsecured Claims with respect to such issues would be at or around $0. Pursuant to the global compromise embodied by the Plan, the Debtors are providing a recovery for the Unsecured Claims with respect to the issues compromised by the Gaming License Settlement and Cash Collateral Settlement of at or around $47 million, which is approximately 77.7% of $60.5 million. The foregoing estimates assume no further diminution in the value of the Debtors' estates as a result of the extensive litigation that would be required to fully adjudicate the disputes and the attendant delay in the Debtors' emergence from bankruptcy; however, the Debtors believe that such diminution in value would be material and increase over time. Based on the forgoing range of potential recoveries on the Unsecured Claims, the Debtors believe that the Plan's recoveries on the Unsecured Claims are in the best interests of all of the Debtors' estates and creditors and are well within the range of reasonableness required under Bankruptcy Rule 9019 and section 112 of the Bankruptcy Code.

<u>Settlement of Claims Relating to Liens on Gaming License Proceeds</u>

As described below, the Debtors, their estates, and the Settling Parties have agreed, as part of the good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code embodied in the Plan, to settle all disputes over the value of the Debtors' Gaming Licenses and the security interests of the Senior Secured Notes Trustee in the proceeds of such Gaming Licenses (the "Gaming License Settlement").

The Security Agreement between the Debtors and the Senior Secured Credit Facility Agent, dated as of October 7, 2003, and the Pledge and Security Agreement between the Debtors and the Senior Secured Notes Trustee, dated as of October 7, 2003 (each, a "Security Agreement," and collectively, the "Security Agreements"), provide that the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee have liens over substantially all the Debtors' assets, including deposit accounts, general intangibles, investment property, and all proceeds of the foregoing. *See* Senior Secured Credit Facility Agent's Security Agreement § 1.1; Trustee's Security Agreement § 2.1. The Security Agreements make clear that Collateral does not include Excluded Assets. *See id.* Excluded Assets include, inter alia, "all Gaming Licenses." Senior Secured Credit Facility Agent's Security Agreement § 1.1; Senior Secured Notes Indenture § 1.1. The definition of Excluded Assets, however, provides that proceeds of the Excluded Assets (including the Gaming Licenses), are expressly included as Collateral. *See* Senior Secured Credit Facility Agent's Security Agreement § 1.1 ("Excluded Assets shall not include (and, accordingly, Collateral shall include) any and all proceeds of any of such assets...."); Senior Secured Notes Indenture § 1.1 ("Excluded Assets does not include the proceeds of [Gaming Licenses]....").

Article 9 of the Uniform Commercial Code (the "UCC"), as adopted in Colorado, Indiana, Mississippi and Delaware (all of the potentially governing jurisdictions), defines "proceeds" as, inter alia, "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected upon, or

---

[18] The estimated recovery set forth above assumes an aggregate Gaming License value of $65 million. The Creditors' Committee has asserted a higher value for such licenses, which the Debtors believe is unsupportable.

distributed on account of, collateral; [and] (C) rights arising out of collateral. . . ." UCC. § 9-102(a)(64). The secured creditors contend that they are entitled to the economic value of the Gaming Licenses under a plan of reorganization because of their perfected liens on the proceeds of the Gaming Licenses. This argument is based on a body of case law that has held that while a licensee may be prohibited from granting a lien on a license itself, the licensee may nonetheless grant a lien over the proceeds of such license.[19]

The Creditors' Committee argues that the aforementioned cases are not applicable to the facts of this case because they concern and thus are confined to FCC licenses rather than gaming licenses. In addition, the Creditors' Committee contends that the secured creditors' liens on the proceeds of the Gaming Licenses did not attach as of the Petition Date, and as a result, such liens were terminated by operation of section 552 of the Bankruptcy Code. Section 552(a) of the Bankruptcy Code provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Section 552(b)(1), however, provides an exception to section 552(a)'s general rule where "the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property." *Id*. § 552(b)(1). Thus, section 552 provides that a creditor may have a perfected lien over post-petition proceeds of property only if the creditor had a pre-petition lien over both the property and its proceeds. The Creditors' Committee argues that section 552(b)(1)'s exception does not apply to the proceeds of the Gaming Licenses because the secured creditors did not have Prepetition liens on the Gaming Licenses themselves.[20]

The secured creditors respond to this section 552 argument by pointing to court decisions that have held that license proceeds are "general intangibles" and that liens thereon are perfected immediately upon the filing of a financing statement regardless of when the actual sale or other disposition occurs and regardless of whether there is a lien on the license itself.[21] The Creditors' Committee argues that these decisions are distinguishable in that they relate to FCC licenses.

Even if the Bankruptcy Court were to determine that the secured creditors do not have a perfected security interest in the proceeds of the Gaming Licenses as of the Petition Date, several issues remain as to the value of the Gaming Licenses. The Creditors' Committee argues that because Indiana is a "closed" gaming jurisdiction, i.e., the number of gaming licenses is capped and the number currently issued, rather than an "open" jurisdiction like Mississippi and Colorado, the Indiana Gaming Licenses have substantial value. The Creditors' Committee could point to such facts as the Debtors' original purchase price for the Trump Indiana license to support a high value. On the other hand, the secured creditors argue that the Gaming Licenses have a low value because of, among other things, the low book value of comparable competitors' gaming licenses, the many restrictions on the Gaming Licenses imposed by the IGC, the inability to use the Indiana Gaming Licenses at another site, and the ability of the IGC to suspend, revoke, or not renew the Indiana Gaming Licenses at any time.

Based on the foregoing, the Debtors believe all parties bear material litigation risk regarding the value of the Gaming Licenses and whether the secured creditors are entitled to the value of such licenses under the Plan. The Debtors carefully weighed the relative risks and probabilities of success of the respective arguments set forth above before agreement to the global settlement embodied in the Plan. The Debtors also considered the substantial delay and cost associated with litigating these contested issues to conclusion. For these reasons, the Debtors believe the Gaming License Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule

---

[19]     *See In re Cheskey*, 9 F.C.C.R. 986 (1994).

[20]     *See Craner v. Marine Midland Bank, N.A.*, 110 B.R. 111, 118 (Bankr. N.D.N.Y. 1988) ("surviving security interest does not extend to the post-petition proceeds of property in which the creditor had no security interest pre-petition."); *In re Keneco Fin. Group, Inc.*, 131 B.R. 90, 93–94 (Bankr. N.D. Ill. 1991) ("Section 552(b) provides that post-petition proceeds of collateral will be subject to a creditor's security interest only if the creditor has a valid pre-petition security interest in the underlying collateral.").

[21]     *See In re Ridgley*, 139 B.R. at 379; *Urban Communicators*, 394 B.R. at 335 (even though no lien over the license itself, creditor may obtain a security interest in the proceeds of the sale of an FCC license as a "general intangible" that may be perfected prior to sale of the license).

9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

Settlement of Claims Relating to Liens on Deposit Accounts and Cash

The global settlement embodied in the Plan also compromises all claims and controversies between the Debtors, their estates, and the Settling Parties concerning the secured creditors' alleged liens on the Debtors' deposit accounts and cash (the "Cash Collateral Settlement"), as described below.

As noted above, the Security Agreements provide that the secured creditors have liens on all Collateral, which includes, among other things, money, investment related property (including deposit accounts), and proceeds of any Collateral. Pursuant to sections 9-312(b)(1) and 913-4(a) of the UCC, as enacted in Indiana, Mississippi, Colorado and Delaware, the secured creditors also have a perfected lien on all of the Debtors' deposit accounts subject to the secured creditors' "control." Pursuant to section 104 of the UCC, "control" over a deposit account is established if (i) the secured party is the bank with which the deposit account is maintained (the depository bank), (ii) the deposit account is subject to a control agreement among the applicable Debtor, the secured party, and the depository bank, or (iii) the secured party becomes the depository bank's customer with respect to the deposit account.[22]

The secured creditors, the Creditors' Committee and the Debtors agree that Majestic's account at Harris Bank (d/b/a Mercantile National Bank of Indiana) (the "Blocked Account"), which had a balance of approximately $153,000 as of the Petition Date (the "Encumbered Cash"),[23] is encumbered by the secured creditors' liens by virtue of such account being subject to a deposit account control agreement.[24]

However, the secured creditors also assert perfected liens over all or at least a substantial portion of the Debtors' other cash and cash equivalents on the basis that such cash constitutes identifiable proceeds of Collateral, including deposit accounts of the Debtors maintained at Wells Fargo Bank, N.A. or its affiliates. Pursuant to section 9-315 of the governing UCC, proceeds of Collateral (other than Goods) are "identifiable" to the extent they are identified "by a method of tracing, including application of equitable principles, that is permitted under law."[25]

The Creditors' Committee argues that all or substantially all of the Debtors' cash as of the Petition Date was unencumbered because, among other things, (i) the secured creditors did not have "control" or de facto "control" over any of the Wells Fargo deposit accounts, and/or (ii) the Debtors' cash (other than the Encumbered Cash) do not constitute "identifiable proceeds" of Collateral because of an inability to trace or otherwise. The Senior Secured Notes Trustee argues that even if the Court were to rule that certain cash is not subject to the secured creditors' liens, the Unsecured Classes are not entitled to the value of such cash under a plan or otherwise to the extent such cash is found to be restricted for regulatory purposes or otherwise.

Regardless of the outcome of the above issues, the secured creditors also contend they have perfected liens on all Postpetition hotel revenue of the Debtors pursuant to section 552(b)(2) of the Bankruptcy Code.[26] Because the Security Agreements provide for a security interest in hotel room revenue, the secured creditors claim their

---

[22]   *See* UCC § 9-104.

[23]   The last four digits of this account number are 6943.

[24]   *See* Account Control Agreement between the Senior Secured Credit Facility Agent, Majestic and Mercantile National Bank of Indiana, dated October 20, 2003.

[25]   UCC § 9-315(b).

[26]   Section 552(b)(2) provides that "if the debtor and an entity entered into a security agreement before the commencement of the case [that] extends to . . . amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels . . . then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case . . . ." 11 U.S.C. § 552(b).

respective security interests extend to such revenue generated Postpetition. The amount of revenue generated by the Debtors' hotels (including complimentary rooms provided to guests at no charge) from the Petition Date through and including August 31, 2010 was approximately $8.4 million. The Creditors' Committee could argue that section 552(b)(2) does not apply to some or all of such Postpetition hotel revenue.

In addition to the foregoing, the secured creditors also have perfected Postpetition adequate protection liens on the Debtors' cash to the extent of any diminution in value of the Collateral during the pendency of the Chapter 11 Cases. The extent of any such diminution in value, if any, would also be the subject of litigation absent the global settlement embodied in the Plan.

Based on the foregoing, there is material litigation risk associated with how much of the Debtors' cash on hand is subject to perfected liens in favor of the secured creditors.[27] The Cash Collateral Settlement takes into account the relative risks and probabilities of success for these claims. The Debtors also considered the substantial delay and cost associated with litigating these contested issues to conclusion. The Debtors believe the Cash Collateral Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

<u>Settlement of Claims Relating to the Standing Motion</u>

As described below, the Debtors and the Settling Parties have agreed, as part of the good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code embodied in the Plan, to settle all disputes over the claims raised in the Standing Motion (the "<u>Standing Motion Settlement</u>").[28]

In the Standing Motion, the Creditors' Committee argues the security interests of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee in the Debtors' Indiana riverboat casinos are unperfected and should be avoided. To support its assertion that the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee did not properly perfect their security interests in the Indiana casinos prior to the Petition Date, the Creditors' Committee argues, among other things, that the Indiana casino boats are fixtures rather than vessels,[29] and the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee did not effect "fixture filings" covering the Majestic Star Casinos as required by the UCC.

In response to the arguments of the Creditors' Committee, the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed objections to the Standing Motion asserting the Majestic Star Casinos are vessels within the meaning of the Commercial Instruments and Maritime Liens Act, and thus, the ship mortgages filed by the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee validly perfected their security interests in the Majestic Star Casinos.[30] In the alternative, the Senior Secured Credit Facility Agent and Senior

---

[27] Article 9 continues to recognize that a security interest may continue in a deposit account as a "proceeds" security interest and that if there is a perfected lien over the initial collateral, Article 9 expressly authorizes tracing using equitable principles to determine the extent of that security interest as proceeds in a commingled account. UCC § 9-315(b)(2).

[28] Pursuant to the Cash Collateral Order, any other potential lien challenges are barred.

[29] *See* 1 U.S.C. § 3 (defining "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"); *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 494 (2005) (explaining "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement"); *RDI/Caesars Riverboat Casino, Inc. v. Conder*, 896 N.E.2d 1172, 1180 (Ind. Ct. App. 2008) (holding a riverboat casino is not a vessel under federal law where the casino's owner intends to continue to use the riverboat as an indefinitely moored stationary casino). The Creditors' Committee contends the Majestic Star Casinos are not "vessels" under federal law because they are currently moored to the shore, and the Debtors intend to continue to use them as stationary casinos.

