# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE MAJESTIC STAR CASINO, LLC, et al.,[1] | ) | Case No. 09-14136 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## NOTICE OF FILING OF DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED PROPOSED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on September 17, 2010, The Majestic Star Casino, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), filed (i) the *Disclosure Statement for the Joint Plan of Reorganization of The Majestic Star Casino, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 593] (as has been and may be amended, supplemented or modified the "Disclosure Statement") and (ii) the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 592] (as has been and may be amended, supplemented or modified, the "Plan") with the United States Bankruptcy Court for the District of Delaware (the "Court").[2]

**PLEASE TAKE FURTHER NOTICE** that the Debtors have amended the Disclosure Statement and the Plan to, among other things, reflect the terms of a consensual plan of reorganization preliminarily reached by the Debtors and their key stakeholders in these chapter 11 cases, modify, add or amend certain language on account of comments received from various parties in interest in the Debtors' chapter 11 cases and correct various clerical and typographical errors. A copy of the amended Disclosure Statement is attached hereto as **Exhibit 1**, and a copy marked against the version filed with the Court on September 17, 2010, is attached as **Exhibit 2**. The Debtors have filed a copy of the amended Plan, together with a similarly marked copy, with the Court concurrently herewith.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to file further revised versions of the Plan and Disclosure Statement as soon as practicable after certain analyses are completed.

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: The Majestic Star Casino, LLC (4986); The Majestic Star Casino II, Inc. (0927); The Majestic Star Casino Capital Corp. (0872); Majestic Star Casino Capital Corp. II (9309); Barden Mississippi Gaming, LLC (8783); Barden Colorado Gaming, LLC (8674); Majestic Holdco, LLC (4648); and Majestic Star Holdco, Inc. (9415). The corporate address for the debtors is 301 Fremont Street, 12th Floor, Las Vegas, Nevada 89101.

[2] Capitalized terms used but not defined in this notice have the meanings set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the adequacy of the Disclosure Statement and approve procedures for soliciting votes on the Plan will be scheduled as soon as practicable before the Honorable Kevin Gross, United States Bankruptcy Judge, at the Court, 24 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801. This hearing may be continued by the Court or the Debtors without further notice other than by announcement of same in open court and/or by filing and service, as applicable, of a notice of adjournment.

Dated: November 30, 2010
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ James E. O'Neill
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
joneill@pszjlaw.com
tcairns@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C.
Edward O. Sassower, Esq.
Stephen E. Hessler, Esq.
601 Lexington Avenue
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
E-Mail: james.sprayregen@kirkland.com
edward.sassower@kirkland.com
stephen.hessler@kirkland.com

Co-Counsel for the Debtors and Debtors in Possession

## Exhibit 1

## Amended Disclosure Statement

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE MAJESTIC STAR CASINO, LLC, <u>et al.</u>,[1] | ) Case No. 09-14136 (KG) |
| | ) |
| | ) Jointly Administered |
| | ) |

## DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones, Esq. (DE Bar No. 2436)
James E. O'Neill, Esq. (DE Bar No. 4042)
Timothy P. Cairns, Esq. (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 198999-8705
Telephone:       (302) 652-4100
Facsimile:       (302) 652-4400

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C.
Edward O. Sassower, Esq.
Stephen E. Hessler, Esq.
601 Lexington Avenue
New York, New York 10022–4611
Telephone:       (212) 446–4800
Facsimile:       (212) 446–4900

Co-Counsel for the Debtors and Debtors in Possession

Dated:   November 30, 2010

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: The Majestic Star Casino, LLC (4986); The Majestic Star Casino II, Inc. (0927); The Majestic Star Casino Capital Corp. (0872); Majestic Star Casino Capital Corp. II (9309); Barden Mississippi Gaming, LLC (8783); Barden Colorado Gaming, LLC (8674); Majestic Holdco, LLC (4648); and Majestic Star Holdco, Inc. (9415). The corporate address for the debtors is 301 Fremont Street, 12th Floor, Las Vegas, Nevada 89101.

# TABLE OF CONTENTS

Page

Important Information About this Disclosure Statement ........................................................................................... 1

Questions and Answers Regarding this Disclosure Statement and the Plan ........................................................... 3

The Debtors' History and Chapter 11 Cases ............................................................................................................. 9

Plan Overview .......................................................................................................................................................... 18

Treatment of Claims Against and Equity Interests in the Debtors ......................................................................... 18

Settlements Contemplated Pursuant to the Plan .................................................................................................... 38

Management of the Company ................................................................................................................................... 44

Composition of Initial Board of Managers ............................................................................................................. 45

Reorganized Debtors' Corporate Organizational and Ownership Structure ......................................................... 45

The Reorganized Debtors' Business Upon Emergence .......................................................................................... 46

Description of New Membership Interests ............................................................................................................... 49

Limitations on Liability and Indemnification of Managers and Officers of The Reorganized Debtors ............... 49

Summary of Gaming Regulations ............................................................................................................................ 50

Summary of Legal Proceedings ............................................................................................................................... 60

Projected Financial Information .............................................................................................................................. 65

Risk Factors ............................................................................................................................................................. 66

Confirmation of the Plan .......................................................................................................................................... 71

Effect of Confirmation of the Plan .......................................................................................................................... 75

Important Securities Law Disclosure ...................................................................................................................... 79

Voting Instructions ................................................................................................................................................... 80

Certain U.S. Federal Income Tax Consequences of the Plan .................................................................................. 81

Recommendation ...................................................................................................................................................... 87

**EXHIBITS**

EXHIBIT A      First Amended Joint Plan of Reorganization

EXHIBIT B      Disclosure Statement Order

EXHIBIT C      Reorganized Debtors' Financial Projections

EXHIBIT D      Reorganized Debtors' Valuation Analysis

EXHIBIT E      Liquidation Analysis

## Important Information About this Disclosure Statement

This Disclosure Statement provides information regarding the First Amended Joint Plan of Reorganization that the debtors referenced on the cover of this Disclosure Statement (collectively, the "Debtors") are seeking to have confirmed by the Bankruptcy Court. The Debtors believe the Plan is in the best interests of all creditors and urge all creditors entitled to vote on the Plan to vote in favor of the Plan.

References to the "Plan" and the "Plan of Reorganization" are to the First Amended Joint Plan of Reorganization attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the District of Delaware, the court in which the Debtors filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code. References to the "Petition Date" are to November 23, 2009.

Unless the context requires otherwise, references to the "Company," "Majestic," "our," and "us" are to the Debtors.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if the Plan is confirmed, that such conditions precedent will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as Exhibit A hereto, and the section herein entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement, and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for the purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe the summaries of certain provisions of the Plan and certain other documents and the financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, including, but not limited to, the Plan and the Plan documents, are qualified in their entirety by reference to those documents. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any creditor entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign regulatory agency, nor has the

SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The New Membership Interests described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. To the extent exemptions from registration other than section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or on registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;
- financing plans;
- projected dividends;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs;

- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing products and services;
- projected general market conditions; and
- effects of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. These risks, uncertainties, and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;
- the Debtors' ability to reduce their overall financial leverage;
- the potentially adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;
- customer response to the Chapter 11 Cases;
- inability to have claims discharged/settled during the chapter 11 proceedings;
- general economic, business and market conditions;
- interest rate fluctuations;

- a decline in the Debtors' market share due to competition;
- ability to implement cost reduction initiatives in a timely manner;
- financial conditions of the Debtors' customers;
- adverse tax changes;
- limited access to capital resources;
- changes in domestic laws and regulations;
- general market conditions;
- natural disasters; and
- geopolitical instability.

## Questions and Answers Regarding this Disclosure Statement and the Plan

**Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval for their Plan. Prior to soliciting acceptances of the proposed Plan, the Debtors are required by section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and your distribution, if any, depend on what kind of Claim or Interest you hold. The Classes of Claims and Interests and their respective voting statuses and anticipated recoveries are as follows:

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| **Claims against and Interests in Majestic Holdco, LLC** | | | | | |
| A-1 | Senior Secured Credit Facility Guarantee Claims | Impaired | Entitled to Vote | | |
| A-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| A-3 | Discount Notes Indenture Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| A-4 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| A-5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in Majestic Star Holdco, Inc.** | | | | | |
| B-1 | Discount Notes Indenture Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| B-2 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| B-3 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in The Majestic Star Casino, LLC** | | | | | |
| C-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | | |
| C-2 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | | |
| C-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| C-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| C-5 | Senior Notes Indenture Claims | Impaired | Entitled to Vote | | |
| C-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | | |

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| C-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | | |
| C-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | | |
| C-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in The Majestic Star Casino II, Inc.** | | | | | |
| D-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | | |
| D-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| D-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| D-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| D-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| D-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | | |
| D-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | | |
| D-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | | |
| D-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in The Majestic Star Casino Capital Corp.** | | | | | |
| E-1 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | | |
| E-2 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| E-3 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in Majestic Star Casino Capital Corp. II** | | | | | |
| F-1 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | | |
| F-2 | Senior Notes Indenture Claims | Impaired | Entitled to Vote | | |
| F-3 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| F-4 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in Barden Mississippi Gaming, LLC** | | | | | |
| G-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | | |

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| G-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| G-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| G-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| G-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| G-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | | |
| G-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | | |
| G-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | | |
| G-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |
| **Claims against and Interests in Barden Colorado Gaming, LLC** | | | | | |
| H-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | | |
| H-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| H-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| H-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | | |
| H-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | | |
| H-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | | |
| H-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | | |
| H-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | | |
| H-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | | |

For more information about the treatment of Claims and Interests see the section herein entitled "Treatment of Claims Against and Equity Interests in the Debtors," which begins on page 18.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance the Debtors will be able to reorganize their businesses. If the Plan is not confirmed or does not go effective in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. Alternatives to Confirmation and consummation of the Plan may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. Moreover, failure to confirm or consummate the Plan may result in an extended chapter 11 proceeding. For a more detailed description of the consequences of a liquidation scenario, see the section herein entitled "Confirmation of the Plan—Best Interests of Creditors/Liquidation Analysis," which begins on page 72 and the Liquidation Analysis attached as Exhibit E hereto.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "consummation?"**

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the "Effective Date" mean the date on which the Plan has been fully consummated and all conditions to the Plan have been satisfied or waived. Distributions will be made only after consummation of the Plan. See the section herein entitled "Confirmation of the Plan," which begins on page 71, for a discussion of the conditions to consummation.

**Where is the cash required to fund the Plan coming from?**

The cash distributions under the Plan shall be funded from the Reorganized Debtors' cash balances and/or cash from business operations. See the section herein entitled "Plan Overview," which begins on page 18.

**Are there risks to owning an interest in the Debtors upon emergence from bankruptcy?**

Yes, please see the section herein entitled "Risk Factors," which begins on page 66.

**Is there potential litigation related to the Plan?**

Yes, in the event it becomes necessary to confirm the Plan over the objection of certain Classes of Claims or Interests, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

In accordance with the terms of the Bankruptcy Court order approving this Disclosure Statement, all parties in interest will receive notice of the hearing on the Confirmation of the Plan. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party at: http://dm.epiq11.com/msc.

**Will the Debtors be filing reports with the SEC?**

The Debtors will not file reports with the SEC upon emergence as they will not be subject to the public reporting requirements of the Securities Exchange Act of 1934, as amended, or the regulations promulgated thereunder.

