**Dan Ihm.** Dan Ihm brings over 16 years of senior executive, corporate, and property-level management experience to the Company. His primary areas of expertise are operations and marketing for gaming, resorts, and entertainment. Prior to joining the Company, Mr. Ihm was the Corporate Director of Marketing for Laguna Development Corporation in Albuquerque, New Mexico. Mr. Ihm has also served as Senior Director of Marketing for Majestic Star Casino in Gary, Indiana and held the position of Vice President of Marketing for the AAA Four-Diamond Ameristar Casino Hotel in Council Bluffs, Iowa. Mr. Ihm previously held the position of Senior Vice President of Marketing and Operations for Majestic I before being named Senior Vice President and General Manager for Fitzgeralds Casino Black Hawk in October 2009.

**Chuck Miller.** Chuck Miller has over 38 years of experience in the gaming industry and was recently named Senior Vice President and General Manager of Fitzgeralds Casino and Hotel in Tunica, Mississippi. Throughout his career, Mr. Miller has gained hands-on experience in nearly every aspect of casino resort operations while working with some of the best known gaming companies and executives in established and emerging markets throughout the United States. Prior to joining Fitzgeralds Casino and Hotel in Tunica, Mr. Miller was President/CEO of Pearl River Resort in southern Mississippi. He has also served as Corporate Vice President of Development for Caesars' Entertainment, President of Tunica Operations at the Grand, Bally's, and Sheraton casinos for Park Place/Caesar's Entertainment, and General Manager of Grand Casino Tunica for Grand Casinos Inc.

<u>Management Consultant</u>

As soon as practicable following approval of the Disclosure Statement, the Debtors shall file a motion, subject to approval by the Bankruptcy Court and applicable regulatory agencies, to retain a Management Consultant that is acceptable to the Debtors, the Creditors' Committee, and the Senior Secured Notes Trustee. The Management Consultant shall be retained by the Debtors for the duration of the Chapter 11 Cases (unless otherwise determined by the Creditors' Committee and the Senior Secured Notes Trustee, in consultation with the Debtors) and may continue to be retained by the Reorganized Debtors after the Effective Date in the sole discretion of the Board of Managers.

## Composition of Initial Board of Managers

The Board of Managers of Reorganized Majestic Holdco shall be comprised of five managers appointed by the holders of New Membership Interests. On the Effective Date, the holder of New Membership Interests that, together with its affiliates, owns the largest principal amount of Senior Secured Notes, shall appoint two Managers, and the Creditors' Committee shall appoint two Managers. The fifth Manager shall be the Chief Executive Officer of Reorganized Majestic Holdco. The other Reorganized Debtors will be managed by a single managing member to be designated. Further information on the composition of the Board of Managers is set forth in the term sheet attached to the Plan as Exhibit II and in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

## Reorganized Debtors' Corporate Organizational and Ownership Structure

The following chart shows the Reorganized Debtors' contemplated corporate organizational and ownership structure immediately following the occurrence of the Effective Date:[33]

---

[33] The Senior Secured Notes Trustee reserves the right, with the consent of the Debtors (which consent shall not be withheld unreasonably), to create special purpose entities to (i) be co-issuers of the New Senior Secured Notes, and (ii) to hold each Gaming License.



**The Reorganized Debtors' Business Upon Emergence**

Upon emergence, the Reorganized Debtors' business will consist primarily of the ownership and operation of the Debtors' gaming facilities located in Gary, Indiana, Tunica County, Mississippi, and Black Hawk, Colorado, subject to the conditions to the Effective Date in the Plan, subject to Barden Colorado remaining a Debtor because of failure to obtain all governmental licenses, suitability determinations, and other approvals required for such property on or prior to 240 days following the Confirmation Date (as further described in Article XII of the Plan).

The valuation conclusions contained below are based upon management projections provided to the Debtors' financial advisors as of August 2010 and are highly dependent upon the Reorganized Debtors' ability to meet those projections. Other key assumptions utilized by the Debtors' financial advisors include: (a) emergence of the Debtors from chapter 11 bankruptcy protection on September 30, 2011; and (b) approval of the transfer of the Debtors' gaming licenses to the Reorganized Debtors by the Debtors' gaming regulators in Indiana, Mississippi, and Colorado.

**The Reorganized Debtors' Capitalization Upon Consummation of the Plan**

The following table sets forth the Company's consolidated assets and liabilities (a) on an actual basis as of June 30, 2010 and (b) on an as-adjusted basis as of September 30, 2011 to reflect the consummation of the Plan.

This table should be read together with the more detailed information contained elsewhere in this Disclosure Statement, including the section herein entitled "Treatment of Claims Against and Equity Interests in the Debtors," beginning on page 18.

[FORTHCOMING]

**Capital Structure and Corporate Governance of the Reorganized Debtors**

The material terms of the capital structure and corporate governance of the Reorganized Debtors are set forth in the term sheet attached to the Plan as Exhibit II and in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit I to the Plan Supplement. The failure by a holder of New Membership Interests to execute the New Holdco LLC Agreement within one year of the Effective Date shall result in the forfeiture of such holder's allocation of New Membership Interests. After such date, all forfeited New Membership Interests shall revert to Reorganized Majestic Holdco, and the claims of any such holders to New Membership Interests shall be discharged and forever barred.

**New Senior Secured Credit Facility**

The New Senior Secured Credit Facility will be a $58 million senior secured credit facility with a term of three years following the substantial consummation of the Plan, with an interest rate *per annum* equal to (a) the Base Rate plus 3.50% or (b) the LIBOR Rate plus 4.75%, provided by the Senior Secured Credit Facility Agent, which shall be secured by a first lien on all of the assets of the Reorganized Debtors to the extent permitted by law.

The New Senior Secured Credit Facility will be issued pursuant to a new credit agreement, the material terms of which are set forth in the term sheet attached as Exhibit 1 to the Plan. The new credit agreement shall be in form and substance acceptable to the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee and shall be attached as Exhibit 3 to the Plan Supplement.

**New Senior Secured Notes**

The New Senior Secured Notes will be senior secured 12.5% notes (or, at the election of the Senior Secured Notes Trustee, amended and restated Senior Secured Notes), dated as of the Effective Date, due on the fifth anniversary of the Effective Date that will be secured by a second lien on all of the assets of the Reorganized Debtors to the extent permitted by law.

The New Senior Secured Notes will be issued pursuant to the New Senior Secured Notes Indenture, which will be an indenture (or at the election of the Senior Secured Notes Trustee, an amended and Restated Senior Secured Notes Indenture), dated as of the Effective Date by and among the Reorganized Debtors, as obligors, and the Senior Secured Notes Trustee, as indenture trustee, which shall be qualified under the Trust Indenture Act pursuant to section 1145(d) of the Bankruptcy Code, and which shall be attached as Exhibit 4 to the Plan Supplement.

**New Intercreditor Agreement**

On the Effective Date, the Senior Secured Credit Facility Agent, on behalf of the Senior Secured Credit Facility Lenders, and the Senior Secured Notes Trustee, on behalf of the Senior Secured Noteholders, shall execute the New Intercreditor Agreement in form and substance acceptable to both the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee, which shall be attached as Exhibit 2 to the Plan Supplement. In the event the First Lien Alternative Financing or the Second Lien Alternative Financing is consummated, neither the Senior Secured Credit Facility Agent nor the Senior Secured Notes Trustee shall have any obligation to enter into the New Intercreditor Agreement, and the provider of any alternative financing may execute an intercreditor agreement with the Senior Secured Credit Facility Agent or the Senior Secured Notes Trustee, as applicable.

**Exit Financing**

The Creditors' Committee or the Senior Secured Notes Trustee, with the cooperation of the Debtors' management team and advisors, may conduct an exit financing process to identify First Lien Alternative Financing to replace the New Senior Secured Credit Facility.

Moreover, the Creditors' Committee, with the cooperation of the Debtors' management team and advisors, may conduct an exit financing process to identify Second Lien Alternative Financing to replace the New Senior Secured Notes. If the Creditors' Committee delivers to the Debtors and the Senior Secured Notes Trustee a Qualified Commitment Letter with respect to the Second Lien Alternative Financing on or prior to sixty (60) calendar days before the Projected Effective Date, closing of such Second Lien Alternative Financing shall be a condition precedent to the Effective Date, which condition cannot be waived without the consent of the Creditors' Committee; provided, however, that if such Second Lien Alternative Financing fails to close within fourteen (14) calendar days after the Projected Effective Date, then this condition to the Effective Date shall be deemed automatically waived by all parties.

A "Qualified Commitment Letter" means a signed commitment letter from one or more third parties unaffiliated with Senior Noteholders (unless consented to by the Senior Secured Notes Trustee) to provide, on a

fully committed basis, the Second Lien Alternative Financing which meets the following criteria: (a) provides for financing on materially better terms regarding the interest rate, maturity, amortization, and all other associated costs and expenses than the New Senior Secured Notes; (b) taken as a whole, has restrictive covenants at least as favorable to the Reorganized Debtors as the New Senior Secured Notes; (c) contains closing conditions customary for a transaction of this type, including without limitation, (i) closing conditions similar to those contained in the New Senior Secured Notes Indenture and (ii) the negotiation, execution, and delivery of definitive documentation, provided, however, a Qualified Commitment Letter shall not contain diligence or syndication conditions; (d) provides for a closing no later than the Projected Effective Date; (e) with respect to any terms and conditions that are less favorable to the Senior Secured Credit Facility Agent and/or materially different than the terms of the Senior Secured Notes, such terms and conditions shall be reasonably acceptable to the Senior Secured Credit Facility Agent; and (f) shall be subject to an intercreditor and subordination agreement which is substantially similar to the Intercreditor Agreement.

## Capital Obligations to be Satisfied or Compromised Upon Emergence

As of the date the Debtors filed the Chapter 11 Cases, the Debtors reported, on a consolidated basis, approximately $654.2 million in aggregate funded debt, primarily consisting of the Senior Secured Credit Facility, Senior Secured Notes, Senior Notes, and Discount Notes. The Debtors plan to satisfy this indebtedness, as described in greater detail below.

### Senior Secured Credit Facility

On October 7, 2003, Majestic I, Barden Mississippi, and Barden Colorado entered into the Loan and Security Agreement with certain financial institutions party thereto as lenders and the Senior Secured Credit Facility Agent, as arranger and administrative agent for such lenders.[34] The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matured on April 15, 2010. As of August 31, 2010, the Debtors owed approximately $65.3 million under the Senior Secured Credit Facility in principal and accrued unpaid interest. Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Senior Secured Credit Facility Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%. In each case the rate is determined based on the Debtors' trailing twelve month EBITDA (defined as earnings before interest, taxes, depreciation and amortization). The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default. As noted above, the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Senior Secured Credit Facility Agent at the default rate on a current basis.

### Senior Secured Notes

The Senior Secured Notes are $300 million in principal amount of obligations issued by Majestic I and MSCC, a non-operating, wholly-owned subsidiary of Majestic I that has no assets. The Senior Secured Notes are governed by the Senior Secured Notes Indenture. The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes matured on October 15, 2010. As of August 31, 2010, the Debtors owed approximately $348.4 million on account of the Senior Secured Notes in principal and accrued unpaid interest.

---

[34] The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and to modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

<u>Senior Notes</u>

The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic I and MSCC II, a non-operating, wholly owned subsidiary of Majestic that has no assets. The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi. The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debenture Trust Company as successor trustee. The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005. The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year. The notes mature on January 15, 2011. As of August 31, 2010, the Debtors owed approximately $233.1 million on account of the Senior Notes in principal and accrued unpaid interest.

<u>Discount Notes</u>

The Discount Notes are $63.5 million principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Holdco that has no assets. The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic or any of its subsidiaries. The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee. The Discount Notes accrue interest at 12½% per annum, with payments due on April 15 and October 15 of each year. Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011. As of August 31, 2010, the Debtors owed approximately $72.6 million on account of the Discount Notes.

<u>Trade Claims and Other Unsecured Obligations</u>

In addition to its funded debt, prior to the date the Debtors filed the Chapter 11 Cases, the Company incurred debt with several creditors in the ordinary course of its business. The Claims related to these obligations are more fully described in the Plan.