[30] *See Stewart*, 543 U.S. at 497 ("Under [1 U.S.C.] § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."); *Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1312 (11th Cir. 2008) (concluding courts should focus on whether a boat has been rendered practically incapable of transportation on water rather than the intent of the shipowner regarding the
(Continued…)

Secured Notes Trustee argue they properly perfected their security interests in the Majestic Star Casinos as fixtures by filing UCC-1 financing statements covering the Majestic Star Casinos.[31]

After the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed their objections to the Standing Motion, the Creditors' Committee filed a supplemental memorandum of law in support of the Standing Motion (the "<u>Supplemental Memorandum of Law</u>"), in which it argued for the first time that the Majestic Star Casinos are real property rather than fixtures.[32] Following the submission of the Supplemental Memorandum of Law, the Senior Secured Credit Facility Agent and the Indenture Trustee filed additional objections to the Standing Motion arguing that these new claims were barred by the Cash Collateral Order and rejecting the notion that the Majestic Star Casinos are real property in any event.[33]

The Debtors have weighed the merits of the respective arguments of the litigants, as well as the benefits of settling the claims raised in the Standing Motion against the costs of litigating such claims to conclusion. Based on the foregoing, the Debtor and the Settling Parties determined the benefits of the Standing Motion Settlement, including allowing the Debtors to focus their efforts on Confirmation, outweigh proceeding with litigation of the claims raised in the Standing Motion. Accordingly, the Standing Motion Settlement is well within the range of reasonableness for settlements pursuant to bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

## Management of the Company

Biographical information for Mr. Michael Darley, Mr. Jon Bennett, Ms. Cara Brown, Mr. Larry Buck, Mr. Dan Ihm, and Mr. Chuck Miller is set forth below:

**Michael Darley.** Michael Darley became the Executive Vice President and Chief Operating Officer of the Company effective as of September 13, 2008, with responsibility for all aspects of the Company's operating activities. Prior to becoming the Chief Operating Officer of the Company, Mr. Darley served as Senior Vice President and General Manager of Fitzgeralds Casino Hotel in Las Vegas beginning in May 2002. Mr. Darley has 28 years of gaming experience, including executive level operating positions in the Trump and Harrah's organizations.

**Jon Bennett.** Jon Bennett has been the Senior Vice President, Chief Financial Officer, and Treasurer of the Company since October 2002 with overall responsibility for all aspects of the Company's financial management, accounting and reporting processes. Prior to Mr. Bennett's appointment as Senior Vice President, Chief Financial Officer, and Treasurer, Mr. Bennett was Vice President of Finance and Administration for Fitzgeralds Casino Hotel in Tunica from its acquisition in December 2001 to his promotion in October 2002.

---

future use of the boat when determining the status of a vessel). The Senior Secured Credit Facility Agent and Senior Secured Notes Trustee argue the Majestic Star Casinos are "vessels" under federal law because the casinos are practically capable of engaging in water transportation and could be unmoored and underway in approximately an hour.

[31] *See* 6 Del. Code § 9-501(a) ("[I]f the local law of this State governs perfection of a security interest . . . the office in which to file a financing statement to perfect the security interest . . . is: (1) the office designated for the filing or recording of a record of a mortgage on the related real property, if . . . the financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures; **or** (2) the office of the Secretary of State, in all other cases, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.") (emphasis added); Ind. Code § 26-4-9.1-501(a) (same).

[32] *See* Ind. Code § 6-1.1-1-15(5)(A) (defining "real property" to include riverboats licensed under Indiana Code section 4-33 for property tax purposes).

[33] *See Indiana Dep't of State Revenue v. Trump Indiana, Inc.*, 814 N.E.2d 1017, 1020 ("[T]he property tax definition of real property is not wholly consistent with the ordinary meaning of the term. Presumably in recognition of these somewhat artificial definitions designed to effect specific property tax policies, the first section of the chapter of the property tax statute that supplies these definitions, Indiana Code section 6-1.1-1-1, expressly provides that they apply to 'this article', i.e. to property taxes.").

**Cara Brown.** Cara Brown has been a Director of the Company since 2006. Ms. Brown joined the Company in December 2001 as its Vice President and General Counsel and served in that capacity until her resignation effective May 31, 2006. After her resignation, Ms. Brown and the Company entered into a consulting agreement with a six-month term commencing June 1, 2006 and ending November 30, 2006. Ms. Brown returned as an employee of the Company on June 1, 2008 and currently serves as Senior Vice President and General Counsel.

**Larry Buck.** Larry Buck is a 26 year veteran of the gaming industry and, in December 2008, was named Senior Vice President and General Manager of Majestic Star Casinos and Hotel in Gary, Indiana. Prior to joining Majestic Star, Mr. Buck was employed by Pinnacle Entertainment, Inc. and served as President of Pinnacle's planned resort in Atlantic City, New Jersey. He was also Vice President & General Manager of Pinnacle's Belterra Casino, Resort & Spa in Florence, Indiana from 2004 to 2006. Prior to Belterra, Mr. Buck was Vice President and General Manager of Hyatt's Grand Victoria Casino Resort in Rising Sun, Indiana from 2000 to 2004. Prior to arriving in southern Indiana, Mr. Buck was also Senior Vice President and General Manager of Harrah's Reno and Vice President/General Manager of Players Island Casino in Missouri.

**Dan Ihm.** Dan Ihm brings over 16 years of senior executive, corporate, and property-level management experience to the Company. His primary areas of expertise are operations and marketing for gaming, resorts, and entertainment. Prior to joining the Company, Mr. Ihm was the Corporate Director of Marketing for Laguna Development Corporation in Albuquerque, New Mexico. Mr. Ihm has also served as Senior Director of Marketing for Majestic Star Casino in Gary, Indiana and held the position of Vice President of Marketing for the AAA Four-Diamond Ameristar Casino Hotel in Council Bluffs, Iowa. Mr. Ihm previously held the position of Senior Vice President of Marketing and Operations for Majestic I before being named Senior Vice President and General Manager for Fitzgeralds Casino Black Hawk in October 2009.

**Chuck Miller.** Chuck Miller has over 38 years of experience in the gaming industry and was recently named Senior Vice President and General Manager of Fitzgeralds Casino and Hotel in Tunica, Mississippi. Throughout his career, Mr. Miller has gained hands-on experience in nearly every aspect of casino resort operations while working with some of the best known gaming companies and executives in established and emerging markets throughout the Untied States. Prior to joining Fitzgeralds Casino and Hotel in Tunica, Mr. Miller was President/CEO of Pearl River Resort in southern Mississippi. He has also served as Corporate Vice President of Development for Caesars' Entertainment, President of Tunica Operations at the Grand, Bally's, and Sheraton casinos for Park Place/Caesar's Entertainment, and General Manager of Grand Casino Tunica for Grand Casinos Inc.

### Composition of New Board of Managers

The Board of Managers of Reorganized Majestic Holdco shall be comprised of three to five managers (the "Managers") appointed by the holders of New Membership Interests. The other Reorganized Debtors will be managed by a single managing member to be designated.

### Reorganized Debtors' Corporate Organizational and Ownership Structure

The following chart shows the Reorganized Debtors' corporate organizational and ownership structure immediately following the occurrence of the Effective Date:[34]

---

[34] The Senior Secured Notes Trustee reserves the right, with the consent of the Debtors (which consent shall not be withheld unreasonably), to create special purpose entities to (i) be co-issuers of the New Senior Secured Notes, and (ii) to hold each Gaming License.



**The Reorganized Debtors' Business Upon Emergence**

Upon emergence, the Reorganized Debtors' business will consist primarily of the ownership and operation of the Debtors' gaming facilities located in Gary, Indiana, Tunica, Mississippi, and Black Hawk, Colorado, subject to the conditions to the Effective Date in the Plan, subject to Barden Colorado remaining a Debtor because of failure to obtain all governmental licenses, suitability determinations, and other approvals required for such property on or prior to 240 days following the Confirmation Date (as further described in Article XII of the Plan).

The valuation conclusions contained below are based upon management projections provided to the Debtors' financial advisors as of August 2010 and are highly dependent upon the Reorganized Debtors' ability to meet those projections. Other key assumptions utilized by the Debtors' financial advisors include: (a) emergence of the Debtors from chapter 11 bankruptcy protection on September 30, 2011; and (b) approval of the transfer of the Debtors' gaming licenses to the Reorganized Debtors by the Debtors' gaming regulators in Indiana, Mississippi, and Colorado.

**The Reorganized Debtors' Capitalization Upon Consummation of the Plan**

The following table sets forth the Company's consolidated assets and liabilities (a) on an actual basis as of June 30, 2010 and (b) on an as-adjusted basis as of September 30, 2011 to reflect the consummation of the Plan.

This table should be read together with the more detailed information contained elsewhere in this Disclosure Statement, including the section herein entitled "Treatment of Claims Against and Equity Interests in the Debtors," beginning on page 18.

[FORTHCOMING]

**New Senior Secured Credit Facility**

The New Senior Secured Credit Facility will be a $58 million senior secured credit facility with a term of three years following the substantial consummation of the Plan, with an interest rate *per annum* equal to (a) the Base Rate plus 3.50% or (b) the LIBOR Rate plus 4.75%, provided by the Senior Secured Credit Facility Agent, which shall be secured by a first lien on all of the assets of the Reorganized Debtors to the extent permitted by law.

The New Senior Secured Credit Facility will be issued pursuant to a new credit agreement, containing the terms as set forth on the term sheet attached as Exhibit I to the Plan, which new credit agreement shall be attached as Exhibit 4 to the Plan Supplement.

**New Senior Secured Notes**

The New Senior Secured Notes will be senior secured [12.5]% notes (or, at the election of the Senior Notes Trustee, amended and restated Senior Secured Notes), dated as of the Effective Date, due on the fifth anniversary of the Effective Date that will be secured by a second lien on all of the assets of the Reorganized Debtors to the extent permitted by law.

The New Senior Secured Notes will be issued pursuant to the New Senior Secured Notes Indenture, which will be an indenture (or at the election of the Senior Secured Notes Trustee, an amended and Restated Senior Secured Notes Indenture), dated as of the Effective Date by and among the Reorganized Debtors, as obligors, and the Senior Secured Notes Trustee, as indenture trustee, which shall be qualified under the Trust Indenture Act pursuant to section 1145(d) of the Bankruptcy Code, and which shall be attached as Exhibit 5 to the Plan Supplement.

**Capital Obligations to be Satisfied or Compromised Upon Emergence**

As of the date the Debtors filed the Chapter 11 Cases, the Debtors reported, on a consolidated basis, approximately $654.2 million in aggregate funded debt, primarily consisting of the Senior Secured Credit Facility, Senior Secured Notes, Senior Notes, and Discount Notes. The Debtors plan to satisfy this indebtedness, as described in greater detail below.

<u>Senior Secured Credit Facility</u>

On October 7, 2003, Majestic I, Barden Mississippi, and Barden Colorado entered into the Loan and Security Agreement with certain financial institutions party thereto as lenders and the Senior Secured Credit Facility Agent, as arranger and administrative agent for such lenders.[35] The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matured on April 15, 2010. As of August 31, 2010, the Debtors owed approximately $65.3 million under the Senior Secured Credit Facility in principal and accrued unpaid interest. Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Senior Secured Credit Facility Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%. In each case the rate is determined based on the Debtors' trailing twelve month EBITDA (defined as earnings before interest, taxes, depreciation and amortization). The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default. As noted above, the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Senior Secured Credit Facility Agent at the default rate on a current basis.

<u>Senior Secured Notes</u>

The Senior Secured Notes are $300 million in principal amount of obligations issued by Majestic I and MSCC, a non-operating, wholly-owned subsidiary of Majestic I that has no assets. The Senior Secured Notes are governed by the Senior Secured Notes Indenture. The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes mature on October 15, 2010. As of August 31, 2010, the Debtors owed approximately $348.4 million on account of the Senior Secured Notes in principal and accrued unpaid interest.

---

[35] The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and to modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

<u>Senior Notes</u>

The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic I and MSCC II, a non-operating, wholly owned subsidiary of Majestic that has no assets. The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi. The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debenture Trust Company as successor trustee. The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005. The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year. The notes mature on January 15, 2011. As of August 31, 2010, the Debtors owed approximately $233.1 million on account of the Senior Notes in principal and accrued unpaid interest.

<u>Discount Notes</u>

The Discount Notes are $63.5 million principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Holdco that has no assets. The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic or any of its subsidiaries. The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee. The Discount Notes accrue interest at 12½% per annum, with payments due on April 15 and October 15 of each year. Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011. As of August 31, 2010, the Debtors owed approximately $72.6 million on account of the Discount Notes.

<u>Trade Claims and Other Unsecured Obligations</u>

In addition to its funded debt, prior to the date the Debtors filed the Chapter 11 Cases, the Company incurred debt with several creditors in the ordinary course of its business. The Claims related to these obligations are more fully described in the Plan.

### Description of New Membership Interests

*The following is a description of the material terms of the New Membership Interests in Majestic Holdco, LLC. This description also summarizes certain provisions of the Delaware General Corporation Law ("<u>DGCL</u>").*

**Authorized Membership Interests**

Majestic Holdco will have the authority to issue New Membership Interests.

<u>Voting Rights</u>

Holders of units of the New Membership Interests will, subject to potential statutory and/or regulatory restrictions, be entitled to vote on all matters submitted to a vote of members, including the election of Managers. On all matters to be voted on by holders of units of New Membership Interests, the holders will be entitled to one vote for each unit of New Membership Interests, held of record, and will have no cumulative voting rights.

<u>Dividend Rights</u>

Subject to limitations under Delaware law, other statutory and/or regulatory restrictions, preferences that may apply to any outstanding preferred membership interests, and contractual restrictions, holders of New Membership Interests are entitled to receive ratably dividends or other distributions when and if declared by the Board of Managers. In addition to such restrictions, whether any future dividends are paid to the holders of the New Membership Interests will depend on decisions that will be made by the Board of Managers and will depend on then existing conditions, including the Reorganized Debtors' financial condition, contractual restrictions, corporate law restrictions, capital requirements, and business prospects. The ability of the Board of Managers to declare dividends

also will be subject to the rights of any holders of any outstanding preferred membership interests of Majestic Holdco (if authorized) and the availability of sufficient funds under applicable law to pay dividends.

### Reorganized Debtors to Act as Transfer Agent and Registrar

The Reorganized Debtors shall act as transfer agent and registrar for the New Membership Interests unless otherwise determined by the Debtors with the consent of the Senior Secured Notes Trustee and disclosed prior to the Effective Date.

### Management Incentive Programs

On or after the Effective Date, the Board of Managers of Reorganized Majestic Holdco may, but is not obligated to, develop, adopt, and implement the Post-Effective Date Management Incentive Program. Up to ten percent (10%) of the New Membership Interests on a fully diluted basis shall be reserved for the implementation of the Post-Effective Date Management Incentive Program if the Board of Managers elects to issue all or any of such New Membership Interests as part of such program, if any.