**What rights will the Debtors' new equity holders have?**

On the Effective Date, the Reorganized Debtors shall authorize and issue units of New Membership Interests in accordance with the Plan. The voting rights, restrictions on transferability, and other rights of the New Membership Interests will be set forth in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

**Will there be releases granted to parties in interest as part of the Plan?**

Yes, see the sections herein entitled "Debtor Releases" and "Third Party Releases" which begin on page 76.

**What is the deadline to vote on the Plan?**

5:00 p.m. (prevailing Eastern Time) on [●], 2011.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests entitled to vote on the Plan. If you are a Holder of Claims or Interests in the following Classes, you may vote for or against the Plan by completing the ballot and timely returning it in the envelope provided to you: Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8.

The Debtors have retained Epiq Bankruptcy Solutions, LLC ("Epiq") to serve as their notice, claims, and solicitation agent (the "Solicitation Agent") to oversee the voting process, provide additional copies of all materials, and answer questions. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on [●], 2011.

The following table provides basic instructions on how to vote on the Plan:

| BALLOTS |
|---|
| Ballots must be actually received by the Solicitation Agent by the voting deadline of 5:00 p.m. (prevailing Eastern Time) on [●], 2011 at the following address: |
| **If by mail:** |
| **Epiq Bankruptcy Solutions, LLC**<br>**Attn.: The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**FDR Station PO Box 5014**<br>**New York, New York 10150** |
| **If by hand delivery or overnight courier:** |
| **Epiq Bankruptcy Solutions, LLC**<br>**Attn.: The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**757 Third Avenue, 3rd Floor**<br>**New York, New York 10017** |
| If you have any questions on the procedure for voting on the Plan, please call the Solicitation Agent at the following telephone number: (646) 282-2400 |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed, and received by 5:00 p.m. (prevailing Eastern Time), on [●], 2011.

Any ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one ballot with respect to each such Claim held. By signing and returning a ballot, each Holder of a Claim or Interest in Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim and/or Equity Interest have been cast or, if any other ballots have been cast with respect to such Class of Claims and/or Equity Interests, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot.

## Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

## When is the Confirmation Hearing scheduled to occur?

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], 2011 to take place at [ : ] (prevailing Eastern Time) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [●], 2011 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The Wall Street Journal* (national edition), *The Post-Tribune of Northwest Indiana*, *The Denver Post*, and *The Tunica Times* to provide notification to those persons who may not receive notice by mail.

## What is the purpose of the Confirmation Hearing?

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The Confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any liability that arose prior to the Confirmation of the plan of reorganization and provides for the treatment of such liability in accordance with the terms of the confirmed plan of reorganization.

## What role does the Bankruptcy Court play after the Confirmation Hearing?

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including disputes over any Claims or Interests arising in the Chapter 11 Cases. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure

distributions to Holders of Claims against the Debtors are accomplished pursuant to the Plan. See the section herein entitled "Retention of Jurisdiction by the Bankruptcy Court," which begins on page 76, for a further description of the matters over which the Bankruptcy Court will retain jurisdiction following the Confirmation of the Plan.

**What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. See the section herein entitled "The Reorganized Debtors' Business Upon Emergence," beginning on page 46, for a further description of the effect of the Plan on the Debtors' ongoing business operations.

**Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

Yes. Under the Plan, the Senior Secured Noteholders and the Senior Noteholders will collectively own a significant majority of the New Membership Interests in the Reorganized Debtors, and individual Senior Secured Noteholders and Senior Noteholders will own substantial ownership stakes in the Reorganized Debtors. Further information regarding the composition of the Board of Managers of the Reorganized Debtors is set forth in the term sheet attached to the Plan as Exhibit II, and will be set forth in the Plan Supplement.

**Does the Company recommend voting in favor of the Plan?**

Yes. In the opinion of the Debtors, the Plan is preferable to the liquidation alternatives described in this Disclosure Statement because the Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. Confirmation of the Plan will also allow the Debtors to continue to operate as a going concern, which will have the effect of preserving jobs at the Debtors' gaming facilities. Accordingly, the Debtors recommend that Holders of Claims who are entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

**The Debtors' History and Chapter 11 Cases**

**The Debtors' Business—Overview and History**

The Majestic Star Casino, LLC ("Majestic I") was formed by Don H. Barden in December 1993 to pursue a license to operate a gaming facility at Buffington Harbor in Gary, Indiana (the "Majestic Star I"). In 1996, Majestic I and Trump Indiana, Inc. (which was not affiliated with the Debtors at that time) ("Trump Indiana") each opened a dockside gaming facility at Buffington Harbor.

In December 2001, Majestic I purchased Fitzgeralds-brand properties in Las Vegas, Nevada, Tunica County, Mississippi (30 miles south of Memphis) and Black Hawk, Colorado (35 miles west of Denver), which it owns through its wholly-owned subsidiaries Barden Nevada Gaming, LLC ("Barden Nevada," not a Debtor in these cases), Barden Mississippi Gaming, LLC ("Barden Mississippi," a Debtor in these cases), and Barden Colorado Gaming, LLC ("Barden Colorado," a Debtor in these cases), respectively. This purchase significantly expanded Majestic I's geographic reach and the scope of its gaming and hospitality operations. It also gave Majestic I proprietary rights in registered and common law trade names, trademarks and service marks used in connection with these operations, certain of which Majestic I licenses to other Fitzgeralds-brand properties.

On December 31, 2003, Majestic I spun off ownership of Barden Nevada to Barden Development Inc. ("BDI"), Majestic I's indirect parent (not a Debtor in these cases). As part of that transaction, Majestic I and Barden Nevada entered into a series of licensing, expense sharing, and other agreements.

On December 21, 2005, Majestic I acquired Trump Indiana (renamed The Majestic Star Casino II, Inc. ("Majestic II"), a Debtor in these cases), which Majestic I rebranded "Majestic Star II," and its 300 room hotel, which was renamed the "Majestic Star Hotel." As part of this transaction, Majestic I also acquired complete ownership of two other subsidiaries: Buffington Harbor Riverboats, LLC ("Buffington Riverboats"), a joint venture

9

between Majestic I and Trump Indiana established to acquire, manage, and develop a dock, pavilion and parking facilities for gaming operations; and Buffington Harbor Parking Associates, LLC ("Buffington Parking"), a joint venture between Trump Indiana and AMB Parking, LLC (an entity owned by BDI) established to own and operate parking facilities for gaming operations.[2] Accordingly, the Debtors' Buffington Harbor operations now include both the Majestic Star I and Majestic Star II casino operations, the Majestic Star Hotel, an entertainment pavilion housing restaurants, retail outlets, an entertainment venue, a lounge and boarding access to the two casinos, and a 2,000 space parking garage. Majestic I also has 266 acres of excess and surplus land at the site, much of which is available for future expansion.[3]

**The Debtors' Organizational Structure**

The following chart depicts the Debtors' current organizational and ownership structure (non-debtors are shaded):



**The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors' total funded debt was approximately $733.8 million, which primarily consists of the amounts outstanding under four Prepetition facilities: (a) an $80 million Senior Secured Credit Facility (the "Senior Secured Credit Facility") funded by a syndicate led by Wells Fargo Capital Finance, Inc. (f/k/a Wells Fargo Foothill, Inc.) (the "Senior Secured Credit Facility Agent"), which matured on April 15, 2010; (b) $300 million in principal amount of 9½% Senior Secured Notes (the "Senior Secured Notes"), which matured on October 15, 2010; (c) $200 million in principal amount of 9¾% Senior Notes (the "Senior Notes"), which mature on January 15, 2011; and (d) $63.5 million in principal amount at maturity of 12½% original issue discount notes (the "Discount Notes"), which mature on October 15, 2011. Each of these facilities is described in further detail below.

---

[2]    On or about August 4, 2006, Buffington Parking was merged into Majestic pursuant to Articles of Merger filed with the Secretaries of State for the States of Indiana and Delaware. On or about December 31, 2006, Buffington Riverboats withdrew from existence as an entity with the Secretary of State of the State of Delaware.

[3]    Non-debtor Gary New Century, LLC ("GNC"), which is controlled by Don H. Barden, owns approximately six acres of land at this site. GNC also holds rights to certain improvements in the harbor and an ownership interest in those improvements. The Debtors are owners of various easements and other rights in the GNC property that permit the Debtors to perpetually operate their business at the Buffington Harbor location, subject to certain reservations, restrictions, and limitations contained in various recorded and unrecorded instruments.

<u>Senior Secured Credit Facility</u>

On October 7, 2003, Majestic I, Barden Mississippi, and Barden Colorado entered into a Loan and Security Agreement (as amended, the "<u>Loan and Security Agreement</u>") with certain financial institutions party thereto as lenders and the Senior Secured Credit Facility Agent, as arranger and administrative agent for such lenders.[4] The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matured on April 15, 2010. As of August 31, 2010, the Debtors owed approximately $65.3 million under the Senior Secured Credit Facility in principal and accrued unpaid interest. Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Senior Secured Credit Facility Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%. In each case the rate is determined based on the Debtors' trailing twelve month EBITDA (defined as earnings before interest, taxes, depreciation and amortization). The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default. As noted above, the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Senior Secured Credit Facility Agent at the default rate on a current basis.

Pursuant to certain mortgages, security agreements, and other related collateral documents, outstanding amounts under the Senior Secured Credit Facility are secured by substantially all of the assets of Majestic I, Majestic II, Barden Colorado, and Barden Mississippi, including all real property and other assets of the Debtors' casinos, all furniture, fixtures and equipment belonging to those entities, those entities' rights to the service marks "Majestic Star" and "Fitzgeralds" and other related trademarks, and the proceeds and products of each of the foregoing, as well as by a pledge by Majestic of its equity interests in Majestic II, Barden Colorado, and Barden Mississippi (collectively, the "<u>Collateral</u>"). Majestic Holdco, LLC ("<u>Majestic Holdco</u>") has also guaranteed the outstanding obligations under the Senior Secured Credit Facility, although its liability is limited to its pledge of 100% of the equity of Majestic I. The Collateral does not include certain "Excluded Assets," including, among other things, cage cash (cash held at the casino properties themselves) and the Debtors' gaming licenses and other licenses that may not be encumbered under applicable law or contract.

<u>Senior Secured Notes</u>

The Senior Secured Notes are $300 million in principal amount of obligations issued by Majestic I and The Majestic Star Casino Capital Corp. ("<u>MSCC</u>"), a non-operating, wholly-owned subsidiary of Majestic I that has no assets. The Senior Secured Notes are governed by an Indenture dated October 7, 2003, and two Supplemental Indentures each dated December 21, 2005 (collectively, the "<u>Senior Secured Notes Indenture</u>"), with The Bank of New York Mellon Trust Company, N.A., as trustee under each indenture (the "<u>Senior Secured Notes Trustee</u>"). The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes matured on October 15, 2010. As of August 31, 2010, the Debtors owed approximately $348.4 million on account of the Senior Secured Notes in principal and accrued unpaid interest.