**Description of New Membership Interests**

The material terms of the New Membership Interests are set forth in the term sheet attached to the Plan as Exhibit II and shall be incorporated into the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

**Limitations on Liability and Indemnification of Managers and Officers of The Reorganized Debtors**

The Delaware Limited Liability Company Act ("<u>DLLCA</u>") authorizes companies to limit or eliminate the personal liability of managers to limited liability companies and their members for monetary damages for breaches of managers' fiduciary duties. The Reorganized Debtors' Amended and Restated Operating Agreements shall provide that the Managers shall have the same fiduciary duties to the Reorganized Debtors and their members as the directors of a Delaware corporation, other than as expressly set forth in the term sheet attached as Exhibit II to the Plan. No Manager or member of the Reorganized Debtors shall have a duty to the Reorganized Debtors or their members to offer the Reorganized Debtors any business opportunity suitable for the Reorganized Debtors that may arise from time to time, which may also be suitable for the Manager, member, or any of their affiliates, nor shall any Manager or member be liable to the Reorganized Debtors or their members for offering any such business opportunity to another person. In addition, the Reorganized Debtors' Amended and Restated Operating Agreements may provide that the Reorganized Debtors must indemnify their Managers and officers to the fullest extent permitted by the DLLCA. The Reorganized Debtors' Amended and Restated Operating Agreements may include a provision that eliminates the personal liability of Managers to the Reorganized Debtors or their members for monetary damages for any breach of fiduciary duty as a manager, except to the extent such exemption from liability or limitation thereof is not permitted under the DLLCA as the same exists or hereafter may be amended.

The limitation of liability and indemnification provisions in the Reorganized Debtors' Amended and Restated Operating Agreements may discourage members from bringing a lawsuit against Managers for breach of their fiduciary duties. These provisions may also have the effect of reducing the likelihood of derivative litigation against Managers and officers, even though such an action, if successful, might otherwise benefit the Debtors or the Reorganized Debtors and their stockholders and members. In addition, the Reorganized Debtors may be adversely affected to the extent they are obligated to pay the costs of settlement and damage awards against Managers and officers pursuant to these indemnification provisions.

## Summary of Gaming Regulations

The ownership and operation of the Debtors' gaming facilities are subject to various state and local laws and regulations in the jurisdictions where they are located. The following is a summary of the provisions of the gaming laws and regulations applicable to the Debtors' operations. The summary does not purport to be a full description thereof and is qualified in its entirety by reference to such laws and regulations.

Consummation of the Plan will require prior approval of gaming authorities. Furthermore, certain persons and/or entities who will be associated with the Reorganized Debtors will be subject to a costly and time-consuming investigatory, licensing, and approval process prior to the Effective Date, and upon their licensing, such persons will be subject to the same or substantially similar gaming laws and regulations as the Debtors and their associates currently face.

Additionally, while the statutory and regulatory requirements discussed herein will apply to the Reorganized Debtors, no assurances can be provided as to the specific form of any statute or regulation that any jurisdiction may adopt or license conditions that any jurisdiction may impose in the licensing process for the restructuring, the Reorganized Debtors, or any persons associated with the Reorganized Debtors.

This summary is provided only as background information for creditors to make an informed voting decision on the Plan. All parties in interest, including creditors who may be subject to the investigatory and licensing processes described herein, are strongly urged to retain their own gaming law counsel for each jurisdiction where the Debtors currently have operations to seek advice concerning their particular circumstances and the investigatory and licensing process. It should be noted in this regard that gaming laws and regulations are often complex and have been interpreted to impose obligations that might not be apparent from an initial reading thereof.

## Background on Indiana Gaming Regulations

The acquisition, ownership, and operation of casinos in Indiana are subject to regulation by the State of Indiana primarily through the IGC. Other state agencies with limited oversight include the Indiana Alcohol and Tobacco Commission and the Indiana Department of Revenue.

The Indiana Riverboat Gambling Act (the "Indiana Act") and administrative rules promulgated thereunder (the "Indiana Rules") give the IGC extensive powers and duties in connection with regulation of casino gaming operations and enforcement of the Indiana Act and Indiana Rules. The jurisdiction of the IGC extends to all facilities, persons, associations, and practices related to casino gaming operations.

The Indiana Act specifies that it is designed to benefit Indiana citizens by promoting tourism and assisting economic development. The Indiana Act further specifies that the public's confidence can be maintained only (i) through comprehensive law enforcement supervision of gambling activities and (ii) strict regulation of facilities, persons, associations, and practices related to casino gaming operations.

The Indiana Act and Indiana Rules cover all facets of gaming operations, including, but not limited to:

- requiring a thorough background investigation to ensure unsuitable persons do not have a direct or indirect ownership interest in a riverboat casino;

- the establishment and maintenance of accounting and internal control procedures that are designed to ensure:

  o the riverboat's assets are safeguarded;

  o the riverboat's financial records are accurate and reliable;

  o the riverboat's transactions are performed in accordance with the Indiana Act and Indiana Rules;

  o the riverboat's transactions are recorded to properly account for adjusted gross receipts, admission fees, and all applicable taxes;

  o assets are maintained in accordance with generally accepted accounting principles;

  o only authorized personnel have access to assets;

  o recorded assets are compared to actual assets at reasonable intervals and appropriate action is taken if discrepancies are discovered;

  o there is appropriate segregation of functions, duties, and responsibilities;

  o all functions, duties, and responsibilities are carried out only in accordance with sound practices and by qualified competent personnel;

  o riverboat employees are not in a position to conceal errors or irregularities; and

  o gambling is conducted with integrity and only in accordance with the Indiana Act and Indiana Rules.

The Indiana Act authorizes the issuance of up to 10 riverboat licenses, one operating agent license, and two licenses to conduct gambling games at pari-mutuel racetracks. Five riverboats licenses have been issued to riverboat facilities in counties contiguous to Lake Michigan. Specifically, four of these riverboats are located in Gary (the Debtors' two casinos), East Chicago, and Hammond in Lake County, and one is located in Michigan City in LaPorte County. Five additional riverboats are located in counties contiguous to the Ohio River in the southern portion of Indiana. Specifically, these five riverboats are located in Evansville (Vanderburgh County), Harrison County, Switzerland County, Rising Sun (Ohio County), and Lawrenceburg (Dearborn County). The operating agent licensee conducts gaming at a facility in French Lick, which is also in the southern portion of Indiana. Pursuant to other Indiana statutes, the two pari-mutuel racetracks have licenses to operate up to 2,000 slot machines at their facilities in Anderson and Shelbyville, which are in central Indiana.

An applicant for an Indiana gaming license must submit a comprehensive application and undergo a thorough background investigation. Additionally, any person who will, directly or indirectly, own 5% or more of a licensee must automatically submit a personal disclosure form and undergo an exhaustive background investigation. However, the IGC may investigate any person with any level of ownership interest. If a licensee is a publicly traded company, its articles of incorporation must contain language concerning transfer of ownership, suitability determinations, and possible divesture of ownership if a shareholder is deemed unsuitable by the IGC. If the IGC determines a person that holds an ownership interest in a licensee is unsuitable, the licensee: (i) may not pay a dividend to the person; (ii) may not pay any remuneration to the person; and (iii) shall not allow the person to vote on any matter. The licensee is responsible for all costs associated with the background investigation.

The Indiana Rules allow a company that qualifies as an institutional investor to exceed the 5% ownership interest threshold before requiring a background investigation. A company qualifies as an institutional investor if it (i) acquires an interest in a licensee in the ordinary course of its investment business and (ii) holds the interest for

investment purposes only and not to cause, directly or indirectly, the election of a majority of the licensee's board of directors or any change in the corporate charter, bylaws, management, policies, or operation of the licensee.

An institutional investor must notify the IGC of its acquisition of 5% or more of the voting securities of a licensee within 10 business days of acquiring such securities. An institutional investor may acquire up to a 15% ownership interest in a licensee without being required to undergo a background investigation. The institutional investor must, within 45 days, complete a form to verify it qualifies as an institutional investor as defined in the Indiana Rules. The IGC reserves the right to require any company claiming institutional investor status to undergo a background investigation if the IGC deems such an investigation necessary.

Additionally, all key persons of a licensee must undergo a thorough investigation and be licensed. A key person is defined as an officer, director, executive, employee, trustee, substantial owner, independent contractor, or agent that has the power to exercise, alone or in conjunction with others, management or operating authority over the licensee or affiliates thereof.

A riverboat owner's license and operating contract entitle a licensee or operating agent to operate one riverboat. The Indiana Act allows a person to hold up to one hundred percent of up to two individual riverboat owner's licenses. The Indiana Act imposes a $2 million transfer fee on any licensee that acquires a controlling interest in a second owner's license.

An initial license runs for a period of five years. Thereafter, a license is subject to renewal on an annual basis upon a determination by the IGC that the licensee continues to be eligible to hold a license pursuant to the Indiana Act and Indiana Rules. Each licensee must undergo a complete reinvestigation every three years, and the IGC reserves the right to investigate a licensee at any time it deems necessary.

The licenses are transferrable only in accordance with the Indiana Act and Indiana Rules, and any proposed transfer requires approval by the IGC. The Indiana Act specifies a license is a revocable privilege granted by the state and not a property right. A license may not be leased, hypothecated, or serve as security for any debt obligation. The IGC may suspend or revoke the license of a licensee or impose civil penalties, in some cases without notice or hearing, for any act in violation of the Act or for any other fraudulent act.

Pursuant to legislation enacted in 2009, licensees must execute and submit a POA and identify a person to temporarily operate the licensee's casino and related facilities (a "POA Trustee") if certain events occur, and the IGC adopts a resolution authorizing the POA Trustee to temporarily conduct the licensee's gaming operations. Specifically, the IGC may adopt a resolution authorizing the POA Trustee to temporarily operate the licensee's facility if one of the following occurs: (i) the IGC revokes the licensee's license; (ii) the IGC does not renew the licensee's license; (iii) a proposed transferee of the licensee's license is not approved, and the licensee is unwilling to retain ownership of the riverboat; or (iv) the licensee agrees, in writing, to relinquish control to a POA Trustee approved by the IGC. If the IGC adopts a resolution authorizing a POA Trustee to temporarily operate the casino, the licensee will have 180 days from the date the resolution is adopted to sell the riverboat to a person approved by the IGC. If the riverboat is not sold within 180 days, the POA Trustee may sell the riverboat to a person approved by the IGC.

The Indiana Rules impose restrictions on a licensee's incurrence of debt. A licensee and its affiliates may enter into debt transactions that total $1.0 million or more only with the prior approval of the IGC. Such approval is subject to compliance with requisite procedures and a showing that each person with whom the licensee and its affiliates enters into a debt transaction would be suitable for licensure under the Act. Unless waived, approval of debt transactions requires consideration by the IGC at two business meetings. The IGC, by resolution, has authorized its executive director, subject to subsequent ratification by the IGC, to approve debt transactions after a review of relevant documents and consultation with the chair of the IGC and the IGC's outside financial analyst.

All of the foregoing regulations are subject to amendment and interpretation by the IGC. Changes in the laws, regulations, and procedures described above could adversely affect the gaming operations of the Debtors and Reorganized Debtors.

The Indiana Act and the Indiana Rules are available for review at http://www.in.gov/legislative/ic/code and http://www.in.gov/legislative/iac.

**Background on Mississippi Gaming Regulations**

The acquisition, ownership, and operation of casino gaming facilities and gaming devices in Mississippi are subject to the Mississippi Gaming Control Act (the "Mississippi Act") and regulations promulgated thereunder as well as various local regulations. Specifically, the Debtors' Mississippi gaming operations are subject to the licensing and regulatory control of the Mississippi Gaming Commission ("MGC").

The Mississippi Act and the regulations and supervisory procedures of the MGC are based upon declarations of public policy concerning, among other things:

- the prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity;

- the establishment and maintenance of responsible accounting practices and procedures;

- the maintenance of effective controls over the financial practices of casino licensees, including the establishment of minimum procedures for internal fiscal affairs and the safeguarding of assets and revenues, providing reliable recordkeeping, and requiring the filing of periodic reports with the MGC;

- the prevention of cheating and fraudulent practices;

- providing a source of state and local revenues through taxation and licensing fees; and

- ensuring that gaming licensees, to the extent practicable, employ Mississippi residents.

Under the Mississippi Act, any person who seeks to own or operate a gaming establishment or gaming devices, or hold a direct or indirect voting ownership interest of greater than 5% therein, must be found suitable by, or obtain a gaming license from, the MGC prior to the consummation of such transaction. If such person is an entity, certain of its managers, directors, officers, key employees, and owners must also demonstrate their suitability to be affiliated with the gaming license applicant. The burden of proving suitability is on the applicant, and the applicant must pay the costs of the investigation, which can be extremely expensive and time-consuming.