## Limitations on Liability and Indemnification of Managers and Officers of The Reorganized Debtors

The Delaware Limited Liability Company Act ("DLLCA") authorizes companies to limit or eliminate the personal liability of managers to limited liability companies and their members for monetary damages for breaches of managers' fiduciary duties. The Reorganized Debtors' Amended and Restated Operating Agreements may limit the liability of Managers to the fullest extent permitted by the DLLCA. In addition, the Reorganized Debtors' Amended and Restated Operating Agreements may provide that the Reorganized Debtors must indemnify their Managers and officers to the fullest extent permitted by the DGCL. The Reorganized Debtors' Amended and Restated Operating Agreements may include a provision that eliminates the personal liability of Managers to the Reorganized Debtors or their members for monetary damages for any breach of fiduciary duty as a manager, except to the extent such exemption from liability or limitation thereof is not permitted under the DLLCA as the same exists or hereafter may be amended.

The limitation of liability and indemnification provisions in the Reorganized Debtors' Amended and Restated Operating Agreements may discourage members from bringing a lawsuit against Managers for breach of their fiduciary duties. These provisions may also have the effect of reducing the likelihood of derivative litigation against Managers and officers, even though such an action, if successful, might otherwise benefit the Debtors or the Reorganized Debtors and their stockholders and members. In addition, the Reorganized Debtors may be adversely affected to the extent they are obligated to pay the costs of settlement and damage awards against Managers and officers pursuant to these indemnification provisions.

## Summary of Gaming Regulations

The ownership and operation of the Debtors' gaming facilities are subject to various state and local laws and regulations in the jurisdictions where they are located. The following is a summary of the provisions of the gaming laws and regulations applicable to the Debtors' operations. The summary does not purport to be a full description thereof and is qualified in its entirety by reference to such laws and regulations.

Consummation of the Plan will require prior approval of gaming authorities. Furthermore, certain persons and/or entities who will be associated with the Reorganized Debtors will be subject to a costly and time-consuming investigatory, licensing, and approval process prior to the Effective Date, and upon their licensing, such persons will be subject to the same or substantially similar gaming laws and regulations as the Debtors and their associates currently face.

Additionally, while the statutory and regulatory requirements discussed herein will apply to the Reorganized Debtors, no assurances can be provided as to the specific form of any statute or regulation that any jurisdiction may adopt or license conditions that any jurisdiction may impose in the licensing process for the restructuring, the Reorganized Debtors, or any persons associated with the Reorganized Debtors.

This summary is provided only as background information for creditors to make an informed voting decision on the Plan. All parties in interest, including creditors who may be subject to the investigatory and licensing processes described herein, are strongly urged to retain their own gaming law counsel for each jurisdiction where the Debtors currently have operations to seek advice concerning their particular circumstances and the investigatory and licensing process. It should be noted in this regard that gaming laws and regulations are often complex and have been interpreted to impose obligations that might not be apparent from an initial reading thereof.

**Background on Indiana Gaming Regulations**

The acquisition, ownership, and operation of casinos in Indiana are subject to regulation by the State of Indiana primarily through the IGC. Other state agencies with limited oversight include the Indiana Alcohol and Tobacco Commission and the Indiana Department of Revenue.

The Indiana Riverboat Gambling Act (the "Indiana Act") and administrative rules promulgated thereunder (the "Indiana Rules") give the IGC extensive powers and duties in connection with regulation of casino gaming operations and enforcement of the Indiana Act and Indiana Rules. The jurisdiction of the IGC extends to all facilities, persons, associations, and practices related to casino gaming operations.

The Indiana Act specifies that it is designed to benefit Indiana citizens by promoting tourism and assisting economic development. The Indiana Act further specifies that the public's confidence can be maintained only (i) through comprehensive law enforcement supervision of gambling activities and (ii) strict regulation of facilities, persons, associations, and practices related to casino gaming operations.

The Indiana Act and Indiana Rules cover all facets of gaming operations, including, but not limited to:

- requiring a thorough background investigation to ensure unsuitable persons do not have a direct or indirect ownership interest in a riverboat casino;

- the establishment and maintenance of accounting and internal control procedures that are designed to ensure:

    o the riverboat's assets are safeguarded;

    o the riverboat's financial records are accurate and reliable;

    o the riverboat's transactions are performed in accordance with the Indiana Act and Indiana Rules;

    o the riverboat's transactions are recorded to properly account for adjusted gross receipts, admission fees, and all applicable taxes;

    o assets are maintained in accordance with generally accepted accounting principles;

    o only authorized personnel have access to assets;

    o recorded assets are compared to actual assets at reasonable intervals and appropriate action is taken if discrepancies are discovered;

    o there is appropriate segregation of functions, duties, and responsibilities;

    o all functions, duties, and responsibilities are carried out only in accordance with sound practices and by qualified competent personnel;

    o riverboat employees are not in a position to conceal errors or irregularities; and

o   gambling is conducted with integrity and only in accordance with the Indiana Act and Indiana Rules.

The Indiana Act authorizes the issuance of up to 10 riverboat licenses, one operating agent license, and two licenses to conduct gambling games at pari-mutuel racetracks.  Five riverboats licenses have been issued to riverboat facilities in counties contiguous to Lake Michigan.  Specifically, four of these riverboats are located in Gary (the Debtors' two casinos), East Chicago, and Hammond in Lake County, and one is located in Michigan City in LaPorte County.  Five additional riverboats are located in counties contiguous to the Ohio River in the southern portion of Indiana.  Specifically, these five riverboats are located in Evansville (Vanderburgh County), Harrison County, Switzerland County, Rising Sun (Ohio County), and Lawrenceburg (Dearborn County).  The operating agent licensee conducts gaming at a facility in French Lick, which is also in the southern portion of Indiana.  Pursuant to other Indiana statutes, the two pari-mutuel racetracks have licenses to operate up to 2,000 slot machines at their facilities in Anderson and Shelbyville, which are in central Indiana.

An applicant for an Indiana gaming license must submit a comprehensive application and undergo a thorough background investigation.  Additionally, any person who will, directly or indirectly, own 5% or more of a licensee must automatically submit a personal disclosure form and undergo an exhaustive background investigation. However, the IGC may investigate any person with any level of ownership interest.  If a licensee is a publicly traded company, its articles of incorporation must contain language concerning transfer of ownership, suitability determinations, and possible divesture of ownership if a shareholder is deemed unsuitable by the IGC.  If the IGC determines a person that holds an ownership interest in a licensee is unsuitable, the licensee:  (i) may not pay a dividend to the person; (ii) may not pay any remuneration to the person; and (iii) shall not allow the person to vote on any matter.  The licensee is responsible for all costs associated with the background investigation.

The Indiana Rules allow a company that qualifies as an institutional investor to exceed the 5% ownership interest threshold before requiring a background investigation.  A company qualifies as an institutional investor if it (i) acquires an interest in a licensee in the ordinary course of its investment business and (ii) holds the interest for investment purposes only and not to cause, directly or indirectly, the election of a majority of the licensee's board of directors or any change in the corporate charter, bylaws, management, policies, or operation of the licensee.

An institutional investor must notify the IGC of its acquisition of 5% or more of the voting securities of a licensee within 10 business days of acquiring such securities.  An institutional investor may acquire up to a 15% ownership interest in a licensee without being required to undergo a background investigation.  The institutional investor must, within 45 days, complete a form to verify it qualifies as an institutional investor as defined in the Indiana Rules.  The IGC reserves the right to require any company claiming institutional investor status to undergo a background investigation if the IGC deems such an investigation necessary.

Additionally, all key persons of a licensee must undergo a thorough investigation and be licensed.  A key person is defined as an officer, director, executive, employee, trustee, substantial owner, independent contractor, or agent that has the power to exercise, alone or in conjunction with others, management or operating authority over the licensee or affiliates thereof.

A riverboat owner's license and operating contract entitle a licensee or operating agent to operate one riverboat.  The Indiana Act allows a person to hold up to one hundred percent of up to two individual riverboat owner's licenses.  The Indiana Act imposes a $2 million transfer fee on any licensee that acquires a controlling interest in a second owner's license.

An initial license runs for a period of five years.  Thereafter, a license is subject to renewal on an annual basis upon a determination by the IGC that the licensee continues to be eligible to hold a license pursuant to the Indiana Act and Indiana Rules.  Each licensee must undergo a complete reinvestigation every three years, and the IGC reserves the right to investigate a licensee at any time it deems necessary.

The licenses are transferrable only in accordance with the Indiana Act and Indiana Rules, and any proposed transfer requires approval by the IGC.  The Indiana Act specifies a license is a revocable privilege granted by the state and not a property right.  A license may not be leased, hypothecated, or serve as security for any debt

obligation. The IGC may suspend or revoke the license of a licensee or impose civil penalties, in some cases without notice or hearing, for any act in violation of the Act or for any other fraudulent act.

Pursuant to legislation enacted in 2009, licensees must execute and submit a POA and identify a person to temporarily operate the licensee's casino and related facilities (a "POA Trustee") if certain events occur, and the IGC adopts a resolution authorizing the POA Trustee to temporarily conduct the licensee's gaming operations. Specifically, the IGC may adopt a resolution authorizing the POA Trustee to temporarily operate the licensee's facility if one of the following occurs: (i) the IGC revokes the licensee's license; (ii) the IGC does not renew the licensee's license; (iii) a proposed transferee of the licensee's license is not approved, and the licensee is unwilling to retain ownership of the riverboat; or (iv) the licensee agrees, in writing, to relinquish control to a POA Trustee approved by the IGC. If the IGC adopts a resolution authorizing a POA Trustee to temporarily operate the casino, the licensee will have 180 days from the date the resolution is adopted to sell the riverboat to a person approved by the IGC. If the riverboat is not sold within 180 days, the POA Trustee may sell the riverboat to a person approved by the IGC.

The Indiana Rules impose restrictions on a licensee's incurrence of debt. A licensee and its affiliates may enter into debt transactions that total $1.0 million or more only with the prior approval of the IGC. Such approval is subject to compliance with requisite procedures and a showing that each person with whom the licensee and its affiliates enters into a debt transaction would be suitable for licensure under the Act. Unless waived, approval of debt transactions requires consideration by the IGC at two business meetings. The IGC, by resolution, has authorized its executive director, subject to subsequent ratification by the IGC, to approve debt transactions after a review of relevant documents and consultation with the chair of the IGC and the IGC's outside financial analyst.

All of the foregoing regulations are subject to amendment and interpretation by the IGC. Changes in the laws, regulations, and procedures described above could adversely affect the gaming operations of the Debtors and Reorganized Debtors.

The Indiana Act and the Indiana Rules are available for review at http://www.in.gov/legislative/ic/code and http://www.in.gov/legislative/iac.

**Background on Mississippi Gaming Regulations**

The acquisition, ownership, and operation of casino gaming facilities and gaming devices in Mississippi are subject to the Mississippi Gaming Control Act (the "Mississippi Act") and regulations promulgated thereunder as well as various local regulations. Specifically, the Debtors' Mississippi gaming operations are subject to the licensing and regulatory control of the Mississippi Gaming Commission ("MGC").

The Mississippi Act and the regulations and supervisory procedures of the MGC are based upon declarations of public policy concerning, among other things:

- the prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity;

- the establishment and maintenance of responsible accounting practices and procedures;

- the maintenance of effective controls over the financial practices of casino licensees, including the establishment of minimum procedures for internal fiscal affairs and the safeguarding of assets and revenues, providing reliable recordkeeping, and requiring the filing of periodic reports with the MGC;

- the prevention of cheating and fraudulent practices;

- providing a source of state and local revenues through taxation and licensing fees; and

- ensuring that gaming licensees, to the extent practicable, employ Mississippi residents.

Under the Mississippi Act, any person who seeks to own or operate a gaming establishment or gaming devices, or hold a direct or indirect voting ownership interest of greater than 5% therein, must be found suitable by, or obtain a gaming license from, the MGC prior to the consummation of such transaction. If such person is an entity, certain of its managers, directors, officers, key employees, and owners must also demonstrate their suitability to be affiliated with the gaming license applicant. The burden of proving suitability is on the applicant, and the applicant must pay the costs of the investigation, which can be extremely expensive and time-consuming.

Entities that engage in gaming operations generally hold the actual gaming licenses. Natural persons or entities materially associated or affiliated with such entities (such as managers, directors, or owners) must be found suitable. Also, the private or publicly-traded parent company of a gaming licensee and any intermediary holding companies must be registered with, or found suitable by, the MGC. Registration and suitability determinations are similar to licensing and involve the submission of a detailed application that allows the MGC to thoroughly investigate the applicant. An application for a determination of suitability requires the submission of detailed personal and financial information followed by a thorough investigation. Registration is similar, and upon approval, specific functional restrictions apply to the registered entity, including restrictions on any intermediary holding companies, licensed subsidiaries, and in some cases, associated shareholders.

In the licensing context, Mississippi makes little distinction between private companies and publicly-traded companies. Private operating subsidiaries of both private and publicly-traded companies must hold a gaming operator license to operate casino and gaming devices. Each privately-held or publicly-traded holding or parent company of a gaming licensee, which directly or indirectly owns, controls, or holds the power to vote greater than 5% of any class of voting equity securities in the licensee, must undergo an investigation, register with, and/or be found suitable by the MGC.

Each manager, director, officer, and investor holding voting equity in such holding company may also be subject to a personal finding of suitability by the MGC. Although the Mississippi Act mandates findings of suitability for those corporate and individual investors holding more than 10% of any class of voting equity, it has long been the practice of the MGC to require approvals of any persons or entities holding a direct or indirect voting equity interest of greater than 5% in any gaming licensee. Such voting equity ownership threshold is increased to greater than 10% in the case of institutional investors. In contrast, holders of non-voting equity in the parent company of a gaming licensee, or in any intermediary holding company, are not ordinarily subject to the mandatory finding of suitability; provided, however, that the MGC has the authority to subject any equity holder, whether such equity is voting or non-voting, to a finding of suitability.

Gaming licenses granted by the MGC are not transferable, are issued for a term not exceeding three years, and must be renewed periodically thereafter.