Outstanding obligations under the Senior Secured Notes are secured by liens in favor of the Trustee on the Collateral, which are junior to the liens granted to the Senior Secured Credit Facility Agent under the Loan and Security Agreement pursuant to the Intercreditor Agreement (as defined below). Additionally, Majestic II, Barden Colorado and Barden Mississippi have each guarantied the Debtors' obligations under the Senior Secured Notes. Majestic Holdco has also guarantied those obligations, but its guaranty is limited to a pledge of its 100% equity interests in Majestic I.

---

[4]    The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and to modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

<u>Intercreditor Agreement</u>

In connection with the issuance of the Senior Secured Notes, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and certain of the Debtors[5] entered into an Intercreditor and Lien Subordination Agreement, dated as of October 7, 2003 (as amended, the "<u>Intercreditor Agreement</u>"). The Intercreditor Agreement, among other things, subordinates the liens and security interests granted to the Senior Secured Notes Trustee to secure the Debtors' obligations under the Senior Secured Notes to the liens and security interests granted to the Senior Secured Credit Facility Agent to secure the Debtors' obligations under the Senior Secured Credit Facility, up to a maximum principal amount outstanding under the Senior Secured Credit Facility of $80 million, plus premiums, interest, fees and all other amounts payable under the Senior Secured Credit Facility (including all amounts accruing after the Debtors commence a chapter 11 case).[6] Additionally, the Intercreditor Agreement imposes up to a 180-day standstill period within which holders of the Senior Secured Notes and the Senior Secured Notes Trustee may not take enforcement action against the Collateral based on an event of default under the Senior Secured Notes Indenture, which period is extended indefinitely with respect to Collateral against which the Senior Secured Credit Facility Agent is pursuing rights or remedies under the Senior Secured Credit Facility.

The Intercreditor Agreement also limits the Senior Secured Notes Trustee and Senior Secured Noteholders from seeking adequate protection and taking certain other actions in any chapter 11 case commenced by the Debtors. Specifically, the Intercreditor Agreement provides that, until the senior obligations under the Senior Secured Credit Facility have been satisfied, the Senior Secured Notes Trustee and the Senior Secured Noteholders (a) will not object to any use of cash collateral or Postpetition financing secured by the Debtors' assets that is consented to by the Senior Secured Credit Facility Agent, and will not seek adequate protection or any other relief based on their respective interests in the Debtors' assets;[7] (b) will subordinate the Senior Secured Notes Trustee's liens to any liens securing such Postpetition financing that are senior to or *pari passu* with the Senior Secured Credit Facility Agent's liens; (c) will not contest any request by the Senior Secured Credit Facility Agent for adequate protection (or support an objection to such request); and (d) will not seek relief from the automatic stay to pursue rights or remedies with respect to its liens and security interests. The Intercreditor Agreement expressly provides in Section 6.04 that the "provisions of this Agreement are intended to be and shall be enforceable under section 510 of [the Bankruptcy Code]."

<u>Senior Notes</u>

The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic I and Majestic Star Casino Capital Corp. II ("<u>MSCC II</u>"), a non-operating, wholly owned subsidiary of Majestic I that has no assets. The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi. The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debenture Trust Company as successor trustee. The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005. The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year. The notes mature on January 15, 2011. As of August 31, 2010, the Debtors owed approximately $233.1 million on account of the Senior Notes in principal and accrued unpaid interest.

---

[5]     The Debtors party to the Intercreditor Agreement are: (a) Majestic I, Majestic II, Barden Mississippi, and Barden Colorado, as borrowers under the Senior Secured Credit Facility, and Majestic Holdco, as guarantor under the Senior Secured Credit Facility; and (b) Majestic I and MSCC, as issuers of, Majestic II, Barden Mississippi, Barden Colorado, and MSCC II as guarantors under, and Majestic Holdco, as pledgor under, the Senior Secured Notes Indenture.

[6]     The liens and security interests granted to the Senior Secured Notes Trustee are senior and prior to the liens and security interests granted to the Senior Secured Credit Facility Agent to the extent the latter secure an amount greater than this amount.

[7]     The Intercreditor Agreement does provide that, if the Senior Secured Credit Facility Agent is granted adequate protection in the form of liens on additional assets of the Debtors, then the Senior Secured Notes Trustee may seek adequate protection in the form of a junior lien on such additional assets.

<u>Discount Notes</u>

The Discount Notes are $63.5 million principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Star Holdco that has no assets. The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic I or any of its subsidiaries. The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee. The Discount Notes accrue interest at 12½% per annum, with payments due on April 15 and October 15 of each year. Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011. As of August 31, 2010, the Debtors owed approximately $72.6 million on account of the Discount Notes in principal and accrued unpaid interest.

## Events That Led to Bankruptcy

<u>The Debtors' Financial and Liquidity Concerns</u>

The recent global financial crisis caused, among other things, a general tightening in the credit markets, lower levels of liquidity, lower consumer and business spending, and lower consumer net worth, all of which have had and will continue to have a negative impact on the Debtors' businesses, results of operation, financial condition, and liquidity. Gaming and other leisure activities comprise discretionary spending, and participation in such activities tend to decline in economic downturns. The recent recession was no exception.

At the same time that the Debtors confronted a decline in customer visits and spending due to economic factors, competition increased in each of the markets in which they compete. Importantly, in Indiana a number of new and renovated gaming properties have materially impacted the Debtors' Buffington Harbor operations. Specifically, in August 2007, the Four Winds Casino Resort opened with approximately 3,000 slot machines and 100 table games. This casino facility is located approximately 48 miles east of the Debtors' Buffington Harbor operations. In July 2008, Harrah's Entertainment completed a $500 million renovation and expansion of its Horseshoe Casino in Hammond, Indiana, doubling the size of its existing facility and making it the largest gaming establishment in the greater Chicago area. Also in 2008, Ameristar Casinos finished the remodeling and rebranding of its riverboat and land-based facilities located in East Chicago, Indiana, which included remodeling casino floors and restaurants and the addition of new slot machines. Boyd Gaming also recently completed a $130 million expansion of its Blue Chip Casino facility located in Michigan City, Indiana, which includes new and improved amenities.

Similar competitive pressures have been brought to bear on the Debtors' Mississippi and Colorado operations. In Tunica County, Mississippi, a competitor recently completed an extensive remodeling and re-branding of its property, and in Colorado a competitor recently completed construction of a 536-room hotel (attached to its existing casino) that has drawn patrons away from Fitzgeralds Black Hawk. In addition, the Black Hawk casino market continues to suffer the negative impacts of a smoking ban to all public areas within a casino, including the casino floor. The smoking ban went into effect on January 1, 2008.

The Debtors' declining operating results and weakening financial position due to increasing competition and adverse economic conditions, together with their significant debt service obligations, have curtailed the Debtors' ability to make the substantial and ongoing capital investments in their operations required to maintain competitiveness and the going concern value of their businesses. Accordingly, to preserve the liquidity necessary to ensure the continued competitiveness of their operations, in October 2008 the Debtors drew substantially all of the remaining availability under their Senior Secured Credit Facility and determined not to make the $24 million interest payment due to holders of their Senior Secured Notes and Senior Notes on October 15, 2008. As a result, as of November 14, 2008, the Debtors were in default under the Senior Secured Notes and Senior Notes, which in turn triggered cross-defaults under the Senior Secured Credit Facility[8] and the Discount Notes. The Debtors have continued to pay interest on the Senior Secured Credit Facility (at the default rate), but have not made any interest

---

[8]   The Senior Secured Credit Facility Agent asserts that other defaults exist under the Senior Secured Credit Facility as well.

payments on the Senior Secured Notes or Senior Notes since April 2008, and did not make the scheduled interest payment on the Discount Notes due April 15, 2009.[9]

<u>Prepetition Negotiations with Creditors</u>

Although the Debtors' operations continued to produce positive cash flow (exclusive of debt service) prior to the defaults under their various debt facilities, the Debtors recognized that their existing capital structure and debt service obligations were depriving their businesses of the funds needed to make the substantial and ongoing capital investments required to succeed in the increasingly competitive markets in which they operate. Accordingly, the Debtors engaged XRoads Solutions Group, LLC ("<u>XRoads</u>") on or about August 7, 2008, and Goldman, Sachs & Co. ("<u>Goldman Sachs</u>") on or about November 14, 2008, to assist the Debtors in evaluating a broad range of financial and strategic alternatives aimed at addressing trends in the Debtors' operating results and financial condition.

The Debtors and their financial advisors pursued a number of financial and operational restructuring alternatives in the year leading up to the commencement of the Chapter 11 Cases, including reaching out to their principal creditor constituencies. To that end, in November 2008, the Debtors agreed to pay the reasonable professional fees and expenses for advisors to an ad hoc group holding a majority of the Senior Secured Notes (the "<u>Senior Secured Notes Committee</u>"), and in December 2008, the Debtors commenced similar agreements with an ad hoc group holding a majority of the Senior Notes (the "<u>Senior Notes Committee</u>") and the Senior Secured Credit Facility Agent, respectively. The Debtors also established a data room to provide access to detailed information regarding their operations, assets and finances, and attempted to foster negotiations with these constituencies regarding a consensual restructuring and deleveraging of the Debtors' balance sheet. Concurrently, the Debtors and their advisors investigated other potential restructuring solutions, including new money investments and sales of certain of the Debtors' businesses and assets. Although the Debtors identified several potential investors, these discussions did not progress beyond expressions of interest.

Despite the substantial efforts of the Debtors, the Senior Secured Notes Committee, and the Senior Notes Committee to reach agreement on a consensual restructuring, by October 2009, the negotiations had reached an impasse.

<u>Exercise of Creditor Remedies</u>

On December 3, 2008, after the Debtors failed to make the October 15, 2008 interest payment to holders of the Senior Secured Notes and Senior Notes, the Senior Secured Notes Trustee notified the Senior Secured Credit Facility Agent that one or more events of default had occurred under the Senior Secured Notes Indenture. The Senior Secured Credit Facility Agent responded by sending the Senior Secured Notes Trustee a "standstill notice" on December 11, 2008, which, under the Intercreditor Agreement, triggered a 180-day "standstill period" in which the Senior Secured Noteholders and Senior Secured Notes Trustee were prohibited from exercising remedies against the Debtors' assets. The Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee subsequently entered into agreements on June 10, 2009 and July 10, 2009 consensually extending the standstill period through August 10, 2009 to allow the Senior Secured Notes Committee, the Senior Notes Committee and the Debtors to continue discussing a consensual restructuring. Upon expiration of the second extension of the standstill period however, the Senior Secured Notes Trustee declined to further extend the standstill period beyond August 10, 2009.

Notwithstanding the expiration of the standstill period under the Intercreditor Agreement, the parties continued to have constructive discussions regarding a consensual restructuring of the Debtors' debt obligations. In October 2009, however, the Senior Secured Notes Trustee sent the Senior Secured Credit Facility Agent a notice of its intent to exercise remedies against the Debtors' assets, which triggered another standstill period under the Intercreditor Agreement, this time of 10 days. Upon the expiration of such 10 day period on October 30, 2009, the Senior Secured Notes Trustee and Senior Secured Noteholders became entitled under the Intercreditor Agreement to seek to enforce remedies against the Debtors' assets.

---

[9]  Interest accruing on the Discount Notes through October 2008 was paid in-kind.