Entities that engage in gaming operations generally hold the actual gaming licenses. Natural persons or entities materially associated or affiliated with such entities (such as managers, directors, or owners) must be found suitable. Also, the private or publicly-traded parent company of a gaming licensee and any intermediary holding companies must be registered with, or found suitable by, the MGC. Registration and suitability determinations are similar to licensing and involve the submission of a detailed application that allows the MGC to thoroughly investigate the applicant. An application for a determination of suitability requires the submission of detailed personal and financial information followed by a thorough investigation. Registration is similar, and upon approval, specific functional restrictions apply to the registered entity, including restrictions on any intermediary holding companies, licensed subsidiaries, and in some cases, associated shareholders.

In the licensing context, Mississippi makes little distinction between private companies and publicly-traded companies. Private operating subsidiaries of both private and publicly-traded companies must hold a gaming operator license to operate casino and gaming devices. Each privately-held or publicly-traded holding or parent company of a gaming licensee, which directly or indirectly owns, controls, or holds the power to vote greater than 5% of any class of voting equity securities in the licensee, must undergo an investigation, register with, and/or be found suitable by the MGC.

Each manager, director, officer, and investor holding voting equity in such holding company may also be subject to a personal finding of suitability by the MGC. Although the Mississippi Act mandates findings of

suitability for those corporate and individual investors holding more than 10% of any class of voting equity, it has long been the practice of the MGC to require approvals of any persons or entities holding a direct or indirect voting equity interest of greater than 5% in any gaming licensee. Such voting equity ownership threshold is increased to greater than 10% in the case of institutional investors. In contrast, holders of non-voting equity in the parent company of a gaming licensee, or in any intermediary holding company, are not ordinarily subject to the mandatory finding of suitability; provided, however, that the MGC has the authority to subject any equity holder, whether such equity is voting or non-voting, to a finding of suitability.

Gaming licenses granted by the MGC are not transferable, are issued for a term not exceeding three years, and must be renewed periodically thereafter.

Any acquisition of a licensed gaming entity, including the takeover of its operating assets by a successor entity, will require similar review, approval, and licensing by the MGC. This process can be extremely lengthy, costly, onerous, and intrusive. The placing of an investigatory item on an agenda for final approval is solely in the discretion of the MGC and will not take place until the applicant has submitted all items requested by the MGC. As a general rule, the licensing process will not begin until all applications relating to a specific transaction have been submitted to the MGC.

The MGC may deny an application for any cause that it deems reasonable. Changes in licensed positions must be reported to the MGC. In addition to its authority to deny an application, the MGC can disapprove a change in a corporate position.

Furthermore, if the MGC were to find a manager, officer, director, key employee, equity holder, lender, or landlord unsuitable for licensing or unsuitable to continue having a relationship with the Debtors or the Reorganized Debtors, the Debtors or the Reorganized Debtors would have to sever all relationships with such person to retain their licenses or approvals. In addition, the MGC may require any licensed company to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or of questions pertaining to licensing are not subject to judicial review in Mississippi.

Under certain circumstances, an institutional investor who acquires more than 10% but not more than 15% of a licensed company's voting securities may apply to the MGC for a waiver of a finding of suitability if that institutional investor holds the voting securities for investment purposes only.

An institutional investor will not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held by the institutional investor in the ordinary course of its business and not for the purpose of causing, directly or indirectly, the election of a majority of the members of a licensed company's board of directors or managers, any change in the charter, bylaws, operating agreement, management, policies, or operations of a licensed company or any of its gaming affiliates, or any other action which the MGC finds to be inconsistent with holding such voting securities for investment purposes.

Activities which are deemed consistent with holding voting securities for investment purposes include:

- voting on all matters voted on by stockholders;

- making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and

- such other activities as the MGC may determine to be consistent with such investment intent.

If the beneficial owner of voting securities that must be found suitable is a corporation, partnership, or trust, it must submit detailed business and financial information to the MGC. Applicants are required to pay all costs of the investigation.

Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the MGC or after otherwise being required to do so, may be found unsuitable. The same requirements apply to a record owner of voting securities of a registered company if the record owner, after request, fails to identify the beneficial owner of such equity. Any equity holder who is found unsuitable and who holds, directly or indirectly, any beneficial ownership of voting securities of a licensed or registered company beyond the period of time proscribed by the MGC may be guilty of a misdemeanor. A licensee may become subject to disciplinary action, if, after receipt of notice that a person is unsuitable to be a stockholder or to have any other relationship with the licensee, the licensee:

- pays the unsuitable person any dividend or other distribution on such person's voting securities;

- recognizes the exercise, directly or indirectly, of any voting right conferred by securities held by that person;

- pays the unsuitable person any remuneration in any form for services rendered or otherwise, except in certain limited and specific circumstances; or

- fails to pursue all lawful efforts to require the unsuitable person to divest himself or herself of the securities, including, if necessary, the immediate purchase of the securities for cash at fair market value.

A gaming licensee may be required to disclose to the MGC the identities of all holders of its debt securities. The MGC may, in its sole discretion, require the holder of any debt security of a registered company or licensee to file applications, be investigated, and be found suitable to own the debt security of a registered company or licensee.

If the MGC determines that a person is unsuitable to own a debt security, then the licensee and/or its registered holding company can be sanctioned, which may include the loss of its approvals, if without the prior approval of the MGC, it:

- pays to the unsuitable person any dividend, interest, or any distribution whatsoever;

- recognizes any voting right by the unsuitable person in connection with the debt securities;

- pays the unsuitable person remuneration in any form; or

- makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation, or a similar transaction.

License fees and taxes, computed in various ways depending on the type of gaming activity involved, are payable to the State of Mississippi and to the counties and cities in which the Mississippi licensee's operations are conducted. The MGC also assesses fees and expenses on gaming licensees. Any taxes levied by the MGC or Mississippi taxing authorities that are not paid by Debtors, as well as unpaid gaming winnings, could be assessed against the Reorganized Debtors.

Any person who is or is required to be licensed, found suitable, or registered or is under common control with any such person, and who is or proposes to become involved in a gaming venture outside of Mississippi or in any internet gaming venture in any jurisdiction, must obtain approval or a waiver of such approval from the MGC prior to engaging in any such gaming venture outside of Mississippi; provided, however, that such a waiver is automatically granted under the MGC's regulations in connection with foreign gaming activities (except for internet gaming activities) conducted (i) within the 50 states or any territory of the United States, (ii) on board any cruise ship embarking from a port located therein, and (iii) in any other jurisdiction in which a casino operator's license or its equivalent is not required to legally conduct gaming operations. The MGC may require, among other things, that it be granted access to information concerning the out-of-state gaming operations of the licensee and its affiliates.

The MGC may limit, condition, suspend, or revoke a license, finding of suitability, registration, or other approval, subject to compliance with certain statutory and regulatory procedures if it is determined that Mississippi gaming laws or regulations were violated. The MGC may also levy substantial fines against the licensee and the individuals involved in violating any gaming laws or regulations.

Changes in laws, regulations, and procedures described above could adversely affect the gaming operations of the Debtors and the Reorganized Debtors.

Mississippi gaming laws and regulations are available for review at the website of the MGC http://www.mgc.state.ms.us.

## Background on Colorado Gaming Regulations

The Colorado Limited Gaming Act of 1991 (as amended, the "Colorado Act"), authorizes limited gaming only in certain designated commercial districts of Central City, Black Hawk, and Cripple Creek, Colorado. Limited gaming consists of the games of poker, blackjack, craps, roulette, and slot machines, all with maximum single bets of $100. Only persons aged 21 or older may participate in limited gaming, and limited gaming may be offered by licensed casinos twenty-four hours per day, seven days per week. Limited gaming is allowed only on premises licensed for that purpose, and the gaming-licensed premises of any building may not exceed 35% of the square footage of the building or 50% of any floor of such building. There is no limitation on the size of any structure or total square footage devoted to limited gaming. Additionally, the gaming-licensed premises of any casino must be physically located within the designated commercial districts of one of the three above-referenced cities. Limited gaming is regulated by the Colorado Limited Gaming Control Commission (the "CLGC") and the Colorado Division of Gaming in the Colorado Department of Revenue (the "CDG").

The public policy of Colorado as stated in the Colorado Act is:

- the success of limited gaming depends upon public confidence and trust that licensed limited gaming is conducted honestly and competitively, that the rights of the creditors of licensees are protected, and that gaming is free from criminal and corruptive elements;

- public confidence and trust can be maintained only by strict regulation of all persons, locations, practices, associations, and activities related to the operation of licensed gaming establishments, and the manufacture or distribution of gaming devices and equipment;

- all establishments where limited gaming is conducted and where gambling devices are operated and all manufacturers, sellers, and distributors of certain gambling devices and equipment must therefore be licensed, controlled, and assisted to protect the public health, safety, good order, and the general welfare of the inhabitants of the state to foster the stability and success of limited gaming and to preserve the economy and policies of free competition of the state of Colorado; and

- no applicant for a license or other affirmative CLGC approval has any right to a license or to the granting of the approval sought. Any license or other CLGC approval granted pursuant to the provisions of the Act is a revocable privilege, and no holder acquires any vested right therein or thereunder.

Pursuant to the Colorado Act and the rules and regulations promulgated thereunder (the "Colorado Gaming Regulations"), the ownership and operation of limited gaming facilities in Colorado, however acquired, are subject to extensive regulation by the CLGC and CDG. The gaming operations of licensed casino operators are also subject to the respective requirements of the three locations where limited gaming is permitted: Central City, Black Hawk, and Cripple Creek. These jurisdictions require each gaming establishment to obtain the appropriate business license, liquor license, and other licenses and permits. Licensed outlets for limited gaming are also subject to fees and taxes established by local authorities, including fees for the possession of gaming devices used in limited gaming. The

three gaming jurisdictions charge annual gaming device fees on each gaming device used in limited gaming ranging from $750 in Black Hawk to $1265 in Central City.

The CLGC may issue the following gaming licenses: (1) slot machine manufacturer or distributor; (2) operator; (3) retail gaming; (4) support; and (5) key employee. These licenses require renewal every two years and are not transferable. Support and key employee licenses may also be issued and renewed by the director of the CDG on behalf of the CLGC. The CLGC has broad discretion to condition, suspend for up to six months, revoke, limit, or restrict a license at any time and also has the authority to impose fines. Disciplinary actions against a licensee's license may be brought for any violations of the Colorado Act or the Colorado Gaming Regulations or for any reason for which a license could be denied. If violations have occurred, the fines imposed by the CLGC can range up to $25,000 per violation for retail gaming (casino) licensees. A fine and license suspension or revocation may be imposed concurrently for each violation of the Colorado Act or the Colorado Gaming Regulations by a licensee.

A retail gaming (casino) license is required for all persons conducting limited gaming on their premises. In addition, an operator license is required for all persons who engage in the business of placing and operating slot machines on the premises of a retailer, or who provide goods or services in return for fees calculated upon a percentage of limited gaming revenue. However, a retailer is not required to hold an operator license. No person may have an ownership interest in more than three retail licenses.

The Colorado Act requires that an applicant for a gaming license or for approval of its acquisition of a direct or indirect interest in a gaming licensee, must demonstrate, to the CLGC's satisfaction, that such applicant is of good moral character and is suitable for participation in the gaming industry. Accordingly, the CLGC requires that every such applicant—except those individuals seeking a support license or approval as a limited owner (under 5%) of a privately-held company—undergo a full suitability investigation. Support licensees and limited owners of privately-held companies typically are subject to less comprehensive background investigations than the other categories of applicants. Notwithstanding the generally less comprehensive nature of background investigations for support licensees and limited owners of privately held companies, the CLGC and/or the CDG may, at their discretion, require a complete a full suitability investigation if they determine such an investigation is necessary.

In the case of a corporation or an entity that is a license applicant or an applicant for CLGC approval to acquire an interest in a licensee, certain distinctions are made between privately-held corporations and entities and publicly-traded corporations and entities. With respect to private companies, no person may acquire any interest in a private company that holds a gaming license without the prior approval of the CLGC. Such approval will be granted only after the person seeking to acquire the interest has undergone a full suitability investigation. With respect to public companies holding gaming licenses, acquisition of an interest in such companies does not require prior CLGC approval. It may, however, require a post-acquisition suitability investigation.