Any acquisition of a licensed gaming entity, including the takeover of its operating assets by a successor entity, will require similar review, approval, and licensing by the MGC. This process can be extremely lengthy, costly, onerous, and intrusive. The placing of an investigatory item on an agenda for final approval is solely in the discretion of the MGC and will not take place until the applicant has submitted all items requested by the MGC. As a general rule, the licensing process will not begin until all applications relating to a specific transaction have been submitted to the MGC.

The MGC may deny an application for any cause that it deems reasonable. Changes in licensed positions must be reported to the MGC. In addition to its authority to deny an application, the MGC can disapprove a change in a corporate position.

Furthermore, if the MGC were to find a manager, officer, director, key employee, equity holder, lender, or landlord unsuitable for licensing or unsuitable to continue having a relationship with the Debtors or the Reorganized Debtors, the Debtors or the Reorganized Debtors would have to sever all relationships with such person to retain their licenses or approvals. In addition, the MGC may require any licensed company to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or of questions pertaining to licensing are not subject to judicial review in Mississippi.

Under certain circumstances, an institutional investor who acquires more than 10% but not more than 15% of a licensed company's voting securities may apply to the MGC for a waiver of a finding of suitability if that institutional investor holds the voting securities for investment purposes only.

An institutional investor will not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held by the institutional investor in the ordinary course of its business and not for the purpose of causing, directly or indirectly, the election of a majority of the members of a licensed company's board of directors or managers, any change in the charter, bylaws, operating agreement, management, policies, or operations of a licensed company or any of its gaming affiliates, or any other action which the MGC finds to be inconsistent with holding such voting securities for investment purposes.

Activities which are deemed consistent with holding voting securities for investment purposes include:

- voting on all matters voted on by stockholders;

- making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and

- such other activities as the MGC may determine to be consistent with such investment intent.

If the beneficial owner of voting securities that must be found suitable is a corporation, partnership, or trust, it must submit detailed business and financial information to the MGC. Applicants are required to pay all costs of the investigation.

Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the MGC or after otherwise being required to do so, may be found unsuitable. The same requirements apply to a record owner of voting securities of a registered company if the record owner, after request, fails to identify the beneficial owner of such equity. Any equity holder who is found unsuitable and who holds, directly or indirectly, any beneficial ownership of voting securities of a licensed or registered company beyond the period of time proscribed by the MGC may be guilty of a misdemeanor. A licensee may become subject to disciplinary action, if, after receipt of notice that a person is unsuitable to be a stockholder or to have any other relationship with the licensee, the licensee:

- pays the unsuitable person any dividend or other distribution on such person's voting securities;

- recognizes the exercise, directly or indirectly, of any voting right conferred by securities held by that person;

- pays the unsuitable person any remuneration in any form for services rendered or otherwise, except in certain limited and specific circumstances; or

- fails to pursue all lawful efforts to require the unsuitable person to divest himself or herself of the securities, including, if necessary, the immediate purchase of the securities for cash at fair market value.

A gaming licensee may be required to disclose to the MGC the identities of all holders of its debt securities. The MGC may, in its sole discretion, require the holder of any debt security of a registered company or licensee to file applications, be investigated, and be found suitable to own the debt security of a registered company or licensee.

If the MGC determines that a person is unsuitable to own a debt security, then the licensee and/or its registered holding company can be sanctioned, which may include the loss of its approvals, if without the prior approval of the MGC, it:

- pays to the unsuitable person any dividend, interest, or any distribution whatsoever;

- recognizes any voting right by the unsuitable person in connection with the debt securities;

- pays the unsuitable person remuneration in any form; or

- makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation, or a similar transaction.

License fees and taxes, computed in various ways depending on the type of gaming activity involved, are payable to the State of Mississippi and to the counties and cities in which the Mississippi licensee's operations are conducted. The MGC also assesses fees and expenses on gaming licensees. Any taxes levied by the MGC or Mississippi taxing authorities that are not paid by Debtors, as well as unpaid gaming winnings, could be assessed against the Reorganized Debtors.

Any person who is or is required to be licensed, found suitable, or registered or is under common control with any such person, and who is or proposes to become involved in a gaming venture outside of Mississippi or in any internet gaming venture in any jurisdiction, must obtain approval or a waiver of such approval from the MGC prior to engaging in any such gaming venture outside of Mississippi; provided, however, that such a waiver is automatically granted under the MGC's regulations in connection with foreign gaming activities (except for internet gaming activities) conducted (i) within the 50 states or any territory of the United States, (ii) on board any cruise ship embarking from a port located therein, and (iii) in any other jurisdiction in which a casino operator's license or its equivalent is not required to legally conduct gaming operations. The MGC may require, among other things, that it be granted access to information concerning the out-of-state gaming operations of the licensee and its affiliates.

The MGC may limit, condition, suspend, or revoke a license, finding of suitability, registration, or other approval, subject to compliance with certain statutory and regulatory procedures if it is determined that Mississippi gaming laws or regulations were violated. The MGC may also levy substantial fines against the licensee and the individuals involved in violating any gaming laws or regulations.

Changes in laws, regulations, and procedures described above could adversely affect the gaming operations of the Debtors and the Reorganized Debtors.

Mississippi gaming laws and regulations are available for review at the website of the MGC http://www.mgc.state.ms.us.

**Background on Colorado Gaming Regulations**

The Colorado Limited Gaming Act of 1991 (as amended, the "Colorado Act"), authorizes limited gaming only in certain designated commercial districts of Central City, Black Hawk, and Cripple Creek, Colorado. Limited gaming consists of the games of poker, blackjack, craps, roulette, and slot machines, all with maximum single bets of $100. Only persons aged 21 or older may participate in limited gaming, and limited gaming may be offered by licensed casinos twenty-four hours per day, seven days per week. Limited gaming is allowed only on premises licensed for that purpose, and the gaming-licensed premises of any building may not exceed 35% of the square footage of the building or 50% of any floor of such building. There is no limitation on the size of any structure or total square footage devoted to limited gaming. Additionally, the gaming-licensed premises of any casino must be physically located within the designated commercial districts of one of the three above-referenced cities. Limited gaming is regulated by the Colorado Limited Gaming Control Commission (the "CLGC") and the Colorado Division of Gaming in the Colorado Department of Revenue (the "CDG").

The public policy of Colorado as stated in the Colorado Act is:

- the success of limited gaming depends upon public confidence and trust that licensed limited gaming is conducted honestly and competitively, that the rights of the creditors of licensees are protected, and that gaming is free from criminal and corruptive elements;

- public confidence and trust can be maintained only by strict regulation of all persons, locations, practices, associations, and activities related to the operation of licensed gaming establishments, and the manufacture or distribution of gaming devices and equipment;

- all establishments where limited gaming is conducted and where gambling devices are operated and all manufacturers, sellers, and distributors of certain gambling devices and equipment must therefore be licensed, controlled, and assisted to protect the public health, safety, good order, and the general welfare of the inhabitants of the state to foster the stability and success of limited gaming and to preserve the economy and policies of free competition of the state of Colorado; and

- no applicant for a license or other affirmative CLGC approval has any right to a license or to the granting of the approval sought. Any license or other CLGC approval granted pursuant to the provisions of the Act is a revocable privilege, and no holder acquires any vested right therein or thereunder.

Pursuant to the Colorado Act and the rules and regulations promulgated thereunder (the "Colorado Gaming Regulations"), the ownership and operation of limited gaming facilities in Colorado, however acquired, are subject to extensive regulation by the CLGC and CDG. The gaming operations of licensed casino operators are also subject to the respective requirements of the three locations where limited gaming is permitted: Central City, Black Hawk, and Cripple Creek. These jurisdictions require each gaming establishment to obtain the appropriate business license, liquor license, and other licenses and permits. Licensed outlets for limited gaming are also subject to fees and taxes established by local authorities, including fees for the possession of gaming devices used in limited gaming. The three gaming jurisdictions charge annual gaming device fees on each gaming device used in limited gaming ranging from $750 in Black Hawk to $1265 in Central City.

The CLGC may issue the following gaming licenses: (1) slot machine manufacturer or distributor; (2) operator; (3) retail gaming; (4) support; and (5) key employee. These licenses require renewal every two years and are not transferable. Support and key employee licenses may also be issued and renewed by the director of the CDG on behalf of the CLGC. The CLGC has broad discretion to condition, suspend for up to six months, revoke, limit, or restrict a license at any time and also has the authority to impose fines. Disciplinary actions against a licensee's license may be brought for any violations of the Colorado Act or the Colorado Gaming Regulations or for any reason for which a license could be denied. If violations have occurred, the fines imposed by the CLGC can range up to $25,000 per violation for retail gaming (casino) licensees. A fine and license suspension or revocation may be imposed concurrently for each violation of the Colorado Act or the Colorado Gaming Regulations by a licensee.

A retail gaming (casino) license is required for all persons conducting limited gaming on their premises. In addition, an operator license is required for all persons who engage in the business of placing and operating slot machines on the premises of a retailer, or who provide goods or services in return for fees calculated upon a percentage of limited gaming revenue. However, a retailer is not required to hold an operator license. No person may have an ownership interest in more than three retail licenses.

The Colorado Act requires that an applicant for a gaming license or for approval of its acquisition of a direct or indirect interest in a gaming licensee, must demonstrate, to the CLGC's satisfaction, that such applicant is of good moral character and is suitable for participation in the gaming industry. Accordingly, the CLGC requires that every such applicant—except those individuals seeking a support license or approval as a limited owner (under 5%) of a privately-held company—undergo a full suitability investigation. Support licensees and limited owners of privately-held companies typically are subject to less comprehensive background investigations than the other categories of applicants.

In the case of a corporation or an entity that is a license applicant or an applicant for CLGC approval to acquire an interest in a licensee, certain distinctions are made between privately-held corporations and entities and publicly-traded corporations and entities. With respect to private companies, no person may acquire any interest in a private company that holds a gaming license without the prior approval of the CLGC. Such approval will be granted

only after the person seeking to acquire the interest has undergone a full suitability investigation.  With respect to public companies holding gaming licenses, acquisition of an interest in such companies does not require prior CLGC approval.  It may, however, require a post-acquisition suitability investigation.

Additionally, the suitability investigation of a private company differs from the investigation that is required for a public company.  The suitability investigation of a private company includes an investigation of the company itself and separate suitability investigations of every officer, director, and stockholder holding an interest of 5% or more in the company.  Stockholders holding an interest of less than 5% in a private company are required to submit "limited ownership" disclosure forms and are not customarily required to undergo a full suitability investigation—although the CLGC has the authority to require a suitability investigation of anyone associated with a company under review.

In the case of a public company, the suitability investigation of such a company includes an investigation of the company itself and separate suitability investigations of all officers, directors, and holders of 5% or more of the company's stock.  Holders of less than 5% of the stock of a public company are not customarily required to report to the Colorado gaming authorities or to submit to a suitability investigation.  Any company that holds or acquires an interest of 5% or more in a gaming licensee or applicant is considered an associated person of such licensee or applicant and must submit to a suitability investigation as if such company were the applicant.

Notwithstanding the foregoing, the CLGC may require any person having or acquiring an interest, however limited or indirect, in a license or a licensee to undergo a full suitability investigation and pay the cost of the investigation in the same manner as an applicant.

Any application for a license or for a finding of suitability can be denied by the CLGC, in its  discretion, based upon any of the following criteria:  (1) the failure of the applicant to prove by clear and convincing evidence that the applicant is qualified for licensure and that the applicant is of good moral character; (2) failure of the applicant to provide appropriate information, documentation, or assurances to the CLGC; (3) failure of the applicant to reveal material facts in connection with a suitability or other investigation of the applicant; (4) conviction of the applicant of certain serious criminal acts, including illegal gambling; (5) pending prosecution for certain enumerated criminal acts; (6) the identification of the applicant as a member of a career-offender cartel; (7) refusal of the applicant to cooperate with governmental investigative agencies; or (8) the identification of the applicant as an illegal professional gambler.

In addition, all persons loaning monies, goods, or real or personal property directly or indirectly to a licensee or applicant, or having any interest in a licensee or applicant, or entering into any agreement with a licensee or applicant, must provide any information requested by CLGC.  At the discretion of the CLGC, these persons may be required to supply all information relevant to a suitability determination and submit to a full suitability investigation.  The failure of such a person to promptly provide all information requested and submit to a suitability or background investigation could result in a finding of unsuitability, the denial of a license application, suspension or revocation of an existing license, termination of any lease, note arrangement, or agreement between the applicant or licensee and the person from whom such information is sought, or the imposition of other sanctions.

Persons found unsuitable by the CLGC may be required immediately to terminate any interest in, association or agreement with, or relationship to a licensee—regardless of any negative financial consequences to such persons.  Specifically, no licensee shall, with respect to any person associated with the licensee and found unsuitable by the CLGC:  (1) pay to that person any interest or dividends; (2) permit the exercise of any voting rights by such person; (3) pay any remuneration for services rendered by that person or otherwise; or (4) fail to pursue all lawful efforts to require such person to relinquish all voting securities, including the immediate purchase of such securities by the licensee.  A finding of unsuitability with respect to any officer, director, employee, associate, lender, or beneficial owner of a licensee or applicant may also jeopardize the licensee's license or applicant's license application.  Licenses may be conditioned upon termination of any relationship with unsuitable persons.

Although authorized pursuant to the Act, as a long-standing matter of policy and practice, the CLGC does not issue temporary licenses, and persons required to be licensed are not permitted to perform activities requiring a license prior to the issuance of the license.

Rule 4.5 of the Colorado Gaming Regulations applies to applicants and licensed entities that are publicly-traded, as defined therein, or which are owned 5% or more directly or indirectly by publicly-traded entities. Persons owning less than 5% of a publicly-traded gaming licensee, or of the publicly-traded parent company of a gaming licensee, do not have to report their ownership interests, or apply for a suitability investigation, unless requested to do so by the CLGC. If such a request is made, the person so requested to apply or report must do so or risk being found unsuitable for involvement or participation in Colorado gaming.