On October 30, 2009, the date the Senior Secured Noteholders' standstill period expired, the Senior Secured Credit Facility Agent sent to the Debtors a notice, among other things, terminating the Debtors' ability to borrow under the Senior Secured Credit Facility and declaring all amounts outstanding under that facility to be immediately due and payable. The notice stated that, as a result of the expiration of the applicable standstill periods under the Intercreditor Agreement and the resulting right of the Senior Secured Notes Trustee and Senior Secured Noteholders to enforce remedies against any of the Collateral that the Senior Secured Credit Facility Agent was not actively enforcing remedies against, the Senior Secured Credit Facility Agent and the lenders under the Senior Secured Credit Facility indicated they were commencing the exercise of their rights and remedies against all of the Collateral to protect their ability to control any foreclosure or similar process with respect to the Collateral.

### The Commencement of the Chapter 11 Cases

On November 23, 2009, the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code.

The Chapter 11 Cases are being jointly administered under the caption In re The Majestic Star Casino, LLC, et al., Case No. 09-14136 (KG). The Debtors continue to operate their businesses and manage their property as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

### Events During Bankruptcy

#### First Day Relief

Through a careful review of their business operations and cash requirements, and following detailed preparations by management and their advisors, the Debtors entered bankruptcy with minimal impact on their day-to-day business operations. To facilitate, among other things, noticing, claims-processing and voting-related matters, the Debtors requested that the Bankruptcy Court enter an order granting certain relief including authorization for the joint administration of the Chapter 11 Cases.

On the Petition Date, the Debtors also sought and obtained several orders authorizing them to pay various Prepetition Claims. These orders were designed to ease the strain on the Debtors' relationships with employees, vendors, customers, and taxing authorities as a consequence of the commencement of the Chapter 11 Cases. Among other things, these orders authorized the Debtors to: (a) honor customer obligations and continue customer programs; (b) pay certain Prepetition employee wages and benefits; (c) maintain cash management systems; (d) use Prepetition bank accounts, checks, and other business forms; (e) make tax payments to federal, local, and state taxing authorities; (e) maintain Prepetition insurance policies and enter into new insurance policies; and (f) prohibit utility companies from discontinuing services. In addition, the Debtors engaged in an extensive communication program with vendors and customers assuring them that the transition into bankruptcy would be smooth and would not result in a discernible interruption in operations.

The Debtors have been funding their operations during the Chapter 11 Cases by using cash on hand and cash flow from operations, which the Debtors believe to be sufficient to meet projected cash needs, including the payment of normal operating costs and expenses, as they proceed with their financial restructuring. Therefore, the Debtors have not sought debtor-in-possession financing.

On the Petition Date, the Debtors sought authority to use cash collateral of their secured creditors to permit, among other things, the orderly continuation of the operation of the Debtors' businesses and to satisfy their working capital and operational needs. The final cash collateral order was entered by the Bankruptcy Court on December 17, 2009 and provides adequate protection to those secured creditors, including: (a) adequate protection payments to the Senior Secured Credit Facility lenders; (b) a section 507(b) superpriority claim to the Senior Secured Credit Facility lenders; (c) adequate protection liens to the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee; and (d) payment of reasonable professional fees to the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee.

## Retention of Restructuring and Other Professionals

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors retained, as of the Petition Date, with authorization from the Bankruptcy Court, the law firms of Kirkland & Ellis LLP and Pachulski Stang Ziehl & Jones as their restructuring counsel. Additionally, pursuant to the Bankruptcy Court's approval, the Debtors retained XRoads Solutions Group LLC ("XRoads") as financial and restructuring advisors, Epiq as Solicitation Agent, Ernst & Young LLP as auditors, Deloitte Financial Advisory Services LLP as accounting services providers, and Realty Consultants, USA, Inc. d/b/a Integra Realty Resources - Chicago Metro as appraisers.

In addition to paying the fees of their own advisors, the Debtors are required to pay fees incurred by various other constituencies and their respective advisors related to the Chapter 11 Cases. On December 4, 2009, the United States Trustee appointed the official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases to represent the interests of all general unsecured creditors of the Debtors. Since the formation of the Creditors' Committee, the Debtors have kept the Creditors' Committee informed about the Debtors' business operations. Additionally, as appropriate, the Debtors have sought the concurrence of the Creditors' Committee in connection with certain actions and transactions taken by the Debtors outside of the ordinary course of business.

## Power of Attorney Agreement

Indiana law requires all riverboat casino licensees (including Majestic I and Majestic II) to enter into a power of attorney agreement ("POA") that provides, in the event of revocation or nonrenewal of a casino's license or in other similar circumstances, for the temporary operation of such casino by a designated trustee. All licensees must submit an executed POA to the Indiana Gaming Commission (the "IGC"), the regulator with authority over the licensing and operation of riverboat casinos in Indiana. Failure to comply with the statutory POA requirement could lead to the nonrenewal of a casino operator's license. Accordingly, on February 24, 2010, the Debtors filed a motion seeking authority to execute a POA for submission to the IGC. The Court granted the Debtors' motion on March 1, 2010, and the Debtors executed and submitted a POA shortly thereafter.

## Unsecured Creditors' Committee's Standing Motion

On March 4, 2010, the Creditors' Committee filed a motion (the "Standing Motion") seeking standing to pursue, and if appropriate, settle certain claims against the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee. In the Standing Motion, the Creditors' Committee requested authority to bring an adversary proceeding for (a) a declaratory judgment holding that the security interests of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee in the Debtors' Indiana riverboat casinos (the "Majestic Star Casinos") are unperfected, (b) an order avoiding these security interests, and (c) disallowance of the claims of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee to the extent their claims are secured by the allegedly unperfected security interests in the Majestic Star Casinos. The Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed objections to the Standing Motion, and the Debtors filed a limited response to the motion requesting that the Court defer consideration of the motion and allow the Debtors to propose a settlement of the claims raised therein as part of their Plan. As of the date of filing of this Disclosure Statement, the Court has not held a hearing on the Standing Motion, and the Debtors have proposed a settlement of the claims raised therein in the Plan.

## Adversary Proceeding Against the City of Gary, Indiana

In 1996, Gary entered into local development agreements with Trump Indiana and Majestic I (each, a "Local Development Agreement"). In 2005, when Majestic II, a Debtor in these Chapter 11 Cases, acquired and began operating the riverboat casino formerly owned and operated by Trump Indiana, the Majestic I Local Development Agreement and certain other agreements related to the development of Buffington Harbor area were amended (collectively, the "Amended Local Development Agreement"), and the Trump Indiana Local Development Agreement was terminated. Under the Amended Local Development Agreement, Majestic I and Majestic II were to make monthly payments of three percent (3%) of the adjusted gross gaming receipts of their respective casinos ("Economic Incentive Payments"), and Gary agreed to make local infrastructure improvements, including construction of access roads and freeway interchange, and to conduct environmental remediation on certain property

16

owned by Majestic I and Majestic II. In 2008, a dispute between the Debtors and Gary developed over Gary's failure to perform its development obligations, and the Debtors began depositing Economic Incentive Payments in a segregated bank account pending resolution of the dispute.

On February 11, 2008, the Debtors commenced an arbitration proceeding (the "Gary Arbitration") and a lawsuit in the Superior Court of Marion County, Indiana (the "Marion County Lawsuit") against Gary to resolve the parties' dispute over the Amended Local Development Agreement, or, if the Amended Local Development Agreement were found to be invalid, the Local Development Agreements. On December 14, 2009, upon being notified of the Debtors' chapter 11 cases, the Superior Court of Marion County stayed further proceedings in the Marion County Lawsuit. The Gary Arbitration has not been formally stayed, but the Debtors are not actively prosecuting the Gary Arbitration at this time.

On March 11, 2010, Gary filed a lawsuit in the Superior Court of Lake County, Indiana (the "Lake County Lawsuit") against eight current and former directors, officers, and employees of Majestic I and its affiliates (the "Lake County Defendants") alleging these individuals converted funds owed by the Debtors to Gary under the Amended Local Development Agreement. In response to the Lake County Lawsuit, on March 29, 2010, the Debtors instituted an adversary proceeding in this Court seeking to extend the automatic stay imposed by section 362 of the Bankruptcy Code to the Lake County Defendants, or in the alternative, requesting a preliminary injunction pursuant to section 105 of the Bankruptcy Code prohibiting Gary from prosecuting the Lake County Lawsuit. On April 15, 2010, a Joint Notice of Removal was filed with the United State District Court for the Northern District of Indiana, Hammond Division, removing the Lake County Lawsuit from the Superior Court of Lake County, Indiana to the United States District Court for the Northern District of Indiana, Hammond Division. By memorandum order dated April 28, 2010, the Court granted the Debtors' motion seeking to extend the automatic stay to the Lake County Defendants.

Gary filed a notice of appeal of the Court's grant of the Debtors' stay extension motion on May 12, 2010, designated the record and issues on appeal on May 26, 2010, and docketed its appeal in the United States District Court for the District of Delaware on June 20, 2010. Pursuant to a standing order of the United States District Court for the District of Delaware, all such appeals are referred to mediation, and the mediation of Gary's appeal is currently pending.

As of the date of the filing of this Disclosure Statement, the Debtors and Gary are engaged in ongoing settlement negotiations.

Key Employee Incentive Plan

Recognizing the myriad of increasingly difficult challenges facing the Debtors' thinly-staffed senior management team and the importance of the performance of the senior management team to the success of these Chapter 11 Cases, the Debtors determined it was necessary to implement a series of measures to properly incentivize the senior management team to continue to operate the Debtors' businesses as efficiently and effectively as possible to maximize the value of the Debtors' estates. To that end, on May 14, 2010, the Debtors' filed a motion (the "KEIP Motion") seeking authority to: (a) make certain outstanding payments due under The Majestic Star Casino, LLC 2009 Executive Incentive Plan (the "2009 EIP"); (b) implement The Majestic Star Casino, LLC 2010 Key Employee Incentive Plan (the "2010 KEIP"); and (c) enter into certain employment agreements. The Creditors' Committee fully supported the Debtors' KEIP Motion.

After the Debtors filed the KEIP Motion, representatives of Holders of the Senior Secured Notes suggested several revisions to the 2010 KEIP and the employment agreements submitted with the KEIP Motion, which resulted in productive discussions, and, ultimately, a revised 2010 KEIP and revised employment agreements acceptable to representatives of Holders of the Senior Secured Notes. On May 28, 2010, the Court entered an order authorizing (a) payments under the 2009 EIP, (b) implementation of the revised 2010 KEIP, and (c) execution of the revised employment agreements. The Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and the Creditors' Committee each consented to entry of the order.

In addition to the foregoing, the Board of Directors of the Debtors may develop, adopt, and implement the Pre-Effective Date Key Employee Incentive Program, subject to the consents of the Senior Secured Credit Facility

Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably), the terms of which shall be described on Exhibit 5 to the Plan Supplement.