Additionally, the suitability investigation of a private company differs from the investigation that is required for a public company. The suitability investigation of a private company includes an investigation of the company itself and separate suitability investigations of every officer, director, and stockholder holding an interest of 5% or more in the company. Stockholders holding an interest of less than 5% in a private company are required to submit "limited ownership" disclosure forms and are not customarily required to undergo a full suitability investigation—although the CLGC has the authority to require a suitability investigation of anyone associated with a company under review.

In the case of a public company, a suitability investigation includes an investigation of the company itself and separate suitability investigations of all officers, directors, and certain holders of the company's stock, as set forth below. Rule 4.5 of the Colorado Gaming Regulations ("Rule 4.5") applies to applicants and licensed entities that are publicly-traded, as defined therein, or which are owned 5% or more directly or indirectly by publicly-traded entities. Persons or entities owning less than 5% of a publicly-traded gaming licensee, or of the publicly-traded parent company of a gaming licensee, do not have to report their ownership interests, or apply for a suitability investigation, unless requested to do so by the CLGC or CDG. If such a request is made, the person or entity so requested to apply or report must do so or risk being found unsuitable for involvement or participation in Colorado gaming.

Persons or entities (including institutional investors as defined in Rule 4.5) who directly or indirectly beneficially own 5% or more (but less than 10%) of an interest in a gaming licensee, through their beneficial ownership of any class of such licensee's voting securities, must report their interest to the CDG within 10 days of their acquisition of such interest and may be required to provide additional information and undergo a suitability investigation. The CDG may, and often do, findings of suitability for persons or entities directly or indirectly beneficially owning 5% or more of an interest in a gaming licensee, other than certain institutional investors discussed below.

A finding of suitability as an "associated person" automatically will be required of all persons or entities (other than certain institutional investors discussed below) that directly or indirectly beneficially own an interest of 10% or more in a gaming licensee. Such persons and entities (including institutional investors) must notify the CDG within ten days of their acquisition of such an interest. In addition, such persons and entities (other than certain institutional investors discussed below) must file appropriate applications within 45 days of their acquisition of such an interest.

Rule 4.5 defines an institutional investor to include certain classes of banks, insurance companies, investment companies, investment advisors, collective trust funds, employee benefit plans, pension funds, and groups composed of persons otherwise individually qualifying pursuant to the definition in the rule. If institutional investors provide specified information to the CDG within 45 days of the acquisition of a direct or indirect interest in a gaming licensee (under the current practice of Colorado gaming regulators, such disclosure is required for the acquisition of an interest of 5% or more in a gaming licensee) and hold such interest for investment purposes only, the CLGC, in its discretion, may permit such institutional investors to own an interest of up to 15% in a gaming licensee without undergoing a full suitability investigation.

Notwithstanding the foregoing, the CLGC may require any person having or acquiring an interest, however limited or indirect, in a license or a licensee to undergo a full suitability investigation and pay the cost of the investigation in the same manner as an applicant.

Where there is a distinction between the record owner and the beneficial owner of stock or other interests in a licensee or applicant, the CDG will review the circumstances to determine, in its discretion, whether either or both must apply for a finding of suitability.

Any application for a license or for a finding of suitability can be denied by the CLGC, in its discretion, based upon any of the following criteria: (1) the failure of the applicant to prove by clear and convincing evidence that the applicant is qualified for licensure and that the applicant is of good moral character; (2) failure of the applicant to provide appropriate information, documentation, or assurances to the CLGC; (3) failure of the applicant to reveal material facts in connection with a suitability or other investigation of the applicant; (4) conviction of the applicant of certain serious criminal acts, including illegal gambling; (5) pending prosecution for certain enumerated criminal acts; (6) the identification of the applicant as a member of a career-offender cartel; (7) refusal of the applicant to cooperate with governmental investigative agencies; or (8) the identification of the applicant as an illegal professional gambler.

In addition, all persons loaning monies, goods, or real or personal property directly or indirectly to a licensee or applicant, or having any interest in a licensee or applicant, or entering into any agreement with a licensee or applicant, must provide any information requested by CLGC. At the discretion of the CLGC, these persons may be required to supply all information relevant to a suitability determination and submit to a full suitability investigation. The failure of such a person to promptly provide all information requested and submit to a suitability or background investigation could result in a finding of unsuitability, the denial of a license application, suspension or revocation of an existing license, termination of any lease, note arrangement, or agreement between the applicant or licensee and the person from whom such information is sought, or the imposition of other sanctions.

Persons found unsuitable by the CLGC may be required immediately to terminate any interest in, association or agreement with, or relationship to a licensee—regardless of any negative financial consequences to such persons. Specifically, no licensee shall, with respect to any person associated with the licensee and found unsuitable by the CLGC: (1) pay to that person any interest or dividends; (2) permit the exercise of any voting rights by such person; (3) pay any remuneration for services rendered by that person or otherwise; or (4) fail to

pursue all lawful efforts to require such person to relinquish all voting securities, including the immediate purchase of such securities by the licensee. A finding of unsuitability with respect to any officer, director, employee, associate, lender, or beneficial owner of a licensee or applicant may also jeopardize the licensee's license or applicant's license application. Licenses may be conditioned upon termination of any relationship with unsuitable persons.

Although authorized pursuant to the Act, as a long-standing matter of policy and practice, the CLGC does not issue temporary licenses, and persons required to be licensed are not permitted to perform activities requiring a license prior to the issuance of the license.

The Colorado Act does not require any approvals for Colorado licensees to engage in foreign gaming activities. However, a Colorado licensee or parent or subsidiary of a licensee in Colorado must promptly report to the CLGC all gaming applications and licenses submitted or obtained in jurisdictions outside Colorado. Upon the request of the CLGC or the CDG, licensees must provide all requested information about such foreign gaming operations. Violations of the gaming or other requirements of foreign jurisdictions could result in a finding of unsuitability in Colorado.

Additional information concerning the Colorado Gaming Regulations is available on the website of the CDG at www.colorado.gov/revenue/gaming.

## Status of The Debtors Under Gaming Regulations

### Indiana

The Debtors are licensed to operate the Majestic Star Casinos in Gary, Indiana. As such, the Debtors must comply with the Indiana Act and Indiana Rules and periodically submit detailed financial, operating, and other reports to the IGC and furnish any other information that the IGC may require. The Debtors currently hold all licenses and permits necessary to operate the Majestic Star Casinos. On September 16, 2010, the IGC concluded the complete reinvestigation of Majestic I and Majestic II required every three years by the Indiana Act and renewed the licenses of Majestic I and Majestic II for one year from June 3, 2010.

If it were determined that the Debtors violated the Indiana Act or Indiana Rules, their licenses could be limited, conditioned, suspended, or revoked. Such violations could expose the Majestic Star Casinos and any person involved in any violation to a substantial fine.

Additionally, as explained above, the IGC could adopt a resolution authorizing a POA Trustee to temporarily operate one or both of the Majestic Star Casinos if (i) the IGC revoked one or both of the Debtors' Indiana licenses; (ii) the IGC did not renew one or both of the licenses; (iii) a proposed transferee of one or both of the Debtors' licenses were denied a license and the Debtors were unwilling to retain ownership of the Majestic Star Casinos; or (iv) Majestic I or Majestic II agreed, in writing, to relinquish control to a POA Trustee approved by the IGC. The POA and POA Trustee for both Majestic I and Majestic II were approved by the IGC on March 4, 2010. To date, the IGC has not exercised any of its rights under the POA.

### Mississippi

Majestic I and Majestic Holdco are registered with the MGC as "publicly traded corporations" with direct and indirect interests in Barden Mississippi, the owner and operator of Fitzgeralds Tunica. Majestic Holdco has been found suitable by the MGC to own the equity securities of its subsidiary intermediary gaming company, Majestic I. Likewise, Majestic I has been found suitable by the MGC to own the equity securities of its gaming operating subsidiary, Barden Mississippi. Barden Mississippi, which owns and operates Fitzgeralds Tunica, is licensed as a casino operator under the Mississippi Act.

Majestic I and Majestic Holdco, as registered holding companies, and Barden Mississippi, as a gaming licensee, must comply with the Mississippi Act and the MGC's regulations and policies promulgated pursuant thereto, periodically submit detailed financial, operating, and other reports to the MGC, and furnish any other

information that the MGC may require, including but not limited to information regarding material loans, leases, sales of securities, and similar financing transactions.

If it were determined that Majestic Holdco, Majestic I, or Barden Mississippi violated the Mississippi Act or the MGC's regulations, the licenses and registrations granted to such entities by the MGC could be limited, conditioned, suspended, or revoked. In addition, Majestic Holdco, Majestic I, and Barden Mississippi, and the persons involved therewith could be subject to substantial fines.

The MGC has renewed Barden Mississippi's license through December 7, 2013.

<u>Colorado</u>

Barden Colorado is licensed in Colorado as a retail gaming licensee and operator licensee. It is wholly-owned directly by Majestic I. Majestic I is considered a publicly-traded entity under Rule 4.5 of the Colorado Gaming Regulations by the CDG. Accordingly, to the extent Majestic I continues to be considered a publicly traded entity, Rule 4.5 will apply to any acquisition of an interest in Barden Colorado through the acquisition of an interest in Majestic I.

Barden Colorado and its owners, officers, and directors have the necessary approvals from the CLGC to engage in their current gaming activities in Colorado. Barden Colorado must periodically submit detailed information about its ownership and activities to the CLGC. This includes information concerning loans, leases, and other commercial activities. Any violation of the laws in Colorado or elsewhere by Barden Colorado or any of its affiliate may jeopardize the licenses held by Barden Colorado and may subject Barden Colorado to the imposition of fines, the cancellation of contracts, and other sanctions.

The CLGC has renewed Barden Colorado's operator and retail gaming licenses for the operation of the Fitzgeralds Casino in Black Hawk, Colorado through October 18, 2012.

**Potential Gaming Regulatory Approvals May Be Necessary For the Restructured Company**

In the event that the Debtors are successful in obtaining Confirmation of the Plan, implementation of the Plan may require the approval of state gaming regulators, as described above. Such necessary prior approvals could include approvals for issuances of equity in the Reorganized Debtors to new investors in the Reorganized Debtors, and related mandatory findings of suitability for certain equity holders as well as approval of the credit facilities notes and certain security for such credit facilities and notes of the Reorganized Debtors.

<strong>Summary of Legal Proceedings</strong>

The Debtors are party to certain legal proceedings. Most of these legal proceedings have arisen in the ordinary course of the Debtors' business and involve claims for money damages. Whether these claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the claims and the debt arising therefrom. Generally, if the debt underlying such claims was incurred by one of the Debtors prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the claim is liquidated and resolved before or after the Effective Date. Claims arising from conduct occurring after the Effective Date, unless provided for under the Plan, generally are not dischargeable through bankruptcy, and will be handled by the Reorganized Debtors in the ordinary course of its business after emergence.

**Legal Proceedings in the Bankruptcy Court**

<u>Avoidance Actions</u>

A number of transactions occurred prior to the Petition Date that may have given rise to claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action

under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "Avoidance Actions").

Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on November 22, 2011, *i.e.*, two years after the Petition Date. To date, the Debtors have not made a determination whether they have any Avoidance Actions to prosecute. For more information, see the section herein entitled "Effect of Confirmation of the Plan," which begins on page 75.

**Pending Legal Proceedings Outside the Bankruptcy Court**

Based on a review of their pending litigations and proceedings, the Debtors are involved in the following material legal proceedings. The Debtors are vigorously defending themselves in each of these matters. Many of the proceedings set forth below are stayed under the automatic stay provisions of section 362 of the Bankruptcy Code. Claims arising from the proceedings set forth below will be treated in accordance with the Plan.

Due to the nature of the Debtors' business, they are frequently subject to various personal injury and property damage claims and suits brought by customers. With respect to each of these claims, the Debtors' maximum monetary exposure is their $250,000 insurance deductible for personal injury claims and a $100,000 deductible for property damage claims. In addition, because approximately 15% of the Debtors' workforce in Gary, Indiana is subject to certain collective bargaining agreements, relatively minor labor grievances and arbitrations are frequently filed by employees. At present, the majority of these proceedings involve monetary exposure of less than $25,000, with a total approximate exposure of $40,000. However, the Debtors are confident that they will prevail in most proceedings.