Persons acquiring an interest of 5% or more but less than 10% must, pursuant to Rule 4.5, notify the CDG within ten days of such acquisition. Any person acquiring 10% or more is required to file application forms for a suitability investigation with the CDG within forty-five days of his acquisition. However, the CDG's current practice is to require a suitability filing for all 5% or greater interest-holders.

Pursuant to Rule 4.5, an institutional investor, as defined in the rule, must notify the CLGC within ten days of acquiring a 10% interest in a gaming licensee and must file for suitability within forty-five days of the acquisition of a 15% or greater interest in a gaming licensee. Rule 4.5 defines institutional investor to include certain classes of banks, insurance companies, investment companies, investment advisors, collective trust funds, employee benefit plans, pension funds, and groups composed of persons otherwise individually qualifying pursuant to the definition in the rule.

Persons acquiring non-voting interests are subject to the same requirements as those who acquire voting interests in a gaming licensee. Additionally, where there is a distinction between the record owner and the beneficial owner of stock or other interests in a licensee or applicant, the CDG will review the circumstances to determine, in its discretion, whether either or both must apply for suitability.

The Colorado Act does not require any approvals for Colorado licensees to engage in foreign gaming activities. However, a Colorado licensee or parent or subsidiary of a licensee in Colorado must promptly report to the CLGC all gaming applications and licenses submitted or obtained in jurisdictions outside Colorado. Upon the request of the CLGC or the CDG, licensees must provide all requested information about such foreign gaming operations. Violations of the gaming or other requirements of foreign jurisdictions could result in a finding of unsuitability in Colorado.

Additional information concerning the Colorado Gaming Regulations is available on the website of the CDG at www.colorado.gov/revenue/gaming.

**Status of The Debtors Under Gaming Regulations**

<u>Indiana</u>

The Debtors are licensed to operate the Majestic Star Casinos in Gary, Indiana. As such, the Debtors must comply with the Indiana Act and Indiana Rules and periodically submit detailed financial, operating, and other reports to the IGC and furnish any other information that the IGC may require. The Debtors currently hold all licenses and permits necessary to operate the Majestic Star Casinos. On September 16, 2010, the IGC concluded the complete reinvestigation of Majestic I and Majestic II required every three years by the Indiana Act and renewed the licenses of Majestic I and Majestic II for one year from June 3, 2010.

If it were determined that the Debtors violated the Indiana Act or Indiana Rules, their licenses could be limited, conditioned, suspended, or revoked. Such violations could expose the Majestic Star Casinos and any person involved in any violation to a substantial fine.

Additionally, as explained above, the IGC could adopt a resolution authorizing a POA Trustee to temporarily operate one or both of the Majestic Star Casinos if (i) the IGC revoked one or both of the Debtors' Indiana licenses; (ii) the IGC did not renew one or both of the licenses; (iii) a proposed transferee of one or both of the Debtors' licenses were denied a license and the Debtors were unwilling to retain ownership of the Majestic Star Casinos; or (iv) Majestic I or Majestic II agreed, in writing, to relinquish control to a POA Trustee approved by the

IGC.  The POA and POA Trustee for both Majestic I and Majestic II were approved by the IGC on March 4, 2010.  To date, the IGC has not exercised any of its rights under the POA.

<u>Mississippi</u>

Majestic I and Majestic Holdco are registered with the MGC as "publicly traded corporations" with direct and indirect interests in Barden Mississippi, the owner and operator of Fitzgeralds Tunica.  Majestic Holdco has been found suitable by the MGC to own the equity securities of its subsidiary intermediary gaming company, Majestic I.  Likewise, Majestic I has been found suitable by the MGC to own the equity securities of its gaming operating subsidiary, Barden Mississippi.  Barden Mississippi, which owns and operates Fitzgeralds Tunica, is licensed as a casino operator under the Mississippi Act.

Majestic I and Majestic Holdco, as registered holding companies, and Barden Mississippi, as a gaming licensee, must comply with the Mississippi Act and the MGC's regulations and policies promulgated pursuant thereto, periodically submit detailed financial, operating, and other reports to the MGC, and furnish any other information that the MGC may require, including but not limited to information regarding material loans, leases, sales of securities, and similar financing transactions.

If it were determined that Majestic Holdco, Majestic I, or Barden Mississippi violated the Mississippi Act or the MGC's regulations, the licenses and registrations granted to such entities by the MGC could be limited, conditioned, suspended, or revoked.  In addition, Majestic Holdco, Majestic I, and Barden Mississippi, and the persons involved therewith could be subject to substantial fines.

The MGC has renewed Barden Mississippi's license through December 7, 2010.  Barden Mississippi is currently in the process of submitting its application for renewal of its license.

<u>Colorado</u>

Barden Colorado is licensed in Colorado as a retail gaming licensee and operator licensee.  It is wholly-owned directly by Majestic I.  Majestic I is considered a publicly-traded entity under Rule 4.5 of the Colorado Gaming Regulations by the CDG.  Accordingly, Rule 4.5 applies to any acquisition of an interest in Barden Colorado through the acquisition of an interest in Majestic I.

Barden Colorado and its owners, officers, and directors have the necessary approvals from the CLGC to engage in their current gaming activities in Colorado.  Barden Colorado must periodically submit detailed information about its ownership and activities to the CLGC.  This includes information concerning loans, leases, and other commercial activities.  Any violation of the laws in Colorado or elsewhere by Barden Colorado or any of its affiliate may jeopardize the licenses held by Barden Colorado and may subject Barden Colorado to the imposition of fines, the cancellation of contracts, and other sanctions.

The CLGC has renewed Barden Colorado's operator and retail gaming licenses for the operation of the Fitzgeralds Casino in Black Hawk, Colorado through October 18, 2010.  The CLGC is currently reviewing Barden Colorado's application for renewal of its licenses.

**Potential Gaming Regulatory Approvals Would Be Necessary For the Restructured Company**

In the event that the Debtors are successful in obtaining Confirmation of the Plan, the state gaming laws described above will require the approval of gaming regulators prior to implementation of the Plan.  Such necessary prior approvals could include approvals for issuances of equity in the Reorganized Debtors to new investors in the Reorganized Debtors, and related mandatory findings of suitability for certain equity holders as well as approval of the credit facilities notes and certain security for such credit facilities and notes of the Reorganized Debtors.

The Debtors are party to certain legal proceedings.  Most of these legal proceedings have arisen in the ordinary course of the Debtors' business and involve claims for money damages.  Whether these claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the claims and the debt arising therefrom.  Generally, if the debt underlying such claims was incurred by one of the Debtors prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the claim is liquidated and resolved before or after the Effective Date.  Claims arising from conduct occurring after the Effective Date, unless provided for under the Plan, generally are not dischargeable through bankruptcy, and will be handled by the Reorganized Debtors in the ordinary course of its business after emergence.

## Legal Proceedings in the Bankruptcy Court

### Avoidance Actions

A number of transactions occurred prior to the Petition Date that may have given rise to claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "Avoidance Actions").

Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on November 22, 2011, *i.e.*, two years after the Petition Date.  To date, the Debtors have not made a determination whether they have any Avoidance Actions to prosecute.  For more information, see the section herein entitled "Effect of Confirmation of the Plan," which begins on page 73.

## Pending Legal Proceedings Outside the Bankruptcy Court

Based on a review of their pending litigations and proceedings, the Debtors are involved in the following material legal proceedings.  The Debtors are vigorously defending themselves in each of these matters.  Many of the proceedings set forth below are stayed under the automatic stay provisions of section 362 of the Bankruptcy Code.  Claims arising from the proceedings set forth below will be treated in accordance with the Plan.

Due to the nature of the Debtors' business, they are frequently subject to various personal injury and property damage claims and suits brought by customers.  With respect to each of these claims, the Debtors' maximum monetary exposure is their $250,000 insurance deductible for personal injury claims and a $100,000 deductible for property damage claims.  In addition, because approximately 15% of the Debtors' workforce in Gary, Indiana is subject to certain collective bargaining agreements, relatively minor labor grievances and arbitrations are frequently filed by employees.  At present, the majority of these proceedings involve monetary exposure of less than $25,000, with a total approximate exposure of $40,000.  However, the Debtors are confident that they will prevail in most proceedings.

### The Majestic Star Casino, LLC, et al v. Trustmark, Inc., Case No. 07C 2474, United States District Court for the Northern District of Illinois

Majestic I, Barden Mississippi, and Barden Colorado (the "Insurance Litigation Plaintiffs") filed suit against their previous stop-loss health insurance provider ("Insurance Provider") and the Insurance Provider's managing general underwriter seeking declaratory relief and damages for unpaid claims totaling approximately $0.7 million, punitive damages and attorneys' fees.  The Insurance Provider has denied that payment on the claims is owing and filed a counter-claim seeking damages totaling $0.1 million plus prejudgment interest or, in the alternative, unspecified damages believed to total $0.3 million for its alleged losses under the contracts.  The parties have completed the discovery phase of the litigation and filed cross-motions for partial summary judgment. The Insurance Litigation Plaintiffs' motion for summary judgment on certain of the Insurance Provider's counterclaims was granted.  The Insurance Provider's partial motion for summary judgment was granted only with respect to

limited claims related to certain exclusions and with respect to the Insurance Litigation Plaintiffs' breach of fiduciary duty claim. All but one count of the Insurance Litigation Plaintiffs' amended complaint remain to be tried against both defendants. The parties have engaged in informal settlement discussions. Should settlement negotiations not be successful, it is anticipated that trial will begin in the fall or winter of 2010. The Insurance Litigation Plaintiffs believe they are entitled to a substantial recovery on their claims, which include both contract and tort claims, and believe the Insurance Provider's counter-claim is without merit; however, the Insurance Litigation Plaintiffs cannot determine with certainty the outcome of the litigation or the likelihood or the amount of any recovery. On December 9, 2009, the Debtors filed a Notice of Bankruptcy and Motion for Stay in the insurance litigation, which was granted pending further order of the Bankruptcy Court. The parties to the Insurance Litigation are engaged in settlement discussions.

<u>The Majestic Star Casino, LLC v. Benefit Administration Systems, LLC, Case No. 51 293 515 09, American Arbitration Association</u>

During the course of the Insurance Litigation, Majestic I learned of various errors and omissions by its former third-party administrator ("<u>TPA</u>") which administered Majestic I's health plans between October 2003 and December 2005. Majestic I believes some of these errors led to the denial of some of the stop loss insurance claims at issue in the insurance litigation described above. On April 20, 2009, Majestic I commenced an arbitration proceeding against the TPA before the American Arbitration Association. Majestic I asserts breach of contract, breach of fiduciary duty, and negligence claims against the TPA and is seeking recovery of approximately $0.7 million, plus attorneys' fees and costs. Contractual damages received from the TPA, if any, are likely to offset contractual damages received from the Insurance Provider and its managing general underwriter, if any, in the insurance litigation, and vice versa. Should Majestic I not prevail in the arbitration, the TPA could recover its attorney's fees and costs from Majestic I. Discovery in the arbitration has concluded and prehearing briefs have been submitted by both parties. The parties' informal settlement discussions have not been successful to date. The arbitration is currently scheduled to begin in mid to late 2010. Majestic I cannot determine with certainty the outcome of the arbitration or the amount of any recovery.

<u>The Majestic Star Casino, LLC v. Indiana Department of State Revenue, Case No. 71T10-0207-TA-84, Indiana Tax Court</u>

Majestic I has been assessed $2.6 million of withholding tax, plus interest, for the fiscal year 1996 and the period January 1, 1998 through June 18, 2001, by the Indiana Department of Revenue ("<u>IDR</u>"). On September 7, 2004, the IDR assessed BDI, Majestic I's ultimate parent and member, $1.3 million of income tax, plus penalties and interest for the remainder of 2001 and all of fiscal year 2002. The IDR held a hearing on the 1996 through 2002 tax years on April 7, 2006 to consider Majestic I's and BDI's protests over the tax assessments and negligence penalties. The IDR issued rulings on January 17, 2007. In those rulings, the IDR sustained BDI's protest of the imposition of a negligence penalty, holding that BDI's failure to pay the assessed tax amount was due to reasonable cause and not due to negligence. The IDR also concurred with the position taken by Majestic I and BDI that to the extent it is ultimately determined they had net operating losses for a taxable year, those net operating losses are to be applied to offset any add-back of riverboat wagering tax for income tax purposes. The IDR denied Majestic I's protest that nonresident withholding taxes did not apply for the fiscal year 1996 and the period January 1, 1998 through 2001. Majestic I and BDI filed petitions with the Indiana Tax Court on March 19, 2007 appealing the IDR's rulings for the 1996-2002 tax years.

BDI's nonresident shareholder has been assessed $0.2 million, plus penalties and interest, for 2003. That assessment was protested by BDI's nonresident shareholder to the legal division of the IDR. The IDR held a hearing on the 2003 protest on December 5, 2006, and issued its ruling on March 14, 2007. In that ruling, the IDR sustained the shareholder's protest of the imposition of a negligence penalty. The IDR denied the protest of the amount of tax assessed. An appeal of that ruling was filed with the Indiana Tax Court on May 14, 2007.

The assessments relate to deductions for gaming taxes paid by Majestic I, which deductions were taken for Indiana income tax purposes. The IDR has taken the position that Majestic I had an obligation to add back state gaming taxes in determining Majestic I's taxable income, and to withhold and remit tax for the nonresident shareholder of BDI. On April 19, 2004, the Indiana Tax Court ruled in a similar case involving another Indiana casino, Aztar Indiana Gaming Corporation ("<u>Aztar</u>"), that the gross wagering tax is a tax based on or measured by

income and that it must be added back to the taxable income base for the purpose of determining adjusted gross income for Indiana tax purposes. On September 28, 2004, the Indiana Supreme Court denied Aztar's request to review the Indiana Tax Court's decision, and thus, the Indiana Tax Court's opinion in the Aztar case is controlling precedent on the wagering tax add-back issue. Majestic I and BDI continue to pursue their protest with the IDR on the grounds that the assessments contain calculation errors and that their protest sets forth issues not decided in the Aztar case. No liability has been accrued in Majestic I's financial statements relating to this matter.