## Plan Overview

On November 30, 2010, the Debtors filed their First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code. The Plan contemplates that the Debtors will retain and operate their gaming properties in the ordinary course of business after emerging from chapter 11. The most significant components of the Plan are as follows:

- The Debtors will retain and reorganize around their casino gaming properties in Gary, Indiana, Tunica County, Mississippi, and Black Hawk, Colorado, subject, in the case of the Black Hawk, Colorado gaming property, to obtaining all governmental licenses, suitability determinations, and other approvals required for such property on or prior to 240 days following the Confirmation Date (as further described in Article XII of the Plan);

- Each Holder of an Allowed Senior Secured Credit Facility Claim will receive its Pro Rata share of either (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing;

- Each Holder of an Allowed Senior Secured Notes Indenture Claim will receive its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing;

- Each Holder of an Allowed Senior Notes Indenture Claim will receive its Pro Rata share of 42 percent of the New Membership Interests; and

- Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim will receive the lesser of (i) Cash in an amount equal to [___] percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim or (ii) its pro rata share of [___].

## Treatment of Claims Against and Equity Interests in the Debtors

### Administrative and Priority Claims

#### Administrative Expense Claims

Except with respect to Administrative Expense Claims that are Professional Compensation and Reimbursement Claims and except to the extent that a Holder of an allowed Administrative Expense Claim and the applicable Debtors agree to less favorable distribution to such Holder, each Holder of an allowed Administrative Expense Claim shall be paid in full in cash on the later of the distribution date under the Plan, the date such Administrative Expense Claim is allowed, and the date such allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

#### Professional Compensation and Reimbursement Claims

Except as provided in Article II.A of the Plan, all Entities seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation

Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (1) File, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay reasonable compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), one of the following treatments on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; (2) such other treatment as may be agreed to by such Holder and the applicable Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), or otherwise determined upon an order of the Bankruptcy Court; or (3) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**Classification and Treatment of Classified Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Pursuant to the terms of the Plan, except for Claims that are (a) expressly exempted from the discharge provisions of the Bankruptcy Code, or (b) specifically identified as being reinstated, all Claims that arose prior to the Confirmation of the Plan will be discharged.

To the extent a Class contains allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.

A.     Majestic Holdco

    1.     **Class A-1: Senior Secured Credit Facility Guarantee Claims against Majestic Holdco**

       (a)     Classification. Class A-1 consists of all Senior Secured Credit Facility Guarantee Claims against Majestic Holdco.

       (b)     Impairment and Voting. Class A-1 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

       (c)     Distributions. Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, (i) in the event no First Lien Alternative Financing is consummated, guarantees substantially similar to the terms of the Senior Secured Credit Facility Guarantee or (ii) in the event the First Lien Alternative Financing is consummated, its Pro Rata share of Cash from the proceeds of the First Lien Alternative Financing.

       (d)     Estimated Allowed Amount of Claims: $65,330,042

(e)    Projected Percentage of Recovery: [ ]%

**2.    Class A-2: Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco**

(a)    Classification. Class A-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco.

(b)    Impairment and Voting. Class A-2 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

(c)    Distributions. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)    Estimated Allowed Amount of Claims: $348,476,521

(e)    Projected Percentage of Recovery: [ ]%

**3.    Class A-3: Discount Notes Indenture Claims against Majestic Holdco**

(a)    Classification. Class A-3 consists of all Discount Notes Indenture Claims against Majestic Holdco.

(b)    Impairment and Voting. Class A-3 is Impaired by the Plan. Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions. Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no distribution under the Plan on account of such Claims.

(d)    Estimated Allowed Amount of Claims: $72,631,322

(e)    Projected Percentage of Recovery: 0%

**4.    Class A-4: Interests in Majestic Holdco**

(a)    Classification. Class A-4 consists of all Interests in Majestic Holdco.

(b)    Impairment and Voting. Class A-4 is Impaired by the Plan. Each Holder of an Interest in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions. Interests in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

(d)    Estimated Allowed Amount of Interests: $131,756

(e)    Projected Percentage of Recovery: 0%

5. **Class A-5: Section 510(b) Claims in Majestic Holdco**

    (a)    <u>Classification</u>. Class A-5 consists of all Section 510(b) Claims that may exist against Majestic Holdco.

    (b)    <u>Impairment and Voting</u>. Class A-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

    (c)    <u>Distributions</u>. Section 510(b) Claims in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

    (d)    <u>Estimated Allowed Amount of Interests</u>: $0

    (e)    <u>Projected Percentage of Recovery</u>: 0%

B.    <u>Majestic Star Holdco</u>

1. **Class B-1: Discount Notes Indenture Claims against Majestic Star Holdco**

    (a)    <u>Classification</u>. Class B-1 consists of all Discount Notes Indenture Claims against Majestic Star Holdco.

    (b)    <u>Impairment and Voting</u>. Class B-1 is Impaired by the Plan. Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

    (c)    <u>Distributions</u>. Discount Notes Indenture Claims against Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Star Holdco shall receive no distribution under the Plan on account of such Claims.

    (d)    <u>Estimated Allowed Amount of Claims</u>: $72,631,322

    (e)    <u>Projected Percentage of Recovery</u>: 0%

2. **Class B-2: Intercompany Interests in Majestic Star Holdco**

    (a)    <u>Classification</u>. Class B-2 consists of all Intercompany Interests in Majestic Star Holdco.

    (b)    <u>Impairment and Voting</u>. Class B-2 is Impaired by the Plan. Each Holder of an Interest in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

    (c)    <u>Distributions</u>. Intercompany Interests in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

    (d)    <u>Estimated Allowed Amount of Interests</u>: $0

    (e)    <u>Projected Percentage of Recovery</u>: 0%

3. **Class B-3: Section 510(b) Claims in Majestic Star Holdco**

(a) <u>Classification</u>. Class B-3 consists of all Section 510(b) Claims that may exist against Majestic Star Holdco.

(b) <u>Impairment and Voting</u>. Class B-3 is Impaired by the Plan. Each Holder of a Section 510(b) Claim in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Section 510(b) Claims in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d) <u>Estimated Allowed Amount of Interests</u>: $0

(e) <u>Projected Percentage of Recovery</u>: 0%

C. <u>Majestic I</u>

1. **Class C-1: Senior Secured Credit Facility Claims against Majestic I**

(a) <u>Classification</u>. Class C-1 consists of all Senior Secured Credit Facility Claims against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-1 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

2. **Class C-2: Senior Secured Notes Indenture Claims against Majestic I**

(a) <u>Classification</u>. Class C-2 consists of all Senior Secured Notes Indenture Claims against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-2 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

3.     **Class C-3: Priority Non-Tax Claims against Majestic I**

(a)     <u>Classification</u>. Class C-3 consists of all Priority Non-Tax Claims that may exist against Majestic I.

(b)     <u>Impairment and Voting</u>. Class C-3 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>. Each Holder of an Allowed Priority Non-Tax Claim against Majestic I shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)     <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e)     <u>Projected Percentage of Recovery</u>: [ ]%

4.     **Class C-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I**

(a)     <u>Classification</u>. Class C-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I.

(b)     <u>Impairment and Voting</u>. Class C-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d)     <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e)     <u>Projected Percentage of Recovery</u>: [ ]%

5.     **Class C-5: Senior Notes Indenture Claims against Majestic I**

(a)     <u>Classification</u>. Class C-5 consists of all Senior Notes Indenture Claims against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-5 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

6. **Class C-6: General Unsecured Claims and Rejection Damages Claims against Majestic I**

(a) <u>Classification</u>. Class C-6 consists of all General Unsecured Claims and Rejection Damages Claims against Majestic I. As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b) <u>Impairment and Voting</u>. Class C-6 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to [___] percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

7. **Class C-7: Intercompany Claims against Majestic I**

(a) <u>Classification</u>. Class C-7 consists of all Intercompany Claims that may exist against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-7 is Impaired by the Plan. Each Holder of an Allowed Intercompany Claim against Majestic I is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c) <u>Distributions</u>. Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic I will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably).

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

8. **Class C-8: Intercompany Interests in Majestic I**

    (a)   <u>Classification</u>. Class C-8 consists of all Intercompany Interests in Majestic I.

    (b)   <u>Impairment and Voting</u>. Class C-8 is Impaired by the Plan. Each Holder of an Intercompany Interest in Majestic I is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

    (c)   <u>Distributions</u>. Intercompany Interests in Majestic I, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic I, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

    (d)   <u>Estimated Allowed Amount of Interests</u>: $[ ]

    (e)   <u>Projected Percentage of Recovery</u>: [ ]%

9. **Class C-9: Section 510(b) Claims in Majestic I**

    (a)   <u>Classification</u>. Class C-9 consists of all Section 510(b) Claims that may exist against Majestic I.

    (b)   <u>Impairment and Voting</u>. Class C-9 is Impaired by the Plan. Each Holder of a Section 510(b) Claim in Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

    (c)   <u>Distributions</u>. Section 510(b) Claims in Majestic I shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

    (d)   <u>Estimated Allowed Amount of Interests</u>: $0

    (e)   <u>Projected Percentage of Recovery</u>: 0%

D.   <u>Majestic II</u>

1. **Class D-1: Senior Secured Credit Facility Claims against Majestic II**

    (a)   <u>Classification</u>. Class D-1 consists of all Senior Secured Credit Facility Claims against Majestic II.

    (b)   <u>Impairment and Voting</u>. Class D-1 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II is entitled to vote to accept or reject the Plan.

    (c)   <u>Distributions</u>. Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

    (d)   <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e)    <u>Projected Percentage of Recovery</u>: [ ]%

**2.**    **Class D-2: Senior Secured Notes Indenture Guarantee Claims against Majestic II**

(a)    <u>Classification</u>. Class D-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic II.

(b)    <u>Impairment and Voting</u>. Class D-2 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)    <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e)    <u>Projected Percentage of Recovery</u>: [ ]%

**3.**    **Class D-3: Priority Non-Tax Claims against Majestic II**

(a)    <u>Classification</u>. Class D-3 consists of all Priority Non-Tax Claims that may exist against Majestic II.

(b)    <u>Impairment and Voting</u>. Class D-3 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>. Each Holder of an Allowed Priority Non-Tax Claim against Majestic II shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)    <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e)    <u>Projected Percentage of Recovery</u>: [ ]%

**4.**    **Class D-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II**

(a)    <u>Classification</u>. Class D-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II.

(b)    <u>Impairment and Voting</u>. Class D-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise

rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

      (d)    <u>Estimated Allowed Amount of Claims</u>: $[ ]

      (e)    <u>Projected Percentage of Recovery</u>: [ ]%

**5.**    **Class D-5: Senior Notes Indenture Guarantee Claims against Majestic II**

      (a)    <u>Classification</u>.  Class D-5 consists of all Senior Notes Indenture Guarantee Claims against Majestic II.

      (b)    <u>Impairment and Voting</u>.  Class D-5 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

      (c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

      (d)    <u>Estimated Allowed Amount of Claims</u>: $[ ]

      (e)    <u>Projected Percentage of Recovery</u>: [ ]%

**6.**    **Class D-6: General Unsecured Claims and Rejection Damages Claims against Majestic II**

      (a)    <u>Classification</u>.  Class D-6 consists of all General Unsecured Claims and Rejection Damages Claims against Majestic II.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

      (b)    <u>Impairment and Voting</u>.  Class D-6 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II is entitled to vote to accept or reject the Plan.

      (c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to [___] percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

    (d)    <u>Estimated Allowed Amount of Claims</u>: $[ ]

    (e)    <u>Projected Percentage of Recovery</u>: [ ]%

**7.    Class D-7:  Intercompany Claims against Majestic II**

    (a)    <u>Classification</u>.  Class D-7 consists of all Intercompany Claims that may exist against Majestic II.