> The Majestic Star Casino, LLC, et al v. Trustmark, Inc.,
> Case No. 07C 2474, United States District Court for the Northern District of Illinois

Majestic I, Barden Mississippi, and Barden Colorado (the "Insurance Litigation Plaintiffs") filed suit against their previous stop-loss health insurance provider ("Insurance Provider") and the Insurance Provider's managing general underwriter seeking declaratory relief and damages for unpaid claims totaling approximately $0.7 million, punitive damages and attorneys' fees. The Insurance Provider has denied that payment on the claims is owing and filed a counter-claim seeking rescission and damages totaling $0.1 million plus prejudgment interest or, in the alternative, unspecified damages believed to total $0.3 million for its alleged losses under the contracts. The parties have completed the discovery phase of the litigation and filed cross-motions for partial summary judgment. The Insurance Litigation Plaintiffs' motion for summary judgment on certain of the Insurance Provider's counterclaims was granted. The Insurance Provider's partial motion for summary judgment was granted in part with respect to certain claims related to specified exclusions and with respect to the Insurance Litigation Plaintiffs' breach of fiduciary duty claim. All but one count of the Insurance Litigation Plaintiffs' amended complaint remain to be tried against both defendants. The parties have engaged in informal settlement discussions. Should settlement negotiations not be successful, it is anticipated that trial will begin in the fall or winter of 2010. The Insurance Litigation Plaintiffs believe they are entitled to a significant recovery on their claims, which include both contract and tort claims, and believe the Insurance Provider's counter-claim is without merit; however, the Insurance Litigation Plaintiffs cannot determine with certainty the outcome of the litigation or the likelihood or the amount of any recovery. On December 9, 2009, the Debtors filed a Notice of Bankruptcy and Motion for Stay in the insurance litigation, which was granted pending further order of the Bankruptcy Court. The parties to the Insurance Litigation are engaged in settlement discussions.

> The Majestic Star Casino, LLC v. Benefit Administration Systems, LLC,
> Case No. 51 293 515 09, American Arbitration Association

During the course of the Insurance Litigation, Majestic I learned of various errors and omissions by its former third-party administrator ("TPA") which administered Majestic I's health plans between October 2003 and December 2005. Majestic I believes some of these errors led to the denial of some of the stop loss insurance claims at issue in the insurance litigation described above. On April 20, 2009, Majestic I commenced an arbitration proceeding against the TPA before the American Arbitration Association. Majestic I asserts breach of contract and

breach of fiduciary duty claims against the TPA and is seeking recovery of approximately $0.7 million, plus attorneys' fees and costs. Contractual damages received from the TPA, if any, are likely to offset contractual damages received from the Insurance Provider and its managing general underwriter, if any, in the insurance litigation, and vice versa. Should Majestic I not prevail in the arbitration, the TPA could recover its attorney's fees and costs from Majestic I. Discovery in the arbitration has concluded and prehearing briefs have been submitted by both parties. The parties' informal settlement discussions have not been successful to date. The arbitration is currently scheduled to begin in December 2010. Majestic I cannot determine with certainty the outcome of the arbitration or the amount of any recovery.

The Majestic Star Casino, LLC v. Indiana Department of State Revenue,
Case No. 71T10-0207-TA-84, Indiana Tax Court

Majestic I has been assessed $2.6 million of withholding tax, plus interest, for the fiscal year 1996 and the period January 1, 1998 through June 18, 2001, by the Indiana Department of Revenue ("IDR"). On September 7, 2004, the IDR assessed BDI, Majestic I's ultimate parent and member, $1.3 million of income tax, plus penalties and interest for the remainder of 2001 and all of fiscal year 2002. The IDR held a hearing on the 1996 through 2002 tax years on April 7, 2006 to consider Majestic I's and BDI's protests over the tax assessments and negligence penalties. The IDR issued rulings on January 17, 2007. In those rulings, the IDR sustained BDI's protest of the imposition of a negligence penalty, holding that BDI's failure to pay the assessed tax amount was due to reasonable cause and not due to negligence. The IDR also concurred with the position taken by Majestic I and BDI that to the extent it is ultimately determined they had net operating losses for a taxable year, those net operating losses are to be applied to offset any add-back of riverboat wagering tax for income tax purposes. The IDR denied Majestic I's protest that nonresident withholding taxes did not apply for the fiscal year 1996 and the period January 1, 1998 through 2002. Majestic I and BDI filed petitions with the Indiana Tax Court on March 19, 2007 appealing the IDR's rulings for the 1996-2002 tax years.

BDI's nonresident shareholder has been assessed $0.2 million, plus penalties and interest, for 2003. That assessment was protested by BDI's nonresident shareholder to the legal division of the IDR. The IDR held a hearing on the 2003 protest on December 5, 2006, and issued its ruling on March 14, 2007. In that ruling, the IDR sustained the shareholder's protest of the imposition of a negligence penalty. The IDR denied the protest of the amount of tax assessed. An appeal of that ruling was filed with the Indiana Tax Court on May 14, 2007.

The assessments relate to deductions for gaming taxes paid by Majestic I, which deductions were taken for Indiana income tax purposes. The IDR has taken the position that Majestic I had an obligation to add back state gaming taxes in determining Majestic I's taxable income, and to withhold and remit tax for the nonresident shareholder of BDI. On April 19, 2004, the Indiana Tax Court ruled in a similar case involving another Indiana casino, Aztar Indiana Gaming Corporation ("Aztar"), that the gross wagering tax is a tax based on or measured by income and that it must be added back to the taxable income base for the purpose of determining adjusted gross income for Indiana tax purposes. On September 28, 2004, the Indiana Supreme Court denied Aztar's request to review the Indiana Tax Court's decision, and thus, the Indiana Tax Court's opinion in the Aztar case is controlling precedent on the wagering tax add-back issue. Majestic I and BDI continue to pursue their protest with the IDR on the grounds that the assessments contain calculation errors and that their protest sets forth issues not decided in the Aztar case. No liability has been accrued in Majestic I's financial statements relating to this matter.

Should Majestic I ultimately be found liable for additional income taxes to the State of Indiana, such liabilities will be treated in accordance with the Plan.

Majestic I and Majestic II Property Tax Assessment Appeals

Majestic I and Majestic II are the owners of certain parcels of real property located in Gary, Lake County, Indiana. These parcels of real property include, *inter alia*, two riverboat casinos, a hotel, and a parking deck. Beginning with the 2006 tax assessment year, Majestic I and Majestic II have disputed and appealed the value of certain of these properties assessed by the Tax Assessor for Lake County, Indiana ("Lake County"). Specifically, for assessment year 2006, Majestic I and Majestic II disputed and appealed Lake County's assessments on the two riverboat casinos. For assessment year 2007, Majestic I and Majestic II disputed and appealed the two riverboat casinos and eight other parcels. For assessment year 2008, Majestic I and Majestic II disputed and appealed the two

riverboat casinos and twelve other parcels. Majestic I and Majestic II intend to file appeals for assessment year 2009 this December.

When a taxpayer appeals an assessment, Indiana law requires the appealing taxpayer to pay taxes based on the assessed property value at the assessment level of the last year that the taxpayer did not appeal the assessment value until the appeal is resolved. Majestic I and Majestic II have been generally paying each year's taxes on the properties in question based on either the 2005 or 2006 assessments, depending on when the respective assessment was first appealed, in accordance with Indiana law.

On November 8, 2010, Lake County filed a motion pursuant to section 505 of the Bankruptcy Code (the "505 Motion") [Docket No. 719] requesting that the Bankruptcy Court enter an order upholding Lake County's assessment value for the parcels of real property in question and deeming Lake County's claims in the amount of approximately $25 million allowed in full (collectively, the "Lake County Claims"). To the extent the 505 Motion is granted and Lake County's assessments are upheld prior to confirmation of the Plan, Lake County believes the Lake County Claims should be treated as Allowed Secured Claims that are unimpaired under the Plan. To the extent the 505 Motion is not fully adjudicated prior to confirmation of the Plan, Lake County believes the Lake County Claims should be treated as Disputed Claims under the Plan, and the Debtors should be required to place into the Disputed Claims Reserve on or before the Effective Date Cash in the amount of the Lake County Claims and maintain such reserve until the Lake County Claims are no longer Disputed Claims.

The Debtors dispute Lake County's valuation of the Lake County Claims and intend to oppose the merits of the 505 Motion in the Bankruptcy Court. In addition, the Debtors believe the Lake County Claims are Claims which, notwithstanding their asserted status as Secured Claims, would otherwise meet the description of an Unsecured Claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code. Pursuant to section 1129(a)(9)(D) of the Bankruptcy Code, Allowed secured claims which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of the claim, are entitled to receive on account of such claim, cash payments, in the same manner and over the same period, as unsecured priority tax claims of a kind specified under section 507(a)(8) of the Bankruptcy Code. As a result, the Debtors believe that if the Lake County Claims are Allowed, they should be classified and treated as Allowed Priority Tax Claims pursuant to the Plan. Because the Debtors do not believe the Lake County Claims are required to be paid in full in Cash on the Effective Date to the extent they are Allowed, the Debtors do not believe they are required to place Cash into the Disputed Claims Reserve on or before the Effective Date on account of the Lake County Claims.

The Majestic Star Casino, LLC, Majestic Star Casino II, Inc., and Gary New Century, LLC v. City of Gary, Case No. 52489 Y 00091 08, American Arbitration Association; and

The Majestic Star Casino, LLC, Majestic Star Casino II, Inc., f/k/a/ Trump Indiana, Inc., and Gary New Century, LLC v. City of Gary and Indiana Gaming Commission, Case No. 49D13 08 02 PL 006612

As discussed above, Gary entered into the Local Development Agreements with Trump Indiana and Majestic I in 1996 and the Amended Local Development Agreement with Majestic I and Majestic II in 2005. The current mayor of the Gary, who took office on April 7, 2006, claims that the Amended Local Development Agreement, signed by the prior mayor on behalf of Gary, is not enforceable because the prior mayor lacked the authority to bind Gary. Majestic I and Majestic II have taken the position that the Amended Local Development Agreement is valid and binding.

Given that both of the original Local Development Agreements contain mandatory arbitration provisions, on February 11, 2008, Majestic I and Majestic II commenced the Gary Arbitration before the American Arbitration Association. In the Gary Arbitration, Majestic I and Majestic II request that the Amended Local Development Agreement be declared to be in full force and effect, and that Gary be found to be in material breach of it and that Majestic I and Majestic II be awarded damages. In the event that the Amended Local Development Agreement is deemed not enforceable, Majestic I and Majestic II alternatively request that Gary be found in breach of the original Local Development Agreements, and that the Majestic I and Majestic II be awarded damages.

Simultaneously with the Gary Arbitration, Majestic I and Majestic II also filed the Marion County Lawsuit in Marion County Superior Court. In the Marion County Lawsuit, Majestic I and Majestic II seek to bind the IGC to the results of the Gary Arbitration and to litigate any matters that are not covered by the parties' arbitration agreement.

Majestic I and Majestic II filed the Gary Arbitration and the Marion County Lawsuit because Gary has failed, pursuant to its obligations under either the Amended Local Development Agreement or, in the alternative, the earlier Local Development Agreements, to conduct environmental remediation of certain property owned by the Company, and to construct the required access roads and freeway interchange to the Majestic Star Casinos. If the Amended Local Development Agreement is found not to be enforceable, then Majestic II could be required to pay Gary an additional 1% of adjusted gross gaming receipts, retroactive to December 21, 2005, which would be due under the previously terminated Local Development Agreement with Trump Indiana. As of September 30, 2010, the additional 1% potentially due to Gary from Majestic II would equal approximately $5.2 million.

Effective for the tax period beginning January 2008, Majestic I and Majestic II began depositing the economic incentive funds payable to Gary for 2008 under the Amended Local Development Agreement into a segregated bank account. On May 2, 2008, the Marion County Superior Court denied Gary's motion for a preliminary injunction to compel Majestic I and Majestic II to resume payment to Gary of the economic incentive funds pending resolution of the case.

Gary appealed the denial of its injunction motion to the Indiana Court of Appeals (No. 49A02-0807-CV-00625), filing its appellate brief on July 30, 2008. After a stay to permit the parties to explore settlement, which expired November 30, 2008, as discussed more fully below, Majestic I and Majestic II timely filed their appellate brief with the Indiana Court of Appeals on January 20, 2009, as did the IGC (which supports the position of Majestic I and Majestic II on the proper trial court venue for the action, and has remained neutral on Gary's attempt to require Majestic I and Majestic II to resume payments of the economic incentive funds). On May 14, 2009, the Indiana Court of Appeals issued a decision affirming the trial court's denial of Gary's motion for a preliminary injunction seeking to compel Majestic I and Majestic II to resume payment to Gary during the pendency of the Marion County Lawsuit. Gary's petition for review of this decision was denied by the Indiana Supreme Court on August 20, 2009.