Should Majestic I ultimately be found liable for additional income taxes to the State of Indiana, such liabilities will be treated in accordance with the Plan.

Majestic I Property Tax Assessment Appeals

Majestic I received several notices of assessment from the Calumet Township (Lake County, Indiana) Assessor increasing the assessed valuation of the Company's real property, including multiple parcels of land and improvements and the Company's riverboats, for the 2006 through 2008 assessment years. The notices of assessment concern taxes payable in calendar years 2007 through 2009. Majestic I has initiated administrative appeals to challenge the increased assessed valuations of the Company's real property for these periods because Majestic I believes such increased assessed valuations are unsupportable. Majestic I has continued to pay its real property taxes based on the assessed valuations in place prior to the increases in assessment. Majestic I has not yet received final tax bills for the 2009 assessment year; however, Majestic I has received provisional property tax bills, based on property tax bills from 2008 that were paid in May 2010. The provisional bills do not contain the actual assessed value of the real property or actual tax rates.

If the increased assessments are ultimately upheld for the 2006 through 2008 years, and if the final 2009 assessment and tax rates approximate the 2008 bills, Majestic I will be required to take an additional charge to earnings, net of property taxes already accrued, of $15.6 million, in addition to interest. Majestic I based its 2010 property tax accrual on the tax rates imposed for the 2008 tax year.

It is too early to predict the outcome of the real property tax assessment appeals or the amounts due for the 2009 assessment year. The range of possible outcomes is between $0 and $18.6 million, exclusive of interest, based upon actual and provisional tax bills received. The Debtors cannot state with certainty whether any amount in this range is more likely to be realized than any other.

The Majestic Star Casino, LLC, Majestic Star Casino, Inc., and Gary New Century, LLC v. City of Gary, Case No. 52489 Y 00091 08, American Arbitration Association; and

The Majestic Star Casino, LLC, Majestic Star Casino II, Inc., f/k/a/ Trump Indiana, Inc., and Gary New Century, LLC v. City of Gary and Indiana Gaming Commission, Case No. 49D13 08 02 PL 006612

As discussed above, Gary entered into the Local Development Agreements with Trump Indiana and Majestic I in 1996 and the Amended Local Development Agreement with Majestic I and Majestic II in 2005. The current mayor of the Gary, who took office on April 7, 2006, claims that the Amended Local Development Agreement, signed by the prior mayor on behalf of Gary, is not enforceable because the prior mayor lacked the authority to bind Gary. Majestic I and Majestic II have taken the position that the Amended Local Development Agreement is valid and binding.

Given that both of the original Local Development Agreements contain mandatory arbitration provisions, on February 11, 2008, Majestic I and Majestic II commenced the Gary Arbitration before the American Arbitration Association. In the Gary Arbitration, Majestic I and Majestic II request that the Amended Local Development Agreement be declared to be in full force and effect, and that Gary be found to be in material breach of it and that Majestic I and Majestic II be awarded damages. In the event that the Amended Local Development Agreement is deemed not enforceable, Majestic I and Majestic II alternatively request that Gary be found in breach of the original Local Development Agreements, and that the Majestic I and Majestic II be awarded damages.

Simultaneously with the Gary Arbitration, Majestic I and Majestic II also filed the Marion County Lawsuit in Marion County Superior Court. In the Marion County Lawsuit, Majestic I and Majestic II seek to bind the IGC to

the results of the Gary Arbitration and to litigate any matters that are not covered by the parties' arbitration agreement.

Majestic I and Majestic II filed the Gary Arbitration and the Marion County Lawsuit because Gary has failed, pursuant to its obligations under either the Amended Local Development Agreement or, in the alternative, the earlier Local Development Agreements, to conduct environmental remediation of certain property owned by the Company, and to construct the required access roads and freeway interchange to the Majestic Star Casinos. If the Amended Local Development Agreement is found not to be enforceable, then Majestic II could be required to pay Gary an additional 1% of adjusted gross gaming receipts, retroactive to December 21, 2005, which would be due under the previously terminated Local Development Agreement with Trump Indiana. As of June 30, 2010, the additional 1% potentially due to Gary from Majestic II would equal approximately $5.0 million.

Effective for the tax period beginning January 2008, Majestic I and Majestic II began depositing the economic incentive funds payable to Gary for 2008 under the Amended Local Development Agreement into a segregated bank account. On May 2, 2008, the Marion County Superior Court denied Gary's motion for a preliminary injunction to compel Majestic I and Majestic II to resume payment to Gary of the economic incentive funds pending resolution of the case.

Gary appealed the denial of its injunction motion to the Indiana Court of Appeals (No. 49A02-0807-CV-00625), filing its appellate brief on July 30, 2008. After a stay to permit the parties to explore settlement, which expired November 30, 2008, as discussed more fully below, Majestic I and Majestic II timely filed their appellate brief with the Indiana Court of Appeals on January 20, 2009, as did the IGC (which supports the position of Majestic I and Majestic II on the proper trial court venue for the action, and has remained neutral on Gary's attempt to require Majestic I and Majestic II to resume payments of the economic incentive funds). On May 14, 2009, the Indiana Court of Appeals issued a decision affirming the trial court's denial of Gary's motion for a preliminary injunction seeking to compel Majestic I and Majestic II to resume payment to Gary during the pendency of the Marion County Lawsuit. Gary's petition for review of this decision was denied by the Indiana Supreme Court on August 20, 2009.

As of June 30, 2010, the balances in the segregated economic incentive fund and lakefront capital improvement fund bank accounts were $10.5 million and $1.2 million, respectively. It is too early to determine with certainty the outcome of the Gary Arbitration or Marion County Lawsuit or the amount or likelihood of any recovery from Gary. Both proceedings have been stayed pending further order of the Bankruptcy Court. Gary, Majestic I, and Majestic II are currently engaged in settlement discussions.

<u>City of Gary, Indiana v. Don H. Barden, et al, Case No. 2:10-CV-00160-PPS-PRC, United States District Court, Northern District of Indiana, Hammond Division</u>

On March 11, 2010, Gary filed the Lake County Lawsuit in the Superior Court of Lake County, Indiana against the Lake County Defendants (eight current and former individual officers, directors, and employees of Majestic I and Majestic II and their affiliated entities). The Lake County Lawsuit alleges two causes of action against the Lake County Defendants for negligence and civil conversion related to and arising out of the segregated economic incentive funds which are the subject of the Marion County Lawsuit. Gary claims to have suffered damages based on those causes of action. Majestic I and Majestic II believe that continuation of the Lake County Lawsuit against the Lake County Defendants threatens to undermine the protection of the automatic stay, to deplete property of the estate, and to disrupt the Debtors' reorganization efforts. Accordingly, on March 29, 2010 the Debtors instituted an adversary proceeding against Gary (10-50841) in the Bankruptcy Court and filed a motion to obtain an order, pursuant to 11 U.S.C. § 362, extending the automatic stay to the Lake County Defendants with respect to the Lake County Lawsuit, or in the alternative, an order preliminarily enjoining Gary from prosecuting the Lake County Lawsuit against the Lake County Defendants. Gary filed pleadings and papers in opposition to the Debtors motion, and the Debtors timely filed their reply. A hearing on the matter was held before the Bankruptcy Court on April 27, 2010, and on April 28, 2010, the Bankruptcy Court entered a memorandum order granting the Debtors' request for the extension of the automatic stay to the Lake County Defendants pending further order of the Bankruptcy Court. On or about May 12, 2010, Gary filed a notice of appeal in the Bankruptcy Court to appeal the memorandum order to the United States District Court for the District of Delaware. The Bankruptcy Court set the pre-trial conference on the Debtors' Verified Complaint to Extend the Automatic Stay, or in the Alternative, for

Injunctive Relief ("Adversarial Complaint") for May 25, 2010. The parties, by agreement, extended the pre-trial conference date to October 26, 2010 and the deadline for Gary to respond to the Adversarial Complaint to September 26, 2010.

On April 15, 2010, a Joint Notice of Removal was filed with the United States District Court for the Northern District of Indiana, Hammond Division, removing the Lake County Lawsuit from the Superior Court of Lake County, Indiana to the United States District Court for the Northern District of Indiana, Hammond Division. On or about April 19, 2010, Gary dismissed its negligence claim against the Lake County Defendants. Gary and the Company are currently engaged in settlement discussions.

## Projected Financial Information

Attached as Exhibit C are the following: (a) a consolidated projected income statement for the period from 2010 through 2015 (the "Projection Period"); (b) a consolidated projected balance sheet for the Projection Period; and (c) a consolidated projected statement of cash flow for the Projection Period.

The projections have been prepared by the Debtors' management with the assistance of the Debtors' retained financial advisors. Such projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants and the rules and regulations of the United States Securities and Exchange Commission. In assisting in the preparation, XRoads relied upon the accuracy and completeness of financial and other information furnished by the Debtors' management and third parties, as well as publicly-available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by the Debtors and third parties with respect to the anticipated future performance of the Reorganized Debtors. XRoads did not attempt to audit or verify such information independently. Neither the Debtors nor their financial advisors conducted an independent investigation into any of the legal, tax, or accounting matters affecting the Debtors or the Reorganized Debtors, and, therefore, neither makes any representation as to their impact on the Debtors or the Reorganized Debtors from a financial point of view. Further, the Debtors' independent accountants have neither examined nor compiled the accompanying actual results and projections and, accordingly, do not express an opinion or any other form of assurance with respect to the projections, assume no responsibility for the projections, and disclaim any association with the projections. Except for purposes of this Disclosure Statement, the Debtors do not publish projections of their anticipated financial position or results of operations.

The projections contain certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are and will be beyond the control of the Reorganized Debtors, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, currency exchange rate fluctuations, existing and future governmental regulations and actions of government bodies, natural disasters and unusual weather conditions and other market and competitive conditions. Holders of claims are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Debtors and the Reorganized Debtors undertake no obligation to update any such statements.

The projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which are and will be beyond the Reorganized Debtors' control. The Debtors caution that no representations can be made or are made as to the accuracy of the historical financial information or the projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions may prove to be inaccurate. Moreover, events and circumstances occurring subsequent to the date on which these projections were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and the Reorganized Debtors do not intend and undertake no obligation to update or otherwise revise the projections to reflect events or circumstances existing or arising after the date this Disclosure Statement is initially filed or to reflect the occurrence of unanticipated events. The projections, therefore, may not be relied upon as a

guarantee or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections.

Creditors and other interested parties should see the section herein entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The projections have been prepared based on the assumptions that the Effective Date of the Plan is September 30, 2011 and the Reorganized Debtors' business plan is successfully implemented. Although the Debtors presently intend to cause the Effective Date to occur as soon as practicable following Confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur given the conditions for the Effective Date to occur pursuant to the terms of the Plan.

The projections are based on, among other things: (a) current and projected market conditions of the Reorganized Debtors' market; (b) the ability to maintain sufficient working capital to fund operations; and (c) Confirmation of the Plan.

## Risk Factors

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to, or incorporated by reference herein, prior to voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.*

### Risks Relating to Bankruptcy

#### The Debtors may not be able to obtain Confirmation of the Plan.

To emerge successfully from the Chapter 11 Cases, the Debtors must obtain approval of the Plan from their creditors, secure Confirmation of the Plan through the Bankruptcy Court, and successfully implement the Plan as confirmed. The foregoing process requires the Debtors to (a) meet statutory requirements with respect to the adequacy of disclosures with respect to the Plan, (b) solicit and obtain creditor acceptances of the Plan, and (c) fulfill other statutory conditions with respect to Plan Confirmation.

With regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm a plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. In order to confirm a plan against a dissenting Class, the Bankruptcy Court also must find that at least one impaired Class has accepted the Plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Finally, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) the Debtors' Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, (b) Confirmation of the Debtors' Plan is not likely to be followed by a liquidation or a need for further financial reorganization, and (c) the value of distributions to non-accepting Holders of Claims within a particular Class under the Debtors' Plan will not be less than the value of distributions such Holders would

receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court may determine that the Plan does not satisfy one or more of these requirements, in which case the Plan would not be confirmed by the Bankruptcy Court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions Holders of Claims against or Holders of the Debtors' common stock or other Equity Interests ultimately would receive with respect to their Claims or Equity Interests. There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Chapter 11 Cases that is acceptable to the Bankruptcy Court and the Debtors' creditors, equity holders, and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization. Finally, the Debtors' emergence from bankruptcy is not assured. While the Debtors expect to emerge from bankruptcy in the future, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur.

### Loss of key management and employees.

The Debtors' success is largely dependent on the skills, experience, and efforts of their people. The loss of the services of one or more members of the Debtors' senior management or of numerous employees with critical skills could have a negative effect on their business, financial condition and results of operations. If the Debtors are not able to attract talented, committed individuals to fill vacant positions when the need arises, it may adversely affect their ability to fully implement their business objectives.

### Increases in costs could adversely affect the Debtors' operating results.

The Debtors' inability to maintain their cost structure and efficiently operate their gaming facilities may reduce their operating results. In addition, increases in certain non-controllable or mandatory costs that are driven by external factors may reduce the Debtors' operating results. Examples of these costs are energy, insurance, and taxes.

### The conditions precedent to the Confirmation and consummation of the Plan may not occur.

As more fully set forth in Exhibit A, the occurrence of Confirmation of the Plan and the Effective Date of the Plan are each subject to a number of conditions precedent. If the conditions precedent to Confirmation are not met or waived, the Plan will not be confirmed, and if the conditions precedent to the Effective Date are not met or waived, the Effective Date will not take place.