    (b)    <u>Impairment and Voting</u>.  Class D-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic II is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

    (c)    <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic II will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably).

    (d)    <u>Estimated Allowed Amount of Claims</u>: $[ ]

    (e)    <u>Projected Percentage of Recovery</u>: [ ]%

**8.    Class D-8:  Intercompany Interests in Majestic II**

    (a)    <u>Classification</u>.  Class D-8 consists of all Intercompany Interests in Majestic II.

    (b)    <u>Impairment and Voting</u>.  Class D-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Majestic II is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

    (c)    <u>Distributions</u>.  Intercompany Interests in Majestic II, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic II, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

    (d)    <u>Estimated Allowed Amount of Interests</u>: $[ ]

    (e)    <u>Projected Percentage of Recovery</u>: [ ]%

**9.    Class D-9:  Section 510(b) Claims in Majestic II**

    (a)    <u>Classification</u>.  Class D-9 consists of all Section 510(b) Claims that may exist against Majestic II.

    (b)    <u>Impairment and Voting</u>.  Class D-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Section 510(b) Claims in Majestic II shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Interests:  $0

(e)     Projected Percentage of Recovery:  0%

E.     MSCC

   1.     Class E-1: Senior Secured Notes Indenture Claims against MSCC

(a)     Classification.  Class E-1 consists of all Senior Secured Notes Indenture Claims against MSCC.

(b)     Impairment and Voting.  Class E-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)     Estimated Allowed Amount of Claims:  $[  ]

(e)     Projected Percentage of Recovery:  [  ]%

   2.     Class E-2: Intercompany Interests in MSCC

(a)     Classification.  Class E-2 consists of all Intercompany Interests in MSCC.

(b)     Impairment and Voting.  Class E-2 is Impaired by the Plan.  Each Holder of an Interest in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Intercompany Interests in MSCC shall be cancelled, released, and extinguished and the Holders of such Intercompany Interests shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Claims:  $0

(e)     Projected Percentage of Recovery:  0%

   3.     Class E-3: Section 510(b) Claims in MSCC

(a)     Classification.  Class E-3 consists of all Section 510(b) Claims that may exist against MSCC.

(b)     Impairment and Voting.  Class E-3 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Section 510(b) Claims in MSCC shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

        (d)      Estimated Allowed Amount of Claims: $0

        (e)      Projected Percentage of Recovery: 0%

## F.    MSCC II

### 1.    Class F-1: Senior Secured Notes Indenture Guarantee Claims against MSCC II

(a)    Classification. Class F-1 consists of all Senior Secured Notes Indenture Guarantee Claims against MSCC II.

(b)    Impairment and Voting. Class F-1 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)    Distributions. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

        (d)      Estimated Allowed Amount of Claims: $[ ]

        (e)      Projected Percentage of Recovery: [ ]%

### 2.    Class F-2: Senior Notes Indenture Claims against MSCC II

(a)    Classification. Class F-2 consists of all Senior Notes Indenture Claims against MSCC II.

(b)    Impairment and Voting. Class F-2 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)    Distributions. Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

        (d)      Estimated Allowed Amount of Claims: $[ ]

        (e)      Projected Percentage of Recovery: [ ]%

### 3.    Class F-3: Intercompany Interests in MSCC II

(a)    Classification. Class F-3 consists of all Intercompany Interests in MSCC II.

(b)    Impairment and Voting. Class F-3 is Impaired by the Plan. Each Holder of an Interest in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions. Intercompany Interests in MSCC II shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

        (d)      Estimated Allowed Amount of Claims: $0

        (e)      Projected Percentage of Recovery: 0%

4.      **Class F-4: Section 510(b) Claims in MSCC II**

(a)      <u>Classification</u>.  Class F-4 consists of all Section 510(b) Claims that may exist against MSCC II.

(b)      <u>Impairment and Voting</u>.  Class F-4 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      <u>Distributions</u>.  Section 510(b) Claims in MSCC II shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)      <u>Estimated Allowed Amount of Claims</u>: $0

(e)      <u>Projected Percentage of Recovery</u>: 0%

G.      <u>Barden Mississippi</u>

1.      **Class G-1: Senior Secured Credit Facility Claims against Barden Mississippi**

(a)      <u>Classification</u>.  Class G-1 consists of all Senior Secured Credit Facility Claims against Barden Mississippi.

(b)      <u>Impairment and Voting</u>.  Class G-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d)      <u>Estimated Allowed Amount of Claims</u>: $[  ]

(e)      <u>Projected Percentage of Recovery</u>: [  ]%

2.      **Class G-2: Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi**

(a)      <u>Classification</u>.  Class G-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi.

(b)      <u>Impairment and Voting</u>.  Class G-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)      <u>Estimated Allowed Amount of Claims</u>: $[  ]

(e)     Projected Percentage of Recovery: [ ]%

3.     **Class G-3: Priority Non-Tax Claims against Barden Mississippi**

(a)     Classification. Class G-3 consists of all Priority Non-Tax Claims that may exist against Barden Mississippi.

(b)     Impairment and Voting. Class G-3 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions. Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)     Estimated Allowed Amount of Claims: $[ ]

(e)     Projected Percentage of Recovery: [ ]%

4.     **Class G-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi**

(a)     Classification. Class G-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi.

(b)     Impairment and Voting. Class G-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d)     Estimated Allowed Amount of Claims: $[ ]

(e)     Projected Percentage of Recovery: [ ]%

5.    **Class G-5: Senior Notes Indenture Guarantee Claims against Barden Mississippi**

(a)    <u>Classification</u>.  Class G-5 consists of all Senior Notes Indenture Guarantee Claims that may exist against Barden Mississippi.

(b)    <u>Impairment and Voting</u>.  Class G-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d)    <u>Estimated Allowed Amount of Claims</u>: $[  ]

(e)    <u>Projected Percentage of Recovery</u>: [  ]%

6.    **Class G-6:  General Unsecured Claims and Rejection Damages Claims against Barden Mississippi**

(a)    <u>Classification</u>.  Class G-6 consists of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Mississippi.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)    <u>Impairment and Voting</u>.  Class G-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to [___] percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

(d)    <u>Estimated Allowed Amount of Claims</u>: $[  ]

(e)    <u>Projected Percentage of Recovery</u>: [  ]%

7.    **Class G-7: Intercompany Claims against Barden Mississippi**

(a)    <u>Classification</u>.  Class G-7 consists of all Intercompany Claims that may exist against Barden Mississippi.

(b)    <u>Impairment and Voting</u>.  Class G-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)    <u>Distributions</u>. Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Mississippi will be paid, adjusted, reinstated, or discharged to the extent reasonably

determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

(d) Estimated Allowed Amount of Claims: $[ ]

(e) Projected Percentage of Recovery: [ ]%

**8. Class G-8: Intercompany Interests in Barden Mississippi**

(a) Classification. Class G-8 consists of all Intercompany Interests in Barden Mississippi.

(b) Impairment and Voting. Class G-8 is Impaired by the Plan. Each Holder of an Intercompany Interest in Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c) Distributions. Intercompany Interests in Barden Mississippi, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Mississippi, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d) Estimated Allowed Amount of Interests: $0

(e) Projected Percentage of Recovery: 0%

**9. Class G-9: Section 510(b) Claims in Barden Mississippi**

(a) Classification. Class G-9 consists of all Section 510(b) Claims that may exist against Barden Mississippi.

(b) Impairment and Voting. Class G-9 is Impaired by the Plan. Each Holder of a Section 510(b) Claim in Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) Distributions. Section 510(b) Claims in Barden Mississippi shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d) Estimated Allowed Amount of Interests: $0

(e) Projected Percentage of Recovery: 0%

**H. Barden Colorado**

**1. Class H-1: Senior Secured Credit Facility Claims against Barden Colorado**

(a) Classification. Class H-1 consists of all Senior Secured Credit Facility Claims against Barden Colorado.

(b) Impairment and Voting. Class H-1 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c) _Distributions_. Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d) _Estimated Allowed Amount of Claims_: $[ ]

(e) _Projected Percentage of Recovery_: [ ]%

**2.    Class H-2: Senior Secured Notes Indenture Guarantee Claims against Barden Colorado**

(a) _Classification_. Class H-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Colorado.

(b) _Impairment and Voting_. Class H-2 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c) _Distributions_. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d) _Estimated Allowed Amount of Claims_: $[ ]

(e) _Projected Percentage of Recovery_: [ ]%

**3.    Class H-3: Priority Non-Tax Claims against Barden Colorado**

(a) _Classification_. Class H-3 consists of all Priority Non-Tax Claims that may exist against Barden Colorado.

(b) _Impairment and Voting_. Class H-3 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) _Distributions_. Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d) _Estimated Allowed Amount of Claims_: [ ]%

(e) _Projected Percentage of Recovery_: [ ]%

**4.    Class H-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado**

(a) _Classification_. Class H-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado.

(b) _Impairment and Voting_. Class H-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture

Guarantee Claims) against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

5. **Class H-5: Senior Notes Indenture Guarantee Claims against Barden Colorado**

(a) <u>Classification</u>. Class H-5 consists of all Senior Notes Indenture Guarantee Claims that may exist against Barden Colorado.

(b) <u>Impairment and Voting</u>. Class H-5 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

6. **Class H-6: General Unsecured Claims and Rejection Damages Claims against Barden Colorado**

(a) <u>Classification</u>. Class H-6 consists of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Colorado. As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; provided, however, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b) <u>Impairment and Voting</u>. Class H-6 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to [ ___ ] percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

7. **Class H-7: Intercompany Claims against Barden Colorado**

(a) <u>Classification</u>. Class H-7 consists of all Intercompany Claims that may exist against Barden Colorado.

(b) <u>Impairment and Voting</u>. Class H-7 is Impaired by the Plan. Each Holder of an Allowed Intercompany Claim against Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c) <u>Distributions</u>. Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Colorado will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

(d) <u>Estimated Allowed Amount of Claims</u>: $[ ]

(e) <u>Projected Percentage of Recovery</u>: [ ]%

8. **Class H-8: Intercompany Interests in Barden Colorado**

(a) <u>Classification</u>. Class H-8 consists of all Intercompany Interests in Barden Colorado.

(b) <u>Impairment and Voting</u>. Class H-8 is Impaired by the Plan. Each Holder of an Intercompany Interest in Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c) <u>Distributions</u>. Intercompany Interests in Barden Colorado, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Colorado, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d) <u>Estimated Allowed Amount of Interests</u>: $0

(e) <u>Projected Percentage of Recovery</u>: 0%

### 9. Class H-9: Section 510(b) Claims in Barden Colorado

(a)      <u>Classification</u>. Class H-9 consists of all Section 510(b) Claims that may exist against Barden Colorado.