As of September 30, 2010, the balances in the segregated economic incentive fund and lakefront capital improvement fund bank accounts were $12.1 million and $1.2 million, respectively. It is too early to determine with certainty the outcome of the Gary Arbitration or Marion County Lawsuit or the amount or likelihood of any recovery from Gary. Both proceedings have been stayed pending further order of the Bankruptcy Court. Gary, Majestic I, and Majestic II are currently engaged in settlement discussions.

City of Gary, Indiana v. Don H. Barden, et al, Case No. 2:10-CV-00160-PPS-PRC, United States District Court, Northern District of Indiana, Hammond Division

On March 11, 2010, Gary filed the Lake County Lawsuit in the Superior Court of Lake County, Indiana against the Lake County Defendants (eight current and former individual officers, directors, and employees of Majestic I and Majestic II and their affiliated entities). The Lake County Lawsuit alleges two causes of action against the Lake County Defendants for negligence and civil conversion related to and arising out of the segregated economic incentive funds which are the subject of the Marion County Lawsuit. Gary claims to have suffered damages based on those causes of action. Majestic I and Majestic II believe that continuation of the Lake County Lawsuit against the Lake County Defendants threatens to undermine the protection of the automatic stay, to deplete property of the estate, and to disrupt the Debtors' reorganization efforts. Accordingly, on March 29, 2010 the Debtors instituted an adversary proceeding against Gary (10-50841) in the Bankruptcy Court and filed a motion to obtain an order, pursuant to 11 U.S.C. § 362, extending the automatic stay to the Lake County Defendants with respect to the Lake County Lawsuit, or in the alternative, an order preliminarily enjoining Gary from prosecuting the Lake County Lawsuit against the Lake County Defendants. Gary filed pleadings and papers in opposition to the Debtors motion, and the Debtors timely filed their reply. A hearing on the matter was held before the Bankruptcy Court on April 27, 2010, and on April 28, 2010, the Bankruptcy Court entered a memorandum order granting the Debtors' request for the extension of the automatic stay to the Lake County Defendants pending further order of the Bankruptcy Court. On or about May 12, 2010, Gary filed a notice of appeal in the Bankruptcy Court to appeal the

memorandum order to the United States District Court for the District of Delaware. The Bankruptcy Court set the pre-trial conference on the Debtors' Verified Complaint to Extend the Automatic Stay, or in the Alternative, for Injunctive Relief ("Adversarial Complaint") for May 25, 2010. The parties, by agreement, extended the deadline for Gary to respond to the Adversarial Complaint to January 21, 2011 and the pre-trial conference date to February 17, 2011.

On April 15, 2010, a Joint Notice of Removal was filed with the United States District Court for the Northern District of Indiana, Hammond Division, removing the Lake County Lawsuit from the Superior Court of Lake County, Indiana to the United States District Court for the Northern District of Indiana, Hammond Division. On or about April 19, 2010, Gary dismissed its negligence claim against the Lake County Defendants. Gary and the Company are currently engaged in settlement discussions.

## Projected Financial Information

Attached as Exhibit C are the following: (a) a consolidated projected income statement for the period from 2010 through 2015 (the "Projection Period"); (b) a consolidated projected balance sheet for the Projection Period; and (c) a consolidated projected statement of cash flow for the Projection Period.

The projections have been prepared by the Debtors' management with the assistance of the Debtors' retained financial advisors. Such projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants and the rules and regulations of the United States Securities and Exchange Commission. In assisting in the preparation, XRoads relied upon the accuracy and completeness of financial and other information furnished by the Debtors' management and third parties, as well as publicly-available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by the Debtors and third parties with respect to the anticipated future performance of the Reorganized Debtors. XRoads did not attempt to audit or verify such information independently. Neither the Debtors nor their financial advisors conducted an independent investigation into any of the legal, tax, or accounting matters affecting the Debtors or the Reorganized Debtors, and, therefore, neither makes any representation as to their impact on the Debtors or the Reorganized Debtors from a financial point of view. Further, the Debtors' independent accountants have neither examined nor compiled the accompanying actual results and projections and, accordingly, do not express an opinion or any other form of assurance with respect to the projections, assume no responsibility for the projections, and disclaim any association with the projections. Except for purposes of this Disclosure Statement, the Debtors do not publish projections of their anticipated financial position or results of operations.

The projections contain certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are and will be beyond the control of the Reorganized Debtors, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, currency exchange rate fluctuations, existing and future governmental regulations and actions of government bodies, natural disasters and unusual weather conditions and other market and competitive conditions. Holders of claims are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Debtors and the Reorganized Debtors undertake no obligation to update any such statements.

The projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which are and will be beyond the Reorganized Debtors' control. The Debtors caution that no representations can be made or are made as to the accuracy of the historical financial information or the projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions may prove to be inaccurate. Moreover, events and circumstances occurring subsequent to the date on which these projections were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and the Reorganized Debtors do not intend and undertake no obligation to update or otherwise revise the

projections to reflect events or circumstances existing or arising after the date this Disclosure Statement is initially filed or to reflect the occurrence of unanticipated events. The projections, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections.

Creditors and other interested parties should see the section herein entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The projections have been prepared based on the assumptions that the Effective Date of the Plan is September 30, 2011 and the Reorganized Debtors' business plan is successfully implemented. Although the Debtors presently intend to cause the Effective Date to occur as soon as practicable following Confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur given the conditions for the Effective Date to occur pursuant to the terms of the Plan.

The projections are based on, among other things: (a) current and projected market conditions of the Reorganized Debtors' market; (b) the ability to maintain sufficient working capital to fund operations; and (c) Confirmation of the Plan.

## Risk Factors

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to, or incorporated by reference herein, prior to voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.*

### Risks Relating to Bankruptcy

#### The Debtors may not be able to obtain Confirmation of the Plan.

To emerge successfully from the Chapter 11 Cases, the Debtors must obtain approval of the Plan from their creditors, secure Confirmation of the Plan through the Bankruptcy Court, and successfully implement the Plan as confirmed. The foregoing process requires the Debtors to (a) meet statutory requirements with respect to the adequacy of disclosures with respect to the Plan, (b) solicit and obtain creditor acceptances of the Plan, and (c) fulfill other statutory conditions with respect to Plan Confirmation.

With regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm a plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. In order to confirm a plan against a dissenting Class, the Bankruptcy Court also must find that at least one impaired Class has accepted the Plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Finally, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) the Debtors' Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, (b) Confirmation of the Debtors' Plan is not likely to be followed by a liquidation or a

need for further financial reorganization, and (c) the value of distributions to non-accepting Holders of Claims within a particular Class under the Debtors' Plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court may determine that the Plan does not satisfy one or more of these requirements, in which case the Plan would not be confirmed by the Bankruptcy Court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions Holders of Claims against or Holders of the Debtors' common stock or other Equity Interests ultimately would receive with respect to their Claims or Equity Interests. There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Chapter 11 Cases that is acceptable to the Bankruptcy Court and the Debtors' creditors, equity holders, and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization. Finally, the Debtors' emergence from bankruptcy is not assured. While the Debtors expect to emerge from bankruptcy in the future, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur.

Loss of key management and employees.

The Debtors' success is largely dependent on the skills, experience, and efforts of their people. The loss of the services of one or more members of the Debtors' senior management or of numerous employees with critical skills could have a negative effect on their business, financial condition and results of operations. If the Debtors are not able to attract talented, committed individuals to fill vacant positions when the need arises, it may adversely affect their ability to fully implement their business objectives.

Increases in costs could adversely affect the Debtors' operating results.

The Debtors' inability to maintain their cost structure and efficiently operate their gaming facilities may reduce their operating results. In addition, increases in certain non-controllable or mandatory costs that are driven by external factors may reduce the Debtors' operating results. Examples of these costs are energy, insurance, and taxes.

The conditions precedent to the Confirmation and consummation of the Plan may not occur.

As more fully set forth in Exhibit A, the occurrence of Confirmation of the Plan and the Effective Date of the Plan are each subject to a number of conditions precedent. If the conditions precedent to Confirmation are not met or waived, the Plan will not be confirmed, and if the conditions precedent to the Effective Date are not met or waived, the Effective Date will not take place.

Article XII.D of the Plan provides, in relevant part, that "[i]f the Effective Date has not occurred within 270 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court." Furthermore, Article XII.C of the Plan provides that, "[w]ith the exception of any governmental, regulatory, and/or other Gaming License-related approvals or consents (as referred to in Article XII.B.4 of the Plan) that are legally required to consummate the restructuring transactions to be effected by the Plan, the Debtors, or the Reorganized Debtors, as applicable, with the consent of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably), may waive any of the conditions to Confirmation or the Effective Date at any time without any notice to parties in interest." In other words, if all conditions precedent to the Effective Date have not occurred within 270 days after Confirmation, the Debtors (or any other party-in-interest) can seek to have the Confirmation Order vacated, and the Debtors can waive the conditions precedent to Confirmation and the Effective Date (other than governmental or regulatory approvals) at any time without notice to any party (other than the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee).

**The Plan requires certain regulatory action by The Indiana Gaming Commission, The Mississippi Gaming Commission, and The Colorado Limited Gaming Control Commission, which may delay the Debtors' emergence from these Chapter 11 Cases.**

For the Plan to become effective, the Debtors' state gaming regulators must license and approve the new owner(s) and operator(s) of the Debtors' gaming businesses and approve the incurrence of debt in connection with, and other aspects of, the restructuring transactions comprising the Plan. While the Debtors will actively pursue such approvals, the Debtors can make no assurances as to if and when such approvals will be granted. Failure by the Debtors' gaming regulators to grant the necessary approvals will delay and may even prevent the Debtors' emergence from Chapter 11.

**The recovery for Holders of the General Unsecured Claims against the Debtors may be diluted and the ultimate amount of Allowed Claims against the Debtors may not be finalized until after the Effective Date.**

To date, 154 proofs of Claim have been filed against the Debtors. The asserted amount of such Claims is approximately $2,950,603,972. The Debtors have not yet completed their Claims reconciliation process and therefore have not fully analyzed these filed proofs of Claim. Through the Debtors' Claims reconciliation process, certain filed proofs of Claim may be reduced or disallowed. As a result, the Claims reconciliation process may result in changes that could affect the recovery for Holders of General Unsecured Claims under the Plan.

**Parties in interest may object to the Debtors' classification of Claims.**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a Claim or an Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Bankruptcy Court may reach a different conclusion.

**The Debtors may object to the amount or classification of a Claim.**

The Debtors reserve the right to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim whose Claim is subject to an objection. Any such Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

**The Debtors may not be able to achieve their projected financial results.**

The financial projections set forth in Exhibit C to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations. The Debtors' actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, the Debtors may lack the necessary capital to continue operating as planned after the Effective Date of the Plan.

**The Holders of Senior Secured Notes Indenture Claims and Senior Notes Claims will acquire a substantial majority of the New Membership Interests upon consummation of the Plan.**

Holders of Senior Secured Notes Indenture Claims and Senior Notes Claims will receive a substantial majority of the New Membership Interests, and thus will be in a position to control the outcome of actions requiring stockholder or member approval, including, among other things, election of the Board of Managers. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Debtors and, consequently, impact the value of the New Membership Interests.

*Historical financial information of the Debtors may not be comparable to the financial information of the Reorganized Debtors.*

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

*Certain tax consequences of the Debtors' Plan raise unsettled and complex legal issues and involve various factual determinations.*

Some of the material consequences of the Plan regarding U.S. federal income taxes are summarized under the section herein entitled "Certain U.S. Federal Income Tax Consequences of the Plan." Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. No ruling from the U.S. Internal Revenue Service ("IRS") has been or will be sought by the Debtors regarding any of the tax consequences described in this Disclosure Statement. The IRS may challenge the various positions the Debtors have taken, or intend to take, with respect to their tax treatment, and a court may sustain such a challenge or objection by the IRS. For a more detailed discussion of risks relating to the specific positions the Debtors intend to take with respect to various tax issues, please review the section herein entitled "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 81.

*The New Holdco LLC Agreement could deter takeover attempts that some shareholders may consider desirable, which could adversely affect the value of the New Membership Interests.*

Various provisions of the New Holdco LLC Agreement and Delaware law could make acquiring control of the Reorganized Debtors without the requisite support of its Board of Managers difficult for a third party, even if the change of control would be beneficial to a recipient of New Membership Interests. The existence of these provisions could deprive certain recipients of New Membership Interests of an opportunity to sell their shares of New Membership Interests at a premium over the prevailing market price. The potential inability of holders of New Membership Interests to obtain a control premium could, in certain instances, depress any future trading prices of New Membership Interests.