Article XII.D of the Plan provides, in relevant part, that "[i]f the Effective Date has not occurred within 270 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court." Furthermore, Article XII.C of the Plan provides that, "[w]ith the exception of any governmental, regulatory, and/or other Gaming License-related approvals or consents (as referred to in Article XII.B.4 of the Plan) that are legally required to consummate the restructuring transactions to be effected by the Plan, the Debtors, or the Reorganized Debtors, as applicable, with the consent of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee (which consents shall not be withheld unreasonably), may waive any of the conditions to Confirmation or the Effective Date at any time without any notice to parties in interest." In other words, if all conditions precedent to the Effective Date have not occurred within 270 days after Confirmation, the Debtors (or any other party-in-interest) can seek to have the Confirmation Order vacated, and the Debtors can waive the conditions precedent to Confirmation and the Effective Date (other than governmental or regulatory approvals) at any time without notice to any party (other than the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee).

The Plan requires certain regulatory action by The Indiana Gaming Commission, The Mississippi Gaming Commission, and The Colorado Limited Gaming Control Commission, which may delay the Debtors' emergence from these Chapter 11 Cases.

For the Plan to become effective, the Debtors' state gaming regulators must license and approve the new owner(s) and operator(s) of the Debtors' gaming businesses and approve the incurrence of debt in connection with, and other aspects of, the restructuring transactions comprising the Plan. While the Debtors will actively pursue such approvals, the Debtors can make no assurances as to if and when such approvals will be granted. Failure by the Debtors' gaming regulators to grant the necessary approvals will delay and may even prevent the Debtors' emergence from Chapter 11.

The recovery for Holders of the General Unsecured Claims against the Debtors may be diluted and the ultimate amount of Allowed Claims against the Debtors may not be finalized until after the Effective Date.

To date, 148 proofs of Claim have been filed against the Debtors. The asserted amount of such Claims is approximately $2,950,646,644. The Debtors have not yet completed their Claims reconciliation process and therefore have not fully analyzed these filed proofs of Claim. Through the Debtors' Claims reconciliation process, certain filed proofs of Claim may be reduced or disallowed. As a result, the Claims reconciliation process may result in changes that could affect the recovery for Holders of General Unsecured Claims under the Plan.

Parties in interest may object to the Debtors' classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a Claim or an Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Bankruptcy Court may reach a different conclusion.

The Debtors may object to the amount or classification of a Claim.

The Debtors reserve the right to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim whose Claim is subject to an objection. Any such Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

The Debtors may not be able to achieve their projected financial results.

The financial projections set forth on Exhibit C to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations. The Debtors' actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, the Debtors may lack the necessary capital to continue operating as planned after the Effective Date of the Plan.

The Holders of Senior Secured Notes Indenture Claims and Senior Notes Claims will acquire a substantial majority of the New Membership Interests upon consummation of the Plan.

Holders of Senior Secured Notes Indenture Claims and Senior Notes Claims will receive a substantial majority of the New Membership Interests, and thus will be in a position to control the outcome of actions requiring stockholder or member approval, including, among other things, election of the Board of Managers. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Debtors and, consequently, impact the value of the New Membership Interests.

<u>Historical financial information of the Debtors may not be comparable to the financial information of the Reorganized Debtors.</u>

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

<u>Certain tax consequences of the Debtors' Plan raise unsettled and complex legal issues and involve various factual determinations.</u>

Some of the material consequences of the Plan regarding U.S. federal income taxes are summarized under the section herein entitled "Certain U.S. Federal Income Tax Consequences of the Plan." Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. No ruling from the U.S. Internal Revenue Service ("<u>IRS</u>") has been or will be sought by the Debtors regarding any of the tax consequences described in this Disclosure Statement. The IRS may challenge the various positions the Debtors have taken, or intend to take, with respect to their tax treatment, and a court may sustain such a challenge or objection by the IRS. For a more detailed discussion of risks relating to the specific positions the Debtors intend to take with respect to various tax issues, please review the section herein entitled "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 78.

<u>The Reorganized Debtors' Amended and Restated Operating Agreements could deter takeover attempts that some shareholders may consider desirable, which could adversely affect the value of the New Membership Interests.</u>

Various provisions of the Reorganized Debtors' Amended and Restated Operating Agreements, and Delaware law, could make acquiring control of the Reorganized Debtors without the requisite support of its Board of Managers difficult for a third party, even if the change of control would be beneficial to a recipient of New Membership Interests. The existence of these provisions could deprive certain recipients of New Membership Interests of an opportunity to sell their shares of New Membership Interests at a premium over the prevailing market price. The potential inability of holders of New Membership Interests to obtain a control premium could, in certain instances, depress any future trading prices of New Membership Interests.

<u>The Debtors depend on generating (and having available to the applicable obligor) sufficient cash flow to fund their debt obligations, capital expenditures, and ongoing operations. The Debtors access to additional financing may be limited, which could adversely affect the Debtors' financial condition and their ability to conduct their business.</u>

The Debtors' ability to service their debt and to fund their planned capital expenditures and ongoing operations will depend on both their ability to generate and grow cash flow and their access (by dividend or otherwise) to additional liquidity sources. The Debtors' ability to generate and grow cash flow is dependent on many factors, including:

- the Debtors' ability to sustain and grow revenues and cash flows from operating activities and to maintain and grow their customer base, particularly in the face of increasing competition;

- general business conditions, economic uncertainty or downturn, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the housing sector and overall economy;

- the effects of current and potential future competitors on the Debtors' business; and

- the effects of governmental regulation on the Debtors' business.

Some of these factors are beyond the Debtors' control.  It is also difficult to assess the impact that the general economic downturn and recent turmoil in the credit markets will have on future operations and financial results.  However, the general economic downturn has resulted in reduced spending by customers, which may have caused the Debtors' revenues and cash flows from operating activities to differ from those that otherwise would have been generated.  If the Debtors are unable to generate sufficient cash flow or are unable to access additional liquidity sources, they may not be able to service and repay their debt, operate their business, respond to competitive challenges, or fund other liquidity and capital needs.  It is uncertain whether the Debtors will be able, under applicable law, to make distributions or otherwise move cash to the relevant entities for payment of interest and principal.

<u>Economic conditions, including a worsening of the current economy and other factors affecting discretionary consumer spending, may harm the Debtors' businesses, financial conditions, and results of operations.</u>

The Debtors' businesses may be adversely affected by the recession currently being experienced in the United States because the Debtors are dependent on discretionary spending by their customers.  The continuation or worsening of current economic conditions could cause fewer people to spend money or cause people to spend less money at the Debtors' facility and could adversely affect the Debtors' revenues.

<u>Intense competition could result in loss of market share or profitability.</u>

The Debtors face intense competition in the market in which each gaming facility is located.  The Debtors' primary facilities, The Majestic Star Casino and The Majestic Star Casino II, compete with several major casino-hotels in Indiana.  Competition continues to increase in the region, with a number of the Debtors' competitors planning to build new or expanded facilities.

Some of the Debtors' competitors have significantly greater financial resources, and, as a result, the Debtors may be unable to compete successfully with them in the future.  In addition, online gaming, despite its current illegality in the United States, is a growing sector in the gaming industry.  Online casinos offer a variety of games, including slot machines, roulette, poker, and blackjack.  Such online casinos allow individuals to participate using credit or debit cards or other forms of electronic payment.  The Debtors are unable to assess the impact that online gaming will have on their business operations in the future and there is no assurance that the impact will not be materially adverse.

Competition from other casino and hotel operators involves not only the quality of casino, hotel room, restaurant, entertainment, and convention facilities, but also the pricing of such services.  The Debtors' operating results may be adversely affected by significant cash outlays for advertising and promotions for complementary services to patrons.  If the Debtors lack the financial resources or liquidity to match the promotions of competitors, the number of casino patrons may decline, adversely affecting the Debtors' financial performance.

The Debtors' ability to compete successfully will also depend on their ability to develop and implement effective marketing campaigns to attract customers to their facilities.  To the extent that they are unable to do so, the Debtors may not be able to successfully compete in their markets, and their financial position could be adversely affected.

<u>Work stoppages, labor problems, and unexpected shutdowns may limit the Debtors' operational flexibility and negatively impact the Debtors' revenue.</u>

The Debtors are party to certain collective-bargaining agreements with labor unions.  There can be no assurances that the Debtors will be able to renegotiate the labor agreements that are currently in effect without incurring significant increases in their labor costs.  Changes to the collective-bargaining agreements could cause significant increases in labor costs, which could have a material adverse affect on the Debtors' businesses, financial conditions, and operations.

Moreover, the unions with which the Debtors have collective-bargaining agreements or other unions could seek to organize groups of employees that are not currently represented by a union. Union organization efforts may occur in the future, potentially causing disruptions to the Debtors' businesses and resulting in increased costs, both of which could have a material adverse effect on the Debtors' businesses, financial condition, and operations.

Lastly, if the Debtors are unable to negotiate new collective-bargaining agreements on mutually acceptable terms, aggrieved employees may engage in strikes or other forms of workplace disruptions, which could have a materially adverse effect on the Debtors' business and operations. Any unexpected work stoppage by the Debtors' employees could have an adverse effect on their businesses and operations, resulting in negative media attention and potentially discouraging customers from visiting the Debtors' facilities. There cannot be assurance that the Debtors can be adequately prepared for unexpected labor developments that may lead to a temporary or permanent shutdown of their facilities.

## Confirmation of the Plan

### The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for December 16, 2010 to take place at 10:00 a.m. (prevailing Eastern Time) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

### Deadline to Object to Confirmation

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than December 9, 2010 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. **Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.**

### Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Equity Interests, or if rejected by an impaired Class, that the Plan is accepted by at least one impaired Class of Claims and "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of Holders of Claims and Equity Interests that are impaired under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of Chapter 11 of the Bankruptcy Code; (2) the Debtors have complied or will have complied with all of the necessary requirements of Chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Debtors believe the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

**Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court find, as a condition to confirmation, that a Chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a Chapter 7 trustee would generate if the debtor's Chapter 11 case were converted to a Chapter 7 case and the assets of the debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed and consummated.

To estimate what members of each impaired Class of Claims would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a Chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to Holders of General Unsecured Claims or Equity Interests would be reduced by, among other things: (a) the claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases; (c) unpaid Administrative Expense Claims of the Chapter 11 cases; and (d) Priority Claims and Priority Tax

Claims. The Debtors' costs of liquidation in Chapter 7 Cases would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the operation of the Debtors during the Chapter 7 Cases, and all unpaid Administrative Expense Claims incurred by the Debtors during the Chapter 11 cases that are allowed in the Chapter 7 cases. The liquidation itself would trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate the payment of other Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business. These Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, before the balance would be made available to pay other Claims or to make any distribution in respect of Equity Interests.

Based on the Liquidation Analyses set forth in Exhibit E of this Disclosure Statement, the Debtors believe Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a Chapter 7 liquidation. In summary, the Debtors and their management believe that Chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by Holders of General Unsecured Claims entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

- The erosion of the value of the Debtors' assets in the context of an expedited going concern sale or asset-by-asset liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail;

- The increased cost and expenses of liquidation under Chapter 7 arising from fees payable to the Chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- Additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation and from the rejection of Unexpired Leases and Executory Contracts in connection with the cessation of the Debtors' operations;

- The adverse effects on the salability of portions of the business resulting from the possible departure of key employees and the attendant loss of customers and vendors; and

- The application of the rule of absolute priority under the Bankruptcy Code to distributions made in a Chapter 7 liquidation.

Consequently, the Debtors and their management believe Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a Chapter 7 liquidation.

If the Plan is not confirmed and the Debtors fail to propose and confirm an alternative plan of reorganization, they may be liquidated pursuant to the provisions of a Chapter 11 liquidating plan. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in higher administrative costs. Because a trustee's appointment is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a Chapter 7 trustee must be appointed. Any distribution to Holders of Claims under a Chapter 11 liquidation plan probably would be delayed substantially. Most importantly, the Debtors believe any distributions to creditors in a liquidation scenario would fail to capture the significant "going concern" value of their business, which is reflected in the New Membership Interests to be distributed under the Plan. Accordingly, the Debtors believe Chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of a debtor, or any successor to a debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the projections, as set forth on Exhibit C. Based upon the projections, the Debtors believe their businesses will be viable operations following the Chapter 11 Cases, and the Plan will meet the feasibility requirements of the Bankruptcy Code.

**Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan, and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

**Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

**No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

> Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; (2) each holder of a secured claim in the class receives

deferred cash payments totaling at least the allowed amount of such claim with a value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens. Alternatively, a plan is "fair and equitable" with respect to a non-accepting class of secured claims if holders of such claims will receive the "indubitable" equivalent of such claims pursuant to the plan of reorganization.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property, subject to the applicability of the "new value" exception.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the Effective Date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or Schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## New Value

A corollary to the "fair and equitable" test, the new value doctrine, permits old equity holders to keep their ownership interests even though senior dissenting creditors do not receive payment in full of their claims provided that the old equity holders make a new contribution (a) in money or money's worth, (b) that is reasonably equivalent to the value of the new equity interests being received in the reorganized debtor, and (c) that is necessary for implementation of a feasible plan of reorganization.

## Valuation of the Debtors

In conjunction with formulating the Plan, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Reorganized Debtors. Accordingly, such valuation is set forth in Exhibit D attached hereto.

## Effect of Confirmation of the Plan

## Preservation of Avoidance Actions

On and after the Effective Date, actions, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "Avoidance

Actions") will be preserved and retained by the Debtors. The Debtors may offset any claim supporting an Avoidance Action against any payment due to any holder of a claim under the Plan. In addition, if a distribution is made in error, the Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such distribution. In the event that the Plan, as proposed, is consummated, Avoidance Actions that may potentially be brought might be waived; provided, however that such waiver will not be effective if the Plan is not effectuated.

## Retention of Jurisdiction by the Bankruptcy Court

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

- Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

- Adjudicate, decide or resolve any and all matters related to Causes of Action;

- Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

- Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

- Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

- Adjudicate any and all disputes arising from or relating to distributions under the Plan;

- Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- Enforce all orders previously entered by the Bankruptcy Court; and

- Hear any other matter not inconsistent with the Bankruptcy Code..

**Term of Bankruptcy Injunction or Stays**

<u>Releases</u>

**Releases by the Debtors**

On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including: (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; (2) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each of the Released Parties (and each such Released Party so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or

otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Released Party in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Released Party from any Causes of Action expressly set forth in and preserved by the Plan. Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future against the Non-Released Parties.