(b)      <u>Impairment and Voting</u>. Class H-9 is Impaired by the Plan. Each Holder of a Section 510(b) Claim in Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      <u>Distributions</u>. Section 510(b) Claims in Barden Colorado shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)      <u>Estimated Allowed Amount of Interests</u>: $0

(e)      <u>Projected Percentage of Recovery</u>: 0%

### Settlements Contemplated Pursuant to the Plan

<u>Overview</u>

As discussed in this Disclosure Statement, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders. In light of the complexity and contentiousness of the issues presented by the Chapter 11 Cases, the Debtors engaged with the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, representatives of Holders of the Senior Secured Notes, and the Creditors' Committee in negotiations to reach an agreement resolving certain threshold issues discussed below, among others. These negotiations included many meetings, the exchange of multiple term sheets or related settlement proposals, and regular correspondence and conference calls among the parties and their advisors. The Debtors were able to reach a global settlement on a range of issues with the Senior Secured Notes Trustee and Senior Secured Noteholders holding a substantial majority of the outstanding Senior Secured Notes as well as the Creditors' Committee (the "Settling Parties"). The Debtors, their estates, and the Settling Parties reached an agreement on key threshold items, including the Reorganized Debtors' capital structure at emergence as reflected in the Plan, and compromised numerous other contested issues. The settlements agreed to among the Debtors, their estates, and the Settling Parties include the Gaming License Settlement, the Cash Collateral Settlement, and the Standing Motion Settlement (all as defined below).

The Debtors believe the Plan is in the best interests of all of the Debtors' creditors and provides the Debtors the best opportunity to restructure their debt obligations in a manner that maximizes their ability to compete effectively post-emergence. Absent the support of the Settling Parties for the Plan and the expeditious implementation of the compromises set forth therein, the Debtors believe they would face a longer, costlier, and more uncertain chapter 11 process mired with contentious litigation, which could materially delay the Debtors' emergence from chapter 11 and ultimately reduce distributions to creditors. Accordingly, in the exercise of their business judgment, the Debtors determined the benefits of a compromised resolution of all disputed issues as part of a global settlement, including timely emergence from chapter 11, outweighed the costs of expensive and time-consuming litigation. Further detail regarding the global settlement embodied in the Plan is provided below.

Although this Disclosure Statement addresses the key disputes being compromised as part of the global settlement individually for purposes of providing analysis and detail, it is important to note the Plan represents a global settlement of all disputed issues, each of which is a necessary component of the overall global settlement. Failure by the Court to approve any of the settlements described herein, the treatment of any Class set forth in the Plan, or any other material term of the Plan may result in the Plan not being confirmable.

Governing Law

The Plan constitutes a good faith compromise and settlement of all Claims and controversies resolved therein pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases, and other benefits provided under the Plan.

Compromises and settlements are "a normal part of the process of reorganization."[10] The Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"[11] Bankruptcy Rule 9019(a) provides in pertinent part that on "motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."[12] The Debtors' right to settle Claims in the Plan pursuant to Bankruptcy Rule 9019 extends to causes of action brought by other constituents on behalf of the Debtors' estates.[13]

Under Bankruptcy Rule 9019, a bankruptcy court may approve a compromise or settlement if it is in the best interests of the debtor's estate.[14] When determining whether a compromise is in the best interests of the estate, courts in the Third Circuit must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."[15] To strike the proper balance, the Third Circuit has adopted a balancing test, under which a bankruptcy court should consider four factors to determine whether to approve a particular compromise or settlement: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors.[16] Ultimately, a proposed settlement need not be the best result that the debtor could have achieved, but only must fall within the "reasonable range of litigation possibilities."[17]

For the reasons discussed herein and based on an analysis by the Debtors and their advisors of the arguments asserted to date by the secured creditors and the Creditors' Committee, the Debtors believe the global settlement embodied in the Plan is in the best interests of the Debtors' estates and is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. Because of the large number of disputed issues being compromised pursuant to the Plan and the wide range of potential outcomes of each such issue if litigated to conclusion, it is practically impossible for the Debtors to describe in detail all of the possible settlement and litigation scenarios. Pursuant to the global compromise embodied by the Plan, the Debtors are providing recoveries for unsecured Claims that fall within an approximate

---

[10]   *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

[11]   *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).

[12]   Fed. R. Bankr. P. 9019(a).

[13]   *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003) (concluding that the Bankruptcy Code "authorizes the Debtor to propose a settlement of the Creditors Committee's Adversary Proceeding in its plan"); *Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 371 B.R. 660, 669–671 (S.D.N.Y. 2007) ("A debtor-in-possession may assert control over an adversary proceeding notwithstanding a committee's derivative standing, where that standing was granted for reasons other than debtor misconduct.").

[14]   *See TMT Trailer Ferry*, 390 U.S. at 424; *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del 2005) ("Under Rule 9019(a), the bankruptcy court has a duty to make an informed, independent, judgment that the compromise is fair and equitable."); *In re Northwestern Corp.*, No. 03-12872 (KJC), 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("In exercising [its] discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[15]   *Martin*, 91 F.3d at 393; *see also Key3Media Group, Inc.*, 336 B.R. at 93.

[16]   *Martin*, 91 F.3d at 393; *see also Nutraquest, Inc.*, 434 F.3d at 645.

[17]   *In re Energy Corp.*, 886 F.2d 921, 929 (7th Cir. 1989); *In re Sea Containers Ltd.*, No. 06-11156 (KJC), 2008 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008).

range of [ ]% to [ ]%. The foregoing estimate assumes no further diminution in the value of the Debtors' estates as a result of the extensive litigation that would be required to fully adjudicate the disputes and the attendant delay in the Debtors' emergence from bankruptcy; however, the Debtors believe that such diminution in value would be material and increase over time. The Debtors believe the recoveries on unsecured Claims provided by the Plan are in the best interests of all of the Debtors' estates and creditors and are well within the range of reasonableness required under Bankruptcy Rule 9019 and section 112 of the Bankruptcy Code.

### Settlement of Claims Relating to Liens on Gaming License Proceeds

As described below, the Debtors, their estates, and the Settling Parties have agreed, as part of the good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code embodied in the Plan, to settle all disputes over the value of the Debtors' Gaming Licenses and the security interests of the Senior Secured Notes Trustee in the proceeds of such Gaming Licenses (the "Gaming License Settlement").

The Security Agreement between the Debtors and the Senior Secured Credit Facility Agent, dated as of October 7, 2003, and the Pledge and Security Agreement between the Debtors and the Senior Secured Notes Trustee, dated as of October 7, 2003 (each, a "Security Agreement," and collectively, the "Security Agreements"), provide that the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee have liens over substantially all the Debtors' assets, including deposit accounts, general intangibles, investment property, and all proceeds of the foregoing. *See* Senior Secured Credit Facility Agent's Security Agreement § 1.1; Trustee's Security Agreement § 2.1. The Security Agreements make clear that Collateral does not include Excluded Assets. *See id.* Excluded Assets include, inter alia, "all Gaming Licenses." Senior Secured Credit Facility Agent's Security Agreement § 1.1; Senior Secured Notes Indenture § 1.1. The definition of Excluded Assets, however, provides that proceeds of the Excluded Assets (including the Gaming Licenses), are expressly included as Collateral. *See* Senior Secured Credit Facility Agent's Security Agreement § 1.1 ("Excluded Assets shall not include (and, accordingly, Collateral shall include) any and all proceeds of any of such assets...."); Senior Secured Notes Indenture § 1.1 ("Excluded Assets does not include the proceeds of [Gaming Licenses]....").

Article 9 of the Uniform Commercial Code (the "UCC"), as adopted in Colorado, Indiana, Mississippi and Delaware (all of the potentially governing jurisdictions), defines "proceeds" as, inter alia, "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected upon, or distributed on account of, collateral; [and] (C) rights arising out of collateral. . . ." UCC. § 9-102(a)(64). The secured creditors contend that they are entitled to the economic value of the Gaming Licenses under a plan of reorganization because of their perfected liens on the proceeds of the Gaming Licenses. This argument is based on a body of case law that has held that while a licensee may be prohibited from granting a lien on a license itself, the licensee may nonetheless grant a lien over the proceeds of such license.[18]

The Creditors' Committee argued that the aforementioned cases are not applicable to the facts of this case because they concern and thus are confined to FCC licenses rather than gaming licenses. In addition, the Creditors' Committee argued that the secured creditors' liens on the proceeds of the Gaming Licenses did not attach as of the Petition Date, and as a result, such liens were terminated by operation of section 552 of the Bankruptcy Code. Section 552(a) of the Bankruptcy Code provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Section 552(b)(1), however, provides an exception to section 552(a)'s general rule where "the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property." *Id.* § 552(b)(1). Thus, section 552 provides that a creditor may have a perfected lien over post-petition proceeds of property only if the creditor had a pre-petition lien over both the property and its proceeds. The

---

[18]  *See In re Cheskey*, 9 F.C.C.R. 986 (1994).

Creditors' Committee argued that section 552(b)(1)'s exception does not apply to the proceeds of the Gaming Licenses because the secured creditors did not have Prepetition liens on the Gaming Licenses themselves.[19]

The secured creditors responded to this section 552 argument by pointing to court decisions that have held that license proceeds are "general intangibles" and that liens thereon are perfected immediately upon the filing of a financing statement regardless of when the actual sale or other disposition occurs and regardless of whether there is a lien on the license itself.[20] The Creditors' Committee argued that these decisions are distinguishable in that they relate to FCC licenses.

Even if the Bankruptcy Court were to determine that the secured creditors do not have a perfected security interest in the proceeds of the Gaming Licenses as of the Petition Date, several issues remain as to the value of the Gaming Licenses. The Creditors' Committee argued that because Indiana is a "closed" gaming jurisdiction, i.e., the number of gaming licenses is capped and the number currently issued, rather than an "open" jurisdiction like Mississippi and Colorado, the Indiana Gaming Licenses have substantial value. The Creditors' Committee could point to such facts as the Debtors' original purchase price for the Trump Indiana license to support a high value. On the other hand, the secured creditors argued that the Gaming Licenses have a low value because of, among other things, the low book value of comparable competitors' gaming licenses, the many restrictions on the Gaming Licenses imposed by the IGC, the inability to use the Indiana Gaming Licenses at another site, and the ability of the IGC to suspend, revoke, or not renew the Indiana Gaming Licenses at any time.

Based on the foregoing, the Debtors believe all parties bear material litigation risk regarding the value of the Gaming Licenses and whether the secured creditors are entitled to the value of such licenses under the Plan. The Debtors carefully weighed the relative risks and probabilities of success of the respective arguments set forth above before agreement to the global settlement embodied in the Plan. The Debtors also considered the substantial delay and cost associated with litigating these contested issues to conclusion. For these reasons, the Debtors believe the Gaming License Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

<u>Settlement of Claims Relating to Liens on Deposit Accounts and Cash</u>

The global settlement embodied in the Plan also compromises all claims and controversies between the Debtors, their estates, and the Settling Parties concerning the secured creditors' alleged liens on the Debtors' deposit accounts and cash (the "Cash Collateral Settlement"), as described below.

As noted above, the Security Agreements provide that the secured creditors have liens on all Collateral, which includes, among other things, money, investment related property (including deposit accounts), and proceeds of any Collateral. Pursuant to sections 9-312(b)(1) and 913-4(a) of the UCC, as enacted in Indiana, Mississippi, Colorado and Delaware, the secured creditors also have a perfected lien on all of the Debtors' deposit accounts subject to the secured creditors' "control." Pursuant to section 104 of the UCC, "control" over a deposit account is established if (i) the secured party is the bank with which the deposit account is maintained (the depository bank), (ii) the deposit account is subject to a control agreement among the applicable Debtor, the secured party, and the

---

[19]    *See Craner v. Marine Midland Bank, N.A.*, 110 B.R. 111, 118 (Bankr. N.D.N.Y. 1988) ("surviving security interest does not extend to the post-petition proceeds of property in which the creditor had no security interest pre-petition."); *In re Keneco Fin. Group, Inc.*, 131 B.R. 90, 93–94 (Bankr. N.D. Ill. 1991) ("Section 552(b) provides that post-petition proceeds of collateral will be subject to a creditor's security interest only if the creditor has a valid pre-petition security interest in the underlying collateral.").