*The Debtors depend on generating (and having available to the applicable obligor) sufficient cash flow to fund their debt obligations, capital expenditures, and ongoing operations. The Debtors access to additional financing may be limited, which could adversely affect the Debtors' financial condition and their ability to conduct their business.*

The Debtors' ability to service their debt and to fund their planned capital expenditures and ongoing operations will depend on both their ability to generate and grow cash flow and their access (by dividend or otherwise) to additional liquidity sources. The Debtors' ability to generate and grow cash flow is dependent on many factors, including:

- the Debtors' ability to sustain and grow revenues and cash flows from operating activities and to maintain and grow their customer base, particularly in the face of increasing competition;

- general business conditions, economic uncertainty or downturn, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the housing sector and overall economy;

- the effects of current and potential future competitors on the Debtors' business; and

- the effects of governmental regulation on the Debtors' business.

Some of these factors are beyond the Debtors' control. It is also difficult to assess the impact that the general economic downturn and recent turmoil in the credit markets will have on future operations and financial

results. However, the general economic downturn has resulted in reduced spending by customers, which may have caused the Debtors' revenues and cash flows from operating activities to differ from those that otherwise would have been generated. If the Debtors are unable to generate sufficient cash flow or are unable to access additional liquidity sources, they may not be able to service and repay their debt, operate their business, respond to competitive challenges, or fund other liquidity and capital needs. It is uncertain whether the Debtors will be able, under applicable law, to make distributions or otherwise move cash to the relevant entities for payment of interest and principal.

<u>Economic conditions, including a worsening of the current economy and other factors affecting discretionary consumer spending, may harm the Debtors' businesses, financial conditions, and results of operations.</u>

The Debtors' businesses may be adversely affected by the recession currently being experienced in the United States because the Debtors are dependent on discretionary spending by their customers. The continuation or worsening of current economic conditions could cause fewer people to spend money or cause people to spend less money at the Debtors' facility and could adversely affect the Debtors' revenues.

<u>Intense competition could result in loss of market share or profitability.</u>

The Debtors face intense competition in the market in which each gaming facility is located. The Debtors' primary facilities, The Majestic Star Casino and The Majestic Star Casino II, compete with several major casino-hotels in Indiana. Competition continues to increase in the region, with a number of the Debtors' competitors planning to build new or expanded facilities.

Some of the Debtors' competitors have significantly greater financial resources, and, as a result, the Debtors may be unable to compete successfully with them in the future. In addition, online gaming, despite its current illegality in the United States, is a growing sector in the gaming industry. Online casinos offer a variety of games, including slot machines, roulette, poker, and blackjack. Such online casinos allow individuals to participate using credit or debit cards or other forms of electronic payment. The Debtors are unable to assess the impact that online gaming will have on their business operations in the future and there is no assurance that the impact will not be materially adverse.

Competition from other casino and hotel operators involves not only the quality of casino, hotel room, restaurant, entertainment, and convention facilities, but also the pricing of such services. The Debtors' operating results may be adversely affected by significant cash outlays for advertising and promotions for complementary services to patrons. If the Debtors lack the financial resources or liquidity to match the promotions of competitors, the number of casino patrons may decline, adversely affecting the Debtors' financial performance.

The Debtors' ability to compete successfully will also depend on their ability to develop and implement effective marketing campaigns to attract customers to their facilities. To the extent that they are unable to do so, the Debtors may not be able to successfully compete in their markets, and their financial position could be adversely affected.

<u>Work stoppages, labor problems, and unexpected shutdowns may limit the Debtors' operational flexibility and negatively impact the Debtors' revenue.</u>

The Debtors are party to certain collective-bargaining agreements with labor unions. There can be no assurances that the Debtors will be able to renegotiate the labor agreements that are currently in effect without incurring significant increases in their labor costs. Changes to the collective-bargaining agreements could cause significant increases in labor costs, which could have a material adverse affect on the Debtors' businesses, financial conditions, and operations.

Moreover, the unions with which the Debtors have collective-bargaining agreements or other unions could seek to organize groups of employees that are not currently represented by a union. Union organization efforts may

70

occur in the future, potentially causing disruptions to the Debtors' businesses and resulting in increased costs, both of which could have a material adverse effect on the Debtors' businesses, financial condition, and operations.

Lastly, if the Debtors are unable to negotiate new collective-bargaining agreements on mutually acceptable terms, aggrieved employees may engage in strikes or other forms of workplace disruptions, which could have a materially adverse effect on the Debtors' business and operations. Any unexpected work stoppage by the Debtors' employees could have an adverse effect on their businesses and operations, resulting in negative media attention and potentially discouraging customers from visiting the Debtors' facilities. There cannot be assurance that the Debtors can be adequately prepared for unexpected labor developments that may lead to a temporary or permanent shutdown of their facilities.

Confirmation of the Plan

**The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], 2011 to take place at [ : ] (prevailing Eastern Time) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**Deadline to Object to Confirmation**

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [●], 2011 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. **Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.**

**Requirements for Confirmation of the Plan**

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Equity Interests, or if rejected by an impaired Class, that the Plan is accepted by at least one impaired Class of Claims and "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of Holders of Claims and Equity Interests that are impaired under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of Chapter 11 of the Bankruptcy Code; (2) the Debtors have complied or will have complied with all of the necessary requirements of Chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Debtors believe the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

**Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court find, as a condition to confirmation, that a Chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a Chapter 7 trustee would generate if the debtor's Chapter 11 case were converted to a Chapter 7 case and the assets of the debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed and consummated.

To estimate what members of each impaired Class of Claims would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a Chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to Holders of General Unsecured Claims or Equity Interests would be reduced by, among other things: (a) the claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases; (c) unpaid Administrative Expense Claims of the Chapter 11 cases; and (d) Priority Claims and Priority Tax Claims. The Debtors' costs of liquidation in Chapter 7 Cases would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by such trustee, asset disposition expenses, applicable

taxes, litigation costs, Claims arising from the operation of the Debtors during the Chapter 7 Cases, and all unpaid Administrative Expense Claims incurred by the Debtors during the Chapter 11 cases that are allowed in the Chapter 7 cases. The liquidation itself would trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate the payment of other Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business. These Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, before the balance would be made available to pay other Claims or to make any distribution in respect of Equity Interests.

Based on the Liquidation Analyses set forth in Exhibit E of this Disclosure Statement, the Debtors believe Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a Chapter 7 liquidation. In summary, the Debtors and their management believe that Chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by Holders of General Unsecured Claims entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

- The erosion of the value of the Debtors' assets in the context of an expedited going concern sale or asset-by-asset liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail;

- The increased cost and expenses of liquidation under Chapter 7 arising from fees payable to the Chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- Additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation and from the rejection of Unexpired Leases and Executory Contracts in connection with the cessation of the Debtors' operations;

- The adverse effects on the salability of portions of the business resulting from the possible departure of key employees and the attendant loss of customers and vendors; and

- The application of the rule of absolute priority under the Bankruptcy Code to distributions made in a Chapter 7 liquidation.

Consequently, the Debtors and their management believe Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a Chapter 7 liquidation.

If the Plan is not confirmed and the Debtors fail to propose and confirm an alternative plan of reorganization, they may be liquidated pursuant to the provisions of a Chapter 11 liquidating plan. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in higher administrative costs. Because a trustee's appointment is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a Chapter 7 trustee must be appointed. Any distribution to Holders of Claims under a Chapter 11 liquidation plan probably would be delayed substantially. Most importantly, the Debtors believe any distributions to creditors in a liquidation scenario would fail to capture the significant "going concern" value of their business, which is reflected in the New Membership Interests to be distributed under the Plan. Accordingly, the Debtors believe Chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of a debtor, or any successor to a debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the projections,

as set forth in Exhibit C. Based upon the projections, the Debtors believe their businesses will be viable operations following the Chapter 11 Cases, and the Plan will meet the feasibility requirements of the Bankruptcy Code.

**Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan, and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

**Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

**No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Alternatively, a plan is "fair and equitable" with respect to a non-accepting class of secured claims if holders of such claims will receive the "indubitable" equivalent of such claims pursuant to the plan of reorganization.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property, subject to the applicability of the "new value" exception.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the Effective Date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or Schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## New Value

A corollary to the "fair and equitable" test, the new value doctrine, permits old equity holders to keep their ownership interests even though senior dissenting creditors do not receive payment in full of their claims provided that the old equity holders make a new contribution (a) in money or money's worth, (b) that is reasonably equivalent to the value of the new equity interests being received in the reorganized debtor, and (c) that is necessary for implementation of a feasible plan of reorganization.

## Valuation of the Debtors

In conjunction with formulating the Plan, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Reorganized Debtors. Accordingly, such valuation is set forth in Exhibit D attached hereto.

## Effect of Confirmation of the Plan

## Preservation of Avoidance Actions

On and after the Effective Date, actions, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "Avoidance Actions") will be preserved and retained by the Reorganized Debtors. The Reorganized Debtors may offset any claim supporting an Avoidance Action against any payment due to any Holder of a Claim under the Plan. In

addition, if a distribution is made in error, the Reorganized Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such distribution. In the event that the Plan, as proposed, is consummated, Avoidance Actions that may potentially be brought might be waived; provided, however that such waiver will not be effective if the Plan is not effectuated.

### Retention of Jurisdiction by the Bankruptcy Court

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

- Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

- Adjudicate, decide or resolve any and all matters related to Causes of Action;

- Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

- Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

- Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

- Adjudicate any and all disputes arising from or relating to distributions under the Plan;

- Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- Enforce all orders previously entered by the Bankruptcy Court; and

- Hear any other matter not inconsistent with the Bankruptcy Code.

**Releases by the Debtors**

On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including: (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; and (2) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each of the Released Parties (and each such Released Party so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Released Party in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or

the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Released Party from any Causes of Action expressly set forth in and preserved by the Plan. Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future against the non-Released Parties, including the Identified Parties.

**Third Party Releases**

On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Released Party) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents. Notwithstanding anything in the Plan to the contrary, the Released Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future against the non-Released Parties, including the Identified Parties. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Released Parties.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties. This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

**Injunction**

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

**Exculpation**

The Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or Postpetition act taken or omitted to be taken in connection with, related to, or arising out of the Debtors' in or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of New Membership Interests, the entry into the New Senior Secured Credit Facility, the entry into the New Senior Secured Notes Indenture and the issuance of the New Senior Secured Notes thereunder, the entry into the First Lien Alternative Financing, if any, the entry into the Second Lien

Alternative Financing, if any, or the distribution of property under the Plan or any other agreement entered into in connection therewith or any other Prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of the Released Parties.

<strong>Important Securities Law Disclosure</strong>

**Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and Pursuant to Exemptions under the Securities Act of 1933, as Amended**

Under the Plan, substantially all of the units of New Membership Interests will be distributed to Holders of Allowed Senior Secured Notes Indenture Claims and Holders of Allowed Senior Notes Indenture Claims.

The Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the New Membership Interests contemplated by the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities; and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive New Membership Interests are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell the New Membership Interests without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, holders of New Membership Interests deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement

that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. As noted in this Disclosure Statement, it is not contemplated that the Reorganized Debtors will be a public reporting company and, therefore, it is unlikely in the period initially following the Effective Date that current public information will be available to permit resales pursuant to Rule 144.

Voting Instructions

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8. Only the Holders of Claims in these Classes are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided.