**Third Party Releases**

On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Released Party) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents. Notwithstanding anything in the Plan to the contrary, the Released Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future against the Non-Released Parties. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Released Parties.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties. This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

Injunction

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

Exculpation

The Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or Postpetition act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other Prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall

have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of the Released Parties.

### Important Securities Law Disclosure

**Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and Pursuant to Exemptions under the Securities Act of 1933, as Amended**

Under the Plan, substantially all of the units of New Membership Interests will be distributed to Holders of Allowed Senior Secured Notes Indenture Claims and Holders of Allowed Senior Notes Indenture Claims.

The Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the New Membership Interests contemplated by the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities; and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive New Membership Interests are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell the New Membership Interests without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, holders of New Membership Interests deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. As noted in this Disclosure Statement, it is not contemplated that the

Reorganized Debtors will be a public reporting company and, therefore, it is unlikely in the period initially following the Effective Date that current public information will be available to permit resales pursuant to Rule 144.

## Voting Instructions

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8.  Only the Holders of Claims in these Classes are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided.

The Debtors, with the approval of the Bankruptcy Court, have engaged Epiq to serve as the Solicitation Agent for Claims to assist in the solicitation process.  The Solicitation Agent will, among other things, answer questions, provide additional copies of all solicitation materials, and generally oversee the solicitation process for their assigned Claims.  The Solicitation Agent will also process and tabulate ballots for each of their respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

**The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on December 6, 2010.**

| **BALLOTS** |
| --- |
| Ballots must be actually received by the Solicitation Agent by the voting deadline of 5:00 p.m. (prevailing Eastern Time) on December 6, 2010 at the following address:<br><br>**If by mail:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.:  The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**FDR Station PO Box 5014**<br>**New York, New York 10150**<br><br>**If by hand delivery or overnight courier:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.:  The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**757 Third Avenue, 3rd Floor**<br>**New York, New York 10017**<br><br>If you have any questions on the procedure for voting on the Plan, please call the Solicitation Agent at the following telephone number:<br><br>(646) 282-2400 |

**MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS AND INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN.  FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED AND RECEIVED BY 5:00 P.M. (PREVAILING EASTERN TIME), ON DECEMBER 6, 2010.**

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.

EACH HOLDER OF A CLAIM AND/OR INTEREST MAY CAST ONLY ONE BALLOT PER EACH SUCH CLAIM OR INTEREST HELD. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST IN CLASSES A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, AND H-8 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM AND/OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS AND/OR INTERESTS, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.

### Certain U.S. Federal Income Tax Consequences of the Plan

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Interests and Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained as to any of the tax consequences of the Plan discussed below and the Debtors do not intend to seek a ruling from the Internal Revenue Service ("IRS") as to any such tax consequences and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

Except as otherwise provided below, this summary does not apply to Holders of Allowed Claims that are not "United States persons" (as such term is defined in the IRC) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that Holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the IRC. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each Holder of an Interest or a Claim. Each holder of an Interest or a Claim is urged to consult his, her, or its tax advisors with respect to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan. This discussion does not address special consideration that may be applicable to Holders holding more than one Class of Claims. Such Holders should consult their tax advisors with respect to their particular circumstances.

*IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the IRC. The tax advice contained in this Disclosure Statement was written to support the promotion or marketing of the transactions described in this Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.*

**Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors and BDI**

For federal income tax purposes, the Debtors, excluding the Debtors organized as corporations, are classified as disregarded entities (the "Disregarded Debtors"). As such, all of the Disregarded Debtors' assets and liabilities are treated as assets and liabilities of BDI. Upon consummation of the Plan, BDI's direct and indirect equity interest in the Debtors will be cancelled and the New Membership Interests will be issued by Majestic Holdco and distributed to certain creditors of the Debtors, as more fully described in the Plan. The federal income tax consequences of these transactions are not entirely clear.

From BDI's perspective, the transaction will likely be characterized as a taxable transfer of the assets of the Disregarded Debtors and the equity interests of the Debtors that are classified as corporations (the "Corporate Debtors") to the creditors in partial satisfaction of their Claims against the Debtors. In that event, BDI will have taxable gain to the extent the amount of the Claims against the Disregarded Debtors exceeds the tax basis in the Disregarded Debtors' assets. Alternatively, it is possible that the amount of taxable gain will be determined by reference to the fair value of the Disregarded Debtors' assets, rather than the amount of Claims, if the Claims are characterized as recourse obligations of BDI for federal income tax purposes. In such case, BDI could have cancellation of debt income ("COD Income") (discussed in more detail below) to the extent that Holders of Claims against the Disregarded Entities receive less than 100% recovery on their Claims. If the Claims against the Disregarded Debtors are characterized as non-recourse obligations of BDI for federal income tax purposes, BDI should not realize any COD Income; rather, the amount of such Claims will be taken into account in determining BDI's gain or loss in connection with the consummation of the Plan, as discussed above.

In general, absent an exception, a debtor realizes COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (including equity) given in satisfaction of such indebtedness at the time of the exchange. To the extent a Disregarded Debtor realizes COD Income, such income will be treated as income of BDI. Because the Plan provides that Holders of certain Allowed Claims will receive New Membership Interests, New Senior Secured Notes, and their pro rata share of the New Senior Secured Credit Facility, the amount of COD Income will depend on the fair market value of the New Membership Interests and the issue price of the New Senior Secured Notes and the New Senior Secured Credit Facility (discussed below). These amounts cannot be known with certainty until after the Effective Date and thus it is impossible to state with certainty whether CODI Income, if any, will be realized by BDI.

Neither BDI nor any Corporate Debtors will be required to include any COD Income in gross income if it is (i) under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding or (ii) insolvent on the Effective Date (in which case, the COD Income may be excluded to the extent of the insolvency). If either exclusion applies, BDI or a Corporate Debtor, as applicable, must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. BDI or the Corporate Debtors may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Any attribute reduction will be applied as of the first day following the taxable year in which COD Income is recognized.

**Certain U.S. Federal Income Tax Consequences to Certain Holders of Allowed Claims**

**Consequences to Holders of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims**

Pursuant to the Plan, each Holder of an Allowed Senior Secured Credit Facility Claim or Allowed Senior Secured Credit Facility Guarantee Claim shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Credit Facility Paydown Amount and (ii) the New Senior Secured Credit Facility.

The exchange of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims for a Pro Rata share of New Senior Secured Credit Facility Paydown Amount and New Senior Secured Credit Facility should be a taxable exchange under section 1001 of the IRC. A Holder of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the sum of the amount of Cash received and the issue price (described below) of such Holder's share of the New Senior Secured Credit Facility and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

### Consequences to Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims

Pursuant to the Plan, each Holder of an Allowed Senior Secured Notes Indenture Claim and Senior Secured Notes Indenture Guarantee Claim shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) the New Senior Secured Notes and (ii) 65 percent of the New Membership Interests.

The exchange of Allowed Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims for the New Senior Secured Notes and New Membership Interests should be a taxable exchange under section 1001 of the IRC. A Holder of Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the issue price (described below) of such Holder's share of the New Senior Secured Notes and the fair value of the Holder's share of New Membership Interests and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

### Consequences to Senior Notes Indenture Claims, General Unsecured Claims, and Rejection Damages Claims against Majestic

Pursuant to the Plan, each Holder of an Allowed Senior Notes Indenture Claim, General Unsecured Claim, and/or Rejection Damages Claim shall receive its Pro Rata share of 35 percent of the New Membership Interests on the Distribution Date or as soon thereafter as is practicable (except to the extent that such Holder and the Debtors agree to less favorable treatment to such Holder).

The exchange of Allowed Senior Notes Indenture Claim, General Unsecured Claim, and/or Rejection Damages Claim for the New Membership Interests should be a taxable exchange under section 1001 of the IRC. A Holder of an exchanged Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the Holder's share of New Membership Interests and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

### Consequences to Holders of Discount Notes Indenture Claims

Pursuant to the Plan, Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no distribution under the Plan on account of such Claims. A Holder of a cancelled Claim should be entitled to claim a loss for tax purposes equal to the Holder's adjusted basis in such Claim.

**Accrued But Untaxed Interest**

A portion of the consideration received by Holders of Claims may be attributable to accrued but unpaid interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, it is possible that a Holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but is not paid in full by Debtors. The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes. The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**Market Discount**

Holders of Claims who receive consideration in exchange for their Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

**Issue Price**

For U.S. federal income tax purposes, the "issue price" of a debt instrument depends on whether such instrument is deemed to be "publicly traded." If, at any time during the 60-day period ending 30 days after the issue date of a debt instrument, a substantial amount of the debt instruments in an issue is "traded on an established market" within the meaning of the applicable Regulations, then the debt instrument will be treated as publicly traded and the issue price of the debt instrument will equal the fair market value of that debt instrument on the date of issuance. In general, a debt instrument will be treated as traded on an established securities market if it is listed on a major securities exchange, appears on a system of general circulation that provides a reasonable basis to determine fair market value or otherwise is, among other things, readily quotable by dealers, brokers or traders. For purposes of applying these rules, each tranche of new debt instruments is treated as a separate issue.

If the New Senior Secured Credit Facility or the New Senior Secured Notes, respectively, are not publicly traded and the old Claims exchanged for such debt instruments also are not publicly traded, then the issue price of the New Senior Secured Credit Facility or the New Senior Secured Notes, as applicable, generally would equal the stated principal amount of such debt instrument. Holders of Claims should consult their tax advisors regarding the issue prices for the New Senior Secured Credit Facility and the New Senior Secured Notes.

**Certain Tax Consequences of Owning New Membership Interests of Majestic Holdco**

It is anticipated that Majestic Holdco will be characterized as a partnership for federal income tax purposes following the Distribution Date. As such, a Holder of Claims who receives New Membership Interests will be treated as a partner for tax purposes. The U.S. federal tax consequences of being a partner in an operating partnership are very complicated. As an example, a partnership itself does not pay U.S. federal income taxes; instead, its income and deductions are allocated to its partners, who include such amounts on their own tax returns. In addition, a partner may generally receive distributions from a partnership up to the amount of the partner's tax basis in its partnership interest without incurring additional tax. Holders who will receive New Membership Interests are urged to consult with their own tax advisers regarding such consequences.

Because the Reorganized Debtors will be engaged in a U.S. trade or business for U.S. federal income tax purposes, Reorganized Majestic Holdco will be required to withhold and pay over to the U.S. tax authorities with respect to each member-partner that is not a "United States person" for federal income tax purposes (a "Foreign Member") a percentage equal to the highest applicable U.S. tax rate of each such Foreign Member's distributive share of Reorganized Majestic Holdco's income that is effectively connected with such trade or business (and withholding taxes may be imposed in other circumstances where Reorganized Majestic Holdco recognizes gain attributable to US real property). Each Foreign Member will be required to file U.S. tax returns and pay U.S. tax on its share of Reorganized Majestic Holdco's net effectively connected income (with any taxes withhold by Reorganized Majestic Holdco creditable against such tax liability). In addition, upon the taxable disposition of an interest in Reorganized Majestic Holdco, if (i) 50% or more of Reorganized Majestic Holdco's gross assets consist of "United States real property interests" and (ii) 90% or more of Reorganized Majestic Holdco's gross assets consist of "United States real property interests" and cash or cash equivalents, a purchaser will be required to withhold 10% of the amount paid for the interest pursuant to section 1445 of the IRC. Alternatively, other tax rules may apply, which could result in all or some portion of any gain recognized on a Holder's taxable disposition of an interest in Reorganized Majestic Holdco being subject to U.S. federal income tax. A tax-exempt organization will generally derive "unrelated business taxable income" from holding interests in Reorganized Majestic Holdco. Tax-exempt organizations and Foreign Members may wish to consider using a "blocker" structure to hold their interests. A discussion of all the relevant tax considerations for these types of Holders is beyond the scope of this Disclosure Statement; such Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of receiving and owning a New Membership Interest in Reorganized Majestic Holdco.

**Certain Consequences of Owning an Interest in New Senior Secured Credit Facility**

Stated interest on the New Senior Secured Credit Facility will generally be taxable to the holder as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes. A holder will generally be required to report the excess, if any, of the stated principal amount of its share of the New Senior Secured Credit Facility over the issue price of its share of the New Senior Secured Credit Facility as original issue discount on a constant yield basis over the term of the New Senior Secured Credit Facility.

**Certain Consequences of Owning New Senior Secured Notes**

Stated interest on the New Senior Secured Notes will generally be taxable to the holder as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes. A holder will generally be required to report the excess, if any, of the stated principal amount of its share of the New Senior Secured Notes over the issue price of its share of the New Senior Secured Notes as original issue discount on a constant yield basis over the term of the New Senior Secured Notes.

**Information Reporting and Backup Withholding**

      In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

      The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of the Holder's circumstances and income tax situation. All Holders of Claims against the Debtors should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the restructuring, including the applicability of any state, local, or foreign tax laws, and any change in applicable tax laws.**

**Recommendation**

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

The Majestic Star Casino, LLC
(for itself and on behalf of each of the Debtors)

_/s/ Jon S. Bennett_
Jon S. Bennett
Senior Vice President, Chief Financial Officer, and Treasurer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:          (302) 652-4100
Facsimile:          (302) 652-4400

- and -

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022-4611
Telephone:          (212) 446-4800
Facsimile:          (212) 446-4900

Co-Counsel for the Debtors and Debtors in Possession

## Exhibit A

## Joint Plan of Reorganization

## Exhibit B

**Disclosure Statement Order**

[FORTHCOMING]

**<u>Exhibit C</u>**

**Reorganized Debtors' Financial Projections**

[FORTHCOMING]

## Exhibit D

## Reorganized Debtors' Valuation Analysis

[FORTHCOMING]

**<u>Exhibit E</u>**

**Liquidation Analysis**

[FORTHCOMING]

<u>**Exhibit F**</u>

**Reconciliation of Non-GAAP Measures**

[FORTHCOMING]