[20]    *See In re Ridgley*, 139 B.R. at 379; *Urban Communicators*, 394 B.R. at 335 (even though no lien over the license itself, creditor may obtain a security interest in the proceeds of the sale of an FCC license as a "general intangible" that may be perfected prior to sale of the license).

depository bank, or (iii) the secured party becomes the depository bank's customer with respect to the deposit account.[21]

The secured creditors, the Creditors' Committee and the Debtors agree that Majestic's account at Harris Bank (d/b/a Mercantile National Bank of Indiana) (the "Blocked Account"), which had a balance of approximately $153,000 as of the Petition Date (the "Encumbered Cash"),[22] is encumbered by the secured creditors' liens by virtue of such account being subject to a deposit account control agreement.[23]

However, the secured creditors also asserted perfected liens over all or at least a substantial portion of the Debtors' other cash and cash equivalents on the basis that such cash constitutes identifiable proceeds of Collateral, including deposit accounts of the Debtors maintained at Wells Fargo Bank, N.A. or its affiliates. Pursuant to section 9-315 of the governing UCC, proceeds of Collateral (other than Goods) are "identifiable" to the extent they are identified "by a method of tracing, including application of equitable principles, that is permitted under law."[24]

The Creditors' Committee argued that all or substantially all of the Debtors' cash as of the Petition Date was unencumbered because, among other things, (i) the secured creditors did not have "control" or de facto "control" over any of the Wells Fargo deposit accounts, and/or (ii) the Debtors' cash (other than the Encumbered Cash) do not constitute "identifiable proceeds" of Collateral because of an inability to trace or otherwise. The Senior Secured Notes Trustee argued that even if the Court were to rule that certain cash is not subject to the secured creditors' liens, the Unsecured Classes are not entitled to the value of such cash under a plan or otherwise to the extent such cash is found to be restricted for regulatory purposes or otherwise.

Regardless of the outcome of the above issues, the secured creditors also contend they have perfected liens on all Postpetition hotel revenue of the Debtors pursuant to section 552(b)(2) of the Bankruptcy Code.[25] Because the Security Agreements provide for a security interest in hotel room revenue, the secured creditors claim their respective security interests extend to such revenue generated Postpetition. The amount of revenue generated by the Debtors' hotels (including complimentary rooms provided to guests at no charge) from the Petition Date through and including August 31, 2010 was approximately $8.4 million. The Creditors' Committee could argue that section 552(b)(2) does not apply to some or all of such Postpetition hotel revenue.

In addition to the foregoing, the secured creditors also have perfected Postpetition adequate protection liens on the Debtors' cash to the extent of any diminution in value of the Collateral during the pendency of the Chapter 11 Cases. The extent of any such diminution in value, if any, would also be the subject of litigation absent the global settlement embodied in the Plan.

Based on the foregoing, there is material litigation risk associated with how much of the Debtors' cash on hand is subject to perfected liens in favor of the secured creditors.[26] The Cash Collateral Settlement takes into account the relative risks and probabilities of success for these claims. The Debtors also considered the substantial

---

[21]   See UCC § 9-104.

[22]   The last four digits of this account number are 6943.

[23]   See Account Control Agreement between the Senior Secured Credit Facility Agent, Majestic and Mercantile National Bank of Indiana, dated October 20, 2003.

[24]   UCC § 9-315(b).

[25]   Section 552(b)(2) provides that "if the debtor and an entity entered into a security agreement before the commencement of the case [that] extends to . . . amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels . . . then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case . . . ." 11 U.S.C. § 552(b).

[26]   Article 9 continues to recognize that a security interest may continue in a deposit account as a "proceeds" security interest and that if there is a perfected lien over the initial collateral, Article 9 expressly authorizes tracing using equitable principles to determine the extent of that security interest as proceeds in a commingled account. UCC § 9-315(b)(2).

delay and cost associated with litigating these contested issues to conclusion. The Debtors believe the Cash Collateral Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

<u>Settlement of Claims Relating to the Standing Motion</u>

As described below, the Debtors and the Settling Parties have agreed, as part of the good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code embodied in the Plan, to settle all disputes over the claims raised in the Standing Motion (the "<u>Standing Motion Settlement</u>").[27]

In the Standing Motion, the Creditors' Committee argued the security interests of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee in the Debtors' Indiana riverboat casinos are unperfected and should be avoided. To support its assertion that the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee did not properly perfect their security interests in the Indiana casinos prior to the Petition Date, the Creditors' Committee argued, among other things, that the Indiana casino boats are fixtures rather than vessels,[28] and the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee did not effect "fixture filings" covering the Majestic Star Casinos as required by the UCC.

In response to the arguments of the Creditors' Committee, the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed objections to the Standing Motion asserting the Majestic Star Casinos are vessels within the meaning of the Commercial Instruments and Maritime Liens Act, and thus, the ship mortgages filed by the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee validly perfected their security interests in the Majestic Star Casinos.[29] In the alternative, the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee argued they properly perfected their security interests in the Majestic Star Casinos as fixtures by filing UCC-1 financing statements covering the Majestic Star Casinos.[30]

After the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed their objections to the Standing Motion, the Creditors' Committee filed a supplemental memorandum of law in support of the Standing Motion (the "<u>Supplemental Memorandum of Law</u>"), in which it argued for the first time that the Majestic

---

[27]   Pursuant to the Cash Collateral Order, any other potential lien challenges are barred.

[28]   *See* 1 U.S.C. § 3 (defining "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"); *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 494 (2005) (explaining "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement"); *RDI/Caesars Riverboat Casino, Inc. v. Conder*, 896 N.E.2d 1172, 1180 (Ind. Ct. App. 2008) (holding a riverboat casino is not a vessel under federal law where the casino's owner intends to continue to use the riverboat as an indefinitely moored stationary casino). The Creditors' Committee contends the Majestic Star Casinos are not "vessels" under federal law because they are currently moored to the shore, and the Debtors intend to continue to use them as stationary casinos.

[29]   *See Stewart*, 543 U.S. at 497 ("Under [1 U.S.C.] § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."); *Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1312 (11th Cir. 2008) (concluding courts should focus on whether a boat has been rendered practically incapable of transportation on water rather than the intent of the shipowner regarding the future use of the boat when determining the status of a vessel). The Senior Secured Credit Facility Agent and Senior Secured Notes Trustee argue the Majestic Star Casinos are "vessels" under federal law because the casinos are practically capable of engaging in water transportation and could be unmoored and underway in approximately an hour.

[30]   *See* 6 Del. Code § 9-501(a) ("[I]f the local law of this State governs perfection of a security interest . . . the office in which to file a financing statement to perfect the security interest . . . is: (1) the office designated for the filing or recording of a record of a mortgage on the related real property, if . . . the financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures; **or** (2) the office of the Secretary of State, in all other cases, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.") (emphasis added); Ind. Code § 26-4-9.1-501(a) (same).

Star Casinos are real property rather than fixtures.[31] Following the submission of the Supplemental Memorandum of Law, the Senior Secured Credit Facility Agent and the Indenture Trustee filed additional objections to the Standing Motion arguing that these new claims were barred by the Cash Collateral Order and rejecting the notion that the Majestic Star Casinos are real property in any event.[32]

The Debtors have weighed the merits of the respective arguments of the litigants, as well as the benefits of settling the claims raised in the Standing Motion against the costs of litigating such claims to conclusion. Based on the foregoing, the Debtor and the Settling Parties determined the benefits of the Standing Motion Settlement, including allowing the Debtors to focus their efforts on Confirmation, outweigh proceeding with litigation of the claims raised in the Standing Motion. Accordingly, the Standing Motion Settlement is well within the range of reasonableness for settlements pursuant to bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

### Management of the Company

Biographical information for Mr. Michael Darley, Mr. Jon Bennett, Ms. Cara Brown, Mr. Larry Buck, Mr. Dan Ihm, and Mr. Chuck Miller is set forth below:

**Michael Darley.** Michael Darley became the Executive Vice President and Chief Operating Officer of the Company effective as of September 13, 2008, with responsibility for all aspects of the Company's operating activities. Prior to becoming the Chief Operating Officer of the Company, Mr. Darley served as Senior Vice President and General Manager of Fitzgeralds Casino Hotel in Las Vegas beginning in May 2002. Mr. Darley has 28 years of gaming experience, including executive level operating positions in the Trump and Harrah's organizations.

**Jon Bennett.** Jon Bennett has been the Senior Vice President, Chief Financial Officer, and Treasurer of the Company since October 2002 with overall responsibility for all aspects of the Company's financial management, accounting and reporting processes. Prior to Mr. Bennett's appointment as Senior Vice President, Chief Financial Officer, and Treasurer, Mr. Bennett was Vice President of Finance and Administration for Fitzgeralds Casino Hotel in Tunica from its acquisition in December 2001 to his promotion in October 2002.

**Cara Brown.** Cara Brown has been a Director of the Company since 2006. Ms. Brown joined the Company in December 2001 as its Vice President and General Counsel and served in that capacity until her resignation effective May 31, 2006. After her resignation, Ms. Brown and the Company entered into a consulting agreement with a six-month term commencing June 1, 2006 and ending November 30, 2006. Ms. Brown returned as an employee of the Company on June 1, 2008 and currently serves as Senior Vice President and General Counsel.

**Larry Buck.** Larry Buck is a 26 year veteran of the gaming industry and, in December 2008, was named Senior Vice President and General Manager of Majestic Star Casinos and Hotel in Gary, Indiana. Prior to joining Majestic Star, Mr. Buck was employed by Pinnacle Entertainment, Inc. and served as President of Pinnacle's planned resort in Atlantic City, New Jersey. He was also Vice President & General Manager of Pinnacle's Belterra Casino, Resort & Spa in Florence, Indiana from 2004 to 2006. Prior to Belterra, Mr. Buck was Vice President and General Manager of Hyatt's Grand Victoria Casino Resort in Rising Sun, Indiana from 2000 to 2004. Prior to arriving in southern Indiana, Mr. Buck was also Senior Vice President and General Manager of Harrah's Reno and Vice President/General Manager of Players Island Casino in Missouri.

---

[31] *See* Ind. Code § 6-1.1-1-15(5)(A) (defining "real property" to include riverboats licensed under Indiana Code section 4-33 for property tax purposes).

[32] *See Indiana Dep't of State Revenue v. Trump Indiana, Inc.*, 814 N.E.2d 1017, 1020 ("[T]he property tax definition of real property is not wholly consistent with the ordinary meaning of the term. Presumably in recognition of these somewhat artificial definitions designed to effect specific property tax policies, the first section of the chapter of the property tax statute that supplies these definitions, Indiana Code section 6-1.1-1-1, expressly provides that they apply to 'this article', i.e. to property taxes.").