The Debtors, with the approval of the Bankruptcy Court, have engaged Epiq to serve as the Solicitation Agent for Claims to assist in the solicitation process. The Solicitation Agent will, among other things, answer questions, provide additional copies of all solicitation materials, and generally oversee the solicitation process for their assigned Claims. The Solicitation Agent will also process and tabulate ballots for each of their respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

**The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on [●], 2011.**

| BALLOTS |
|---|
| Ballots must be actually received by the Solicitation Agent by the voting deadline of 5:00 p.m. (prevailing Eastern Time) on [●], 2011 at the following address: <br> **If by mail:** <br> **Epiq Bankruptcy Solutions, LLC** <br> **Attn.: The Majestic Star Casino, LLC** <br> **Ballot Processing Center** <br> **FDR Station PO Box 5014** <br> **New York, New York 10150** <br> **If by hand delivery or overnight courier:** <br> **Epiq Bankruptcy Solutions, LLC** <br> **Attn.: The Majestic Star Casino, LLC** <br> **Ballot Processing Center** <br> **757 Third Avenue, 3rd Floor** <br> **New York, New York 10017** <br> If you have any questions on the procedure for voting on the Plan, <br> please call the Solicitation Agent at the following telephone number: (646) 282-2400 |

**MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS AND INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN. FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED AND RECEIVED BY 5:00 P.M. (PREVAILING EASTERN TIME), ON [●], 2011.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM AND/OR INTEREST MAY CAST ONLY ONE BALLOT PER EACH SUCH CLAIM OR INTEREST HELD. BY SIGNING AND RETURNING A BALLOT, EACH**

80

**HOLDER OF A CLAIM OR INTEREST IN CLASSES A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, AND H-8, WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM AND/OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS AND/OR INTERESTS, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

### Certain U.S. Federal Income Tax Consequences of the Plan

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Interests and Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained as to any of the tax consequences of the Plan discussed below and the Debtors do not intend to seek a ruling from the Internal Revenue Service ("IRS") as to any such tax consequences and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

Except as otherwise provided below, this summary does not apply to Holders of Allowed Claims that are not "United States persons" (as such term is defined in the IRC) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that Holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the IRC. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each Holder of an Interest or a Claim. Each holder of an Interest or a Claim is urged to consult his, her, or its tax advisors with respect to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan. This discussion does not address special consideration that may be applicable to Holders holding more than one Class of Claims. Such Holders should consult their tax advisors with respect to their particular circumstances.

*IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the IRC. The tax advice contained in this Disclosure Statement was written to support the promotion or marketing of the transactions described in this Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.*

### Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors and BDI

For federal income tax purposes, the Debtors, excluding the Debtors organized as corporations, are classified as disregarded entities (the "Disregarded Debtors"). As such, all of the Disregarded Debtors' assets and liabilities are treated as assets and liabilities of BDI. Upon consummation of the Plan, BDI's direct and indirect equity interest in the Debtors will be cancelled and the New Membership Interests will be issued by Majestic Holdco and distributed to certain creditors of the Debtors, as more fully described in the Plan. The federal income tax consequences of these transactions are not entirely clear.

From BDI's perspective, the transaction will likely be characterized as a taxable transfer of the assets of the Disregarded Debtors and the equity interests of the Debtors that are classified as corporations (the "Corporate Debtors") to the creditors in partial satisfaction of their Claims against the Debtors. In that event, BDI will have taxable gain to the extent the amount of the Claims against the Disregarded Debtors exceeds the tax basis in the Disregarded Debtors' assets. Alternatively, it is possible that the amount of taxable gain will be determined by reference to the fair value of the Disregarded Debtors' assets, rather than the amount of Claims, if the Claims are characterized as recourse obligations of BDI for federal income tax purposes. In such case, BDI could have cancellation of debt income ("COD Income") (discussed in more detail below) to the extent that Holders of Claims against the Disregarded Entities receive less than 100% recovery on their Claims. If the Claims against the Disregarded Debtors are characterized as non-recourse obligations of BDI for federal income tax purposes, BDI should not realize any COD Income; rather, the amount of such Claims will be taken into account in determining BDI's gain or loss in connection with the consummation of the Plan, as discussed above.

In general, absent an exception, a debtor realizes COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (including equity) given in satisfaction of such indebtedness at the time of the exchange. To the extent a Disregarded Debtor realizes COD Income, such income will be treated as income of BDI. Because the Plan provides that Holders of certain Allowed Claims will receive New Membership Interests, New Senior Secured Notes, and their pro rata share of the New Senior Secured Credit Facility, the amount of COD Income will depend on the fair market value of the New Membership Interests and the issue price of the New Senior Secured Notes and the New Senior Secured Credit Facility (discussed below). These amounts cannot be known with certainty until after the Effective Date and thus it is impossible to state with certainty whether CODI Income, if any, will be realized by BDI.

Neither BDI nor any Corporate Debtors will be required to include any COD Income in gross income if it is (i) under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding or (ii) insolvent on the Effective Date (in which case, the COD Income may be excluded to the extent of the insolvency). If either exclusion applies, BDI or a Corporate Debtor, as applicable, must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. BDI or the Corporate Debtors may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Any attribute reduction will be applied as of the first day following the taxable year in which COD Income is recognized.

## Certain U.S. Federal Income Tax Consequences to Certain Holders of Allowed Claims

### Consequences to Holders of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims

Pursuant to the Plan, each Holder of an Allowed Senior Secured Credit Facility Claim or Allowed Senior Secured Credit Facility Guarantee Claim shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

The exchange of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims for a Pro Rata share of (x) the New Senior Secured Credit Facility Paydown Amount and the New Senior Secured Credit Facility or (y) Cash should be a taxable exchange under section 1001 of the IRC. A Holder of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the sum of the amount of Cash received and the issue price (described below) of such Holder's share of the New Senior Secured Credit Facility, if any, and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration

received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

<u>Consequences to Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims</u>

Pursuant to the Plan, each Holder of an Allowed Senior Secured Notes Indenture Claim and Senior Secured Notes Indenture Guarantee Claim shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

The exchange of Allowed Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims for the New Membership Interests and (x) the New Senior Secured Notes or (y) Cash should be a taxable exchange under section 1001 of the IRC. A Holder of Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the issue price (described below) of such Holder's share of the New Senior Secured Notes and either the fair value of the Holder's share of New Membership Interests or the amount of Cash received by the Holder and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

<u>Consequences to Senior Notes Indenture Claims against Majestic</u>

Pursuant to the Plan, each Holder of an Allowed Senior Notes Indenture Claim shall receive its Pro Rata share of 42 percent of the New Membership Interests on the Distribution Date or as soon thereafter as is practicable (except to the extent that such Holder and the Debtors agree to less favorable distribution to such Holder).

The exchange of Allowed Senior Notes Indenture Claims for the New Membership Interests should be a taxable exchange under section 1001 of the IRC. A Holder of an exchanged Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the Holder's share of New Membership Interests and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

<u>Consequences to General Unsecured Claims and Rejection Damages Claims against Majestic</u>

Pursuant to the Plan, each Holder of a General Unsecured Claim and/or Rejection Damages Claim shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to [___] percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic or (ii) its pro rata share of [___] (except to the extent that such Holder and the Debtors agree to less favorable distribution to such Holder).

The exchange of General Unsecured Claims and/or Rejection Damages Claims for Cash should be a taxable exchange under section 1001 of the IRC. A Holder of an exchanged Claim will generally recognize income gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents

accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognized ordinary interest income.

<u>Consequences to Holders of Discount Notes Indenture Claims</u>

Pursuant to the Plan, Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no distribution under the Plan on account of such Claims. A Holder of a cancelled Claim should be entitled to claim a loss for tax purposes equal to the Holder's adjusted basis in such Claim.

**Accrued But Untaxed Interest**

A portion of the consideration received by Holders of Claims may be attributable to accrued but unpaid interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, it is possible that a Holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but is not paid in full by Debtors. The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes. The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**Market Discount**

Holders of Claims who receive consideration in exchange for their Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

**Issue Price**

For U.S. federal income tax purposes, the "issue price" of a debt instrument depends on whether such instrument is deemed to be "publicly traded." If, at any time during the 60-day period ending 30 days after the issue date of a debt instrument, a substantial amount of the debt instruments in an issue is "traded on an established market" within the meaning of the applicable Regulations, then the debt instrument will be treated as publicly traded and the issue price of the debt instrument will equal the fair market value of that debt instrument on the date of issuance. In general, a debt instrument will be treated as traded on an established securities market if it is listed on a major securities exchange, appears on a system of general circulation that provides a reasonable basis to determine fair market value or otherwise is, among other things, readily quotable by dealers, brokers or traders. For purposes of applying these rules, each tranche of new debt instruments is treated as a separate issue.

If the New Senior Secured Credit Facility or the New Senior Secured Notes, respectively, are not publicly traded and the old Claims exchanged for such debt instruments also are not publicly traded, then the issue price of the New Senior Secured Credit Facility or the New Senior Secured Notes, as applicable, generally would equal the stated principal amount of such debt instrument. Holders of Claims should consult their tax advisors regarding the issue prices for the New Senior Secured Credit Facility and the New Senior Secured Notes.

**Certain Tax Consequences of Owning New Membership Interests of Majestic Holdco**

It is anticipated that Majestic Holdco will be characterized as a partnership for federal income tax purposes following the Distribution Date. As such, a Holder of Claims who receives New Membership Interests will be treated as a partner for tax purposes. The U.S. federal tax consequences of being a partner in an operating partnership are very complicated. As an example, a partnership itself does not pay U.S. federal income taxes; instead, its income and deductions are allocated to its partners, who include such amounts on their own tax returns. In addition, a partner may generally receive distributions from a partnership up to the amount of the partner's tax basis in its partnership interest without incurring additional tax. Holders who will receive New Membership Interests are urged to consult with their own tax advisers regarding such consequences.

Because the Reorganized Debtors will be engaged in a U.S. trade or business for U.S. federal income tax purposes, Reorganized Majestic Holdco will be required to withhold and pay over to the U.S. tax authorities with respect to each member-partner that is not a "United States person" for federal income tax purposes (a "Foreign Member") a percentage equal to the highest applicable U.S. tax rate of each such Foreign Member's distributive share of Reorganized Majestic Holdco's income that is effectively connected with such trade or business (and withholding taxes may be imposed in other circumstances where Reorganized Majestic Holdco recognizes gain attributable to US real property). Each Foreign Member will be required to file U.S. tax returns and pay U.S. tax on its share of Reorganized Majestic Holdco's net effectively connected income (with any taxes withhold by Reorganized Majestic Holdco creditable against such tax liability). In addition, upon the taxable disposition of an interest in Reorganized Majestic Holdco, if (i) 50% or more of Reorganized Majestic Holdco's gross assets consist of "United States real property interests" and (ii) 90% or more of Reorganized Majestic Holdco's gross assets consist of "United States real property interests" and cash or cash equivalents, a purchaser will be required to withhold 10% of the amount paid for the interest pursuant to section 1445 of the IRC. Alternatively, other tax rules may apply, which could result in all or some portion of any gain recognized on a Holder's taxable disposition of an interest in Reorganized Majestic Holdco being subject to U.S. federal income tax. A tax-exempt organization will generally derive "unrelated business taxable income" from holding interests in Reorganized Majestic Holdco. Tax-exempt organizations and Foreign Members may wish to consider using a "blocker" structure to hold their interests. A discussion of all the relevant tax considerations for these types of Holders is beyond the scope of this Disclosure Statement; such Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of receiving and owning a New Membership Interest in Reorganized Majestic Holdco.

**Certain Consequences of Owning an Interest in New Senior Secured Credit Facility**

Stated interest on the New Senior Secured Credit Facility will generally be taxable to the holder as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes. A holder will generally be required to report the excess, if any, of the stated principal amount of its share of the New Senior Secured Credit Facility over the issue price of its share of the New Senior

Secured Credit Facility as original issue discount on a constant yield basis over the term of the New Senior Secured Credit Facility.

**Certain Consequences of Owning New Senior Secured Notes**

Stated interest on the New Senior Secured Notes will generally be taxable to the holder as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes. A holder will generally be required to report the excess, if any, of the stated principal amount of its share of the New Senior Secured Notes over the issue price of its share of the New Senior Secured Notes as original issue discount on a constant yield basis over the term of the New Senior Secured Notes.

**Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of the Holder's circumstances and income tax situation. All Holders of Claims against the Debtors should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the restructuring, including the applicability of any state, local, or foreign tax laws, and any change in applicable tax laws.**

**Recommendation**

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

The Majestic Star Casino, LLC
(for itself and on behalf of each of the Debtors)

*/s/ Jon S. Bennett*

Jon S. Bennett
Senior Vice President, Chief Financial Officer, and
Treasurer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400

- and -

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Co-Counsel for the Debtors and Debtors in Possession

## Exhibit A

**Amended Joint Plan of Reorganization**

**<u>Exhibit B</u>**

**Disclosure Statement Order**

[FORTHCOMING]

**Exhibit C**

**Reorganized Debtors' Financial Projections**

[FORTHCOMING]

**Exhibit D**

**Reorganized Debtors' Valuation Analysis**

[FORTHCOMING]

**Exhibit E**

**Liquidation Analysis**

[FORTHCOMING]

**Exhibit 2**

**Disclosure Statement Redline**