# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE MAJESTIC STAR CASINO, LLC, <u>et al.</u>,[1] | ) | Case No. 09-14136 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## NOTICE OF FILING OF AMENDED DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED PROPOSED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on September 17, 2010, The Majestic Star Casino, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), filed (i) the *Disclosure Statement for the Joint Plan of Reorganization of The Majestic Star Casino, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 593] (as has been and may be amended, supplemented or modified the "Disclosure Statement") and (ii) the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 592] (as has been and may be amended, supplemented or modified, the "Plan") with the United States Bankruptcy Court for the District of Delaware (the "Court").[2]

**PLEASE TAKE FURTHER NOTICE** that the Debtors have made immaterial modifications to the Disclosure Statement and the Plan to, among other things, reflect the terms of a consensual plan of reorganization preliminarily reached by the Debtors and their key stakeholders in these chapter 11 cases, modify, add or amend certain language on account of comments received after January 7, 2011 from various parties in interest in the Debtors' chapter 11 cases, and correct various clerical and typographical errors. A copy of the amended Disclosure Statement is attached hereto as **Exhibit 1**, and a copy marked against the version filed with the Court on January 7, 2011 is marked as **Exhibit 2**. The Debtors have filed a copy of the amended Plan, together with a similarly marked copy, with the Court concurrently herewith.

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: The Majestic Star Casino, LLC (4986); The Majestic Star Casino II, Inc. (0927); The Majestic Star Casino Capital Corp. (0872); Majestic Star Casino Capital Corp. II (9309); Barden Mississippi Gaming, LLC (8783); Barden Colorado Gaming, LLC (8674); Majestic Holdco, LLC (4648); and Majestic Star Holdco, Inc. (9415). The corporate address for the debtors is 301 Fremont Street, 12th Floor, Las Vegas, Nevada 89101.

[2] Capitalized terms used but not defined in this notice have the meanings set forth in the Plan.

Dated: January 12, 2011
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ James E. O'Neill
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
E-mail:        ljones@pszjlaw.com
               joneill@pszjlaw.com
               tcairns@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C.
Edward O. Sassower, Esq.
Stephen E. Hessler, Esq.
601 Lexington Avenue
New York, NY 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
E-Mail:        james.sprayregen@kirkland.com
               edward.sassower@kirkland.com
               stephen.hessler@kirkland.com

Co-Counsel for the Debtors and Debtors in
Possession

**Exhibit 1**

**Amended Second Amended Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| THE MAJESTIC STAR CASINO, LLC, et al.,[1] | ) |
|  | ) Case No. 09-14136 (KG) |
|  | ) |
|  | ) Jointly Administered |
|  | ) |

### DISCLOSURE STATEMENT FOR THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING IN EACH OF THE EXHIBITS HERETO, IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones, Esq. (DE Bar No. 2436)
James E. O'Neill, Esq. (DE Bar No. 4042)
Timothy P. Cairns, Esq. (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 198999-8705
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C.
Edward O. Sassower, Esq.
Stephen E. Hessler, Esq.
601 Lexington Avenue
New York, New York 10022–4611
Telephone:     (212) 446–4800
Facsimile:     (212) 446–4900

Co-Counsel for the Debtors and Debtors in Possession

Dated:   January 12, 2011

---

[1]    The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are:  The Majestic Star Casino, LLC (4986); The Majestic Star Casino II, Inc. (0927); The Majestic Star Casino Capital Corp. (0872); Majestic Star Casino Capital Corp. II (9309); Barden Mississippi Gaming, LLC (8783); Barden Colorado Gaming, LLC (8674); Majestic Holdco, LLC (4648); and Majestic Star Holdco, Inc. (9415).  The corporate address for the debtors is 301 Fremont Street, 12th Floor, Las Vegas, Nevada 89101.

**TABLE OF CONTENTS**

Page

Important Information About this Disclosure Statement ....................................................................................1

Questions and Answers Regarding this Disclosure Statement and the Plan ......................................................3

The Debtors' History and Chapter 11 Cases....................................................................................................10

Plan Overview.................................................................................................................................................19

Treatment of Claims Against and Equity Interests in the Debtors ...................................................................20

Settlements Contemplated Pursuant to the Plan .............................................................................................39

Management of the Company..........................................................................................................................45

Composition of Initial Board of Managers .....................................................................................................46

Reorganized Debtors' Corporate Organizational and Ownership Structure ....................................................47

The Reorganized Debtors' Business Upon Emergence ...................................................................................47

Description of New Membership Interests ......................................................................................................51

Limitations on Liability and Indemnification of Managers and Officers of The Reorganized Debtors ...........52

Summary of Gaming Regulations ...................................................................................................................53

Summary of Legal Proceedings......................................................................................................................63

Projected Financial Information ......................................................................................................................68

Risk Factors ...................................................................................................................................................69

Confirmation of the Plan.................................................................................................................................74

Effect of Confirmation of the Plan .................................................................................................................79

Important Securities Law Disclosure...............................................................................................................82

Voting Instructions .........................................................................................................................................83

Certain U.S. Federal Income Tax Consequences of the Plan ..........................................................................84

Recommendation ............................................................................................................................................91

**EXHIBITS**

EXHIBIT A        Second Amended Joint Plan of Reorganization

EXHIBIT B        Disclosure Statement Order

EXHIBIT C        Reorganized Debtors' Financial Projections

EXHIBIT D        Reorganized Debtors' Valuation Analysis

EXHIBIT E        Liquidation Analysis

**Important Information About this Disclosure Statement**

This Disclosure Statement provides information regarding the First Amended Joint Plan of Reorganization that the debtors referenced on the cover of this Disclosure Statement (collectively, the "Debtors") are seeking to have confirmed by the Bankruptcy Court. The Debtors believe the Plan is in the best interests of all creditors and urge all creditors entitled to vote on the Plan to vote in favor of the Plan.

**References to the "Plan" and the "Plan of Reorganization" are to the First Amended Joint Plan of Reorganization attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.**

**References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the District of Delaware, the court in which the Debtors filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code. References to the "Petition Date" are to November 23, 2009.**

**Unless the context requires otherwise, references to the "Company," "Majestic," "our," and "us" are to the Debtors.**

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if the Plan is confirmed, that such conditions precedent will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as Exhibit A hereto, and the section herein entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement, and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for the purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe the summaries of certain provisions of the Plan and certain other documents and the financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, including, but not limited to, the Plan and the Plan documents, are qualified in their entirety by reference to those documents. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any creditor entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign regulatory agency, nor has the

SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The New Membership Interests described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. To the extent exemptions from registration other than section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or on registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;
- financing plans;
- projected dividends;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs;

- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing products and services;
- projected general market conditions; and
- effects of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. These risks, uncertainties, and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;
- the Debtors' ability to reduce their overall financial leverage;
- the potentially adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;
- customer response to the Chapter 11 Cases;
- inability to have claims discharged/settled during the chapter 11 proceedings;
- general economic, business and market conditions;
- interest rate fluctuations;

- a decline in the Debtors' market share due to competition;
- ability to implement cost reduction initiatives in a timely manner;
- financial conditions of the Debtors' customers;
- adverse tax changes;
- limited access to capital resources;
- changes in domestic laws and regulations;
- general market conditions;
- natural disasters; and
- geopolitical instability.

2

**Questions and Answers Regarding this Disclosure Statement and the Plan**

**Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval for their Plan. Prior to soliciting acceptances of the proposed Plan, the Debtors are required by section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and your distribution, if any, depend on what kind of Claim or Interest you hold. The Classes of Claims and Interests and their respective voting statuses and anticipated recoveries are as follows:

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|-------|---------------------|--------|---------------|-------------------------|---------------------------|
| **Claims against and Interests in Majestic Holdco, LLC** | | | | | |
| A-1 | Senior Secured Credit Facility Guarantee Claims | Impaired | Entitled to Vote | 100% | N/A |
| A-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 52% | 0% |
| A-3 | Discount Notes Indenture Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| A-4 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| A-5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in Majestic Star Holdco, Inc.** | | | | | |
| B-1 | Discount Notes Indenture Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| B-2 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| B-3 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in The Majestic Star Casino, LLC** | | | | | |
| C-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | 100% | 100% |
| C-2 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | 52% | 12% |
| C-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| C-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| C-5 | Senior Notes Indenture Claims | Impaired | Entitled to Vote | 25% | 4% |
| C-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 25% | 4% |

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| C-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| C-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| C-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in The Majestic Star Casino II, Inc.** | | | | | |
| D-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | 100% | 100% |
| D-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 52% | 8% |
| D-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| D-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| D-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 25% | 7% |
| D-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 25% | 7% |
| D-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| D-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| D-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in The Majestic Star Casino Capital Corp.** | | | | | |
| E-1 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | 52% | 0% |
| E-2 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| E-3 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in Majestic Star Casino Capital Corp. II** | | | | | |
| F-1 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | 52% | 0% |
| F-2 | Senior Notes Indenture Claims | Impaired | Entitled to Vote | 25% | 0% |
| F-3 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| F-4 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in Barden Mississippi Gaming, LLC** | | | | | |
| G-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | 100% | 100% |

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| G-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 52% | 12% |
| G-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| G-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| G-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 25% | 2% |
| G-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 25% | 2% |
| G-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| G-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| G-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in Barden Colorado Gaming, LLC** | | | | | |
| H-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | 100% | 100% |
| H-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 52% | 2% |
| H-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| H-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| H-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 25% | 0% |
| H-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 25% | 0% |
| H-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| H-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| H-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |

For more information about the treatment of Claims and Interests see the section herein entitled "Treatment of Claims Against and Equity Interests in the Debtors," which begins on page 20.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance the Debtors will be able to reorganize their businesses. If the Plan is not confirmed or does not go effective in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. Alternatives to Confirmation and consummation of the Plan may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. Moreover, failure to confirm or consummate the Plan may result in an extended chapter 11 proceeding. For a more detailed description of the consequences of a liquidation scenario, see the section herein entitled "Confirmation of the Plan—Best Interests of Creditors/Liquidation Analysis," which begins on page 75 and the Liquidation Analysis attached as Exhibit E hereto.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "consummation?"**

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the "Effective Date" mean the date on which the Plan has been fully consummated and all conditions to the Plan have been satisfied or waived. Distributions will be made only after consummation of the Plan. See the section herein entitled "Confirmation of the Plan," which begins on page 74, for a discussion of the conditions to consummation.

**Where is the cash required to fund the Plan coming from?**

The cash distributions under the Plan shall be funded from the Reorganized Debtors' cash balances and/or cash from business operations. See the section herein entitled "Plan Overview," which begins on page 19.

**Are there risks to owning an interest in the Debtors upon emergence from bankruptcy?**

Yes, please see the section herein entitled "Risk Factors," which begins on page 69.

**Is there potential litigation related to the Plan?**

Yes, in the event it becomes necessary to confirm the Plan over the objection of certain Classes of Claims or Interests, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

In accordance with the terms of the Bankruptcy Court order approving this Disclosure Statement, all parties in interest will receive notice of the hearing on the Confirmation of the Plan. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party at: http://dm.epiq11.com/msc.

**Will the Debtors be filing reports with the SEC?**

The Debtors will not file reports with the SEC upon emergence as they will not be subject to the public reporting requirements of the Securities Exchange Act of 1934, as amended, or the regulations promulgated thereunder.

**What rights will the Debtors' new equity holders have?**

On the Effective Date, the Reorganized Debtors shall authorize and issue units of New Membership Interests in accordance with the Plan. The voting rights, restrictions on transferability, and other rights of the New Membership Interests will be set forth in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

**Will there be releases granted to parties in interest as part of the Plan?**

Yes, see the sections herein entitled "Releases by the Debtors" and "Third Party Releases," which begin on page 81.

**What is the deadline to vote on the Plan?**

5:00 p.m. (prevailing Eastern Time) on [●], 2011.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests entitled to vote on the Plan. If you are a Holder of Claims or Interests in the following Classes, you may vote for or against the Plan by completing the ballot and timely returning it in the envelope provided to you: Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8.

The Debtors have retained Epiq Bankruptcy Solutions, LLC ("Epiq") to serve as their notice, claims, and solicitation agent (the "Solicitation Agent") to oversee the voting process, provide additional copies of all materials, and answer questions. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on [●], 2011.

The following table provides basic instructions on how to vote on the Plan:

| BALLOTS |
|---|
| Ballots must be actually received by the Solicitation Agent by the<br>voting deadline of 5:00 p.m. (prevailing Eastern Time) on [●], 2011 at the following address:<br><br>**If by mail:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.:  The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**FDR Station PO Box 5014**<br>**New York, New York 10150**<br><br>**If by hand delivery or overnight courier:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.:  The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**757 Third Avenue, 3rd Floor**<br>**New York, New York 10017**<br><br>If you have any questions on the procedure for voting on the Plan,<br>please call the Solicitation Agent at the following telephone number:  (646) 282-2400 |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed, signed, and received by 5:00 p.m. (prevailing Eastern Time), on [●], 2011.

Any ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one ballot with respect to each such Claim held.  By signing and returning a ballot, each Holder of a Claim or Interest in Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1,  D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim and/or Equity Interest have been cast or, if any other ballots have been cast with respect to such Class of Claims and/or Equity Interests, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot.

**Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**When is the Confirmation Hearing scheduled to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], 2011 to take place at [   :   ] (prevailing Eastern Time) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, DE 19801.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [●], 2011 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.  Unless objections to Confirmation of the Plan are timely

served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The Wall Street Journal* (national edition), *The Post-Tribune of Northwest Indiana*, *The Denver Post*, and *The Tunica Times* to provide notification to those persons who may not receive notice by mail.

**What is the purpose of the Confirmation Hearing?**

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The Confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any liability that arose prior to the Confirmation of the plan of reorganization and provides for the treatment of such liability in accordance with the terms of the confirmed plan of reorganization.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including disputes over any Claims or Interests arising in the Chapter 11 Cases. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure distributions to Holders of Claims against the Debtors are accomplished pursuant to the Plan. See the section herein entitled "Retention of Jurisdiction by the Bankruptcy Court," which begins on page 79, for a further description of the matters over which the Bankruptcy Court will retain jurisdiction following the Confirmation of the Plan.

**What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. See the section herein entitled "The Reorganized Debtors' Business Upon Emergence," beginning on page 47, for a further description of the effect of the Plan on the Debtors' ongoing business operations.

**Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

Yes. Under the Plan, the Senior Secured Noteholders and the Senior Noteholders will collectively own a significant majority of the New Membership Interests in the Reorganized Debtors, and individual Senior Secured Noteholders and Senior Noteholders will own substantial ownership stakes in the Reorganized Debtors. Further information regarding the composition of the Board of Managers of the Reorganized Debtors is set forth in the term sheet attached to the Plan as Exhibit II, and will be set forth in the Plan Supplement.

**Does the Company recommend voting in favor of the Plan?**

Yes. In the opinion of the Debtors, the Plan is preferable to the liquidation alternatives described in this Disclosure Statement because the Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. Confirmation of the Plan will also allow the Debtors to continue to operate as a going concern, which will have the effect of preserving jobs at the Debtors' gaming facilities. Accordingly, the Debtors recommend that Holders of Claims who are entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

# The Debtors' History and Chapter 11 Cases

## The Debtors' Business—Overview and History

The Majestic Star Casino, LLC ("Majestic I") was formed by Don H. Barden in December 1993 to pursue a license to operate a gaming facility at Buffington Harbor in Gary, Indiana (the "Majestic Star I"). In 1996, Majestic I and Trump Indiana, Inc. (which was not affiliated with the Debtors at that time) ("Trump Indiana") each opened a dockside gaming facility at Buffington Harbor.

In December 2001, Majestic I purchased Fitzgeralds-brand properties in Las Vegas, Nevada, Tunica County, Mississippi (30 miles south of Memphis) and Black Hawk, Colorado (35 miles west of Denver), which it owns through its wholly-owned subsidiaries Barden Nevada Gaming, LLC ("Barden Nevada," not a Debtor in these cases), Barden Mississippi Gaming, LLC ("Barden Mississippi," a Debtor in these cases), and Barden Colorado Gaming, LLC ("Barden Colorado," a Debtor in these cases), respectively. This purchase significantly expanded Majestic I's geographic reach and the scope of its gaming and hospitality operations. It also gave Majestic I proprietary rights in registered and common law trade names, trademarks and service marks used in connection with these operations, certain of which Majestic I licenses to other Fitzgeralds-brand properties.

On December 31, 2003, Majestic I spun off ownership of Barden Nevada to Barden Development Inc. ("BDI"), Majestic I's indirect parent (not a Debtor in these cases). As part of that transaction, Majestic I and Barden Nevada entered into a series of licensing, expense sharing, and other agreements.

On December 21, 2005, Majestic I acquired Trump Indiana (renamed The Majestic Star Casino II, Inc. ("Majestic II"), a Debtor in these cases), which Majestic I rebranded "Majestic Star II," and its 300 room hotel, which was renamed the "Majestic Star Hotel." As part of this transaction, Majestic I also acquired complete ownership of two other subsidiaries: Buffington Harbor Riverboats, LLC ("Buffington Riverboats"), a joint venture between Majestic I and Trump Indiana established to acquire, manage, and develop a dock, pavilion and parking facilities for gaming operations; and Buffington Harbor Parking Associates, LLC ("Buffington Parking"), a joint venture between Trump Indiana and AMB Parking, LLC (an entity owned by BDI) established to own and operate parking facilities for gaming operations.[2] Accordingly, the Debtors' Buffington Harbor operations now include both the Majestic Star I and Majestic Star II casino operations, the Majestic Star Hotel, an entertainment pavilion housing restaurants, retail outlets, an entertainment venue, a lounge and boarding access to the two casinos, and a 2,000 space parking garage. Majestic I also has 266 acres of excess and surplus land at the site, much of which is available for future expansion.[3]

## The Debtors' Organizational Structure

The following chart depicts the Debtors' current organizational and ownership structure (non-debtors are shaded):

---

[2]     On or about August 4, 2006, Buffington Parking was merged into Majestic pursuant to Articles of Merger filed with the Secretaries of State for the States of Indiana and Delaware. On or about December 31, 2006, Buffington Riverboats withdrew from existence as an entity with the Secretary of State of the State of Delaware.

[3]     Non-debtor Gary New Century, LLC ("GNC"), which is controlled by Don H. Barden, owns approximately six acres of land at this site. GNC also holds rights to certain improvements in the harbor and an ownership interest in those improvements. The Debtors are owners of various easements and other rights in the GNC property that permit the Debtors to perpetually operate their business at the Buffington Harbor location, subject to certain reservations, restrictions, and limitations contained in various recorded and unrecorded instruments.



**The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors' total funded debt was approximately $733.8 million, which primarily consists of the amounts outstanding under four Prepetition facilities: (a) an $80 million Senior Secured Credit Facility (the "Senior Secured Credit Facility") funded by a syndicate led by Wells Fargo Capital Finance, Inc. (f/k/a Wells Fargo Foothill, Inc.) (the "Senior Secured Credit Facility Agent"), which matured on April 15, 2010; (b) $300 million in principal amount of 9½% Senior Secured Notes (the "Senior Secured Notes"), which matured on October 15, 2010; (c) $200 million in principal amount of 9¾% Senior Notes (the "Senior Notes"), which mature on January 15, 2011; and (d) $63.5 million in principal amount at maturity of 12½% original issue discount notes (the "Discount Notes"), which mature on October 15, 2011. Each of these facilities is described in further detail below.

Senior Secured Credit Facility

On October 7, 2003, Majestic I, Barden Mississippi, and Barden Colorado entered into a Loan and Security Agreement (as amended, the "Loan and Security Agreement") with certain financial institutions party thereto as lenders and the Senior Secured Credit Facility Agent, as arranger and administrative agent for such lenders.[4] The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matured on April 15, 2010. As of August 31, 2010, the Debtors owed approximately $65.3 million under the Senior Secured Credit Facility in principal and accrued unpaid interest. Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Senior Secured Credit Facility Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%. In each case the rate is determined based on the Debtors' trailing twelve month EBITDA (defined as earnings before interest, taxes, depreciation and amortization). The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default. As noted above, the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Senior Secured Credit Facility Agent at the default rate on a current basis.

---

[4] The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and to modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

Pursuant to certain mortgages, security agreements, and other related collateral documents, outstanding amounts under the Senior Secured Credit Facility are secured by substantially all of the assets of Majestic I, Majestic II, Barden Colorado, and Barden Mississippi, including all real property and other assets of the Debtors' casinos, all furniture, fixtures and equipment belonging to those entities, those entities' rights to the service marks "Majestic Star" and "Fitzgeralds" and other related trademarks, and the proceeds and products of each of the foregoing, as well as by a pledge by Majestic of its equity interests in Majestic II, Barden Colorado, and Barden Mississippi (collectively, the "Collateral"). Majestic Holdco, LLC ("Majestic Holdco") has also guarantied the outstanding obligations under the Senior Secured Credit Facility, although its liability is limited to its pledge of 100% of the equity of Majestic I. The Collateral does not include certain "Excluded Assets," including, among other things, cage cash (cash held at the casino properties themselves) and the Debtors' gaming licenses and other licenses that may not be encumbered under applicable law or contract.

Senior Secured Notes

The Senior Secured Notes are $300 million in principal amount of obligations issued by Majestic I and The Majestic Star Casino Capital Corp. ("MSCC"), a non-operating, wholly-owned subsidiary of Majestic I that has no assets. The Senior Secured Notes are governed by an Indenture dated October 7, 2003, and two Supplemental Indentures each dated December 21, 2005 (collectively, the "Senior Secured Notes Indenture"), with The Bank of New York Mellon Trust Company, N.A., as trustee under each indenture (the "Senior Secured Notes Trustee"). The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes matured on October 15, 2010. As of August 31, 2010, the Debtors owed approximately $348.4 million on account of the Senior Secured Notes in principal and accrued unpaid interest.

Outstanding obligations under the Senior Secured Notes are secured by liens in favor of the Trustee on the Collateral, which are junior to the liens granted to the Senior Secured Credit Facility Agent under the Loan and Security Agreement pursuant to the Intercreditor Agreement (as defined below). Additionally, Majestic I, Barden Colorado and Barden Mississippi have each guarantied the Debtors' obligations under the Senior Secured Notes. Majestic Holdco has also guarantied those obligations, but its guaranty is limited to a pledge of its 100% equity interests in Majestic I.

Intercreditor Agreement

In connection with the issuance of the Senior Secured Notes, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and certain of the Debtors[5] entered into an Intercreditor and Lien Subordination Agreement, dated as of October 7, 2003 (as amended, the "Intercreditor Agreement"). The Intercreditor Agreement, among other things, subordinates the liens and security interests granted to the Senior Secured Notes Trustee to secure the Debtors' obligations under the Senior Secured Notes to the liens and security interests granted to the Senior Secured Credit Facility Agent to secure the Debtors' obligations under the Senior Secured Credit Facility, up to a maximum principal amount outstanding under the Senior Secured Credit Facility of $80 million, plus premiums, interest, fees and all other amounts payable under the Senior Secured Credit Facility (including all amounts accruing after the Debtors commence a chapter 11 case).[6] Additionally, the Intercreditor Agreement imposes up to a 180-day standstill period within which holders of the Senior Secured Notes and the Senior Secured Notes Trustee may not take enforcement action against the Collateral based on an event of default under the Senior Secured Notes

---

[5]   The Debtors party to the Intercreditor Agreement are: (a) Majestic I, Majestic II, Barden Mississippi, and Barden Colorado, as borrowers under the Senior Secured Credit Facility, and Majestic Holdco, as guarantor under the Senior Secured Credit Facility; and (b) Majestic I and MSCC, as issuers of, Majestic II, Barden Mississippi, Barden Colorado, and MSCC II as guarantors under, and Majestic Holdco, as pledgor under, the Senior Secured Notes Indenture.

[6]   The liens and security interests granted to the Senior Secured Notes Trustee are senior and prior to the liens and security interests granted to the Senior Secured Credit Facility Agent to the extent the latter secure an amount greater than this amount.

Indenture, which period is extended indefinitely with respect to Collateral against which the Senior Secured Credit Facility Agent is pursuing rights or remedies under the Senior Secured Credit Facility.

The Intercreditor Agreement also limits the Senior Secured Notes Trustee and Senior Secured Noteholders from seeking adequate protection and taking certain other actions in any chapter 11 case commenced by the Debtors. Specifically, the Intercreditor Agreement provides that, until the senior obligations under the Senior Secured Credit Facility have been satisfied, the Senior Secured Notes Trustee and the Senior Secured Noteholders (a) will not object to any use of cash collateral or Postpetition financing secured by the Debtors' assets that is consented to by the Senior Secured Credit Facility Agent, and will not seek adequate protection or any other relief based on their respective interests in the Debtors' assets;[7] (b) will subordinate the Senior Secured Notes Trustee's liens to any liens securing such Postpetition financing that are senior to or *pari passu* with the Senior Secured Credit Facility Agent's liens; (c) will not contest any request by the Senior Secured Credit Facility Agent for adequate protection (or support an objection to such request); and (d) will not seek relief from the automatic stay to pursue rights or remedies with respect to its liens and security interests. The Intercreditor Agreement expressly provides in Section 6.04 that the "provisions of this Agreement are intended to be and shall be enforceable under section 510 of [the Bankruptcy Code]."

<u>Senior Notes</u>

The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic I and Majestic Star Casino Capital Corp. II ("<u>MSCC II</u>"), a non-operating, wholly owned subsidiary of Majestic I that has no assets. The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi. The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debenture Trust Company as successor trustee. The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005. The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year. The notes mature on January 15, 2011. As of August 31, 2010, the Debtors owed approximately $233.1 million on account of the Senior Notes in principal and accrued unpaid interest.

<u>Discount Notes</u>

The Discount Notes are $63.5 million principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Holdco that has no assets. The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic I or any of its subsidiaries. The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee. The Discount Notes accrue interest at 12½% per annum, with payments due on April 15 and October 15 of each year. Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011. As of August 31, 2010, the Debtors owed approximately $72.6 million on account of the Discount Notes in principal and accrued unpaid interest.

**Events That Led to Bankruptcy**

<u>The Debtors' Financial and Liquidity Concerns</u>

The recent global financial crisis caused, among other things, a general tightening in the credit markets, lower levels of liquidity, lower consumer and business spending, and lower consumer net worth, all of which have had and will continue to have a negative impact on the Debtors' businesses, results of operation, financial condition, and liquidity. Gaming and other leisure activities comprise discretionary spending, and participation in such activities tend to decline in economic downturns. The recent recession was no exception.

---

[7]    The Intercreditor Agreement does provide that, if the Senior Secured Credit Facility Agent is granted adequate protection in the form of liens on additional assets of the Debtors, then the Senior Secured Notes Trustee may seek adequate protection in the form of a junior lien on such additional assets.

At the same time that the Debtors confronted a decline in customer visits and spending due to economic factors, competition increased in each of the markets in which they compete. Importantly, in Indiana a number of new and renovated gaming properties have materially impacted the Debtors' Buffington Harbor operations. Specifically, in August 2007, the Four Winds Casino Resort opened with approximately 3,000 slot machines and 100 table games. This casino facility is located approximately 48 miles east of the Debtors' Buffington Harbor operations. In July 2008, Harrah's Entertainment completed a $500 million renovation and expansion of its Horseshoe Casino in Hammond, Indiana, doubling the size of its existing facility and making it the largest gaming establishment in the greater Chicago area. Also in 2008, Ameristar Casinos finished the remodeling and rebranding of its riverboat and land-based facilities located in East Chicago, Indiana, which included remodeling casino floors and restaurants and the addition of new slot machines. Boyd Gaming also recently completed a $130 million expansion of its Blue Chip Casino facility located in Michigan City, Indiana, which includes new and improved amenities.

Similar competitive pressures have been brought to bear on the Debtors' Mississippi and Colorado operations. In Tunica County, Mississippi, a competitor recently completed an extensive remodeling and re-branding of its property, and in Colorado a competitor recently completed construction of a 536-room hotel (attached to its existing casino) that has drawn patrons away from Fitzgeralds Black Hawk. In addition, the Black Hawk casino market continues to suffer the negative impacts of a smoking ban to all public areas within a casino, including the casino floor. The smoking ban went into effect on January 1, 2008.

The Debtors' declining operating results and weakening financial position due to increasing competition and adverse economic conditions, together with their significant debt service obligations, have curtailed the Debtors' ability to make the substantial and ongoing capital investments in their operations required to maintain competitiveness and the going concern value of their businesses. Accordingly, to preserve the liquidity necessary to ensure the continued competitiveness of their operations, in October 2008 the Debtors drew substantially all of the remaining availability under their Senior Secured Credit Facility and determined not to make the $24 million interest payment due to holders of their Senior Secured Notes and Senior Notes on October 15, 2008. As a result, as of November 14, 2008, the Debtors were in default under the Senior Secured Notes and Senior Notes, which in turn triggered cross-defaults under the Senior Secured Credit Facility[8] and the Discount Notes. The Debtors have continued to pay interest on the Senior Secured Credit Facility (at the default rate), but have not made any interest payments on the Senior Secured Notes or Senior Notes since April 2008, and did not make the scheduled interest payment on the Discount Notes due April 15, 2009.[9]

<u>Prepetition Negotiations with Creditors</u>

Although the Debtors' operations continued to produce positive cash flow (exclusive of debt service) prior to the defaults under their various debt facilities, the Debtors recognized that their existing capital structure and debt service obligations were depriving their businesses of the funds needed to make the substantial and ongoing capital investments required to succeed in the increasingly competitive markets in which they operate. Accordingly, the Debtors engaged XRoads Solutions Group, LLC ("<u>XRoads</u>") on or about August 7, 2008, and Goldman, Sachs & Co. ("<u>Goldman Sachs</u>") on or about November 14, 2008, to assist the Debtors in evaluating a broad range of financial and strategic alternatives aimed at addressing trends in the Debtors' operating results and financial condition.

The Debtors and their financial advisors pursued a number of financial and operational restructuring alternatives in the year leading up to the commencement of the Chapter 11 Cases, including reaching out to their principal creditor constituencies. To that end, in November 2008, the Debtors agreed to pay the reasonable professional fees and expenses for advisors to an ad hoc group holding a majority of the Senior Secured Notes (the "<u>Senior Secured Notes Committee</u>"), and in December 2008, the Debtors commenced similar agreements with an ad hoc group holding a majority of the Senior Notes (the "<u>Senior Notes Committee</u>") and the Senior Secured Credit

---

[8]    The Senior Secured Credit Facility Agent asserts that other defaults exist under the Senior Secured Credit Facility as well.

[9]    Interest accruing on the Discount Notes through October 2008 was paid in-kind.

Facility Agent, respectively. The Debtors also established a data room to provide access to detailed information regarding their operations, assets and finances, and attempted to foster negotiations with these constituencies regarding a consensual restructuring and deleveraging of the Debtors' balance sheet. Concurrently, the Debtors and their advisors investigated other potential restructuring solutions, including new money investments and sales of certain of the Debtors' businesses and assets. Although the Debtors identified several potential investors, these discussions did not progress beyond expressions of interest.

Despite the substantial efforts of the Debtors, the Senior Secured Notes Committee, and the Senior Notes Committee to reach agreement on a consensual restructuring, by October 2009, the negotiations had reached an impasse.

<u>Exercise of Creditor Remedies</u>

On December 3, 2008, after the Debtors failed to make the October 15, 2008 interest payment to holders of the Senior Secured Notes and Senior Notes, the Senior Secured Notes Trustee notified the Senior Secured Credit Facility Agent that one or more events of default had occurred under the Senior Secured Notes Indenture. The Senior Secured Credit Facility Agent responded by sending the Senior Secured Notes Trustee a "standstill notice" on December 11, 2008, which, under the Intercreditor Agreement, triggered a 180-day "standstill period" in which the Senior Secured Noteholders and Senior Secured Notes Trustee were prohibited from exercising remedies against the Debtors' assets. The Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee subsequently entered into agreements on June 10, 2009 and July 10, 2009 consensually extending the standstill period through August 10, 2009 to allow the Senior Secured Notes Committee, the Senior Notes Committee and the Debtors to continue discussing a consensual restructuring. Upon expiration of the second extension of the standstill period however, the Senior Secured Notes Trustee declined to further extend the standstill period beyond August 10, 2009.

Notwithstanding the expiration of the standstill period under the Intercreditor Agreement, the parties continued to have constructive discussions regarding a consensual restructuring of the Debtors' debt obligations. In October 2009, however, the Senior Secured Notes Trustee sent the Senior Secured Credit Facility Agent a notice of its intent to exercise remedies against the Debtors' assets, which triggered another standstill period under the Intercreditor Agreement, this time of 10 days. Upon the expiration of such 10 day period on October 30, 2009, the Senior Secured Notes Trustee and Senior Secured Noteholders became entitled under the Intercreditor Agreement to seek to enforce remedies against the Debtors' assets.

On October 30, 2009, the date the Senior Secured Noteholders' standstill period expired, the Senior Secured Credit Facility Agent sent to the Debtors a notice, among other things, terminating the Debtors' ability to borrow under the Senior Secured Credit Facility and declaring all amounts outstanding under that facility to be immediately due and payable. The notice stated that, as a result of the expiration of the applicable standstill periods under the Intercreditor Agreement and the resulting right of the Senior Secured Notes Trustee and Senior Secured Noteholders to enforce remedies against any of the Collateral that the Senior Secured Credit Facility Agent was not actively enforcing remedies against, the Senior Secured Credit Facility Agent and the lenders under the Senior Secured Credit Facility indicated they were commencing the exercise of their rights and remedies against all of the Collateral to protect their ability to control any foreclosure or similar process with respect to the Collateral.

**The Commencement of the Chapter 11 Cases**

On November 23, 2009, the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code.

The Chapter 11 Cases are being jointly administered under the caption <u>In re The Majestic Star Casino, LLC, et al.</u>, Case No. 09-14136 (KG). The Debtors continue to operate their businesses and manage their property as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

**Events During Bankruptcy**

First Day Relief

Through a careful review of their business operations and cash requirements, and following detailed preparations by management and their advisors, the Debtors entered bankruptcy with minimal impact on their day-to-day business operations. To facilitate, among other things, noticing, claims-processing and voting-related matters, the Debtors requested that the Bankruptcy Court enter an order granting certain relief including authorization for the joint administration of the Chapter 11 Cases.

On the Petition Date, the Debtors also sought and obtained several orders authorizing them to pay various Prepetition Claims. These orders were designed to ease the strain on the Debtors' relationships with employees, vendors, customers, and taxing authorities as a consequence of the commencement of the Chapter 11 Cases. Among other things, these orders authorized the Debtors to: (a) honor customer obligations and continue customer programs; (b) pay certain Prepetition employee wages and benefits; (c) maintain cash management systems; (d) use Prepetition bank accounts, checks, and other business forms; (e) make tax payments to federal, local, and state taxing authorities; (e) maintain Prepetition insurance policies and enter into new insurance policies; and (f) prohibit utility companies from discontinuing services. In addition, the Debtors engaged in an extensive communication program with vendors and customers assuring them that the transition into bankruptcy would be smooth and would not result in a discernible interruption in operations.

The Debtors have been funding their operations during the Chapter 11 Cases by using cash on hand and cash flow from operations, which the Debtors believe to be sufficient to meet projected cash needs, including the payment of normal operating costs and expenses, as they proceed with their financial restructuring. Therefore, the Debtors have not sought debtor-in-possession financing.

On the Petition Date, the Debtors sought authority to use cash collateral of their secured creditors to permit, among other things, the orderly continuation of the operation of the Debtors' businesses and to satisfy their working capital and operational needs. The final cash collateral order was entered by the Bankruptcy Court on December 17, 2009 and provides adequate protection to those secured creditors, including: (a) adequate protection payments to the Senior Secured Credit Facility lenders; (b) a section 507(b) superpriority claim to the Senior Secured Credit Facility lenders; (c) adequate protection liens to the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee; and (d) payment of reasonable professional fees to the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee.

Retention of Restructuring and Other Professionals

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors retained, as of the Petition Date, with authorization from the Bankruptcy Court, the law firms of Kirkland & Ellis LLP and Pachulski Stang Ziehl & Jones as their restructuring counsel. Additionally, pursuant to the Bankruptcy Court's approval, the Debtors retained XRoads Solutions Group LLC ("XRoads") as financial and restructuring advisors, Epiq as Solicitation Agent, Ernst & Young LLP as auditors, Deloitte Financial Advisory Services LLP as accounting services providers, and Realty Consultants, USA, Inc. d/b/a Integra Realty Resources - Chicago Metro as appraisers.

In addition to paying the fees of their own advisors, the Debtors are required to pay fees incurred by various other constituencies and their respective advisors related to the Chapter 11 Cases. On December 4, 2009, the United States Trustee appointed the official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases to represent the interests of all general unsecured creditors of the Debtors. Since the formation of the Creditors' Committee, the Debtors have kept the Creditors' Committee informed about the Debtors' business operations. Additionally, as appropriate, the Debtors have sought the concurrence of the Creditors' Committee in connection with certain actions and transactions taken by the Debtors outside of the ordinary course of business.

<u>Power of Attorney Agreement</u>

Indiana law requires all riverboat casino licensees (including Majestic I and Majestic II) to enter into a power of attorney agreement ("<u>POA</u>") that provides, in the event of revocation or nonrenewal of a casino's license or in other similar circumstances, for the temporary operation of such casino by a designated trustee. All licensees must submit an executed POA to the Indiana Gaming Commission (the "<u>IGC</u>"), the regulator with authority over the licensing and operation of riverboat casinos in Indiana. Failure to comply with the statutory POA requirement could lead to the nonrenewal of a casino operator's license. Accordingly, on February 24, 2010, the Debtors filed a motion seeking authority to execute a POA for submission to the IGC. The Court granted the Debtors' motion on March 1, 2010, and the Debtors executed and submitted a POA shortly thereafter.

<u>Unsecured Creditors' Committee's Standing Motion</u>

On March 4, 2010, the Creditors' Committee filed a motion (the "<u>Standing Motion</u>") seeking standing to pursue, and if appropriate, settle certain claims against the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee. In the Standing Motion, the Creditors' Committee requested authority to bring an adversary proceeding for (a) a declaratory judgment holding that the security interests of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee in the Debtors' Indiana riverboat casinos (the "<u>Majestic Star Casinos</u>") are unperfected, (b) an order avoiding these security interests, and (c) disallowance of the claims of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee to the extent their claims are secured by the allegedly unperfected security interests in the Majestic Star Casinos. The Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed objections to the Standing Motion, and the Debtors filed a limited response to the motion requesting that the Court defer consideration of the motion and allow the Debtors to propose a settlement of the claims raised therein as part of their Plan. As of the date of filing of this Disclosure Statement, the Court has not held a hearing on the Standing Motion, and the Debtors have proposed a settlement of the claims raised therein in the Plan.

<u>Adversary Proceeding Against the City of Gary, Indiana</u>

In 1996, Gary entered into local development agreements with Trump Indiana and Majestic I (each, a "<u>Local Development Agreement</u>"). In 2005, when Majestic II, a Debtor in these Chapter 11 Cases, acquired and began operating the riverboat casino formerly owned and operated by Trump Indiana, the Majestic I Local Development Agreement and certain other agreements related to the development of Buffington Harbor area were amended (collectively, the "<u>Amended Local Development Agreement</u>"), and the Trump Indiana Local Development Agreement was terminated. Under the Amended Local Development Agreement, Majestic I and Majestic II were to make monthly payments of three percent (3%) of the adjusted gross gaming receipts of their respective casinos ("<u>Economic Incentive Payments</u>"), and Gary agreed to make local infrastructure improvements, including construction of access roads and freeway interchange, and to conduct environmental remediation on certain property owned by Majestic I and Majestic II. In 2008, a dispute between the Debtors and Gary developed over Gary's failure to perform its development obligations, and the Debtors began depositing Economic Incentive Payments in a segregated bank account pending resolution of the dispute.

On February 11, 2008, the Debtors commenced an arbitration proceeding (the "<u>Gary Arbitration</u>") and a lawsuit in the Superior Court of Marion County, Indiana (the "<u>Marion County Lawsuit</u>") against Gary to resolve the parties' dispute over the Amended Local Development Agreement, or, if the Amended Local Development Agreement were found to be invalid, the Local Development Agreements. On December 14, 2009, upon being notified of the Debtors' chapter 11 cases, the Superior Court of Marion County stayed further proceedings in the Marion County Lawsuit. The Gary Arbitration has not been formally stayed, but the Debtors are not actively prosecuting the Gary Arbitration at this time.

On March 11, 2010, Gary filed a lawsuit in the Superior Court of Lake County, Indiana (the "<u>Lake County Lawsuit</u>") against eight current and former directors, officers, and employees of Majestic I and its affiliates (the "<u>Lake County Defendants</u>") alleging these individuals converted funds owed by the Debtors to Gary under the Amended Local Development Agreement. In response to the Lake County Lawsuit, on March 29, 2010, the Debtors instituted an adversary proceeding in this Court seeking to extend the automatic stay imposed by section 362 of the Bankruptcy Code to the Lake County Defendants, or in the alternative, requesting a preliminary injunction pursuant

to section 105 of the Bankruptcy Code prohibiting Gary from prosecuting the Lake County Lawsuit. On April 15, 2010, a Joint Notice of Removal was filed with the United State District Court for the Northern District of Indiana, Hammond Division, removing the Lake County Lawsuit from the Superior Court of Lake County, Indiana to the United States District Court for the Northern District of Indiana, Hammond Division. By memorandum order dated April 28, 2010, the Court granted the Debtors' motion seeking to extend the automatic stay to the Lake County Defendants.

Gary filed a notice of appeal of the Court's grant of the Debtors' stay extension motion on May 12, 2010, designated the record and issues on appeal on May 26, 2010, and docketed its appeal in the United States District Court for the District of Delaware on June 20, 2010. Pursuant to a standing order of the United States District Court for the District of Delaware, all such appeals are referred to mediation, and the mediation of Gary's appeal is currently pending.

As of the date of the filing of this Disclosure Statement, the Debtors and Gary are engaged in ongoing settlement negotiations.

<u>Key Employee Incentive Plan</u>

Recognizing the myriad of increasingly difficult challenges facing the Debtors' thinly-staffed senior management team and the importance of the performance of the senior management team to the success of these Chapter 11 Cases, the Debtors determined it was necessary to implement a series of measures to properly incentivize the senior management team to continue to operate the Debtors' businesses as efficiently and effectively as possible to maximize the value of the Debtors' estates. To that end, on May 14, 2010, the Debtors' filed a motion (the "<u>KEIP Motion</u>") seeking authority to: (a) make certain outstanding payments due under The Majestic Star Casino, LLC 2009 Executive Incentive Plan (the "<u>2009 EIP</u>"); (b) implement The Majestic Star Casino, LLC 2010 Key Employee Incentive Plan (the "<u>2010 KEIP</u>"); and (c) enter into certain employment agreements. The Creditors' Committee fully supported the Debtors' KEIP Motion.

After the Debtors filed the KEIP Motion, representatives of Holders of the Senior Secured Notes suggested several revisions to the 2010 KEIP and the employment agreements submitted with the KEIP Motion, which resulted in productive discussions, and, ultimately, a revised 2010 KEIP and revised employment agreements acceptable to representatives of Holders of the Senior Secured Notes. On May 28, 2010, the Court entered an order authorizing (a) payments under the 2009 EIP, (b) implementation of the revised 2010 KEIP, and (c) execution of the revised employment agreements. The Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and the Creditors' Committee each consented to entry of the order.

In addition to the foregoing, the Board of Directors of the Debtors may develop, adopt, and implement the Pre-Effective Date Key Employee Incentive Program, subject to the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably), the terms of which shall be described on Exhibit 5 to the Plan Supplement.

<u>Majestic II Tax Action(s)</u>

Prior to December 21, 2005, BDI elected to be classified as an "S corporation" under subchapter S of the Internal Revenue Code (an "<u>S Corp.</u>"). Described generally, unlike the regime applicable to a subchapter C corporation (a "<u>C Corp.</u>"), where income generated by the corporation is taxed both when earned at the corporate level and at the shareholder level when received as part of a dividend or other distribution, the income and losses of an S Corp. are passed through to its shareholders and are reflected in such shareholders' personal tax returns, while the S Corp. itself is generally exempt from taxes imposed under chapter 1 of the Internal Revenue Code. Thus, use of an S Corp. results in only one level of taxation.

On or around December 21, 2005, Majestic I acquired Trump Indiana, Inc. (subsequently renamed The Majestic Star Casino II, Inc., a Debtor), including its dockside gaming facility at Buffington Harbor and its 300 room hotel. Upon acquiring Majestic II in this transaction, BDI elected to treat Majestic II as a "Qualified Subchapter S Subsidiary" (a "<u>QSub</u>"). A QSub is classified as a disregarded entity for income tax purposes and all

of its income is reported on the tax return of its sole shareholder. As a result, a QSub is not liable to pay tax on such income. A corporation can only qualify as a QSub if its ultimate parent is an S Corp. As of the Petition Date, Majestic II maintained its status as a QSub.

After the Petition Date, but at some point prior to March 16, 2010, BDI filed a notice of revocation of its S Corp. status with the Internal Revenue Service (the "Revocation"). The effective date of the Revocation was January 1, 2010. By operation of law, Majestic II's status as a QSub was automatically terminated as of December 31, 2009 and Majestic II became a C Corp. effective January 1, 2010.

As a result of the Revocation, Majestic II is now required to pay income tax under chapter 1 of the Internal Revenue Code and applicable state tax laws, including Indiana state tax laws, on account of MSC II's taxable income. To obviate the need for Majestic II to pay certain taxes that it was not required to pay prior to the Petition Date, has never historically been legally required to pay, and to maximize value for the Debtors' estates, the Debtors, with the support of their key stakeholders, filed a motion seeking authority to convert MSC II from a corporation to a limited liability company (the "LLC Conversion Motion"). On December 16, 2010, the Bankruptcy Court entered an order authorizing the Debtors to convert Majestic II from a corporation to a limited liability company.

Shortly prior to the hearing to consider the LLC Conversion Motion, the Debtors received information indicating that the conversion of Majestic II from a corporation to a limited liability company could result in a significant tax liability to Majestic II. Accordingly, the Debtors, in consultation with their creditors, determined not to effectuate the conversion prior to December 31, 2010.

On December 31, 2010, the Debtors commenced an adversary proceeding in the Bankruptcy Court against BDI, Don H. Barden, the United States of America on behalf of the Internal Revenue Service, and the Indiana Department of Revenue to restore the QSub status of Majestic II, to recover tax payments Majestic II was forced to make as a result of the unauthorized and improper disposition of estate property, to avoid any tax-related liabilities Majestic II would not owe but for the revocation of Majestic II's QSub status, and to recover the monetary damages suffered by Majestic II. A pretrial conference has been scheduled for February 17, 2011.

### Plan Overview

On January 6, 2011, the Debtors filed their Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code. The Plan contemplates that the Debtors will retain and operate their gaming properties in the ordinary course of business after emerging from chapter 11. The most significant components of the Plan are as follows:

- The Debtors will retain and reorganize around their casino gaming properties in Gary, Indiana, Tunica County, Mississippi, and Black Hawk, Colorado, subject, in the case of the Black Hawk, Colorado gaming property, to obtaining all governmental licenses, suitability determinations, and other approvals required for such property on or prior to 240 days following the Confirmation Date (as further described in Article XII of the Plan);

- Each Holder of an Allowed Senior Secured Credit Facility Claim will receive its Pro Rata share of either (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing;

- Each Holder of an Allowed Senior Secured Notes Indenture Claim will receive its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing;

- Each Holder of an Allowed Senior Notes Indenture Claim will receive its Pro Rata share of 42 percent of the New Membership Interests; and

- Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim will receive the lesser of (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim or (ii) its pro rata share of $1,000,000.

### Treatment of Claims Against and Equity Interests in the Debtors

**Administrative and Priority Claims**

Administrative Expense Claims

Except with respect to Administrative Expense Claims that are Professional Compensation and Reimbursement Claims and except to the extent that a Holder of an allowed Administrative Expense Claim and the applicable Debtors agree to less favorable distribution to such Holder, each Holder of an allowed Administrative Expense Claim shall be paid in full in cash on the later of the distribution date under the Plan, the date such Administrative Expense Claim is allowed, and the date such allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

Professional Compensation and Reimbursement Claims

Except as provided in Article II.A of the Plan, all Entities seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (1) File, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay reasonable compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), one of the following treatments on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; (2) such other treatment as may be agreed to by such Holder and the applicable Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), or otherwise determined upon an order of the Bankruptcy Court; or (3) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**Classification and Treatment of Classified Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A

Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Pursuant to the terms of the Plan, except for Claims that are (a) expressly exempted from the discharge provisions of the Bankruptcy Code, or (b) specifically identified as being reinstated, all Claims that arose prior to the Confirmation of the Plan will be discharged.

To the extent a Class contains allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.

A.      Majestic Holdco

**1.      Class A-1:  Senior Secured Credit Facility Guarantee Claims against Majestic Holdco**

(a)      <u>Classification</u>.  Class A-1 consists of all Senior Secured Credit Facility Guarantee Claims against Majestic Holdco.

(b)      <u>Impairment and Voting</u>.  Class A-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, (i) in the event no First Lien Alternative Financing is consummated, guarantees substantially similar to the terms of the Senior Secured Credit Facility Guarantee or (ii) in the event the First Lien Alternative Financing is consummated, its Pro Rata share of Cash from the proceeds of the First Lien Alternative Financing.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $63,514,042

(e)      <u>Projected Percentage of Recovery</u>:  100%

**2.      Class A-2:  Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco**

(a)      <u>Classification</u>.  Class A-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco.

(b)      <u>Impairment and Voting</u>.  Class A-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $348,384,885

(e)      <u>Projected Percentage of Recovery</u>:  52%

**3.      Class A-3:  Discount Notes Indenture Claims against Majestic Holdco**

(a)      <u>Classification</u>.  Class A-3 consists of all Discount Notes Indenture Claims against Majestic Holdco.

(b)　<u>Impairment and Voting</u>.　Class A-3 is Impaired by the Plan.　Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)　<u>Distributions</u>.　Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no distribution under the Plan on account of such Claims.

(d)　<u>Estimated Allowed Amount of Claims</u>:　$72,631,322

(e)　<u>Projected Percentage of Recovery</u>:　0%

**4.　Class A-4:  Interests in Majestic Holdco**

(a)　<u>Classification</u>.　Class A-4 consists of all Interests in Majestic Holdco.

(b)　<u>Impairment and Voting</u>.　Class A-4 is Impaired by the Plan.　Each Holder of an Interest in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)　<u>Distributions</u>.　Interests in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

(d)　<u>Estimated Allowed Amount of Interests</u>:　$0

(e)　<u>Projected Percentage of Recovery</u>:　0%

**5.　Class A-5:  Section 510(b) Claims in Majestic Holdco**

(a)　<u>Classification</u>.　Class A-5 consists of all Section 510(b) Claims that may exist against Majestic Holdco.

(b)　<u>Impairment and Voting</u>.　Class A-5 is Impaired by the Plan.　Each Holder of a Section 510(b) Claim in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)　<u>Distributions</u>.　Section 510(b) Claims in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)　<u>Estimated Allowed Amount of Interests</u>:　$0

(e)　<u>Projected Percentage of Recovery</u>:　0%

B.　<u>Majestic Star Holdco</u>

**1.　Class B-1:  Discount Notes Indenture Claims against Majestic Star Holdco**

(a)　<u>Classification</u>.　Class B-1 consists of all Discount Notes Indenture Claims against Majestic Star Holdco.

(b)　<u>Impairment and Voting</u>.　Class B-1 is Impaired by the Plan.　Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Discount Notes Indenture Claims against Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Star Holdco shall receive no distribution under the Plan on account of such Claims.

(d)     Estimated Allowed Amount of Claims:  $72,631,322

(e)     Projected Percentage of Recovery:  0%

**2.     Class B-2:  Intercompany Interests in Majestic Star Holdco**

(a)     Classification.  Class B-2 consists of all Intercompany Interests in Majestic Star Holdco.

(b)     Impairment and Voting.  Class B-2 is Impaired by the Plan.  Each Holder of an Interest in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Intercompany Interests in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Interests:  $0

(e)     Projected Percentage of Recovery:  0%

**3.     Class B-3:  Section 510(b) Claims in Majestic Star Holdco**

(a)     Classification.  Class B-3 consists of all Section 510(b) Claims that may exist against Majestic Star Holdco.

(b)     Impairment and Voting.  Class B-3 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Section 510(b) Claims in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Interests:  $0

(e)     Projected Percentage of Recovery:  0%

C.     Majestic I

**1.     Class C-1:  Senior Secured Credit Facility Claims against Majestic I**

(a)     Classification.  Class C-1 consists of all Senior Secured Credit Facility Claims against Majestic I.

(b)     Impairment and Voting.  Class C-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New

Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

    (d)    <u>Estimated Allowed Amount of Claims</u>:  $63,514,042

    (e)    <u>Projected Percentage of Recovery</u>:  100%

**2.    Class C-2:  Senior Secured Notes Indenture Claims against Majestic I**

    (a)    <u>Classification</u>.  Class C-2 consists of all Senior Secured Notes Indenture Claims against Majestic I.

    (b)    <u>Impairment and Voting</u>.  Class C-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

    (c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

    (d)    <u>Estimated Allowed Amount of Claims</u>:  $348,384,885

    (e)    <u>Projected Percentage of Recovery</u>:  52%

**3.    Class C-3:  Priority Non-Tax Claims against Majestic I**

    (a)    <u>Classification</u>.  Class C-3 consists of all Priority Non-Tax Claims that may exist against Majestic I.

    (b)    <u>Impairment and Voting</u>.  Class C-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

    (c)    <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic I shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

    (d)    <u>Estimated Allowed Amount of Claims</u>:  $0

    (e)    <u>Projected Percentage of Recovery</u>:  100%

**4.    Class C-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I**

    (a)    <u>Classification</u>.  Class C-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I.

    (b)    <u>Impairment and Voting</u>.  Class C-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

    (c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is

reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

> (d)  <u>Estimated Allowed Amount of Claims</u>:  $2,850,000

> (e)  <u>Projected Percentage of Recovery</u>:  100%

**5.  Class C-5:  Senior Notes Indenture Claims against Majestic I**

> (a)  <u>Classification</u>.  Class C-5 consists of all Senior Notes Indenture Claims against Majestic I.

> (b)  <u>Impairment and Voting</u>.  Class C-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

> (c)  <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

> (d)  <u>Estimated Allowed Amount of Claims</u>:  $233,149,526

> (e)  <u>Projected Percentage of Recovery</u>:  25%

**6.  Class C-6:  General Unsecured Claims and Rejection Damages Claims against Majestic I**

> (a)  <u>Classification</u>.  Class C-6 consists of all General Unsecured Claims and Rejection Damages Claims against Majestic I.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

> (b)  <u>Impairment and Voting</u>.  Class C-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I is entitled to vote to accept or reject the Plan.

> (c)  <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against

Majestic I shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I or (ii) Cash in an amount equal to its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

      (d)     <u>Estimated Allowed Amount of Claims</u>: $1,212,309

      (e)     <u>Projected Percentage of Recovery</u>: 25%

**7.     Class C-7:  Intercompany Claims against Majestic I**

      (a)     <u>Classification</u>.  Class C-7 consists of all Intercompany Claims that may exist against Majestic I.

      (b)     <u>Impairment and Voting</u>.  Class C-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic I is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Allowed Intercompany Claims against Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

      (c)     <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic I will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably).

      (d)     <u>Estimated Allowed Amount of Claims</u>: $4,111,192

      (e)     <u>Projected Percentage of Recovery</u>: up to 100%

**8.     Class C-8:  Intercompany Interests in Majestic I**

      (a)     <u>Classification</u>.  Class C-8 consists of all Intercompany Interests in Majestic I.

      (b)     <u>Impairment and Voting</u>.  Class C-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Majestic I is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

      (c)     <u>Distributions</u>.  Intercompany Interests in Majestic I, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic I, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

      (d)     <u>Estimated Allowed Amount of Interests</u>: $91,211,476

      (e)     <u>Projected Percentage of Recovery</u>: up to 100%

**9.     Class C-9:  Section 510(b) Claims in Majestic I**

      (a)     <u>Classification</u>.  Class C-9 consists of all Section 510(b) Claims that may exist against Majestic I.

(b)    Impairment and Voting.  Class C-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions.  Section 510(b) Claims in Majestic I shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)    Estimated Allowed Amount of Interests:  $0

(e)    Projected Percentage of Recovery:  0%

D.    Majestic II

**1.    Class D-1:  Senior Secured Credit Facility Claims against Majestic II**

(a)    Classification.  Class D-1 consists of all Senior Secured Credit Facility Claims against Majestic II.

(b)    Impairment and Voting.  Class D-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d)    Estimated Allowed Amount of Claims:  $63,514,042

(e)    Projected Percentage of Recovery:  100%

**2.    Class D-2:  Senior Secured Notes Indenture Guarantee Claims against Majestic II**

(a)    Classification.  Class D-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic II.

(b)    Impairment and Voting.  Class D-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)    Estimated Allowed Amount of Claims:  $348,384,885

(e)    Projected Percentage of Recovery:  52%

**3.    Class D-3:  Priority Non-Tax Claims against Majestic II**

(a)    Classification.  Class D-3 consists of all Priority Non-Tax Claims that may exist against Majestic II.

(b)        <u>Impairment and Voting</u>.  Class D-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)        <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic II shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)        <u>Estimated Allowed Amount of Claims</u>:  $0

(e)        <u>Projected Percentage of Recovery</u>:  100%

**4.      Class D-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II**

(a)        <u>Classification</u>.  Class D-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II.

(b)        <u>Impairment and Voting</u>.  Class D-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)        <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d)        <u>Estimated Allowed Amount of Claims</u>:  $0

(e)        <u>Projected Percentage of Recovery</u>:  100%

**5.      Class D-5:  Senior Notes Indenture Guarantee Claims against Majestic II**

(a)        <u>Classification</u>.  Class D-5 consists of all Senior Notes Indenture Guarantee Claims against Majestic II.

(b)        <u>Impairment and Voting</u>.  Class D-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d)    <u>Estimated Allowed Amount of Claims</u>:  $233,149,526

(e)    <u>Projected Percentage of Recovery</u>:  25%

**6.    Class D-6:  General Unsecured Claims and Rejection Damages Claims against Majestic II**

(a)    <u>Classification</u>.  Class D-6 consists of all General Unsecured Claims and Rejection Damages Claims against Majestic II.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)    <u>Impairment and Voting</u>.  Class D-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

(d)    <u>Estimated Allowed Amount of Claims</u>:  $197,893

(e)    <u>Projected Percentage of Recovery</u>:  25%

**7.    Class D-7:  Intercompany Claims against Majestic II**

(a)    <u>Classification</u>.  Class D-7 consists of all Intercompany Claims that may exist against Majestic II.

(b)    <u>Impairment and Voting</u>.  Class D-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic II is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)    <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic II will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably).

(d)    <u>Estimated Allowed Amount of Claims</u>:  $118,290,830

(e)    <u>Projected Percentage of Recovery</u>:  up to 100%

8. **Class D-8: Intercompany Interests in Majestic II**

(a) <u>Classification</u>. Class D-8 consists of all Intercompany Interests in Majestic II.

(b) <u>Impairment and Voting</u>. Class D-8 is Impaired by the Plan. Each Holder of an Intercompany Interest in Majestic II is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c) <u>Distributions</u>. Intercompany Interests in Majestic II, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic II, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d) <u>Estimated Allowed Amount of Interests</u>: $0

(e) <u>Projected Percentage of Recovery</u>: up to 100%

9. **Class D-9: Section 510(b) Claims in Majestic II**

(a) <u>Classification</u>. Class D-9 consists of all Section 510(b) Claims that may exist against Majestic II.

(b) <u>Impairment and Voting</u>. Class D-9 is Impaired by the Plan. Each Holder of a Section 510(b) Claim in Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Section 510(b) Claims in Majestic II shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d) <u>Estimated Allowed Amount of Interests</u>: $0

(e) <u>Projected Percentage of Recovery</u>: 0%

E. <u>MSCC</u>

1. **Class E-1: Senior Secured Notes Indenture Claims against MSCC**

(a) <u>Classification</u>. Class E-1 consists of all Senior Secured Notes Indenture Claims against MSCC.

(b) <u>Impairment and Voting</u>. Class E-1 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d) <u>Estimated Allowed Amount of Claims</u>: $348,384,885

(e)     Projected Percentage of Recovery:  52%

**2.     Class E-2:  Intercompany Interests in MSCC**

(a)     Classification.  Class E-2 consists of all Intercompany Interests in MSCC.

(b)     Impairment and Voting.  Class E-2 is Impaired by the Plan.  Each Holder of an Interest in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Intercompany Interests in MSCC shall be cancelled, released, and extinguished and the Holders of such Intercompany Interests shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Claims:  $0

(e)     Projected Percentage of Recovery:  0%

**3.     Class E-3:  Section 510(b) Claims in MSCC**

(a)     Classification.  Class E-3 consists of all Section 510(b) Claims that may exist against MSCC.

(b)     Impairment and Voting.  Class E-3 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Section 510(b) Claims in MSCC shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Claims:  $0

(e)     Projected Percentage of Recovery:  0%

F.     MSCC II

**1.     Class F-1:  Senior Secured Notes Indenture Guarantee Claims against MSCC II**

(a)     Classification.  Class F-1 consists of all Senior Secured Notes Indenture Guarantee Claims against MSCC II.

(b)     Impairment and Voting.  Class F-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)     Estimated Allowed Amount of Claims:  $348,384,885

(e)     Projected Percentage of Recovery:  52%

2. **Class F-2: Senior Notes Indenture Claims against MSCC II**

    (a)     <u>Classification</u>.  Class F-2 consists of all Senior Notes Indenture Claims against MSCC II.

    (b)     <u>Impairment and Voting</u>.  Class F-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II is entitled to vote to accept or reject the Plan.

    (c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

    (d)     <u>Estimated Allowed Amount of Claims</u>:  $233,149,526

    (e)     <u>Projected Percentage of Recovery</u>:  25%

3. **Class F-3: Intercompany Interests in MSCC II**

    (a)     <u>Classification</u>.  Class F-3 consists of all Intercompany Interests in MSCC II.

    (b)     <u>Impairment and Voting</u>.  Class F-3 is Impaired by the Plan.  Each Holder of an Interest in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

    (c)     <u>Distributions</u>.  Intercompany Interests in MSCC II shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

    (d)     <u>Estimated Allowed Amount of Claims</u>:  $0

    (e)     <u>Projected Percentage of Recovery</u>:  0%

4. **Class F-4: Section 510(b) Claims in MSCC II**

    (a)     <u>Classification</u>.  Class F-4 consists of all Section 510(b) Claims that may exist against MSCC II.

    (b)     <u>Impairment and Voting</u>.  Class F-4 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

    (c)     <u>Distributions</u>.  Section 510(b) Claims in MSCC II shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

    (d)     <u>Estimated Allowed Amount of Claims</u>:  $0

    (e)     <u>Projected Percentage of Recovery</u>:  0%

G.     <u>Barden Mississippi</u>

1. **Class G-1: Senior Secured Credit Facility Claims against Barden Mississippi**

    (a)     <u>Classification</u>.  Class G-1 consists of all Senior Secured Credit Facility Claims against Barden Mississippi.

(b) <u>Impairment and Voting</u>.  Class G-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d) <u>Estimated Allowed Amount of Claims</u>:  $63,514,042

(e) <u>Projected Percentage of Recovery</u>:  100%

**2.    Class G-2:  Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi**

(a) <u>Classification</u>.  Class G-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi.

(b) <u>Impairment and Voting</u>.  Class G-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d) <u>Estimated Allowed Amount of Claims</u>:  $348,384,885

(e) <u>Projected Percentage of Recovery</u>:  52%

**3.    Class G-3:  Priority Non-Tax Claims against Barden Mississippi**

(a) <u>Classification</u>.  Class G-3 consists of all Priority Non-Tax Claims that may exist against Barden Mississippi.

(b) <u>Impairment and Voting</u>.  Class G-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d) <u>Estimated Allowed Amount of Claims</u>:  $0

(e) <u>Projected Percentage of Recovery</u>:  100%

**4.    Class G-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi**

(a) <u>Classification</u>.  Class G-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi.

(b)     <u>Impairment and Voting</u>.  Class G-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $0

(e)     <u>Projected Percentage of Recovery</u>:  100%

**5.     Class G-5:  Senior Notes Indenture Guarantee Claims against Barden Mississippi**

(a)     <u>Classification</u>.  Class G-5 consists of all Senior Notes Indenture Guarantee Claims that may exist against Barden Mississippi.

(b)     <u>Impairment and Voting</u>.  Class G-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $ 233,149,526

(e)     <u>Projected Percentage of Recovery</u>:  25%

**6.     Class G-6:   General Unsecured Claims and Rejection Damages Claims against Barden Mississippi**

(a)     <u>Classification</u>.  Class G-6 consists of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Mississippi.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided, however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors'

Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)     _Impairment and Voting_.  Class G-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)     _Distributions_.   Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

(d)     _Estimated Allowed Amount of Claims_:  $605,779

(e)     _Projected Percentage of Recovery_:  25%

### 7.     Class G-7:  Intercompany Claims against Barden Mississippi

(a)     _Classification_.   Class G-7 consists of all Intercompany Claims that may exist against Barden Mississippi.

(b)     _Impairment and Voting_.  Class G-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     _Distributions_.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Mississippi will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

(d)     _Estimated Allowed Amount of Claims_:  $0

(e)     _Projected Percentage of Recovery_:  up to 100%

### 8.     Class G-8:  Intercompany Interests in Barden Mississippi

(a)     _Classification_.  Class G-8 consists of all Intercompany Interests in Barden Mississippi.

(b)     _Impairment and Voting_.   Class G-8 is Impaired by the Plan.   Each Holder of an Intercompany Interest in Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     _Distributions_.   Intercompany Interests in Barden Mississippi, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Mississippi, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d)     _Estimated Allowed Amount of Interests_:  $0

(e)  <u>Projected Percentage of Recovery</u>:  up to 100%

**9.  Class G-9:  Section 510(b) Claims in Barden Mississippi**

(a)  <u>Classification</u>.  Class G-9 consists of all Section 510(b) Claims that may exist against Barden Mississippi.

(b)  <u>Impairment and Voting</u>.  Class G-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)  <u>Distributions</u>.  Section 510(b) Claims in Barden Mississippi shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)  <u>Estimated Allowed Amount of Interests</u>:  $0

(e)  <u>Projected Percentage of Recovery</u>:  0%

H.  <u>Barden Colorado</u>

**1.  Class H-1: Senior Secured Credit Facility Claims against Barden Colorado**

(a)  <u>Classification</u>.  Class H-1 consists of all Senior Secured Credit Facility Claims against Barden Colorado.

(b)  <u>Impairment and Voting</u>.  Class H-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)  <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d)  <u>Estimated Allowed Amount of Claims</u>:  $63,514,042

(e)  <u>Projected Percentage of Recovery</u>:  100%

**2.  Class H-2:  Senior Secured Notes Indenture Guarantee Claims against Barden Colorado**

(a)  <u>Classification</u>.  Class H-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Colorado.

(b)  <u>Impairment and Voting</u>.  Class H-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)  <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)　　__Estimated Allowed Amount of Claims__:  $348,384,885

(e)　　__Projected Percentage of Recovery__:  52%

**3.　　Class H-3:  Priority Non-Tax Claims against Barden Colorado**

(a)　　__Classification__.  Class H-3 consists of all Priority Non-Tax Claims that may exist against Barden Colorado.

(b)　　__Impairment and Voting__.  Class H-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)　　__Distributions__.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)　　__Estimated Allowed Amount of Claims__:  $0

(e)　　__Projected Percentage of Recovery__:  100%

**4.　　Class H-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado**

(a)　　__Classification__.  Class H-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado.

(b)　　__Impairment and Voting__.  Class H-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)　　__Distributions__.  Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d)　　__Estimated Allowed Amount of Claims__:  $54,793

(e)　　__Projected Percentage of Recovery__:  100%

5.      **Class H-5: Senior Notes Indenture Guarantee Claims against Barden Colorado**

(a)      <u>Classification</u>.  Class H-5 consists of all Senior Notes Indenture Guarantee Claims that may exist against Barden Colorado.

(b)      <u>Impairment and Voting</u>.  Class H-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $233,149,526

(e)      <u>Projected Percentage of Recovery</u>:  25%

6.      **Class H-6:   General Unsecured Claims and Rejection Damages Claims against Barden Colorado**

(a)      <u>Classification</u>.   Class H-6 consists of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Colorado.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)      <u>Impairment and Voting</u>.  Class H-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $113,737

(e)      <u>Projected Percentage of Recovery</u>:  25%

7.      **Class H-7: Intercompany Claims against Barden Colorado**

(a)      <u>Classification</u>.  Class H-7 consists of all Intercompany Claims that may exist against Barden Colorado.

(b)      <u>Impairment and Voting</u>.  Class H-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)      <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Colorado will be paid, adjusted, reinstated, or discharged to the extent reasonably determined

to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

    (d)    <u>Estimated Allowed Amount of Claims</u>:  $11,542,962

    (e)    <u>Projected Percentage of Recovery</u>:  up to 100%

**8.**    **Class H-8:  Intercompany Interests in Barden Colorado**

    (a)    <u>Classification</u>.  Class H-8 consists of all Intercompany Interests in Barden Colorado.

    (b)    <u>Impairment and Voting</u>.  Class H-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

    (c)    <u>Distributions</u>.  Intercompany Interests in Barden Colorado, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Colorado, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

    (d)    <u>Estimated Allowed Amount of Interests</u>:  $0

    (e)    <u>Projected Percentage of Recovery</u>:  up to 100%

**9.**    **Class H-9:  Section 510(b) Claims in Barden Colorado**

    (a)    <u>Classification</u>.  Class H-9 consists of all Section 510(b) Claims that may exist against Barden Colorado.

    (b)    <u>Impairment and Voting</u>.  Class H-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

    (c)    <u>Distributions</u>.  Section 510(b) Claims in Barden Colorado shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

    (d)    <u>Estimated Allowed Amount of Interests</u>:  $0

    (e)    <u>Projected Percentage of Recovery</u>:  0%

**Settlements Contemplated Pursuant to the Plan**

<u>Overview</u>

As discussed in this Disclosure Statement, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders.  In light of the complexity and contentiousness of the issues presented by the Chapter 11 Cases, the Debtors engaged with the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, representatives of Holders of the Senior Secured Notes, and the Creditors' Committee in negotiations to reach an agreement resolving certain threshold issues discussed below, among others.  These negotiations included many meetings, the exchange of multiple term sheets or related settlement proposals, and regular correspondence and conference calls among the parties and their advisors.  The Debtors were able to reach a

global settlement on a range of issues with the Senior Secured Notes Trustee and Senior Secured Noteholders holding a substantial majority of the outstanding Senior Secured Notes as well as the Creditors' Committee (the "Settling Parties"). The Debtors, their estates, and the Settling Parties reached an agreement on key threshold items, including the Reorganized Debtors' capital structure at emergence as reflected in the Plan, and compromised numerous other contested issues. The settlements agreed to among the Debtors, their estates, and the Settling Parties include the Gaming License Settlement, the Cash Collateral Settlement, and the Standing Motion Settlement (all as defined below).

The Debtors believe the Plan is in the best interests of all of the Debtors' creditors and provides the Debtors the best opportunity to restructure their debt obligations in a manner that maximizes their ability to compete effectively post-emergence. Absent the support of the Settling Parties for the Plan and the expeditious implementation of the compromises set forth therein, the Debtors believe they would face a longer, costlier, and more uncertain chapter 11 process mired with contentious litigation, which could materially delay the Debtors' emergence from chapter 11 and ultimately reduce distributions to creditors. Accordingly, in the exercise of their business judgment, the Debtors determined the benefits of a compromised resolution of all disputed issues as part of a global settlement, including timely emergence from chapter 11, outweighed the costs of expensive and time-consuming litigation. Further detail regarding the global settlement embodied in the Plan is provided below.

Although this Disclosure Statement addresses the key disputes being compromised as part of the global settlement individually for purposes of providing analysis and detail, it is important to note the Plan represents a global settlement of all disputed issues, each of which is a necessary component of the overall global settlement. Failure by the Court to approve any of the settlements described herein, the treatment of any Class set forth in the Plan, or any other material term of the Plan may result in the Plan not being confirmable.

Governing Law

The Plan constitutes a good faith compromise and settlement of all Claims and controversies resolved therein pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases, and other benefits provided under the Plan.

Compromises and settlements are "a normal part of the process of reorganization."[10] The Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"[11] Bankruptcy Rule 9019(a) provides in pertinent part that on "motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."[12] The Debtors' right to settle Claims in the Plan pursuant to Bankruptcy Rule 9019 extends to causes of action brought by other constituents on behalf of the Debtors' estates.[13]

Under Bankruptcy Rule 9019, a bankruptcy court may approve a compromise or settlement if it is in the best interests of the debtor's estate.[14] When determining whether a compromise is in the best interests of the estate,

---

[10]   *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

[11]   *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).

[12]   Fed. R. Bankr. P. 9019(a).

[13]   *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003) (concluding that the Bankruptcy Code "authorizes the Debtor to propose a settlement of the Creditors Committee's Adversary Proceeding in its plan"); *Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 371 B.R. 660, 669–671 (S.D.N.Y. 2007) ("A debtor-in-possession may assert control over an adversary proceeding notwithstanding a committee's derivative standing, where that standing was granted for reasons other than debtor misconduct.").

[14]   *See TMT Trailer Ferry*, 390 U.S. at 424; *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del 2005) ("Under Rule 9019(a), the bankruptcy court has a duty to make an informed, independent, judgment that the compromise is fair and equitable."); *In re Northwestern Corp.*, No. 03-12872 (KJC), 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("In
(Continued…)

courts in the Third Circuit must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."[15] To strike the proper balance, the Third Circuit has adopted a balancing test, under which a bankruptcy court should consider four factors to determine whether to approve a particular compromise or settlement: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors.[16] Ultimately, a proposed settlement need not be the best result that the debtor could have achieved, but only must fall within the "reasonable range of litigation possibilities."[17]

For the reasons discussed herein and based on an analysis by the Debtors and their advisors of the arguments asserted to date by the secured creditors and the Creditors' Committee, the Debtors believe the global settlement embodied in the Plan is in the best interests of the Debtors' estates and is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. Because of the large number of disputed issues being compromised pursuant to the Plan and the wide range of potential outcomes of each such issue if litigated to conclusion, it is practically impossible for the Debtors to describe in detail all of the possible settlement and litigation scenarios. Pursuant to the global compromise embodied by the Plan, the Debtors are providing recoveries for unsecured Claims of approximately 25%. The foregoing estimate assumes no further diminution in the value of the Debtors' estates as a result of the extensive litigation that would be required to fully adjudicate the disputes and the attendant delay in the Debtors' emergence from bankruptcy; however, the Debtors believe that such diminution in value would be material and increase over time. The Debtors believe the recoveries on unsecured Claims provided by the Plan are in the best interests of all of the Debtors' estates and creditors and are well within the range of reasonableness required under Bankruptcy Rule 9019 and section 112 of the Bankruptcy Code.

<u>Settlement of Claims Relating to Liens on Gaming License Proceeds</u>

As described below, the Debtors, their estates, and the Settling Parties have agreed, as part of the good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code embodied in the Plan, to settle all disputes over the value of the Debtors' Gaming Licenses and the security interests of the Senior Secured Notes Trustee in the proceeds of such Gaming Licenses (the "<u>Gaming License Settlement</u>").

The Security Agreement between the Debtors and the Senior Secured Credit Facility Agent, dated as of October 7, 2003, and the Pledge and Security Agreement between the Debtors and the Senior Secured Notes Trustee, dated as of October 7, 2003 (each, a "<u>Security Agreement</u>," and collectively, the "<u>Security Agreements</u>"), provide that the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee have liens over substantially all the Debtors' assets, including deposit accounts, general intangibles, investment property, and all proceeds of the foregoing. *See* Senior Secured Credit Facility Agent's Security Agreement § 1.1; Trustee's Security Agreement § 2.1. The Security Agreements make clear that Collateral does not include Excluded Assets. *See id.* Excluded Assets include, inter alia, "all Gaming Licenses." Senior Secured Credit Facility Agent's Security Agreement § 1.1; Senior Secured Notes Indenture § 1.1. The definition of Excluded Assets, however, provides that proceeds of the Excluded Assets (including the Gaming Licenses), are expressly included as Collateral. *See* Senior Secured Credit Facility Agent's Security Agreement § 1.1 ("Excluded Assets shall not include (and, accordingly, Collateral shall include) any and all proceeds of any of such assets…."); Senior Secured Notes Indenture § 1.1 ("Excluded Assets does not include the proceeds of [Gaming Licenses]….").

---

exercising [its] discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[15] *Martin*, 91 F.3d at 393; *see also Key3Media Group, Inc.*, 336 B.R. at 93.

[16] *Martin*, 91 F.3d at 393; *see also Nutraquest, Inc.*, 434 F.3d at 645.

[17] *In re Energy Corp.*, 886 F.2d 921, 929 (7th Cir. 1989); *In re Sea Containers Ltd.*, No. 06-11156 (KJC), 2008 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008).

Article 9 of the Uniform Commercial Code (the "UCC"), as adopted in Colorado, Indiana, Mississippi and Delaware (all of the potentially governing jurisdictions), defines "proceeds" as, inter alia, "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected upon, or distributed on account of, collateral; [and] (C) rights arising out of collateral. . . ." UCC. § 9-102(a)(64). The secured creditors contend that they are entitled to the economic value of the Gaming Licenses under a plan of reorganization because of their perfected liens on the proceeds of the Gaming Licenses. This argument is based on a body of case law that has held that while a licensee may be prohibited from granting a lien on a license itself, the licensee may nonetheless grant a lien over the proceeds of such license.[18]

The Creditors' Committee argued that the aforementioned cases are not applicable to the facts of this case because they concern and thus are confined to FCC licenses rather than gaming licenses. In addition, the Creditors' Committee argued that the secured creditors' liens on the proceeds of the Gaming Licenses did not attach as of the Petition Date, and as a result, such liens were terminated by operation of section 552 of the Bankruptcy Code. Section 552(a) of the Bankruptcy Code provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Section 552(b)(1), however, provides an exception to section 552(a)'s general rule where "the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property." *Id*. § 552(b)(1). Thus, section 552 provides that a creditor may have a perfected lien over post-petition proceeds of property only if the creditor had a pre-petition lien over both the property and its proceeds. The Creditors' Committee argued that section 552(b)(1)'s exception does not apply to the proceeds of the Gaming Licenses because the secured creditors did not have Prepetition liens on the Gaming Licenses themselves.[19]

The secured creditors responded to this section 552 argument by pointing to court decisions that have held that license proceeds are "general intangibles" and that liens thereon are perfected immediately upon the filing of a financing statement regardless of when the actual sale or other disposition occurs and regardless of whether there is a lien on the license itself.[20] The Creditors' Committee argued that these decisions are distinguishable in that they relate to FCC licenses.

Even if the Bankruptcy Court were to determine that the secured creditors do not have a perfected security interest in the proceeds of the Gaming Licenses as of the Petition Date, several issues remain as to the value of the Gaming Licenses. The Creditors' Committee argued that because Indiana is a "closed" gaming jurisdiction, i.e., the number of gaming licenses is capped and the number currently issued, rather than an "open" jurisdiction like Mississippi and Colorado, the Indiana Gaming Licenses have substantial value. The Creditors' Committee could point to such facts as the Debtors' original purchase price for the Trump Indiana license to support a high value. On the other hand, the secured creditors argued that the Gaming Licenses have a low value because of, among other things, the low book value of comparable competitors' gaming licenses, the many restrictions on the Gaming Licenses imposed by the IGC, the inability to use the Indiana Gaming Licenses at another site, and the ability of the IGC to suspend, revoke, or not renew the Indiana Gaming Licenses at any time.

Based on the foregoing, the Debtors believe all parties bear material litigation risk regarding the value of the Gaming Licenses and whether the secured creditors are entitled to the value of such licenses under the Plan. The Debtors carefully weighed the relative risks and probabilities of success of the respective arguments set forth above

---

[18]  *See In re Cheskey*, 9 F.C.C.R. 986 (1994).

[19]  *See Craner v. Marine Midland Bank, N.A.*, 110 B.R. 111, 118 (Bankr. N.D.N.Y. 1988) ("surviving security interest does not extend to the post-petition proceeds of property in which the creditor had no security interest pre-petition."); *In re Keneco Fin. Group, Inc.*, 131 B.R. 90, 93–94 (Bankr. N.D. Ill. 1991) ("Section 552(b) provides that post-petition proceeds of collateral will be subject to a creditor's security interest only if the creditor has a valid pre-petition security interest in the underlying collateral.").

[20]  *See In re Ridgley*, 139 B.R. at 379; *Urban Communicators*, 394 B.R. at 335 (even though no lien over the license itself, creditor may obtain a security interest in the proceeds of the sale of an FCC license as a "general intangible" that may be perfected prior to sale of the license).

before agreement to the global settlement embodied in the Plan. The Debtors also considered the substantial delay and cost associated with litigating these contested issues to conclusion. For these reasons, the Debtors believe the Gaming License Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

### Settlement of Claims Relating to Liens on Deposit Accounts and Cash

The global settlement embodied in the Plan also compromises all claims and controversies between the Debtors, their estates, and the Settling Parties concerning the secured creditors' alleged liens on the Debtors' deposit accounts and cash (the "Cash Collateral Settlement"), as described below.

As noted above, the Security Agreements provide that the secured creditors have liens on all Collateral, which includes, among other things, money, investment related property (including deposit accounts), and proceeds of any Collateral. Pursuant to sections 9-312(b)(1) and 913-4(a) of the UCC, as enacted in Indiana, Mississippi, Colorado and Delaware, the secured creditors also have a perfected lien on all of the Debtors' deposit accounts subject to the secured creditors' "control." Pursuant to section 104 of the UCC, "control" over a deposit account is established if (i) the secured party is the bank with which the deposit account is maintained (the depository bank), (ii) the deposit account is subject to a control agreement among the applicable Debtor, the secured party, and the depository bank, or (iii) the secured party becomes the depository bank's customer with respect to the deposit account.[21]

The secured creditors, the Creditors' Committee and the Debtors agree that Majestic's account at Harris Bank (d/b/a Mercantile National Bank of Indiana) (the "Blocked Account"), which had a balance of approximately $153,000 as of the Petition Date (the "Encumbered Cash"),[22] is encumbered by the secured creditors' liens by virtue of such account being subject to a deposit account control agreement.[23]

However, the secured creditors also asserted perfected liens over all or at least a substantial portion of the Debtors' other cash and cash equivalents on the basis that such cash constitutes identifiable proceeds of Collateral, including deposit accounts of the Debtors maintained at Wells Fargo Bank, N.A. or its affiliates. Pursuant to section 9-315 of the governing UCC, proceeds of Collateral (other than Goods) are "identifiable" to the extent they are identified "by a method of tracing, including application of equitable principles, that is permitted under law."[24]

The Creditors' Committee argued that all or substantially all of the Debtors' cash as of the Petition Date was unencumbered because, among other things, (i) the secured creditors did not have "control" or de facto "control" over any of the Wells Fargo deposit accounts, and/or (ii) the Debtors' cash (other than the Encumbered Cash) do not constitute "identifiable proceeds" of Collateral because of an inability to trace or otherwise. The Senior Secured Notes Trustee argued that even if the Court were to rule that certain cash is not subject to the secured creditors' liens, the Unsecured Classes are not entitled to the value of such cash under a plan or otherwise to the extent such cash is found to be restricted for regulatory purposes or otherwise.

Regardless of the outcome of the above issues, the secured creditors also contend they have perfected liens on all Postpetition hotel revenue of the Debtors pursuant to section 552(b)(2) of the Bankruptcy Code.[25] Because the

---

[21]    *See* UCC § 9-104.

[22]    The last four digits of this account number are 6943.

[23]    *See* Account Control Agreement between the Senior Secured Credit Facility Agent, Majestic and Mercantile National Bank of Indiana, dated October 20, 2003.

[24]    UCC § 9-315(b).

[25]    Section 552(b)(2) provides that "if the debtor and an entity entered into a security agreement before the commencement of the case [that] extends to . . . amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels . . . then such security interest extends to such rents and such

(Continued…)

Security Agreements provide for a security interest in hotel room revenue, the secured creditors claim their respective security interests extend to such revenue generated Postpetition. The amount of revenue generated by the Debtors' hotels (including complimentary rooms provided to guests at no charge) from the Petition Date through and including August 31, 2010 was approximately $8.4 million. The Creditors' Committee could argue that section 552(b)(2) does not apply to some or all of such Postpetition hotel revenue.

In addition to the foregoing, the secured creditors also have perfected Postpetition adequate protection liens on the Debtors' cash to the extent of any diminution in value of the Collateral during the pendency of the Chapter 11 Cases. The extent of any such diminution in value, if any, would also be the subject of litigation absent the global settlement embodied in the Plan.

Based on the foregoing, there is material litigation risk associated with how much of the Debtors' cash on hand is subject to perfected liens in favor of the secured creditors.[26] The Cash Collateral Settlement takes into account the relative risks and probabilities of success for these claims. The Debtors also considered the substantial delay and cost associated with litigating these contested issues to conclusion. The Debtors believe the Cash Collateral Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

<u>Settlement of Claims Relating to the Standing Motion</u>

As described below, the Debtors and the Settling Parties have agreed, as part of the good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code embodied in the Plan, to settle all disputes over the claims raised in the Standing Motion (the "<u>Standing Motion Settlement</u>").[27]

In the Standing Motion, the Creditors' Committee argued the security interests of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee in the Debtors' Indiana riverboat casinos are unperfected and should be avoided. To support its assertion that the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee did not properly perfect their security interests in the Indiana casinos prior to the Petition Date, the Creditors' Committee argued, among other things, that the Indiana casino boats are fixtures rather than vessels,[28] and the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee did not effect "fixture filings" covering the Majestic Star Casinos as required by the UCC.

In response to the arguments of the Creditors' Committee, the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed objections to the Standing Motion asserting the Majestic Star Casinos are vessels within the meaning of the Commercial Instruments and Maritime Liens Act, and thus, the ship mortgages filed by the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee validly perfected their security

---

fees, charges, accounts, or other payments acquired by the estate after the commencement of the case . . . ." 11 U.S.C. § 552(b).

[26] Article 9 continues to recognize that a security interest may continue in a deposit account as a "proceeds" security interest and that if there is a perfected lien over the initial collateral, Article 9 expressly authorizes tracing using equitable principles to determine the extent of that security interest as proceeds in a commingled account. UCC § 9-315(b)(2).

[27] Pursuant to the Cash Collateral Order, any other potential lien challenges are barred.

[28] *See* 1 U.S.C. § 3 (defining "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"); *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 494 (2005) (explaining "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement"); *RDI/Caesars Riverboat Casino, Inc. v. Conder*, 896 N.E.2d 1172, 1180 (Ind. Ct. App. 2008) (holding a riverboat casino is not a vessel under federal law where the casino's owner intends to continue to use the riverboat as an indefinitely moored stationary casino). The Creditors' Committee contends the Majestic Star Casinos are not "vessels" under federal law because they are currently moored to the shore, and the Debtors intend to continue to use them as stationary casinos.

interests in the Majestic Star Casinos.[29]  In the alternative, the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee argued they properly perfected their security interests in the Majestic Star Casinos as fixtures by filing UCC-1 financing statements covering the Majestic Star Casinos.[30]

After the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed their objections to the Standing Motion, the Creditors' Committee filed a supplemental memorandum of law in support of the Standing Motion (the "Supplemental Memorandum of Law"), in which it argued for the first time that the Majestic Star Casinos are real property rather than fixtures.[31]  Following the submission of the Supplemental Memorandum of Law, the Senior Secured Credit Facility Agent and the Indenture Trustee filed additional objections to the Standing Motion arguing that these new claims were barred by the Cash Collateral Order and rejecting the notion that the Majestic Star Casinos are real property in any event.[32]

The Debtors have weighed the merits of the respective arguments of the litigants, as well as the benefits of settling the claims raised in the Standing Motion against the costs of litigating such claims to conclusion.  Based on the foregoing, the Debtor and the Settling Parties determined the benefits of the Standing Motion Settlement, including allowing the Debtors to focus their efforts on Confirmation, outweigh proceeding with litigation of the claims raised in the Standing Motion.  Accordingly, the Standing Motion Settlement is well within the range of reasonableness for settlements pursuant to bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

### Management of the Company

Biographical information for Mr. Michael Darley, Mr. Jon Bennett, Ms. Cara Brown, Mr. Larry Buck, Mr. Dan Ihm, and Mr. Chuck Miller is set forth below:

**Michael Darley.**  Michael Darley became the Executive Vice President and Chief Operating Officer of the Company effective as of September 13, 2008, with responsibility for all aspects of the Company's operating activities.  Prior to becoming the Chief Operating Officer of the Company, Mr. Darley served as Senior Vice President and General Manager of Fitzgeralds Casino Hotel in Las Vegas beginning in May 2002.  Mr. Darley has 28 years of gaming experience, including executive level operating positions in the Trump and Harrah's organizations.

---

[29]  *See Stewart*, 543 U.S. at 497 ("Under [1 U.S.C.] § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."); *Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1312 (11th Cir. 2008) (concluding courts should focus on whether a boat has been rendered practically incapable of transportation on water rather than the intent of the shipowner regarding the future use of the boat when determining the status of a vessel).  The Senior Secured Credit Facility Agent and Senior Secured Notes Trustee argue the Majestic Star Casinos are "vessels" under federal law because the casinos are practically capable of engaging in water transportation and could be unmoored and underway in approximately an hour.

[30]  *See* 6 Del. Code § 9-501(a) ("[I]f the local law of this State governs perfection of a security interest . . . the office in which to file a financing statement to perfect the security interest . . . is:  (1) the office designated for the filing or recording of a record of a mortgage on the related real property, if . . . the financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures; **or** (2) the office of the Secretary of State, in all other cases, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.") (emphasis added); Ind. Code § 26-4-9.1-501(a) (same).

[31]  *See* Ind. Code § 6-1.1-1-15(5)(A) (defining "real property" to include riverboats licensed under Indiana Code section 4-33 for property tax purposes).

[32]  *See Indiana Dep't of State Revenue v. Trump Indiana, Inc.*, 814 N.E.2d 1017, 1020 ("[T]he property tax definition of real property is not wholly consistent with the ordinary meaning of the term.  Presumably in recognition of these somewhat artificial definitions designed to effect specific property tax policies, the first section of the chapter of the property tax statute that supplies these definitions, Indiana Code section 6-1.1-1-1, expressly provides that they apply to 'this article', i.e. to property taxes.").

**Jon Bennett.**  Jon Bennett has been the Senior Vice President, Chief Financial Officer, and Treasurer of the Company since October 2002 with overall responsibility for all aspects of the Company's financial management, accounting and reporting processes.  Prior to Mr. Bennett's appointment as Senior Vice President, Chief Financial Officer, and Treasurer, Mr. Bennett was Vice President of Finance and Administration for Fitzgeralds Casino Hotel in Tunica from its acquisition in December 2001 to his promotion in October 2002.

**Cara Brown.**  Cara Brown has been a Director of the Company since 2006.  Ms. Brown joined the Company in December 2001 as its Vice President and General Counsel and served in that capacity until her resignation effective May 31, 2006.  After her resignation, Ms. Brown and the Company entered into a consulting agreement with a six-month term commencing June 1, 2006 and ending November 30, 2006.  Ms. Brown returned as an employee of the Company on June 1, 2008 and currently serves as Senior Vice President and General Counsel.

**Larry Buck.**  Larry Buck is a 26 year veteran of the gaming industry and, in December 2008, was named Senior Vice President and General Manager of Majestic Star Casinos and Hotel in Gary, Indiana.  Prior to joining Majestic Star, Mr. Buck was employed by Pinnacle Entertainment, Inc. and served as President of Pinnacle's planned resort in Atlantic City, New Jersey.  He was also Vice President & General Manager of Pinnacle's Belterra Casino, Resort & Spa in Florence, Indiana from 2004 to 2006.  Prior to Belterra, Mr. Buck was Vice President and General Manager of Hyatt's Grand Victoria Casino Resort in Rising Sun, Indiana from 2000 to 2004.  Prior to arriving in southern Indiana, Mr. Buck was also Senior Vice President and General Manager of Harrah's Reno and Vice President/General Manager of Players Island Casino in Missouri.

**Dan Ihm.**  Dan Ihm brings over 16 years of senior executive, corporate, and property-level management experience to the Company.  His primary areas of expertise are operations and marketing for gaming, resorts, and entertainment.  Prior to joining the Company, Mr. Ihm was the Corporate Director of Marketing for Laguna Development Corporation in Albuquerque, New Mexico.  Mr. Ihm has also served as Senior Director of Marketing for Majestic Star Casino in Gary, Indiana and held the position of Vice President of Marketing for the AAA Four-Diamond Ameristar Casino Hotel in Council Bluffs, Iowa.  Mr. Ihm previously held the position of Senior Vice President of Marketing and Operations for Majestic I before being named Senior Vice President and General Manager for Fitzgeralds Casino Black Hawk in October 2009.

**Chuck Miller.**  Chuck Miller has over 38 years of experience in the gaming industry and was recently named Senior Vice President and General Manager of Fitzgeralds Casino and Hotel in Tunica, Mississippi.  Throughout his career, Mr. Miller has gained hands-on experience in nearly every aspect of casino resort operations while working with some of the best known gaming companies and executives in established and emerging markets throughout the United States.  Prior to joining Fitzgeralds Casino and Hotel in Tunica, Mr. Miller was President/CEO of Pearl River Resort in southern Mississippi.  He has also served as Corporate Vice President of Development for Caesars' Entertainment, President of Tunica Operations at the Grand, Bally's, and Sheraton casinos for Park Place/Caesar's Entertainment, and General Manager of Grand Casino Tunica for Grand Casinos Inc.

<u>Management Consultant</u>

As soon as practicable following approval of the Disclosure Statement, the Debtors shall file a motion, subject to approval by the Bankruptcy Court and applicable regulatory agencies, to retain a Management Consultant that is acceptable to the Debtors, the Creditors' Committee, and the Senior Secured Notes Trustee.  The Management Consultant shall be retained by the Debtors for the duration of the Chapter 11 Cases (unless otherwise determined by the Creditors' Committee and the Senior Secured Notes Trustee, in consultation with the Debtors) and may continue to be retained by the Reorganized Debtors after the Effective Date in the sole discretion of the Board of Managers.

### Composition of Initial Board of Managers

The Board of Managers of Reorganized Majestic Holdco shall be comprised of five managers appointed by the holders of New Membership Interests.  On the Effective Date, the holder of New Membership Interests that, together with its affiliates, owns the largest principal amount of Senior Secured Notes, shall appoint two Managers, and the Creditors' Committee shall appoint two Managers.  The fifth Manager shall be the Chief Executive Officer of Reorganized Majestic Holdco.  The other Reorganized Debtors will be managed by a single managing member to

be designated. Further information on the composition of the Board of Managers is set forth in the term sheet attached to the Plan as Exhibit II and in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

### Reorganized Debtors' Corporate Organizational and Ownership Structure

The following chart shows the Reorganized Debtors' contemplated corporate organizational and ownership structure immediately following the occurrence of the Effective Date:[33]



### The Reorganized Debtors' Business Upon Emergence

Upon emergence, the Reorganized Debtors' business will consist primarily of the ownership and operation of the Debtors' gaming facilities located in Gary, Indiana, Tunica County, Mississippi, and Black Hawk, Colorado, subject to the conditions to the Effective Date in the Plan, subject to Barden Colorado remaining a Debtor because of failure to obtain all governmental licenses, suitability determinations, and other approvals required for such property on or prior to 240 days following the Confirmation Date (as further described in Article XII of the Plan).

The Company currently owns in excess of 266 acres of real property that the Debtors are not currently utilizing as part of the Debtors' core casino business. As part of the restructuring, on the Effective Date, the Debtors may effectuate the Land Transfer Transaction. To the extent the Land Transfer Transaction will occur, its terms will be set forth more fully in the Plan Supplement.

The valuation conclusions contained below are based upon management projections provided to the Debtors' financial advisors as of August 2010 and are highly dependent upon the Reorganized Debtors' ability to meet those projections. Other key assumptions utilized by the Debtors' financial advisors include: (a) emergence of the Debtors from chapter 11 bankruptcy protection on September 30, 2011; and (b) approval of the transfer of the Debtors' gaming licenses to the Reorganized Debtors by the Debtors' gaming regulators in Indiana, Mississippi, and Colorado.

---

[33] The Senior Secured Notes Trustee reserves the right, with the consent of the Debtors (which consent shall not be withheld unreasonably), to create special purpose entities to (i) be co-issuers of the New Senior Secured Notes, and (ii) to hold each Gaming License.

**The Reorganized Debtors' Capitalization Upon Consummation of the Plan**

The following table sets forth the Company's consolidated assets and liabilities (a) on an actual basis as of September 30, 2011 prior to consummation of the Plan and (b) on an as-adjusted basis as of September 30, 2011 to reflect the consummation of the Plan.

This table should be read together with the more detailed information contained elsewhere in this Disclosure Statement, including the section herein entitled "Treatment of Claims Against and Equity Interests in the Debtors," beginning on page 20.

| | As of 9/30/2011 (Pre-Emergence) | | As of 9/30/2011 (Post-Emergence) | |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash & Cash Equivalents | $ | 49.7 | $ | 41.0 |
| Restricted Cash | | 22.5 | | 22.5 |
| Accounts Receivable, net | | 1.9 | | 1.9 |
| Inventories | | 1.0 | | 1.0 |
| Prepaid Expenses | | 3.7 | | 3.7 |
| Total Current Assets | | 78.8 | | 70.1 |
| | | | | |
| Property, Building and Equipment, net | | 226.3 | | 176.0 |
| Intangible Asset, net | | 35.3 | | 76.3 |
| Goodwill | | 4.0 | | - |
| Reorganization Value in Excess of Amounts Allocable to Identifiable Assets | | - | | 20.8 |
| Other Assets | | 2.2 | | 2.6 |
| | | | | |
| **Total Assets** | $ | 346.6 | $ | 345.8 |
| | | | | |
| **Liabilities and Equity** | | | | |
| Current Portion of Long Term Debt | $ | 58.0 | $ | - |
| Accounts Payable | | 1.1 | | 1.1 |
| Accrued Expenses | | 20.4 | | 20.4 |
| Other Accrued Liabilities | | 25.9 | | 33.7 |
| Total Current Liabilities | | 105.4 | | 55.2 |
| | | | | |
| Liabilities Subject to Compromise | | 664.8 | | - |
| New Senior Secured Credit Facility | | - | | 52.0 |
| New Senior Secured Notes | | - | | 100.6 |
| **Total Liabilities** | | 770.2 | | 207.8 |
| | | | | |
| **Equity** | | | | |
| Members' Equity | | (423.6) | | 138.0 |
| **Total Equity** | | (423.6) | | 138.0 |
| | | | | |
| **Total Liabilities and Equity** | $ | 346.6 | $ | 345.8 |

**Capital Structure and Corporate Governance of the Reorganized Debtors**

The material terms of the capital structure and corporate governance of the Reorganized Debtors are set forth in the term sheet attached to the Plan as Exhibit II and in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement. The failure by a holder of New Membership Interests to execute the New Holdco LLC Agreement within one year of the Effective Date shall result in the forfeiture of such holder's allocation of New Membership Interests. After such date, all forfeited New Membership Interests shall revert to Reorganized Majestic Holdco, and the claims of any such holders to New Membership Interests shall be discharged and forever barred.

**New Senior Secured Credit Facility**

The New Senior Secured Credit Facility will be a $58 million senior secured credit facility with a term of three years following the substantial consummation of the Plan, with an interest rate *per annum* equal to (a) the Base Rate plus 3.50% or (b) the LIBOR Rate plus 4.75%, provided by the Senior Secured Credit Facility Agent, which shall be secured by a first lien on all of the assets of the Reorganized Debtors to the extent permitted by law.

The New Senior Secured Credit Facility will be issued pursuant to a new credit agreement, the material terms of which are set forth in the term sheet attached as Exhibit I to the Plan. The new credit agreement shall be in form and substance acceptable to the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee. A copy of either the New Senior Secured Credit Facility or a term sheet setting forth the principal terms thereof shall be attached as Exhibit 3 to the Plan Supplement.

**New Senior Secured Notes**

The New Senior Secured Notes will be senior secured 12.5% notes (or, at the election of the Senior Secured Notes Trustee, amended and restated Senior Secured Notes), dated as of the Effective Date, due on the fifth anniversary of the Effective Date that will be secured by a second lien on all of the assets of the Reorganized Debtors to the extent permitted by law.

The New Senior Secured Notes will be issued pursuant to the New Senior Secured Notes Indenture, which will be an indenture (or at the election of the Senior Secured Notes Trustee, an amended and Restated Senior Secured Notes Indenture), dated as of the Effective Date by and among the Reorganized Debtors, as obligors, and the Senior Secured Notes Trustee, as indenture trustee, which shall be qualified under the Trust Indenture Act pursuant to section 1145(d) of the Bankruptcy Code. A copy of either the New Senior Secured Notes Indenture or a term sheet setting forth the principal terms thereof shall be attached as Exhibit 4 to the Plan Supplement.

**New Intercreditor Agreement**

On the Effective Date, the Senior Secured Credit Facility Agent, on behalf of the Senior Secured Credit Facility Lenders, and the Senior Secured Notes Trustee, on behalf of the Senior Secured Noteholders, shall execute the New Intercreditor Agreement in form and substance acceptable to both the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee. A copy of either the New Intercreditor Agreement or a term sheet setting forth the principal terms thereof shall be attached as Exhibit 2 to the Plan Supplement. In the event the First Lien Alternative Financing or the Second Lien Alternative Financing is consummated, neither the Senior Secured Credit Facility Agent nor the Senior Secured Notes Trustee shall have any obligation to enter into the New Intercreditor Agreement, and the provider of any alternative financing may execute an intercreditor agreement with the Senior Secured Credit Facility Agent or the Senior Secured Notes Trustee, as applicable.

**Exit Financing**

The Creditors' Committee or the Senior Secured Notes Trustee, with the cooperation of the Debtors' management team and advisors, may conduct an exit financing process to identify First Lien Alternative Financing to replace the New Senior Secured Credit Facility.

Moreover, the Creditors' Committee, with the cooperation of the Debtors' management team and advisors, may conduct an exit financing process to identify Second Lien Alternative Financing to replace the New Senior Secured Notes. If the Creditors' Committee delivers to the Debtors and the Senior Secured Notes Trustee a Qualified Commitment Letter with respect to the Second Lien Alternative Financing on or prior to sixty (60) calendar days before the Projected Effective Date, closing of such Second Lien Alternative Financing shall be a condition precedent to the Effective Date, which condition cannot be waived without the consent of the Creditors' Committee; provided, however, that if such Second Lien Alternative Financing fails to close within fourteen (14) calendar days after the Projected Effective Date, then this condition to the Effective Date shall be deemed automatically waived by all parties.

A "Qualified Commitment Letter" means a signed commitment letter from one or more third parties unaffiliated with Senior Noteholders (unless consented to by the Senior Secured Notes Trustee) to provide, on a fully committed basis, the Second Lien Alternative Financing which meets the following criteria: (a) provides for financing on materially better terms regarding the interest rate, maturity, amortization, and all other associated costs and expenses than the New Senior Secured Notes; (b) taken as a whole, has restrictive covenants at least as favorable to the Reorganized Debtors as the New Senior Secured Notes; (c) contains closing conditions customary for a transaction of this type, including without limitation, (i) closing conditions similar to those contained in the New Senior Secured Notes Indenture and (ii) the negotiation, execution, and delivery of definitive documentation, provided, however, a Qualified Commitment Letter shall not contain diligence or syndication conditions; (d) provides for a closing no later than the Projected Effective Date; (e) with respect to any terms and conditions that are less favorable to the Senior Secured Credit Facility Agent and/or materially different than the terms of the Senior Secured Notes, such terms and conditions shall be reasonably acceptable to the Senior Secured Credit Facility Agent; and (f) shall be subject to an intercreditor and subordination agreement which is substantially similar to the Intercreditor Agreement.

## Capital Obligations to be Satisfied or Compromised Upon Emergence

As of the date the Debtors filed the Chapter 11 Cases, the Debtors reported, on a consolidated basis, approximately $654.2 million in aggregate funded debt, primarily consisting of the Senior Secured Credit Facility, Senior Secured Notes, Senior Notes, and Discount Notes. The Debtors plan to satisfy this indebtedness, as described in greater detail below.

### Senior Secured Credit Facility

On October 7, 2003, Majestic I, Barden Mississippi, and Barden Colorado entered into the Loan and Security Agreement with certain financial institutions party thereto as lenders and the Senior Secured Credit Facility Agent, as arranger and administrative agent for such lenders.[34] The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matured on April 15, 2010. As of August 31, 2010, the Debtors owed approximately $65.3 million under the Senior Secured Credit Facility in principal and accrued unpaid interest. Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Senior Secured Credit Facility Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%. In each case the rate is determined based on the Debtors' trailing twelve month EBITDA (defined as earnings before interest, taxes, depreciation and amortization). The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default. As noted above, the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Senior Secured Credit Facility Agent at the default rate on a current basis.

### Senior Secured Notes

The Senior Secured Notes are $300 million in principal amount of obligations issued by Majestic I and MSCC, a non-operating, wholly-owned subsidiary of Majestic I that has no assets. The Senior Secured Notes are governed by the Senior Secured Notes Indenture. The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes matured on October 15, 2010. As of August 31, 2010, the Debtors owed approximately $348.4 million on account of the Senior Secured Notes in principal and accrued unpaid interest.

---

[34] The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and to modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

<u>Senior Notes</u>

The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic I and MSCC II, a non-operating, wholly owned subsidiary of Majestic that has no assets. The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi. The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debenture Trust Company as successor trustee. The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005. The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year. The notes mature on January 15, 2011. As of August 31, 2010, the Debtors owed approximately $233.1 million on account of the Senior Notes in principal and accrued unpaid interest.

<u>Discount Notes</u>

The Discount Notes are $63.5 million principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Holdco that has no assets. The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic or any of its subsidiaries. The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee. The Discount Notes accrue interest at 12½% per annum, with payments due on April 15 and October 15 of each year. Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011. As of August 31, 2010, the Debtors owed approximately $72.6 million on account of the Discount Notes.

<u>Trade Claims and Other Unsecured Obligations</u>

In addition to its funded debt, prior to the date the Debtors filed the Chapter 11 Cases, the Company incurred debt with several creditors in the ordinary course of its business. The Claims related to these obligations are more fully described in the Plan.

**Description of New Membership Interests**

The material terms of the New Membership Interests are set forth in the term sheet attached to the Plan as Exhibit II and shall be incorporated into the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

<u>Information Rights Relating to New Membership Interests</u>

Reorganized Majestic Holdco will provide or make available the following reports and information to the holders of New Membership Interests:

(i)     As soon as available but in any event within one hundred twenty (120) days after the end of the fiscal year, audited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous fiscal year, all in reasonable detail, together with a copy of the audit report of Reorganized Majestic Holdco's independent public accountants and a summary "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of Reorganized Majestic Holdco and its consolidated subsidiaries.

(ii)    As soon as available but in any event within forty-five (45) days after the end of each fiscal quarter, unaudited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), all in reasonable detail, together with a summary "Management's Discussion and Analysis of Financial Condition

and Results of Operations" that describes the financial condition and results of operations of Reorganized Majestic Holdco and its consolidated subsidiaries.

(iii)     In addition, as soon as available but in any event within forty-five (45) days after the end of each month, Reorganized Majestic Holdco shall provide to all holders of New Membership Interests unaudited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), all in reasonable detail, for Reorganized Majestic Holdco and its consolidated subsidiaries.

(iv)     All current reports that would be required to be filed with the SEC on Form 8-K if Reorganized Majestic Holdco were required to file such reports, in each case, within the time periods required for filing such forms and reports as specified in the SEC's rules and regulations.

The holders of New Membership Interests may furnish copies of the foregoing reports and information to any prospective transferee that enters into a confidentiality agreement reasonably acceptable to Reorganized Majestic Holdco.

Submission of Reports.

Reorganized Majestic Holdco will make such information and such reports available to the extent required by the terms hereof, which access may be provided by posting such information and reports on IntraLinks or a comparable password protected online data system, which will require a confidentiality acknowledgement, and will make such information and reports readily available to any prospective transferee of the New Membership Interests who (x) agrees to treat such information as confidential, and (y) accesses such information on IntraLinks or such comparable password protected online data system, which will require a confidentiality acknowledgement.

**Limitations on Liability and Indemnification of Managers and Officers of The Reorganized Debtors**

The Delaware Limited Liability Company Act ("DLLCA") authorizes companies to limit or eliminate the personal liability of managers to limited liability companies and their members for monetary damages for breaches of managers' fiduciary duties. The Reorganized Debtors' Amended and Restated Operating Agreements shall provide that the Managers shall have the same fiduciary duties to the Reorganized Debtors and their members as the directors of a Delaware corporation, other than as expressly set forth in the term sheet attached as Exhibit II to the Plan. No Manager or member of the Reorganized Debtors shall have a duty to the Reorganized Debtors or their members to offer the Reorganized Debtors any business opportunity suitable for the Reorganized Debtors that may arise from time to time, which may also be suitable for the Manager, member, or any of their affiliates, nor shall any Manager or member be liable to the Reorganized Debtors or their members for offering any such business opportunity to another person. In addition, the Reorganized Debtors' Amended and Restated Operating Agreements may provide that the Reorganized Debtors must indemnify their Managers and officers to the fullest extent permitted by the DLLCA. The Reorganized Debtors' Amended and Restated Operating Agreements may include a provision that eliminates the personal liability of Managers to the Reorganized Debtors or their members for monetary damages for any breach of fiduciary duty as a manager, except to the extent such exemption from liability or limitation thereof is not permitted under the DLLCA as the same exists or hereafter may be amended.

The limitation of liability and indemnification provisions in the Reorganized Debtors' Amended and Restated Operating Agreements may discourage members from bringing a lawsuit against Managers for breach of their fiduciary duties. These provisions may also have the effect of reducing the likelihood of derivative litigation against Managers and officers, even though such an action, if successful, might otherwise benefit the Debtors or the Reorganized Debtors and their stockholders and members. In addition, the Reorganized Debtors may be adversely affected to the extent they are obligated to pay the costs of settlement and damage awards against Managers and officers pursuant to these indemnification provisions.

## Summary of Gaming Regulations

The ownership and operation of the Debtors' gaming facilities are subject to various state and local laws and regulations in the jurisdictions where they are located. The following is a summary of the provisions of the gaming laws and regulations applicable to the Debtors' operations. The summary does not purport to be a full description thereof and is qualified in its entirety by reference to such laws and regulations.

Consummation of the Plan will require prior approval of gaming authorities. Furthermore, certain persons and/or entities who will be associated with the Reorganized Debtors will be subject to a costly and time-consuming investigatory, licensing, and approval process prior to the Effective Date, and upon their licensing, such persons will be subject to the same or substantially similar gaming laws and regulations as the Debtors and their associates currently face.

Additionally, while the statutory and regulatory requirements discussed herein will apply to the Reorganized Debtors, no assurances can be provided as to the specific form of any statute or regulation that any jurisdiction may adopt or license conditions that any jurisdiction may impose in the licensing process for the restructuring, the Reorganized Debtors, or any persons associated with the Reorganized Debtors.

This summary is provided only as background information for creditors to make an informed voting decision on the Plan. All parties in interest, including creditors who may be subject to the investigatory and licensing processes described herein, are strongly urged to retain their own gaming law counsel for each jurisdiction where the Debtors currently have operations to seek advice concerning their particular circumstances and the investigatory and licensing process. It should be noted in this regard that gaming laws and regulations are often complex and have been interpreted to impose obligations that might not be apparent from an initial reading thereof. Failure to comply with applicable gaming laws and regulations will result in forfeiture of New Membership Interests under Section IX.F of the Plan and/or applicable law. Senior Noteholders with questions or who would like additional guidance on obtaining the required approvals may contact counsel to the Creditors' Committee; Senior Secured Noteholders may contact counsel to the Senior Secured Notes Trustee.

## Background on Indiana Gaming Regulations

The acquisition, ownership, and operation of casinos in Indiana are subject to regulation by the State of Indiana primarily through the IGC. Other state agencies with limited oversight include the Indiana Alcohol and Tobacco Commission and the Indiana Department of Revenue.

The Indiana Riverboat Gambling Act (the "Indiana Act") and administrative rules promulgated thereunder (the "Indiana Rules") give the IGC extensive powers and duties in connection with regulation of casino gaming operations and enforcement of the Indiana Act and Indiana Rules. The jurisdiction of the IGC extends to all facilities, persons, associations, and practices related to casino gaming operations.

The Indiana Act specifies that it is designed to benefit Indiana citizens by promoting tourism and assisting economic development. The Indiana Act further specifies that the public's confidence can be maintained only (i) through comprehensive law enforcement supervision of gambling activities and (ii) strict regulation of facilities, persons, associations, and practices related to casino gaming operations.

The Indiana Act and Indiana Rules cover all facets of gaming operations, including, but not limited to:

- requiring a thorough background investigation to ensure unsuitable persons do not have a direct or indirect ownership interest in a riverboat casino;

- the establishment and maintenance of accounting and internal control procedures that are designed to ensure:

    o the riverboat's assets are safeguarded;

o  the riverboat's financial records are accurate and reliable;

o  the riverboat's transactions are performed in accordance with the Indiana Act and Indiana Rules;

o  the riverboat's transactions are recorded to properly account for adjusted gross receipts, admission fees, and all applicable taxes;

o  assets are maintained in accordance with generally accepted accounting principles;

o  only authorized personnel have access to assets;

o  recorded assets are compared to actual assets at reasonable intervals and appropriate action is taken if discrepancies are discovered;

o  there is appropriate segregation of functions, duties, and responsibilities;

o  all functions, duties, and responsibilities are carried out only in accordance with sound practices and by qualified competent personnel;

o  riverboat employees are not in a position to conceal errors or irregularities; and

o  gambling is conducted with integrity and only in accordance with the Indiana Act and Indiana Rules.

The Indiana Act authorizes the issuance of up to 10 riverboat licenses, one operating agent license, and two licenses to conduct gambling games at pari-mutuel racetracks. Five riverboats licenses have been issued to riverboat facilities in counties contiguous to Lake Michigan. Specifically, four of these riverboats are located in Gary (the Debtors' two casinos), East Chicago, and Hammond in Lake County, and one is located in Michigan City in LaPorte County. Five additional riverboats are located in counties contiguous to the Ohio River in the southern portion of Indiana. Specifically, these five riverboats are located in Evansville (Vanderburgh County), Harrison County, Switzerland County, Rising Sun (Ohio County), and Lawrenceburg (Dearborn County). The operating agent licensee conducts gaming at a facility in French Lick, which is also in the southern portion of Indiana. Pursuant to other Indiana statutes, the two pari-mutuel racetracks have licenses to operate up to 2,000 slot machines at their facilities in Anderson and Shelbyville, which are in central Indiana.

An applicant for an Indiana gaming license must submit a comprehensive application and undergo a thorough background investigation. Additionally, any person who will, directly or indirectly, own 5% or more of a licensee must automatically submit a personal disclosure form and undergo an exhaustive background investigation. However, the IGC may investigate any person with any level of ownership interest. If a licensee is a publicly traded company, its articles of incorporation must contain language concerning transfer of ownership, suitability determinations, and possible divesture of ownership if a shareholder is deemed unsuitable by the IGC. If the IGC determines a person that holds an ownership interest in a licensee is unsuitable, the licensee: (i) may not pay a dividend to the person; (ii) may not pay any remuneration to the person; and (iii) shall not allow the person to vote on any matter. The licensee is responsible for all costs associated with the background investigation.

The Indiana Rules allow a company that qualifies as an institutional investor to exceed the 5% ownership interest threshold before requiring a background investigation. A company qualifies as an institutional investor if it (i) acquires an interest in a licensee in the ordinary course of its investment business and (ii) holds the interest for investment purposes only and not to cause, directly or indirectly, the election of a majority of the licensee's board of directors or any change in the corporate charter, bylaws, management, policies, or operation of the licensee.

An institutional investor must notify the IGC of its acquisition of 5% or more of the voting securities of a licensee within 10 business days of acquiring such securities. An institutional investor may acquire up to a 15% ownership interest in a licensee without being required to undergo a background investigation. The institutional

investor must, within 45 days, complete a form to verify it qualifies as an institutional investor as defined in the Indiana Rules. The IGC reserves the right to require any company claiming institutional investor status to undergo a background investigation if the IGC deems such an investigation necessary.

Additionally, all key persons of a licensee must undergo a thorough investigation and be licensed. A key person is defined as an officer, director, executive, employee, trustee, substantial owner, independent contractor, or agent that has the power to exercise, alone or in conjunction with others, management or operating authority over the licensee or affiliates thereof.

A riverboat owner's license and operating contract entitle a licensee or operating agent to operate one riverboat. The Indiana Act allows a person to hold up to one hundred percent of up to two individual riverboat owner's licenses. The Indiana Act imposes a $2 million transfer fee on any licensee that acquires a controlling interest in a second owner's license.

An initial license runs for a period of five years. Thereafter, a license is subject to renewal on an annual basis upon a determination by the IGC that the licensee continues to be eligible to hold a license pursuant to the Indiana Act and Indiana Rules. Each licensee must undergo a complete reinvestigation every three years, and the IGC reserves the right to investigate a licensee at any time it deems necessary.

The licenses are transferrable only in accordance with the Indiana Act and Indiana Rules, and any proposed transfer requires approval by the IGC. The Indiana Act specifies a license is a revocable privilege granted by the state and not a property right. A license may not be leased, hypothecated, or serve as security for any debt obligation. The IGC may suspend or revoke the license of a licensee or impose civil penalties, in some cases without notice or hearing, for any act in violation of the Act or for any other fraudulent act.

Pursuant to legislation enacted in 2009, licensees must execute and submit a POA and identify a person to temporarily operate the licensee's casino and related facilities (a "POA Trustee") if certain events occur, and the IGC adopts a resolution authorizing the POA Trustee to temporarily conduct the licensee's gaming operations. Specifically, the IGC may adopt a resolution authorizing the POA Trustee to temporarily operate the licensee's facility if one of the following occurs: (i) the IGC revokes the licensee's license; (ii) the IGC does not renew the licensee's license; (iii) a proposed transferee of the licensee's license is not approved, and the licensee is unwilling to retain ownership of the riverboat; or (iv) the licensee agrees, in writing, to relinquish control to a POA Trustee approved by the IGC. If the IGC adopts a resolution authorizing a POA Trustee to temporarily operate the casino, the licensee will have 180 days from the date the resolution is adopted to sell the riverboat to a person approved by the IGC. If the riverboat is not sold within 180 days, the POA Trustee may sell the riverboat to a person approved by the IGC.

The Indiana Rules impose restrictions on a licensee's incurrence of debt. A licensee and its affiliates may enter into debt transactions that total $1.0 million or more only with the prior approval of the IGC. Such approval is subject to compliance with requisite procedures and a showing that each person with whom the licensee and its affiliates enters into a debt transaction would be suitable for licensure under the Act. Unless waived, approval of debt transactions requires consideration by the IGC at two business meetings. The IGC, by resolution, has authorized its executive director, subject to subsequent ratification by the IGC, to approve debt transactions after a review of relevant documents and consultation with the chair of the IGC and the IGC's outside financial analyst.

All of the foregoing regulations are subject to amendment and interpretation by the IGC. Changes in the laws, regulations, and procedures described above could adversely affect the gaming operations of the Debtors and Reorganized Debtors.

The Indiana Act and the Indiana Rules are available for review at http://www.in.gov/legislative/ic/code and http://www.in.gov/legislative/iac.

**Background on Mississippi Gaming Regulations**

The acquisition, ownership, and operation of casino gaming facilities and gaming devices in Mississippi are subject to the Mississippi Gaming Control Act (the "Mississippi Act") and regulations promulgated thereunder as well as various local regulations. Specifically, the Debtors' Mississippi gaming operations are subject to the licensing and regulatory control of the Mississippi Gaming Commission ("MGC").

The Mississippi Act and the regulations and supervisory procedures of the MGC are based upon declarations of public policy concerning, among other things:

- the prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity;

- the establishment and maintenance of responsible accounting practices and procedures;

- the maintenance of effective controls over the financial practices of casino licensees, including the establishment of minimum procedures for internal fiscal affairs and the safeguarding of assets and revenues, providing reliable recordkeeping, and requiring the filing of periodic reports with the MGC;

- the prevention of cheating and fraudulent practices;

- providing a source of state and local revenues through taxation and licensing fees; and

- ensuring that gaming licensees, to the extent practicable, employ Mississippi residents.

Under the Mississippi Act, any person who seeks to own or operate a gaming establishment or gaming devices, or hold a direct or indirect voting ownership interest of greater than 5% therein, must be found suitable by, or obtain a gaming license from, the MGC prior to the consummation of such transaction. If such person is an entity, certain of its managers, directors, officers, key employees, and owners must also demonstrate their suitability to be affiliated with the gaming license applicant. The burden of proving suitability is on the applicant, and the applicant must pay the costs of the investigation, which can be extremely expensive and time-consuming.

Entities that engage in gaming operations generally hold the actual gaming licenses. Natural persons or entities materially associated or affiliated with such entities (such as managers, directors, or owners) must be found suitable. Also, the private or publicly-traded parent company of a gaming licensee and any intermediary holding companies must be registered with, or found suitable by, the MGC. Registration and suitability determinations are similar to licensing and involve the submission of a detailed application that allows the MGC to thoroughly investigate the applicant. An application for a determination of suitability requires the submission of detailed personal and financial information followed by a thorough investigation. Registration is similar, and upon approval, specific functional restrictions apply to the registered entity, including restrictions on any intermediary holding companies, licensed subsidiaries, and in some cases, associated shareholders.

In the licensing context, Mississippi makes little distinction between private companies and publicly-traded companies. Private operating subsidiaries of both private and publicly-traded companies must hold a gaming operator license to operate casino and gaming devices. Each privately-held or publicly-traded holding or parent company of a gaming licensee, which directly or indirectly owns, controls, or holds the power to vote greater than 5% of any class of voting equity securities in the licensee, must undergo an investigation, register with, and/or be found suitable by the MGC.

Each manager, director, officer, and investor holding voting equity in such holding company may also be subject to a personal finding of suitability by the MGC. Although the Mississippi Act mandates findings of suitability for those corporate and individual investors holding more than 10% of any class of voting equity, it has long been the practice of the MGC to require approvals of any persons or entities holding a direct or indirect voting equity interest of greater than 5% in any gaming licensee. Such voting equity ownership threshold is increased to

greater than 10% in the case of institutional investors. In contrast, holders of non-voting equity in the parent company of a gaming licensee, or in any intermediary holding company, are not ordinarily subject to the mandatory finding of suitability; provided, however, that the MGC has the authority to subject any equity holder, whether such equity is voting or non-voting, to a finding of suitability.

Gaming licenses granted by the MGC are not transferable, are issued for a term not exceeding three years, and must be renewed periodically thereafter.

Any acquisition of a licensed gaming entity, including the takeover of its operating assets by a successor entity, will require similar review, approval, and licensing by the MGC. This process can be extremely lengthy, costly, onerous, and intrusive. The placing of an investigatory item on an agenda for final approval is solely in the discretion of the MGC and will not take place until the applicant has submitted all items requested by the MGC. As a general rule, the licensing process will not begin until all applications relating to a specific transaction have been submitted to the MGC.

The MGC may deny an application for any cause that it deems reasonable. Changes in licensed positions must be reported to the MGC. In addition to its authority to deny an application, the MGC can disapprove a change in a corporate position.

Furthermore, if the MGC were to find a manager, officer, director, key employee, equity holder, lender, or landlord unsuitable for licensing or unsuitable to continue having a relationship with the Debtors or the Reorganized Debtors, the Debtors or the Reorganized Debtors would have to sever all relationships with such person to retain their licenses or approvals. In addition, the MGC may require any licensed company to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or of questions pertaining to licensing are not subject to judicial review in Mississippi.

Under certain circumstances, an institutional investor who acquires more than 10% but not more than 15% of a licensed company's voting securities may apply to the MGC for a waiver of a finding of suitability if that institutional investor holds the voting securities for investment purposes only.

An institutional investor will not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held by the institutional investor in the ordinary course of its business and not for the purpose of causing, directly or indirectly, the election of a majority of the members of a licensed company's board of directors or managers, any change in the charter, bylaws, operating agreement, management, policies, or operations of a licensed company or any of its gaming affiliates, or any other action which the MGC finds to be inconsistent with holding such voting securities for investment purposes.

Activities which are deemed consistent with holding voting securities for investment purposes include:

- voting on all matters voted on by stockholders;

- making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and

- such other activities as the MGC may determine to be consistent with such investment intent.

If the beneficial owner of voting securities that must be found suitable is a corporation, partnership, or trust, it must submit detailed business and financial information to the MGC. Applicants are required to pay all costs of the investigation.

Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the MGC or after otherwise being required to do so, may be found unsuitable. The same requirements apply to a record owner of voting securities of a registered company if the record owner, after request, fails to identify the beneficial owner of such equity. Any equity holder who is found unsuitable and who holds,

directly or indirectly, any beneficial ownership of voting securities of a licensed or registered company beyond the period of time proscribed by the MGC may be guilty of a misdemeanor. A licensee may become subject to disciplinary action, if, after receipt of notice that a person is unsuitable to be a stockholder or to have any other relationship with the licensee, the licensee:

- pays the unsuitable person any dividend or other distribution on such person's voting securities;

- recognizes the exercise, directly or indirectly, of any voting right conferred by securities held by that person;

- pays the unsuitable person any remuneration in any form for services rendered or otherwise, except in certain limited and specific circumstances; or

- fails to pursue all lawful efforts to require the unsuitable person to divest himself or herself of the securities, including, if necessary, the immediate purchase of the securities for cash at fair market value.

A gaming licensee may be required to disclose to the MGC the identities of all holders of its debt securities. The MGC may, in its sole discretion, require the holder of any debt security of a registered company or licensee to file applications, be investigated, and be found suitable to own the debt security of a registered company or licensee.

If the MGC determines that a person is unsuitable to own a debt security, then the licensee and/or its registered holding company can be sanctioned, which may include the loss of its approvals, if without the prior approval of the MGC, it:

- pays to the unsuitable person any dividend, interest, or any distribution whatsoever;

- recognizes any voting right by the unsuitable person in connection with the debt securities;

- pays the unsuitable person remuneration in any form; or

- makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation, or a similar transaction.

License fees and taxes, computed in various ways depending on the type of gaming activity involved, are payable to the State of Mississippi and to the counties and cities in which the Mississippi licensee's operations are conducted. The MGC also assesses fees and expenses on gaming licensees. Any taxes levied by the MGC or Mississippi taxing authorities that are not paid by Debtors, as well as unpaid gaming winnings, could be assessed against the Reorganized Debtors.

Any person who is or is required to be licensed, found suitable, or registered or is under common control with any such person, and who is or proposes to become involved in a gaming venture outside of Mississippi or in any internet gaming venture in any jurisdiction, must obtain approval or a waiver of such approval from the MGC prior to engaging in any such gaming venture outside of Mississippi; provided, however, that such a waiver is automatically granted under the MGC's regulations in connection with foreign gaming activities (except for internet gaming activities) conducted (i) within the 50 states or any territory of the United States, (ii) on board any cruise ship embarking from a port located therein, and (iii) in any other jurisdiction in which a casino operator's license or its equivalent is not required to legally conduct gaming operations. The MGC may require, among other things, that it be granted access to information concerning the out-of-state gaming operations of the licensee and its affiliates.

The MGC may limit, condition, suspend, or revoke a license, finding of suitability, registration, or other approval, subject to compliance with certain statutory and regulatory procedures if it is determined that Mississippi gaming laws or regulations were violated. The MGC may also levy substantial fines against the licensee and the individuals involved in violating any gaming laws or regulations.

Changes in laws, regulations, and procedures described above could adversely affect the gaming operations of the Debtors and the Reorganized Debtors.

Mississippi gaming laws and regulations are available for review at the website of the MGC http://www.mgc.state.ms.us.

## Background on Colorado Gaming Regulations

The Colorado Limited Gaming Act of 1991 (as amended, the "Colorado Act"), authorizes limited gaming only in certain designated commercial districts of Central City, Black Hawk, and Cripple Creek, Colorado. Limited gaming consists of the games of poker, blackjack, craps, roulette, and slot machines, all with maximum single bets of $100. Only persons aged 21 or older may participate in limited gaming, and limited gaming may be offered by licensed casinos twenty-four hours per day, seven days per week. Limited gaming is allowed only on premises licensed for that purpose, and the gaming-licensed premises of any building may not exceed 35% of the square footage of the building or 50% of any floor of such building. There is no limitation on the size of any structure or total square footage devoted to limited gaming. Additionally, the gaming-licensed premises of any casino must be physically located within the designated commercial districts of one of the three above-referenced cities. Limited gaming is regulated by the Colorado Limited Gaming Control Commission (the "CLGC") and the Colorado Division of Gaming in the Colorado Department of Revenue (the "CDG").

The public policy of Colorado as stated in the Colorado Act is:

- the success of limited gaming depends upon public confidence and trust that licensed limited gaming is conducted honestly and competitively, that the rights of the creditors of licensees are protected, and that gaming is free from criminal and corruptive elements;

- public confidence and trust can be maintained only by strict regulation of all persons, locations, practices, associations, and activities related to the operation of licensed gaming establishments, and the manufacture or distribution of gaming devices and equipment;

- all establishments where limited gaming is conducted and where gambling devices are operated and all manufacturers, sellers, and distributors of certain gambling devices and equipment must therefore be licensed, controlled, and assisted to protect the public health, safety, good order, and the general welfare of the inhabitants of the state to foster the stability and success of limited gaming and to preserve the economy and policies of free competition of the state of Colorado; and

- no applicant for a license or other affirmative CLGC approval has any right to a license or to the granting of the approval sought. Any license or other CLGC approval granted pursuant to the provisions of the Act is a revocable privilege, and no holder acquires any vested right therein or thereunder.

Pursuant to the Colorado Act and the rules and regulations promulgated thereunder (the "Colorado Gaming Regulations"), the ownership and operation of limited gaming facilities in Colorado, however acquired, are subject to extensive regulation by the CLGC and CDG. The gaming operations of licensed casino operators are also subject to the respective requirements of the three locations where limited gaming is permitted: Central City, Black Hawk, and Cripple Creek. These jurisdictions require each gaming establishment to obtain the appropriate business license, liquor license, and other licenses and permits. Licensed outlets for limited gaming are also subject to fees and taxes established by local authorities, including fees for the possession of gaming devices used in limited gaming. The three gaming jurisdictions charge annual gaming device fees on each gaming device used in limited gaming ranging from $750 in Black Hawk to $1265 in Central City.

The CLGC may issue the following gaming licenses: (1) slot machine manufacturer or distributor; (2) operator; (3) retail gaming; (4) support; and (5) key employee. These licenses require renewal every two years and are not transferable. Support and key employee licenses may also be issued and renewed by the director of the

CDG on behalf of the CLGC. The CLGC has broad discretion to condition, suspend for up to six months, revoke, limit, or restrict a license at any time and also has the authority to impose fines. Disciplinary actions against a licensee's license may be brought for any violations of the Colorado Act or the Colorado Gaming Regulations or for any reason for which a license could be denied. If violations have occurred, the fines imposed by the CLGC can range up to $25,000 per violation for retail gaming (casino) licensees. A fine and license suspension or revocation may be imposed concurrently for each violation of the Colorado Act or the Colorado Gaming Regulations by a licensee.

A retail gaming (casino) license is required for all persons conducting limited gaming on their premises. In addition, an operator license is required for all persons who engage in the business of placing and operating slot machines on the premises of a retailer, or who provide goods or services in return for fees calculated upon a percentage of limited gaming revenue. However, a retailer is not required to hold an operator license. No person may have an ownership interest in more than three retail licenses.

The Colorado Act requires that an applicant for a gaming license or for approval of its acquisition of a direct or indirect interest in a gaming licensee, must demonstrate, to the CLGC's satisfaction, that such applicant is of good moral character and is suitable for participation in the gaming industry. Accordingly, the CLGC requires that every such applicant—except those individuals seeking a support license or approval as a limited owner (under 5%) of a privately-held company—undergo a full suitability investigation. Support licensees and limited owners of privately-held companies typically are subject to less comprehensive background investigations than the other categories of applicants. Notwithstanding the generally less comprehensive nature of background investigations for support licensees and limited owners of privately held companies, the CLGC and/or the CDG may, at their discretion, require a complete a full suitability investigation if they determine such an investigation is necessary.

In the case of a corporation or an entity that is a license applicant or an applicant for CLGC approval to acquire an interest in a licensee, certain distinctions are made between privately-held corporations and entities and publicly-traded corporations and entities. With respect to private companies, no person may acquire any interest in a private company that holds a gaming license without the prior approval of the CLGC. Such approval will be granted only after the person seeking to acquire the interest has undergone a full suitability investigation. With respect to public companies holding gaming licenses, acquisition of an interest in such companies does not require prior CLGC approval. It may, however, require a post-acquisition suitability investigation.

Additionally, the suitability investigation of a private company differs from the investigation that is required for a public company. The suitability investigation of a private company includes an investigation of the company itself and separate suitability investigations of every officer, director, and stockholder holding an interest of 5% or more in the company. Stockholders holding an interest of less than 5% in a private company are required to submit "limited ownership" disclosure forms and are not customarily required to undergo a full suitability investigation—although the CLGC has the authority to require a suitability investigation of anyone associated with a company under review.

In the case of a public company, a suitability investigation includes an investigation of the company itself and separate suitability investigations of all officers, directors, and certain holders of the company's stock, as set forth below. Rule 4.5 of the Colorado Gaming Regulations ("Rule 4.5") applies to applicants and licensed entities that are publicly-traded, as defined therein, or which are owned 5% or more directly or indirectly by publicly-traded entities. Persons or entities owning less than 5% of a publicly-traded gaming licensee, or of the publicly-traded parent company of a gaming licensee, do not have to report their ownership interests, or apply for a suitability investigation, unless requested to do so by the CLGC or CDG. If such a request is made, the person or entity so requested to apply or report must do so or risk being found unsuitable for involvement or participation in Colorado gaming.

Persons or entities (including institutional investors as defined in Rule 4.5) who directly or indirectly beneficially own 5% or more (but less than 10%) of an interest in a gaming licensee, through their beneficial ownership of any class of such licensee's voting securities, must report their interest to the CDG within 10 days of their acquisition of such interest and may be required to provide additional information and undergo a suitability investigation. The CDG may, and often does, require findings of suitability for persons or entities directly or

indirectly beneficially owning 5% or more of an interest in a gaming licensee, other than certain institutional investors discussed below.

A finding of suitability as an "associated person" automatically will be required of all persons or entities (other than certain institutional investors discussed below) that directly or indirectly beneficially own an interest of 10% or more in a gaming licensee. Such persons and entities (including institutional investors) must notify the CDG within ten days of their acquisition of such an interest. In addition, such persons and entities (other than certain institutional investors discussed below) must file appropriate applications within 45 days of their acquisition of such an interest.

Rule 4.5 defines an institutional investor to include certain classes of banks, insurance companies, investment companies, investment advisors, collective trust funds, employee benefit plans, pension funds, and groups composed of persons otherwise individually qualifying pursuant to the definition in the rule. If institutional investors provide specified information to the CDG within 45 days of the acquisition of a direct or indirect interest in a gaming licensee (under the current practice of Colorado gaming regulators, such disclosure is required for the acquisition of an interest of 5% or more in a gaming licensee) and hold such interest for investment purposes only, the CLGC, in its discretion, may permit such institutional investors to own an interest of up to 15% in a gaming licensee without undergoing a full suitability investigation.

Notwithstanding the foregoing, the CLGC may require any person having or acquiring an interest, however limited or indirect, in a license or a licensee to undergo a full suitability investigation and pay the cost of the investigation in the same manner as an applicant.

Where there is a distinction between the record owner and the beneficial owner of stock or other interests in a licensee or applicant, the CDG will review the circumstances to determine, in its discretion, whether either or both must apply for a finding of suitability.

Any application for a license or for a finding of suitability can be denied by the CLGC, in its discretion, based upon any of the following criteria: (1) failure of the applicant to prove by clear and convincing evidence that the applicant is qualified for licensure and that the applicant is of good moral character; (2) failure of the applicant to provide appropriate information, documentation, or assurances to the CLGC; (3) failure of the applicant to reveal material facts in connection with a suitability or other investigation of the applicant; (4) conviction of the applicant of certain serious criminal acts, including illegal gambling; (5) pending prosecution for certain enumerated criminal acts; (6) the identification of the applicant as a member of a career-offender cartel; (7) refusal of the applicant to cooperate with governmental investigative agencies; or (8) the identification of the applicant as an illegal professional gambler.

In addition, all persons loaning monies, goods, or real or personal property directly or indirectly to a licensee or applicant, or having any interest in a licensee or applicant, or entering into any agreement with a licensee or applicant, must provide any information requested by CLGC. At the discretion of the CLGC, these persons may be required to supply all information relevant to a suitability determination and submit to a full suitability investigation. The failure of such a person to promptly provide all information requested and submit to a suitability or background investigation could result in a finding of unsuitability, the denial of a license application, suspension or revocation of an existing license, termination of any lease, note arrangement, or agreement between the applicant or licensee and the person from whom such information is sought, or the imposition of other sanctions.

Persons found unsuitable by the CLGC may be required immediately to terminate any interest in, association or agreement with, or relationship to a licensee—regardless of any negative financial consequences to such persons. Specifically, no licensee shall, with respect to any person associated with the licensee and found unsuitable by the CLGC: (1) pay to that person any interest or dividends; (2) permit the exercise of any voting rights by such person; (3) pay any remuneration for services rendered by that person or otherwise; or (4) fail to pursue all lawful efforts to require such person to relinquish all voting securities, including the immediate purchase of such securities by the licensee. A finding of unsuitability with respect to any officer, director, employee, associate, lender, or beneficial owner of a licensee or applicant may also jeopardize the licensee's license or applicant's license application. Licenses may be conditioned upon termination of any relationship with unsuitable persons.

Although authorized pursuant to the Act, as a long-standing matter of policy and practice, the CLGC does not issue temporary licenses, and persons required to be licensed are not permitted to perform activities requiring a license prior to the issuance of the license.

The Colorado Act does not require any approvals for Colorado licensees to engage in foreign gaming activities. However, a Colorado licensee or parent or subsidiary of a licensee in Colorado must promptly report to the CLGC all gaming applications and licenses submitted or obtained in jurisdictions outside Colorado. Upon the request of the CLGC or the CDG, licensees must provide all requested information about such foreign gaming operations. Violations of the gaming or other requirements of foreign jurisdictions could result in a finding of unsuitability in Colorado.

Additional information concerning the Colorado Gaming Regulations is available on the website of the CDG at www.colorado.gov/revenue/gaming.

## Status of The Debtors Under Gaming Regulations

### Indiana

The Debtors are licensed to operate the Majestic Star Casinos in Gary, Indiana. As such, the Debtors must comply with the Indiana Act and Indiana Rules and periodically submit detailed financial, operating, and other reports to the IGC and furnish any other information that the IGC may require. The Debtors currently hold all licenses and permits necessary to operate the Majestic Star Casinos. On September 16, 2010, the IGC concluded the complete reinvestigation of Majestic I and Majestic II required every three years by the Indiana Act and renewed the licenses of Majestic I and Majestic II for one year from June 3, 2010.

If it were determined that the Debtors violated the Indiana Act or Indiana Rules, their licenses could be limited, conditioned, suspended, or revoked. Such violations could expose the Majestic Star Casinos and any person involved in any violation to a substantial fine.

Additionally, as explained above, the IGC could adopt a resolution authorizing a POA Trustee to temporarily operate one or both of the Majestic Star Casinos if (i) the IGC revoked one or both of the Debtors' Indiana licenses; (ii) the IGC did not renew one or both of the licenses; (iii) a proposed transferee of one or both of the Debtors' licenses were denied a license and the Debtors were unwilling to retain ownership of the Majestic Star Casinos; or (iv) Majestic I or Majestic II agreed, in writing, to relinquish control to a POA Trustee approved by the IGC. The POA and POA Trustee for both Majestic I and Majestic II were approved by the IGC on March 4, 2010. To date, the IGC has not exercised any of its rights under the POA.

### Mississippi

Majestic I and Majestic Holdco are registered with the MGC as "publicly traded corporations" with direct and indirect interests in Barden Mississippi, the owner and operator of Fitzgeralds Tunica. Majestic Holdco has been found suitable by the MGC to own the equity securities of its subsidiary intermediary gaming company, Majestic I. Likewise, Majestic I has been found suitable by the MGC to own the equity securities of its gaming operating subsidiary, Barden Mississippi. Barden Mississippi, which owns and operates Fitzgeralds Tunica, is licensed as a casino operator under the Mississippi Act.

Majestic I and Majestic Holdco, as registered holding companies, and Barden Mississippi, as a gaming licensee, must comply with the Mississippi Act and the MGC's regulations and policies promulgated pursuant thereto, periodically submit detailed financial, operating, and other reports to the MGC, and furnish any other information that the MGC may require, including but not limited to information regarding material loans, leases, sales of securities, and similar financing transactions.

If it were determined that Majestic Holdco, Majestic I, or Barden Mississippi violated the Mississippi Act or the MGC's regulations, the licenses and registrations granted to such entities by the MGC could be limited,

conditioned, suspended, or revoked. In addition, Majestic Holdco, Majestic I, and Barden Mississippi, and the persons involved therewith could be subject to substantial fines.

The MGC has renewed Barden Mississippi's license through December 6, 2013.

<u>Colorado</u>

Barden Colorado is licensed in Colorado as a retail gaming licensee and operator licensee. It is wholly-owned directly by Majestic I. Majestic I is considered a publicly-traded entity under Rule 4.5 of the Colorado Gaming Regulations by the CDG. Accordingly, to the extent Majestic I continues to be considered a publicly traded entity, Rule 4.5 will apply to any acquisition of an interest in Barden Colorado through the acquisition of an interest in Majestic I.

Barden Colorado and its owners, officers, and directors have the necessary approvals from the CLGC to engage in their current gaming activities in Colorado. Barden Colorado must periodically submit detailed information about its ownership and activities to the CLGC. This includes information concerning loans, leases, and other commercial activities. Any violation of the laws in Colorado or elsewhere by Barden Colorado or any of its affiliate may jeopardize the licenses held by Barden Colorado and may subject Barden Colorado to the imposition of fines, the cancellation of contracts, and other sanctions.

The CLGC has renewed Barden Colorado's operator and retail gaming licenses for the operation of the Fitzgeralds Casino in Black Hawk, Colorado through October 18, 2012.

**Potential Gaming Regulatory Approvals May Be Necessary For the Restructured Company**

In the event that the Debtors are successful in obtaining Confirmation of the Plan, implementation of the Plan may require the approval of state gaming regulators, as described above. Such necessary prior approvals could include approvals for issuances of equity in the Reorganized Debtors to new investors in the Reorganized Debtors, and related mandatory findings of suitability for certain equity holders as well as approval of the credit facilities notes and certain security for such credit facilities and notes of the Reorganized Debtors.

<b>Summary of Legal Proceedings</b>

The Debtors are party to certain legal proceedings. Most of these legal proceedings have arisen in the ordinary course of the Debtors' business and involve claims for money damages. Whether these claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the claims and the debt arising therefrom. Generally, if the debt underlying such claims was incurred by one of the Debtors prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the claim is liquidated and resolved before or after the Effective Date. Claims arising from conduct occurring after the Effective Date, unless provided for under the Plan, generally are not dischargeable through bankruptcy, and will be handled by the Reorganized Debtors in the ordinary course of its business after emergence.

**Legal Proceedings in the Bankruptcy Court**

<u>Avoidance Actions</u>

A number of transactions occurred prior to the Petition Date that may have given rise to claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "<u>Avoidance Actions</u>").

Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on November 22, 2011, *i.e.,* two years after the Petition Date. To date, the Debtors have not made

a determination whether they have any Avoidance Actions to prosecute. For more information, see the section herein entitled "Effect of Confirmation of the Plan," which begins on page 79.

### Majestic II Tax Action(s)

On December 31, 2010, the Debtors commenced an adversary proceeding in the Bankruptcy Court against BDI, Don H. Barden, the United States of America on behalf of the Internal Revenue Service, and the Indiana Department of Revenue to restore the QSub status of Majestic II, to recover tax payments Majestic II was forced to make as a result of the unauthorized and improper disposition of estate property, to avoid any tax-related liabilities Majestic II would not owe but for the revocation of Majestic II's QSub status, and to recover the monetary damages suffered by Majestic II. A pretrial conference has been scheduled for February 17, 2011. For more information, see the section herein entitled "Majestic II Tax Action(s)," which begins on page 18.

## Pending Legal Proceedings Outside the Bankruptcy Court

Based on a review of their pending litigations and proceedings, the Debtors are involved in the following material legal proceedings. The Debtors are vigorously defending themselves in each of these matters. Many of the proceedings set forth below are stayed under the automatic stay provisions of section 362 of the Bankruptcy Code. Claims arising from the proceedings set forth below will be treated in accordance with the Plan.

Due to the nature of the Debtors' business, they are frequently subject to various personal injury and property damage claims and suits brought by customers. With respect to each of these claims, the Debtors' maximum monetary exposure is their $250,000 insurance deductible for personal injury claims and a $100,000 deductible for property damage claims. In addition, approximately 15% of the Debtors' workforce in Gary, Indiana is subject to certain collective bargaining agreements, relatively minor labor grievances and arbitrations are frequently filed by employees. At present, the majority of these proceedings involve monetary exposure of less than $25,000, with a total approximate exposure of $40,000. However, the Debtors are confident that they will prevail in most proceedings.

### The Majestic Star Casino, LLC, et al v. Trustmark, Inc., Case No. 07C 2474, United States District Court for the Northern District of Illinois

Majestic I, Barden Mississippi, and Barden Colorado (the "Insurance Litigation Plaintiffs") filed suit against their previous stop-loss health insurance provider ("Insurance Provider") and the Insurance Provider's managing general underwriter seeking declaratory relief and damages for unpaid claims totaling approximately $0.7 million, punitive damages and attorneys' fees. The Insurance Provider has denied that payment on the claims is owing and filed a counter-claim seeking rescission and damages totaling $0.1 million plus prejudgment interest or, in the alternative, unspecified damages believed to total $0.3 million for its alleged losses under the contracts. The parties have completed the discovery phase of the litigation and filed cross-motions for partial summary judgment. The Insurance Litigation Plaintiffs' motion for summary judgment on certain of the Insurance Provider's counterclaims was granted. The Insurance Provider's partial motion for summary judgment was granted in part with respect to certain claims related to specified exclusions and with respect to the Insurance Litigation Plaintiffs' breach of fiduciary duty claim. All but one count of the Insurance Litigation Plaintiffs' amended complaint remain to be tried against both defendants. The parties have engaged in informal settlement discussions. Should settlement negotiations not be successful, it is anticipated that trial will begin in the fall or winter of 2010. The Insurance Litigation Plaintiffs believe they are entitled to a significant recovery on their claims, which include both contract and tort claims, and believe the Insurance Provider's counter-claim is without merit; however, the Insurance Litigation Plaintiffs cannot determine with certainty the outcome of the litigation or the likelihood or the amount of any recovery. On December 9, 2009, the Debtors filed a Notice of Bankruptcy and Motion for Stay in the insurance litigation, which was granted pending further order of the Bankruptcy Court. The parties to the Insurance Litigation are engaged in settlement discussions.

### The Majestic Star Casino, LLC v. Benefit Administration Systems, LLC, Case No. 51 293 515 09, American Arbitration Association

During the course of the Insurance Litigation, Majestic I learned of various errors and omissions by its former third-party administrator ("TPA") which administered Majestic I's health plans between October 2003 and December 2005. Majestic I believes some of these errors led to the denial of some of the stop loss insurance claims at issue in the insurance litigation described above. On April 20, 2009, Majestic I commenced an arbitration proceeding against the TPA before the American Arbitration Association. Majestic I asserts breach of contract and breach of fiduciary duty claims against the TPA and is seeking recovery of approximately $0.7 million, plus attorneys' fees and costs. Contractual damages received from the TPA, if any, are likely to offset contractual damages received from the Insurance Provider and its managing general underwriter, if any, in the insurance litigation, and vice versa. Should Majestic I not prevail in the arbitration, the TPA could recover its attorney's fees and costs from Majestic I. Discovery in the arbitration has concluded and prehearing briefs have been submitted by both parties. The parties' informal settlement discussions have not been successful to date. The arbitration is currently scheduled to begin in December 2010. Majestic I cannot determine with certainty the outcome of the arbitration or the amount of any recovery.

The Majestic Star Casino, LLC v. Indiana Department of State Revenue,
Case No. 71T10-0207-TA-84, Indiana Tax Court

Majestic I has been assessed $2.6 million of withholding tax, plus interest, for the fiscal year 1996 and the period January 1, 1998 through June 18, 2001, by the Indiana Department of Revenue ("IDR"). On September 7, 2004, the IDR assessed BDI, Majestic I's ultimate parent and member, $1.3 million of income tax, plus penalties and interest for the remainder of 2001 and all of fiscal year 2002. The IDR held a hearing on the 1996 through 2002 tax years on April 7, 2006 to consider Majestic I's and BDI's protests over the tax assessments and negligence penalties. The IDR issued rulings on January 17, 2007. In those rulings, the IDR sustained BDI's protest of the imposition of a negligence penalty, holding that BDI's failure to pay the assessed tax amount was due to reasonable cause and not due to negligence. The IDR also concurred with the position taken by Majestic I and BDI that to the extent it is ultimately determined they had net operating losses for a taxable year, those net operating losses are to be applied to offset any add-back of riverboat wagering tax for income tax purposes. The IDR denied Majestic I's protest that nonresident withholding taxes did not apply for the fiscal year 1996 and the period January 1, 1998 through 2002. Majestic I and BDI filed petitions with the Indiana Tax Court on March 19, 2007 appealing the IDR's rulings for the 1996-2002 tax years.

BDI's nonresident shareholder has been assessed $0.2 million, plus penalties and interest, for 2003. That assessment was protested by BDI's nonresident shareholder to the legal division of the IDR. The IDR held a hearing on the 2003 protest on December 5, 2006, and issued its ruling on March 14, 2007. In that ruling, the IDR sustained the shareholder's protest of the imposition of a negligence penalty. The IDR denied the protest of the amount of tax assessed. An appeal of that ruling was filed with the Indiana Tax Court on May 14, 2007.

The assessments relate to deductions for gaming taxes paid by Majestic I, which deductions were taken for Indiana income tax purposes. The IDR has taken the position that Majestic I had an obligation to add back state gaming taxes in determining Majestic I's taxable income, and to withhold and remit tax for the nonresident shareholder of BDI. On April 19, 2004, the Indiana Tax Court ruled in a similar case involving another Indiana casino, Aztar Indiana Gaming Corporation ("Aztar"), that the gross wagering tax is a tax based on or measured by income and that it must be added back to the taxable income base for the purpose of determining adjusted gross income for Indiana tax purposes. On September 28, 2004, the Indiana Supreme Court denied Aztar's request to review the Indiana Tax Court's decision, and thus, the Indiana Tax Court's opinion in the Aztar case is controlling precedent on the wagering tax add-back issue. Majestic I and BDI continue to pursue their protest with the IDR on the grounds that the assessments contain calculation errors and that their protest sets forth issues not decided in the Aztar case. No liability has been accrued in Majestic I's financial statements relating to this matter.

Should Majestic I ultimately be found liable for additional income taxes to the State of Indiana, such liabilities will be treated in accordance with the Plan.

Majestic I and Majestic II Property Tax Assessment Appeals

Majestic I and Majestic II are the owners of certain parcels of real property located in Gary, Lake County, Indiana. These parcels of real property include, *inter alia*, two riverboat casinos, a hotel, and a parking deck.

Beginning with the 2006 tax assessment year, Majestic I and Majestic II have disputed and appealed the value of certain of these properties assessed by the Tax Assessor for Lake County, Indiana ("Lake County"). Specifically, for assessment year 2006, Majestic I and Majestic II disputed and appealed Lake County's assessments on the two riverboat casinos. For assessment year 2007, Majestic I and Majestic II disputed and appealed the assessed values of the two riverboat casinos and eight other parcels. For assessment years 2008 and 2009, Majestic I and Majestic II disputed and appealed the assessed values of the two riverboat casinos and twelve other parcels.

When a taxpayer appeals an assessment, Indiana law requires the appealing taxpayer to pay taxes based on the assessed property value at the assessment level of the last year that the taxpayer did not appeal the assessment value until the appeal is resolved. Majestic I and Majestic II have been generally paying each year's taxes on the properties in question based on either the 2005 or 2006 assessments, depending on when the respective assessment was first appealed, in accordance with Indiana law.

On November 8, 2010, Lake County filed a motion pursuant to section 505 of the Bankruptcy Code (the "505 Motion") [Docket No. 719] requesting that the Bankruptcy Court enter an order upholding Lake County's assessment value for the parcels of real property in question and deeming Lake County's claims in the amount of approximately $25 million allowed in full (collectively, the "Lake County Claims"). To the extent the 505 Motion is granted and Lake County's assessments are upheld prior to confirmation of the Plan, Lake County believes the Lake County Claims should be treated as Allowed Secured Claims that are unimpaired under the Plan. To the extent the 505 Motion is not fully adjudicated prior to confirmation of the Plan, Lake County believes the Lake County Claims should be treated as Disputed Claims under the Plan, and the Debtors should be required to place into the Disputed Claims Reserve on or before the Effective Date Cash in the amount of the Lake County Claims and maintain such reserve until the Lake County Claims are no longer Disputed Claims.

The Debtors dispute Lake County's valuation of the Lake County Claims and intend to oppose the merits of the 505 Motion in the Bankruptcy Court. In addition, the Debtors believe the Lake County Claims are Claims which, notwithstanding their asserted status as Secured Claims, would otherwise meet the description of an Unsecured Claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code. Pursuant to section 1129(a)(9)(D) of the Bankruptcy Code, Allowed secured claims which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of the claim, are entitled to receive on account of such claim, cash payments, in the same manner and over the same period, as unsecured priority tax claims of a kind specified under section 507(a)(8) of the Bankruptcy Code. As a result, the Debtors believe that if the Lake County Claims are Allowed, they should be classified and treated as Allowed Priority Tax Claims pursuant to the Plan. Because the Debtors do not believe the Lake County Claims are required to be paid in full in Cash on the Effective Date to the extent they are Allowed, the Debtors do not believe they are required to place Cash into the Disputed Claims Reserve on or before the Effective Date on account of the Lake County Claims.

The Majestic Star Casino, LLC, Majestic Star Casino II, Inc., and Gary New Century, LLC v. City of Gary, Case No. 52489 Y 00091 08, American Arbitration Association; and

The Majestic Star Casino, LLC, Majestic Star Casino II, Inc., f/k/a/ Trump Indiana, Inc., and Gary New Century, LLC v. City of Gary and Indiana Gaming Commission, Case No. 49D13 08 02 PL 006612

As discussed above, Gary entered into the Local Development Agreements with Trump Indiana and Majestic I in 1996 and the Amended Local Development Agreement with Majestic I and Majestic II in 2005. The current mayor of the Gary, who took office on April 7, 2006, claims that the Amended Local Development Agreement, signed by the prior mayor on behalf of Gary, is not enforceable because the prior mayor lacked the authority to bind Gary. Majestic I and Majestic II have taken the position that the Amended Local Development Agreement is valid and binding.

Given that both of the original Local Development Agreements contain mandatory arbitration provisions, on February 11, 2008, Majestic I and Majestic II commenced the Gary Arbitration before the American Arbitration Association. In the Gary Arbitration, Majestic I and Majestic II request that the Amended Local Development Agreement be declared to be in full force and effect, and that Gary be found to be in material breach of it and that Majestic I and Majestic II be awarded damages. In the event that the Amended Local Development Agreement is

deemed not enforceable, Majestic I and Majestic II alternatively request that Gary be found in breach of the original Local Development Agreements, and that the Majestic I and Majestic II be awarded damages.

Simultaneously with the Gary Arbitration, Majestic I and Majestic II also filed the Marion County Lawsuit in Marion County Superior Court. In the Marion County Lawsuit, Majestic I and Majestic II seek to bind the IGC to the results of the Gary Arbitration and to litigate any matters that are not covered by the parties' arbitration agreement.

Majestic I and Majestic II filed the Gary Arbitration and the Marion County Lawsuit because Gary has failed, pursuant to its obligations under either the Amended Local Development Agreement or, in the alternative, the earlier Local Development Agreements, to conduct environmental remediation of certain property owned by the Company, and to construct the required access roads and freeway interchange to the Majestic Star Casinos. If the Amended Local Development Agreement is found not to be enforceable, then Majestic II could be required to pay Gary an additional 1% of adjusted gross gaming receipts, retroactive to December 21, 2005, which would be due under the previously terminated Local Development Agreement with Trump Indiana. As of September 30, 2010, the additional 1% potentially due to Gary from Majestic II would equal approximately $5.2 million.

Effective for the tax period beginning January 2008, Majestic I and Majestic II began depositing the economic incentive funds payable to Gary for 2008 under the Amended Local Development Agreement into a segregated bank account. On May 2, 2008, the Marion County Superior Court denied Gary's motion for a preliminary injunction to compel Majestic I and Majestic II to resume payment to Gary of the economic incentive funds pending resolution of the case.

Gary appealed the denial of its injunction motion to the Indiana Court of Appeals (No. 49A02-0807-CV-00625), filing its appellate brief on July 30, 2008. After a stay to permit the parties to explore settlement, which expired November 30, 2008, as discussed more fully below, Majestic I and Majestic II timely filed their appellate brief with the Indiana Court of Appeals on January 20, 2009, as did the IGC (which supports the position of Majestic I and Majestic II on the proper trial court venue for the action, and has remained neutral on Gary's attempt to require Majestic I and Majestic II to resume payments of the economic incentive funds). On May 14, 2009, the Indiana Court of Appeals issued a decision affirming the trial court's denial of Gary's motion for a preliminary injunction seeking to compel Majestic I and Majestic II to resume payment to Gary during the pendency of the Marion County Lawsuit. Gary's petition for review of this decision was denied by the Indiana Supreme Court on August 20, 2009.

As of September 30, 2010, the balances in the segregated economic incentive fund and lakefront capital improvement fund bank accounts were $12.1 million and $1.2 million, respectively. It is too early to determine with certainty the outcome of the Gary Arbitration or Marion County Lawsuit or the amount or likelihood of any recovery from Gary. Both proceedings have been stayed pending further order of the Bankruptcy Court. Gary, Majestic I, and Majestic II are currently engaged in settlement discussions.

City of Gary, Indiana v. Don H. Barden, et al, Case No. 2:10-CV-00160-PPS-PRC, United States District Court, Northern District of Indiana, Hammond Division

On March 11, 2010, Gary filed the Lake County Lawsuit in the Superior Court of Lake County, Indiana against the Lake County Defendants (eight current and former individual officers, directors, and employees of Majestic I and Majestic II and their affiliated entities). The Lake County Lawsuit alleges two causes of action against the Lake County Defendants for negligence and civil conversion related to and arising out of the segregated economic incentive funds which are the subject of the Marion County Lawsuit. Gary claims to have suffered damages based on those causes of action. Majestic I and Majestic II believe that continuation of the Lake County Lawsuit against the Lake County Defendants threatens to undermine the protection of the automatic stay, to deplete property of the estate, and to disrupt the Debtors' reorganization efforts. Accordingly, on March 29, 2010 the Debtors instituted an adversary proceeding against Gary (10-50841) in the Bankruptcy Court and filed a motion to obtain an order, pursuant to 11 U.S.C. § 362, extending the automatic stay to the Lake County Defendants with respect to the Lake County Lawsuit, or in the alternative, an order preliminarily enjoining Gary from prosecuting the Lake County Lawsuit against the Lake County Defendants. Gary filed pleadings and papers in opposition to the Debtors motion, and the Debtors timely filed their reply. A hearing on the matter was held before the Bankruptcy

Court on April 27, 2010, and on April 28, 2010, the Bankruptcy Court entered a memorandum order granting the Debtors' request for the extension of the automatic stay to the Lake County Defendants pending further order of the Bankruptcy Court. On or about May 12, 2010, Gary filed a notice of appeal in the Bankruptcy Court to appeal the memorandum order to the United States District Court for the District of Delaware. The Bankruptcy Court set the pre-trial conference on the Debtors' Verified Complaint to Extend the Automatic Stay, or in the Alternative, for Injunctive Relief ("Adversarial Complaint") for May 25, 2010. The parties, by agreement, extended the deadline for Gary to respond to the Adversarial Complaint to January 21, 2011 and the pre-trial conference date to February 17, 2011.

On April 15, 2010, a Joint Notice of Removal was filed with the United States District Court for the Northern District of Indiana, Hammond Division, removing the Lake County Lawsuit from the Superior Court of Lake County, Indiana to the United States District Court for the Northern District of Indiana, Hammond Division. On or about April 19, 2010, Gary dismissed its negligence claim against the Lake County Defendants. Gary and the Company are currently engaged in settlement discussions.

### Projected Financial Information

Attached as Exhibit C are the following: (a) a consolidated projected income statement for the period from 2010 through 2015 (the "Projection Period"); (b) a consolidated projected balance sheet for the Projection Period; and (c) a consolidated projected statement of cash flow for the Projection Period.

The projections have been prepared by the Debtors' management with the assistance of the Debtors' retained financial advisors. Such projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants and the rules and regulations of the United States Securities and Exchange Commission. In assisting in the preparation, XRoads relied upon the accuracy and completeness of financial and other information furnished by the Debtors' management and third parties, as well as publicly-available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by the Debtors and third parties with respect to the anticipated future performance of the Reorganized Debtors. XRoads did not attempt to audit or verify such information independently. Neither the Debtors nor their financial advisors conducted an independent investigation into any of the legal, tax, or accounting matters affecting the Debtors or the Reorganized Debtors, and, therefore, neither makes any representation as to their impact on the Debtors or the Reorganized Debtors from a financial point of view. Further, the Debtors' independent accountants have neither examined nor compiled the accompanying actual results and projections and, accordingly, do not express an opinion or any other form of assurance with respect to the projections, assume no responsibility for the projections, and disclaim any association with the projections. Except for purposes of this Disclosure Statement, the Debtors do not publish projections of their anticipated financial position or results of operations.

The projections contain certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are and will be beyond the control of the Reorganized Debtors, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, currency exchange rate fluctuations, existing and future governmental regulations and actions of government bodies, natural disasters and unusual weather conditions and other market and competitive conditions. Holders of claims are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Debtors and the Reorganized Debtors undertake no obligation to update any such statements.

The projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which are and will be beyond the Reorganized Debtors' control. The Debtors caution that no representations can be made or are made as to the accuracy of the historical financial information or the projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions may prove to be inaccurate. Moreover, events and circumstances occurring subsequent to the date on which these projections

were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and the Reorganized Debtors do not intend and undertake no obligation to update or otherwise revise the projections to reflect events or circumstances existing or arising after the date this Disclosure Statement is initially filed or to reflect the occurrence of unanticipated events. The projections, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections.

Creditors and other interested parties should see the section herein entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The projections have been prepared based on the assumptions that the Effective Date of the Plan is September 30, 2011 and the Reorganized Debtors' business plan is successfully implemented. Although the Debtors presently intend to cause the Effective Date to occur as soon as practicable following Confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur given the conditions for the Effective Date to occur pursuant to the terms of the Plan.

The projections are based on, among other things: (a) current and projected market conditions of the Reorganized Debtors' market; (b) the ability to maintain sufficient working capital to fund operations; and (c) Confirmation of the Plan.

## Risk Factors

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to, or incorporated by reference herein, prior to voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.*

### Risks Relating to Bankruptcy

<u>The Debtors may not be able to obtain Confirmation of the Plan.</u>

To emerge successfully from the Chapter 11 Cases, the Debtors must obtain approval of the Plan from their creditors, secure Confirmation of the Plan through the Bankruptcy Court, and successfully implement the Plan as confirmed. The foregoing process requires the Debtors to (a) meet statutory requirements with respect to the adequacy of disclosures with respect to the Plan, (b) solicit and obtain creditor acceptances of the Plan, and (c) fulfill other statutory conditions with respect to Plan Confirmation.

With regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm a plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. In order to confirm a plan against a dissenting Class, the Bankruptcy Court also must find that at least one impaired Class has accepted the Plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Finally, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. Specifically, section 1129 of the

Bankruptcy Code sets forth the requirements for Confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) the Debtors' Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, (b) Confirmation of the Debtors' Plan is not likely to be followed by a liquidation or a need for further financial reorganization, and (c) the value of distributions to non-accepting Holders of Claims within a particular Class under the Debtors' Plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court may determine that the Plan does not satisfy one or more of these requirements, in which case the Plan would not be confirmed by the Bankruptcy Court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions Holders of Claims against or Holders of the Debtors' common stock or other Equity Interests ultimately would receive with respect to their Claims or Equity Interests. There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Chapter 11 Cases that is acceptable to the Bankruptcy Court and the Debtors' creditors, equity holders, and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization. Finally, the Debtors' emergence from bankruptcy is not assured. While the Debtors expect to emerge from bankruptcy in the future, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur.

<u>Loss of key management and employees.</u>

The Debtors' success is largely dependent on the skills, experience, and efforts of their people. The loss of the services of one or more members of the Debtors' senior management or of numerous employees with critical skills could have a negative effect on their business, financial condition and results of operations. If the Debtors are not able to attract talented, committed individuals to fill vacant positions when the need arises, it may adversely affect their ability to fully implement their business objectives.

<u>Increases in costs could adversely affect the Debtors' operating results.</u>

The Debtors' inability to maintain their cost structure and efficiently operate their gaming facilities may reduce their operating results. In addition, increases in certain non-controllable or mandatory costs that are driven by external factors may reduce the Debtors' operating results. Examples of these costs are energy, insurance, and taxes.

<u>The conditions precedent to the Confirmation and consummation of the Plan may not occur.</u>

As more fully set forth in Exhibit A, the occurrence of Confirmation of the Plan and the Effective Date of the Plan are each subject to a number of conditions precedent. If the conditions precedent to Confirmation are not met or waived, the Plan will not be confirmed, and if the conditions precedent to the Effective Date are not met or waived, the Effective Date will not take place.

Article XII.D of the Plan provides, in relevant part, that "[i]f the Effective Date has not occurred within 270 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court." Furthermore, Article XII.C of the Plan provides that "the Debtors, or the Reorganized Debtors, as applicable, with the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably), may waive any of the conditions to Confirmation or the Effective Date at any time without any notice to parties in interest." In other words, if all conditions precedent to the Effective Date have not occurred within 270 days after Confirmation, the Debtors (or any other party-in-interest) can seek to have the Confirmation Order vacated, and the Debtors can waive the conditions precedent to Confirmation and the Effective Date (other than governmental or regulatory approvals) at any time without notice to any party (other than the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee).

The Plan requires certain regulatory action by The Indiana Gaming Commission, The Mississippi Gaming Commission, and The Colorado Limited Gaming Control Commission, which may delay the Debtors' emergence from these Chapter 11 Cases.

For the Plan to become effective, the Debtors' state gaming regulators must license and approve the new owner(s) and operator(s) of the Debtors' gaming businesses and approve the incurrence of debt in connection with, and other aspects of, the restructuring transactions comprising the Plan. While the Debtors will actively pursue such approvals, the Debtors can make no assurances as to if and when such approvals will be granted. Failure by the Debtors' gaming regulators to grant the necessary approvals will delay and may even prevent the Debtors' emergence from Chapter 11.

Creditors entitled to New Membership Interests may be required to obtain regulatory approval before receiving the New Membership Interests

Creditors in classes entitled to receive distributions of New Membership Interests will not receive New Membership Interests and will receive no compensation in place of the New Membership Interests if they fail to obtain the Requisite Approvals from the three applicable state gaming authorities and no exemption from obtaining Requisite Approvals is available to them. The cost of obtaining Requisite Approvals could be substantial to a creditor entitled to receive New Membership Interests.

The recovery for Holders of the General Unsecured Claims against the Debtors may be diluted and the ultimate amount of Allowed Claims against the Debtors may not be finalized until after the Effective Date.

315 proofs of Claim were filed against the Debtors on or before the Bar Date in these cases. The asserted amount of such Claims is approximately $3,288,411,296.29. The Debtors have not yet completed their Claims reconciliation process and therefore have not fully analyzed these filed proofs of Claim. Through the Debtors' Claims reconciliation process, certain filed proofs of Claim may be reduced or disallowed. As a result, the Claims reconciliation process may result in changes that could affect the recovery for Holders of General Unsecured Claims under the Plan.

Parties in interest may object to the Debtors' classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a Claim or an Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Bankruptcy Court may reach a different conclusion.

The Debtors may object to the amount or classification of a Claim.

The Debtors reserve the right to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim whose Claim is subject to an objection. Any such Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

The Debtors May Not Prevail in Litigation Regarding the Lake County Claims.

As described above, the Debtors dispute Lake County's valuation of the Lake County Claims and intend to oppose the merits of the 505 Motion in the Bankruptcy Court. While the Debtors are confident their arguments will ultimately prevail, they recognize there are risks associated with litigating these issues. The outcome of litigation regarding the Lake County Claims could change the valuation disclosed herein and affect distributions to holders of allowed claims under the Plan.

<u>The Debtors may not be able to achieve their projected financial results.</u>

The financial projections set forth in Exhibit C to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations. The Debtors' actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, the Debtors may lack the necessary capital to continue operating as planned after the Effective Date of the Plan.

<u>The Holders of Senior Secured Notes Indenture Claims and Senior Notes Claims will acquire a substantial majority of the New Membership Interests upon consummation of the Plan.</u>

Holders of Senior Secured Notes Indenture Claims and Senior Notes Claims will receive a substantial majority of the New Membership Interests, and thus will be in a position to control the outcome of actions requiring stockholder or member approval, including, among other things, election of the Board of Managers. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Debtors and, consequently, impact the value of the New Membership Interests.

<u>Historical financial information of the Debtors may not be comparable to the financial information of the Reorganized Debtors.</u>

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

<u>Certain tax consequences of the Debtors' Plan raise unsettled and complex legal issues and involve various factual determinations.</u>

Some of the material consequences of the Plan regarding U.S. federal income taxes are summarized under the section herein entitled "Certain U.S. Federal Income Tax Consequences of the Plan." Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. No ruling from the U.S. Internal Revenue Service ("<u>IRS</u>") has been or will be sought by the Debtors regarding any of the tax consequences described in this Disclosure Statement. The IRS may challenge the various positions the Debtors have taken, or intend to take, with respect to their tax treatment, and a court may sustain such a challenge or objection by the IRS. For a more detailed discussion of risks relating to the specific positions the Debtors intend to take with respect to various tax issues, please review the section herein entitled "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 84.

<u>The New Holdco LLC Agreement could deter takeover attempts that some shareholders may consider desirable, which could adversely affect the value of the New Membership Interests.</u>

Various provisions of the New Holdco LLC Agreement and Delaware law could make acquiring control of the Reorganized Debtors without the requisite support of its Board of Managers difficult for a third party, even if the change of control would be beneficial to a recipient of New Membership Interests. The existence of these provisions could deprive certain recipients of New Membership Interests of an opportunity to sell their shares of New Membership Interests at a premium over the prevailing market price. The potential inability of holders of New Membership Interests to obtain a control premium could, in certain instances, depress any future trading prices of New Membership Interests.

The Debtors' ability to service their debt and to fund their planned capital expenditures and ongoing operations will depend on both their ability to generate and grow cash flow and their access (by dividend or otherwise) to additional liquidity sources.  The Debtors' ability to generate and grow cash flow is dependent on many factors, including:

- the Debtors' ability to sustain and grow revenues and cash flows from operating activities and to maintain and grow their customer base, particularly in the face of increasing competition;

- general business conditions, economic uncertainty or downturn, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the housing sector and overall economy;

- the effects of current and potential future competitors on the Debtors' business; and

- the effects of governmental regulation on the Debtors' business.

Some of these factors are beyond the Debtors' control.  It is also difficult to assess the impact that the general economic downturn and recent turmoil in the credit markets will have on future operations and financial results.  However, the general economic downturn has resulted in reduced spending by customers, which may have caused the Debtors' revenues and cash flows from operating activities to differ from those that otherwise would have been generated.  If the Debtors are unable to generate sufficient cash flow or are unable to access additional liquidity sources, they may not be able to service and repay their debt, operate their business, respond to competitive challenges, or fund other liquidity and capital needs.  It is uncertain whether the Debtors will be able, under applicable law, to make distributions or otherwise move cash to the relevant entities for payment of interest and principal.

Economic conditions, including a worsening of the current economy and other factors affecting discretionary consumer spending, may harm the Debtors' businesses, financial conditions, and results of operations.

The Debtors' businesses may be adversely affected by the recession currently being experienced in the United States because the Debtors are dependent on discretionary spending by their customers.  The continuation or worsening of current economic conditions could cause fewer people to spend money or cause people to spend less money at the Debtors' facility and could adversely affect the Debtors' revenues.

Intense competition could result in loss of market share or profitability.

The Debtors face intense competition in the market in which each gaming facility is located.  The Debtors' primary facilities, The Majestic Star Casino and The Majestic Star Casino II, compete with several major casino-hotels in Indiana.  Competition continues to increase in the region, with a number of the Debtors' competitors planning to build new or expanded facilities.

Some of the Debtors' competitors have significantly greater financial resources, and, as a result, the Debtors may be unable to compete successfully with them in the future.  In addition, online gaming, despite its current illegality in the United States, is a growing sector in the gaming industry.  Online casinos offer a variety of games, including slot machines, roulette, poker, and blackjack.  Such online casinos allow individuals to participate using credit or debit cards or other forms of electronic payment.  The Debtors are unable to assess the impact that online gaming will have on their business operations in the future and there is no assurance that the impact will not be materially adverse.

Competition from other casino and hotel operators involves not only the quality of casino, hotel room, restaurant, entertainment, and convention facilities, but also the pricing of such services. The Debtors' operating results may be adversely affected by significant cash outlays for advertising and promotions for complementary services to patrons. If the Debtors lack the financial resources or liquidity to match the promotions of competitors, the number of casino patrons may decline, adversely affecting the Debtors' financial performance.

The Debtors' ability to compete successfully will also depend on their ability to develop and implement effective marketing campaigns to attract customers to their facilities. To the extent that they are unable to do so, the Debtors may not be able to successfully compete in their markets, and their financial position could be adversely affected.

<u>Work stoppages, labor problems, and unexpected shutdowns may limit the Debtors' operational flexibility and negatively impact the Debtors' revenue.</u>

The Debtors are party to certain collective-bargaining agreements with labor unions. There can be no assurances that the Debtors will be able to renegotiate the labor agreements that are currently in effect without incurring significant increases in their labor costs. Changes to the collective-bargaining agreements could cause significant increases in labor costs, which could have a material adverse affect on the Debtors' businesses, financial conditions, and operations.

Moreover, the unions with which the Debtors have collective-bargaining agreements or other unions could seek to organize groups of employees that are not currently represented by a union. Union organization efforts may occur in the future, potentially causing disruptions to the Debtors' businesses and resulting in increased costs, both of which could have a material adverse effect on the Debtors' businesses, financial condition, and operations.

Lastly, if the Debtors are unable to negotiate new collective-bargaining agreements on mutually acceptable terms, aggrieved employees may engage in strikes or other forms of workplace disruptions, which could have a materially adverse effect on the Debtors' business and operations. Any unexpected work stoppage by the Debtors' employees could have an adverse effect on their businesses and operations, resulting in negative media attention and potentially discouraging customers from visiting the Debtors' facilities. There cannot be assurance that the Debtors can be adequately prepared for unexpected labor developments that may lead to a temporary or permanent shutdown of their facilities.

## Confirmation of the Plan

### The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], 2011 to take place at [ : ] (prevailing Eastern Time) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

### Deadline to Object to Confirmation

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [●], 2011 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. **Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.**

## Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Equity Interests, or if rejected by an impaired Class, that the Plan is accepted by at least one impaired Class of Claims and "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of Holders of Claims and Equity Interests that are impaired under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of Chapter 11 of the Bankruptcy Code; (2) the Debtors have complied or will have complied with all of the necessary requirements of Chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Debtors believe the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

## Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court find, as a condition to confirmation, that a Chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under

the plan property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a Chapter 7 trustee would generate if the debtor's Chapter 11 case were converted to a Chapter 7 case and the assets of the debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed and consummated.

To estimate what members of each impaired Class of Claims would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a Chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to Holders of General Unsecured Claims or Equity Interests would be reduced by, among other things: (a) the claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases; (c) unpaid Administrative Expense Claims of the Chapter 11 cases; and (d) Priority Claims and Priority Tax Claims. The Debtors' costs of liquidation in Chapter 7 Cases would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the operation of the Debtors during the Chapter 7 Cases, and all unpaid Administrative Expense Claims incurred by the Debtors during the Chapter 11 cases that are allowed in the Chapter 7 cases. The liquidation itself would trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate the payment of other Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business. These Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, before the balance would be made available to pay other Claims or to make any distribution in respect of Equity Interests.

Based on the Liquidation Analyses set forth in Exhibit E of this Disclosure Statement, the Debtors believe Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a Chapter 7 liquidation. In summary, the Debtors and their management believe that Chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by Holders of General Unsecured Claims entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

- The erosion of the value of the Debtors' assets in the context of an expedited going concern sale or asset-by-asset liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail;

- The increased cost and expenses of liquidation under Chapter 7 arising from fees payable to the Chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- Additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation and from the rejection of Unexpired Leases and Executory Contracts in connection with the cessation of the Debtors' operations;

- The adverse effects on the salability of portions of the business resulting from the possible departure of key employees and the attendant loss of customers and vendors; and

- The application of the rule of absolute priority under the Bankruptcy Code to distributions made in a Chapter 7 liquidation.

Consequently, the Debtors and their management believe Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a Chapter 7 liquidation.

If the Plan is not confirmed and the Debtors fail to propose and confirm an alternative plan of reorganization, they may be liquidated pursuant to the provisions of a Chapter 11 liquidating plan. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in higher administrative costs. Because a trustee's appointment is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a Chapter 7 trustee must be appointed. Any distribution to Holders of Claims under a Chapter 11 liquidation plan probably would be delayed substantially. Most importantly, the Debtors believe any distributions to creditors in a liquidation scenario would fail to capture a significant portion of the "going concern" value of their business, which is reflected in the New Membership Interests to be distributed under the Plan. Accordingly, the Debtors believe Chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of a debtor, or any successor to a debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the projections, as set forth in Exhibit C. Based upon the projections, the Debtors believe their businesses will be viable operations following the Chapter 11 Cases, and the Plan will meet the feasibility requirements of the Bankruptcy Code.

**Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan, and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

**Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

**No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens. Alternatively, a plan is "fair and equitable" with respect to a non-accepting class of secured claims if holders of such claims will receive the "indubitable" equivalent of such claims pursuant to the plan of reorganization.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property, subject to the applicability of the "new value" exception.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the Effective Date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or Schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**New Value**

A corollary to the "fair and equitable" test, the new value doctrine, permits old equity holders to keep their ownership interests even though senior dissenting creditors do not receive payment in full of their claims provided that the old equity holders make a new contribution (a) in money or money's worth, (b) that is reasonably equivalent to the value of the new equity interests being received in the reorganized debtor, and (c) that is necessary for implementation of a feasible plan of reorganization.

**Valuation of the Debtors**

In conjunction with formulating the Plan, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Reorganized Debtors. Accordingly, such valuation is set forth in Exhibit D attached hereto.

**Effect of Confirmation of the Plan**

**Preservation of Avoidance Actions**

On and after the Effective Date, actions, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "Avoidance Actions") will be preserved and retained by the Reorganized Debtors. The Reorganized Debtors may offset any claim supporting an Avoidance Action against any payment due to any Holder of a Claim under the Plan. In addition, if a distribution is made in error, the Reorganized Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such distribution. In the event that the Plan, as proposed, is consummated, Avoidance Actions that may potentially be brought might be waived; provided, however that such waiver will not be effective if the Plan is not effectuated.

**Retention of Jurisdiction by the Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

- Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

- Adjudicate, decide or resolve any and all matters related to Causes of Action;

- Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

- Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

- Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

- Adjudicate any and all disputes arising from or relating to distributions under the Plan;

- Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- Enforce all orders previously entered by the Bankruptcy Court; and

- Hear any other matter not inconsistent with the Bankruptcy Code.

**Releases by the Debtors**

On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including: (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; and (2) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each of the Released Parties (and each such Released Party so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Released Party in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Released Party from any Causes of Action expressly set forth in and preserved by the Plan. Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future (a) related to (i) the adversary proceeding commenced by the Debtors on December 31, 2010 regarding, inter alia, the tax status of Majestic II, and (ii) any other related Causes of Action the Debtors or Reorganized Debtors subsequently may assert (collectively, the "Majestic II Tax Action(s)") and (b) against the non-Released Parties, including the Identified Parties.

**Third Party Releases**

On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Released Party) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents. Notwithstanding anything in the Plan to the contrary, the Released Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future (a) related to the Majestic II Tax Action(s) and (b) against the non-Released Parties, including the Identified Parties. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Released Parties.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without

limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties. This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

## Injunction

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

## Exculpation

The Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or Postpetition act taken or omitted to be taken in connection with, related to, or arising out of the Debtors' in or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of New Membership Interests, the entry into the New Senior Secured Credit Facility, the entry into the New Senior Secured Notes Indenture and the issuance of the New Senior Secured Notes thereunder, the entry into the First Lien Alternative Financing, if any, the entry into the Second Lien Alternative Financing, if any, or the distribution of property under the Plan or any other agreement entered into in connection therewith or any other Prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of the Released Parties.

## Important Securities Law Disclosure

## Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and Pursuant to Exemptions under the Securities Act of 1933, as Amended

Under the Plan, substantially all of the units of New Membership Interests will be distributed to Holders of Allowed Senior Secured Notes Indenture Claims and Holders of Allowed Senior Notes Indenture Claims.

The Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the New Membership Interests contemplated by the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities; and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive New Membership Interests are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell the New Membership Interests without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, holders of New Membership Interests deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. As noted in this Disclosure Statement, it is not contemplated that the Reorganized Debtors will be a public reporting company and, therefore, it is unlikely in the period initially following the Effective Date that current public information will be available to permit resales pursuant to Rule 144.

### Voting Instructions

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8. Only the Holders of Claims in these Classes are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided.

The Debtors, with the approval of the Bankruptcy Court, have engaged Epiq to serve as the Solicitation Agent for Claims to assist in the solicitation process. The Solicitation Agent will, among other things, answer questions, provide additional copies of all solicitation materials, and generally oversee the solicitation process for their assigned Claims. The Solicitation Agent will also process and tabulate ballots for each of their respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

**The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on [●], 2011.**

| BALLOTS |
|---|
| Ballots must be actually received by the Solicitation Agent by the<br>voting deadline of 5:00 p.m. (prevailing Eastern Time) on [●], 2011 at the following address:<br><br>**If by mail:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.: The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**FDR Station PO Box 5014**<br>**New York, New York 10150**<br><br>**If by hand delivery or overnight courier:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.: The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**757 Third Avenue, 3rd Floor**<br>**New York, New York 10017**<br><br>If you have any questions on the procedure for voting on the Plan,<br>please call the Solicitation Agent at the following telephone number: (646) 282-2400 |

**MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS AND INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN. FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED AND RECEIVED BY 5:00 P.M. (PREVAILING EASTERN TIME), ON [●], 2011.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM AND/OR INTEREST MAY CAST ONLY ONE BALLOT PER EACH SUCH CLAIM OR INTEREST HELD. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST IN CLASSES A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, AND H-8, WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM AND/OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS AND/OR INTERESTS, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

### Certain U.S. Federal Income Tax Consequences of the Plan

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Interests and Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained as to any of the tax consequences of the Plan discussed below and the Debtors do not intend to seek a ruling from the Internal Revenue Service ("IRS") as to any such tax consequences and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

Except as otherwise provided below, this summary does not apply to Holders of Allowed Claims that are not "United States persons" (as such term is defined in the IRC) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that Holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the IRC. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each Holder of an Interest or a Claim. Each holder of an Interest or a Claim is urged to consult his, her, or its advisors with respect to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan. This discussion does not address special consideration that may be applicable to Holders holding more than one Class of Claims. Such Holders should consult their tax advisors with respect to their particular circumstances.

*IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the IRC. The tax advice contained in this Disclosure Statement was written to support the promotion or marketing of the transactions described in this Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.*

## Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors and BDI

For federal income tax purposes, the Debtors, excluding the Debtors organized as corporations, are classified as disregarded entities (the "Disregarded Debtors"). As such, all of the Disregarded Debtors' assets and liabilities are treated as assets and liabilities of BDI. Upon consummation of the Plan, BDI's direct and indirect equity interest in the Debtors will be cancelled and the New Membership Interests will be issued by Majestic Holdco and distributed to certain creditors of the Debtors, as more fully described in the Plan. The federal income tax consequences of these transactions are not entirely clear.

From BDI's perspective, the transaction will likely be characterized as a taxable transfer of the assets of the Disregarded Debtors and the equity interests of the Debtors that are classified as corporations (the "Corporate Debtors") to the creditors in partial satisfaction of their Claims against the Debtors. In that event, BDI will have taxable gain to the extent the amount of the Claims against the Disregarded Debtors exceeds the tax basis in the Disregarded Debtors' assets. Alternatively, it is possible that the amount of taxable gain will be determined by reference to the fair value of the Disregarded Debtors' assets, rather than the amount of Claims, if the Claims are characterized as recourse obligations of BDI for federal income tax purposes. In such case, BDI could have cancellation of debt income ("COD Income") (discussed in more detail below) to the extent that Holders of Claims against the Disregarded Entities receive less than 100% recovery on their Claims. If the Claims against the Disregarded Debtors are characterized as non-recourse obligations of BDI for federal income tax purposes, BDI should not realize any COD Income; rather, the amount of such Claims will be taken into account in determining BDI's gain or loss in connection with the consummation of the Plan, as discussed above.

In general, absent an exception, a debtor realizes COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (including equity) given in satisfaction of such indebtedness at the time of the exchange. To the extent a Disregarded Debtor realizes COD Income, such income will be treated as income of BDI. Because the Plan provides that Holders of certain Allowed Claims will receive New Membership Interests, New Senior Secured Notes, and their pro rata share of the New Senior Secured Credit Facility, the amount of COD Income will depend on the fair market value of the New Membership Interests and the issue price of the New Senior Secured Notes and the New Senior Secured Credit Facility (discussed below). These amounts cannot

be known with certainty until after the Effective Date and thus it is impossible to state with certainty whether CODI Income, if any, will be realized by BDI.

Neither BDI nor any Corporate Debtors will be required to include any COD Income in gross income if it is (i) under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding or (ii) insolvent on the Effective Date (in which case, the COD Income may be excluded to the extent of the insolvency). If either exclusion applies, BDI or a Corporate Debtor, as applicable, must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. BDI or the Corporate Debtors may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Any attribute reduction will be applied as of the first day following the taxable year in which COD Income is recognized.

## Certain U.S. Federal Income Tax Consequences to Certain Holders of Allowed Claims

<u>Consequences to Holders of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims</u>

Pursuant to the Plan, each Holder of an Allowed Senior Secured Credit Facility Claim or Allowed Senior Secured Credit Facility Guarantee Claim shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

The exchange of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims for a Pro Rata share of (x) the New Senior Secured Credit Facility Paydown Amount and the New Senior Secured Credit Facility or (y) Cash should be a taxable exchange under section 1001 of the IRC. A Holder of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the sum of the amount of Cash received and the issue price (described below) of such Holder's share of the New Senior Secured Credit Facility, if any, and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

<u>Consequences to Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims</u>

Pursuant to the Plan, each Holder of an Allowed Senior Secured Notes Indenture Claim and Senior Secured Notes Indenture Guarantee Claim shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

The exchange of Allowed Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims for the New Membership Interests and (x) the New Senior Secured Notes or (y) Cash should be a taxable exchange under section 1001 of the IRC. A Holder of Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the issue price (described below) of such Holder's share of the New Senior Secured Notes and either the fair value of the Holder's share of New Membership Interests or the amount of Cash received by the Holder and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration

received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

<u>Consequences to Senior Notes Indenture Claims against Majestic</u>

Pursuant to the Plan, each Holder of an Allowed Senior Notes Indenture Claim shall receive its Pro Rata share of 42 percent of the New Membership Interests on the Distribution Date or as soon thereafter as is practicable (except to the extent that such Holder and the Debtors agree to less favorable distribution to such Holder).

The exchange of Allowed Senior Notes Indenture Claims for the New Membership Interests should be a taxable exchange under section 1001 of the IRC. A Holder of an exchanged Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the Holder's share of New Membership Interests and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

<u>Consequences to General Unsecured Claims and Rejection Damages Claims against Majestic</u>

Pursuant to the Plan, each Holder of a General Unsecured Claim and/or Rejection Damages Claim shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic or (ii) its pro rata share of the Aggregate General Unsecured Claim Recovery (except to the extent that such Holder and the Debtors agree to less favorable distribution to such Holder).

The exchange of General Unsecured Claims and/or Rejection Damages Claims for Cash should be a taxable exchange under section 1001 of the IRC. A Holder of an exchanged Claim will generally recognize income gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognized ordinary interest income.

<u>Consequences to Holders of Discount Notes Indenture Claims</u>

Pursuant to the Plan, Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no distribution under the Plan on account of such Claims. A Holder of a cancelled Claim should be entitled to claim a loss for tax purposes equal to the Holder's adjusted basis in such Claim.

**Accrued But Untaxed Interest**

A portion of the consideration received by Holders of Claims may be attributable to accrued but unpaid interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, it is possible that a Holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but is not paid in full by Debtors. The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated

first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes. The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**Market Discount**

Holders of Claims who receive consideration in exchange for their Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

**Issue Price**

For U.S. federal income tax purposes, the "issue price" of a debt instrument depends on whether such instrument is deemed to be "publicly traded." If, at any time during the 60-day period ending 30 days after the issue date of a debt instrument, a substantial amount of the debt instruments in an issue is "traded on an established market" within the meaning of the applicable Regulations, then the debt instrument will be treated as publicly traded and the issue price of the debt instrument will equal the fair market value of that debt instrument on the date of issuance. In general, a debt instrument will be treated as traded on an established securities market if it is listed on a major securities exchange, appears on a system of general circulation that provides a reasonable basis to determine fair market value or otherwise is, among other things, readily quotable by dealers, brokers or traders. For purposes of applying these rules, each tranche of new debt instruments is treated as a separate issue.

If the New Senior Secured Credit Facility or the New Senior Secured Notes, respectively, are not publicly traded and the old Claims exchanged for such debt instruments also are not publicly traded, then the issue price of the New Senior Secured Credit Facility or the New Senior Secured Notes, as applicable, generally would equal the stated principal amount of such debt instrument. Holders of Claims should consult their tax advisors regarding the issue prices for the New Senior Secured Credit Facility and the New Senior Secured Notes.

**Certain Tax Consequences of Owning New Membership Interests of Majestic Holdco**

It is anticipated that Majestic Holdco will be characterized as a partnership for federal income tax purposes following the Distribution Date. As such, a Holder of Claims who receives New Membership Interests will be treated as a partner for tax purposes. The U.S. federal tax consequences of being a partner in an operating partnership are very complicated. As an example, a partnership itself does not pay U.S. federal income taxes; instead, its income and deductions are allocated to its partners, who include such amounts on their own tax returns. In addition, a partner may generally receive distributions from a partnership up to the amount of the partner's tax

basis in its partnership interest without incurring additional tax. The Board of Managers of the Reorganized Debtors shall determine in its sole discretion whether to make any tax distributions, in accordance with the New Holdco LLC Agreement, and no person or entity may rely on this Disclosure Statement or the exhibits attached hereto as evidencing a right to receive any such tax distributions. Holders who will receive New Membership Interests are urged to consult with their own tax advisers regarding such consequences.

Because the Reorganized Debtors will be engaged in a U.S. trade or business for U.S. federal income tax purposes, Reorganized Majestic Holdco will be required to withhold and pay over to the U.S. tax authorities with respect to each member-partner that is not a "United States person" for federal income tax purposes (a "Foreign Member") a percentage equal to the highest applicable U.S. tax rate of each such Foreign Member's distributive share of Reorganized Majestic Holdco's income that is effectively connected with such trade or business (and withholding taxes may be imposed in other circumstances where Reorganized Majestic Holdco recognizes gain attributable to US real property). Each Foreign Member will be required to file U.S. tax returns and pay U.S. tax on its share of Reorganized Majestic Holdco's net effectively connected income (with any taxes withhold by Reorganized Majestic Holdco creditable against such tax liability). In addition, upon the taxable disposition of an interest in Reorganized Majestic Holdco, if (i) 50% or more of Reorganized Majestic Holdco's gross assets consist of "United States real property interests" and (ii) 90% or more of Reorganized Majestic Holdco's gross assets consist of "United States real property interests" and cash or cash equivalents, a purchaser will be required to withhold 10% of the amount paid for the interest pursuant to section 1445 of the IRC. Alternatively, other tax rules may apply, which could result in all or some portion of any gain recognized on a Holder's taxable disposition of an interest in Reorganized Majestic Holdco being subject to U.S. federal income tax. A tax-exempt organization will generally derive "unrelated business taxable income" from holding interests in Reorganized Majestic Holdco. Tax-exempt organizations and Foreign Members may wish to consider using a "blocker" structure to hold their interests. A discussion of all the relevant tax considerations for these types of Holders is beyond the scope of this Disclosure Statement; such Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of receiving and owning a New Membership Interest in Reorganized Majestic Holdco.

**Certain Consequences of Owning an Interest in New Senior Secured Credit Facility**

Stated interest on the New Senior Secured Credit Facility will generally be taxable to the holder as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes. A holder will generally be required to report the excess, if any, of the stated principal amount of its share of the New Senior Secured Credit Facility over the issue price of its share of the New Senior Secured Credit Facility as original issue discount on a constant yield basis over the term of the New Senior Secured Credit Facility.

**Certain Consequences of Owning New Senior Secured Notes**

Stated interest on the New Senior Secured Notes will generally be taxable to the holder as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes. A holder will generally be required to report the excess, if any, of the stated principal amount of its share of the New Senior Secured Notes over the issue price of its share of the New Senior Secured Notes as original issue discount on a constant yield basis over the term of the New Senior Secured Notes.

**Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of the Holder's circumstances and income tax situation. All Holders of Claims against the Debtors should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the restructuring, including the applicability of any state, local, or foreign tax laws, and any change in applicable tax laws.**

## Recommendation

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

The Majestic Star Casino, LLC
(for itself and on behalf of each of the Debtors)

/s/ *Jon S. Bennett*
_____
Jon S. Bennett
Senior Vice President, Chief Financial Officer, and Treasurer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400

- and -

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Co-Counsel for the Debtors and Debtors in Possession

<u>**Exhibit A**</u>

**Amended Joint Plan of Reorganization**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE MAJESTIC STAR CASINO, LLC, <u>et al.</u>,[1] | ) Case No. 09-14136 (KG) |
| | ) |
| | ) Jointly Administered |
| | ) |

## DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION
## <u>PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>

PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Laura Davis Jones, Esq. (DE Bar No. 2436)
James E. O'Neill, Esq. (DE Bar No. 4042)
Timothy P. Cairns, Esq. (DE Bar No. 4228)

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
James H.M. Sprayregen, P.C.
Edward O. Sassower, Esq.
Stephen E. Hessler, Esq.

Dated: January 12, 2011      Counsel to the Debtors and Debtors in Possession

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: The Majestic Star Casino, LLC (4986); The Majestic Star Casino II, Inc. (0927); The Majestic Star Casino Capital Corp. (0872); Majestic Star Casino Capital Corp. II (9309); Barden Mississippi Gaming, LLC (8783); Barden Colorado Gaming, LLC (8674); Majestic Holdco, LLC (4648); and Majestic Star Holdco, Inc. (9415). The corporate address for the debtors is 301 Fremont Street, 12th Floor, Las Vegas, Nevada 89101.

# TABLE OF CONTENTS

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ....................................................................1
    A.    Defined Terms ......................................................................1
    B.    Rules of Interpretation ....................................................13
    C.    Computation of Time ......................................................14

**ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS** ............15
    A.    Administrative Expense Claims .....................................15
    B.    Professional Compensation and Reimbursement Claims ................15
    C.    Priority Tax Claims .........................................................15

**ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS** ...............................................16
    A.    Majestic Holdco ..............................................................16
    B.    Majestic Star Holdco ......................................................16
    C.    Majestic I ........................................................................16
    D.    Majestic II .......................................................................17
    E.    MSCC ..............................................................................17
    F.    MSCC II...........................................................................17
    G.    Barden Mississippi .........................................................17
    H.    Barden Colorado .............................................................18

**ARTICLE IV. TREATMENT OF CLAIMS AND INTERESTS** .......................................................19
    A.    Majestic Holdco ..............................................................19
    B.    Majestic Star Holdco ......................................................20
    C.    Majestic I ........................................................................21
    D.    Majestic II .......................................................................24
    E.    MSCC ..............................................................................26
    F.    MSCC II...........................................................................27
    G.    Barden Mississippi .........................................................28
    H.    Barden Colorado .............................................................31

**ARTICLE V. IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS;**
        **ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION** ...................35
    A.    Classes Entitled to Vote ..................................................35
    B.    Classes Entitled to Vote on a Provisional Basis .............35
    C.    Classes Not Entitled to Vote; Deemed to Accept............36
    D.    Classes Not Entitled to Vote; Deemed to Reject............36
    E.    Nonconsensual Confirmation ........................................36

**ARTICLE VI. PROVISIONS FOR IMPLEMENTATION OF THE PLAN** ......................................37
    A.    Sources of Consideration for Plan Distributions ...........37
    B.    Reorganized Debtors' Equity Interests ..........................37
    C.    General Settlement of Claims and Interests ...................37
    D.    Agent and Trustees..........................................................37
    E.    New Senior Secured Credit Facility................................38
    F.    New Senior Secured Notes Indenture .............................38
    G.    Corporate Existence ........................................................38
    H.    Vesting of Assets in the Reorganized Debtors ...............39
    I.    Cancellation of Securities and Agreements ...................39
    J.    Discharge of Debtors ......................................................40
    K.    Restructuring Transactions .............................................40
    L.    Exemption from Certain Transfer Taxes and Recording Fees ............41
    M.    Board Representation .......................................................41

N.        Senior Management .................................................................................................. 41
O.        Pre-Effective Date Key Employee Incentive Plan and Post-Effective Date Management
           Incentive Program ................................................................................................... 42
P.        Employee and Retiree Benefits ............................................................................... 42
Q.       Creation of Holdback Escrow Account ................................................................... 42
R.        Preservation of Rights of Action ............................................................................ 42

**ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS ................................................. 44**
A.        Assumption and Rejection of Executory Contracts ................................................ 44
B.        Indemnification Obligations .................................................................................... 44
C.        Cure of Defaults for Assumed Executory Contracts ............................................... 44
D.       Claims Based on Rejection or Repudiation of Executory Contracts ...................... 45
E.        Reservation of Rights ............................................................................................... 45

**ARTICLE VIII. PROCEDURES FOR RESOLVING CLAIMS AND DISPUTES ........................... 46**
A.        Allowance of Claims and Interests .......................................................................... 46
B.        Survival of Reorganized Debtor Defenses to Surviving Claims ............................. 46
C.        Claims and Interests Administration Responsibilities ............................................. 46
D.       Estimation of Claims and Interests .......................................................................... 46
E.        Adjustment to Claims and Interests Without Objection .......................................... 46
F.        Disallowance of Claims or Interests ........................................................................ 46
G.       Offer of Judgment ................................................................................................... 47
H.       Amendments to Claims ............................................................................................ 47
I.         Fractional Shares ..................................................................................................... 47

**ARTICLE IX. PROVISIONS GOVERNING DISTRIBUTIONS ................................................ 48**
A.        Distributions on Account of Claims and Interests Allowed as of the Effective Date ..... 48
B.        Distributions on Account of Claims and Interests Allowed After the Effective Date .... 48
C.        Delivery of Distributions ......................................................................................... 49
D.       Claims Paid or Payable by Third Parties ................................................................. 50
E.        Allocation Between Principal and Accrued Interest ................................................ 51
F.        Compliance with Gaming and Related Regulations ................................................ 51

**ARTICLE X. EFFECT OF PLAN CONFIRMATION ................................................................. 53**
A.        Discharge of Claims and Termination of Interests .................................................. 53
B.        Compromise and Settlement of Claims and Controversies ..................................... 53
C.        **Releases by the Debtors** ......................................................................................... 53
D.       **Third Party Releases** ............................................................................................. 54
E.        Injunction ................................................................................................................. 54
F.        Exculpation .............................................................................................................. 54
G.       Protection Against Discriminatory Treatment ......................................................... 55
H.       Setoffs and Recoupment .......................................................................................... 55
I.         Release of Liens ....................................................................................................... 55
J.         Reimbursement or Contribution .............................................................................. 55
K.       Subordination ........................................................................................................... 56

**ARTICLE XI. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE
CLAIMS .......................................................................................................................... 57**
A.        Professional Claims ................................................................................................. 57
B.        Other Administrative Expense Claims ..................................................................... 58

**ARTICLE XII. CONDITIONS PRECEDENT TO CONFIRMATION AND TO EFFECTIVE DATE ...... 59**
A.        Conditions Precedent to Confirmation .................................................................... 59
B.        Conditions Precedent to Effective Date ................................................................... 59
C.        Waiver of Conditions Precedent .............................................................................. 60
D.       Effect of Non-Occurrence of Conditions to the Effective Date .............................. 61

E.      Post-Confirmation Date / Pre-Effective Date Governance ........................................... 61

**ARTICLE XIII. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........................... 62**
A.      Modification or Amendments ........................................................................ 62
B.      Effect of Confirmation on Modifications ........................................................ 62
C.      Revocation or Withdrawal of Plan .................................................................. 62

**ARTICLE XIV. RETENTION OF JURISDICTION ..............................................................................63**

**ARTICLE XV. MISCELLANEOUS PROVISIONS ................................................................................65**
A.      Immediate Binding Effect ............................................................................... 65
B.      Additional Documents .................................................................................... 65
C.      Payment of Statutory Fees .............................................................................. 65
D.      Dissolution of the Creditors' Committee ........................................................ 65
E.      Reservation of Rights ..................................................................................... 65
F.      Successors and Assigns ................................................................................... 65
G.      Service of Documents ..................................................................................... 65
H.      Term of Injunctions or Stays .......................................................................... 67
I.      Entire Agreement ........................................................................................... 67
J.      Governing Law ............................................................................................... 67
K.      Exhibits ........................................................................................................... 67
L.      Closing of Chapter 11 Cases ........................................................................... 67
M.      Waiver or Estoppel ......................................................................................... 67
N.      Conflicts ......................................................................................................... 67

# INTRODUCTION

The Majestic Star Casino, LLC ("Majestic I") and the other Debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") propose the following amended joint plan of reorganization (the "Plan") for the resolution of Claims against and Interests in the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

Reference is made to the Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

# ARTICLE I.

## DEFINITIONS AND INTERPRETATION

A.     Defined Terms.  As used in the Plan, the capitalized terms below have the following meanings, except as expressly provided or unless the context otherwise requires.

1.      "Accrued Professional Compensation" means, at any given moment, all accrued fees and expenses for services rendered by all Professionals retained in these Chapter 11 Cases through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

2.      "Administrative Expense Claim" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Claims of retained Professionals in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.      "Administrative Expense Claim Bar Date" means the date that is the forty-fifth (45th) day after the Effective Date.

4.      "Affiliate" is as defined in section 101(2) of the Bankruptcy Code.

5.      "Aggregate General Unsecured Claim Recovery" means an aggregate amount of $1,000,000.

6.      "Allowed" means, with respect to any Claim against any Debtor, except as otherwise provided herein, any Claim listed by such Debtor in its books and records as liquidated in amount and not disputed or contingent; provided, that to the extent that a Claim is a Disputed Claim, the determination of whether such Claim shall be allowed and/or the amount of any such Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated, as the case may be, if the Chapter 11 Cases had not been commenced; and provided further, the Debtors, the Reorganized Debtors, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, or the Creditors' Committee may bring any objection or other motion with respect to a Disputed Claim for resolution.  For the purpose of determining the amount in which a Claim is Allowed, the Debtors or Reorganized Debtors may, at their option, deduct therefrom an amount equal to the amount of any claim which the Debtors or Reorganized Debtors may hold against the Holder thereof, to the extent such claim may be set off pursuant to applicable law.

7.      "Amended and Restated Operating Agreements" means the operating agreements of the Reorganized Debtors, which shall be attached as Exhibit 1 to the Plan Supplement.

8.      "Assumed Executory Contract and/or Unexpired Lease List" means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors, subject to the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), of Executory Contracts

and/or Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the provisions of Exhibit 2 to the Plan Supplement.

9.      "<u>Avoidance Actions</u>" means any and all actual or potential Claims to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

10.      "<u>Ballot</u>" means the ballot upon which Holders of Impaired Claims entitled to vote shall cast their vote to accept or reject the Plan.

11.      "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

12.      "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

13.      "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075.

14.      "<u>Bar Date</u>" means January 4, 2011 at 5:00 p.m. prevailing Eastern Time, the deadline by which all Claims against the Debtors must be Filed, except for (a) Administrative Expense Claims and (b) Claims Allowed pursuant to this Plan.

15.      "<u>Barden Colorado</u>" means Barden Colorado Gaming, LLC.

16.      "<u>Barden Mississippi</u>" means Barden Mississippi Gaming, LLC.

17.      "<u>Board of Directors</u>" means the board of directors of the Debtors.

18.      "<u>Board of Managers</u>" means the board of managers of Reorganized Majestic Holdco.

19.      "<u>Business Day</u>" means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

20.      "<u>Cash</u>" means legal tender of the United States of America.

21.      "<u>Cash Collateral Order</u>" means the *Final Order (I) Authorizing Consensual Use of Cash Collateral Pursuant to Section 363 of Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Lenders and Secured Noteholders Pursuant to Sections 361, 362, 363, and 364 of Bankruptcy Code*, entered December 17, 2009 [Docket No. 114], and any order subsequently entered by the Bankruptcy Court governing the use of cash collateral or providing adequate protection for the use thereof.

22.      "<u>Causes of Action</u>" means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date, including Avoidance Actions.

23.      "<u>Certificate</u>" means any instrument evidencing a Claim or an Interest.

24.      "<u>CFO</u>" means the individual who holds the position of Senior Vice President, Chief Financial Officer, and Treasurer of the Debtors or the Reorganized Debtors.

25. "<u>Chapter 11 Cases</u>" means (a) when used with reference to a particular Debtor, the chapter 11 case Filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the procedurally-consolidated chapter 11 cases for all of the Debtors.

26. "<u>Claim</u>" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

27. "<u>Claims Objection Deadline</u>" means, for each Claim, the later of (a) 120 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claim.

28. "<u>Claims Register</u>" means the official register of Claims or Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

29. "<u>Class</u>" means any group of substantially similar Claims or Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

30. "<u>Collateral</u>" means any property or interest in property of the estates of the Debtors subject to a Lien, security interest, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, security interest, charge, or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

31. "<u>Confirmation</u>" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32. "<u>Confirmation Date</u>" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

33. "<u>Confirmation Hearing</u>" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

34. "<u>Confirmation Hearing Notice</u>" means the notice of the Confirmation Hearing that sets forth in detail the voting and objection deadlines with respect to the Plan.

35. "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

36. "<u>COO</u>" means the individual who holds the position of Executive Vice President and Chief Operating Officer of the Debtors or the Reorganized Debtors.

37. "<u>Creditor</u>" means any Holder of a Claim.

38. "<u>Creditors' Committee</u>" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the United States Trustee for the District of Delaware on December 4, 2009 [Docket No. 84], with such additions and changes as may have occurred from time to time.

39. "<u>Cure</u>" means the payment of Cash by the Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the applicable Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

40. "<u>Cure Bar Date</u>" means the deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty (30) days after the Effective Date or (b) thirty (30) days after the assumption of the applicable Executory Contract, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors, with the

consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), and the counterparty to the applicable Executory Contract.

41.     "Cure Claim" means a Claim based upon the Debtors' defaults on an Executory Contract or an Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

42.     "D&O Liability Insurance Policies" means all Prepetition and Postpetition insurance policies for directors' and officers' liability maintained by the Debtors.

43.     "Debtor" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

44.     "Debtors" means, collectively, Majestic Holdco, Majestic Star Holdco, Majestic I, Majestic II, MSCC, MSCC II, Barden Mississippi, and Barden Colorado.

45.     "Debtors in Possession" means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

46.     "Disclosure Statement" means the disclosure statement for the Plan, as amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

47.     "Discount Noteholders" means the Holders of the Discount Notes and their successors and assigns.

48.     "Discount Notes" means the 12.5% senior discount notes due October 15, 2011 issued pursuant to the Discount Notes Indenture.

49.     "Discount Notes Indenture" means that certain indenture, dated December 21, 2005, by and among Majestic Holdco and Majestic Star Holdco, as issuers, and the Discount Notes Trustee, as indenture trustee.

50.     "Discount Notes Indenture Claim" means a Claim arising under the Discount Notes Indenture.

51.     "Discount Notes Trustee" means Wilmington Trust Company, as successor to The Bank of New York Mellon Trust Company, N.A. (formerly known as The Bank of New York Trust Company, N.A.), or any successor indenture trustee appointed in accordance with such agreement.

52.     "Disputed Administrative Expense Claim" means any Administrative Expense Claim that, as of the date of determination, is a Disputed Claim.

53.     "Disputed Claim" means any Claim against or Interest in any Reorganized Debtor that such Reorganized Debtor believes is unliquidated, disputed, or contingent or that is objected to in accordance with the Plan, and that has not been allowed by Final Order of a court of competent jurisdiction or by agreement with such Reorganized Debtor.

54.     "Disputed Claims Reserve" means the reserve established and maintained by the Reorganized Debtors to hold Cash or other Plan consideration, as appropriate, to be distributed, as applicable, to Holders of Allowed Claims pending resolution of Disputed Claims.

55.     "Disputed General Unsecured Claim" means any General Unsecured Claim that, as of the date of determination, is a Disputed Claim.

56.     "Disputed Priority Tax Claim" means any Priority Tax Claim that, as of the date of determination, is a Disputed Claim.

57. "<u>Distribution Agent</u>" means the Reorganized Debtors, or the Entity or Entities selected by the Debtors or Reorganized Debtors, to make or facilitate distributions pursuant to the Plan.

58. "<u>Distribution Date</u>" means the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence, but not later than ten (10) days after the Effective Date, without further Bankruptcy Court order.

59. "<u>Effective Date</u>" means the date that all conditions to the effectiveness of the Plan have been satisfied or waived.

60. "<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

61. "<u>Equity Interests</u>" means any: (a) Equity Security, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors, together with any warrants, options, or contractual rights to purchase or acquire such Equity Securities at any time and all rights arising with respect thereto, and (b) partnership, limited liability company, or similar interest in a Debtor.

62. "<u>Equity Security</u>" has the meaning set forth in section 101(16) of the Bankruptcy Code.

63. "<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

64. "<u>Estate</u>" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

65. "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq., as now in effect and hereafter amended.

66. "<u>Exculpated Party</u>" means each of: (a) the Debtors, the Reorganized Debtors, and their Affiliates; (b) the Senior Secured Credit Facility Agent and the Senior Secured Credit Facility Lenders, in each case, in their capacity as such; (c) the Senior Secured Notes Trustee and the Senior Secured Noteholders, and any group or committee thereof, in each case, in their capacity as such; (d) the Senior Notes Trustee and the Senior Noteholders; (e) the Creditors' Committee and the members thereof in their capacity as such; (f) the Discount Notes Trustee, the Discount Noteholders, in each case, in their capacity as such; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), such Entities' respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates and representatives; <u>provided</u>, <u>however</u>, the Exculpated Parties exclude all Identified Parties.

67. "<u>Executory Contract</u>" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

68. "<u>Federal Judgment Rate</u>" means the federal judgment rate in effect on the Petition Date.

69. "<u>File</u>" means to file with the Bankruptcy Court in the Chapter 11 Cases, or in the case of a Proof of Claim or Interest, to file with the Notice, Claims, and Solicitation Agent.

70. "<u>Final Decree</u>" means the decree contemplated under Bankruptcy Rule 3022.

71. "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely-filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial,

reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

72. "First Lien Alternative Financing" means alternative financing resulting from a process to identify options to replace the New Senior Secured Credit Facility, which alternative financing shall not be consummated without the consents of the Senior Secured Notes Trustee and the Creditors' Committee.

73. "Gaming Licenses" means the Debtors' gaming licenses, including: (a) Majestic I's five-year gaming license issued June 3, 1996 that was last renewed on September 16, 2010 for one year from June 3, 2010; (b) Majestic II's five-year gaming license issued June 3, 1996 to Trump Indiana, Inc., that was transferred to Majestic II on November 11, 2005, that was last renewed on September 16, 2010 for one year from June 3, 2010; (c) Barden Mississippi's three-year gaming license issued on April 21, 1994 to Fitzgeralds Casino Hotel Tunica, that was transferred to Barden Mississippi on December 6, 2001, that was last renewed at the November 18, 2010 meeting of the Mississippi Gaming Commission for three years, and that will expire on December 7, 2013; and (d) Barden Colorado's two-year retailer gaming license and two-year operator gaming license, allowing the operation of Fitzgeralds Casino Black Hawk, were renewed by the Colorado Limited Gaming Control Commission through October 18, 2012.

74. "General Counsel" means the individual who holds the position of Senior Vice President and General Counsel of the Debtors or the Reorganized Debtors.

75. "General Unsecured Claim" means any Unsecured Claim not otherwise classified pursuant to this Plan.

76. "Governmental Unit" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

77. "Governmental Unit Bar Date" means the date to be set by the Bankruptcy Court by which all Claims against the Debtors have to be Filed by Governmental Units.

78. "Holdback Amount" means the aggregate holdback of those Professional fees billed to the Debtors during the Chapter 11 Cases that have been held back pursuant to the Professional Fee Order or any other order of the Bankruptcy Court, which amount is to be deposited in the Holdback Escrow Account as of the Effective Date. The Holdback Amount shall not be considered property of the Debtors or the Reorganized Debtors.

79. "Holdback Escrow Account" means the escrow account established by the Reorganized Debtors into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Fee Claims to the extent not previously paid or disallowed.

80. "Holder" means an Entity holding a Claim.

81. "Identified Parties" means (a) Don H. Barden in any capacity other than as an officer or director of the Debtors and (b) any non-Debtor Entity controlled or owned by Don H. Barden, including but not limited to Barden Development, Inc., Barden Nevada Gaming, LLC, and Gary New Century, LLC.

82. "Impaired" means Claims or Interests in an Impaired Class.

83. "Impaired Class" means an impaired class within the meaning of section 1124 of the Bankruptcy Code.

84. "Indemnification Obligation" means a Debtor's obligation under an Executory Contract or otherwise to indemnify directors, officers, or employees of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtor's respective articles of incorporation,

certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

85. "<u>Intercompany Claim</u>" means any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate against a Debtor.

86. "<u>Intercompany Interest</u>" means an Equity Interest in a Debtor held by another Debtor.

87. "<u>Intercreditor Agreement</u>" means that certain intercreditor and lien subordination agreement dated as of October 7, 2003 and as amended on May 4, 2004, March 1, 2005, June 15, 2005, December 21, 2005, April 13, 2006, July 31, 2006, March 15, 2007, and March 31, 2008, by and among Wells Fargo Capital Finance, Inc. (formerly known as Wells Fargo Foothill, Inc.), as the arranger and administrative agent under and pursuant to the Senior Secured Credit Facility, The Bank of New York Mellon Trust Company, N.A. (formerly known as The Bank of New York Trust Company, N.A., successor to The Bank of New York), solely in its capacity as trustee under the Senior Secured Notes Indenture, and Majestic I and its affiliates signatory thereto as the debtors.

88. "<u>Interests</u>" mean, collectively, Equity Interests and Intercompany Interests.

89. "<u>Judicial Code</u>" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

90. "<u>Lake County Property Tax Motion</u>" means the *Motion of Lake County, Indiana for Allowance of Claims and Determination of Tax Liability Pursuant to Sections 502, 505(a) and 105(a) of the Bankruptcy Code*, filed on November 9, 2010 [Docket No. 719].

91. "<u>Land Transfer Transaction</u>" means a potential restructuring transaction that may occur on the Effective Date, whereby the Debtors would transfer surplus real property that is not currently being utilized by their ongoing casino operations to a newly-formed affiliate entity on terms and conditions that would be set forth more fully in the Plan Supplement, which terms and conditions shall be acceptable to the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.

92. "<u>Largest Committee Senior Noteholder</u>" means the Senior Noteholder that is a member of the Creditors' Committee and, together with its affiliates, holds the greatest principal amount of Senior Notes on the Voting Record Date of any member of the Creditors' Committee.

93. "<u>Largest Secured Noteholder</u>" means the Senior Secured Noteholder that, together with its affiliates, holds the greatest principal amount of Senior Secured Notes on the Voting Record Date.

94. "<u>Lien</u>" has the meaning set forth in section 101(37) of the Bankruptcy Code.

95. "<u>Local Bankruptcy Rules</u>" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

96. "<u>Majestic Holdco</u>" means Majestic Holdco, LLC.

97. "<u>Majestic I</u>" means The Majestic Star Casino, LLC.

98. "<u>Majestic II</u>" means The Majestic Star Casino II, Inc.

99. "<u>Majestic II Tax Action(s)</u>" means (a) the adversary proceeding commenced by the Debtors on December 31, 2010 regarding, <u>inter</u> <u>alia</u>, the tax status of Majestic II, and (b) any other related Causes of Action the Debtors or Reorganized Debtors subsequently may assert.

100. "<u>Majestic Star Holdco</u>" means Majestic Star Holdco, Inc.

101. "<u>Management Consultant</u>" means the management consultant to be retained by the Debtors pursuant to the terms and conditions set forth in Article VI.R of the Plan.

102. "<u>Manager</u>" means a member of the Board of Managers.

103. "<u>MSCC</u>" means The Majestic Star Casino Capital Corp.

104. "<u>MSCC II</u>" means Majestic Start Casino Capital Corp. II.

105. "<u>New Intercreditor Agreement</u>" means that certain intercreditor and lien subordination agreement dated as of the Effective Date, by and among the Senior Secured Credit Facility Agent, on behalf of the Senior Secured Credit Facility Lenders, and the Senior Secured Notes Trustee, on behalf of the Senior Secured Noteholders. A copy of either the New Intercreditor Agreement, or a term sheet setting forth the principal terms thereof, shall be attached as Exhibit 3 to the Plan Supplement.

106. "<u>New Holdco LLC Agreement</u>" means the amended and restated limited liability company agreement of Reorganized Majestic Holdco that all Holders of the New Membership Interests shall be parties to, which shall be attached as part of the Amended and Restated Operating Agreements, attached as Exhibit 1 to the Plan Supplement.

107. "<u>New Membership Interests</u>" means the new membership interests of Reorganized Majestic Holdco.

108. "<u>New Senior Secured Credit Facility</u>" means the $58 million senior secured credit facility with a term of three years following the Effective Date of the Plan, with an interest rate *per annum* equal to (a) the Base Rate plus 3.50% or (b) the LIBOR Rate plus 4.75%, to be provided by the Senior Secured Credit Facility Agent, which shall be secured by a first lien on all of the assets of the Reorganized Debtors to the extent permitted by law and issued pursuant to a new credit agreement, containing the terms as set forth on the term sheet attached hereto as Exhibit I, which new credit agreement shall be in form and substance reasonably satisfactory to the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee. A copy of either the New Senior Secured Credit Facility, or a term sheet setting forth the principal terms thereof, shall be attached as Exhibit 5 to the Plan Supplement.

109. "<u>New Senior Secured Credit Facility Borrowers</u>" means the Reorganized Debtors.

110. "<u>New Senior Secured Credit Facility Paydown Amount</u>" means the payment to be made to Holders of Senior Secured Credit Facility Claims, in the aggregate amount of the total Unrestricted Cash Balances of the Senior Secured Credit Facility Borrowers as of the last day of the calendar month immediately preceding the Effective Date, less $40 million.

111. "<u>New Senior Secured Notes</u>" means the senior secured 12.5% notes (or, at the election of the Senior Secured Notes Trustee, amended and restated Senior Secured Notes), dated as of the Effective Date, due on the fifth anniversary of the Effective Date issued pursuant to the New Senior Secured Notes Indenture, which shall be secured by a second lien on all of the assets of the Reorganized Debtors to the extent permitted by law and issued pursuant to the New Senior Secured Notes Indenture, and subject to the New Intercreditor Agreement.

112. "<u>New Senior Secured Notes Indenture</u>" means that certain indenture (or, at the election of the Senior Secured Notes Trustee, amended and restated Senior Secured Notes Indenture), dated as of the Effective Date, by and among the Reorganized Debtors and any issuing Entity the Debtors or Reorganized Debtors may form, as obligors, and the Senior Secured Notes Trustee, as indenture trustee, which shall be qualified under the Trust Indenture Act pursuant to section 1145(d) of the Bankruptcy Code, and which shall be in form and substance satisfactory to the Senior Secured Credit Facility Agent (in its reasonable discretion), the Senior Secured Notes Trustee, and the Creditors' Committee. A copy of either the New Senior Secured Notes Indenture, or a term sheet setting forth the principal terms thereof, shall be attached as Exhibit 6 to the Plan Supplement.

113.    "Notice, Claims and Solicitation Agent" means Epiq Bankruptcy Solutions, LLC, located at 757 Third Avenue, Third Floor, New York, New York 10017, retained as the Debtors' notice, claims and solicitation agent.

114.    "Periodic Distribution Date" means the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the immediately preceding Periodic Distribution Date.

115.    "Person" means any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, government or agency or political subdivision thereof or any other Entity.

116.    "Petition Date" means November 23, 2009, the date on which the Debtors Filed their voluntary petitions commencing these Chapter 11 Cases in the Bankruptcy Court.

117.    "Plan" means this amended joint plan of reorganization, including the exhibits hereto or contained in the Plan Supplement.

118.    "Plan Supplement" means the compilation of documents and forms of documents and exhibits to the Plan Filed herewith, as supplemented or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules. The forms of each of the documents in the Plan Supplement shall be filed with the Bankruptcy Court prior to the Effective Date.

119.    "Post-Effective Date Management Incentive Program" means a management incentive program that the Board of Managers of Reorganized Majestic Holdco may, but shall have no obligation to, develop, adopt, and implement on or after the Effective Date.

120.    "Postpetition" means the period of time beginning on and following the Petition Date.

121.    "Pre-Effective Date Key Employee Incentive Program" means the key employee incentive program for the Debtors' senior executives, including but not limited to the COO, CFO, General Counsel, and Project Managers, that the Board of Directors of the Debtors may develop, adopt, and implement, subject to the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), which, if implemented, shall cover the period from January 1, 2011 through the Effective Date (and which shall expire by its terms on the Effective Date), the material terms of which shall be described on Exhibit 7 to the Plan Supplement. Without limiting the foregoing, no Pre-Effective Date Key Employee Incentive Program shall provide for the issuance of any New Membership Interests to any Person.

122.    "Prepetition" means the period of time before the Petition Date.

123.    "Priority Non-Tax Claims" mean any and all Claims entitled to priority in payment as specified in section 507(a)(4), (5), (6), or (7) of the Bankruptcy Code.

124.    "Priority Tax Claim" means any and all Claims of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code, as well as any Claim that would otherwise meet the description of an unsecured claim of a Governmental Unit under section 507(a)(8), but for the secured status of the Claim.

125.    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that particular Class and in other Classes entitled to share in the same recovery as such Allowed Claims under the Plan.

126.    "Professional" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363 or 331 of the Bankruptcy Code or (b) awarded

compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code, but excluding, for avoidance of doubt, the advisors and attorneys of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, the Senior Notes Trustee, and the Discount Notes Trustee.

127. "<u>Professional Compensation and Reimbursement Claim</u>" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

128. "<u>Professional Fee Order</u>" means that certain order of the Bankruptcy Court entered on December 17, 2009 [Docket No. 117], establishing procedures for interim compensation and reimbursement of expenses of Professionals.

129. "<u>Projected Effective Date</u>" means a date to be determined from time to time by the Debtors with the consent of the Senior Secured Notes Trustee and the Creditors' Committee (which consent shall not be withheld unreasonably), or by order of the Bankruptcy Court after notice and hearing, that is the anticipated date upon which the Debtors shall have received all necessary regulatory and licensing approvals to lawfully consummate the Plan, for avoidance of doubt excluding those approvals related to Barden Colorado if both the Senior Secured Notes Trustee and the Creditors' Committee waive the condition to the Effective Date related to such approvals.

130. "<u>Property Managers</u>" mean those individuals who hold the position of General Manager of the Debtors' or the Reorganized Debtors' gaming properties in Indiana, Colorado, or Mississippi.

131. "<u>Proof of Claim</u>" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

132. "<u>Qualified Commitment Letter</u>" means a signed commitment letter from one or more third parties unaffiliated with Senior Noteholders (unless consented to by the Senior Secured Notes Trustee) to provide, on a fully committed basis, the Second Lien Alternative Financing which meets the following criteria: (a) provides for financing on materially better terms regarding the interest rate, maturity, amortization, and all other associated costs and expenses than the New Senior Secured Notes; (b) taken as a whole, has restrictive covenants at least as favorable to the Reorganized Debtors as the New Senior Secured Notes; (c) contains closing conditions customary for a transaction of this type, including without limitation, (i) closing conditions similar to those contained in the New Senior Secured Notes Indenture and (ii) the negotiation, execution, and delivery of definitive documentation, <u>provided</u>, <u>however</u>, a Qualified Commitment Letter shall not contain diligence or syndication conditions; (d) provides for a closing no later than the Projected Effective Date; (e) with respect to any terms and conditions that are less favorable to the Senior Secured Credit Facility Agent and/or materially different than the terms of the Senior Secured Notes, such terms and conditions shall be reasonably acceptable to the Senior Secured Credit Facility Agent; and (f) shall be subject to an intercreditor and subordination agreement which is substantially similar to the Intercreditor Agreement.

133. "<u>Qualified Commitment Letter Deadline</u>" means sixty (60) calendar days before the Projected Effective Date.

134. "<u>Rejection Damages Claim</u>" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract or lease.

135. "<u>Released Party</u>" means each of the Senior Secured Credit Facility Agent, the Senior Secured Credit Facility Lenders (and any group or committee thereof), the Senior Secured Notes Trustee, the Senior Secured Noteholders (and any group or committee thereof), the Senior Notes Trustee, the Senior Noteholders, the Discount Notes Trustee, the Discount Noteholders, the Creditors' Committee, and, with respect to each releasing Debtor, each other Debtor (except for Intercompany Claims, which will be treated as provided in the Plan), and each of the respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and

representatives of each of the foregoing parties; <u>provided</u>, <u>however</u>, that the foregoing shall not include any of the Identified Parties.

136. "<u>Reorganized Debtors</u>" means, collectively, the Debtors upon and after the Effective Date.

137. "<u>Reorganized Majestic Holdco</u>" means, Majestic Holdco upon and after the Effective Date.

138. "<u>Retained Liens List</u>" means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors, subject to the consents of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee (which consents shall not be withheld unreasonably), of Senior Secured Credit Facility Liens and New Senior Secured Notes Indenture Liens that shall be permitted to be retained under the New Senior Secured Credit Facility and the New Senior Secured Notes Indenture, respectively, and which shall be attached as Exhibit 8 to the Plan Supplement.

139. "<u>Schedules</u>" means the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

140. "<u>Second Lien Alternative Financing</u>" means alternative financing resulting from an exit financing process to identify options to replace the New Senior Secured Notes, which may be conducted by the Creditors' Committee, with the cooperation of the Debtors' management team and advisors, and which may only be consummated if (a) the Creditors' Committee delivers to the Debtors and the Senior Secured Notes Trustee a Qualified Commitment Letter on or prior to the Qualified Commitment Letter Deadline, (b) the financing to be consummated satisfies the requirements of the Qualified Commitment Letter, and (c) the Second Lien Alternative Financing is consummated within fourteen (14) calendar days of the Projected Effective Date.

141. "<u>Section 510(b) Claims</u>" means any Claim arising from rescission of a purchase or sale of a Security (including any Interest) of the Debtors, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

142. "<u>Secured Claim</u>" means, with respect to any Claim against any Debtor, that portion which, pursuant to section 506 of the Bankruptcy Code, is (a) secured by a valid, perfected, and enforceable security interest, Lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or nonbankruptcy law, in or upon any right, title or interest of a Debtor in and to property of the relevant estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the occurrence of the Effective Date).

143. "<u>Securities Act</u>" means the Securities Act of 1933, as amended.

144. "<u>Security</u>" means any instrument that qualifies under section 2(a)(1) of the Securities Act.

145. "<u>Senior Noteholders</u>" means the Holders of the Senior Notes and their successors and assigns.

146. "<u>Senior Notes</u>" means the senior 9.75% notes due January 15, 2011 issued pursuant to the Senior Notes Indenture.

147. "<u>Senior Notes Indenture</u>" means that certain indenture, dated December 21, 2005, by and among Majestic I and MSCC II, as issuers, and the Majestic II, Barden Mississippi, and Barden Colorado, as guarantors, and the Senior Notes Trustee, as indenture trustee.

148. "<u>Senior Notes Indenture Claim</u>" means a Claim arising under the Senior Notes Indenture or the Senior Notes.

149. "<u>Senior Notes Indenture Guarantee</u>" means the guarantees issued by Majestic II, Barden Mississippi, and Barden Colorado, as guarantors of the Senior Notes.

150.    "Senior Notes Indenture Guarantee Claim" means a Claim arising under the Senior Notes Indenture Guarantee.

151.    "Senior Notes Trustee" means Law Debenture Trust Company of New York, as successor to The Bank of New York Mellon Trust Company, N.A. (formerly known as The Bank of New York Trust Company, N.A., successor to The Bank of New York), as indenture trustee under the Senior Notes Indenture, or any successor indenture trustee appointed in accordance with such agreement.

152.    "Senior Secured Credit Facility Agent" means Wells Fargo Capital Finance, Inc. (formerly known as Wells Fargo Foothill, Inc.), as arranger and administrative agent under the Senior Secured Credit Facility, or any successor agent appointed in accordance with such agreement.

153.    "Senior Secured Credit Facility" means that certain loan and security agreement dated as of October 7, 2003, and as amended on May 4, 2004, March 1, 2005, June 15, 2005, December 21, 2005, April 13, 2006, July 31, 2006, March 15, 2007, and March 31, 2008, by and among Majestic I, Majestic II, Barden Mississippi, and Barden Colorado, as borrowers, and Majestic Holdco, as guarantor, and the other loan parties to the Senior Secured Credit Facility, and the Senior Secured Credit Facility Agent as agent for the Senior Secured Credit Facility Lenders.

154.    "Senior Secured Credit Facility Claim" means a Claim arising under the Senior Secured Credit Facility.

155.    "Senior Secured Credit Facility Guarantee" means the guarantees issued by Majestic Holdco, as guarantor of the Senior Secured Credit Facility.

156.    "Senior Secured Credit Facility Guarantee Claim" means a Claim arising under the Senior Secured Notes Credit Facility Guarantee.

157.    "Senior Secured Credit Facility Lenders" means the lenders under the Senior Secured Credit Facility and their successors and assigns.

158.    "Senior Secured Noteholders" means the Holders of the Senior Secured Notes and their successors and assigns.

159.    "Senior Secured Notes" means the senior secured 9.5% notes due October 15, 2010 issued pursuant to the Senior Secured Notes Indenture.

160.    "Senior Secured Notes Indenture" means that certain indenture, dated October 7, 2003, and the supplemental indentures, each dated as of December 21, 2005, by and among Majestic I and MSCC, as issuers, and Majestic Holdco, Majestic II, MSCC II, Barden Mississippi, and Barden Colorado, as guarantors, and the Senior Secured Notes Trustee, as indenture trustee.

161.    "Senior Secured Notes Indenture Claim" means a Claim arising under the Senior Secured Notes Indenture or the Senior Secured Notes, including the fees and expenses of the Senior Secured Notes Trustee and its attorneys and advisors.

162.    "Senior Secured Notes Indenture Guarantee" means the guarantees issued by Majestic Holdco, Majestic II, MSCC II, Barden Mississippi, and Barden Colorado, as guarantors of the Senior Secured Notes.

163.    "Senior Secured Notes Indenture Guarantee Claim" means a claim arising under the Senior Secured Notes Indenture Guarantee.

164.    "Senior Secured Notes Trustee" means The Bank of New York Mellon Trust Company, N.A. (formerly known as The Bank of New York Trust Company, N.A., successor to The Bank of New York), as

indenture trustee under the Senior Secured Notes Indenture, or any successor indenture trustee appointed in accordance with such agreement.

165. "Servicer" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

166. "Standing Motion" means the *Motion of the Official Committee of Unsecured Creditors of The Majestic Star Casino, LLC, et al., Pursuant to 11 U.S.C. §§ 105(a), 1103(c) and 1109(b), for Entry of an Order Granting Leave, Standing and Authority to Prosecute and, if Appropriate, Settle Claims on Behalf of the Debtors' Estates*, filed by the Creditors' Committee on March 4, 2010 [Docket No. 237].

167. "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

168. "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

169. "Unimpaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

170. "United States Trustee" means the Office of the United States Trustee for the District of Delaware.

171. "Unrestricted Cash Balances" means, as of any date of determination, all of the cash on hand of the Debtors or Reorganized Debtors, as applicable, except restricted cash which includes, but not necessarily limited to, (a) certificates of deposit collateralizing certain liabilities, (b) segregated accounts for local taxing authorities, (c) deposits held by utility providers pursuant to the *Final Order Determining Adequate Assurance of Payment for Future Utility Services*, entered on December 17, 2009 [Docket No. 115], and (d) reserves for potential liabilities arising under or related to certain agreements with the City of Gary, Indiana, including the Development Agreement, dated as of March 26, 1996 (as amended or otherwise restated).

172. "Unsecured Claim" means any Claim that is neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including any Rejection Damages Claim.

173. "Voting Deadline" means the date determined by an order of the Bankruptcy Court by which vote to accept or reject the Plan must be cast.

174. "Voting Record Date" shall have the meaning ascribed to it in the Order approving the Disclosure Statement.

B. Rules of Interpretation. For purposes of the Plan:

1. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or gender-neutral shall include the masculine, feminine, and the gender-neutral;

2. Any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions;

3. Unless otherwise specified, any reference in the Plan to an existing document or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented in accordance with its terms;

4.	Any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns;

5.	Unless otherwise specified, all references in the Plan to "Articles" are references to Articles of the Plan;

6.	Unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Plan Supplement;

7.	The words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

8.	Subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules;

9.	Captions and headings of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

10.	Unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

11.	Any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

12.	All references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

13.	All references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and

14.	Any immaterial effectuating provisions may be interpreted by the Reorganized Debtors after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order.

C.	Computation of Time.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

# ARTICLE II.

## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III.

A.        <u>Administrative Expense Claims</u>.   Except with respect to Administrative Expense Claims that are Professional Compensation and Reimbursement Claims and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the later of the Distribution Date under the Plan, the date such Administrative Expense Claim is Allowed, and the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

B.        <u>Professional Compensation and Reimbursement Claims</u>.   Except as provided in Article II.A hereof, all Entities seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (1) File, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay reasonable compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

C.        <u>Priority Tax Claims</u>.  Each Holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), one of the following treatments on account of such Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; (2) such other treatment as may be agreed to by such Holder and the applicable Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), or otherwise determined upon an order of the Bankruptcy Court; or (3) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class, and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

A. <u>Majestic Holdco</u>

1. **Class A-1** shall consist of all Senior Secured Credit Facility Guarantee Claims against Majestic Holdco.

2. **Class A-2** shall consist of all Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco.

3. **Class A-3** shall consist of all Discount Notes Indenture Claims against Majestic Holdco.

4. **Class A-4** shall consist of all Interests in Majestic Holdco.

5. **Class A-5** shall consist of all Section 510(b) Claims that may exist against Majestic Holdco.

B. <u>Majestic Star Holdco</u>

1. **Class B-1** shall consist of all Discount Notes Indenture Claims against Majestic Star Holdco.

2. **Class B-2** shall consist of all Intercompany Interests in Majestic Star Holdco.

3. **Class B-3** shall consist of all Section 510(b) Claims that may exist against Majestic Star Holdco.

C. <u>Majestic I</u>

1. **Class C-1** shall consist of all Senior Secured Credit Facility Claims against Majestic I.

2. **Class C-2** shall consist of all Senior Secured Notes Indenture Claims against Majestic I.

3. **Class C-3** shall consist of all Priority Non-Tax Claims that may exist against Majestic I.

4. **Class C-4** shall consist of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) that may exist against Majestic I.

5. **Class C-5** shall consist of all Senior Notes Indenture Claims that may exist against Majestic I.

6. **Class C-6** shall consist of all General Unsecured Claims and Rejection Damages Claims that may exist against Majestic I.

7. **Class C-7** shall consist of all Intercompany Claims that may exist against Majestic I.

8. **Class C-8** shall consist of all Intercompany Interests in Majestic I.

9. **Class C-9** shall consist of all Section 510(b) Claims that may exist against Majestic I.

D.      <u>Majestic II</u>

      1.      **Class D-1** shall consist of all Senior Secured Credit Facility Claims against Majestic II.

      2.      **Class D-2** shall consist of all Senior Secured Notes Indenture Guarantee Claims against Majestic II.

      3.      **Class D-3** shall consist of all Priority Non-Tax Claims that may exist against Majestic II.

      4.      **Class D-4** shall consist of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) that may exist against Majestic II.

      5.      **Class D-5** shall consist of all Senior Notes Indenture Guarantee Claims that may exist against Majestic II.

      6.      **Class D-6** shall consist of all General Unsecured Claims and Rejection Damages Claims that may exist against Majestic II.

      7.      **Class D-7** shall consist of all Intercompany Claims that may exist against Majestic II.

      8.      **Class D-8** shall consist of all Intercompany Interests in Majestic II.

      9.      **Class D-9** shall consist of all Section 510(b) Claims that may exist against Majestic II.

E.      <u>MSCC</u>

      1.      **Class E-1** shall consist of all Senior Secured Notes Indenture Claims against MSCC.

      2.      **Class E-2** shall consist of all Intercompany Interests in MSCC.

      3.      **Class E-3** shall consist of all Section 510(b) Claims that may exist against MSCC.

F.      <u>MSCC II</u>

      1.      **Class F-1** shall consist of all Senior Secured Notes Indenture Guarantee Claims against MSCCII.

      2.      **Class F-2** shall consist of all Senior Notes Indenture Claims against MSCC II.

      3.      **Class F-3** shall consist of all Intercompany Interests in MSCC II.

      4.      **Class F-4** shall consist of all Section 510(b) Claims that may exist against MSCC II.

G.      <u>Barden Mississippi</u>

      1.      **Class G-1** shall consist of all Senior Secured Credit Facility Claims against Barden Mississippi.

      2.      **Class G-2** shall consist of all Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi.

      3.      **Class G-3** shall consist of all Priority Non-Tax Claims that may exist against Barden Mississippi.

      4.      **Class G-4** shall consist of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) that may exist against Barden Mississippi.

      5.      **Class G-5** shall consist of all Senior Notes Indenture Guarantee Claims that may exist against

Barden Mississippi.

6.     **Class G-6** shall consist of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Mississippi.

7.     **Class G-7** shall consist of all Intercompany Claims that may exist against Barden Mississippi.

8.     **Class G-8** shall consist of all Intercompany Interests in Barden Mississippi.

9.     **Class G-9** shall consist of all Section 510(b) Claims that may exist against Barden Mississippi.

H.     <u>Barden Colorado</u>

1.     **Class H-1** shall consist of all Senior Secured Credit Facility Claims against Barden Colorado.

2.     **Class H-2** shall consist of all Senior Secured Notes Indenture Guarantee Claims against Barden Colorado.

3.     **Class H-3** shall consist of all Priority Non-Tax Claims that may exist against Barden Colorado.

4.     **Class H-4** shall consist of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) that may exist against Barden Colorado.

5.     **Class H-5** shall consist of all Senior Notes Indenture Guarantee Claims that may exist against Barden Colorado.

6.     **Class H-6** shall consist of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Colorado.

7.     **Class H-7** shall consist of all Intercompany Claims that may exist against Barden Colorado.

8.     **Class H-8** shall consist of all Intercompany Interests in Barden Colorado.

9.     **Class H-9** shall consist of all Section 510(b) Claims that may exist against Barden Colorado.

# ARTICLE IV.

## TREATMENT OF CLAIMS AND INTERESTS

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.  Consistent with the intent to provide a single recovery in respect of all Claims filed against one or more of the Debtors, the classification and treatment of Allowed Claims under the Plan shall take into consideration and shall be deemed to be in full satisfaction, release and discharge of, and in exchange for, all Allowed Claims.  Holders of Claims will be entitled to only one distribution in respect of the primary and secondary liabilities related to the underlying Allowed Claim.  No multiple recoveries on account of any Allowed Claim against any Debtor will be provided or permitted.

A.    <u>Majestic Holdco</u>

1.    **Class A-1:  Senior Secured Credit Facility Guarantee Claims against Majestic Holdco**

(a)    <u>Classification</u>.  Class A-1 consists of all Senior Secured Credit Facility Guarantee Claims against Majestic Holdco.

(b)    <u>Impairment and Voting</u>.  Class A-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, (i) in the event no First Lien Alternative Financing is consummated, guarantees substantially similar to the terms of the Senior Secured Credit Facility Guarantee or (ii) in the event the First Lien Alternative Financing is consummated, its Pro Rata share of Cash from the proceeds of the First Lien Alternative Financing.

2.    **Class A-2:  Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco**

(a)    <u>Classification</u>.  Class A-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco.

(b)    <u>Impairment and Voting</u>.  Class A-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

3.    **Class A-3:  Discount Notes Indenture Claims against Majestic Holdco**

(a)    <u>Classification</u>.  Class A-3 consists of all Discount Notes Indenture Claims against Majestic Holdco.

(b)    <u>Impairment and Voting</u>.  Class A-3 is Impaired by the Plan.  Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)　　　Distributions.　Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no distribution under the Plan on account of such Claims.

4.　　**Class A-4:　Interests in Majestic Holdco**

(a)　　　Classification.　Class A-4 consists of all Interests in Majestic Holdco.

(b)　　　Impairment and Voting.　Class A-4 is Impaired by the Plan.　Each Holder of an Interest in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)　　　Distributions.　Interests in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

5.　　**Class A-5:　Section 510(b) Claims in Majestic Holdco**

(a)　　　Classification.　Class A-5 consists of all Section 510(b) Claims that may exist against Majestic Holdco.

(b)　　　Impairment and Voting.　Class A-5 is Impaired by the Plan.　Each Holder of a Section 510(b) Claim in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)　　　Distributions.　Section 510(b) Claims in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

B.　　Majestic Star Holdco

1.　　**Class B-1:　Discount Notes Indenture Claims against Majestic Star Holdco**

(a)　　　Classification.　Class B-1 consists of all Discount Notes Indenture Claims against Majestic Star Holdco.

(b)　　　Impairment and Voting.　Class B-1 is Impaired by the Plan.　Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)　　　Distributions.　Discount Notes Indenture Claims against Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Star Holdco shall receive no distribution under the Plan on account of such Claims.

2.　　**Class B-2:　Intercompany Interests in Majestic Star Holdco**

(a)　　　Classification.　Class B-2 consists of all Intercompany Interests in Majestic Star Holdco.

(b)　　　Impairment and Voting.　Class B-2 is Impaired by the Plan.　Each Holder of an Interest in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)　　　Distributions.　Intercompany Interests in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

3.    **Class B-3:  Section 510(b) Claims in Majestic Star Holdco**

(a)    <u>Classification</u>.  Class B-3 consists of all Section 510(b) Claims that may exist against Majestic Star Holdco.

(b)    <u>Impairment and Voting</u>.  Class B-3 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Section 510(b) Claims in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

C.    <u>Majestic I</u>

1.    **Class C-1:  Senior Secured Credit Facility Claims against Majestic I**

(a)    <u>Classification</u>.  Class C-1 consists of all Senior Secured Credit Facility Claims against Majestic I.

(b)    <u>Impairment and Voting</u>.  Class C-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

2.    **Class C-2:  Senior Secured Notes Indenture Claims against Majestic I**

(a)    <u>Classification</u>.  Class C-2 consists of all Senior Secured Notes Indenture Claims against Majestic I.

(b)    <u>Impairment and Voting</u>.  Class C-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

3.    **Class C-3:  Priority Non-Tax Claims against Majestic I**

(a)    <u>Classification</u>.  Class C-3 consists of all Priority Non-Tax Claims that may exist against Majestic I.

(b)    <u>Impairment and Voting</u>.  Class C-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic I shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4. **Class C-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I**

(a) <u>Classification</u>. Class C-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

5. **Class C-5: Senior Notes Indenture Claims against Majestic I**

(a) <u>Classification</u>. Class C-5 consists of all Senior Notes Indenture Claims against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-5 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

6. **Class C-6: General Unsecured Claims and Rejection Damages Claims against Majestic I**

(a) <u>Classification</u>. Class C-6 consists of all General Unsecured Claims and Rejection Damages Claims against Majestic I. As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b) <u>Impairment and Voting</u>.  Class C-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

7.     **Class C-7:  Intercompany Claims against Majestic I**

(a) <u>Classification</u>.  Class C-7 consists of all Intercompany Claims that may exist against Majestic I.

(b) <u>Impairment and Voting</u>.  Class C-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic I is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Allowed Intercompany Claims against Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c) <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic I will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

8.     **Class C-8:  Intercompany Interests in Majestic I**

(a) <u>Classification</u>.  Class C-8 consists of all Intercompany Interests in Majestic I.

(b) <u>Impairment and Voting</u>.  Class C-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Majestic I is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c) <u>Distributions</u>.  Intercompany Interests in Majestic I, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic I, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

9.     **Class C-9:  Section 510(b) Claims in Majestic I**

(a) <u>Classification</u>.  Class C-9 consists of all Section 510(b) Claims that may exist against Majestic I.

(b) <u>Impairment and Voting</u>.  Class C-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>.  Section 510(b) Claims in Majestic I shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

D.      Majestic II

1.      **Class D-1:  Senior Secured Credit Facility Claims against Majestic II**

(a)      Classification.  Class D-1 consists of all Senior Secured Credit Facility Claims against Majestic II.

(b)      Impairment and Voting.  Class D-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)      Distributions.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

2.      **Class D-2:  Senior Secured Notes Indenture Guarantee Claims against Majestic II**

(a)      Classification.  Class D-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic II.

(b)      Impairment and Voting.  Class D-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)      Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

3.      **Class D-3:  Priority Non-Tax Claims against Majestic II**

(a)      Classification.  Class D-3 consists of all Priority Non-Tax Claims that may exist against Majestic II.

(b)      Impairment and Voting.  Class D-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic II shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.      **Class D-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II**

(a)      Classification.  Class D-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II.

(b)      Impairment and Voting.  Class D-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.   Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

5.      **Class D-5:  Senior Notes Indenture Guarantee Claims against Majestic II**

(a)      Classification.   Class D-5 consists of all Senior Notes Indenture Guarantee Claims against Majestic II.

(b)      Impairment and Voting.   Class D-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)      Distributions.   Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

6.      **Class D-6:  General Unsecured Claims and Rejection Damages Claims against Majestic II**

(a)      Classification.   Class D-6 consists of all General Unsecured Claims and Rejection Damages Claims against Majestic II.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; provided, however, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)      Impairment and Voting.   Class D-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)      Distributions.   Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

7.     **Class D-7:  Intercompany Claims against Majestic II**

(a)     <u>Classification</u>.  Class D-7 consists of all Intercompany Claims that may exist against Majestic II.

(b)     <u>Impairment and Voting</u>.  Class D-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic II is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Allowed Intercompany Claims against Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic II will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

8.     **Class D-8:  Intercompany Interests in Majestic II**

(a)     <u>Classification</u>.  Class D-8 consists of all Intercompany Interests in Majestic II.

(b)     <u>Impairment and Voting</u>.  Class D-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Majestic II is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     <u>Distributions</u>.  Intercompany Interests in Majestic II, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic II, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

9.     **Class D-9:  Section 510(b) Claims in Majestic II**

(a)     <u>Classification</u>.  Class D-9 consists of all Section 510(b) Claims that may exist against Majestic II.

(b)     <u>Impairment and Voting</u>.  Class D-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     <u>Distributions</u>.  Section 510(b) Claims in Majestic II shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

E.     <u>MSCC</u>

1.     **Class E-1:  Senior Secured Notes Indenture Claims against MSCC**

(a)     <u>Classification</u>.  Class E-1 consists of all Senior Secured Notes Indenture Claims against MSCC.

(b)     <u>Impairment and Voting</u>.  Class E-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

2.     **Class E-2:  Intercompany Interests in MSCC**

(a)     Classification.  Class E-2 consists of all Intercompany Interests in MSCC.

(b)     Impairment and Voting.  Class E-2 is Impaired by the Plan.  Each Holder of an Interest in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Intercompany Interests in MSCC shall be cancelled, released, and extinguished and the Holders of such Intercompany Interests shall receive no distribution under the Plan on account thereof.

3.     **Class E-3:  Section 510(b) Claims in MSCC**

(a)     Classification.  Class E-3 consists of all Section 510(b) Claims that may exist against MSCC.

(b)     Impairment and Voting.  Class E-3 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Section 510(b) Claims in MSCC shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

F.     MSCC II

1.     **Class F-1:  Senior Secured Notes Indenture Guarantee Claims against MSCC II**

(a)     Classification.  Class F-1 consists of all Senior Secured Notes Indenture Guarantee Claims against MSCC II.

(b)     Impairment and Voting.  Class F-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) if there is no Second Lien Alternative Financing, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

2.     **Class F-2:  Senior Notes Indenture Claims against MSCC II**

(a)     Classification.  Class F-2 consists of all Senior Notes Indenture Claims against MSCC II.

(b)     Impairment and Voting.  Class F-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)  Distributions.  Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

3.  **Class F-3:  Intercompany Interests in MSCC II**

(a)  Classification.  Class F-3 consists of all Intercompany Interests in MSCC II.

(b)  Impairment and Voting.  Class F-3 is Impaired by the Plan.  Each Holder of an Interest in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)  Distributions.  Intercompany Interests in MSCC II shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

4.  **Class F-4:  Section 510(b) Claims in MSCC II**

(a)  Classification.  Class F-4 consists of all Section 510(b) Claims that may exist against MSCC II.

(b)  Impairment and Voting.  Class F-4 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)  Distributions.  Section 510(b) Claims in MSCC II shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

G.  Barden Mississippi

1.  **Class G-1: Senior Secured Credit Facility Claims against Barden Mississippi**

(a)  Classification.  Class G-1 consists of all Senior Secured Credit Facility Claims against Barden Mississippi.

(b)  Impairment and Voting.  Class G-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)  Distributions.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

2.  **Class G-2:  Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi**

(a)  Classification.  Class G-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi.

(b)  Impairment and Voting.  Class G-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)  Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its

Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

3.      **Class G-3:  Priority Non-Tax Claims against Barden Mississippi**

(a)      <u>Classification</u>.  Class G-3 consists of all Priority Non-Tax Claims that may exist against Barden Mississippi.

(b)      <u>Impairment and Voting</u>.  Class G-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.      **Class G-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi**

(a)      <u>Classification</u>.  Class G-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi.

(b)      <u>Impairment and Voting</u>.  Class G-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

5.      **Class G-5:  Senior Notes Indenture Guarantee Claims against Barden Mississippi**

(a)      <u>Classification</u>.  Class G-5 consists of all Senior Notes Indenture Guarantee Claims that may exist against Barden Mississippi.

(b)      <u>Impairment and Voting</u>.  Class G-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c) _Distributions_. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

6.    **Class G-6:    General Unsecured Claims and Rejection Damages Claims against Barden Mississippi**

(a)    _Classification_.    Class G-6 consists of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Mississippi.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; _provided_, _however_, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)    _Impairment and Voting_.  Class G-6 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim, General Unsecured Claim, and/or Rejection Damages Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)    _Distributions_.    Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

7.    **Class G-7: Intercompany Claims against Barden Mississippi**

(a)    _Classification_.    Class G-7 consists of all Intercompany Claims that may exist against Barden Mississippi.

(b)    _Impairment and Voting_.  Class G-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Allowed Intercompany Claims against Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)    _Distributions_.    Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Mississippi will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

8.    **Class G-8: Intercompany Interests in Barden Mississippi**

(a)    _Classification_.  Class G-8 consists of all Intercompany Interests in Barden Mississippi.

(b)    _Impairment and Voting_.    Class G-8 is Impaired by the Plan.    Each Holder of an Intercompany Interest in Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)    _Distributions_.    Intercompany Interests in Barden Mississippi, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Mississippi, to

provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

9. **Class G-9: Section 510(b) Claims in Barden Mississippi**

(a) <u>Classification</u>. Class G-9 consists of all Section 510(b) Claims that may exist against Barden Mississippi.

(b) <u>Impairment and Voting</u>. Class G-9 is Impaired by the Plan. Each Holder of a Section 510(b) Claim in Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Section 510(b) Claims in Barden Mississippi shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

H. <u>Barden Colorado</u>

1. **Class H-1: Senior Secured Credit Facility Claims against Barden Colorado**

(a) <u>Classification</u>. Class H-1 consists of all Senior Secured Credit Facility Claims against Barden Colorado.

(b) <u>Impairment and Voting</u>. Class H-1 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

2. **Class H-2: Senior Secured Notes Indenture Guarantee Claims against Barden Colorado**

(a) <u>Classification</u>. Class H-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Colorado.

(b) <u>Impairment and Voting</u>. Class H-2 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

3. **Class H-3: Priority Non-Tax Claims against Barden Colorado**

(a) <u>Classification</u>. Class H-3 consists of all Priority Non-Tax Claims that may exist against Barden Colorado.

(b)      Impairment and Voting.  Class H-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.      **Class H-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado**

(a)      Classification.  Class H-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado.

(b)      Impairment and Voting.  Class H-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado, with consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

5.      **Class H-5:  Senior Notes Indenture Guarantee Claims against Barden Colorado**

(a)      Classification.  Class H-5 consists of all Senior Notes Indenture Guarantee Claims that may exist against Barden Colorado.

(b)      Impairment and Voting.  Class H-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)      Distributions.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

6.      **Class H-6:  General Unsecured Claims and Rejection Damages Claims against Barden Colorado**

(a)      Classification.  Class H-6 consists of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Colorado.  As part of the global settlement embodied in the Plan,

Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; provided, however, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)     Impairment and Voting.  Class H-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

7.     **Class H-7:  Intercompany Claims against Barden Colorado**

(a)     Classification.  Class H-7 consists of all Intercompany Claims that may exist against Barden Colorado.

(b)     Impairment and Voting.  Class H-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     Distributions.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Colorado will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

8.     **Class H-8:  Intercompany Interests in Barden Colorado**

(a)     Classification.  Class H-8 consists of all Intercompany Interests in Barden Colorado.

(b)     Impairment and Voting.  Class H-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     Distributions.  Intercompany Interests in Barden Colorado, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Colorado, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

9.     **Class H-9:  Section 510(b) Claims in Barden Colorado**

(a)     Classification.  Class H-9 consists of all Section 510(b) Claims that may exist against Barden Colorado.

(b)     <u>Impairment and Voting</u>.  Class H-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     <u>Distributions</u>.  Section 510(b) Claims in Barden Colorado shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

# ARTICLE V.

## IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS; ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION

A.     Classes Entitled to Vote.  The following Classes are Impaired by the Plan and thus are entitled to vote to accept or reject the Plan.

**Class A-1** (Senior Secured Credit Facility Guarantee Claims against Majestic Holdco)
**Class A-2** (Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco)

**Class C-1** (Senior Secured Credit Facility Claims against Majestic I)
**Class C-2** (Senior Secured Notes Indenture Claims against Majestic I)
**Class C-5** (Senior Notes Indenture Claims against Majestic I)
**Class C-6** (General Unsecured Claims and Rejection Damages Claims against Majestic I)

**Class D-1** (Senior Secured Credit Facility Claims against Majestic II)
**Class D-2** (Senior Secured Notes Indenture Guarantee Claims against Majestic II)
**Class D-5** (Senior Notes Indenture Guarantee Claims against Majestic II)
**Class D-6** (General Unsecured Claims and Rejection Damages Claims against Majestic II)

**Class E-1** (Senior Secured Notes Indenture Claims against MSCC)

**Class F-1** (Senior Secured Notes Indenture Guarantee Claims against MSCC II)
**Class F-2** (Senior Notes Indenture Claims against MSCC II)

**Class G-1** (Senior Secured Credit Facility Claims against Barden Mississippi)
**Class G-2** (Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi)
**Class G-5** (Senior Notes Indenture Guarantee Claims against Barden Mississippi)
**Class G-6** (General Unsecured Claims and Rejection Damages Claims against Barden Mississippi)

**Class H-1** (Senior Secured Credit Facility Claims against Barden Colorado)
**Class H-2** (Senior Secured Notes Indenture Guarantee Claims against Barden Colorado)
**Class H-5** (Senior Notes Indenture Guarantee Claims against Barden Colorado)
**Class H-6** (General Unsecured Claims and Rejection Damages Claims against Barden Colorado)

B.     Classes Entitled to Vote on a Provisional Basis.  The following Classes are Impaired by the Plan.  Each Holder of a Claim or Interest in these Classes shall be permitted to vote to accept or reject the Plan on a provisional basis.  Holders of Claims or Interests that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

**Class C-7** (Intercompany Claims against Majestic I)
**Class C-8** (Intercompany Interests in Majestic I)

**Class D-7** (Intercompany Claims against Majestic II)
**Class D-8** (Intercompany Interests in Majestic II)

**Class G-7** (Intercompany Claims against Barden Mississippi)
**Class G-8** (Intercompany Interests in Barden Mississippi)

**Class H-7** (Intercompany Claims against Barden Colorado)
**Class H-8** (Intercompany Interests in Barden Colorado)

C.    <u>Classes Not Entitled to Vote; Deemed to Accept</u>.  The following Classes are Unimpaired by the Plan—and thus are not entitled to vote to accept or reject the Plan—and shall be deemed conclusively to have accepted the Plan.

**Class C-3** (Priority Non-Tax Claims against Majestic I)
**Class C-4** (Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I)

**Class D-3** (Priority Non-Tax Claims against Majestic II)
**Class D-4** (Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II)

**Class G-3** (Priority Non-Tax Claims against Barden Mississippi)
**Class G-4** (Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi)

**Class H-3** (Priority Non-Tax Claims against Barden Colorado)
**Class H-4** (Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado)

D.    <u>Classes Not Entitled to Vote; Deemed to Reject</u>.  The following Classes are Impaired by the Plan—but are not entitled to vote to accept or reject the Plan—and shall be deemed conclusively to have rejected the Plan.

**Class A-3** (Discount Notes Indenture Claims against Majestic Holdco)
**Class A-4** (Interests in Majestic Holdco)
**Class A-5** (Section 510(b) Claims against Majestic Holdco)

**Class B-1** (Discount Notes Indenture Claims against Majestic Star Holdco)
**Class B-2** (Intercompany Interests in Majestic Star Holdco)
**Class B-3** (Section 510(b) Claims against Majestic Star Holdco)

**Class C-9** (Section 510(b) Claims against Majestic I)

**Class D-9** (Section 510(b) Claims against Majestic II)

**Class E-2** (Intercompany Interests in MSCC)
**Class E-3** (Section 510(b) Claims against MSCC)

**Class F-3** (Intercompany Interests in MSCC II)
**Class F-4** (Section 510(b) Claims against MSCC II)

**Class G-9** (Section 510(b) Claims against Barden Mississippi)

**Class H-9** (Section 510(b) Claims against Barden Colorado)

E.    <u>Nonconsensual Confirmation</u>.  Except as otherwise specifically provided in the Plan, if any Impaired Class shall not accept the Plan by the requisite statutory majority provided in sections 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

**ARTICLE VI.**

**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

A.    Sources of Consideration for Plan Distributions.  Cash Distributions under the Plan shall be funded from the Reorganized Debtors' Cash balances and/or Cash from business operations.  Further, the Debtors and the Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

B.    Reorganized Debtors' Equity Interests.  The Reorganized Debtors' equity interests shall consist of New Membership Interests and reinstated Intercompany Interests.  On the Effective Date, shares of New Membership Interests shall be issued and distributed to the Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, Senior Notes Indenture Guarantee Claims, General Unsecured Claims and Rejection Damages Claims in accordance with the terms of this Plan without the need for any further corporate action or without any further action by a Holder of Claims or Interests.  All of the shares of New Membership Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of New Membership Interests shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

C.    General Settlement of Claims and Interests.  As discussed in detail in the Disclosure Statement and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, distributions, releases and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation:

>    (a)    the settlement arising from or related to proceeds of the Gaming Licenses;

>    (b)    the settlement related to the valuation of the Gaming Licenses;

>    (c)    the settlement related to determining the enterprise value of the Debtors;

>    (d)    the settlement arising from or related to the Senior Secured Notes Trustee's alleged liens on the Debtors' deposit accounts and Cash; and

>    (e)    the settlement arising from or related to the claims and causes of action set forth in the Standing Motion;

Subject to Article IX, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final and indefeasible.

D.    Agent and Trustees.  The Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and the Senior Notes Trustee, respectively, shall be deemed to be the Holder of all Senior Secured Credit Facility Claims, Senior Secured Notes Indenture Claims, and Senior Notes Indenture Claims, respectively, for purposes of any distributions to be made hereunder, and all distributions on account of such Claims shall be made to or on behalf of the Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and Senior Notes Trustee, as applicable. The Senior Secured Credit Facility Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Senior Secured Credit Facility Claims.  The Senior Secured Notes Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Senior Secured Notes Indenture Claims in accordance with the Senior Secured Notes Indenture and the terms of this Plan.  The Senior Notes Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Senior Notes Indenture Claims in accordance with the Senior

Notes Indenture and the terms of this Plan. The Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and Senior Notes Trustee shall arrange to deliver such distributions to or on behalf of their respective claimants, which distributions will be subject to the lien rights and priority of payment rights of the Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and Senior Notes Trustee, as applicable.

The Senior Secured Credit Facility Agent, Senior Secured Notes Trustee and the Senior Notes Trustee shall be compensated for all of their reasonable services and disbursements related to distributions pursuant to the Plan, including with respect to facilitating the regulatory approvals for prospective holders of New Membership Interests and satisfying other conditions to the Effective Date (and for the related reasonable fees and expenses of any counsel or professional engaged by the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee and the Senior Notes Trustee with respect to administering or implementing such distributions), by the Debtors, the Reorganized Debtors, or the Distribution Agent, as appropriate, in the ordinary course upon the presentation of invoices by the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee and the Senior Notes Trustee. The compensation of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee and the Senior Notes Trustee for services relating to distributions under the Plan shall be made without the need for filing any application or request with, or approval by, the Bankruptcy Court.

The Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee and the Senior Notes Trustee shall not be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions.

The exercise of any rights and remedies by the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee or the Senior Notes Trustee under their respective credit agreements or indentures against a distribution to recover payment of any unpaid fees and expenses shall not subject the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee and/or the Senior Notes Trustee to the jurisdiction of the Bankruptcy Court with respect to either the exercise of such rights and remedies or the fees and costs recovered thereby.

E.      New Senior Secured Credit Facility.  On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the New Senior Secured Credit Facility, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any other person.

F.      New Intercreditor Agreement.  On the Effective Date, the Senior Secured Credit Facility Agent, on behalf of the Senior Secured Credit Facility Lenders, and the Senior Secured Notes Trustee, on behalf of the Senior Secured Noteholders, shall execute the New Intercreditor Agreement in form and substance acceptable to both the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee, except if the First Lien Alternative Financing or the Second Lien Alternative Financing is consummated, in which case an intercreditor agreement may be executed with the parties to such agreements.

G.      New Senior Secured Notes Indenture.  On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the New Senior Secured Notes Indenture, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any other person.

H.      Corporate Existence.  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation, operating agreements, and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation, operating agreements, and bylaws (or other formation documents) are amended by the Plan or otherwise, in either case with the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably) and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval. The Senior Secured Notes Trustee reserves the right, with the consents of the Debtors and the Creditors Committee (which

consents shall not be withheld unreasonably), to create special purpose entities to (i) be co-issuers of the New Senior Secured Notes, and (ii) to hold each Gaming License.

I.      Capital Structure and Corporate Governance of the Reorganized Debtors. The material terms of the capital structure and corporate governance of the Reorganized Debtors are set forth on the term sheet attached hereto as Exhibit II, the terms of which shall be reflected in the New Holdco LLC Agreement, which shall be part of the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

J.      Vesting of Assets in the Reorganized Debtors. Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, and all Causes of Action shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure any indebtedness as contemplated by the Plan). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Senior Secured Notes Trustee reserves the right, with the consents of the Debtors and the Creditors' Committee (which consents shall not be withheld unreasonably), to provide in the Plan Supplement that certain assets will be left behind in the applicable Debtors' estates for liquidation and future distribution in accordance with applicable law.

K.      Securities Exemption. The offering, issuance, and distribution of any New Membership Interests contemplated by the Plan and all agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code, Section 4(2) of the Securities Act and/or any other applicable exemptions. New Membership Interests contemplated by the Plan that are issued pursuant to an exemption under section 1145 of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions on the transferability of such securities and instruments, and (4) applicable regulatory approval. Without limiting the effect of section 1145 of the Bankruptcy Code, New Membership Interests contemplated by the Plan that are issued pursuant to an exemption under Section 4(2) of the Securities Act may only be resold in a registered offering or pursuant to another exemption under applicable securities laws.

L.      Cancellation of Securities and Agreements. On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the Senior Secured Credit Facility, Senior Secured Notes Indenture, Senior Notes Indenture, and Discount Notes Indenture, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan) shall be cancelled, the obligations of the Debtors thereunder or in any way related thereto shal be fully released, terminated, extinguished and discharged, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, operating agreements, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors.

Notwithstanding anything contained herein to the contrary, the Senior Secured Notes Indenture and the Senior Notes Indenture shall continue to exist solely for the additional purposes of the following:

1.  allowing distributions to be made under the Plan pursuant to the Senior Secured Notes Indenture and the Senior Notes Indenture and the Senior Secured Notes Trustee and the Senior Notes Trustee to perform such other necessary functions with respect thereto and to have the benefit of all the protections and other provisions of the Senior Secured Notes Indenture and the Senior Notes Indenture in doing so;

2.  permitting the Senior Secured Notes Trustee and the Senior Notes Trustee to maintain or assert any right or charging lien they may have with respect to distributions pursuant to the terms of the Plan for fees and expenses incurred by the Senior Notes Trustee (including fees and expenses of their counsel and other professionals) prior to or after the Petition Date;

3.  permitting the Senior Secured Notes Trustee and the Senior Notes Trustee to assert any right to indemnification, contribution, or other Claim they may have under their respective indentures, subject to any and all defenses any party may have under the Plan or applicable law to any such asserted right or claims; provided, however, that any such Claim as against the Debtors must be asserted prior to the Bar Date, shall be paid pursuant to Article XI.A.7 of the Plan to the extent allowed or discharged, and shall not survive the Effective Date; and

4.  permitting the Senior Secured Notes Trustee and the Senior Notes Trustee to exercise their rights and obligations relating to the interests of the Senior Secured Notes Indenture Claims and/or Plan Senior Notes Indenture Claims and their relationship with the holders of such Claims pursuant to the Senior Secured Notes Indenture or the Senior Notes Indenture, respectively, including all rights they may have to appear and be heard in the Debtors' bankruptcy cases and any appeals.

M.  **Discharge of Debtors.**  Except as otherwise provided in the Plan, on the Effective Date and effective as of the Effective Date:  (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, or any of their assets, property or Estates; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims against and Interests in the Debtors shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (4) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  All debt under the Plan that shall be surrendered, redeemed, exchanged or cancelled shall be deemed for all purposes, including income tax purposes, to be outstanding until the Effective Date, and such debt shall not be deemed surrendered, redeemed, exchanged or cancelled on any date earlier than the Effective Date.

N.  **Restructuring Transactions.**  On and after the Effective Date, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, conversion, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; (4) the Land Transfer Transaction; and (5) all other actions that the Reorganized Debtors determine are necessary or appropriate.  Prior to the Effective Date, the Debtors shall have obtained the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) with respect to any such restructuring transactions occurring on the Effective Date.

O.    Exemption from Certain Transfer Taxes and Recording Fees.    Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.    Board Representation.    The New Holdco LLC Agreement shall provide that the Board of Managers shall be comprised of five individuals appointed by Holders of the New Membership Interests.  On the Effective Date, the Holder that, together with its affiliates, owns the largest principal amount of Senior Secured Notes shall appoint two Managers, the Creditors' Committee shall appoint two Managers, and one Manager shall be the Chief Executive Officer of Reorganized Majestic Holdco.  The other Reorganized Debtors shall be member managed.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement, to the extent known, the identity and affiliations of any Person proposed to serve on the initial Board of Managers of each of the Reorganized Debtors.  To the extent any such manager or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such manager or officer will also be disclosed. Each such manager and officer shall serve from and after the Effective Date pursuant to the terms of the Amended and Restated Operating Agreements, and other constituent documents of the Reorganized Debtors.

Q.    Senior Management.    The Reorganized Debtors intend that, immediately following the Effective Date, the COO, CFO, General Counsel, and Property Managers of the Reorganized Debtors shall be the same as the COO, CFO, General Counsel, and Property Managers of the Debtors on the date hereof.  To the extent known, all initial officers of the Reorganized Debtors shall be disclosed in the Plan Supplement and shall be acceptable to the Senior Secure Notes Trustee and the Creditors' Committee.

R.    Management Consultant.    As soon as practicable following approval of the Disclosure Statement, the Debtors shall file a motion, subject to approval by the Bankruptcy Court and applicable regulatory agencies, to retain a Management Consultant that is acceptable to the Debtors, the Creditors' Committee, and the Senior Secured Notes Indenture Trustee.  The terms of the engagement shall be reasonably acceptable to the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.  The Management Consultant shall be retained by the Debtors only for the duration of the Chapter 11 Cases (unless otherwise determined by the Creditors' Committee and the Senior Secured Notes Indenture Trustee, in consultation with the Debtors), but may continue to be retained by the Reorganized Debtors after the Effective Date in the sole discretion of the Board of Managers.

Authority to Act:  The Management Consultant will serve in an advisory capacity.  All actions of the Management Consultant shall be approved by the Board of Directors or the Board of Managers, as applicable. Unless otherwise authorized by the Board of Directors or the Board of Managers, as applicable, the Management Consultant shall have no authority to legally bind the Debtors.

Scope of Engagement:  The Management Consultant shall work with current senior management to provide comprehensive marketing and operational consulting services and such other services as may be agreed upon by the Debtors and the Management Consultant in consultation with the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.  The aggregate amount of fees and expenses the Debtors pay to the Management Consultant shall be reasonably acceptable to the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.  The Management Consultant shall prepare detailed assessments and analyses of the Debtors' current marketing and operational strategies, develop new marketing and operational strategies designed to optimize revenue and contain costs at each property, and collaborate with senior

management to execute such marketing and operational strategies approved by the Debtors in consultation with the Creditors' Committee and the Senior Secured Notes Indenture Trustee, or by the Reorganized Debtors. Such Management Consultant will have full access to the Debtors' and, if applicable, Reorganized Debtors', management, books and records and employees. For the avoidance of doubt, the Debtors' senior management will not have any power or authority to direct the Management Consultant.

Reporting: The Management Consultant will report directly to (a) the Board of Directors, and (b) if applicable, to the Board of Managers. In addition, the Management Consultant shall (a) hold weekly status calls with representatives of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee regarding the consulting services, (b) respond promptly and in good faith to all reasonable requests of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee and (c) make its employees available at the Debtors' offices to meet in person or via teleconference with representatives of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.

Regulatory Considerations: The Management Consultant shall provide services at the respective properties operated by the Debtors in compliance with applicable gaming rules and regulations in effect at such time in such jurisdictions.

S.    Pre-Effective Date Key Employee Incentive Plan and Post-Effective Date Management Incentive Program. The Board of Directors of the Debtors may develop, adopt, and implement the Pre-Effective Date Key Employee Incentive Program, subject to the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably), the terms of which shall be described on Exhibit 7 to the Plan Supplement. On or after the Effective Date, the Board of Managers of Reorganized Majestic Holdco may, but shall not be obligated to, develop, adopt, and implement a Post-Effective Date Management Incentive Program. Up to ten percent (10%) of the New Membership Interests on a fully diluted basis shall be reserved as of the Effective Date for the implementation of a Post-Effective Date Management Incentive Program if the Board of Managers elects to issue all or any of such New Membership Interests as part of such program.

T.    Employee and Retiree Benefits. Except with respect to any rejected employment agreements, on and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement that is not a rejected employment agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

U.    Creation of Holdback Escrow Account. On the Effective Date, the Reorganized Debtors shall establish the Holdback Escrow Account and reserve an amount necessary to pay all of the Accrued Professional Compensation.

V.    Preservation of Rights of Action. Subject to the releases set forth in Article X.C, Article X.D and Article X.F below, and in accordance with section 1123(b) of the Bankruptcy Code and the terms of this Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such

Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.  Proceeds of any Causes of Action that become available prior to the Effective Date shall be retained by the Debtors, and proceeds of any Causes of Action that become available on or after the Effective Date shall be retained by the Reorganized Debtors.

Further, subject to the releases set forth in Article X.C, Article X.D, and Article X.F below, the Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

**ARTICLE VII.**

**TREATMENT OF EXECUTORY CONTRACTS**

A.    <u>Assumption and Rejection of Executory Contracts</u>.    Each of the Debtors' Executory Contracts shall be deemed rejected as of the Effective Date, other than those Executory Contracts that are (1) identified on the Assumed Executory Contract List, (2) the subject of a notice of assumption of Executory Contract or motion to assume Executory Contract that is pending on the Confirmation Date, or (3) subject to a notice of assumption of Executory Contract or motion to assume Executory Contract pursuant to which the requested effective date of such assumption is after the Effective Date.    Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code; provided, however, that the Debtors may, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) (i) assume or reject an Executory Contract before the Effective Date with Bankruptcy Court approval, and (ii) add or remove contracts from the Assumed Executory Contract and/or Unexpired Lease List between the Confirmation Date and the Effective Date.    Unless otherwise indicated, all assumptions or rejections of such Executory Contracts in the Plan are effective as of the Effective Date.    Each such Executory Contract assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.

B.    <u>Indemnification Obligations</u>.    Notwithstanding anything to the contrary herein, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, or operating agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who were directors or officers of such Debtor at any time prior to the Effective Date, respectively, against any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged by operation of the Plan and/or the Confirmation Order, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Petition Date but no later than the Effective Date.    Any Claim based on the Debtors' obligations discussed in this Section B shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

As of the Effective Date, each Debtor's bylaws or operating agreement, as applicable, shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors and officers who were directors or officers of such Debtor, at any time prior to the Effective Date to the same extent as the bylaws of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors' or officers' rights.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

Notwithstanding anything to the contrary contained in the Plan, the foregoing obligations in this Section B shall not apply to any Identified Parties.

C.    <u>Cure of Defaults for Assumed Executory Contracts</u>.    With respect to each of the Debtors' Executory Contracts to be assumed, the Debtors shall have designated a proposed Cure, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) and the

assumption of such Executory Contract may be conditioned upon the disposition of all issues with respect to Cure. Any provisions or terms of the Debtors' Executory Contracts to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by an agreed-upon waiver of Cure. Except with respect to Executory Contracts in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Notice, Claims and Solicitation Agent on or before the Cure Bar Date. Any request for payment of Cure that is not timely-Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the applicable Debtor of the amount listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors, Reorganized Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee, as applicable, objects to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) and the counterparty to the Executory Contract. Any counterparty to an Executory Contract that fails to object timely to the proposed assumption of any Executory Contract will be deemed to have consented to such assumption. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract no later than thirty (30) days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption of any Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption. Any Proof of Claim Filed with respect to an Executory Contract that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.  Claims Based on Rejection or Repudiation of Executory Contracts.  Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' Executory Contracts pursuant to the Plan or otherwise must be Filed with the Notice, Claims and Solicitation Agent within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall be classified as Rejection Damages Claims and shall be treated in accordance with the Plan.

E.  Reservation of Rights.  Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE VIII.**

**PROCEDURES FOR RESOLVING CLAIMS AND DISPUTES**

A.     <u>Allowance of Claims and Interests</u>.   Only Claims and Interests that are Allowed shall be entitled to distributions under the Plan.  Any Claim, other than Claims of Governmental Units and Claims for which a proof of claim need not be filed under the Bankruptcy Code or Bankruptcy Rules, shall be barred if proof of such Claims is not Filed on or prior to the Bar Date.  Any Claim of a Governmental Unit shall be barred if proof of such Claim is not Filed on or prior to the Governmental Unit Bar Date.

B.     <u>Survival of Reorganized Debtor Defenses to Surviving Claims</u>.  After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

C.     <u>Claims and Interests Administration Responsibilities</u>.  Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.  Notwithstanding the foregoing, the Creditors' Committee shall retain authority to file, withdraw, or litigate to judgment any objections to Claims or Interests initiated by the Creditors' Committee prior to the Effective Date other than objections to Claims, Interests, or Causes of Action released and discharged pursuant to the Plan.

D.     <u>Estimation of Claims and Interests</u>.  Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, or the Creditors' Committee may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.     <u>Adjustment to Claims and Interests Without Objection</u>.  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  Beginning on the end of the first full calendar quarter that is at least ninety (90) days after the Effective Date, the Reorganized Debtors shall publish every calendar quarter a list of all Claims or Interests that have been paid, satisfied, amended or superseded during such prior calendar quarter.

F.     <u>Disallowance of Claims or Interests</u>.  Except for any Claims Allowed pursuant to the Plan, any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all property or sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan without any further notice to or action, order or approval of the Bankruptcy Court.  All Claims Filed on account of

an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit without any further notice to or action, order or approval of the Bankruptcy Court.

G.  Offer of Judgment.  The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to set off such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

H.  Amendments to Claims.  On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

I.  Fractional Shares.  No fractional units of New Membership Interests will be issued or distributed under the Plan.  The actual distribution of units of New Membership Interests will be rounded to the next higher or lower whole number as follows: (a) fractions of one-half (1/2) or less shall be rounded to the next lower whole number, and (b) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number.  The total number of units, as applicable, of New Membership Interests to be distributed herein will be adjusted as necessary to account for such rounding.  No consideration will be provided in lieu of fractional shares or units that are rounded down.

## ARTICLE IX.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.     Distributions on Account of Claims and Interests Allowed as of the Effective Date.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (2) in accordance with Article II.C herein, Allowed Priority Tax Claims, unless otherwise agreed, shall receive (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; (b) such other treatment as may be agreed to by such Holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court; or (c) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

Pursuant to the Plan, (a) the Senior Secured Credit Facility Claim and the Senior Secured Credit Facility Guarantee Claim shall be Allowed in the aggregate amount equal to $65,330,042.00 (with all interest paid to date) plus all other fees and other amounts owed or owing by, or chargeable to, the Debtors under the Senior Secured Credit Facility, the Cash Collateral Order or applicable law, (b) the Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims shall be Allowed in the aggregate amount equal to $348,384,885.00 (which amount includes principal of $300,000,000.00 and accrued unpaid prepetition interest of $48,384,885.00) plus all other fees, interest, and other amounts owed or owing by, or chargeable to, the Debtors under the Senior Secured Notes Indenture, the Senior Secured Notes, the Cash Collateral Order or applicable law, and (c) the Senior Notes Indenture Claims shall be Allowed in the aggregate amount equal to $233,149,526.00 (which amount includes principal of $200,000,000.00 and accrued unpaid prepetition interest of $33,149,526.00) plus all other fees and other amounts owed or owing by, or chargeable to, the Debtors under the Senior Notes Indenture, the Senior Notes, the Cash Collateral Order or applicable law.

B.     Distributions on Account of Claims and Interests Allowed After the Effective Date.

1.     Payments and Distributions on Disputed Claims.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim or Interest; provided, however, that (a) Disputed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed to by the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim.

2.     Special Rules for Distributions to Holders of Disputed Claims.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties:  (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.  In the event there are Disputed Claims requiring adjudication and resolution after the Effective Date, the Reorganized Debtors shall establish a Disputed Claims Reserve in an amount appropriate for potential payment of such Claims.  All distributions made from the Disputed Claims Reserve on account of an Allowed Claim shall be made as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class.

C.    Delivery of Distributions.

1.    Record Date for Distributions.  On the Effective Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Effective Date; provided, however, that distributions made by the Senior Notes Trustee to the Senior Noteholders on account of a Senior Notes Indenture Claim, or by the Senior Secured Notes Trustee to the Senior Secured Noteholders on account of a Senior Secured Notes Indenture Claim, shall not be made with regard to any distribution record date but rather shall be accomplished in accordance with the Senior Notes Indenture and the Senior Secured Notes Indenture, respectively, and the policies and procedures of the Depository Trust Company, if applicable.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly-traded Certificate, is transferred twenty (20) or fewer days before the Effective Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Distribution Agent.  The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims and Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

3.    Delivery of Distributions in General.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Interests shall be made to Holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate:  (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim or Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Interest is Filed or if the Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim or Interest; (d) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Distributions under the Plan on account of Allowed Claims and Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan, subject to the rights of the Senior Secured Notes Trustee and Senior Notes Trustee to distribute funds according to the Senior Secured Notes Indenture and the Senior Notes Indenture, respectively.  The Debtors, the Reorganized Debtors, the Distribution Agent(s) the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, the Senior Notes Trustee, and the Creditors' Committee and its members thereof, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

4.    Compliance Matters.  In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.   The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

5.    Undeliverable Distributions.  If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date.  Undeliverable

distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors and shall not be supplemented with any interest, dividends or other accruals of any kind. No New Membership Interests shall be distributed to any Holder until such Holder (a) executes the New Holdco LLC Agreement and (b) obtains the Requisite Approvals (as defined in Article IX.F of the Plan). The failure of a Holder to execute the New Holdco LLC Agreement within one (1) year of the Effective Date shall result in the forfeiture of such Holder's allocation of New Membership Interests. After such date, all forfeited New Membership Interest shall revert to Reorganized Majestic Holdco and the Claim of such Holder to such New Membership Interests shall be discharged and forever barred. For avoidance of doubt, all Holders of New Membership Interests shall be bound by the New Holdco LLC Agreement from and after the Effective Date, irrespective of when such Holders sign the New Holdco LLC Agreement.

6. <u>Reversion</u>. Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

7. <u>Manner of Payment Pursuant to the Plan</u>. Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer. Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims and Interests shall be null and void if not negotiated within ninety (90) days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors.

8. <u>Surrender of Cancelled Instruments or Securities</u>. On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such surrendered Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

D. <u>Claims Paid or Payable by Third Parties</u>.

1. <u>Claims Paid by Third Parties</u>. The Notice, Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2. <u>Claims Payable by Third Parties</u>. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed

Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed-upon satisfaction on the Claims Register by the Notice, Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      Allocation Between Principal and Accrued Interest. Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to any interest, if any, accrued through the Effective Date.

F.      Compliance with Gaming and Related Regulations. New Membership Interests shall not be distributed to any Person or Entity in violation of the gaming laws and regulations, and other applicable laws and regulations, of the states in which the Reorganized Debtors operate (collectively, the "Relevant States") unless and until such Holder comes into compliance with such laws and regulations.

        Notwithstanding anything to the contrary contained herein, no Holder shall be entitled to receive New Membership Interests unless and until it has obtained the requisite licenses, waivers, qualifications or suitability determinations, if any, permitting it to hold its allocable distribution of New Membership Interests on a final and unconditional basis (the "Requisite Approvals") from the applicable governmental or regulatory authorities in each of the Relevant States (the "Applicable Gaming Authorities").

        The Debtors shall take reasonable steps, through the balloting procedures or otherwise, to obtain the identity and contact information of the beneficial holders of Senior Notes and Senior Secured Notes for purposes of creating a list of Holders anticipated to be entitled to receive New Membership Interests under the Plan. The Debtors shall provide this list of such Holders to the Senior Notes Trustee and the Senior Secured Notes Trustee and assist the Senior Notes Trustee and the Senior Secured Notes Trustee to obtain from the Applicable Gaming Authorities information concerning the Requisite Approvals, if any, such Holders must obtain. Such Holders, the Senior Notes Trustee and the Senior Secured Notes Trustee shall cooperate with the Debtors to provide the information to the Debtors and the Applicable Gaming Authorities concerning the ownership and structure(s) by which such Holders intend to own and hold the New Membership Interests and respond to requests for information from the Applicable Gaming Authorities. The Debtors, the Senior Notes Trustee, and the Senior Secured Notes Trustee shall inform each other of any relevant information received from the Applicable Gaming Authorities with respect to the Requisite Approvals that may be applicable to any Senior Noteholder or Senior Secured Noteholder, respectively, regarding ownership or receipt of New Membership Interests under the Plan. Any Holder that is required to obtain Requisite Approvals or any other licenses, waivers, qualifications or suitability determinations from Applicable Gaming Authorities must provide to the Senior Notes Trustee or the Senior Secured Notes Trustee, as applicable, evidence of receipt of the foregoing before receiving its distribution of New Membership Interests.

        In the event that any Holder fails to obtain the Requisite Approvals on or before the date that is 180 days after the Effective Date (the "Regulatory Approval Deadline"), then the New Membership Interests such Holder would otherwise be entitled to, and any Claim with respect thereto, shall be automatically cancelled and such Holder will receive no distribution on account of such Holder's Claims that otherwise would entitle it to New Membership Interests; provided, however, that if any Holder demonstrates in writing to the Board of Managers on or prior to 150 days after the Effective Date that such Holder has filed all required applications and supporting documentation, promptly responded to all regulatory inquiries and requests related thereto, cooperated fully with the Applicable Gaming Authorities, taken all other necessary and appropriate actions, and otherwise has diligently pursued the Requisite Approvals during such 150 day period (collectively, the "Required Actions"), then the Regulatory Approval Deadline shall be extended by an additional 180 days (the "Regulatory Approval Extension Period") for such Holder for a total of 360 days (a Holder subject to the Regulatory Approval Extension Period is referred to herein as a "Prospective Holder"), unless the Board of Managers notifies such Holder in writing within 15 Business Days of receiving such written request that it has determined such Holder has not taken the Required Actions, in which case such Holder's exclusive remedy shall be to petition the Bankruptcy Court for an extension of the Regulatory Approval Deadline (but in no event beyond the Regulatory Approval Extension Period) on or prior to the Regulatory Approval Deadline (unless the Bankruptcy Court tolls the passage of such deadline).

During the Regulatory Approval Extension Period, Prospective Holders may continue to seek the Requisite Approvals or may sell, assign, or transfer their Claims if permitted by the Applicable Gaming Authorities and in accordance with any terms and conditions (including but not limited to transfer restrictions) imposed by the Applicable Gaming Authorities and the New Holdco LLC Agreement. In the event that a Prospective Holder has not received all Requisite Approvals prior to the expiration of the Regulatory Approval Extension Period, or has not sold, assigned, or transferred its Claim to a person who has received all Requisite Approvals prior to the Regulatory Approval Extension Period, such Prospective Holder's Claim shall be automatically cancelled and such Prospective Holder will receive no distribution on account of its Claims that otherwise would entitle it to New Membership Interests. For avoidance of doubt, from and after the Effective Date, the terms of the New Holdco LLC Agreement, including the transfer restrictions therein, shall govern and control the New Membership Interests and any Claims with respect thereto, including any disposition thereof, and the transfer of any Claim shall be treated in the same manner as the transfer of any New Membership Interests.

G.      Single Satisfaction of Claims.  Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claims; provided, however, that Holders of Claims will be entitled to only one distribution in respect of the primary and secondary liabilities related to the underlying Allowed Claim, and no multiple or duplicative recoveries on account of any Allowed Claim against any Debtor will be provided or permitted. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claims plus applicable interest.

## ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.      Discharge of Claims and Termination of Interests.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services expended by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests, subject to the occurrence of the Effective Date.

B.      Compromise and Settlement of Claims and Controversies.  Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

C.      **Releases by the Debtors.  On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including:  (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; and (2) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each of the Released Parties (and each such Released Party so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Released Party in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Released Party from any causes of action expressly set forth in and preserved by the Plan.  Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future (a) related to the Majestic II Tax Action(s) and (b) against the non-Released Parties, including the Identified Parties.**

D.     **Third Party Releases.  On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Released Party) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.   Notwithstanding anything in the Plan to the contrary, the Released Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future (a) related to the Majestic II Tax Action(s) and (b) against the non-Released Parties, including the Identified Parties.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Released Parties.**

**Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties.    This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.**

E.     Injunction. From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

F.     Exculpation.  The Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or Postpetition act taken or omitted to be taken in connection with, related to, or arising out of the Debtors' in or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of New Membership Interests, the entry into the New Senior Secured Credit Facility, the entry into the New Senior Secured Notes Indenture and the issuance of the New Senior Secured Notes thereunder, the entry into the First Lien Alternative Financing, if any, the entry into the Second Lien Alternative Financing, if any, or the distribution of property under the Plan or any other agreement entered into in connection therewith or any other Prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of the Released Parties.

G.      Protection Against Discriminatory Treatment.  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      Setoffs and Recoupment.  Other than with respect to the Senior Secured Notes Trustee and the Senior Secured Noteholders  and the Senior Notes Trustee and the Senior Noteholders (as to whom any and all rights of setoff or recoupment have been waived by the Debtors) the Debtors may set off against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against such claimant.

In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

I.      Release of Liens.  Except as otherwise provided in the Plan or specified on the Retained Liens List, including with respect to new Liens granted pursuant to the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns; provided, however, that the charging Liens held by the Senior Secured Notes Trustee and the Senior Notes Trustee against distributions to Senior Secured Noteholders and Senior Noteholders, respectively, on account of their fees and expenses will only be deemed released upon payment of the Senior Secured Notes Trustee and the Senior Notes Trustee's fees and expenses, respectively, in accordance with the terms of the Senior Secured Notes Indenture and the Senior Notes Trustee, as applicable, and this Plan.

J.      Debtors' Cash Collateral Order Stipulations.  The Debtors' stipulations set forth in the Cash Collateral Order shall be deemed binding on all parties in interest, including the Creditors' Committee.  Upon the Effective Date, the Limited Reservation or Rights in paragraph 21 of the Cash Collateral Order shall be deemed forever waived and shall no longer apply to the Debtors or any party in interest.  On the Effective Date, the Creditors' Committee will withdraw the Standing Motion (as defined in the Disclosure Statement) with prejudice, and will be forever barred from challenging the validity, perfection, or amount of the Senior Secured Notes Indenture Claims, the Senior Secured Notes Indenture Guarantee Claims, the Senior Secured Credit Facility Claims, and the Senior Secured Credit Facility Guarantee Claims.

K.      Reimbursement or Contribution.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date: (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

L.      <u>Subordination</u>.  Except as otherwise provided in the Plan or the Confirmation Order (including the release and exculpation provisions), the right of any of the Debtors, the Reorganized Debtors, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and/or the Creditors' Committee, to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination.

## ARTICLE XI.

## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS

A.     Professional Claims.

1.     Final Fee Applications.  All final requests for Professional Compensation and Reimbursement Claims shall be Filed no later than ninety (90) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

2.     Payment of Interim Amounts.  Except as otherwise provided in the Plan, Professionals shall be paid pursuant to the Professional Fee Order.

3.     Holdback Escrow Account.  On the Effective Date, the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals.  The Holdback Escrow Account shall be maintained in trust for the Professionals retained in these Chapter 11 Cases with respect to whom fees or expenses have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount of Professional Compensation and Reimbursement Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Holdback Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order.  When all Claims by Professional have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

4.     Holdback Amount.  To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors.  If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Holdback Amount.

5.     Post-Confirmation Date Fees and Expenses.  Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, each Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional or other fees and expenses incurred by that Reorganized Debtor after the Confirmation Date pursuant to the Plan.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

6.     Substantial Contribution Compensation and Expenses.  Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules no later than thirty (30) days after the Effective Date.

7.     Agent and Trustee Obligations.  All reasonable fees and expenses of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, the Senior Notes Trustee, the Discount Notes Trustee, and the respective counsel, agents, and advisors of the foregoing parties that are provided for under the Cash Collateral Order or under the respective credit agreements and related documents or agreements, including any unpaid administrative agency fees, and including, for avoidance of doubt, reasonable fees and expenses incurred before or after the Effective Date in connection with facilitating regulatory approvals and making distributions under the Plan (as provided in Section VI.D hereof), shall be paid in full in Cash on the Distribution Date, or in the case of fees and expenses incurred after the Distribution Date, in the ordinary course upon the presentation of invoices.  Such

payment to the Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and Senior Notes Trustee shall be deemed part of the recoveries of the applicable Holders of Allowed Senior Secured Facility Claims, Senior Secured Notes Indenture Claims, and Senior Notes Indenture Claims respectively, on the Distribution Date, without the need for the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, the Senior Notes Trustee, or the Discount Notes Trustee to file an application for allowance with the Bankruptcy Court. To the extent such fees and expenses have been paid prior to the Distribution Date pursuant to the Cash Collateral Order or otherwise, such payments shall be deemed part of the recoveries of the applicable Holders of Allowed Secured Credit Facility Claims, Allowed Senior Secured Notes Indenture Claims, and Allowed Senior Notes Indenture Claims, respectively, and shall be deemed fully and finally Allowed and indefeasible upon entry of the Confirmation Order. To the extent not paid in full before the Distribution Date the Debtors shall indefeasibly pay such fees and expenses in full in Cash on the Distribution Date without the need to file a fee application or obtain further Bankruptcy Court approval, and such payments shall be deemed fully and finally Allowed and indefeasible as of the Effective Date.

B.      Other Administrative Expense Claims.  All requests for payment of an Administrative Expense Claim must be Filed with the Notice, Claims and Solicitation Agent, and served upon counsel to the Debtors or Reorganized Debtors, as applicable, on or before the Administrative Expense Claims Bar Date. The Reorganized Debtors may settle and pay any Administrative Expense Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed by Final Order.

## ARTICLE XII.

## CONDITIONS PRECEDENT TO CONFIRMATION AND TO EFFECTIVE DATE

A.      Conditions Precedent to Confirmation.  The following shall be satisfied or waived as conditions precedent to Confirmation.

1.      The Plan shall be acceptable in form and substance to the Debtors, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.

2.      The Confirmation Order shall be acceptable in form and substance to the Debtors, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.

3.      The Management Consultant retained by the Debtors shall continue to be employed by the Debtors, unless such retention has been (a) not allowed by the Bankruptcy Court or the applicable regulatory bodies or (b) discontinued by agreement of the Debtors, the Creditors' Committee, and the Senior Secured Notes Trustee.

B.      Conditions Precedent to Effective Date.  The following shall be satisfied or waived as conditions precedent to the Effective Date.

1.      The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.      The final version of the Plan, the Plan Supplement and all of the documents and exhibits contained therein shall have been Filed and approved in form and substance acceptable to the Debtors, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.

3.      The Bankruptcy Court shall enter the Confirmation Order, in form and substance acceptable to the Debtors, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee, and such order shall not have been stayed or modified or vacated on appeal.

4.      No fact or circumstance shall exist as a result of the consummation of the Plan that could result in the New Membership Interests being treated as public equity.

5.      The Debtors shall not have entered into any settlement related to claims or causes of actions the Debtors may have against Don H. Barden and/or any non-Debtor Entity controlled or owned by Don H. Barden that is not acceptable to the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee.

6.      The Debtors shall not have entered into any settlement related to claims or causes of actions the Debtors may have related to their pending litigation with the City of Gary, Indiana without the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably).

7.      The Bankruptcy Court shall have entered a Final Order resolving all claims and issues raised in the Lake County Property Tax Motion, unless the Bankruptcy Court has approved a settlement of the Claims raised therein.

8.      If the Creditors' Committee delivers to the Debtors and the Senior Secured Notes Trustee a Qualified Commitment Letter with respect to the Second Lien Alternative Financing on or prior to the Qualified Commitment Letter Deadline, closing of such Second Lien Alternative Financing shall be a condition precedent to the Effective Date, which condition cannot be waived without the consent of the Creditors' Committee; provided, however, that if such Second Lien Alternative Financing fails to close within fourteen (14) calendar days after the Projected Effective Date, then this condition precedent to the Effective Date shall be deemed automatically waived by all

parties.

9.  Any First Lien Alternative Financing (including, without limitation, as part of a combined alternative financing with a Second Lien Alternative Financing), shall be acceptable to the Senior Secured Notes Trustee and the Creditors' Committee.

10.  The Management Consultant retained by the Debtors shall continue to be employed by the Debtors or the Reorganized Debtors, unless such retention has been (A) not allowed by the Bankruptcy Court or the applicable regulatory bodies or (B) discontinued by agreement of the Debtors or the Reorganized Debtors, the Creditors' Committee, and the Senior Secured Notes Trustee.

11.  With respect to the Reorganized Debtors, all governmental, regulatory, and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated herein shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose any conditions on such transactions, including, without limitation, all required gaming regulatory and other approvals, consents, licenses and findings of suitability issuable by the States in which the Debtors operate their facilities. Notwithstanding the foregoing, if all governmental licenses, suitability determinations and other approvals related to the Debtors' Black Hawk, Colorado casino are not obtained on or prior to 240 days following the Confirmation Date, then, unless the Creditors' Committee and the Senior Secured Notes Trustee jointly elect, this condition precedent shall be deemed satisfied but Barden Colorado shall remain as a Debtor and shall be reorganized, liquidated or otherwise disposed of, as the case may be, in a manner reasonably acceptable to the Senior Secured Notes Trustee and the Creditors' Committee, and the proceeds of such reorganization or disposition shall be remitted to the Reorganized Debtors.

12.  With respect to the Largest Committee Senior Noteholder and the Largest Secured Noteholder, all governmental, regulatory, and material third party approvals, waivers, and/or consents, including Bankruptcy Court approval, related to the equity ownership such Holders are to receive in connection with the transactions contemplated herein shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose any conditions on such equity ownership, including, without limitation, all required gaming regulatory and other approvals, waivers, consents, licenses and findings of suitability issuable by the States in which the Debtors operate their facilities. The Largest Committee Senior Noteholder and the Largest Secured Noteholder shall determine, each in its sole discretion, whether this condition has been satisfied with respect to itself.

13.  The Confirmation Order shall provide that, prior to the Effective Date, the Debtors, the Creditors' Committee, the Senior Secured Notes Trustee, or the Senior Secured Credit Facility Agent, due to any resolution by the Bankruptcy Court, or any settlement approved by the Bankruptcy Court, of the claims and issues raised in the Lake County Property Tax Motion, may request that the Bankruptcy Court reconsider, after notice and a hearing, any finding or conclusion of law in the Confirmation Order concerning feasibility of the Plan under section 1129(a)(11) of the Bankruptcy Code.

C.  <u>Waiver of Conditions Precedent</u>. The Debtors or the Reorganized Debtors, as applicable, with the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall be subject to the same standard of acceptance as the applicable underlying condition), may waive any of the conditions to Confirmation or the Effective Date set forth above at any time without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan, with the exceptions of (a) any governmental, regulatory, and/or other Gaming License-related approvals or consents (as referred to in Article XII.B.11 of the Plan), which waiver could have the effect of Barden Colorado remaining as a Debtor after the other Debtors emerge, and (b) any approvals, waivers, or consents referred to in Article XII.B.12 of the Plan, each of which may only be waived jointly by the Largest Secured Noteholder and the Largest Committee Senior Noteholder. The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

D.      Effect of Non-Occurrence of Conditions to the Effective Date.  Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur within 270 days after Confirmation, or by such later date established by Bankruptcy Court order.  If the Effective Date has not occurred within 270 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

E.      Post-Confirmation Date / Pre-Effective Date Governance.  Upon the Confirmation Date and through the Effective Date, subject to the applicable provisions and restrictions of the Bankruptcy Code, gaming laws, and any other governing legal authority, the Debtors shall (a) operate in accordance with the Debtors' board-approved 2011 annual operating budget provided in accordance with the cash collateral order and the Debtors' board-approved 2011 annual capital expenditure budget, both of which shall be subject to the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee and which consents shall be provided by February 28, 2011 and shall not be withheld unreasonably; (b) not undertake any transaction outside the ordinary course of business, including any action to change the compensation, for service in any capacity, of the individual who served as the Debtors' President and Chief  Executive Officer on the Petition Date, without the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably) or approval of the Bankruptcy Court after notice and hearing if the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee do not consent within a reasonable period of time after the Debtors have made any such request; and (c) not enter into, extend, renew, amend, or effectuate any contract or agreement without the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably), if entering into such contract or agreement, or if such extension, renewal, or amendment thereof will result in:  (i) the Debtors or Reorganized Debtors incurring an obligation in an amount greater than $350,000, unless the Reorganized Debtors may cancel such contract, extension, renewal or amendment upon no more than 30 days' notice and before the accrual of a liability reasonably projected by the Debtors to be in an amount greater than $350,000 (without penalty or additional payment); provided, however, that the Debtors shall not be required to receive consent hereunder for contracts or agreements (A) related to the Debtors' insurance programs and workers' compensation programs maintained in the ordinary course of business, (B) related to the Debtors' medical benefit programs maintained in the ordinary course of business, (C) related to the Debtors' engagement letters with the Debtors' professionals, or (D) that reflect capital expenditures or other disbursements provided for in the Debtors' board-approved 2011 annual capital expenditure budget; or (ii) an obligation of the Debtors or the Reorganized Debtors of longer than one year in duration, unless the Debtors or the Reorganized Debtors may cancel such contract, extension, renewal, or amendment without penalty or additional payment upon no more than 60 days' notice.  In the event a contract or agreement, or the extension, renewal, or amendment thereof, does not specify an aggregate dollar amount of the Debtors' obligations thereunder, the amount of the contract or agreement, for the limited purpose of determining whether creditor consent is required to enter into such contract or agreement, shall be the amount the Debtors reasonably project to be the obligations they will incur under such contract or agreement over the period of 12 months from the date of entry, extension, renewal or amendment of the contract or agreement.

**ARTICLE XIII.**

**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.      <u>Modification or Amendments</u>.  Except as otherwise specifically provided in the Plan, and subject to the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably) and conditions to the Effective Date, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw or to alter, amend or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, subject in all cases to the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably) and the conditions to the Effective Date.  Upon its filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the electronic docket for the Chapter 11 Cases maintained on the Bankruptcy Court's website at ecf.deb.uscourts.gov, and at the Debtors' website at http://chap11.epiqsystems.com/MSC.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

B.      <u>Effect of Confirmation on Modifications</u>.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      <u>Revocation or Withdrawal of Plan</u>.  Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization, subject to the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably).  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XIV.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4. Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5. Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. Adjudicate, decide or resolve any and all matters related to Causes of Action;

7. Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9. Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10. Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12. Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XV.

## MISCELLANEOUS PROVISIONS

A.      <u>Immediate Binding Effect</u>.  Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts with the Debtors.

B.      <u>Additional Documents</u>.  On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

D.      <u>Dissolution of the Creditors' Committee</u>.  On the Effective Date, the Creditors' Committee shall dissolve except that the Creditors' Committee will remain intact with respect to any pending litigation or contested matter to which the Creditors' Committee is a party, appeals filed regarding Confirmation, the resolution of any substantial contribution applications, the resolution of applications for Professional Compensation and Reimbursement Claims, and disputes regarding the allowance of secured Claims (other than those Allowed pursuant to this Plan).  On the Effective Date, subject to the proviso above, the members of the Creditors' Committee shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall continue to compensate the Creditors' Committee Professionals for reasonable services provided in connection with any of the foregoing post-Effective Date activities.

E.      <u>Reservation of Rights</u>.  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      <u>Successors and Assigns</u>.  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

G.      <u>Service of Documents</u>.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to the Debtors |
|---|---|
| The Majestic Star Casino, LLC<br>301 Fremont Street<br>Las Vegas, Nevada 89101<br>Attn:    Cara Brown, Esq. | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:    James H.M. Sprayregen, P.C.<br>          Edward O. Sassower, Esq.<br>          Stephen E. Hessler, Esq.<br><br>-and-<br><br>Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>Wilmington, Delaware 19899-8705<br>Attn:    Laura Davis Jones, Esq.<br>          James E. O'Neill, Esq.<br>          Timothy P. Cairns, Esq. |
| **United States Trustee** | **Counsel to the Creditors' Committee** |
| 844 King Street, Suite 2207<br>Lockbox #35<br>Wilmington, Delaware 19801<br>Attn:    Richard Schepacarter, Esq. | Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York 10036<br>Attn:    Michael S. Stamer, Esq.<br>          Joshua Y. Sturm, Esq.<br><br>Akin Gump Strauss Hauer & Feld LLP<br>1333 New Hampshire Avenue<br>Washington, D.C. 20036<br>Attn:    Scott L. Alberino, Esq.<br><br>-and-<br><br>Blank Rome LLP<br>1201 Market Street, Suite 800<br>Wilmington, Delaware 19801-4226<br>Attn:    Bonnie Glantz Fatell, Esq.<br>          David W. Carickhoff, Esq. |
| **Counsel to the Senior Secured Credit Facility Agent** | **Counsel to the Senior Secured Notes Trustee** |
| Paul, Hastings, Janofsky & Walker LLP<br>600 Peachtree Street, N.E., 24th Floor<br>Atlanta, Georgia 30308<br>Attn:    Jesse H. Austin, III, Esq.<br>          Cassie Coppage, Esq.<br><br>-and-<br><br>Duane Morris LLP<br>1100 North Market Street, Suite 1200<br>Wilmington, Delaware 19801<br>Attn:    Richard W. Riley, Esq. | Latham & Watkins LLP<br>233 South Wacker Drive, Suite 5800<br>Chicago, Illinois 60606<br>Attn:    Peter P. Knight, Esq.<br>          James Ktsanes, Esq.<br><br>-and-<br><br>Reed Smith LLP<br>1201 Market Street, Suite 1500<br>Wilmington, Delaware 19801<br>Attn:    Kurt Gwynne, Esq. |

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list

of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      <u>Term of Injunctions or Stays</u>.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      <u>Entire Agreement</u>.  On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; <u>provided</u>, <u>however</u>, that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

K.      <u>Exhibits</u>.  All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' website at http://chap11.epiqsystems.com/MSC or on the electronic docket maintained on the Bankruptcy Court's website at ecf.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

L.      <u>Closing of Chapter 11 Cases</u>.  The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.      <u>Waiver or Estoppel</u>.  Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

N.      <u>Conflicts</u>.  Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

THE MAJESTIC STAR CASINO, LLC,
(on behalf of itself and all of the other Debtors)

By: */s/ Jon S. Bennett*
　　Jon S. Bennett
Its: 　Senior Vice President, Chief Financial Officer, and
　　Treasurer

<u>**Exhibit I**</u>

**New Senior Secured Credit Facility Term Sheet**

## THE MAJESTIC STAR CASINO, LLC, ET AL.
## TERM SHEET
## $58,000,000 SENIOR SECURED EXIT CREDIT FACILITY

*THIS SENIOR SECURED EXIT CREDIT FACILITY TERM SHEET, DATED JANUARY [\_\_], 2011 (THIS "**TERM SHEET**") IS A PROPOSAL, TO BE USED AS A BASIS FOR CONTINUED DISCUSSIONS, AND IS NOT INTENDED TO, AND DOES NOT, CONSTITUTE A BINDING AGREEMENT OR COMMITMENT WITH RESPECT TO THE EXIT CREDIT FACILITY OUTLINED HEREIN OR OTHERWISE. THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS, AND IS INTENDED TO BE ENTITLED TO THE PROTECTIONS OF FEDERAL RULE OF EVIDENCE 408 AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.*

*UPON THE EFFECTIVENESS OF A CONFIRMED PLAN OF REORGANIZATION ("**PLAN OF REORGANIZATION**") PROPOSED BY THE MAJESTIC STAR CASINO, LLC AND ITS SUBSIDIARIES (COLLECTIVELY, "**MAJESTIC STAR**") UNDER THE CHAPTER 11 CASES, AND SUPPORTED BY THE LENDERS UNDER THE PRE-PETITION CREDIT FACILITY (AS DEFINED BELOW), THE LOAN COMMITMENTS AND ALL OUTSTANDING OBLIGATIONS UNDER THE PRE-PETITION CREDIT FACILITY SHALL CONVERT INTO COMMITMENTS UNDER THE EXIT CREDIT FACILITY ON TERMS AND CONDITIONS AS SET FORTH HEREIN.*

*NOTE: THIS TERM SHEET IS BASED ON MAJESTIC STAR'S FIVE-YEAR BUSINESS PROJECTIONS DATED MAY 24, 2010 ("**BUSINESS PROJECTIONS**") AND ON THE ASSUMPTION THAT ALL CURRENT GAMING FACILITIES WILL CONTINUE TO BE OPERATED BY THE REORGANIZED DEBTORS FOLLOWING CONSUMMATION OF A PLAN OF REORGANIZATION. TO THE EXTENT THAT THE BUSINESS PROJECTIONS HAVE BEEN OR WILL BE REVISED AND/OR ANY CURRENTLY OPERATING GAMING FACILITIES CEASE OPERATIONS OR ARE NO LONGER OWNED BY THE REORGANIZED DEBTORS, THIS TERM SHEET MAY NEED TO BE ADJUSTED ACCORDINGLY.*

| | |
|---|---|
| ***Borrowers:*** | The Majestic Star Casino, LLC ("***Parent***") and certain of its subsidiaries[2] (together with Parent, "***Borrowers***"). |
| ***Guarantors:*** | All of Borrowers' present and future subsidiaries (other than Borrowers) (each a "***Guarantor***" and collectively, "***Guarantors***", and such Guarantors, together with Borrowers, each a "***Loan Party***" and collectively, "***Loan Parties***"). Guarantors shall include, without limitation, each of the guarantors under that certain Loan and Security |

---

[2] [The Majestic Star Casino II, LLC, Barden Mississippi Gaming, LLC, and Barden Colorado Gaming, LLC]

Agreement, dated as of October 7, 2003, among Parent and certain of its subsidiaries, as borrowers, Wells Fargo Capital Finance, Inc. (formerly known as Wells Fargo Foothill, Inc.) ("**WFCF**"), as agent and a lender, and the other lenders party thereto (as amended, the "**Pre-Petition Credit Facility**").[3]

**Lenders and Agent:**     WFCF and a syndicate of other banks, financial institutions, and/or institutional lenders (collectively, the "**Lenders**"). WFCF shall act as the sole agent for the Lenders (in such capacity, the "**Agent**").

**Facility and Amortization:**     A first priority senior secured revolving credit facility (the "**Exit Credit Facility**") with a maximum credit amount ("**Maximum Credit Amount**") of $58,000,000. The Maximum Credit Amount shall be reduced by (i) $1,000,000, beginning on the first day of the seventh full calendar month following the Exit Facility Effective Date (as hereinafter defined) and on the first day of each three-month period ending for the eighteen-month period thereafter, and (ii) $1,100,000 on the first day of each three-month period ending thereafter, with any remaining amounts paid on the Maturity Date (as defined herein). In addition, the Maximum Credit Amount shall be reduced by the amount of any mandatory prepayments from asset dispositions as described below. WFCF's proposal is to provide 50% of the Exit Credit Facility in an aggregate principal amount not to exceed $29,000,000 and to arrange and syndicate the remaining 50% of the Exit Credit Facility to the Lenders listed and as indicated on Annex A-II in the amounts listed therein.

**Revolver:**     Advances under the Revolver ("**Advances**") plus Letters of Credit would be available up to a maximum amount outstanding at any time not to exceed the Maximum Credit Amount. In addition, the amount of Advances plus Letters of Credit shall not, at any time, exceed the Credit Amount (as set forth in the section immediately following).

**Credit Amount:**     Prior to any requested Advance or request for a Letter of Credit under the Exit Credit Facility, Agent shall have received a certificate of the Loan Parties certifying that the ratio of indebtedness outstanding under the Exit Credit

---

[3] [The Majestic Star Casino Capital Corp, Majestic Investor, LLC, Majestic Investor Capital Corp., Buffington Harbor Parking Associates, LLC, Buffington Harbor Riverboats, LLC, and Majestic Investor Holdings, LLC, and Majestic Holdco, LLC]

Facility (after giving effect to the requested Advance or Letter of Credit) to EBITDA (to be defined in a manner mutually acceptable to Borrowers and Agent, but to include in any event the Restructuring Charge Add-Back referred to below) for the most recently ended 12 month period ("***TTM EBITDA***") for which the Loan Parties have delivered financial statements to Agent will not exceed, (a) for any Advance or Letter of Credit requested during the first 12 months after the Exit Facility Effective Date, 1.75 to 1.00, (b) for any Advance or Letter of Credit requested during months 13-24 after the Exit Facility Effective Date, 1.65 to 1.00, (c) for any Advance or Letter of Credit requested during months 25-30 after the Exit Facility Effective Date, 1.60 to 1.00, and (d) for any Advance or Letter of Credit requested at any time thereafter, 1.50 to 1.00. For each fiscal quarter period ending during fiscal years 2010 and 2011, EBITDA for such fiscal quarter shall be determined by adding back restructuring charges / reorganization items as reflected on the consolidated income statement of the Borrowers for the relevant periods (the "***Restructuring Charge Add-Back***").

***Letter of Credit Subfacility:*** Under the Exit Credit Facility, Borrowers would be entitled to request that Agent issue or cause Wells Fargo Bank, N.A. ("***WFB***"), as Agent's agent, to issue letters of credit (each a "***Letter of Credit***") in an aggregate amount not to exceed $5,000,000 at any one time outstanding. The aggregate amount of outstanding Letters of Credit would be reserved against the credit availability created under the Credit Amount and against the Maximum Credit Amount.

***Payment on the Effective Date:*** On the Exit Facility Effective Date, Lenders shall be paid, to apply against the claims under the Pre-Petition Credit Facility, the Loan Parties' Excess Cash Balance, where "Excess Cash Balance" shall mean the total unrestricted cash balances held by Borrowers as of the last day of the calendar month immediately preceding the effective date of the Plan of Reorganization, less $40 million.

***Optional Prepayment:*** The Advances may be prepaid in whole or in part from time to time without penalty or premium. The Exit Credit Facility may be prepaid and the commitments terminated in whole at any time upon 10 business days prior written notice.

**Mandatory Prepayments:**   The Exit Credit Facility will be required to be prepaid as follows:

> (a) in an amount equal to 100% of the net cash proceeds of asset dispositions which are outside the ordinary course of the Loan Parties' business operations (except for dispositions resulting from casualty losses or condemnations, subject to exceptions to the extent mutually agreed upon, including from reinvestment);

> (b) in an amount equal to the amount by which the outstanding Advances plus Letter of Credit usage exceeds the Maximum Credit Amount as it may be reduced from time to time; and

> (c) in an amount equal to the amount by which the outstanding amount of Advances plus Letter of Credit usage exceeds the then applicable Credit Amount.

All mandatory prepayments shall be applied (i) first, to outstanding Advances, and (ii) second to cash collateralize the Letters of Credit. With the exception of the mandatory prepayments specified in clause (a) above, mandatory prepayments of the Advances shall not reduce the Maximum Credit Amount. The Maximum Credit Amount shall be reduced by the amount of any mandatory prepayments specified in clause (a) above.

**Use of Proceeds:**   The proceeds of the loans under the Exit Credit Facility shall be used (i) to pay administrative claims, expenses, and payments to holders of unsecured and senior secured indebtedness of Majestic Star in connection with the consummation of the Plan of Reorganization (as hereinafter defined), (ii) finance the ongoing general corporate needs of the Loan Parties and their subsidiaries, and (iii) fund certain fees and expenses associated with the Exit Credit Facility.

**Fees and Interest Rates:**   As set forth on Annex A-I.

**Term:**   3 years following the Exit Facility Effective Date ("**Maturity Date**").

**Loan Documentation:**   The definitive documentation for the Exit Credit Facility will, to the extent practicable but subject to updating to incorporate provisions of current WFCF form loan

documents, subject to Borrowers' review and consent, represent amended and restated versions of the corresponding documentation under the Pre-Petition Credit Facility.

**Collateral:**
Subject to exclusions consistent with the Pre-Petition Credit Facility, a first priority perfected security interest (a) in substantially all of the Loan Parties' now owned or hereafter acquired property and assets and all proceeds and products thereof subject to permitted liens (to be mutually agreeable to Agent and Majestic Star), and (b) in all of the stock (or other ownership interests in) of each Loan Party (other than Parent) and all proceeds and products thereof.

**Bank Products and Cash Management:**
On the closing date, the Loan Parties shall be required to establish and maintain all of their depository and treasury management relationships with WFB or one of its affiliates (other than with respect to Cage Cash (to be defined in a manner mutually acceptable to Borrowers and Agent)) and shall enter into control agreements, in form and substance satisfactory to Agent, with respect to all such deposit and other accounts (the "***Controlled Accounts***").

**Representations and Warranties:**
The definitive documentation for the Exit Credit Facility will include such representations and warranties with respect to the Loan Parties and their subsidiaries as are usual and customary for Agent's financings of this type, and as are consistent with the representations and warranties contained in the Pre-Petition Credit Facility (as modified to take account of current financial condition of the Loan Parties and the exit from the bankruptcy cases and as may be otherwise required by Agent and the Required Lenders).

**Affirmative Covenants:**
The definitive documentation for the Exit Credit Facility will include such affirmative covenants applicable to the Loan Parties and their subsidiaries as are usual and customary for Agent's financings of this type, and as are consistent with the affirmative covenants contained in the Pre-Petition Credit Facility (as modified to take account of current financial condition of the Loan Parties, the exit from the bankruptcy cases, the longer term of the Exit Credit Facility and as may be otherwise required by Agent and the Required Lenders).

**Negative Covenants:**
The definitive documentation for the Exit Credit Facility will include such negative covenants applicable to the Loan Parties and their subsidiaries as are usual and customary for

Agent's financings of this type, and as are consistent with the negative covenants contained in the Pre-Petition Credit Facility (as modified to take account of current financial condition of the Loan Parties, the exit from the bankruptcy cases, the longer term of the Exit Credit Facility and as may be otherwise required by Agent and the Required Lenders).

*Financial Covenants:*

The Loan Parties, on a consolidated basis, shall be required to maintain a minimum level of TTM EBITDA (measured quarterly and subject to any applicable Restructuring Charge Add-Back and any other agreed add-back/exclusion for restructuring fees, restructuring charges or other similar reorganization items), and will be subject to limitations on annual capital expenditures (provided such agreed-upon limitations will be subject to adjustment to allow for an annual "roll over" of some or all of the unexpended amounts below such limitations to be carried forward into the subsequent fiscal year, all of which are subject to amounts to be determined).

In addition, the Loan Parties shall also be required, at all times, to maintain "Liquidity" of no less than $30 million (the "***Minimum Liquidity***").  Liquidity shall consist of the unrestricted cash of the Loan Parties, which shall include Casino Cash (up to $15 million for the purpose of calculating the Loan Parties' Liquidity), deposits in the Controlled Accounts and in unrestricted accounts (if any), and unused availability under the Exit Credit Facility.[4]

*Restricted Payments:*

The definitive documentation for the Exit Credit Facility will permit the Loan Parties to make semi-annual cash interest payments to the holders of the proposed new senior secured notes (the "*New Senior Secured Notes*") so long as (i) no default or event of default exists or would result therefrom, (ii) TTM EBITDA shall equal or exceed $33 million, and (iii) after giving effect to any interest payment to be made, the Borrowers shall maintain Liquidity of no less than $30 million; provided, however, that in the event that TTM EBITDA, determined as of the last day of the fiscal quarter ending on or immediately prior to any semi-annual interest payment date for the New Senior Secured Notes, falls below $33 million, then a portion of any scheduled interest payment on the New Senior Secured

---

[4] Casino Cash includes:  cash in the casino cages, cash on the casino floors, and cash otherwise on-site at the Loan Parties' gaming properties.

Notes with respect to the semi-annual period then ended which is equal to such deficiency shall be paid in kind; provided further, however, that in the event TTM EBITDA falls below $30 million, then all interest on the New Senior Secured Notes with respect to the semi-annual period then ended shall be paid in kind.

**New Senior Secured Notes:**

1.  Principal Amount upon issuance not to exceed $101,000,000.

2.  To be both lien and claim subordinated to liens and claims under the Exit Credit Facility.

3.  Shall have a maturity of 5 years following the Exit Facility Effective Date.

4.  Shall provide for interest to be payable at a rate not to exceed 12.5% per annum (if paid in cash) or 14.5% (if paid in kind) and to be payable on a semi-annual basis.

5.  Shall contain other terms and conditions to be determined but which shall be reasonably acceptable to Agent.

**Events of Default:**

The definitive documentation for the Exit Credit Facility will include such events of default applicable to the Loan Parties and their subsidiaries as are usual and customary for Agent's financings of this type, and as are consistent with the events of default contained in the Pre-Petition Credit Facility (as modified to take account of current financial condition of the Loan Parties and the exit from the bankruptcy cases and as may be otherwise required by Agent and the Required Lenders).

**Financial Reporting:**

The definitive documentation for the Exit Credit Facility will include financial reporting requirements applicable to the Loan Parties and their subsidiaries as are usual and customary for Agent's financings of this kind, and as are consistent with the financial reporting requirements contained in the Pre-Petition Credit Facility (as modified to take account of current financial condition of the Loan Parties, the exit from the bankruptcy cases, the longer term of the Exit Credit Facility and as may be otherwise required by Agent and the Required Lenders). For the avoidance of doubt, neither the Parent nor any of the Loan Parties shall have an obligation to file quarterly reports under Form 10-Q

and/or annual reports under Form 10-K with the Securities and Exchange Commission for any period commencing on on, or subsequent to, the Exit Facility Effective Date.

**Conditions Precedent to Closing:**  The definitive documentation for the Exit Credit Facility will include such conditions precedent as are usual and customary for Agent's financings of this type, and consistent with the conditions precedent contained in the Pre-Petition Credit Facility. Conditions precedent shall include, but not be limited to, (i) the entry of a final order of the Bankruptcy Court confirming a Chapter 11 plan of reorganization for the Loan Parties (the "**Plan of Reorganization**"), with such order and such plan to be in form and substance acceptable to Agent and the Required Lenders, (ii) the satisfaction of Agent and the Required Lenders with all other orders of the Bankruptcy Court confirming, approving, implementing or affect the Plan of Reorganization and the Exit Credit Facility, or otherwise affecting the rights, remedies, and obligations of Agent and the Lenders, (iii) Agent's receipt of credit approval for the Exit Credit Facility, (iv) Liquidity at closing, after giving effect to the initial use of proceeds (including the payment of all fees and expenses), of not less than $40 million, (v) funding commitments have been obtained for the Maximum Credit Amount under the Exit Credit Facility, (vi) entry into an intercreditor and subordination agreement with respect to the New Senior Secured Notes on terms and conditions substantially similar to those which currently exist with respect to the Pre-Petition Credit Facility, (vii) the Loan Parties having delivered three-year financial projections which are mutually acceptable to the Agent and the Loan Parties and which include income statements, balance sheets, statements of cash flow, and detailed restructuring expense budgets (reflecting the items to be included in the Restructuring Charge Add-Back), and (viii) the Loan Parties having received all applicable gaming and regulatory approvals. The date on which all conditions precedent have been satisfied shall be hereinafter referred to as the "**Exit Facility Effective Date**."

**Required Lenders:**  Lenders holding more than 50% of total commitments and/or exposure under the Exit Credit Facility, provided that Required Lenders shall include not less than 2 Lenders.

**Assignments:**  Each Lender shall be permitted to assign its rights and obligations under the loan documents, or any part thereof, to any person or entity with the consent of Agent. Subject to

customary voting limitations, each Lender shall be permitted to sell participations in such rights and obligations, or any part thereof to any person or entity without the consent of Borrowers.

**Fee Reimbursement:**    Agent and each of the Lenders shall be entitled to prompt reimbursement of their fees and expenses (including, without limitation, the reasonable fees and expenses of their respective counsel) as provided in the Pre-Petition Credit Facility.

**Governing Law and Forum:**    State of New York

**Counsel to Agent:**    Paul, Hastings, Janofsky & Walker LLP

**Interest Rates and Fees**

**Interest Rate Options**...................... Borrowers may elect that the loans bear interest at a rate *per annum* equal to:

(i) the Base Rate plus 3.50%; or

(ii) the LIBOR Rate plus 4.75%.

As used herein:

The "***Base Rate***" means the greatest of (a) the prime lending rate as announced from time to time by WFB, (b) the Federal Funds Rate plus ½%, and (c) the 3 month LIBOR Rate (which rate shall be determined on a daily basis), plus 1%. The "***LIBOR Rate***" means the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate, to be the rate at which Dollar deposits (for delivery on the first day of the requested interest period) are offered to major banks in the London interbank market 2 Business Days prior to the commencement of the requested interest period adjusted by the reserve percentage prescribed by governmental authorities as determined by Agent. The LIBOR Rate shall be available for interest periods of 1, 2, or 3 months.

**Interest Payment Dates**.................. In the case of loans bearing interest based upon the Base Rate ("***Base Rate Loans***"), monthly in arrears.

In the case of loans bearing interest based upon the LIBOR Rate ("***LIBOR Rate Loans***"), on the last day of each relevant interest period.

**Letter of Credit Fees**....................... 2.00% per annum *times* the amount of each Letter of Credit, payable in cash monthly in arrears, plus the charges imposed by the letter of credit issuing bank; provided however, that if the Default Rate is in effect, the Letter of Credit Fee shall be increased by an additional 2.00% per annum.

**Default Rate**........................................ At any time when an event of default has occurred and is continuing and upon written election of the Required Lenders all amounts owing under the Exit Credit Facility shall bear interest at 2.00% per annum above the interest rate otherwise applicable thereto.

**Rate and Fee Basis**.......................... All *per* annum rates shall be calculated on the basis of a year of 360 days and the actual number of days elapsed.

**Closing Fee**........................................ A fee in the amount of $350,000[5] shall be payable in full on the Exit Facility Effective Date to be shared among the Lenders on a pro rata basis.

**Agent Fee**.......................................... A fee in the amount of $75,000 shall be payable in full to the Agent on the Exit Facility Effective Date.

**Unused Line Fee**............................... A fee in an amount equal to 0.50% per annum times the unused portion of the Maximum Credit Amount shall be due and payable monthly in arrears.

**Annual Facility Fee**.......................... A fee of in an amount equal to 0.30% of the Maximum Credit Amount shall be due and payable on the twelve-month anniversary of the Exit Facility Effective Date and every six months thereafter.

**Collateral Management Fee**........... A fee of $10,000 per quarter, for the account of Agent, for each quarter (or portion of a quarter) from and after the Exit Facility Effective Date and up to the date on which the Exit Credit Facility is repaid in full (and all commitments are terminated) shall be due and payable quarterly in arrears.

**Audit, Appraisal, and Examination Fees**:........................... Borrowers will be required to pay (a) a fee of $1,000 per day, per field examiner, plus reasonable out-of-pocket expenses for each financial field exam of the Loan Parties performed by personnel, employed by Agent, and (b) the actual charges paid or incurred by Agent if it elects to employ the services of one or more third persons to perform financial audits of the Loan Parties or their subsidiaries or to appraise the Collateral or any portion thereof; provided, however, that so long as no event of default shall have occurred and be continuing, Borrowers

---

[5] Provided that a fully-earned and non-refundable "Cash Collateral Extension Fee" of $175,000 was received by the Agent (on behalf of the Lenders) in connection with extending the term of cash collateral use beyond January 26, 2011. If such Cash Collateral Extension Fee was not received in connection with extending the term of cash collateral use beyond January 26,2011, the Closing Fee shall be payable in the amount of $525,000.

shall not be obligated to reimburse the Agent (or any other party) for (i) more than $80,000 with respect to field exams conducted during any 12-month period; (ii) more than 1 appraisal of the Collateral during any 12-month period up to a maximum of $75,000.  In addition to the foregoing, Agent shall have the right to require that a financial consultant reasonably acceptable to Agent be engaged, at Borrowers' expense up to a maximum of $60,000 annually, to provide Agent and the Lenders with a review of Borrowers' projections and quarterly financial results.

**Annex A-II**

**Syndicated Amounts**

| Lender | Percentage of Principal Provided | Amount |
|---|---|---|
| Wells Fargo Capital Finance, Inc. | 50.00% | $29,000,000 |
| General Electric Capital Corporation | 18.75% | $10,875,000 |
| Allied Irish Banks plc. | 18.75% | $10,875,000 |
| Canpartners Investments IV, LLC | 12.50% | $7,250,000 |
| **TOTAL** | **100.0%** | **$58,000,000** |

[signature page to follow]

Each party hereto has ACCEPTED AND AGREED to this Term Sheet as of the date first written above.


**WELLS FARGO CAPITAL FINANCE, INC.,**
**in its capacity as Agent and as a Lender**


By:_____
    Name:
    Title:


**GENERAL ELECTRIC CAPITAL CORPORATION,**
**as a Lender**


By:_____
    Name:
    Title:


**ALLIED IRISH BANKS plc.,**
**as a Lender**


By:_____
    Name:
    Title:


**CANPARTNERS INVESTMENTS IV, LLC,**
**as a Lender**


By:_____
    Name:
    Title:

## Exhibit II

## Corporate Governance Term Sheet

<u>EXHIBIT A TO PLAN TERM SHEET</u>

**Corporate Governance Term Sheet**
**for**
**Majestic Holdco, LLC**

**November 30, 2010**

The following term sheet presents certain preliminary material terms in respect of the capital structure and corporate governance of Reorganized Majestic Holdco, LLC (the "***Company***"). All holders of new equity of the Company shall be parties to an amended and restated limited liability company agreement, (the "***LLC Agreement***"). The LLC Agreement shall be effective as of the Effective Date and contain the following provisions:

**Due Diligence**

**Matters:**    The parties are continuing their legal, gaming, tax and regulatory due diligence analysis. As a result of that analysis, the parties acknowledge that the structure of the transactions may need to be modified in order comply with certain gaming, tax, legal or other regulatory requirements. In such event, such modifications will be made in a manner to preserve, to the maximum extent possible, the intent and structure of the terms outlined in this term sheet.

**Common Units:**    The LLC Agreement will provide that the New Equity of the Company will be Common Units. The Common Units will initially be issued to the holders of the 9.5% Senior Secured Notes due 2010 (the "***Senior Secured Notes***") and the 9.75% Senior Notes due 2011 (the "***Senior Notes***").

**Voting Rights:**    Subject to applicable law (including the requirements of applicable licensing authorities), the approval of the holders of Common Units shall be required to approve certain extraordinary events.

Subject to approval of the Board as set forth herein, the approval of the following events shall require the affirmative vote of holders of at least 66 2/3% of the Common Units:

(i)    any change in the size or classification of the Board;

<table>
<tr><td>(ii)</td><td>any action to cause the Company to become a public reporting company under the Securities Exchange Act of 1934, as amended, and the related rules and interpretations thereunder;</td></tr>
<tr><td>(iii)</td><td>any sale of all or substantially all of the assets of the Company and/or its subsidiaries or any other transaction that results in a change in control of the Company, other than a sale pursuant to Drag-Along Rights; or</td></tr>
<tr><td>(iv)</td><td>any winding up or liquidation of the business and operations of the Company.</td></tr>
</table>

**Board of Managers:** The post-Effective Date board of managers of the Company (the "***Board***") shall be composed of five (5) members (each, a "***Manager***"), to be appointed as follows:

(i) On the Effective Date, the holder who, together with its Affiliates, owns the largest number of Senior Secured Notes (the "***Initial Significant Holder***") shall appoint two (2) Managers (each, a "***Senior Secured Notes Manager***"). The initial term of the Senior Secured Notes Managers shall be two (2) years. From and after the Effective Date, as long as the Initial Significant Holder holds at least 25% of the Common Units, without regard to any Common Units issued or issuable pursuant to a management incentive plan or similar arrangement ("***Base Common Units***"), there will be two Senior Secured Notes Managers and, the Initial Significant Holder shall have the right to appoint the two (2) Senior Secured Notes Managers. At such time as the Initial Significant Holder holds less than 25% but at least 10% of the Base Common Units, the Initial Significant Holder shall have the right to appoint one (1) Senior Secured Notes Manager and one (1) Senior Secured Notes Manager appointed by the Initial Significant Holder shall immediately resign. At such time as the Initial Significant Holder holds less than 10% of the Base Common Units, the remaining Senior Notes Secured Manager shall immediately resign and the designation of Senior Secured Notes Manager shall be eliminated.

(ii) On the Effective Date, the Committee of Unsecured Creditors of the Company (the "***Committee***") shall appoint two (2) Managers (each a "***Senior Notes Manager***"). The initial term of the Senior Notes Managers shall be two (2) years (the "***Initial Term***").

From and after the Effective Date, as long as the holders of Senior Notes on the Effective Date (the "***Original Senior Notes Holders***") hold at least 30% of the Base Common Units, there will be two Senior Notes Managers and the Original Senior Notes Holders who are Qualified Members (as defined below) shall have the right to appoint the two (2) Senior Notes Managers by majority vote of such Qualified Members.

2

After the Initial Term, if at any time the Original Senior Notes Holders hold less than 30% but at least 10% of the Base Common Units, the largest Original Senior Notes Holder serving on the Committee as of the Effective Date shall have the right to appoint one (1) Senior Notes Manager and the Initial Significant Holder may elect to remove one (1) Senior Notes Manager. If the Initial Significant Holder elects to exercise its right to remove one (1) Senior Notes Manager, the largest Original Senior Notes Holder serving on the Committee as of the Effective Date shall designate which Senior Notes Manager shall be removed (the "***Removed Senior Notes Manager***"). In such event, the Initial Significant Holder may appoint a director to fill the vacancy created by the removal of such Removed Senior Notes Manager (the "***Replacement Manager***"). Such Replacement Manager shall serve the remaining term of the Removed Senior Notes Manager and the designation right with respect to one (1) Senior Notes Manager shall be eliminated at the expiration of such term.

At any time, including during the Initial Term, that the Original Senior Notes Holders hold less than 10% of the Base Common Units, the Initial Significant Holder may elect to remove one or all Senior Notes Managers. If the Initial Significant Holder elects to exercise its right to remove one or all Senior Notes Manager(s), the Initial Significant Holder may appoint a director(s) to fill the vacancy created by the removal of such Removed Senior Notes Manager(s). Such Replacement Manager(s) shall serve the remaining term of the Removed Senior Notes Manager(s) and the designation right with respect to all Senior Notes Manager(s) shall be eliminated at the expiration of such term.

(iii)    One (1) Manager shall be the Chief Executive Officer of the Company. The Chief Executive Officer will be precluded under the LLC Agreement from voting on Board matters concerning (i) the Chief Executive Officer's employment status, compensation and other terms of employment, and (ii) the hiring of a replacement Chief Executive Officer.

The Chairman of the Board shall be appointed from among the members of the Board by the Senior Secured Notes Managers, and if there are no Senior Secured Notes Managers, by a majority vote of the Board; *provided* that the initial Chairman of the Board shall be a senior executive of the Initial Significant Holder. The Chairman of the Board shall have the rights and duties customary for non-executive chairman position. A "***Supermajority Vote of the Board***" shall mean a majority of the Managers, which majority shall include, during the period there is a Senior Notes Manager, at least one (1) Senior Notes Manager, and during the period there is a Senior Secured Notes Manager, at least one (1)

3

Senior Secured Notes Manager.  All committees of the Board shall include, during the period such designation exists, at least one (1) Senior Notes Manager and at least one (1) Senior Secured Notes Manager.  Vacancies resulting from death, resignation, retirement, disqualification, removal or other cause of a Senior Secured Notes Manager may be filled by the remaining Senior Secured Notes Manager or, if permitted by applicable law, the Initial Significant Holder; *provided* that until such time as a replacement Senior Secured Notes Manager is appointed, any remaining Senior Secured Notes Manager shall be entitled to two votes on all matters considered or approved by the Board.  Except as set forth in sub-paragraph (ii) above, vacancies resulting from death, resignation, retirement, disqualification, removal or other cause of a Senior Notes Manager may be filled by the remaining Senior Notes Manager, or if permitted by applicable law, holders of a majority of the Base Common Units of the Original Senior Notes Holders; *provided* that until such time as a replacement Senior Notes Manager is appointed, any remaining Senior Notes Manager shall be entitled to two votes on all matters considered or approved by the Board.  Except as set forth in sub-paragraph (ii) above, vacancies resulting from the elimination of any Senior Secured Notes Manager or Senior Notes Manager designation shall be filled immediately by candidates who are (x) nominated by any Qualified Member (as defined below) and (y) elected by majority vote of the Common Units.  Any Managers who are not designated as Senior Secured Notes Managers or Senior Notes Managers shall serve for a term of one (1) year.

The Managers shall have the same fiduciary duties to the Company and the Members as the directors of a Delaware corporation, other than as expressly described in this term sheet.

No Manager or member of the Company ("***Member***") shall have a duty to the Company or the Members to offer to the Company any business opportunity suitable for the Company that may arise from time to time which may also be suitable for the Manager, Member, or any of their Affiliates, nor shall any Manager or Member be liable to any Member or the Company for offering any such business opportunity to any other person.

**Refinancing:**     The Senior Notes Managers, during the period such designation exists, subject to the limitations set forth in this paragraph, shall have the right to cause the Company to effect the refinancing of the 12.5% Senior Secured Notes.  To the extent that any refinancing alternatives are identified through such process (i) on materially better terms regarding the interest rate, maturity, amortization, and all associated costs and expenses (and including all associated transaction costs) than the 12.5% Senior Secured Notes, (ii) taken as a whole, has restrictive covenants at least as favorable to the Company as the 12.5% Senior Secured Notes, and (iii) do not include the participation of persons affiliated with holders of Senior Notes, the Senior Secured Notes Managers shall recuse themselves on

4

voting on such refinancing.  In the event that any such refinancing is structured as a single package which includes both replacement senior secured notes and a new first lien credit facility, the Senior Secured Notes Managers shall have the right to vote on such financing, but shall be obligated to evaluate the entire proposal in good faith.

**Supermajority Votes:** The taking of any of the following actions by the Company or its Subsidiaries, as applicable, shall require a Supermajority Vote of the Board unless the Initial Significant Holder holds more than 90% of the Common Units:

(i)    material amendments to the LLC Agreement;

(ii)    any change in the size or classification of the Board;

(iii)    transactions between the Company or any of its Subsidiaries, on the one part, and, on the other part, (A) any Member or Affiliate of a Member (other than pursuant to (1) the Exit Credit Agreement and (2) the New Senior Secured Notes Indenture and transactions among any of the Company and its Subsidiaries); or (B) any Manager or officer of the Company or any of its Subsidiaries or any of their Affiliates (other than ordinary course employment arrangements);

(iv)    converting the Company to a corporation, if converting to a corporation would alter, limit, or modify rights relating to the appointment of managers or directors, supermajority voting, refinancing, preemptive rights, tag-along rights, registration rights and information rights;

(v)    the engagement by the Company or any of its Subsidiaries in any unrelated line of business;

(vi)    the entrance into any agreement, commitment or arrangement to effect any of the foregoing.

The taking of any of the following actions by the Company or its Subsidiaries, as applicable, shall require a Supermajority Vote of the Board unless the Initial Significant Holder holds more than 60% of the Common Units:

(i)    the approval of each proposed Annual Operating and Capital Budget of the Company and its Subsidiaries and any amendments thereto, or the material deviation during any fiscal year from the business strategy, operating expense level, or headcount levels expressed in the then current Annual Operating and Capital Budget for that fiscal year, in each case to the extent such deviations are within the control of the Company

5

or its Subsidiaries and also to the extent that such deviation is not directly caused by an increase in revenues or sales unit volumes;

(ii)     the approval or making of any capital expenditures not specifically included in the Annual Operating and Capital Budget;

(iii)    other than as contemplated in the Annual Operating and Capital Budget, the entry into or amendment of any contract with a value in excess of $1,000,000 (or contracts with an aggregate value in excess of $2,500,000 in any fiscal year) or requiring payments in excess of $1,000,000 per annum (or contract requiring aggregate payments in excess of $2,500,000 per annum) (excluding contracts related to the purchase of materials and services for cost of goods sold);

(iv)    other than pursuant to the Exit Credit Agreement or the New Senior Secured Notes Indenture, any incurrence of new indebtedness or refinancing of existing indebtedness by the Company or any of its Subsidiaries, any guarantee made by the Company or any of its Subsidiaries, or any grant of any security interest in any of the assets of the Company or any of its Subsidiaries, in each case with a value in excess of $2,000,000;

(v)     the sale, transfer, lease, license or other disposition of assets or properties with an aggregate value in excess of $1,000,000 individually or $2,500,000 in the aggregate in any twelve month period (other than pursuant to Drag-Along Rights);

(vi)    any authorization or issuance of equity securities of the Company or any of its Subsidiaries, or any options to subscribe for or securities convertible into or exchangeable for such equity securities, but excluding any grants of equity to management pursuant to a management incentive plan duly approved by the Board;

(vii)   the authorization or consummation of an initial public offering or any public offering of equity securities of the Company or any of its Subsidiaries;

(viii)  any liquidation, dissolution, recapitalization, reclassification or similar action with respect to the authorized or issued equity securities of the Company or any of its Subsidiaries (or any options to subscribe for or securities convertible into or exchangeable for such equity securities);

CH\1188823.24

(ix)  the adoption of, or amendment to or termination of, the management incentive plan or any other management incentive or other material benefit program of Company or any of its Subsidiaries (except for any amendment requirement by law);

(x)  the establishment or entrance into any joint ventures, partnerships, alliances or similar arrangements in which the Company and/or its wholly-owned Subsidiaries invests (or commits to invest), or becomes liable for, an aggregate amount in excess of $1,000,000;

(xi)  any change to tax elections or accounting methods of the Company or any of its material Subsidiaries;

(xii)  any distribution on or with respect to any equity securities of the Company;

(xiii)  any purchase, redemption or retirement, directly or indirectly, of any equity securities of the Company or its subsidiaries (other than redemptions from employees of the Company upon termination of their employment with the Company);

(xiv)  settling any material litigation or similar action to which the Company or any subsidiary is a party or could otherwise be bound;

(xv)  any acquisition by the Company of all or substantially all of the ownership interest in assets of any other entity;

(xvi)  any action to cause the Company to become a public reporting company under the Securities Exchange Act of 1934, as amended, and the related rules and interpretations thereunder;

(xvii)  undertaking any lobbying activities with government officials or representatives relating to the Company or its Subsidiaries;

(xviii)  the hiring, termination or change in the terms of employment of the Company's Chief Executive Officer or Chief Financial Officer; and

(xix)  the entrance into any agreement, commitment or arrangement to effect any of the foregoing.

**Restrictions on**

**Transfer of**

**Common Units:**     No transfer restrictions shall relate to the Common Units except for (i) transfers to persons who are competitors of the Company or its subsidiaries (other than

7

transfers to any such persons who are holders of Common Units as a result of the restructuring and their Affiliates or affiliated funds (collectively, "**_Original Holders_**")), (ii) restrictions on transfers not in compliance with the applicable securities laws and applicable licensing authorities, (iii) requirements that transferees execute the LLC Agreement and agree to be bound thereby as a condition to any transfer, (iv) restrictions necessary to keep the number of holders under 450, (v) restrictions on any transfer that would result in the Company being treated as a "publicly traded partnership" within the meaning of section 7704 of the Internal Revenue Code and (vi) requirements to comply with the Right of First Refusal, the Tag-Along Rights and the Drag-Along Rights.

**Right of**

**First Refusal**: If a holder of Common Units proposes to transfer all or a portion of its Common Units (the "**_Subject Units_**") to a third party, except pursuant to the exercise of "drag-along rights" or "tag-along rights" described below, (i) each Original Holder who holds at least 5% of the outstanding Base Common Units (a "**_Qualified Member_**") shall have a right of first refusal to purchase a *pro rata* portion of the Subject Units, and then (ii) should the right of first refusal not be exercised by any Qualified Member, the other Qualified Members shall have a right of first refusal to purchase a *pro rata* portion of the remaining Subject Units, in each case on the same terms, conditions and price offered by such transferor to the transferee.

**Tag Along Rights:** If one or more holders of Base Common Units (collectively, the "**_Transferring Common Member_**") proposes to transfer in one or a series of related transactions a number of Base Common Units representing 40% or more of the outstanding Base Common Units, other than transfers to an Affiliate of the Transferring Common Member, then the Transferring Common Member shall give written notice to the Company and the other Members at least twenty (20) Business Days prior to the closing of such Transfer and such other holders shall have the right (but not the obligation) to include in such sale its *pro rata* portion of the Base Common Units to be transferred to the proposed purchaser on the same terms and conditions as the Transferring Common Member, including, without limitation, in exchange for a *pro rata* share of all consideration received by the Transferring Common Member.

**Drag Along Rights:** If one or more holders of Base Common Units (collectively, the "**_Selling Common Members_**") proposes to sell a number of Base Common Units representing 50% or more of the outstanding Base Common Units, to any purchaser, other than to an Affiliate of any Selling Common Member, the Selling Common Members may require the other holders of Base Common Units to include a *pro rata* portion of their Base Common Units in such sale and on the

8

same terms and conditions applicable to the Selling Common Member or Members.

**Pre-emptive Rights:** Until an initial public offering (if any) by the Company occurs, if the Company offers any equity securities, except for Excluded Issuances (as defined below), each Qualified Member who is an accredited investor and holds Base Common Units shall have a right of first refusal to purchase that number of such equity securities on the same terms and conditions as would allow it to maintain its fully-diluted equity interest percentage ownership in the Company. To the extent that such Qualified Member does not fully exercise its pre-emptive rights, any Qualified Member that fully exercised its pre-emptive rights may exercise such Member's unexercised pre-emptive rights. "***Excluded Issuances***" shall mean the issuance of equity securities (i) pursuant to or issued upon the exercise of options granted under a management incentive plan, (ii) in consideration for an M&A transaction, (iii) pursuant to conversion or exchange rights included in equity interests previously issued, (iv) in connection with an equity interests split, division or dividend or (v) to financial institutions, lenders, lessors, brokers or similar persons in connection with commercial credit arrangements, debt financings, equipment financings or similar transactions.

**Information**

**Rights:** The Company will provide or make available the following reports and information to the Members:

(i)     As soon as available but in any event within one hundred twenty (120) days after the end of the fiscal year, audited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous fiscal year, all in reasonable detail, together with a copy of the audit report of the Company's independent public accountants and a summary "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Company and its consolidated Subsidiaries.

(ii)    As soon as available but in any event within forty-five (45) days after the end of each fiscal quarter, unaudited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), all in reasonable detail, together with a summary "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the

9

financial condition and results of operations of the Company and its consolidated Subsidiaries.

(iii)    In addition, as soon as available but in any event within forty-five (45) days after the end of each month, the Company shall provide to all Members unaudited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), all in reasonable detail, for the Company and its consolidated Subsidiaries.

(iv)    All current reports that would be required to be filed with the SEC on Form 8-K if the Company were required to file such reports, in each case, within the time periods required for filing such forms and reports as specified in the SEC's rules and regulations.

The Holders of Common Units and Qualified Members, as applicable, may furnish copies of the foregoing reports and information to any prospective transferee that enters into a confidentiality agreement reasonably acceptable to the Company.

*Conference Calls.*  At the request of one or more Qualified Members, the Company shall hold conference calls with the Members to discuss the results of the Company's operations and the financial performance of the Company for the prior fiscal quarter and year-to-date and to answer questions related thereto.

*Management Visitation Rights.*  Each Qualified Member shall have the right, upon reasonable notice and at reasonable times, to meet with the management of the Company and to have access to the management of the Company, *provided*, *however*, that the Company shall have a right to limit such access if the Company determines that it is necessary to do so in order for the Company to preserve any privilege that the Company is entitled to claim.

*Submission of Reports.*  The Company will make such information and such reports available to the extent required by the terms hereof, which access may be provided by posting such information and reports on IntraLinks or a comparable password protected online data system, which will require a confidentiality acknowledgement, and will make such information and reports readily available to any prospective transferee of the Common Units who (x) agrees to treat such information as confidential, and (y) accesses such information on IntraLinks or such comparable password protected online data system, which will require a confidentiality acknowledgement.

**Registration Rights:**   *Demand Registration*.  At any time after a Qualified Public Offering, the Company shall register all Registrable Securities requested to be registered by the Members if the Company receives a written request from holders of at least

15% of the Base Common Units requesting the registration of at least 10% of the Base Common Units then outstanding and the reasonably anticipated aggregate gross proceeds covered by the request would equal or exceed $15 million. The holders of Registrable Securities will be entitled to an aggregate of three (3) demand registrations; *provided*, that each holder who owns at least 25% of the Registrable Securities on the Effective Date will be entitled to one (1) demand registration in addition to the foregoing. A "***Qualified Public Offering***" means an initial public offering of the Company's equity securities with net proceeds of $50 million or more. "***Registrable Securities***" means all Common Units held by Members, whether acquired on or after the effective date of the Plan and includes any equity securities issued by a corporation formed for the purpose of effecting the Qualified Public Offering. The demand rights will otherwise be subject to usual and customary limitations.

*Piggyback Registration*. Each Qualified Member shall have the right to include its Registrable Securities each time the Company proposes for any reason to register any of its Registrable Shares under the Securities Act. The rights to piggyback registration may be exercised an unlimited number of occasions. The rights to piggyback registration will be subject to usual and customary exceptions and limitations (including, without limitation, as to exceptions employee plan S-8 filings and acquisition transactions and as to limitations, selection of underwriters, priority and cutbacks).

*S-3 Registration*. Any Qualified Member, following a Qualified Public Offering, may request that the Company file a registration statement under the Securities Act on Form S-3 (or similar or successor form), covering Registrable Securities held by such Qualified Member if the reasonably anticipated aggregate gross proceeds would equal or exceed $10 million, (ii) the Company is a registrant qualified to use Form S-3 to register the Registrable Shares and (iii) the plan of distribution of the Registrable Shares is other than pursuant to an underwritten public offering. Demands to register the Registrable Shares on Form S-3 will not be deemed to be demand requests (as described above) and the Qualified Members shall have the right to request an unlimited number of registrations on Form S-3.

*Registration Procedures*. The Registration Rights Agreement will contain usual and customary provisions relating to the registration procedures to be followed by the Company, termination of registration rights, as well as indemnification obligations.

**Amendment of the LLC Agreement:** Subject to any required Supermajority Vote of the Board, holders of 66 2/3% of the Base Common Units may amend the LLC Agreement, *provided*, *however*, that no such amendment shall alter or eliminate, without the consent of the holders of a majority of the Base Common Units of the Original Senior Notes Holders, the preemptive rights, the tag-along rights and/or the information rights; *provided*, *further*, that non-material amendments to the LLC Agreement may be effected with a majority vote of the Board after compliance with this provision. The Board shall provide prior written notice of such non-material amendment to

11

the Qualified Members (which notice may be posted to IntraLinks or a similar electronic data room or distributed to the Qualified Members via email). If a Qualified Member has an objection to such amendment, such amendment shall be deemed to be a material amendment and shall be subject to the approval requirements of material amendments to the LLC Agreement. If no Qualified Member informs the Board of an objection to such amendment within ten (10) days of the date of the Board's notice, such amendment shall be deemed to be non-material and may be effected solely with the approval of a simple majority of the Board. Notwithstanding the foregoing, the LLC Agreement may be amended as required to facilitate or implement any of the following purposes solely with the approval of a simple majority of the Board:

(i)      to reflect the admission, substitution, termination or withdrawal of, or change of the ownership of the Common Units by, any Member in accordance with the LLC Agreement;

(ii)      a change that is necessary to qualify the Company as a limited liability company or a Company in which the Members have limited liability; or

(iii)      a change that is: (i) required or specifically contemplated by the LLC Agreement; and (ii) necessary to reflect the current Capital Contributions and number of Common Units held by each Member on the Company Register, following any change to such items in accordance with the provisions of this Agreement.

CH\1188823.24

**Exhibit B**

**Disclosure Statement Order**

[Form of Proposed Disclosure Statement Order Filed on November 3, 2010 [Docket No. 709]

<u>**Exhibit C**</u>

**Reorganized Debtors' Financial Projections**

**Financial Projections / Projected Financial Statements**

The Projected Financial Statements (as defined below) attached herewith relate to the projected operating results, cash flow and financial position of The Majestic Star Casino, LLC, its consolidated subsidiaries and Majestic Holdco, LLC (collectively, the "Company") for the period from January 1, 2010 through September 30, 2011 and to the projected operating results, cash flow and financial position of the Reorganized Debtors, on a consolidated basis, upon the Effective Date of the Plan (as defined below), for the periods from October 1, 2011 through December 31, 2015 (collectively, the "Projected Financial Statements"). For purposes of the Projected Financial Statements, the Effective Date is assumed to occur on September 30, 2011. The Projected Financial Statements are comprised of a statement of operations (the "Income Statement"), statement of financial position (the "Balance Sheet"), and statement of cash flows (the "Cash Flow Statement") for the period from January 1, 2010 through December 31, 2015 (the "Projection Period") and the narrative assumptions and qualifications incorporated herein. The Projected Financial Statements are based on the actual and/or projected consolidated operating results of the Company and the Reorganized Debtors. Additionally, a projected balance sheet (hereinafter, the "Pro Forma Balance Sheet") has been prepared as of the Effective Date with *pro forma* adjustments to account for (i) the reorganization and related transactions to occur upon the consummation of the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11of the Bankruptcy Code* (the "Plan") and (ii) the adoption of "fresh start" reporting pursuant to Financial Accounting Standards Board ("FASB") Accounting Standards Codification 852, *Reorganizations* ("ASC 852"). ASC 852 was formerly referred to as the *AICPA Statement of Position 90-7 Financial Reporting by Entities in Reorganization Under the Bankruptcy Code*.

As described in greater detail below, the Projected Financial Statements were prepared using a projection model developed by the Company and its financial advisors, XRoads Solutions Group, LLC ("XRoads), and incorporate myriad assumptions, the most significant of which were determined by the Company's management. Although management believes the assumptions incorporated into the Financial Projections (as defined below) are reasonable, certain of such assumptions ultimately may not be realized or may otherwise prove not to be materially accurate. The presentation of certain financial information in the Projected Financial Statements is designed to help the reader evaluate the feasibility of the Plan and, thus, may depart from, or otherwise be inconsistent with, U.S. generally accepted accounting principles ("GAAP"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan and/or in the Disclosure Statement unless the context otherwise requires. Certain other capitalized terms have been italicized to indicate that such terms reflect line item captions in the Projected Financial Statements.

THE PROJECTED FINANCIAL STATEMENTS MAY NOT NECESSARILY COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS ISSUED BY THE FASB OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE COMPANY'S INDEPENDENT ACCOUNTANTS HAVE NEITHER COMPILED, REVIEWED NOR EXAMINED THE PROJECTED FINANCIAL STATEMENTS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTED FINANCIAL

STATEMENTS, ASSUME NO RESPONSIBILITY FOR THE PROJECTED FINANCIAL STATEMENTS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS. THE PROJECTED FINANCIAL STATEMENTS WERE PREPARED SOLELY FOR USE IN CONNECTION WITH THE DISCLOSURE STATEMENT AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE AND ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTIONS AND LIMITATIONS AS CONTAINED IN THE DISCLOSURE STATEMENT AND AS SET FORTH HEREIN.

MOREOVER, THE PROJECTED FINANCIAL STATEMENTS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY AND/OR THE REORGANIZED DEBTORS, AS APPLICABLE, INCLUDING CONSUMMATION AND IMPLEMENTATION OF THE PLAN, CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY AND/OR OTHER FINANCING TO FUND OPERATIONS, REALIZATION OF OPERATING EFFICIENCIES, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN THE DISCLOSURE STATEMENT UNDER "RISK FACTORS") AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE AS OF THE DATE THEREOF AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS AND/OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS, WHETHER EXPRESS OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE COMPANY AND/OR THE REORGANIZED DEBTORS, AS APPLICABLE, UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTED FINANCIAL STATEMENTS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE COMPANY'S MANAGEMENT, MAY, IN FACT, NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY AND/OR THE REORGANIZED DEBTORS, AS APPLICABLE. NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTED FINANCIAL STATEMENTS OR THE ABILITY OF THE COMPANY AND/OR THE REORGANIZED DEBTORS, AS APPLICABLE, TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTED FINANCIAL STATEMENTS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FUTURE FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR

MATERIALLY BENEFICIAL MANNER. THE COMPANY AND THE REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTED FINANCIAL STATEMENTS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE ON WHICH THEY WERE PREPARED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTED FINANCIAL STATEMENTS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER FORM OF ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN INDEPENDENT DETERMINATIONS AS TO THE ADEQUACY AND REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTED FINANCIAL STATEMENTS AND SHOULD CONSULT WITH THEIR OWN ADVISORS ON ALL MATTERS.

## I.     Process Overview

As stated above, XRoads assisted the Company with the development of a detailed, interactive financial model (the "Projection Model") for purposes of projecting the future operating performance of the Company and the Reorganized Debtors for the years 2010 through 2015 (the "Financial Projections"). The Financial Projections (as described in greater detail below) serve as the basis for the Projected Financial Statements. For calendar year 2010, the Projection Model incorporates the Company's year-to-date actual results (through September 30, 2010) as well information from the 2010 operating budget (the "Operating Budget") for the period from October 1, 2010 through December 31, 2010 (albeit subject to certain adjustments to reflect recent trends in the Company's operating performance ("2010 Actual / Budget"). Projected financial information for years 2011 through 2015 are based, in part, on the projected full-year financial performance for 2010 as well as numerous assumptions concerning economic conditions, competitive climate and future performance metrics, the most significant of which were determined by the Company's management.

The modeling process that ultimately gave rise to the Financial Projections involved, among other things, analyzing detailed departmental financial statements for each of the Company's gaming properties / business units for year-to-date 2010 as well as for prior years. The historical information for each of the Company's gaming properties / business units was analyzed on a department-by-department basis to identify trends and normalized operating margins.

The Projection Model consists of numerous templates, including templates for substantially all of the significant departments at each of the Company's gaming properties/business units. These templates incorporate key drivers and assumptions necessary to develop the Financial Projections, including but not limited to, various growth rates, operating metrics, market share data, seasonality adjustments, inflation adjustments and revenue mix.

**General Projection Assumptions**

The Financial Projections, and consequently the Projected Financial Statements, are based on a series of assumptions which are believed to be reasonable based on the information available at the time the Financial Projections and the various underlying analyses related thereto were prepared. Management, with input from XRoads, made such an assessment based on many years of experience operating in the gaming industry in general, as well as in the specific markets in which the Company competes, and given the specific facts and circumstances relevant to each of the Company's gaming properties as known at such time.

**Operations**

The Company owns and operates the: i) Majestic Star Casinos (as defined below) located in Gary, Indiana; ii) Fitzgeralds Casino & Hotel in Tunica, Mississippi; and iii) Fitzgeralds Casino Black Hawk, located in Black Hawk, Colorado.

Located in Gary, Indiana, the "Majestic Star Casinos" consists of: i) two gaming vessels (the Majestic Star and the Majestic Star II); ii) a 300-room hotel; iii) an 85,000 square foot entertainment pavilion that features two restaurants, a fast food venue, a coffee bar, a gift shop, banquet and entertainment facilities and a lounge; iv) a covered parking structure capable of accommodating approximately 1,450 vehicles; and iii) surface parking for approximately 3,150 vehicles.

The Majestic Star is a four-story, 360-foot long gaming vessel docked at Buffington Harbor in Gary, Indiana. Home to a Las Vegas-style casino that features approximately 40,800 square feet of gaming space and offers customers a selection of over 1,000 slot machines and 58 table games, the vessel can accommodate a total of approximately 3,000 customers and employees at any given time. Given its proximity to Chicago (approximately 23 miles southeast of downtown Chicago), the Majestic Star draws a significant portion of its customer base from the Chicagoland area and northwest Indiana.

The Majestic Star II is a four-story, 280-foot long gaming vessel docked at Buffington Harbor adjacent to the Majestic Star. The vessel serves as home to a Las Vegas-style casino that features approximately 37,300 square feet of gaming space and offers customers a selection of approximately 1,100 slot machines, twelve table games and 21 poker tables. The Majestic Star II can accommodate a combined total of over 2,700 customers and employees at any given time

Fitzgeralds Casino & Hotel in Tunica, Mississippi ("Fitzgeralds Tunica") features a 506-room hotel (including 68 suites) and approximately 38,000 square feet of gaming space on two levels offering a variety of gaming activities, including over 1,200 slot machines and 40 table games. The property has a covered parking structure capable of accommodating over 400 vehicles, surface parking with capacity for approximately 1,250 additional vehicles, valet parking and conveniently located bus loading/unloading facilities. Given its proximity to Memphis (approximately 30 miles from the downtown area), Fitzgeralds Tunica attracts customers primarily from the Memphis metropolitan area, as well as drive-in customers from northern Mississippi, Arkansas, Missouri, Alabama and regional travelers flying into Memphis.

Fitzgeralds Casino Black Hawk ("Fitzgeralds Black Hawk") is approximately 35 miles from Denver, Colorado. Located adjacent to the entrance to the downtown gaming area of the City of Black Hawk, Fitzgeralds Black Hawk attracts drive-in or "day trip" customers from the population centers of Denver, Boulder, Colorado Springs and Fort Collins, Colorado, as well as Cheyenne, Wyoming. The property features a 17,000 square-foot casino offering a selection approximately 700 slot machines and twelve table games, a steak house, a coffee shop, three bars and a 392-space all-valet parking garage adjacent to the casino.

**Majestic Star Casinos**

In connection with developing the Financial Projections, an analysis of the northwest Indiana gaming market was performed. Among other things, such analysis involved an assessment of: i) the past performance of the northwest Indiana gaming market; ii) existing competition and the impact of recent changes in the competitive environment; iii) recent and potential future legislative changes which have impacted, and/or may in the future impact, the northwest Indiana gaming market; iv) prospects for future market growth/contraction; v) the impact of the permanent closure of Cline Avenue and the re-routing of traffic from Chicago; and vi) the existing and anticipated future economic climate of the Chicago metropolitan area and surrounding region from which gaming customers are drawn. Based on the foregoing, a projection of the gross gaming revenues for the market was developed. Although year-to-year fluctuations are expected, the Financial Projections contemplate market gross gaming revenues growing at a compound annual rate of approximately 2.1% during the Projection Period.

As part of the process of developing the Financial Projections, management also evaluated Majestic Star Casinos' current and historical shares of the northwest Indiana gaming market, changes in such market shares, potential underlying causes for such changes and recent trends. Based on the foregoing, and given management's assessment of Majestic Star Casinos' recent performance, its market share of gross gaming revenue during the Projection Period is projected at approximately 17.7% in 2010 and 18.0% in years 2011 through 2015. Projected gaming revenues (gross) for the Majestic Star Casinos are a function of the projected market share and the projected size of the gaming revenue market for each year of the Projection Period.

Room (hotel) revenues for were projected based on various factors including projected: i) average daily rates ("ADR"); ii) occupancy rates; and iii) the volume of complimentary room nights.

Food & Beverage revenues were projected based primarily on: i) projected gaming revenues; and ii) the projected level of complimentary food items offered to casino patrons.

With respect to the expense side of the operation, various analyses were performed to assess: i) the normalized expense margins; ii) recent operational and other changes impacting Majestic Star Casinos' cost structure (e.g. change in marketing strategy due to the permanent closure of Cline Avenue); iii) contractual obligations (e.g. collective bargaining agreements); iv) projected revenues; and v) anticipated levels of inflation. The cost structure at the Majestic Star Casinos was also evaluated in order to assess areas of fixed and variable costs. Utilizing the foregoing assessment, expenses were projected based on the factors that are most relevant to each expense category.

**Fitzgeralds Tunica**

In connection with developing the Financial Projections, an analysis of the Tunica market was performed. Among other things, such analysis involved an assessment of: i) the past performance of the Tunica gaming market; ii) existing competition and the impact of recent changes in the competitive environment; iii) recent and potential future legislative changes which have impacted, and/or may in the future impact, the Tunica gaming market; iv) prospects for future market growth/contraction; and v) the existing and anticipated future economic climate of the Memphis metropolitan area and surrounding region from which gaming customers are drawn. Based on the foregoing, a projection of the gross gaming revenues for the market was developed. Although year-to-year fluctuations are expected, the Financial Projections contemplate market gross gaming revenues growing at a compound annual rate of approximately 1.9% during the Projection Period.

As part of the process of developing the Financial Projections, management also evaluated Fitzgeralds Tunica's current and historical shares of the Tunica gaming market, changes in such market shares, potential underlying causes for such changes and recent trends. Based on the foregoing, and given management's assessment of Fitzgeralds Tunica's recent performance, its market share of gross gaming revenue during the Projection Period is projected at approximately 9.3% in 2010 and increasing to approximately 9.8% by 2015. Projected gaming revenues (gross) for Fitzgeralds Tunica are a function of the projected market share and the projected size of the gaming revenue market for each year of the Projection Period.

Room revenues were projected based on various factors including projected: i) ADR; ii) occupancy rates; and iii) volume of complimentary room nights.

Food & Beverage revenues were projected based primarily on: i) projected gaming revenues; and ii) the projected level of complimentary food and beverage items offered to casino patrons.

With respect to the expense side of the operation, various analyses were performed to assess: i) the normalized expense margins; ii) recent operational and other changes impacting Fitzgeralds Tunica's cost structure; iii) contractual obligations; iv) projected revenues; and v) anticipated levels of inflation. The cost structure at Fitzgeralds Tunica was also evaluated in order to assess areas of fixed and variable costs. Utilizing the foregoing assessment, expenses were projected based on the factors that are most relevant to each expense category.

**Fitzgeralds Black Hawk**

In connection with developing the Financial Projections, an analysis of the Black Hawk market was performed. Among other things, such analysis involved an assessment of: i) the past performance of the Black Hawk gaming market; ii) existing competition and the impact of recent changes in the competitive environment; iii) recent and potential future legislative changes which have impacted, and/or may in the future impact, the Black Hawk gaming market; iv) prospects

for future market growth/contraction; and v) the existing and anticipated future economic climate of the Denver metropolitan area and surrounding region from which gaming customers are drawn. Based on the foregoing, a projection of the gross gaming revenues for the market was developed. Although year-to-year fluctuations are expected, the Financial Projections contemplate market gross gaming revenues growing at a compound annual rate of approximately 2.8% during the Projection Period.

As part of the process of developing the Financial Projections, management also evaluated Fitzgeralds Black Hawk's current and historical shares of the Black Hawk gaming market, changes in such market shares, potential underlying causes for such changes and recent trends. Based on the foregoing, and given management's assessment of Fitzgeralds Black Hawk's recent performance, its market share of gross gaming revenue during the Projection Period is projected at approximately 5.3%. Projected gaming revenues (gross) for Fitzgeralds Black Hawk are a function of the projected market share and the projected size of the gaming revenue market for each year of the Projection Period.

Food & Beverage revenues were projected based primarily on: i) projected gaming revenues; and ii) the projected level of complimentary food and beverage items offered to casino patrons.

With respect to the expense side of the operation, various analyses were performed to assess: i) the normalized expense margins; ii) recent operational and other changes impacting Fitzgeralds Black Hawk's cost structure; iii) contractual obligations; iv) projected revenues; and v) anticipated levels of inflation. The cost structure at Fitzgeralds Black Hawk was also evaluated in order to assess areas of fixed and variable costs. Utilizing the foregoing assessment, expenses were projected based on the factors that are most relevant to each expense category.

**Corporate**

Certain costs related to corporate management, regulatory compliance and administration of the Company and its affairs are captured at The Majestic Star Casino, LLC. Such costs are generally of a fixed nature and, subject to certain exceptions, are grown by the projected inflation rate throughout the Projection Period.

**Income Statement and Cash Flow Statement**

   *A.     Approach*

The Projection Model consolidates the financial performance of the Company's / Reorganized Debtors' gaming properties / business units (and the departments within such units) using an approach designed to project future operating results and generate them in the form of the Financial Projections. The Income Statement, which incorporates the Financial Projections, takes into account historical trends, market conditions, competitive pressures, macroeconomic conditions and anticipated changes in the Company's / Reorganized Debtors' business model.

Revenues are generally categorized into one of four categories: i) *Casino*; ii) *Rooms*; iii) *Food and Beverage*; and iv) *Other*. Expenses are categorized similarly with the addition of *Overhead*, which includes other operating expenses such as general and administrative expenses.

### B.      Revenue Drivers

*Gross Revenues* represent total gross revenues derived from casino, food and beverage, rooms and other operations. *Net Revenues* represent *Gross Revenues* less *Promotional Allowances*, which include the retail value of complimentary hotel accommodations, food and beverage, and other services provided to casino patrons without charge.

*Casino* revenue is derived primarily from patrons wagering at slot machines, video poker devices and table games. Table games include blackjack, craps, roulette, poker and other specialty games. Casino operating revenue is recognized as earned at the time the relevant services are provided. Casino revenue is dependent upon certain factors, including but not limited to, market size, market share, slot and table game mix, win/hold percentages, amenities, promotional offerings and the level of complimentary services provided.

*Rooms* revenue is derived primarily from hotel rooms and suites rented or provided free of charge to guests at the Majestic Star Casinos and Fitzgeralds Tunica. Hotel room revenue and other hotel service revenues are recognized at the time the hotel rooms are provided to guests.

*Food and Beverage* revenues are derived from food and beverage sales at the various outlets located at each of the gaming properties operated by the Company / Reorganized Debtors. Such outlets include restaurants, bars, snack stations and banquets catering. *Food and Beverage* revenue is recognized at the time the relevant services are provided. *Food and Beverage* revenue is impacted by various drivers, including hotel occupancy, the level of complimentary food and beverage offerings provided to casino patrons, as well as macroeconomic conditions such as inflation

*Other* revenue is obtained from ancillary sources such as the operation of gift shops, commissions on automated teller machine transactions, telephone, pay phone, rental income derived from leasing out retail outlets at the gaming properties operated by the Company and certain other activities conducted by the Company and the Reorganized Debtors.

### C.      Direct Expenses and Overhead Costs

Direct expenses represent the direct costs associated with, among other things, operating the Company's / Reorganized Debtors' casino, hotel, food and beverage and retail operations. These direct operating costs relate primarily to payroll, supplies, gaming taxes and, in the case of food and beverage and retail operations, the cost of goods sold.

Gaming tax expense, which is included in the *Casino* expense line item within the Income Statement, accounts for the single largest component of operating expenses. Such expenses represent amounts payable to various state and local governmental entities in connection with conducting gaming operations in such jurisdictions. Such amounts are based on

the levels of gaming revenue projected at each of the gaming properties and are computed in accordance with the relevant governing statutes and agreements.

Direct labor costs for 2010 are generally based on the 2010 Actual / Budget and grown by a payroll inflation factor for the remainder of the Projection Period. Several departments such as Table Games, Poker, Housekeeping and those in which the various food and beverage activities are captured have partially variable cost structures and, accordingly, have a portion of their costs adjusted based on an underlying driver such as projected gross revenues. Payroll-related taxes and benefits are based on a fixed percentage of wages.

*Overhead* expenses typically consist of utility costs, marketing, facilities maintenance, administrative expenses, insurance, property taxes and other related expenses. Most of the overhead expenses are based on the Company's 2010 Actual / Budget and grown at the projected inflation rates. Certain line items are modeled as variable expenses and are projected based on their historical percentage of an underlying driver.

As more fully discussed in the Disclosure Statement, the Company is currently in a dispute with the Tax Assessor for Lake County, Indiana regarding the assessed value of certain real property owned by the Debtors (the "Lake County Dispute"). The Projected Financial Statements assume that the Company / Reorganized Debtors ultimately prevail in the Lake County Dispute in that the increased assessed values are not upheld. Based on the foregoing, the Financial Projections and Projected Financial Statements include annual property tax expenses for the Majestic Star Casinos that were projected utilizing assessed values for the Company's real property that are consistent, albeit subject to annual inflationary adjustments, with the assessed values in place prior to such increases which are the subject of the Lake County Dispute.

### D. Depreciation and Amortization

For the years 2011 through 2015, depreciation and amortization expenses are projected on a tax basis. If computed and presented on a GAAP basis, the depreciation and amortization expenses for such years would likely be materially different (on a year-to-year basis).

### E. Interest Expense

*Interest Expense* through the Effective Date includes projected interest accrued on the Senior Secured Credit Facility at the default rate for the period from January 1, 2010 through the Effective Date. For the period commencing on the Effective Date and continuing through the end of the Projection Period, interest expense includes: i) interest on the outstanding balance of the New Senior Secured Credit Facility at an annual rate of (a) the Base Rate plus 3.5% or (b) the LIBOR Rate plus 4.75%; and ii) interest on the New Senior Secured Notes at the 12.5% stated cash interest rate or, under certain circumstances, the 14.5% paid-in-kind interest rate, to which such notes are subject (as more fully described in the New Senior Secured Notes Indenture). The current Base Rate and LIBOR Rate are applied for the Projection Period, which rates are 3.25% and 0.29%, respectively. In addition to the aforementioned interest rates, the Reorganized Debtors are required to pay various fees and expenses in connection with the New Senior Secured Credit Facility and the New Senior Secured Notes. Such fees and expenses were

capitalized and amortized over the period during which such debt instruments are projected to be outstanding.

### F.    Reorganization Items and Gain on Debt Discharge

It is projected that the Company will incur approximately $31.8 million of restructuring-related expenses during the period from January 1, 2010 through the Effective Date.  These expenses represent primarily professional fees relating to the Chapter 11 Cases.  Professional fees were projected by examining the billing run-rates and the engagement letters of the various restructuring professionals representing the Company and its primary creditor constituencies.  Such professionals bill for their services based on time incurred and hourly rates applied, fixed monthly rates and/or success/transaction fees required to be paid (by the Company) in the event certain restructuring milestones are achieved.

The estimated gain on extinguishment of debt of $416.1 million pursuant to the Plan is based on *Liabilities Subject to Compromise* as of September 30, 2011 estimated to total $664.8 million.

### G.    Income Taxes

#### i.    Disregarded Entities[1]

Any income, gain, loss or discharge of indebtedness realized by the Disregarded Entities on their operating results or generated in connection with the reorganization and the related transactions to occur upon the consummation of the Plan will not be taxable to the Disregarded Entities for federal and state income tax purposes, but will be taxable to Barden Development, Inc. ("Barden") through the Effective Date, the regarded entity that indirectly owns the Disregarded Entities.  Barden is not a party to the Plan and, as such, any discussion of the federal and state income tax implications to Barden is outside the scope of this disclosure.  Barden should consult with its own tax advisors related to any potential federal and state income tax matters resulting from the Plan.

The foregoing notwithstanding, it is theoretically possible that the Disregarded Entities may be required to distribute funds to Barden and/or to the taxing authorities for the purpose of satisfying Barden's federal and state income tax obligations related to the operating results of the Disregarded Entities. Consequently, out of an abundance of caution, the Income Statement for the period through the Effective Date reflects an income tax expense based on a 35.0% rate for federal, 8.5% Indiana state, 5.0% Mississippi state, and 4.63% Colorado state income tax to the extent there is projected taxable income (if any), as well as Mississippi franchise tax. However, because the Company does not believe that it is legally responsible for income tax liabilities related to the operating results of the Disregarded Entities, the Projected Financial Statements reflect an accrual of the tax liability (to the extent projected in the Income Statement) but do not reflect the actual payment of such liabilities.  It is anticipated that the Disregarded Entities will take federal and state income tax deductions for their share of the interest expense that accrues

---

[1] For purposes of this income tax discussion, the "Disregarded Entities" include all of the named Debtors in these matters with the exception of The Majestic Star Casino II, Inc. which is discussed separately herein.

on the Company's debt through the Effective Date. For state income tax purposes, the taxable income is apportioned between states based on the projected apportionment factors. It should be noted that the State of Indiana requires that the calculation of state income taxes due and payable in Indiana must be based on taxable income after adding back any Indiana state gaming taxes paid. The net effect of this adjustment is to disallow gaming taxes as a deduction in arriving at taxable income for purposes of quantifying Indiana state income taxes, although such deduction is allowable for purposes of quantifying federal income tax liability. The State of Mississippi allows a state tax credit against Mississippi state income taxes for Mississippi state gaming taxes paid. It is assumed that any tax liability will be reduced by the anticipated Mississippi tax credit that Barden can claim.

The reorganization and related transactions to occur upon consummation of the Plan are expected to be taxed as a sale of the Disregarded Entities to an unrelated entity taxed as a partnership. The sale will result in a gain or loss that will be recognized by Barden. The amount of the gain or loss will depend, in part, on whether Barden treats the debt as being recourse or nonrecourse to it for income tax purposes. If Barden treats the debt as recourse, then the assets will likely be treated as sold for their fair market value and any debt discharged will likely result in cancelation of indebtedness income. Cancelation of indebtedness income may or may not be taxable to Barden, depending on its other tax attributes. If Barden treats the debt as nonrecourse, then the assets will likely be treated as sold for the amount owed on the debt and it is likely that no cancelation of debt income will result. The Project Financial Statements do not incorporate any distribution to Barden related for any income taxes that may result from the consummation of the Plan.

    ii.    *Majestic II*

Majestic II is currently taxed as a "C" corporation and is subject to both federal and Indiana state income taxes. For the period from January 1, 2010 through the date that Majestic II is converted to a disregarded entity as discussed below, the Projected Financial Statements reflect income taxes for Majestic II based on a 35.0% rate for federal and 8.5% rate for Indiana state income tax, respectively. As discussed above, the State of Indiana requires that the calculation of state income taxes due and payable in Indiana must be based on taxable income after adding back any Indiana state gaming taxes paid. The net effect of this adjustment is to disallow gaming taxes as a deduction in arriving at taxable income for purposes of quantifying Indiana state income taxes, although such deduction is allowable for purposes of quantifying federal income tax liability. It is anticipated that Majestic II will recognize a federal and state income tax deduction for its share of the interest expense that accrues on the debt prior to the conversion discussed below.

The Projected Financial Statements assume that Majestic II is converted from a corporation to a limited liability company that will be disregarded for federal and state income tax purposes effective as of December 31, 2010. As Majestic II is assumed to be insolvent, such conversion is assumed to be a taxable liquidation for federal and state income tax purposes. For tax purposes, Majestic II is deemed to sell its assets for fair market value and not less than the amount of its liabilities, including any tax liability created by the liquidation. As Majestic II's liabilities are projected to exceed the tax basis in its assets, a tax gain is anticipated on the

liquidation. Accordingly, the Projected Financial Statements contemplate federal and state income tax liabilities applicable to Majestic II.

After the contemplated conversion, Majestic II is assumed to be treated the same as the other Disregarded Entities and any income, gain, loss or discharge of indebtedness realized by Majestic II on its operating results or generated in connection with the reorganization and related transactions to occur upon the consummation of the Plan is assumed not to be taxable to Majestic II for federal and state income tax purposes but is, however, assumed to be taxable to Barden as discussed above.

      iii.    *Post Effective Date*

As of the Effective Date, it is assumed that the Reorganized Debtors are organized as limited liabilities companies that are not subjected to federal and state income taxes at the entity level and owned by an entity that is taxed as a partnership for federal and state income tax purposes. The Projected Financial Statements assume that post Effective Date, the Reorganized Debtors will distribute funds to the partnership and that the partnership will make distributions to its partners to fund any federal and state income taxes related to the operating results of the Reorganized Debtors. As such, the Projected Financial Statements reflect a cash tax distribution based on a 35.0% rate for federal, 8.5% Indiana state, 5.0% Mississippi state, and 4.63% Colorado state income tax. Notwithstanding the foregoing, the Board of Managers of the Reorganized Debtors shall determine in its sole discretion whether to make any tax distributions, in accordance with the New Holdco LLC Agreement (as defined in the Plan), and no person or entity may rely on the Projected Financial Statements as evidencing a right to receive any such distributions. For state income tax purposes, the taxable income is apportioned between states based on the projected apportionment factors. As discussed above, the State of Indiana requires that the calculation of state income taxes due and payable in Indiana must be based on taxable income after adding back any Indiana state gaming taxes paid. The net effect of this adjustment is to disallow gaming taxes as a deduction in arriving at taxable income for purposes of quantifying Indiana state income taxes, although such deduction is allowable for purposes of quantifying federal income tax liability. The State of Mississippi allows a state tax credit against Mississippi state income taxes for Mississippi state gaming taxes paid. It is assumed that cash tax distributions will be reduced by the anticipated Mississippi tax credit that the ultimate partners can claim.

### H.    *Cash Flow from Operating Activities*

Cash flow from operating activities captures cash flows generated from the Company's / Reorganized Debtors' operations and includes the net effect of revenues less operating expenses, interest expense, plus/minus projected changes in working capital.

### I.    *Cash Flow from Capital Expenditures / Investing Activities*

Capital expenditures reflected in the Projected Financial Statements are primarily maintenance related. The expenditures are projected at a level which is anticipated to enable management to maintain the Company's / Reorganized Debtors' operating assets at a level that

allows it to compete effectively and to capture / maintain the projected market shares in each of its markets during the Projection Period. Such capital expenditures include: i) new slot machines, slot conversion kits and new slot stands and chairs; ii) extensive repairs to the "sprung structure" that houses the entertainment pavilion utilized by Majestic Star I and Majestic Star II; iii) new fixtures and furniture (carpeting, tile, televisions, etc.) for the hotel rooms; and iv) various software / hardware upgrades to many of the information systems utilized by the Company / Reorganized Debtors.

### J.    Cash Flow from Financing Activities

The Consolidated Cash Flow Statement reflects various financing activities including, but not limited to, the financing events which are to occur on the Effective Date. Such events include: i) entering into the New Senior Secured Credit Facility; ii) issuing the New Senior Secured Notes; and iii) making cash payments on or about the Effective Date to various holders of Allowed Claims as provided under the Plan. From October 1, 2011 through December 31, 2015, the Cash Flow Statement reflects financing activities that include: i) borrowings and payments on the New Senior Secured Credit Facility; ii) scheduled principal payments on the New Senior Secured Credit Facility; and iii) estimated repayments of the New Senior Secured Notes from "excess" cash flow, to the extent applicable. Although the New Senior Secured Credit Facility matures on the third anniversary of the Effective Date, the Projected Financial Statements assume that such credit facility is either extended or refinanced on substantially similar terms when it is scheduled to come due.

## II.    Balance Sheet and Pro Forma Balance Sheet

The Pro Forma Balance Sheet reflects adjustments to the Company's Balance Sheet resulting from the consummation of the Plan on the Effective Date. Such pro forma adjustments reflect, among other things, the estimated Reorganization Value (as defined in ASC 852) of the Reorganized Debtors as implied by the Plan and the adoption of "fresh-start" reporting. The implied Reorganization Value of the Reorganized Debtors as reflected in the Pro Forma Balance Sheet is approximately $290.6 million. The pro forma adjustments referenced above, including those relating the adoption of "fresh-start" reporting, have been prepared for illustrative purposes only. The effect of "fresh-start" reporting, when actually adopted, may result in adjustments to the assets and liabilities balances that are materially different than those reflected in the Pro Forma Balance Sheet and carried through the Balance Sheet for the remainder of the Projection Period.

The aspects of the Plan which have a significant effect on the Pro Forma Balance Sheet are described in greater detail below.

### A.    Reorganization Value

As described above, the Pro Forma Balance Sheet reflects an implied Reorganization Value of $290.6 million.

### B. Restricted Cash

*Restricted Cash* consists of cash held in interest-bearing bank accounts and certificates of deposits. Such *Restricted Cash* serves as security for letters of credit supporting the Company's self-insured workers' compensation programs, security for various surety bonds, amounts which are the subject of litigation between the Company and the City of Gary, Indiana (the "City of Gary Dispute") as more fully described in the Disclosure Statement. Pending resolution of the City of Gary Dispute, Economic Incentive Payments (as defined in the Disclosure Statement) payable by the Company to the City of Gary have been, and continue to be, deposited into segregated bank accounts until such time as the City of Gary Dispute is resolved.

### C. Property, Building and Equipment, net

The value of these assets is presented in the Pro Forma Balance Sheet as reflected in the Company's unaudited September 30, 2010 balance sheet, subject to the adjustments required to reflect: i) the projected activity through September 30, 2011; ii) estimated market value for certain assets; and iii) the adoption of "fresh-start" reporting.

### D. Intangible Assets, net

Included among these assets are: i) the combined estimated value of the two (2) separate Indiana gaming licenses issued to Majestic I and Majestic II; and ii) certain other intangible assets. The adjustment of $41.0 million as reflected in the Pro Forma Balance Sheet relates to various intangible assets, the most significant of which is the estimated value of Majestic I's Indiana gaming license. Because Majestic I is the original recipient of the Indiana gaming license that it holds and operates under, such license is carried on Majestic I's books at historical cost (i.e. $0) rather than the estimated market value.

### E. Reorganization Value in Excess of Amounts Allocable to Identifiable Assets

The adjustment of $20.8 million reflects amount of the Reorganization Value in excess of amounts allocable to identifiable assets.

### F. Other Assets

The adjustment of $0.4 million consists of the fees and costs (as described in more detail below) associated with the New Senior Secured Credit Facility. Such fees and costs are capitalized as deferred financing costs and amortized over the 3-year term of the New Senior Secured Credit Facility.

### G. Other Accrued Liabilities

Included among these liabilities are amounts which are the subject of the City of Gary Dispute as more fully described in the Disclosure Statement. Pending resolution of the City of Gary Dispute, Economic Incentive Payments payable by the Company to the City of Gary have been, and continue to be, deposited into a segregated bank account until such time as the City of

Gary Dispute is resolved. In connection with making such deposits, the Company has been, and continues to be, increasing a related liability account in its books and records by a corresponding amount. Because the likely outcome of the City of Gary Dispute remains unknown, the Projected Financial Statements do not reflect the satisfaction of the corresponding liability accrued throughout the Projection Period. For avoidance of doubt, nothing provided herein or in the Projected Financial Statements shall constitute an admission of any kind with respect to the City of Gary Dispute and the Debtors fully reserve all of their rights and defenses related thereto.

### H.    Liabilities Subject to Compromise

*Liabilities Subject to Compromise* will be cancelled and receive the treatment as provided under the Plan. Pursuant to the Plan, Discount Notes Indenture Claims shall be cancelled, released, and extinguished and the holders of Discount Notes Indenture Claims shall receive no distribution under the Plan on account of such Claims. Holders of Allowed Senior Secured Notes Indenture Claims and Allowed Senior Secured Notes Indenture Guarantee Claims are to receive a Pro Rata share of: (i) the New Senior Secured Notes; and (ii) 58% of the New Membership Interests. Holders of Allowed Senior Notes Indenture Claims and Allowed Senior Notes Indenture Guarantee Claims are to receive a Pro Rata share of 42% of the New Membership Interests. Holders of various other Allowed Claims will receive specified cash payments as provided in the Plan. For purposes of the Pro Forma Balance Sheet, it is assumed that aforementioned distributions are to be made to the holders of Allowed Claims on the Effective Date.

### I.    New Senior Secured Credit Facility

The terms of the Plan provide for the Reorganized Debtors to enter into a new credit agreement governing the New Senior Secured Credit Facility on the Effective Date. The New Senior Secured Credit Facility is a first priority secured credit facility, with a term of 3 years following the Effective Date and with an interest rate per annum equal to (a) the Base Rate plus 3.50% or (b) the LIBOR Rate plus 4.75%. In addition to paying interest, the Reorganized Debtors are required to pay a closing fee of $350,000, an agent fee of $75,000, an annual facility fee of 0.30% of the Maximum Credit Amount (as defined below), an unused line fee of 0.50% of the unused portion of the Maximum Credit Amount and certain other fees / expenses. Borrowings under the New Senior Secured Credit Facility are not to exceed $58.0 million (the "Maximum Credit Amount") and are available for: i) certain payments owing in connection with the substantial consummation of the Plan; ii) ongoing general corporate needs of the Reorganized Debtors; and iii) payments of fees and expenses associated with the New Senior Secured Credit Facility.

### J.    New Senior Secured Notes

The terms of the Plan also include the issuance of the New Senior Secured Note*s* on the Effective Date in the initial principal amount of $100.6 million. The New Senior Secured Notes, with a maturity date of 5 years following the Effective Date, are secured by a second priority lien on substantially all of the Reorganized Debtors' assets and earn interest, payable semi-annually, at an annual rate of 12.5% or, under certain circumstances, earn interest at an annual rate of 14.5%, which interest is paid-in-kind.

**K.** *Equity*

Adjustments to the *Equity* section of the Pro Forma Balance Sheet were made to reflect the estimated value of the New Membership Interests of the Reorganized Debtors in accordance with "fresh start" reporting pursuant to ASC 852.

**The Majestic Star Casino, LLC et al.**
Projected Consolidated Balance Sheet
($millions)

| | Company | Reorganized Debtors | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 12/31/2010 | 9/30/2011 | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 |
| **Assets** | | | | | | | |
| Cash & Cash Equivalents | $ 47.7 | $ 41.0 | $ 30.0 | $ 30.0 | $ 30.0 | $ 30.0 | $ 30.0 |
| Restricted Cash | 17.8 | 22.5 | 24.1 | 29.8 | 36.1 | 42.5 | 49.0 |
| Accounts Receivable, net | 2.3 | 1.9 | 2.1 | 2.2 | 2.1 | 2.1 | 2.1 |
| Inventories | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Prepaid Expenses | 2.3 | 3.7 | 1.9 | 2.0 | 2.0 | 2.1 | 2.3 |
| Total Current Assets | 71.1 | 70.1 | 59.1 | 65.0 | 71.2 | 77.7 | 84.4 |
| | | | | | | | |
| Property, Building and Equipment, net | 236.1 | 176.0 | 183.9 | 175.4 | 170.2 | 163.9 | 159.5 |
| Intangible Asset, net | 37.2 | 76.3 | 75.0 | 70.0 | 64.9 | 59.9 | 54.8 |
| Goodwill | 4.0 | - | - | - | - | - | - |
| Reorganization Value in Excess of Amounts Allocable to Identifiable Assets | - | 20.8 | 20.8 | 20.8 | 20.8 | 20.8 | 20.8 |
| Other Assets | 3.3 | 2.6 | 2.6 | 2.5 | 2.4 | 2.3 | 2.3 |
| | | | | | | | |
| **Total Assets** | $ 351.7 | $ 345.8 | $ 341.4 | $ 333.7 | $ 329.5 | $ 324.6 | $ 321.8 |
| | | | | | | | |
| **Liabilities and Equity** | | | | | | | |
| Current Portion of Long Term Debt | $ 62.5 | $ - | $ - | $ - | $ - | $ - | $ - |
| Accounts Payable | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| Accrued Expenses | 19.9 | 20.4 | 23.1 | 22.7 | 23.1 | 23.4 | 23.7 |
| Other Accrued Liabilities | 21.7 | 33.7 | 32.2 | 38.9 | 44.7 | 51.4 | 58.1 |
| Total Current Liabilities | 105.2 | 55.2 | 56.4 | 62.7 | 68.9 | 75.9 | 82.9 |
| | | | | | | | |
| Liabilities Subject to Compromise | 664.8 | - | - | - | - | - | - |
| | | | | | | | |
| New Senior Secured Credit Facility | - | 52.0 | 49.8 | 42.8 | 35.0 | 22.8 | 11.2 |
| New Senior Secured Notes | - | 100.6 | 100.6 | 100.6 | 100.6 | 100.6 | 100.6 |
| | | | | | | | |
| **Total Liabilities** | 770.0 | 207.8 | 206.8 | 206.1 | 204.5 | 199.3 | 194.7 |
| **Equity** | | | | | | | |
| Members' Equity | (418.3) | 138.0 | 134.6 | 127.6 | 125.0 | 125.3 | 127.1 |
| **Total Equity** | (418.3) | 138.0 | 134.6 | 127.6 | 125.0 | 125.3 | 127.1 |
| | | | | | | | |
| | $ 351.7 | $ 345.8 | $ 341.4 | $ 333.7 | $ 329.5 | $ 324.6 | $ 321.8 |

**The Majestic Star Casino, LLC et al.**
Consolidated Income Statement
($millions)

| | 2010 Actual/ Budget (a) | Projected Results for the Period | | | | |
|---|---|---|---|---|---|---|
| | Company | | Reorganized Debtors | | | |
| | FY 2010 | Q1-Q3 2011 | Q4 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
| **Revenues** | | | | | | | |
| Casino | $ 283.4 | $ 248.4 | $ 45.3 | $ 301.3 | $ 311.5 | $ 319.9 | $ 327.9 |
| Rooms | 11.0 | 9.5 | 1.8 | 11.5 | 12.0 | 12.3 | 12.6 |
| Food and Beverage | 23.9 | 20.3 | 3.8 | 24.7 | 25.6 | 26.3 | 27.0 |
| Other | 7.1 | 6.0 | 1.1 | 7.3 | 7.5 | 7.7 | 7.8 |
| Gross Revenues | 325.4 | 284.2 | 52.0 | 344.8 | 356.6 | 366.2 | 375.3 |
| Less: Promotional Allowance | (45.1) | (37.6) | (7.3) | (46.1) | (47.8) | (49.1) | (50.4) |
| Net Revenues | 280.3 | 246.6 | 44.7 | 298.7 | 308.8 | 317.1 | 324.9 |
| **Direct Expenses** | | | | | | | |
| Casino | 108.4 | 95.3 | 17.1 | 115.5 | 119.7 | 123.2 | 126.5 |
| Rooms | 2.1 | 1.9 | 0.3 | 2.3 | 2.3 | 2.4 | 2.4 |
| Food and Beverage | 13.4 | 11.3 | 2.1 | 13.7 | 14.2 | 14.6 | 14.9 |
| Payroll and Other | 97.0 | 85.2 | 16.4 | 103.3 | 105.8 | 108.1 | 110.7 |
| Total Direct Expenses | 220.9 | 193.7 | 35.9 | 234.8 | 242.0 | 248.3 | 254.5 |
| **Overhead** | 26.9 | 23.3 | 4.2 | 28.2 | 28.4 | 28.8 | 29.2 |
| **EBITDAR** | 32.5 | 29.6 | 4.6 | 35.7 | 38.4 | 40.0 | 41.2 |
| **Other Income (Expenses)** | | | | | | | |
| Depreciation | (28.1) | (17.8) | (2.7) | (19.7) | (18.0) | (16.8) | (15.8) |
| Amortization | (2.5) | (1.9) | (1.3) | (5.1) | (5.1) | (5.1) | (5.1) |
| Amortization of Financing Fees | - | - | - | (0.1) | (0.1) | (0.1) | - |
| Interest Expense | (3.9) | (2.5) | (3.8) | (15.0) | (14.6) | (14.2) | (13.6) |
| Interest Expense (PIK) | - | - | - | - | - | - | - |
| Other | (0.5) | (0.2) | - | (0.6) | (0.6) | (0.6) | (0.6) |
| Total Other Income (Expenses) | (35.0) | (22.4) | (7.8) | (40.5) | (38.4) | (36.8) | (35.1) |
| Earnings Before Reorganization Items, Extraordinary Items, and Income Taxes | (2.5) | 7.2 | (3.2) | (4.8) | - | 3.2 | 6.1 |
| Reorganization Items | (19.3) | (12.5) | - | - | - | - | - |
| Earnings Before Extraordinary Items, and Income Taxes | (21.8) | (5.3) | (3.2) | (4.8) | - | 3.2 | 6.1 |
| Extraordinary Gain on Prepetition Debt Discharge | - | 416.1 | - | - | - | - | - |
| Income Tax (Provision) Benefit | (2.0) | - | - | - | - | - | - |
| Net Income | $ (23.8) | $ 410.8 | $ (3.2) | $ (4.8) | $ - | $ 3.2 | $ 6.1 |

**NOTE:**
   *(a)* Actual results through September 30, 2010.

**The Majestic Star Casino, LLC et al.**
Consolidated Cash Flow Statement
($millions)

| | 2010 Actual/ Budget (a) | | Projected Results for the Period | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Company** | | | | **Reorganized Debtors** | | | |
| | FY 2010 | Q1-Q3 2011 | Q4 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | |
| **Cash Flow from Operating Activities** | | | | | | | | |
| Net Income | $ (23.8) | $ 410.8 | $ (3.2) | $ (4.8) | $ - | $ 3.2 | $ 6.1 | |
| Gain on discharge of prepetition debt | - | (416.1) | - | - | - | - | - | |
| Depreciation | 28.1 | 17.8 | 2.7 | 19.7 | 18.0 | 16.8 | 15.8 | |
| Amortization | 2.5 | 1.9 | 1.3 | 5.1 | 5.1 | 5.1 | 5.1 | |
| Amortization financing fees | - | - | - | 0.1 | 0.1 | 0.1 | - | |
| Deferred Income Tax | - | - | - | - | - | - | - | |
| Change in working capital | 1.7 | (0.5) | 4.3 | (0.6) | 0.5 | 0.2 | 0.1 | |
| Other | 9.4 | 5.3 | (1.6) | 6.7 | 5.8 | 6.7 | 6.7 | |
| Net cash provided by (used in) Operating Activities | 17.9 | 19.2 | 3.5 | 26.2 | 29.5 | 32.1 | 33.8 | |
| **Cash Flow from Investing Activities** | | | | | | | | |
| Capital expenditures | (14.9) | (8.0) | (10.5) | (11.2) | (12.7) | (10.5) | (11.4) | |
| Increase in restricted cash | (6.1) | (4.7) | (1.6) | (5.7) | (6.3) | (6.4) | (6.5) | |
| Net cash (used in) Investing Activities | (21.0) | (12.7) | (12.1) | (16.9) | (19.0) | (16.9) | (17.9) | |
| **Cash Flow from Financing Activities** | | | | | | | | |
| Proceeds from Pre-Petition Senior Secured Credit Facility | 3.1 | - | - | - | - | - | - | |
| (Repayment) of Pre-Petition Senior Secured Credit Facility | (15.0) | (10.5) | - | - | - | - | - | |
| Proceeds/(Repayment) of New Senior Secured Credit Facility | - | - | (2.2) | (7.0) | (7.8) | (12.2) | (11.6) | |
| (Repayment) of New Senior Secured Notes | - | - | - | - | - | - | - | |
| Payments and Distributions pursuant to Plan of Reorganization | - | (2.3) | - | - | - | - | - | |
| Payment of Closing Costs on New Senior Secured Credit Facility | - | (0.4) | - | - | - | - | - | |
| Distribution to Equity Holders (Federal & State Income Taxes) | - | - | (0.2) | (2.3) | (2.7) | (3.0) | (4.3) | |
| Net cash provided by (used in) Financing Activities | (11.9) | (13.2) | (2.4) | (9.3) | (10.5) | (15.2) | (15.9) | |
| Net increase (decrease) in cash and cash equivalents | (15.0) | (6.7) | (11.0) | - | - | - | - | |
| **Cash and cash equivalents (unrestricted), beginning of period** | 62.7 | 47.7 | 41.0 | 30.0 | 30.0 | 30.0 | 30.0 | |
| **Cash and cash equivalents (unrestricted), end of period** | $ 47.7 | $ 41.0 | $ 30.0 | $ 30.0 | $ 30.0 | $ 30.0 | $ 30.0 | |

NOTE:
 (a) Actual results through September 30, 2010.

**The Majestic Star Casino, LLC et al.**
Pro Forma Balance Sheet as of September 30, 2011
($millions)

| | Predecessor Company (projected) | Debt Discharge | Equity Interest Exchange | Fresh Start | Reorganized Debtors (projected) |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash & Cash Equivalents | $ 49.7 | $ (8.7) *(a)* | $ - | $ - | $ 41.0 |
| Restricted Cash | 22.5 | - | - | - | 22.5 |
| Accounts Receivable, net | 1.9 | - | - | - | 1.9 |
| Inventories | 1.0 | - | - | - | 1.0 |
| Prepaid Expenses | 3.7 | - | - | - | 3.7 |
| Deferred Tax Assets | - | - | - | - | - |
| Total Current Assets | 78.8 | (8.7) | - | - | 70.1 |
| | | | | | |
| Property, Building and Equipment, net | 226.3 | - | - | (50.3) *(h)* | 176.0 |
| Intangible Asset, net | 35.3 | - | - | 41.0 *(h)* | 76.3 |
| Goodwill | 4.0 | - | - | (4.0) *(h)* | - |
| Reorganization Value in Excess of Amounts Allocable to Identifiable Assets | - | - | - | 20.8 *(h)* | 20.8 |
| Other Assets | 2.2 | 0.4 *(b)* | - | - | 2.6 |
| | | | | | |
| **Total Assets** | 346.6 | (8.3) | - | 7.5 | 345.8 |
| | | | | | |
| **Liabilities and Equity** | | | | | |
| Current Portion of Long Term Debt | 58.0 | (58.0) *(c)* | - | - | - |
| Accounts Payable | 1.1 | - | - | - | 1.1 |
| Accrued Expenses | 20.4 | - | - | - | 20.4 |
| Payable to Related Parties | - | - | - | - | - |
| Other Accrued Liabilities | 25.9 | 7.8 *(d)* | - | - | 33.7 |
| Total Current Liabilities | 105.4 | (50.2) | - | - | 55.2 |
| | | | | | |
| Liabilities Subject to Compromise | 664.8 | (664.8) *(e)* | - | - | - |
| | | | | | |
| Deferred Tax Liabilities | - | - | - | - | - |
| New Senior Secured Credit Facility | - | 52.0 *(f)* | - | - | 52.0 |
| New Senior Secured Notes | - | 100.6 *(f)* | - | - | 100.6 |
| | | | | | |
| **Total Liabilities** | 770.2 | (562.4) | - | - | 207.8 |
| | | | | | |
| **Equity** | | | | | |
| Members' Equity | (423.6) | 554.1 *(g)* | - | 7.5 *(i)* | 138.0 |
| **Total Equity** | (423.6) | 554.1 | - | 7.5 | 138.0 |
| | | | | | |
| **Total Liabilities and Equity** | $ 346.6 | $ (8.3) | $ - | $ 7.5 | $ 345.8 |

**NOTES:**

*(a)* Adjustment reflects cash activity projected to occur upon consummation of the Plan. Such cash transactions are projected to include disbursements as provided in the Plan to i) the holders of Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Unsecured Claims; ii) paydown the outstanding principal of the Senior Secured Credit Facility to the initial borrowing amount of the New Senior Secured Credit Facility; and (iii) pay fees and costs totaling $425,000 associated with the closing of the New Senior Secured Credit Facility.

*(b)* Adjustment reflects capitalization of $425,000 in fees and costs associated with the New Senior Secured Credit Facility.

*(c)* Adjustment reflects the satisfaction of the Senior Secured Credit Facility.

*(d)* Adjustment reflects a reserved portion of the Liabilities Subject to Compromise that is projected to be adjudicated subsequent to the Effective Date.

*(e)* Adjustment reflects the satisfaction and/or discharge of the Liabilities Subject to Comprise which include Allowed Claims relating to: i) the Senior Secured Notes; ii) the Senior Notes; iii) the Discount Notes; and v) all other Unsecured Claims other than those referenced in Note (d) above.

*(f)* Adjustment reflects balance of the New Senior Secured Credit Facility and the issuance of New Senior Secured Notes.

*(g)* Adjustment reflects i) the recognition of $416.1 million gain resulting from the discharge of the Liabilities Subject to Compromise; and ii) recording of the New Membership Interests of $138 million.

*(h)* Adjustment reflects i) the re-valuation of certain Property, Buildings & Equipment, other tangible assets, and intangible assets to estimated fair market value; ii) the write off of existing Goodwill and iii) the recording of excess of allocated Reorganization Value over identifiable assets.

*(i)* Adjustment reflects the adoption of fresh-start reporting and the corresponding net increase to Members' Equity based on the imputed Reorganization Value of the Reorganized Debtors.

**Exhibit D**

**Reorganized Debtors' Valuation Analysis**

**Valuation Summary**

**a.      Introduction**

In connection with developing the Plan described in the Disclosure Statement to which this document is an exhibit, XRoads Solutions Group, LLC ("XRoads") worked with the Debtors to quantify the total value of the Estates.  In connection with quantifying the total value of the Estates, XRoads prepared a valuation analysis (the "Valuation Analysis") to estimate the value of the Debtors' business as a going concern.  The Valuation Analysis is more fully described herein and should be read in conjunction with the discussion of the risk factors contained in the Disclosure Statement.  Capitalized terms not defined herein shall have the meanings ascribed to them in the *Debtors' Second Joint Plan of Reorganization Pursuant to Chapter11 of the Bankruptcy Code* (the "Plan") and/or in the Disclosure Statement unless the context otherwise requires.

The Valuation Analysis was prepared using an "as of" date of October 1, 2010 ("Valuation Date") and is based on data and information applicable to such Valuation Date.  Neither XRoads nor the Debtors make representations as to changes relating to such data and information that may have occurred since the Valuation Date.  In preparing the Valuation Analysis, XRoads, among other things:

(i)      Conducted discussions with the Debtors' management with respect to the Debtors' business operations, both current and projected;

(ii)      Reviewed various documents and pleadings in the Chapter 11 Cases;

(iii)      Reviewed the operations and historical financial performance of the Debtors;

(iv)      Reviewed the Debtors' business plans;

(v)      Worked with Debtors' management to analyze  current market conditions and general trends in the gaming industry, the business models and performance of the Debtors' key competitors, and trends affecting local markets in which the Debtors operate;

(vi)      Reviewed industry research reports and other publicly-available financial information with respect to certain other companies in lines of business believed to be comparable, in certain respects, to the Debtors' business(es);

(vii)      Analyzed the performance, financial information and market position of the Debtors relative to certain competitors and/or similar publicly traded companies;

(viii)      Analyzed relevant trading multiples (e.g. enterprise value to EBITDA) for publicly traded gaming companies that are believed to be comparable to the Debtors;

(ix)      Analyzed relevant precedential transactions in the industry to determine prices paid for assets or companies believed to be comparable to the Debtors;

(x)      Reviewed the Plan and the information in the Disclosure Statement; and

(xi)      Reviewed such other information and conducted such other analyses as XRoads deemed appropriate.

XRoads assumed, without independent verification, the accuracy, completeness, and fairness of all of the financial and other information available from public sources and/or as provided to XRoads by the Debtors or their representatives. XRoads did not make any independent evaluation or appraisal of the Debtors' assets, nor did XRoads independently verify any of the information it reviewed. XRoads worked with Debtors' management to ensure that the Projected Financial Statements (as defined in the Disclosure Statement - see EXHIBIT C: Debtors' / Reorganized Debtors' Financial Projections) were reasonably prepared based on estimates and good faith judgments of the Debtors' management as to future operating and financial performance as of the date of their preparation. XRoads performed the Valuation Analysis with the explicit understanding that it is based on standards of assessment, including economic, political, legal and other conditions as in existence as of the Valuation Date, that are beyond the control of XRoads and the Debtors. Such standards of assessment may change in the future and such changes could have a material impact (positive or negative) on XRoads' assessment of the valuation of the Debtors set forth in this Disclosure Statement. Although subsequent developments may affect XRoads' conclusions, XRoads does not have any obligation to update, revise or reaffirm its analysis following the Confirmation Hearing. XRoads disclaims responsibility for any impact any such change may have on its assessment of the valuation of the Debtors' as set forth in the Plan and/or Disclosure Statement.

**b.        Valuation Approaches**

The Valuation Analysis summarizes XRoads' views on the value of the Debtors' ongoing business operations. In preparing a valuation analysis for a company operating in the gaming industry, XRoads typically utilizes the following three methodologies: (i) a calculation of the present value of projected free cash flows and a terminal value, using a range of discount rates (the "DCF Analysis"); (ii) a comparison of the total value of the Debtors' business as a multiple of its earnings before interest, taxes, depreciation and amortization ("EBITDA")[1], with that multiple determined by reference to a review of comparable publicly traded gaming companies (the "Comparable Company Analysis"); and (iii) an analysis of the relevant precedential transactions involving companies operating in the gaming industry to determine an appropriate EBITDA multiple for determining the value of Debtors' business as a going concern (the "Precedent Transactions Analysis").

The DCF Analysis estimates the value of the Debtors' business as the present value of its future unlevered free cash flows. The projected cash flows were derived from the Financial Projections (as defined in the Disclosure Statement - see EXHIBIT C: Debtors' / Reorganized Debtors' Financial Projections) prepared by the Debtors' management for the period of October 1, 2010 through December 31, 2015. XRoads then discounted these projected cash flows by the risk-adjusted cost of capital - or weighted average cost of capital ("WACC") - to derive a present value. The WACC was calculated as the average of the cost of equity and the after-tax cost of debt, weighted by the ratios of total equity to capitalization and total debt to capitalization. Based on the comparable statistics of the Debtors' peer group, XRoads calculated a WACC range of approximately 11.25% to 12.25%. XRoads also calculated the present value of all cash flows beyond 2015 using a terminal value approach. Specifically, XRoads applied exit multiples ranging from 7.0x to 8.0x to the Debtors' 2015 estimated EBITDA to obtain a range of terminal values. XRoads then discounted these terminal values to present value using the aforementioned WACC. Ultimately, this approach yielded a range of value (as of the Valuation Date) for the Debtors' business as a going concern of $225 million to $258 million.

The Comparable Company Analysis involved carefully selecting comparable companies, deriving valuation multiples (e.g. EBITDA multiples) for such companies and applying an appropriate range of valuation multiples to calculate an estimated going-concern value for the Debtors' business. A key factor to the Comparable Company Analysis approach is the selection of companies with business and operational characteristics that are relatively similar to the Debtors. This process of selecting comparable companies is often difficult and subject to

---

[1] The term "EBITDA" as used herein is intended to be exclusive of restructuring fees and costs.

interpretation. Criteria for selecting comparable companies include, but are not limited to, type of business, business risks, key business drivers, capital structure, geographical markets, growth prospects, maturity of businesses, market presence and brands, size and scale of operations.

To determine the comparable companies to be used in the analysis, XRoads first screened the universe of publicly traded, gaming-focused companies with primarily domestic operations, typically with multiple properties and/or operations in the same markets (or similar to those) in which the Debtors conduct gaming operations. After determining the Debtors' peer group, XRoads computed a range of appropriate EBITDA multiples derived from a comparison of value for each company in the peer group to its: (i) EBITDA for the latest twelve months ("LTM"); and (ii) projected EBITDA for the next twelve months ("NTM"). Applying the range of LTM EBITDA multiples (i.e. 6.5x to 7.5x) to the Debtors' projected EBITDA for 2010 (which was used as a proxy for the LTM EBITDA), XRoads determined an implied value range (as of the Valuation Date) for the Debtors' business as a going concern of $212 million to $244 million. XRoads also derived the range of implied EBITDA multiples for the NTM period based on the Debtors' projected EBITDA for 2011 and evaluated same relative to the NTM EBITDA multiples for the peer group companies.

For the Precedent Transactions Analysis, XRoads utilized an approach similar to the Comparable Company Analysis to arrive at a relevant set of transactions. The Precedent Transactions Analysis approach entails calculating EBITDA multiples based upon implied values (including any debt assumed and equity purchased) in change of control transactions of companies determined to be comparable to the Debtors. These multiples are then applied to the Debtors' projections to determine an implied range of value for the Debtors business as going concern. In performing the Precedent Transactions Analysis, XRoads evaluated various acquisitions and restructuring transactions that have occurred in the gaming industry over the past several years for which information is publicly available. For the relevant group of transactions, XRoads calculated the value of the acquired company as a multiple of actual EBITDA for the latest twelve months for which such information was likely available immediately prior to the announcement of the transaction. Utilizing the Precedent Transactions Analysis approach, XRoads determined an implied range of value (as of the Valuation Date) for the Debtors' business as a going concern of $228 million to $260 million.

Based on the methodologies described above, and after further review, discussions, considerations, and assumptions, XRoads has estimated a range of value (as of the Valuation Date) for the Debtors' business as a going concern of $222 million to $254 million, with a midpoint of $238 million.

In the course of evaluating the Debtors and analyzing their operations, XRoads and the Debtors' management identified Excess Assets (as defined below) held by the Debtors as of the Valuation Date that do not currently contribute to the ongoing operations of the Debtors' gaming business but represent assets that are additive to the going-concern value of such business. Certain of these Excess Assets include unimproved land (the "Excess Land") held at each of the casino properties operated by the Debtors. In order to determine the value of the Excess Land, the Debtors commissioned an outside firm to perform appraisals with respect to all such Excess Land. The appraised value of the Excess Land, in total, is approximately $42.9 million as of July 30, 2010. Although the appraised value date of the Excess Land is approximately two months prior to the Valuation Date, the Debtors do not believe the value of the Excess Land has changed in any material respect during such interim period.

In addition to the Excess Land, the Debtors held cash as of the Valuation Date in excess of what the Debtors' management believe is necessary for normal, ongoing operations (hereinafter, the "Excess Cash" and together with the Excess Land, the "Excess Assets"). The amount of such Excess Cash held by the Debtors as of the Valuation Date is approximately $27.3 million. When this amount is combined with the Excess Land, the total value attributable to the Excess Assets is approximately $70.2 million. As referenced above, the combined value of the

Excess Assets is additive to the range of value derived for the Debtors' business as a going concern. Adding the estimated value of the Excess Assets to the range of value derived for the Debtors' business as a going concern results in a range of value for the Estates as of the Valuation Date of $292 million to $324 million.

**<u>Exhibit E</u>**

**Liquidation Analysis**

**THE MAJESTIC STAR CASINO, LLC [A, B]**
**LIQUIDATION ANALYSIS (UNAUDITED)**
*(dollar amounts in thousands)*

| **I. STATEMENT OF ASSETS** | Note Reference | Projected Book Value as of 6/30/11 (Unaudited) | Estimated Net Liquidation Value as of 6/30/11 (Unaudited) |
|---|---|---|---|
| Cash | 1 | $ 30,467 | $ 30,467 |
| Accounts Receivable | 2 | 2,146 | 1,610 |
| Inventory | 3 | 395 | 297 |
| Prepaid Expenses | 4 | 2,921 | 896 |
| Property and Equipment, Net | 5 | 116,279 | 50,442 |
| Intercompany Receivables | 6 | 137,093 | 7,265 |
| Gaming License and Other Intangible Assets | 7 | 0 | 30,346 |
| Other Assets | 8 | 1,717 | 1,666 |
| Total | | $ 291,018 | $ 122,988 |

*Notes:*
[A] This schedule should be read in conjunction with the accompanying "Notes to the Liquidation Analysis".
[B] Discrepancies may exist relative to figures elsewhere in the Plan and Disclosure Statement
    due to rounding of numbers.

**THE MAJESTIC STAR CASINO, LLC [A, B]**
**LIQUIDATION ANALYSIS (UNAUDITED)**
*(dollar amounts in thousands)*

| | Estimated Allowed Claims | | % Recovery |
|---|---|---|---|
| **II. ALLOCATION OF NET LIQUIDATION PROCEEDS TO SECURED, ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS AND EQUITY INTERESTS** | | | |
| | | | |
| Net Liquidation Proceeds: | | $ 122,988 | |
| Less: Contingency Reserve of 2.5% | | (3,075) | |
| *Net Liquidation Proceeds after Contingency Reserve* | | 119,913 | |
| | | | |
| Senior Secured Credit Facility Claims (Class C-1) | $ 23,701 | (23,701) | 100.0% |
| Senior Secured Note Indenture Claims (Class C-2) | 30,889 | (30,889) | 100.0% |
| Other Secured Claims (Class C-4) | 2,850 | (2,850) | 100.0% |
| *Net Liquidation Proceeds after Secured Claims* | | 62,473 | |
| | | | |
| Chapter 7 Trustee Fees | 3,621 | (3,621) | 100.0% |
| Chapter 7 Professional Fees and Expenses | 1,070 | (1,070) | 100.0% |
| Chapter 7 Administrative Claims (Excluding Professional Fees) | 11,993 | (11,993) | 100.0% |
| *Net Liquidation Proceeds after Chapter 7 Administrative Claims* | | 45,790 | |
| | | | |
| Chapter 11 Professional Fees and Expenses | 2,239 | (2,239) | 100.0% |
| Chapter 11 Administrative Claims (Excluding Professional Fees) | 25,092 | (25,092) | 100.0% |
| *Net Liquidation Proceeds after Chapter 11 Administrative Claims* | | 18,459 | |
| | | | |
| Priority Claims | | | |
|     Priority Claims - Allowed Priority Tax Claims | 3 | (3) | 100.0% |
|     Priority Non-Tax Claims (Class C-3) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Priority Claims* | | 18,457 | |
| | | | |
| Unsecured Claims | | | |
|     Deficiency Portion of Senior Secured Notes Indenture Claims (Class C-2) | 264,197 | (9,630) | 3.6% |
|     Senior Notes Indenture Claims (Class C-5) | 233,150 | (8,498) | 3.6% |
|     General Unsecured Claims (Class C-6) | 8,696 | (317) | 3.6% |
|     Rejection Damages Claims (Class C-6) | 315 | (11) | 3.6% |
| *Net Liquidation Proceeds after Distributions to Deficiency Portion of Senior Secured Notes Indenture Claims, Senior Notes Indenture Claims, General Unsecured Claims, Senior Notes Indenture Unsecured Claims and Rejection Damages Claims* | | 0 | |
| | | | |
|     Intercompany Claims (Class C-7) | 4,111 | 0 | 0.0% |
| | | | |
| *Net Liquidation Proceeds after Distributions to Claim Holders* | | $ 0 | |
| | | | |
| Estimated (Shortfall) on Unsecured Claims | | $ (492,012) | |
| | | | |
| *Net Proceeds Available to Intercompany Interests (Class C-8) and Section 510(b) Claims (Class C-9)* | | $ 0 | |

Notes:
[A] This schedule should be read in conjunction with the accompanying "Notes to the Liquidation Analysis".
[B] Discrepancies may exist relative to figures elsewhere in the Plan and Disclosure Statement due to rounding of numbers.

# The Majestic Star Casino, LLC

## Notes to the Liquidation Analysis

The Majestic Star Casino, LLC ("Majestic I") owns and operates the Majestic Star, a gaming vessel docked at Buffington Harbor which is located in Gary, Indiana, approximately 23 miles southeast of downtown Chicago, Illinois. Given the location of Buffington Harbor, the Majestic Star draws a significant portion of its customer base from northwest Indiana and the Chicagoland area. The Majestic Star is a four-story, 360-foot long vessel that can accommodate a total of approximately 3,000 customers and employees. The vessel houses a Las Vegas-style casino that features approximately 40,800 square feet of gaming space and offers customers a selection of approximately 1,017 slot machines and 58 table games. In addition to being the owner and operator of the Majestic Star, Majestic I is also the parent entity and 100% equity owner of: (i) Barden Colorado Gaming, LLC, the owner and operator of the Fitzgeralds Casino in Black Hawk, CO; (ii) Barden Mississippi Gaming, LLC, the owner and operator of the Fitzgeralds Casino & Hotel in Tunica, MS; and (iii) The Majestic Star Casino II, Inc., the owner and operator of the Majestic Star II.

The Majestic Star operates under a gaming license issued to Majestic I in 1994 by the Indiana Gaming Commission ("IGC"). By statute, the IGC is authorized to award up to eleven gaming licenses for the operation of riverboat casinos in the State of Indiana, including five such licenses to counties contiguous to Lake Michigan in northern Indiana. The gaming license held by Majestic I (the "Majestic I Gaming License") is one of the five aforementioned licenses issued for operation of riverboat casinos in northern Indiana.

In addition to the Majestic Star, Majestic I owns and operates various complementary assets which are utilized to provide services to, and otherwise enhance the experiences of, customers visiting either or both of the Majestic Star Casinos (as defined below) (such assets are hereinafter referred to as the "MSC I Shared Assets"). The MSC I Shared Assets include: (i) an 85,000 square foot entertainment pavilion which features two restaurants, a fast food venue, a coffee bar, a gift shop, banquet and entertainment facilities and a lounge; (ii) a covered parking structure capable of accommodating approximately 1,450 vehicles; and (iii) surface parking for approximately 3,150 vehicles. Majestic I also owns approximately 291 acres of land (inclusive of the land on which the Majestic I Shared Assets are constructed), of which approximately 266 acres are unimproved and available for development ("Excess Land").

The Majestic Star Casino II, Inc. ("Majestic II"), a subsidiary of Majestic I, owns and operates the Majestic Star II (and, together with the Majestic Star, the "Majestic Star Casinos"), a second gaming vessel that is also docked at Buffington Harbor adjacent to the Majestic Star. Although technically operating under a separate gaming license issued by the IGC, Majestic Star II is jointly marketed and operated with the Majestic Star under the guidance of a single management team.

Majestic II also owns and operates certain complementary assets which are utilized to provide services to, and otherwise enhance the experiences of, customers visiting either or both of the Majestic Star Casinos (such assets are hereinafter referred to as the "MSC II Shared Assets"). The most significant of the MSC II Shared Assets is the 300-room Majestic Star Hotel located at

Buffington Harbor.  Completed in 1998, the Majestic Star Hotel features: (i) 280 standard rooms, 13 deluxe rooms and seven suites; (ii) a restaurant and bar; and (iii) meeting rooms to host private events and banquets. The combined assets held by Majestic I and Majestic II at Buffington Harbor are hereinafter referred as the "Majestic Star Complex."

The attached liquidation analysis ("Liquidation Analysis") concerning Majestic I was prepared in conjunction with developing the Plan described in the Disclosure Statement to which this document is an exhibit.  The Liquidation Analysis may be helpful to holders of Allowed Claims in reaching a determination of whether to accept or reject the Plan.  The Liquidation Analysis has not been audited or reviewed by an independent public accountant, and accordingly, no opinion, or any other form of assurance, has been expressed in connection therewith.  Capitalized terms which are not defined herein shall have the meaning ascribed to them in the Plan and/or in the Disclosure Statement unless the context otherwise requires.  Capitalized terms not otherwise defined herein, in the Plan and/or in the Disclosure Statement have been italicized to indicate that such terms reflect line item captions in the Liquidation Analysis.

The Liquidation Analysis reflects management's estimate of the proceeds that may be realized by the Majestic I estate and the potential recoveries that may be realized by the holders of Allowed Claims and Equity Interests if the assets of Majestic I were liquidated and the proceeds distributed in accordance with chapter 7 of the Bankruptcy Code ("Chapter 7").  Underlying the Liquidation Analysis are various estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of management and are based upon assumptions with respect to the liquidation decisions which could be subject to change. Accordingly, there can be no assurance that the values and the costs reflected in the Liquidation Analysis would be realized if Majestic I were, in fact, to undergo a Chapter 7 liquidation.

The Liquidation Analysis is based on the assets projected to be held by Majestic I as of June 30, 2011.  It has been assumed, hypothetically, that a plan of reorganization could not ultimately be confirmed and that on or about December 31, 2010 ("Conversion Date") Majestic I's Chapter 11 Case is converted to proceedings under Chapter 7.  From a timing standpoint, it is assumed that a trustee ("Chapter 7 Trustee") would be appointed immediately upon the hypothetical conversion of the Chapter 11 Case.

Subsequent to the Conversion Date, it is anticipated that management would continue to operate the Majestic Star and manage Majestic I's other assets under the supervision of the Chapter 7 Trustee until such time as the liquidation process is substantially completed.  It is assumed that the process undertaken to liquidate Majestic I's assets will be completed on or about June 30, 2011 (the "Liquidation Date").  The net liquidation proceeds available to holders of Allowed Secured Claims and Allowed Priority Tax Claims (if any) are assumed to be distributed on or about July 5, 2011 (the "Secured Claim Distribution Date").  The Chapter 7 Trustee is expected to conclude substantially all of Majestic I's remaining affairs by December 31, 2011.  Net liquidation proceeds available to holders of all other Allowed Claims are assumed to be distributed on or about January 3, 2012 ("Distribution Date").

For purposes of the Liquidation Analysis, it has been assumed that the Majestic Operating Business (as defined below) would be sold as a single "going concern" commonly known as the Majestic Star Casinos & Hotel.  Furthermore, it has been assumed that such a sale would be subject to "forced-sale" conditions.  Because of the restricted time period imposed by the forced-sale conditions for consummating a transaction, it has been assumed that a sale of the Majestic

Star Complex would occur at a substantial discount to its otherwise market value. The foregoing notwithstanding, under the hypothetical scenario laid out in the Liquidation Analysis, it has been assumed that Majestic I would be liquidated under an independent Chapter 7 case and not substantively consolidated with the other Debtors; provided, however, it has also been assumed that the Chapter 7 cases of the various Debtors would be jointly administered.

As referenced elsewhere herein, the collection of assets that comprise the Majestic Operating Business and the Majestic Star Complex are separately owned by Majestic I and Majestic II. If Majestic I and Majestic II were to sell their assets to two or more unrelated purchasers, the recovery on such assets would likely be diminished. It is also highly unlikely that the restricted marketing period available under a forced-sale scenario would provide ample time to identify, negotiate and consummate separate and unrelated transactions involving the assets and operations of Majestic I and Majestic II. Accordingly, for purposes of quantifying the liquidation proceeds available to satisfy creditors of Majestic I, the market value of a single going concern consisting of the Majestic Operating Business was estimated, such value was adjusted downward to reflect a discount resulting from the forced-sale conditions likely to be imposed by a Chapter 7 Trustee, and then the resulting liquidation proceeds were allocated between Majestic I and Majestic II based on various factors including: (i) the pro forma historical operating results of Majestic I and Majestic II (adjusted to reflect unrecorded intercompany activity between Majestic I and Majestic II); (ii) projected operating results of Majestic I and Majestic II (adjusted to reflect the impact of certain projected intercompany activity between Majestic I and Majestic II); and (iii) the assets projected to be held by Majestic I and Majestic II as of the Liquidation Date.

Management has projected revenues, expenses and cash flows for Majestic I based on the assumption that they continue to operate the Majestic Operating Business and manage the assets comprising the Majestic Star Complex through the Liquidation Date. With the exception of Cash, and equivalents thereof, accrued payroll and payroll-related expenses (which accrued payroll and payroll-related expenses are assumed to be paid in full as of the Liquidation Date), the working capital account balances as of the Liquidation Date are projected to approximate normalized historical levels. For the purpose of the Liquidation Analysis, it is generally assumed that the working capital account balances as of June 30, 2010 are representative of normalized historical balances unless otherwise stated herein.

Costs that have been specifically identified in connection with the liquidation of Majestic I's assets have been netted against the estimated gross liquidation proceeds derived therefrom. The classification and dollar amounts of estimated Allowed Claims incorporated within the Liquidation Analysis are subject to material modification pending further analysis and the receipt of additional information with respect to such Claims. Certain Claims that are disputed by Majestic I have not been incorporated into the Liquidation Analysis or have been reduced to the estimated Allowed amount. Recoveries resulting from potential avoidance actions (to the extent any exist) that could hypothetically be pursued by Majestic I have not been addressed in the Liquidation Analysis.

The following notes describe the significant assumptions utilized in arriving at the liquidation proceeds and amounts of the estimated Allowed Claims reflected at the various captions within the Liquidation Analysis.

Note 1 – Cash

*Cash* (including equivalents thereof, segregated cash and/or restricted cash) is assumed to have a liquidation value equal to the projected book value as of the Liquidation Date.  Certain of the segregated cash held by Majestic I is the subject of litigation between the Debtors and the City of Gary, Indiana (the "City of Gary Dispute"), which litigation is more fully described in the Disclosure Statement.

Note 2 – Accounts Receivable

*Accounts Receivable* (excluding amounts, if any, which are owing from the other Debtors) is projected to have a balance as of the Liquidation Date that is generally consistent with the balance that was outstanding as of June 30, 2010.  The ability to collect on the various categories of receivables is projected based on estimates of collection given such factors as the aging of the receivables, past collection history and/or the likelihood of such receivables being transferred to the ultimate purchaser of the Majestic Star Complex in a Chapter 7 Liquidation.  The projected liquidation proceeds are shown net of incremental collection costs (if any) estimated to be incurred.

Note 3 – Inventory

*Inventory* consists primarily of food and beverage products, retail goods and non-food supplies.  The *Inventory* balance as of the Liquidation Date is projected to be generally consistent with the balance that existed as of June 30, 2010.  It is assumed that the inventory would be sold to the ultimate purchaser of the Majestic Star Complex (albeit under forced-sale conditions) resulting in an estimated recovery equal to 75% of the projected book balance.

Note 4 – Prepaid Expenses

*Prepaid Expenses* with material projected balances were analyzed to assess whether they are either refundable and/or transferable in the event of liquidation.  It is assumed in the Liquidation Analysis that refundable *Prepaid Expenses* projected to be held as of the Liquidation Date will be collected in full.  *Prepaid Expenses* that are not refundable but are, however, transferable to a new owner of the Majestic Star Complex are estimated to have a liquidation value equal to 75% of the projected book value as of the Liquidation Date.  *Prepaid Expenses* which are deemed to be neither transferable nor refundable are assumed to have a liquidation value of zero.

Note 5 – Property and Equipment, Net

In support of the restructuring process, the Debtors and their advisors performed certain analyses and market surveys with respect to the value of gaming companies and individual gaming properties. This effort resulted in various market data which, in conjunction with financial projections prepared by management concerning the future consolidated financial performance of the Majestic Star Casinos, MSC I Shared Assets and MSC II Shared Assets, were used to estimate the market value of the combined operation (hereinafter, the "Majestic Operating Business") on a going-concern basis.  When determining the market value of an enterprise, it is appropriate to assess the time period that would be required in order to realize such value. Because of the scope and nature of the Majestic Operating Business, and given the time period typically required in order for a buyer to obtain the requisite approvals required from the Indiana

gaming authorities to own and operate a gaming operation such as the Majestic Operating Business, it is contemplated that a period of at least 12 months would be required in order to consummate a transaction that would result in the realization of proceeds substantially equal to the estimated market value of the Majestic Operating Business as a going concern. Under the forced-sale conditions likely to be imposed by a Chapter 7 Trustee, the time available to consummate a transaction(s) involving the Majestic Star Complex would likely be substantially less than the 12-month (minimum) period referenced above. Therefore, in order to arrive at a liquidation value under such forced-sale conditions, a discount has been applied to the estimated market value of the Majestic Operating Business (as a going concern) to adjust for the negative impact that the compressed time period allotted for consummating a transaction in a Chapter 7 scenario would likely have on the value that is ultimately realized. It is estimated that such a discount would fall within a range of 20% to 30%. For purposes of the Liquidation Analysis, a discount of 25% was applied. In addition, the estimated transaction costs associated with the liquidation process were netted against the estimated liquidation value in order to arrive at the net liquidation proceeds.

As referenced above, the collection of assets that comprise the Majestic Operating Business are separately owned by Majestic I and Majestic II. For purposes of quantifying the liquidation proceeds available to satisfy creditors of Majestic I, the market value of a single going concern consisting of the Majestic Operating Business was estimated, such value was adjusted downward to reflect a discount resulting from the forced-sale conditions likely to be imposed by a Chapter 7 Trustee, and then the resulting liquidation proceeds were allocated between Majestic I and Majestic II based on the various factors described above.

The Majestic I Gaming License and the Majestic II Gaming License (as defined below) collectively authorize the holders to operate the Majestic Star Casinos. Furthermore, as a result of the limitation imposed (by statute) on the number of such licenses that can be issued by the IGC, competition in the immediate market area in which the Majestic Star Casinos operate and compete is restricted. Accordingly, a significant portion of the Majestic I Going-Concern Value (as defined below) has been attributed to the Majestic I Gaming License. The value attributed to the Majestic I Gaming License has been adjusted downward to reflect the forced-sale conditions that would likely be imposed by a Chapter 7 Trustee.

For purposes of the Liquidation Analysis, the going-concern value assigned to *Property and Equipment* is equal to the *pro rata* portion of the value of the Majestic Operating Business (albeit adjusted downward to reflect forced-sale conditions) that is allocated to Majestic I (hereinafter, the "Majestic I Going-Concern Value") but which is not specifically attributed to other assets excluding Other Intangible Assets (as defined below) projected to be held by Majestic I as of the Liquidation Date.

The value of the Excess Land is not captured in the value of the Majestic Operating Business. Thus, in addition to performing the analyses described above, the Debtors also recently commissioned an appraisal of the Excess Land. The appraised value of the Excess Land is approximately $39.2 million. Due to the forced-sale conditions described above, a discount of 30% (the midpoint of the assumed forced-sale discount range of 25% to 35% applicable to the Excess Land) was applied to the appraised value in order to arrive at the liquidation value. The estimated transaction costs associated with the liquidation process were netted against the estimated liquidation value in order to arrive at the net liquidation value.

Note 6 – Intercompany Receivables

The *Intercompany Receivables* category consists of the sum of the net receivable balances (if any) owing from each of the other Debtors to Majestic I. For purposes of the Liquidation Analysis, such receivables have been segregated based on whether the underlying intercompany transaction occurred: (i) prior to the Petition Date ("Pre-petition InterCo Transactions"); or (ii) subsequent to the Petition Date ("Post-petition InterCo Transactions"). It is assumed in the Liquidation Analysis that the Pre-petition InterCo Transactions give rise to Claims against the counterparty Debtor that are classified as *Intercompany Claims (Class C-7)* and such Claims are subordinated to all other Classes of Unsecured Claims. Accordingly, no recovery is projected to be realized from the *Intercompany Receivables* arising from Pre-petition InterCo Transactions. With respect to *Intercompany Receivables* arising from Post-petition InterCo Transactions, it is assumed in the Liquidation Analysis that such receivables result in Claims against the counterparty Debtor which are classified as *Chapter 11 Administrative Claims* and receive the same treatment as all other *Chapter 11 Administrative Claims* against the relevant counterparty Debtor.

Note 7 – Gaming License and Other Intangible Assets

These assets include the value, if any, attributable to: 1) the Majestic I Gaming License; and 2) other intangible assets held by Majestic I exclusive of the Majestic I Gaming License (the "Other Intangible Assets*"*). Such assets were analyzed in conjunction with estimating the recovery on the tangible assets held by Majestic I. Although the financial statements of Majestic I do not reflect a value for the Majestic I Gaming License, such license represents a significant asset held by the Majestic I estate. In order to estimate the value of the Majestic I Gaming License and, correspondingly, a second gaming license issued by the IGC which is currently held by Majestic II (the "Majestic II Gaming License" and together with the Majestic I Gaming License, the "Majestic Gaming Licenses"), the Debtors and their advisors performed certain analyses and market surveys with respect to the value of the Majestic Gaming Licenses as well as the value of similar gaming licenses awarded to competing gaming companies. This effort resulted in various market data which, in conjunction with financial projections and related analyses prepared by management concerning the future financial performance of the Majestic Star Casinos, were used to estimate the value of the Majestic Gaming Licenses. For purposes of the Liquidation Analysis, it has been assumed that the value of the Majestic Gaming Licenses falls within a range of approximately $60 to $70 million. The midpoint of this range (i.e. $65 million) was selected and, for the purposes of the Liquidation Analysis, such value has been allocated to each of the Majestic Gaming Licenses based on the proportionate share of net gaming revenues generated at each of the Majestic Star Casinos. Due to the forced-sale conditions described in Note 5 above, a discount of 25% was applied to the value of the Majestic I Gaming License for purposes of the Liquidation Analysis.

The Other Intangible Assets include value attributable to the trade name and the assembled workforce utilized by Majestic I in connection with operating the Majestic Star and the MSC I Shared Assets and goodwill (if any). For purposes of the Liquidation Analysis, the going-concern value assigned to Other Intangible Assets is equal to the *pro rata* portion of the Majestic I Going-Concern Value (albeit adjusted downward to reflect the forced-sale conditions) that is not attributed to other assets (excluding *Property and Equipment, Net*) projected to be held by Majestic I as of the Liquidation Date.

Note 8 – Other Assets

The *Other Assets* category consists primarily of base stock and deposits. Base stock consists primarily of uniforms that have life spans in excess of one year. The recovery on such assets is estimated to be approximately 75%. Deposits consist of: (i) various deposits required from Majestic I, by third parties, in connection with operating the Majestic Star and the MSC I Shared Assets, and (ii) retainers paid to certain professionals in connection with the Debtors' restructuring efforts. Deposits that are assumed to be fully refundable in the event of a sale are estimated to have a recovery of 100%. Deposits that are not refundable but are, however, transferable to a new owner of the Majestic Star Complex are estimated to have a liquidation value equal to 75% of the projected book value as of the Liquidation Date. Deposits which are deemed to be neither transferable nor refundable are assumed to have a liquidation value of zero.

Note 9 – Income and Related Taxes

For purposes of the Liquidation Analysis, it is assumed that Majestic I has been, at all times since formation, a limited liability company. It is further assumed that Majestic I has, at all such times, not elected to be treated as an association taxable as a corporation for federal or state income purposes. As of the Conversion Date and continuing until Majestic I's assets are liquidated, Majestic I is assumed to have only Majestic Holdco, LLC as the sole holder of its Equity Interests and, as such, Majestic I will be disregarded for federal and state income tax purposes. Furthermore, Majestic Holdco, LLC is assumed to have only Barden Development, Inc. as the sole holder of its Equity Interests and, as such, Majestic Holdco, LLC will be disregarded for federal and state income tax purposes. Any gain or loss realized as a result of the liquidation sale to an unrelated third party will be recognized for federal and state income tax purposes, but will not be taxable to Majestic I and will instead be taxable to any regarded entity that owns Majestic I. Any cancellation of indebtedness income may also be taxed at such regarded entity. Accordingly, the Liquidation Analysis does not contemplate any federal or state income tax liabilities to Majestic I as a result of the liquidation of its assets pursuant to Chapter 7 or any obligation to distribute funds to its owner to pay any such federal or state income tax liabilities that may be owed by a regarded entity with respect to the liquidation of Majestic I's assets.

For purposes of the Liquidation Analysis, it is assumed that Barden Development, Inc. is taxed as a C corporation for federal and state income tax purposes. Barden Development, Inc. is not a Debtor in the bankruptcy proceedings and, accordingly, any discussion of the federal and state income tax implication to Barden Development, Inc. is outside the scope of this disclosure. Barden Development, Inc. should consult with its own tax advisors with respect to any potential federal and state income tax matters resulting from the Liquidation Analysis.

Note 10 – Allocation of Net Liquidation Proceeds to Secured, Administrative, Priority and Unsecured Claims

The projected *Net Liquidation Proceeds* are reduced by 2.5% (the "Contingency Reserve") in order to arrive at the *Net Liquidation Proceeds after Contingency Reserve*. The Contingency Reserve is intended to serve as a buffer and reflects, among other things, the uncertainties inherent in: (i) implementing the liquidation process; (ii) quantifying and classifying unliquidated, contingent and/or disputed Claims; and (iii) providing for disputed Claims to the extent Majestic I does not ultimately prevail in defending against them. The *Net Liquidation Proceeds after*

*Contingency Reserve* are then allocated in accordance with priorities set forth in the Bankruptcy Code.

*Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) (Class C-4)* (the "*Other Secured Claims (Class C-4)*"), if any, are assumed to be satisfied from the proceeds resulting from the sale of the underlying collateral.  It is further assumed that substantially all of Majestic I's assets would be liquidated prior to the Secured Claim Distribution Date and that the liquidation value of the underlying collateral for the *Other Secured Claims (Class C-4)* (if any) approximates the allowed amount of the *Other Secured Claims (Class C-4)*.  Accordingly, it is not anticipated that any *Other Secured Claims (Class C-4)* would remain outstanding beyond the Secured Claim Distribution Date.

The *Senior Secured Credit Facility Claims (Class C-1)* are projected to be satisfied from the net liquidation proceeds available from the sale of assets which serve as collateral for the Senior Secured Credit Facility.  It is assumed that the *Senior Secured Credit Facility Claims (Class C-1)* are secured by either a first lien or junior lien on all assets in which Majestic I holds title with the exception of the Majestic I Gaming License, cash generated by gaming activities (and held in segregated bank accounts that are not subject to account control agreements), cage cash and cash on the casino floor, which assets management believes are unencumbered.  The Allowed *Senior Secured Credit Facility Claims*, are estimated to total approximately $62.5 million as of the Conversion Date, of which approximately $23.7 million has been allocated to Majestic I.

The *Senior Secured Notes Indenture Claims (Class C-2)* consist of all Allowed Claims against Majestic I arising under, or in any way related to, the 9½% Senior Secured Notes.  The non-deficiency portion of such Claims are projected to be satisfied through the application of net liquidation proceeds available from the sale of assets which serve as collateral for both the *Senior Secured Credit Facility Claims (Class C-1)* and *Senior Secured Notes Indenture Claims (Class C-2)*.  It is assumed that the *Senior Secured Notes Indenture Claims (Class C-2)* are secured by junior liens (relative to the liens securing the *Senior Secured Credit Facility Claims (Class C-1))* on all assets in which Majestic I holds title with the exception of the Majestic I Gaming License, cash generated by gaming activities (and held in segregated bank accounts that are not subject to account control agreements), cage cash and cash on the casino floor, which assets management believes are unencumbered.  The Allowed *Senior Secured Notes Indenture Claims (Class C-2)* as of the Petition Date, excluding any deficiency, are estimated to total approximately $30.1 million.

It is anticipated that the net liquidation proceeds resulting from the sale of assets collateralizing the Senior Secured Notes Indenture would be substantially less than the total amount of the associated Allowed Claims arising therefrom.  Therefore, to the extent such Allowed Claims are not satisfied in full, the unsecured deficiency portion resulting from *Senior Secured Notes Indenture Claims (Class C-2)* are treated in the same manner as *General Unsecured Claims (Class C-6)* and *Rejection Damages Claims (Class C-6)* (collectively, the "Class C-6 Claims") and the *Senior Notes Indenture Claims (Class C-5)* ("Class C-5 Claims").  The Allowed Claims arising from the unsecured deficiency relating to the *Senior Secured Notes Indenture Claims (Class C-2)* are estimated to total approximately $264.2 million.

*Chapter 7 Trustee Fees* are estimated in accordance with the upper limit established under Section 326 of the Bankruptcy Code.  Accordingly, for the purposes of the Liquidation Analysis, the *Chapter 7 Trustee Fees* are equal to 25% of the first $5,000 disbursed by the Chapter 7

Trustee to parties-in-interest; 10% on any amount distributed in excess of $5,000, but not in excess of $50,000; 5% on any amount distributed in excess of $50,000, but not in excess of $1 million; and, 3% on any amount distributed in excess of $1 million. Due to the magnitude of the estimated liquidation value of Majestic I's assets, the Bankruptcy Court could conclude that *Chapter 7 Trustee Fees* of an amount as determined under the algorithm described above is not reasonable and, therefore, approve *Chapter 7 Trustee Fees* of a materially lesser amount.

*Chapter 11 Professional Fees and Expenses* are estimated at approximately $910,000 per month from October 1, 2010 through the Conversion Date. *Chapter 7 Professional Fees and Expenses* are estimated at approximately $232,000 per month from the Conversion Date through the Liquidation Date and approximately $79,000 per month thereafter until the Distribution Date. For illustrative purposes only, it is assumed in the Liquidation Analysis that *Chapter 11 Professional Fees and Expenses* which are outstanding and unpaid as of the Conversion Date are not paid until the Distribution Date. Likewise, it is assumed that *Chapter 7 Professional Fees and Expenses* which are outstanding as of the Liquidation Date, or which are incurred subsequent to that date, are not paid until the Distribution Date. The outstanding *Chapter 7 Professional Fees and Expenses* and *Chapter 11 Professional Fees and Expenses* as of the Distribution Date are estimated to be approximately $1.1 million and $2.2 million, respectively. In the event that the *Net Liquidation Proceeds after Secured Claims* are not sufficient to satisfy all Administrative Claims relating to professional fees and expenses (inclusive of those arising from the Chapter 7 proceedings), the outstanding *Chapter 7 Professional Fees and Expenses* amounts would be paid in full prior to distributions being made in respect of outstanding Allowed Administrative Claims relating to Majestic I's Chapter 11 Case.

*Chapter 7 Administrative Claims (Excluding Professional Fees)* and *Chapter 11 Administrative Claims (Excluding Professional Fees)* include unpaid post-petition liabilities incurred in the ordinary course of business (including those resulting from Post-petition InterCo Transactions). Also included among such Claims are those asserted by the City of Gary in connection with the Economic Incentive Payments withheld by the Debtors subsequent to the Petition Date. The estimated post-petition current liability balances at June 30, 2011 (excluding those Claims related to withheld Economic Incentive Payments and Post-petition InterCo Transactions) are believed to reflect normalized balances. In the event that the *Net Liquidation Proceeds after Secured Claims* are not sufficient to satisfy all Administrative Claims, the outstanding *Chapter 7 Administrative Claims (Excluding Professional Fees)* would be paid in full prior to any distributions being made in respect of outstanding Allowed Administrative Claims relating to Majestic I's Chapter 11 Case.

Certain Claims against Majestic I are entitled priority under the Bankruptcy Code. Such Claims consist of *Priority Tax Claims* and *Priority Non-Tax Claims (Class C-3)* (collectively, the "*Priority Claims*"). *Priority Tax Claims* consist of Allowed Claims entitled to priority of payment under Sections 502(i) and 507(a)(8) of the Bankruptcy Code. *Priority Non-Tax Claims (Class C-3)* are those Allowed Claims that are entitled to priority of payment under Section 507(a) of the Bankruptcy Code, other than *Priority Tax Claims*. *Priority Claims* are projected to be satisfied in full prior to allocating any proceeds for distribution to holders of Class C-5 Claims, Class C-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Claims (Class C-2)* and *Intercompany Claims (Class C-7)*.

The *Senior Notes Indenture Claims (Class C-5)* consist of all Claims arising under, or in any way, related to, the Senior Notes Indenture.

As described above, the Class C-6 Claims consist of *General Unsecured Claims (Class C-6)* and *Rejection Damages Claims (Class C-6)*. *General Unsecured Claims (Class C-6)* consist of, among other things, any pre-petition unsecured liabilities incurred in the ordinary course of business that are not a Priority Claim, a deficiency Claim arising from the *Senior Secured Notes Indenture Claims (Class C-2)*, *Senior Notes Indenture Claims (Class C-5)*, *Rejection Damages Claims (Class C-6)* or *Intercompany Claims (Class C-7)*. Included among such Claims are those asserted by the City of Gary in connection with the Economic Incentive Payments withheld by the Debtors prior to the Petition Date.

*Rejection Damages Claims (Class C-6)*, if any, consist of all Claims arising from of the rejection (by Majestic I) of any Executory Contract or Unexpired Lease pursuant to Section 365 of the Bankruptcy Code or the repudiation of such contract or lease.

For purposes of the Liquidation Analysis, the Class C-5 Claims, the Class C-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Claims (Class C-2)* are all consolidated into a single "pool" of Allowed Claims. Liquidation proceeds that would be available to satisfy the Class C-5 Claims, the Class C-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Claims (Class C-2)* are allocated amongst the holders of such Allowed Claims on a *pari passu* basis.

*Intercompany Claims (Class C-7)* consist of the sum of the net payable balances (if any) owing by Majestic I to each of the other Debtors as a result of Pre-petition InterCo Transactions. The Allowed *Intercompany Claims (Class C-7)* are estimated to total approximately $4.1 million. It is assumed that in the context of a Chapter 7 liquidation, the Intercompany Claims against Majestic I would be subordinated to all other classes of Unsecured Claims. Due to the estimated shortfall in net liquidation proceeds available to satisfy the Class C-5 Claims, the Class C-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Claims (Class C-2)*, it is not contemplated in the Liquidation Analysis that any distributions will be made to the holders of *Intercompany Claims (Class C-7)*.

*Intercompany Interests (Class C-8)* consist of all Intercompany Interests in Majestic I. Due to the estimated shortfall in net liquidation proceeds available to satisfy the Class C-5 Claims, the Class C-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Claims (Class C-2)* and *Intercompany Claims (Class C-7)*, it is not contemplated in the Liquidation Analysis that any distributions will be made to the holders of *Intercompany Interests (Class C-8)*.

*Section 510(b) Claims (Class C-9)* consist of, among other things, any Allowed Claim (i) arising from rescission of a purchase or sale of a Security (including any Interest) of the Debtors; (ii) for damages arising from the purchase or sale of such a Security; or (iii) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim. Pursuant to the Bankruptcy Code, *Section 510(b) Claims (Class C-9)* are subordinated to most other Unsecured Claims including the Class C-5 Claims, the Class C-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Claims (Class C-2)*, *Intercompany Claims (Class C-7)* and *Intercompany Interests (Class C-8)*. The Debtors are not currently aware of any *Section 510(b) Claims* that are or will become Allowed Claims.

**THE MAJESTIC STAR CASINO II, INC. [A, B]**
**LIQUIDATION ANALYSIS (UNAUDITED)**
*(dollar amounts in thousands)*

| I. **STATEMENT OF ASSETS** | Note Reference | Projected Book Value as of 6/30/11 (Unaudited) | Estimated Net Liquidation Value as of 6/30/11 (Unaudited) |
|---|---|---|---|
| Cash | 1 | $ 4,396 | $ 4,396 |
| Accounts Receivable | 2 | 124 | 93 |
| Prepaid Expenses | 3 | 1,834 | 306 |
| Property and Equipment, Net | 4 | 24,939 | 10,594 |
| Intercompany Receivables | 5 | 17,565 | 17,565 |
| Gaming License and Other Intangible Assets | 6 | 35,456 | 25,021 |
| Other Assets | 7 | 3,893 | 85 |
| Total | | $ 88,207 | $ 58,060 |

*Notes:*
[A] This schedule should be read in conjunction with the accompanying "Notes to the Liquidation Analysis".
[B] Discrepancies may exist relative to figures elsewhere in the Plan and Disclosure Statement
   due to rounding of numbers.

**THE MAJESTIC STAR CASINO II, INC. [A, B]**
**LIQUIDATION ANALYSIS (UNAUDITED)**
*(dollar amounts in thousands)*

II. ALLOCATION OF NET LIQUIDATION PROCEEDS TO SECURED,
ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS AND EQUITY INTERESTS

| | Estimated Allowed Claims | | % Recovery |
|---|---|---|---|
| Net Liquidation Proceeds: | | $ 58,060 | |
| Less: Contingency Reserve of 2.5% | | (1,452) | |
| *Net Liquidation Proceeds after Contingency Reserve* | | 56,609 | |
| | | | |
| Senior Secured Credit Facility Claims (Class D-1) | $ 5,481 | (5,481) | 100.0% |
| Senior Secured Note Indenture Guarantee Claims (Class D-2) | 7,803 | (7,803) | 100.0% |
| Other Secured Claims (Class D-4) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Secured Claims* | | 43,325 | |
| | | | |
| Chapter 7 Trustee Fees | 1,722 | (1,722) | 100.0% |
| Chapter 7 Professional Fees and Expenses | 535 | (535) | 100.0% |
| Chapter 7 Administrative Claims (Excluding Professional Fees) | 4,750 | (4,750) | 100.0% |
| *Net Liquidation Proceeds after Chapter 7 Administrative Claims* | | 36,318 | |
| | | | |
| Chapter 11 Professional Fees and Expenses | 1,119 | (1,119) | 100.0% |
| Chapter 11 Administrative Claims (Excluding Professional Fees) | 50 | (50) | 100.0% |
| *Net Liquidation Proceeds after Chapter 11 Administrative Claims* | | 35,148 | |
| | | | |
| Priority Claims | | | |
| Priority Claims - Allowed Priority Tax Claims | 300 | (300) | 100.0% |
| Priority Non-Tax Claims (Class D-3) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Priority Claims* | | 34,848 | |
| | | | |
| Unsecured Claims | | | |
| Deficiency Portion of Senior Secured Notes Indenture Guarantee Claims (Class D-2) | 264,197 | (18,504) | 7.0% |
| Senior Notes Indenture Guarantee Claims (Class D-5) | 233,150 | (16,330) | 7.0% |
| General Unsecured Claims (Class D-6) | 198 | (14) | 7.0% |
| Rejection Damages Claims (Class D-6) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Distributions to Deficiency Portion of Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Guarantee Claims, General Unsecured Claims, Senior Notes Indenture Guarantee Unsecured Claims and Rejection Damages Claims* | | 0 | |
| | | | |
| Intercompany Claims (Class D-7) | 118,291 | 0 | 0.0% |
| | | | |
| *Net Liquidation Proceeds after Distributions to Claim Holders* | | $ 0 | |
| | | | |
| Estimated (Shortfall) on Unsecured Claims | | $ (580,987) | |
| | | | |
| *Net Proceeds Available to Intercompany Interests (Class D-8) and Section 510(b) Claims (Class D-9)* | | $ 0 | |

*Notes:*
[A] This schedule should be read in conjunction with the accompanying "Notes to the Liquidation Analysis".
[B] Discrepancies may exist relative to figures elsewhere in the Plan and Disclosure Statement due to rounding of numbers.

# The Majestic Star Casino II, Inc.

## Notes to the Liquidation Analysis

The Majestic Star Casino II, Inc. ("Majestic II") owns and operates the Majestic Star II, a gaming vessel docked at Buffington Harbor which is located in Gary, Indiana, approximately 23 miles southeast of downtown Chicago, Illinois. Given the location of Buffington Harbor, the Majestic Star II draws a significant portion of its customer base from northwest Indiana and the Chicagoland area. The Majestic Star II is a four-story, 280-foot long vessel that can accommodate a total of approximately 2,740 customers and employees. The vessel houses a Las Vegas-style casino that features approximately 37,300 square feet of gaming space and offers customers a selection of approximately 1,082 slot machines, 12 table games and 21 poker tables.

The Majestic Star II operates under a gaming license originally issued to Trump Indiana, Inc. ("Trump Indiana") in 1994 by the Indiana Gaming Commission ("IGC"). Trump Indiana was subsequently acquired by The Majestic Star Casino, LLC ("Majestic I") in December of 2005 and the gaming vessel that had previously been owned and operated by Trump Indiana was rebranded as the Majestic Star II. By statute, the IGC is authorized to award up to eleven gaming licenses for the operation of riverboat casinos in the State of Indiana, including five such licenses to counties contiguous to Lake Michigan in northern Indiana. The gaming license held by Majestic II (the "Majestic II Gaming License") is one of the five aforementioned licenses issued for operation of riverboat casinos in northern Indiana.

In addition to the Majestic Star II, Majestic II also owns and operates certain complementary assets which are utilized to provide services to, and otherwise enhance the experiences of, customers visiting either or both of the Majestic Star Casinos (as defined below) (such assets are hereinafter referred to as the "MSC II Shared Assets"). The most significant of the MSC II Shared Assets is the 300-room Majestic Star Hotel located at Buffington Harbor. Completed in 1998, the Majestic Star Hotel features: (i) 280 standard rooms, 13 deluxe rooms and seven suites; (ii) a restaurant and bar; and (iii) meeting rooms to host private events and banquets.

Majestic I, the parent entity and owner of 100% of the Equity Interest of Majestic II, owns and operates the Majestic Star (and, together with the Majestic Star II, the "Majestic Star Casinos"), a second gaming vessel that is also docked at Buffington Harbor adjacent to the Majestic Star II. Although technically operating under a separate gaming license issued by the IGC, Majestic Star is jointly marketed and operated with the Majestic Star II under the guidance of a single management team.

Majestic I also owns and operates various complementary assets which are utilized to provide services to, and otherwise enhance the experiences of, customers visiting either or both of the Majestic Star Casinos (such assets are hereinafter referred to as the "MSC I Shared Assets"). The MSC I Shared Assets include: (i) an 85,000 square foot entertainment pavilion which features two restaurants, a fast food venue, a coffee bar, a gift shop, banquet and entertainment facilities and a lounge; (ii) a covered parking structure capable of accommodating approximately 1,450 vehicles; and (iii) surface parking for approximately 3,150 vehicles. Majestic I also owns approximately 291 acres of land (inclusive of the land on which the Majestic I Shared Assets are

constructed), of which approximately 266 acres are unimproved and available for development. The combined assets held by Majestic II and Majestic I at Buffington Harbor are hereinafter referred as the "Majestic Star Complex."

The attached liquidation analysis ("Liquidation Analysis") concerning Majestic II was prepared in conjunction with developing the Plan described in the Disclosure Statement to which this document is an exhibit. The Liquidation Analysis may be helpful to holders of Allowed Claims in reaching a determination of whether to accept or reject the Plan. The Liquidation Analysis has not been audited or reviewed by an independent public accountant, and accordingly, no opinion, or any other form of assurance, has been expressed in connection therewith. Capitalized terms which are not defined herein shall have the meaning ascribed to them in the Plan and/or in the Disclosure Statement unless the context otherwise requires. Capitalized terms not otherwise defined herein, in the Plan and/or in the Disclosure Statement have been italicized to indicate that such terms reflect line item captions in the Liquidation Analysis.

The Liquidation Analysis reflects management's estimate of the proceeds that may be realized by the Majestic II estate and the potential recoveries that may be realized by the holders of Allowed Claims and Equity Interests if the assets of Majestic II were liquidated and the proceeds distributed in accordance with chapter 7 of the Bankruptcy Code ("Chapter 7"). Underlying the Liquidation Analysis are various estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of management and are based upon assumptions with respect to the liquidation decisions which could be subject to change. Accordingly, there can be no assurance that the values and the costs reflected in the Liquidation Analysis would be realized if Majestic II were, in fact, to undergo a Chapter 7 liquidation.

The Liquidation Analysis is based on the assets projected to be held by Majestic II as of June 30, 2011. It has been assumed, hypothetically, that a plan of reorganization could not ultimately be confirmed and that on or about December 31, 2010 ("Conversion Date") Majestic II's Chapter 11 Case is converted to proceedings under Chapter 7. From a timing standpoint, it is assumed that a trustee ("Chapter 7 Trustee") would be appointed immediately upon the hypothetical conversion of the Chapter 11 Case.

Subsequent to the Conversion Date, it is anticipated that management would continue to operate the Majestic Star II and manage Majestic II's other assets under the supervision of the Chapter 7 Trustee until such time as the liquidation process is substantially completed. It is assumed that the process undertaken to liquidate Majestic II's assets will be completed on or about June 30, 2011 (the "Liquidation Date"). The net liquidation proceeds available to holders of Allowed Secured Claims and Allowed Priority Tax Claims (if any) are assumed to be distributed on or about July 5, 2011 (the "Secured Claim Distribution Date"). The Chapter 7 Trustee is expected to conclude substantially all of Majestic II's remaining affairs by December 31, 2011. Net liquidation proceeds available to holders of all other Allowed Claims are assumed to be distributed on or about January 3, 2012 ("Distribution Date").

For purposes of the Liquidation Analysis, it has been assumed that the Majestic Operating Business (as defined below) would be sold as a single "going concern" commonly known as the Majestic Star Casinos & Hotel. Furthermore, it has been assumed that such a sale would be subject to "forced-sale" conditions. Because of the restricted time period imposed by the forced-sale conditions for consummating a transaction, it has been assumed that a sale of the Majestic Star Complex would occur at a substantial discount to its otherwise market value. The

foregoing notwithstanding, under the hypothetical scenario laid out in the Liquidation Analysis, it has been assumed that Majestic II would be liquidated under an independent Chapter 7 case and not substantively consolidated with the other Debtors; provided, however, it has also been assumed that the Chapter 7 cases of the various Debtors would be jointly administered.

As referenced elsewhere herein, the collection of assets that comprise the Majestic Operating Business and the Majestic Star Complex are separately owned by Majestic II and Majestic I. If Majestic II and Majestic I were to sell their assets to two or more unrelated purchasers, the recovery on such assets would likely be diminished. It is also highly unlikely that the restricted marketing period available under a forced-sale scenario would provide ample time to identify, negotiate and consummate separate and unrelated transactions involving the assets and operations of Majestic II and Majestic I. Accordingly, for purposes of quantifying the liquidation proceeds available to satisfy creditors of Majestic II, the market value of a single going concern consisting of the Majestic Operating Business was estimated, such value was adjusted downward to reflect a discount resulting from the forced-sale conditions likely to be imposed by a Chapter 7 Trustee, and then the resulting liquidation proceeds were allocated between Majestic II and Majestic I based on various factors including: (i) the pro forma historical operating results of Majestic II and Majestic I (adjusted to reflect unrecorded intercompany activity between Majestic II and Majestic I); (ii) projected operating results of Majestic II and Majestic I (adjusted to reflect the impact of certain projected intercompany activity between Majestic II and Majestic I); and (iii) the assets projected to be held by Majestic II and Majestic I as of the Liquidation Date.

Management has projected revenues, expenses and cash flows for Majestic II based on the assumption that they continue to operate the Majestic Operating Business and manage the assets comprising the Majestic Star Complex through the Liquidation Date. With the exception of Cash, and equivalents thereof, accrued payroll and payroll-related expenses (which accrued payroll and payroll-related expenses are assumed to be paid in full as of the Liquidation Date), the working capital account balances as of the Liquidation Date are projected to approximate normalized historical levels. For the purpose of the Liquidation Analysis, it is generally assumed that the working capital account balances as of June 30, 2010 are representative of normalized historical balances unless otherwise stated herein.

Costs that have been specifically identified in connection with the liquidation of Majestic II's assets have been netted against the estimated gross liquidation proceeds derived therefrom. The classification and dollar amounts of estimated Allowed Claims incorporated within the Liquidation Analysis are subject to material modification pending further analysis and the receipt of additional information with respect to such Claims. Certain Claims that are disputed by Majestic II have not been incorporated into the Liquidation Analysis or have been reduced to the estimated Allowed amount. Recoveries resulting from potential avoidance actions (to the extent any exist) that could hypothetically be pursued by Majestic II have not been addressed in the Liquidation Analysis.

The following notes describe the significant assumptions utilized in arriving at the liquidation proceeds and amounts of the estimated Allowed Claims reflected at the various captions within the Liquidation Analysis.

Note 1 – Cash

*Cash* (including equivalents thereof and restricted cash) is assumed to have a liquidation value equal to the projected book value as of the Liquidation Date.

Note 2 – Accounts Receivable

*Accounts Receivable* (excluding amounts, if any, which are owing from the other Debtors) is projected to have a balance as of the Liquidation Date that is generally consistent with the balance that was outstanding as of June 30, 2010. The ability to collect on the various categories of receivables is projected based on estimates of collection given such factors as the aging of the receivables, past collection history and/or the likelihood of such receivables being transferred to the ultimate purchaser of the Majestic Star Complex in a Chapter 7 Liquidation. The projected liquidation proceeds are shown net of incremental collection costs (if any) estimated to be incurred.

Note 3 – Prepaid Expenses

*Prepaid Expenses* with material projected balances were analyzed to assess whether they are either refundable and/or transferable in the event of liquidation. It is assumed in the Liquidation Analysis that refundable *Prepaid Expenses* projected to be held as of the Liquidation Date will be collected in full. *Prepaid Expenses* that are not refundable but are, however, transferable to a new owner of the Majestic Star Complex are estimated to have a liquidation value equal to 75% of the projected book value as of the Liquidation Date. *Prepaid Expenses* which are deemed to be neither transferable nor refundable are assumed to have a liquidation value of zero.

Note 4 – Property and Equipment, Net

In support of the restructuring process, the Debtors and their advisors performed certain analyses and market surveys with respect to the value of gaming companies and individual gaming properties. This effort resulted in various market data which, in conjunction with financial projections prepared by management concerning the future consolidated financial performance of the Majestic Star Casinos, MSC II Shared Assets and MSC I Shared Assets, were used to estimate the market value of the combined operation (hereinafter, the "Majestic Operating Business") on a going-concern basis. When determining the market value of an enterprise, it is appropriate to assess the time period that would be required in order to realize such value. Because of the scope and nature of the Majestic Operating Business, and given the time period typically required in order for a buyer to obtain the requisite approvals required from the Indiana gaming authorities to own and operate a gaming operation such as the Majestic Operating Business, it is contemplated that a period of at least 12 months would be required in order to consummate a transaction that would result in the realization of proceeds substantially equal to the estimated market value of the Majestic Operating Business as a going concern. Under the forced-sale conditions likely to be imposed by a Chapter 7 Trustee, the time available to consummate a transaction(s) involving the Majestic Star Complex would likely be substantially less than the 12-month (minimum) period referenced above. Therefore, in order to arrive at a liquidation value under such forced-sale conditions, a discount has been applied to the estimated market value of the Majestic Operating Business (as a going concern) to adjust for the negative impact that the compressed time period allotted for consummating a transaction in a Chapter 7 scenario would likely have on the value that is ultimately realized. It is estimated

that such a discount would fall within a range of 20% to 30%. For purposes of the Liquidation Analysis, a discount of 25% was applied. In addition, the estimated transaction costs associated with the liquidation process were netted against the estimated liquidation value in order to arrive at the net liquidation proceeds.

As referenced above, the collection of assets that comprise the Majestic Operating Business are separately owned by Majestic II and Majestic I. For purposes of quantifying the liquidation proceeds available to satisfy creditors of Majestic II, the market value of a single going concern consisting of the Majestic Operating Business was estimated, such value was adjusted downward to reflect a discount resulting from the forced-sale conditions likely to be imposed by a Chapter 7 Trustee, and then the resulting liquidation proceeds were allocated between Majestic II and Majestic I based on the various factors described above.

The Majestic II Gaming License and the Majestic I Gaming License (as defined below) collectively authorize the holders to operate the Majestic Star Casinos. Furthermore, as a result of the limitation imposed (by statute) on the number of such licenses that can be issued by the IGC, competition in the immediate market area in which the Majestic Star Casinos operate and compete is restricted. Accordingly, a significant portion of the Majestic II Going-Concern Value (as defined below) has been attributed to the Majestic II Gaming License. The value attributed to the Majestic II Gaming License has been adjusted downward to reflect the forced-sale conditions that would likely be imposed by a Chapter 7 Trustee.

For purposes of the Liquidation Analysis, the going-concern value assigned to *Property and Equipment* is equal to the *pro rata* portion of the value of the Majestic Operating Business (albeit adjusted downward to reflect forced-sale conditions) that is allocated to Majestic II (hereinafter, the "Majestic II Going-Concern Value") but which is <u>not</u> specifically attributed to other assets excluding Other Intangible Assets (as defined below) projected to be held by Majestic II as of the Liquidation Date.

Note 5 – Intercompany Receivables

The *Intercompany Receivables* category consists of the sum of the net receivable balances (if any) owing from each of the other Debtors to Majestic II. For purposes of the Liquidation Analysis, such receivables have been segregated based on whether the underlying intercompany transaction occurred: (i) prior to the Petition Date ("Pre-petition InterCo Transactions"); or (ii) subsequent to the Petition Date ("Post-petition InterCo Transactions"). It is assumed in the Liquidation Analysis that the Pre-petition InterCo Transactions give rise to Claims against the counterparty Debtor that are classified as *Intercompany Claims (Class D-7)* and such Claims are subordinated to all other Classes of Unsecured Claims. Accordingly, no recovery is projected to be realized from the *Intercompany Receivables* arising from Pre-petition InterCo Transactions. With respect to *Intercompany Receivables* arising from Post-petition InterCo Transactions, it is assumed in the Liquidation Analysis that such receivables result in Claims against the counterparty Debtor which are classified as *Chapter 11 Administrative Claims* and receive the same treatment as all other *Chapter 11 Administrative Claims* against the relevant counterparty Debtor.

Note 6 – Gaming License and Other Intangible Assets

These assets include the value, if any, attributable to: 1) the Majestic II Gaming License; and 2) other intangible assets held by Majestic II exclusive of the Majestic II Gaming License (the

"Other Intangible Assets").  Such assets were analyzed in conjunction with estimating the recovery on the tangible assets held by Majestic II.  In order to estimate the value of the Majestic II Gaming License and, correspondingly, a second gaming license issued by the IGC which is currently held by Majestic I (the "Majestic I Gaming License" and together with the Majestic II Gaming License, the "Majestic Gaming Licenses"), the Debtors and their advisors performed certain analyses and market surveys with respect to the value of the Majestic Gaming Licenses as well as the value of similar gaming licenses awarded to competing gaming companies.  This effort resulted in various market data which, in conjunction with financial projections and related analyses prepared by management concerning the future financial performance of the Majestic Star Casinos, were used to estimate the value of the Majestic Gaming Licenses. For purposes of the Liquidation Analysis, it has been assumed that the value of the Majestic Gaming Licenses falls within a range of approximately $60 to $70 million.  The midpoint of this range (i.e. $65 million) was selected and, for the purposes of the Liquidation Analysis, such value has been allocated to each of the Majestic Gaming Licenses based on the proportionate share of net gaming revenues generated at each of the Majestic Star Casinos. Due to the forced-sale conditions described in Note 4 above, a discount of 25% was applied to the value of the Majestic II Gaming License for purposes of the Liquidation Analysis.

The Other Intangible Assets include value attributable to the trade name and the assembled workforce utilized by Majestic II in connection with operating the Majestic Star II and the MSC II Shared Assets.  For purposes of the Liquidation Analysis, the going-concern value assigned to Other Intangible Assets is equal to the *pro rata* portion of the Majestic II Going-Concern Value (albeit adjusted downward to reflect the forced-sale conditions) that is not attributed to other assets (excluding *Property and Equipment, Net*) projected to be held by Majestic II as of the Liquidation Date.

Note 7 – Other Assets

The *Other Assets* category consists primarily of deferred tax assets and deposits.  The timing differences associated with the accrual and payment of federal and state income taxes result in a deferred tax asset depicted on Majestic II's projected balance sheet as of the Liquidation Date.  Such asset is assumed to have a liquidation value of zero.  Deposits are comprised of various deposits required from Majestic II, by third parties, in connection with operating the Majestic Star II and the Majestic II Shared Assets.  These deposits are believed to be fully refundable in the event of a sale and are, therefore, estimated to have a recovery of 100%.

Note 8 – Income and Related Taxes

For purposes of the Liquidation Analysis, it is assumed that Majestic II was a qualified sub-chapter S-corporation for federal and state income tax purposes at all times prior to the revocation of Barden Development, Inc.'s election effective as of January 1, 2010.  It is also assumed that such revocation resulted in a taxable transaction, which increased the income tax basis of its assets so that they equaled the then total liabilities of Majestic II.  It is assumed that since such revocation, Majestic II was taxed as a C–corporation for federal and state income tax purposes until it was converted from a corporation to a limited liability company effective on the Conversion Date    As of the Conversion Date and continuing until Majestic II's assets are liquidated, Majestic II is assumed to have only Majestic I as the sole holder of its Equity Interests and, as such, Majestic II will be disregarded for federal and state income tax purposes. Furthermore, Majestic I is assumed to have only Majestic Holdco, LLC as the sole holder of its Equity Interests and, as such, Majestic I will be disregarded for federal and state income tax

purposes. Any gain or loss realized as a result of a sale to an unrelated third party will be recognized for federal and state income tax purposes, but will not be taxable to Majestic II and will instead be taxable to any regarded entity that owns Majestic II. Any cancellation of indebtedness income may also be taxed at such regarded entity. Accordingly, the Liquidation Analysis does not contemplate any federal or state income tax liabilities to Majestic II as a result of the liquidation of its assets pursuant to Chapter 7 or any obligation to distribute funds to its owner to pay any such federal or state income tax liabilities that may be owed by a regarded entity with respect to the liquidation of Majestic II's assets.

For purposes of the Liquidation Analysis, it is assumed that Barden Development, Inc. is taxed as a C corporation for federal and state income tax purposes. Barden Development, Inc. is not a Debtor in the bankruptcy proceedings and, accordingly, any discussion of the federal and state income tax implication to Barden Development, Inc. is outside the scope of this disclosure. Barden Development, Inc. should consult with its own tax advisors with respect to any potential federal and state income tax matters resulting from the Liquidation Analysis.

Note 9 – Allocation of Net Liquidation Proceeds to Secured, Administrative, Priority and Unsecured Claims

The projected *Net Liquidation Proceeds* are reduced by 2.5% (the "Contingency Reserve") in order to arrive at the *Net Liquidation Proceeds after Contingency Reserve*. The Contingency Reserve is intended to serve as a buffer and reflects, among other things, the uncertainties inherent in: (i) implementing the liquidation process; (ii) quantifying and classifying unliquidated, contingent and/or disputed Claims; and (iii) providing for disputed Claims to the extent Majestic II does not ultimately prevail in defending against them. The *Net Liquidation Proceeds after Contingency Reserve* are then allocated in accordance with priorities set forth in the Bankruptcy Code.

*Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) (Class D-4)* (the "*Other Secured Claims (Class D-4)*"), if any, are assumed to be satisfied from the proceeds resulting from the sale of the underlying collateral. It is further assumed that substantially all of Majestic II's assets would be liquidated prior to the Secured Claim Distribution Date and that the liquidation value of the underlying collateral for the *Other Secured Claims (Class D-4)* (if any) approximates the allowed amount of the *Other Secured Claims (Class D-4)*. Accordingly, it is not anticipated that any *Other Secured Claims (Class D-4)* would remain outstanding beyond the Secured Claim Distribution Date.

The *Senior Secured Credit Facility Claims (Class D-1)* are projected to be satisfied from the net liquidation proceeds available from the sale of assets which serve as collateral for the Senior Secured Credit Facility. It is assumed that the *Senior Secured Credit Facility Claims (Class D-1)* are secured by either a first lien or junior lien on all assets in which Majestic II holds title with the exception of the Majestic II Gaming License, cash generated by gaming activities (and held in segregated bank accounts that are not subject to account control agreements), cage cash and cash on the casino floor, which assets management believes are unencumbered. The Allowed *Senior Secured Credit Facility Claims*, are estimated to total approximately $62.5 million as of the Conversion Date, of which approximately $5.5 million has been allocated to Majestic II.

The *Senior Secured Notes Indenture Guarantee Claims (Class D-2)* consist of all Allowed Claims against Majestic II arising under, or in any way related to, the 9½% Senior Secured

Notes. The non-deficiency portion of such Claims are projected to be satisfied through the application of net liquidation proceeds available from the sale of assets which serve as collateral for both the *Senior Secured Credit Facility Claims (Class D-1)* and the *Senior Secured Notes Indenture Guarantee Claims (Class D-2)*. It is assumed that the *Senior Secured Notes Indenture Guarantee Claims (Class D-2)* are secured by junior liens (relative to the liens securing the *Senior Secured Credit Facility Claims (Class D-1))* on all assets in which Majestic II holds title with the exception of the Majestic II Gaming License, cash generated by gaming activities (and held in segregated bank accounts that are not subject to account control agreements), cage cash and cash on the casino floor, which assets management believes are unencumbered. The Allowed Senior Secured Notes Indenture Guarantee Claims (Class D-2) as of the Petition Date, excluding any deficiency, are estimated to total approximately $7.8 million.

It is anticipated that the net liquidation proceeds resulting from the sale of assets collateralizing the Senior Secured Notes Indenture Guarantee would be substantially less than the total amount of the associated Allowed Claims arising therefrom. Therefore, to the extent such Allowed Claims are not satisfied in full, the unsecured deficiency portion resulting from *Senior Secured Notes Indenture Guarantee Claims (Class D-2)* are treated in the same manner as *General Unsecured Claims (Class D-6)* and *Rejection Damages Claims (Class D-6)* (collectively, the "Class D-6 Claims") and the *Senior Notes Indenture Guarantee Claims (Class D-5)* ("Class D-5 Claims"). The Allowed Claims arising from the unsecured deficiency relating to the *Senior Secured Notes Indenture Guarantee Claims (Class D-2)* are estimated to total approximately $264.2 million.

*Chapter 7 Trustee Fees* are estimated in accordance with the upper limit established under Section 326 of the Bankruptcy Code. Accordingly, for the purposes of the Liquidation Analysis, the *Chapter 7 Trustee Fees* are equal to 25% of the first $5,000 disbursed by the Chapter 7 Trustee to parties-in-interest; 10% on any amount distributed in excess of $5,000, but not in excess of $50,000; 5% on any amount distributed in excess of $50,000, but not in excess of $1 million; and, 3% on any amount distributed in excess of $1 million. Due to the magnitude of the estimated liquidation value of Majestic II's assets, the Bankruptcy Court could conclude that *Chapter 7 Trustee Fees* of an amount as determined under the algorithm described above is not reasonable and, therefore, approve *Chapter 7 Trustee Fees* of a materially lesser amount.

*Chapter 11 Professional Fees and Expenses* are estimated at approximately $455,000 per month from October 1, 2010 through the Conversion Date. *Chapter 7 Professional Fees and Expenses* are estimated at approximately $116,000 per month from the Conversion Date through the Liquidation Date and approximately $39,000 per month thereafter until the Distribution Date. For illustrative purposes only, it is assumed in the Liquidation Analysis that *Chapter 11 Professional Fees and Expenses* which are outstanding and unpaid as of the Conversion Date are not paid until the Distribution Date. Likewise, it is assumed that *Chapter 7 Professional Fees and Expenses* which are outstanding as of the Liquidation Date, or which are incurred subsequent to that date, are not paid until the Distribution Date. The outstanding *Chapter 7 Professional Fees and Expenses* and *Chapter 11 Professional Fees and Expenses* as of the Distribution Date are estimated to be approximately $535,000 and $1.1 million, respectively. In the event that the *Net Liquidation Proceeds after Secured Claims* are not sufficient to satisfy all Administrative Claims relating to professional fees and expenses (inclusive of those arising from the Chapter 7 proceedings), the outstanding *Chapter 7 Professional Fees and Expenses* amounts would be paid in full prior to distributions being made

in respect of outstanding Allowed Administrative Claims relating to Majestic II's Chapter 11 Case.

*Chapter 7 Administrative Claims (Excluding Professional Fees)* and *Chapter 11 Administrative Claims (Excluding Professional Fees)* include unpaid post-petition liabilities incurred in the ordinary course of business (including those resulting from Post-petition InterCo Transactions). The estimated post-petition current liability balances at June 30, 2011 (excluding those Claims related to Post-petition InterCo Transactions) are believed to reflect normalized balances. In the event that the *Net Liquidation Proceeds after Secured Claims* are not sufficient to satisfy all Administrative Claims, the outstanding *Chapter 7 Administrative Claims (Excluding Professional Fees)* would be paid in full prior to any distributions being made in respect of outstanding Allowed Administrative Claims relating to Majestic II's Chapter 11 Case.

Certain Claims against Majestic II are entitled priority under the Bankruptcy Code. Such Claims consist of *Priority Tax Claims* and *Priority Non-Tax Claims (Class D-3)* (collectively, the "*Priority Claims*"). *Priority Tax Claims* consist of Allowed Claims entitled to priority of payment under Sections 502(i) and 507(a)(8) of the Bankruptcy Code. *Priority Non-Tax Claims (Class D-3)* are those Allowed Claims that are entitled to priority of payment under Section 507(a) of the Bankruptcy Code, other than *Priority Tax Claims. Priority Claims* are projected to be satisfied in full prior to allocating any proceeds for distribution to holders of Class D-5 Claims, Class D-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class D-2)* and *Intercompany Claims (Class D-7)*.

The *Senior Notes Indenture Guarantee Claims (Class D-5)* consist of all Claims arising under, or in any way, related to, the Senior Notes Indenture Guarantee.

As described above, the Class D-6 Claims consist of *General Unsecured Claims (Class D-6),* and *Rejection Damages Claims (Class D-6). General Unsecured Claims (Class D-6)* consist of, among other things, any pre-petition unsecured liabilities incurred in the ordinary course of business that are not a Priority Claim, a deficiency Claim arising from the *Senior Secured Notes Indenture Guarantee Claims (Class D-2), Senior Notes Indenture Guarantee Claims (Class D-5), Rejection Damages Claims (Class D-6)* or *Intercompany Claims (Class D-7)*.

*Rejection Damages Claims (Class D-6)*, if any, consist of all Claims arising from of the rejection (by Majestic II) of any Executory Contract or Unexpired Lease pursuant to Section 365 of the Bankruptcy Code or the repudiation of such contract or lease.

For purposes of the Liquidation Analysis, the Class D-5 Claims, the Class D-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class D-2)* are all consolidated into a single "pool" of Allowed Claims. Liquidation proceeds that would be available to satisfy the Class D-5 Claims, the Class D-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class D-2)* are allocated amongst the holders of such Allowed Claims on a *pari passu* basis.

*Intercompany Claims (Class D-7)* consist of the sum of the net payable balances (if any) owing by Majestic II to each of the other Debtors as a result of Pre-petition InterCo Transactions. The Allowed *Intercompany Claims (Class D-7)* are estimated to total approximately $118.3 million. It is assumed that in the context of a Chapter 7 liquidation, the Intercompany Claims against Majestic II would be subordinated to all other classes of Unsecured Claims. Due to the estimated shortfall in net liquidation proceeds available to satisfy the Class D-5 Claims, the

Class D-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class D-2),* it is not contemplated in the Liquidation Analysis that any distributions will be made to the holders of *Intercompany Claims (Class D-7).*

*Intercompany Interests (Class D-8)* consist of all Intercompany Interests in Majestic II. Due to the estimated shortfall in net liquidation proceeds available to satisfy the Class D-5 Claims, the Class D-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class D-2)* and *Intercompany Claims (Class D-7)*, it is not contemplated in the Liquidation Analysis that any distributions will be made to the holders of *Intercompany Interests (Class D-8).*

*Section 510(b) Claims (Class D-9)* consist of, among other things, any Allowed Claim (i) arising from rescission of a purchase or sale of a Security (including any Interest) of the Debtors; (ii) for damages arising from the purchase or sale of such a Security; or (iii) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim. Pursuant to the Bankruptcy Code, *Section 510(b) Claims (Class D-9)* are subordinated to most other Unsecured Claims including the Class D-5 Claims, the Class D-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class D-2)*, *Intercompany Claims (Class D-7)* and *Intercompany Interests (Class D-8).* The Debtors are not currently aware of any *Section 510(b) Claims* that are or will become Allowed Claims.

**BARDEN MISSISSIPPI GAMING, LLC [A, B]**
**LIQUIDATION ANALYSIS (UNAUDITED)**
*(dollar amounts in thousands)*

| I. **STATEMENT OF ASSETS** | Note Reference | Projected Book Value as of 6/30/11 (Unaudited) | Estimated Net Liquidation Value as of 6/30/11 (Unaudited) |
|---|---|---|---|
| Cash | 1 | $ 23,265 | $ 23,265 |
| Accounts Receivable | 2 | 472 | 372 |
| Inventory | 3 | 407 | 306 |
| Prepaid Expenses | 4 | 922 | 691 |
| Property and Equipment, Net | 5 | 39,457 | 41,674 |
| Intercompany Receivables | 6 | 4,118 | 1 |
| Intangible Assets and Goodwill | 7 | 4,463 | 22,599 |
| Other Assets | 8 | 499 | 441 |
| Total | | $ 73,603 | $ 89,350 |

*Notes:*
[A] This schedule should be read in conjunction with the accompanying "Notes to the Liquidation Analysis".
[B] Discrepancies may exist relative to figures elsewhere in the Plan and Disclosure Statement
    due to rounding of numbers.

**Subject to Modification**

---

**BARDEN MISSISSIPPI GAMING, LLC [A, B]**
**LIQUIDATION ANALYSIS (UNAUDITED)**
*(dollar amounts in thousands)*

---

**II. ALLOCATION OF NET LIQUIDATION PROCEEDS TO SECURED,**
**ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS AND EQUITY INTERESTS**

%
Recovery

| | Estimated Allowed Claims | | %Recovery |
|---|---|---|---|
| Net Liquidation Proceeds: | | $ 89,350 | |
| Less: Contingency Reserve of 2.5% | | (2,234) | |
| *Net Liquidation Proceeds after Contingency Reserve* | | 87,116 | |
| Senior Secured Credit Facility Claims (Class G-1) | $ 26,747 | (26,747) | 100.0% |
| Senior Secured Note Indenture Guarantee Claims (Class G-2) | 38,075 | (38,075) | 100.0% |
| Other Secured Claims (Class G-4) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Secured Claims* | | 22,294 | |
| Chapter 7 Trustee Fees | 2,637 | (2,637) | 100.0% |
| Chapter 7 Professional Fees and Expenses | 535 | (535) | 100.0% |
| Chapter 7 Administrative Claims (Excluding Professional Fees) | 4,770 | (4,770) | 100.0% |
| *Net Liquidation Proceeds after Chapter 7 Administrative Claims* | | 14,353 | |
| Chapter 11 Professional Fees and Expenses | 1,119 | (1,119) | 100.0% |
| Chapter 11 Administrative Claims (Excluding Professional Fees) | 2,793 | (2,793) | 100.0% |
| *Net Liquidation Proceeds after Chapter 11 Administrative Claims* | | 10,440 | |
| Priority Claims | | | |
| Priority Claims - Allowed Priority Tax Claims | 1,053 | (1,053) | 100.0% |
| Priority Non-Tax Claims (Class G-3) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Priority Claims* | | 9,387 | |
| Unsecured Claims | | | |
| Deficiency Portion of Senior Secured Notes Indenture Guarantee Claims (Class G-2) | 264,197 | (4,980) | 1.9% |
| Senior Notes Indenture Guarantee Claims (Class G-5) | 233,150 | (4,395) | 1.9% |
| General Unsecured Claims (Class G-6) | 606 | (11) | 1.9% |
| Rejection Damages Claims (Class G-6) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Distributions to Deficiency Portion of Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Guarantee Claims, General Unsecured Claims, Senior Notes Indenture Guarantee Unsecured Claims and Rejection Damages Claims* | | 0 | |
| Intercompany Claims (Class G-7) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Distributions to Claim Holders* | | $ 0 | |
| Estimated (Shortfall) on Unsecured Claims | | $ (488,565) | |
| *Net Proceeds Available to Intercompany Interests (Class G-8) and Section 510(b) Claims (Class G-9)* | | $ 0 | |

*Notes:*
[A] This schedule should be read in conjunction with the accompanying "Notes to the Liquidation Analysis".
[B] Discrepancies may exist relative to figures elsewhere in the Plan and Disclosure Statement due to rounding of numbers.

# Barden Mississippi Gaming, LLC

# Notes to the Liquidation Analysis

Barden Mississippi Gaming, LLC ("BMG") owns and operates Fitzgeralds Casino & Hotel in Tunica, Mississippi ("Fitzgeralds Tunica"), which is located approximately 30 miles from downtown Memphis, Tennessee. Fitzgeralds Tunica attracts customers primarily from the Memphis area, as well as drive-in customers from northern Mississippi, Arkansas, Missouri, Alabama and regional travelers flying into Memphis. Fitzgeralds Tunica features a 506-room hotel (which includes 68 suites) and approximately 38,000 square feet of gaming space on two levels offering a variety of gaming activities, including approximately 1,247 slot machines and 40 table games. The property has a covered parking structure capable of accommodating over 400 vehicles, surface parking with capacity for approximately 1,250 additional vehicles, valet parking and conveniently located bus loading/unloading facilities. BMG also owns approximately 46 acres (inclusive of the land on which Fitzgeralds Tunica is constructed), of which 16.1 acres remains available for future development (the "Excess Land"). Most of the Excess Land is located adjacent to Fitzgeralds Tunica. Included as part of the Excess Land is approximately 3.7 acres that is jointly owned with Tunica County. In 2007, BMG completed a $7.1 million renovation project at the Tunica property, which included the upgrading and remodeling of hotel rooms, room corridors, elevator access areas and the hotel lobby. In 2009, the Company completed renovation projects which included a remodel of the casino floor and buffet area and the construction of a new deli and grill.

The attached liquidation analysis ("Liquidation Analysis") concerning BMG was prepared in conjunction with developing the Plan described in the Disclosure Statement to which this document is an exhibit. The Liquidation Analysis may be helpful to holders of Allowed Claims in reaching a determination of whether to accept or reject the Plan. The Liquidation Analysis has <u>not</u> been audited or reviewed by an independent public accountant, and accordingly, no opinion, or any other form of assurance, has been expressed in connection therewith. Capitalized terms which are not defined herein shall have the meaning ascribed to them in the Plan and/or in the Disclosure Statement unless the context otherwise requires. Capitalized terms not otherwise defined herein, in the Plan and/or in the Disclosure Statement have been italicized to indicate that such terms reflect line item captions in the Liquidation Analysis.

The Liquidation Analysis reflects management's estimate of the proceeds that may be realized by the BMG estate and the potential recoveries that may be realized by the holders of Allowed Claims and Equity Interests if the assets of BMG were liquidated and the proceeds distributed in accordance with chapter 7 of the Bankruptcy Code ("Chapter 7"). Underlying the Liquidation Analysis are various estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of management, and are based upon assumptions with respect to the liquidation decisions which could be subject to change. Accordingly, there can be no assurance that the values and the costs reflected in the Liquidation Analysis would be realized if BMG were, in fact, to undergo such a liquidation.

The Liquidation Analysis is based on the assets projected to be held by BMG as of June 30, 2011. It has been assumed, hypothetically, that a plan of reorganization could not ultimately be

confirmed and that on or about December 31, 2010 ("Conversion Date") BMG's Chapter 11 Case is converted to proceedings under Chapter 7. From a timing standpoint, it is assumed that a trustee ("Chapter 7 Trustee") would be appointed immediately upon the hypothetical conversion of the Chapter 11 Case.

Subsequent to the Conversion Date, it is anticipated that management would continue to operate Fitzgeralds Tunica and manage its other assets under the supervision of the Chapter 7 Trustee until such time as the liquidation process is substantially completed. It is assumed that the process undertaken to liquidate BMG's assets will be completed on or about June 30, 2011 (the "Liquidation Date"). The net liquidation proceeds available to holders of Allowed Secured Claims and Allowed Priority Tax Claims (if any) are assumed to be distributed on or about July 5, 2011 (the "Secured Claim Distribution Date"). The Chapter 7 Trustee is expected to conclude substantially all of BMG's remaining affairs by December 31, 2011. Net liquidation proceeds available to holders of all other Allowed Claims are assumed to be distributed on or about January 3, 2012 ("Distribution Date").

For purposes of the Liquidation Analysis, it has been assumed that Fitzgeralds Tunica will be liquidated as a single "going concern," albeit subject to "forced-sale" conditions. Because of the restricted time period imposed by the forced-sale conditions for consummating a transaction, it is further assumed that a sale of Fitzgeralds Tunica will occur at a substantial discount to its otherwise market value. Under the hypothetical scenario laid out in the Liquidation Analysis, BMG is assumed to be liquidated under an independent Chapter 7 case and not substantively consolidated with The Majestic Star Casino, LLC and/or any of the other Debtors; provided, however, it is contemplated that the Chapter 7 cases of the various Debtors would be jointly administered. Management has projected revenues, expenses and cash flows for BMG based on the assumption that they continue to manage BMG's assets and operate Fitzgeralds Tunica through the Liquidation Date. With the exception of Cash, and equivalents thereof, accrued payroll and payroll-related expenses (which accrued payroll and payroll-related expenses are assumed to be paid in full at the Liquidation Date), the working capital account balances as of the Liquidation Date are projected to approximate normalized historical levels. For the purpose of the Liquidation Analysis, it is generally assumed that the working capital account balances as of June 30, 2010 are representative of normalized historical balances unless otherwise stated herein.

Costs that have been specifically identified in connection with the liquidation of BMG's assets have been netted against the estimated gross liquidation proceeds derived therefrom. The classification and dollar amounts of estimated Allowed Claims incorporated within the Liquidation Analysis are subject to material modification pending further analysis and the receipt of additional information with respect to such Claims. Certain Claims that are disputed by BMG have not been incorporated into the Liquidation Analysis or have been reduced to the estimated Allowed amount. Recoveries resulting from potential avoidance actions (to the extent any exist) that could hypothetically be pursued by BMG have not been addressed in the Liquidation Analysis.

The following notes describe the significant assumptions utilized in arriving at the liquidation proceeds and amounts of the estimated Allowed Claims reflected at the various captions within the Liquidation Analysis.

Note 1 – Cash

*Cash* (including equivalents thereof and restricted cash) is assumed to have a liquidation value equal to the projected book value as of the Liquidation Date.

Note 2 – Accounts Receivable

*Accounts Receivable* (excluding amounts, if any, which are owing from the other Debtors) is projected to have a balance as of the Liquidation Date that is generally consistent with the balance that was outstanding as of June 30, 2010 adjusted to reflect changes related to a recently implemented tighter credit policy for casino markers. The ability to collect on the various categories of receivables is projected based on estimates of collection given such factors as the aging of the receivables, past collection history and/or the likelihood of such receivables being transferred to the ultimate purchaser of Fitzgeralds Tunica in a Chapter 7 liquidation. The projected liquidation proceeds are shown net of incremental collection costs (if any) estimated to be incurred.

Note 3 – Inventory

*Inventory* consists primarily of food and beverage products, retail goods and non-food supplies. The *Inventory* balance as of the Liquidation Date is projected to be generally consistent with the balance that existed as of June 30, 2010. It is assumed that the inventory would be sold to the ultimate purchaser of Fitzgeralds Tunica (albeit under forced-sale conditions) resulting in an estimated recovery equal to 75% of the projected book balance.

Note 4 – Prepaid Expenses

*Prepaid Expenses* with material projected balances were analyzed to assess whether they are either refundable and/or transferable in the event of liquidation. It is assumed in the Liquidation Analysis that refundable *Prepaid Expenses* projected as of the Liquidation Date will be collected in full. *Prepaid Expenses* that are not refundable but are, however, transferable to a new owner of Fitzgeralds Tunica are estimated to have a liquidation value equal to 75% of the projected book value as of the Liquidation Date. *Prepaid Expenses* which are deemed to be neither transferable nor refundable are assumed to have a liquidation value of zero.

Note 5 – Property and Equipment, Net

In support of the restructuring process, BMG and their advisors performed certain analyses and market surveys with respect to the value of gaming companies and individual gaming properties. This effort resulted in various market data which, in conjunction with financial projections prepared by management concerning the future financial performance of Fitzgeralds Tunica, were used to estimate its market value on a going-concern basis. When determining the market value of an enterprise, it is appropriate to assess the time period that would be required in order to realize such value. Because of the scope and nature of its operations, and given the time period typically required in order for a buyer to obtain the requisite approvals required from the Mississippi gaming authorities to own and operate a gaming operation such as Fitzgeralds Tunica, it is contemplated that a period of at least 12 months would be required in order to consummate a transaction that would result in the realization of proceeds substantially

equal to the estimated market value of Fitzgeralds Tunica as a going concern. Under the forced-sale conditions likely to be imposed by a Chapter 7 Trustee, the time available to consummate a transaction(s) involving Fitzgeralds Tunica would likely be substantially less than the 12-month (minimum) period referenced above. Therefore, in order to arrive at a liquidation value under such forced-sale conditions, a discount has been applied to the estimated market value of Fitzgeralds Tunica (as a going concern) to adjust for the negative impact that the compressed time period allotted for consummating a transaction in a Chapter 7 scenario would likely have on the value that is ultimately realized. It is estimated that such a discount would fall within a range of 20% to 30%. For purposes of the Liquidation Analysis, a discount of 25% was applied. In addition, the estimated transaction costs associated with the liquidation process were netted against the estimated liquidation value in order to arrive at the net liquidation proceeds.

In addition to valuing Fitzgeralds Tunica's operations on a going-concern basis, BMG also retained a real estate appraiser to value the Excess Land. The appraised value of the Excess Land is approximately $1.6 million. Due to the forced-sale conditions described above, a discount of 30% (the midpoint of the assumed forced-sale discount range of 25% to 35% applicable to the Excess Land) was applied to the appraised market value in order to arrive at the liquidation value. The estimated transaction costs associated with the liquidation process were netted against the estimated liquidation value in order to arrive at the net liquidation proceeds.

Note 6 – Intercompany Receivables

The *Intercompany Receivables* category consists of the sum of the net receivable balances (if any) owing from each of the other Debtors to BMG. For purposes of the Liquidation Analysis, such receivables have been segregated based on whether the underlying intercompany transaction occurred: (i) prior to the Petition Date ("Pre-petition InterCo Transactions"); or (ii) subsequent to the Petition Date ("Post-petition InterCo Transactions"). It is assumed in the Liquidation Analysis that the Pre-petition InterCo Transactions give rise to Claims against the counterparty Debtor that are classified as *Intercompany Claims (Class G-7)* and such Claims are subordinated to all other Classes of Unsecured Claims. Accordingly, no recovery is projected to be realized from the pre-petition portion of the *Intercompany Receivables* arising from Pre-petition InterCo Transactions. With respect to *Intercompany Receivables* arising from Post-petition InterCo Transactions, it is assumed in the Liquidation Analysis that such receivables result in Claims against the counterparty Debtor which are classified as *Chapter 11 Administrative Claims* and receive the same treatment as all other *Chapter 11 Administrative Claims* against the relevant counterparty Debtor.

Note 7 – Intangible Assets and Goodwill

The *Intangible Assets* category consists primarily of certain licensing rights, BMG's tradenames, customer relationships and goodwill. The amounts associated with tradenames, customer relationships and goodwill were originally capitalized by BMG as the excess of the purchase price over tangible assets acquired in connection with the acquisition of Fitzgeralds Tunica in 2001. To the extent the liquidation proceeds available to attribute to *Property and Equipment, Net* are estimated to be less than the carrying value of such identifiable assets, no value is reflected in the Liquidation Analysis as being attributable to *Intangible Assets and Goodwill.* The *Property and Equipment, Net* and *Intangible Assets and Goodwill* were not separately valued or appraised in connection with the preparation of the Liquidation Analysis. Accordingly, if the aforementioned assets had been separately valued / appraised, the allocation of

liquidation proceeds between *Property and Equipment, Net* and *Intangible Assets and Goodwill* may have been different from that reflected in the Liquidation Analysis.

Note 8 – Other Assets

The *Other Assets* category consists primarily of base stock and deposits. Base stock consists primarily of dining supplies (such as silverware and glassware) and linens that have life spans in excess of one year. The recovery is estimated to be approximately 75%. Deposits consist primarily of a security deposit with a local utility and security deposits with beverage vendors. These deposits are assumed to be fully refundable and/or transferrable in the event of sale and are, therefore, estimated to be fully recoverable.

Note 9 – Income and Related Taxes

For purposes of the Liquidation Analysis, it is assumed that BMG has been, at all times since formation, a limited liability company. It is further assumed that BMG has, at all such times, not elected to be treated as an association taxable as a corporation for federal or state income purposes. As of the Conversion Date and continuing until BMG's assets are liquidated, BMG is assumed to have only The Majestic Star Casino, LLC ("Majestic I") as the sole holder of its Equity Interests and, as such, BMG will be disregarded for federal and state income tax purposes. Furthermore, Majestic I is assumed to have only Majestic Holdco, LLC as the sole holder of its Equity Interests and, as such, Majestic I will be disregarded for federal and state income tax purposes. Any gain or loss realized as a result of the liquidation sale to an unrelated third party will be recognized for federal and state income tax purposes, but will not be taxable to BMG and will instead be taxable to any regarded entity that owns BMG (i.e. Barden Development, Inc.). Any cancellation of indebtedness income may also be taxed at such regarded entity. Accordingly, the Liquidation Analysis does not contemplate any federal or state income tax liabilities to BMG as a result of the liquidation of its assets pursuant to Chapter 7 or any obligation to distribute funds to its owner to pay any such federal or state income tax liabilities that may be owed by a regarded entity with respect to the liquidation of BMG's assets.

For purposes of the Liquidation Analysis, it is assumed that Barden Development, Inc. is taxed as a C corporation for federal and state income tax purposes. Barden Development, Inc. is not a Debtor in the bankruptcy proceedings and, accordingly, any discussion of the federal and state income tax implication to Barden Development, Inc. is outside the scope of this disclosure. Barden Development, Inc. should consult with its own tax advisors with respect to any potential federal and state income tax matters resulting from the Liquidation Analysis.

Note 10 – Allocation of Net Liquidation Proceeds to Secured, Administrative, Priority and Unsecured Claims

The projected *Net Liquidation Proceeds* are reduced by 2.5% (the "Contingency Reserve") in order to arrive at the *Net Liquidation Proceeds after Contingency Reserve*. The Contingency Reserve is intended to serve as a buffer and reflects, among other things, the uncertainties inherent in: (i) implementing the liquidation process; (ii) quantifying and classifying unliquidated, contingent and/or disputed Claims; and (iii) providing for disputed Claims to the extent BMG does not ultimately prevail in defending against them. The *Net Liquidation Proceeds after Contingency Reserve* are then allocated in accordance with priorities set forth in the Bankruptcy Code.

*Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) (Class G-4)* (the "*Other Secured Claims (Class G-4)*"), if any, are assumed to be satisfied from the proceeds resulting from the sale of the underlying collateral. It is further assumed that substantially all of BMG's assets would be liquidated prior to the Secured Claim Distribution Date and that the liquidation value of the underlying collateral for the *Other Secured Claims (Class G-4)* (if any) approximates the allowed amount of the *Other Secured Claims (Class G-4).* Accordingly, it is not anticipated that any *Other Secured Claims (Class G-4)* would remain outstanding beyond the Secured Claim Distribution Date.

The *Senior Secured Credit Facility Claims (Class G-1)* are projected to be satisfied from the net liquidation proceeds available from the sale of assets which serve as collateral for the Senior Secured Credit Facility. It is assumed that the *Senior Secured Credit Facility Claims (Class G-1)* are secured by either a first lien or junior lien on all assets in which BMG holds title with the exception of cash generated by gaming activities (and held in segregated bank accounts that are not subject to account control agreements), cage cash and cash on the casino floor, which assets management believes are unencumbered. The Allowed *Senior Secured Credit Facility Claims*, are estimated to total approximately $62.5 million as of the Conversion Date, of which $26.7 million has been allocated to BMG.

The *Senior Secured Notes Indenture Guarantee Claims (Class G-2)* consist of all Allowed Claims against BMG arising under, or in any way related to, the 9½% Senior Secured Notes. The non-deficiency portion of such Claims are projected to be satisfied through the application of net liquidation proceeds available from the sale of assets which serve as collateral for both the *Senior Secured Credit Facility Claims (Class G-1)* and *Senior Secured Notes Indenture Guarantee Claims (Class G-2).* It is assumed that the *Senior Secured Notes Indenture Guarantee Claims (Class G-2)* are secured by junior liens (relative to the liens securing the *Senior Secured Credit Facility Claims (Class G-1))* on all assets in which BMG holds title with the exception of cash generated by gaming activities (and held in segregated bank accounts that are not subject to account control agreements), cage cash and cash on the casino floor, which assets management believes are unencumbered. The Allowed *Senior Secured Notes Indenture Guarantee Claims (Class G-2)* as of the Petition Date, excluding any deficiency, are estimated to total approximately $38.1 million.

It is anticipated that the net liquidation proceeds resulting from the sale of assets collateralizing the Senior Secured Notes Indenture Guarantee would be substantially less than the total amount of the associated Allowed Claims arising therefrom. Therefore, to the extent such Allowed Claims are not satisfied in full, the unsecured deficiency portion resulting from *Senior Secured Notes Indenture Guarantee Claims (Class G-2)* are treated in the same manner as *General Unsecured Claims (Class G-6)* and *Rejection Damages Claims (Class G-6)* (collectively, the "Class G-6 Claims") and the *Senior Notes Indenture Guarantee Claims (Class G-5)* ("Class G-5 Claims"). The Allowed Claims arising from the unsecured deficiency relating to the *Senior Secured Notes Indenture Guarantee Claims (Class G-2)* are estimated to total approximately $264.2 million.

*Chapter 7 Trustee Fees* are estimated in accordance with the upper limit established under Section 326 of the Bankruptcy Code. Accordingly, for the purposes of the Liquidation Analysis, the *Chapter 7 Trustee Fees* are equal to: 25% of the first $5,000 disbursed by the Chapter 7 Trustee to parties-in-interest; 10% on any amount distributed in excess of $5,000, but not in excess of $50,000; 5% on any amount distributed in excess of $50,000, but not in excess of $1 million; and, 3% on any amount distributed in excess of $1 million. Due to the magnitude of

the estimated liquidation value of BMG's assets, the Bankruptcy Court could conclude that *Chapter 7 Trustee Fees* of an amount as determined under the algorithm described above is not reasonable and, therefore, approve *Chapter 7 Trustee Fees* of a materially lesser amount.

*Chapter 11 Professional Fees and Expenses* are estimated at approximately $455,000 per month from October 1, 2010 through the Conversion Date. *Chapter 7 Professional Fees and Expenses* are estimated at approximately $116,000 per month from the Conversion Date through the Liquidation Date and approximately $39,000 per month thereafter until the Distribution Date. For illustrative purposes only, it is assumed in the Liquidation Analysis that *Chapter 11 Professional Fees and Expenses* which are outstanding and unpaid as of the Conversion Date are not paid until the Distribution Date. Likewise, it is assumed that *Chapter 7 Professional Fees and Expenses* which are outstanding as of the Liquidation Date, or which are incurred subsequent to that date, are not paid until the Distribution Date. The outstanding *Chapter 7 Professional Fees and Expenses* and *Chapter 11 Professional Fees and Expenses* as of the Distribution Date are estimated to be approximately $535,000 and $1.1 million, respectively. In the event that the *Net Liquidation Proceeds after Secured Claims* are not sufficient to satisfy all Administrative Claims relating to professional fees and expenses (inclusive of those arising from the Chapter 7 proceedings), the outstanding *Chapter 7 Professional Fees and Expenses* amounts would be paid in full prior to distributions being made in respect of outstanding Allowed Administrative Claims relating to BMG's Chapter 11 Case.

*Chapter 7 Administrative Claims (Excluding Professional Fees)* and *Chapter 11 Administrative Claims (Excluding Professional Fees)* include unpaid post-petition liabilities incurred in the ordinary course of business (including those resulting from Post-petition InterCo Transactions). The estimated post-petition current liability balances at June 30, 2011 (excluding those Claims related to Post-petition InterCo Transactions) are believed to reflect normalized balances. In the event that the *Net Liquidation Proceeds after Secured Claims* are not sufficient to satisfy all Administrative Claims, the outstanding *Chapter 7 Administrative Claims (Excluding Professional Fees)* would be paid in full prior to any distributions being made in respect of outstanding Allowed Administrative Claims relating to BMG's Chapter 11 Case.

Certain Claims against BMG are entitled priority under the Bankruptcy Code. Such Claims consist of *Priority Tax Claims* and *Priority Non-Tax Claims (Class G-3)* (collectively, the "*Priority Claims*"). *Priority Tax Claims* consist of Allowed Claims entitled to priority of payment under Sections 502(i) and 507(a)(8) of the Bankruptcy Code. *Priority Non-Tax Claims (Class G-3)* are those Allowed Claims that are entitled to priority of payment under Section 507(a) of the Bankruptcy Code, other than *Priority Tax Claims*. *Priority Claims* are projected to be satisfied in full prior to allocating any proceeds for distribution to holders of Class G-5 Claims, Class G-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class G-2)* and *Intercompany Claims (Class G-7)*.

The *Senior Notes Indenture Guarantee Claims (Class G-5)* consist of all Claims arising under, or in any way, related to, the Senior Notes Indenture Guarantee.

As described above, the Class G-6 Claims consist of *General Unsecured Claims (Class G-6),* and *Rejection Damages Claims (Class G-6)*. *General Unsecured Claims (Class G-6)* consist of, among other things, any pre-petition unsecured liabilities incurred in the ordinary course of business that are not a Priority Claim, a deficiency Claim arising from the *Senior Secured Notes Indenture Guarantee Claims (Class G-2)*, *Senior Notes Indenture Guarantee Claims (Class G-5), Rejection Damages Claims (Class G-6)* or *Intercompany Claims (Class G-7)*.

*Rejection Damages Claims (Class G-6)*, if any, consist of all Claims arising from of the rejection (by BMG) of any Executory Contract or Unexpired Lease pursuant to Section 365 of the Bankruptcy Code or the repudiation of such contract or lease.

For purposes of the Liquidation Analysis, the Class G-5 Claims, the Class G-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class G-2))* are all consolidated into a single "pool" of Allowed Claims. Liquidation proceeds that would be available to satisfy the Class G-5 Claims, the Class G-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class G-2)* are allocated amongst the holders of such Allowed Claims on a *pari passu* basis.

*Intercompany Claims (Class G-7)* consist of the sum of the net payable balances (if any) owing by BMG to each of the other Debtors as a result of Pre-petition InterCo Transactions. It is assumed that in the context of a Chapter 7 liquidation, the Intercompany Claims against BMG would be subordinated to all other classes of Unsecured Claims. Due to the estimated shortfall in net liquidation proceeds available to satisfy the Class G-5 Claims, the Class G-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class G-2)*, it is not contemplated in the Liquidation Analysis that any distributions will be made to the holders of *Intercompany Claims (Class G-7)*.

*Intercompany Interests (Class G-8)* consist of all Intercompany Interests in BMG. Due to the estimated shortfall in net liquidation proceeds available to satisfy the Class G-5 Claims, the Class G-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class G-2)* and *Intercompany Claims (Class G-7)*, it is not contemplated in the Liquidation Analysis that any distributions will be made to the holders of *Intercompany Interests (Class G-8)*.

*Section 510(b) Claims (Class G-9)* consist of, among other things, any Allowed Claim (i) arising from rescission of a purchase or sale of a Security (including any Interest) of the Debtors; (ii) for damages arising from the purchase or sale of such a Security; or (iii) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim. Pursuant to the Bankruptcy Code, *Section 510(b) Claims (Class G-9)* are subordinated to most other Unsecured Claims including the Class G-5 Claims, the Class G-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class G-2)*, *Intercompany Claims (Class G-7)* and *Intercompany Interests (Class G-8)*. The Debtors are not currently aware of any *Section 510(b) Claims* that are or will become Allowed Claims.

**BARDEN COLORADO GAMING, LLC [A, B]**
**LIQUIDATION ANALYSIS (UNAUDITED)**
*(dollar amounts in thousands)*

| I. **STATEMENT OF ASSETS** | Note Reference | Projected Book Value as of 6/30/11 (Unaudited) | Estimated Net Liquidation Value as of 6/30/11 (Unaudited) |
|---|---|---|---|
| Cash | 1 | $ 6,699 | $ 6,699 |
| Accounts Receivable | 2 | 47 | 35 |
| Inventory | 3 | 173 | 129 |
| Prepaid Expenses | 4 | 328 | 272 |
| Property and Equipment, Net | 5 | 48,649 | 15,059 |
| Intercompany Receivables | 6 | 0 | 0 |
| Intangible Assets | 7 | 0 | 646 |
| Other Assets | 8 | 131 | 98 |
| Total | | $ 56,026 | $ 22,939 |

*Notes:*
[A] This schedule should be read in conjunction with the accompanying "Notes to the Liquidation Analysis".
[B] Discrepancies may exist relative to figures elsewhere in the Plan and Disclosure Statement
   due to rounding of numbers.

**BARDEN COLORADO GAMING, LLC [A, B]**
**LIQUIDATION ANALYSIS (UNAUDITED)**
*(dollar amounts in thousands)*

**II. ALLOCATION OF NET LIQUIDATION PROCEEDS TO SECURED, ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS AND EQUITY INTERESTS**

| | Estimated Allowed Claims | | % Recovery |
|---|---|---|---|
| Net Liquidation Proceeds: | | $ 22,939 | |
| Less: Contingency Reserve of 2.5% | | (573) | |
| *Net Liquidation Proceeds after Contingency Reserve* | | 22,365 | |
| | | | |
| Senior Secured Credit Facility Claims (Class H-1) | $ 6,584 | (6,584) | 100.0% |
| Senior Secured Note Indenture Guarantee Claims (Class H-2) | 7,422 | (7,422) | 100.0% |
| Other Secured Claims (Class H-4) | 55 | (55) | 100.0% |
| *Net Liquidation Proceeds after Secured Claims* | | 8,304 | |
| | | | |
| Chapter 7 Trustee Fees | 694 | (694) | 100.0% |
| Chapter 7 Professional Fees and Expenses | 535 | (535) | 100.0% |
| Chapter 7 Administrative Claims (Excluding Professional Fees) | 1,179 | (1,179) | 100.0% |
| *Net Liquidation Proceeds after Chapter 7 Administrative Claims* | | 5,896 | |
| | | | |
| Chapter 11 Professional Fees and Expenses | 1,119 | (1,119) | 100.0% |
| Chapter 11 Administrative Claims (Excluding Professional Fees) | 4,777 | (4,777) | 100.0% |
| *Net Liquidation Proceeds after Chapter 11 Administrative Claims* | | 0 | |
| | | | |
| Priority Claims | | | |
|     Priority Claims - Allowed Priority Tax Claims | 4 | 0 | 0.0% |
|     Priority Non-Tax Claims (Class H-3) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Priority Claims* | | 0 | |
| | | | |
| Unsecured Claims | | | |
|     Deficiency Portion of Senior Secured Notes Indenture Guarantee Claims (Class H-2) | 264,197 | 0 | 0.0% |
|     Senior Notes Indenture Guarantee Claims (Class H-5) | 233,150 | 0 | 0.0% |
|     General Unsecured Claims (Class H-6) | 114 | 0 | 0.0% |
|     Rejection Damages Claims (Class H-6) | 0 | 0 | N/A |
| *Net Liquidation Proceeds after Distributions to Deficiency Portion of Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Guarantee Claims, General Unsecured Claims, Senior Notes Indenture Guarantee Unsecured Claims and Rejection Damages Claims* | | 0 | |
| | | | |
|     Intercompany Claims (Class H-7) | 11,543 | 0 | 0.0% |
| | | | |
| *Net Liquidation Proceeds after Distributions to Claim Holders* | | $ 0 | |
| | | | |
| Estimated (Shortfall) on Unsecured Claims | | $ (509,003) | |
| | | | |
| *Net Proceeds Available to Intercompany Interests (Class H-8) and Section 510(b) Claims (Class H-9)* | | $ 0 | |

*Notes:*
[A] This schedule should be read in conjunction with the accompanying "Notes to the Liquidation Analysis".
[B] Discrepancies may exist relative to figures elsewhere in the Plan and Disclosure Statement due to rounding of numbers.

# Barden Colorado Gaming, LLC

## Notes to the Liquidation Analysis

Barden Colorado Gaming, LLC ("BCG") owns and operates Fitzgeralds Casino Black Hawk ("Fitzgeralds Black Hawk") in Black Hawk, Colorado, which is approximately 35 miles from Denver, Colorado. Fitzgeralds Black Hawk is located adjacent to the entrance to the downtown gaming area of the City of Black Hawk and attracts drive-in or "day trip" customers from the population centers of Denver, Boulder, Colorado Springs and Fort Collins, Colorado, as well as Cheyenne, Wyoming. In June 2008, BCG completed an expansion of its gaming, entertainment and administration facilities at Fitzgeralds Black Hawk including a fine dining outlet, additional administrative space and an events area. Following the expansion of the facility, Fitzgeralds Black Hawk consists of a 17,000 square foot casino, approximately 708 slot machines and twelve table games, a steak house, a coffee shop, three bars and a 392-space all-valet parkinggarage adjacent to the casino. BCG also owns approximately 4.1 acres of land (inclusive of the land on which Fitzgeralds Black Hawk is constructed), of which approximately 2.5 acres is unimproved and available for development ("Excess Land"). The Excess Land is located directly behind, and adjacent to, Fitzgeralds Black Hawk.

The attached liquidation analysis ("Liquidation Analysis") concerning BCG was prepared in conjunction with developing the Plan described in the Disclosure Statement to which this document is an exhibit. The Liquidation Analysis may be helpful to holders of Allowed Claims in reaching a determination of whether to accept or reject the Plan. The Liquidation Analysis has <u>not</u> been audited or reviewed by an independent public accountant, and accordingly, no opinion, or any other form of assurance, has been expressed in connection therewith. Capitalized terms which are not defined herein shall have the meaning ascribed to them in the Plan and/or in the Disclosure Statement unless the context otherwise requires. Capitalized terms not otherwise defined herein, in the Plan and/or in the Disclosure Statement have been italicized to indicate that such terms reflect line item captions in the Liquidation Analysis.

The Liquidation Analysis reflects management's estimate of the proceeds that may be realized by the BCG estate and the potential recoveries that may be realized by the holders of Allowed Claims and Equity Interests if the assets of BCG were liquidated and the proceeds distributed in accordance with chapter 7 of the Bankruptcy Code ("Chapter 7"). Underlying the Liquidation Analysis are various estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of management, and are based upon assumptions with respect to the liquidation decisions which could be subject to change. Accordingly, there can be no assurance that the values and the costs reflected in the Liquidation Analysis would be realized if BCG were, in fact, to undergo such a liquidation.

The Liquidation Analysis is based on the assets projected to be held by BCG as of June 30, 2011. It has been assumed, hypothetically, that a plan of reorganization could not ultimately be confirmed and that on or about December 31, 2010 ("Conversion Date"), BCG's Chapter 11 Case is converted to proceedings under Chapter 7. From a timing standpoint, it is assumed that a trustee ("Chapter 7 Trustee") would be appointed immediately upon the hypothetical conversion of the Chapter 11 Case.

Subsequent to the Conversion Date, it is anticipated that management would continue to operate Fitzgeralds Black Hawk and manage its other assets under the supervision of the Chapter 7 Trustee until such time as the liquidation process is substantially completed. It is assumed that the process undertaken to liquidate BCG's assets will be completed on or about June 30, 2011 (the "Liquidation Date"). The net liquidation proceeds available to holders of Allowed Secured Claims and Allowed Priority Tax Claims (if any) are assumed to be distributed on or about July 5, 2011 (the "Secured Claim Distribution Date"). The Chapter 7 Trustee is expected to conclude substantially all of BCG's remaining affairs by December 31, 2011. Net liquidation proceeds available to holders of all other Allowed Claims are assumed to be distributed on or about January 3, 2012 ("Distribution Date").

For purposes of the Liquidation Analysis, it has been assumed that Fitzgeralds Black Hawk will be liquidated as a single "going concern," albeit subject to "forced-sale" conditions. Because of the restricted time period imposed by the forced-sale conditions for consummating a transaction, it is further assumed that a sale of Fitzgeralds Black Hawk will occur at a substantial discount to its otherwise market value. Under the hypothetical scenario laid out in the Liquidation Analysis, BCG is assumed to be liquidated under an independent Chapter 7 case and not substantively consolidated with The Majestic Star Casino, LLC and/or any of the other Debtors; provided, however, it is contemplated that the Chapter 7 cases of the various Debtors would be jointly administered. Management has projected revenues, expenses and cash flows for BCG based on the assumption that they continue to manage BCG's assets and operate Fitzgeralds Black Hawk through the Liquidation Date. With the exception of Cash, and equivalents thereof, accrued payroll and payroll-related expenses (which accrued payroll and payroll-related expenses are assumed to be paid in full at the Liquidation Date), the working capital account balances as of the Liquidation Date are projected to approximate normalized historical levels. For the purpose of the Liquidation Analysis, it is generally assumed that the working capital account balances as of June 30, 2010 are representative of normalized historical balances unless otherwise noted herein.

Costs that have been specifically identified in connection with the liquidation of BCG's assets have been netted against the estimated gross liquidation proceeds derived therefrom. The classification and dollar amounts of estimated Allowed Claims incorporated within the Liquidation Analysis are subject to material modification pending further analysis and the receipt of additional information with respect to such Claims. Certain Claims that are disputed by BCG have not been incorporated into the Liquidation Analysis or have been reduced to the estimated Allowed amount. Recoveries resulting from potential avoidance actions (to the extent any exist) that could hypothetically be pursued by BCG have not been addressed in the Liquidation Analysis.

The following notes describe the significant assumptions utilized in arriving at the liquidation proceeds and amounts of the estimated Allowed Claims reflected at the various captions within the Liquidation Analysis.

Note 1 – Cash

*Cash* (including equivalents thereof and restricted cash) is assumed to have a liquidation value equal to the projected book value as of the Liquidation Date.

Note 2 – Accounts Receivable

*Accounts Receivable* (excluding amounts, if any, which are owing from the other Debtors) is projected to have a balance as of the Liquidation Date that is generally consistent with the

balance that was outstanding as of June 30, 2010. The ability to collect on the various categories of receivables is projected based on estimates of collection given such factors as the aging of the receivables, past collection history and/or the likelihood of such receivables being transferred to the ultimate purchaser of Fitzgeralds Black Hawk in a Chapter 7 liquidation. The projected liquidation proceeds are shown net of incremental collection costs (if any) estimated to be incurred.

Note 3 – Inventory

*Inventory* consists primarily of food and beverage products, retail goods and non-food supplies. The *Inventory* balance as of the Liquidation Date is projected to be generally consistent with the balance that existed as of June 30, 2010. It is assumed that the inventory would be sold to the ultimate purchaser of Fitzgeralds Black Hawk (albeit under forced-sale conditions) resulting in an estimated recovery equal to 75% of the projected book balance.

Note 4 – Prepaid Expenses

*Prepaid Expenses* with material projected balances were analyzed to assess whether they are either refundable and/or transferable in the event of liquidation. It is assumed in the Liquidation Analysis that refundable *Prepaid Expenses* projected as of the Liquidation Date will be collected in full. *Prepaid Expenses* that are not refundable but are, however, transferable to a new owner of Fitzgeralds Black Hawk are estimated to have a liquidation value equal to 75% of the projected book value as of the Liquidation Date. *Prepaid Expenses* which are deemed to be neither transferable nor refundable are assumed to have a liquidation value of zero.

Note 5 – Property and Equipment, Net

In support of the restructuring process, BCG and their advisors performed certain analyses and market surveys with respect to the value of gaming companies and individual gaming properties. This effort resulted in various market data which, in conjunction with financial projections prepared by management concerning the future financial performance of Fitzgeralds Black Hawk, were used to estimate its market value on a going-concern basis. When determining the market value of an enterprise, it is appropriate to assess the time period that would be required in order to realize such value. Because of the scope and nature of its operations, and given the time period typically required in order for a buyer to obtain the requisite approvals required from the Colorado gaming authorities to own and operate a gaming operation such as Fitzgeralds Black Hawk, it is contemplated that a period of at least 12 months would be required in order to consummate a transaction that would result in the realization of proceeds substantially equal to the estimated market value of Fitzgeralds Black Hawk as a going concern. Under the forced-sale conditions likely to be imposed by a Chapter 7 Trustee, the time available to consummate a transaction(s) involving Fitzgeralds Black Hawk would likely be substantially less than the 12-month (minimum) period referenced above. Therefore, in order to arrive at a liquidation value under such forced-sale conditions, a discount has been applied to the estimated market value of Fitzgeralds Black Hawk (as a going concern) to adjust for the negative impact that the compressed time period allotted for consummating a transaction in a Chapter 7 scenario would likely have on the value that is ultimately realized. It is estimated that such a discount would fall within a range of 20% to 30%. For purposes of the Liquidation Analysis, a discount of 25% was applied. In addition, the estimated transaction costs associated with the liquidation process were netted against the estimated liquidation value in order to arrive at the net liquidation proceeds.

For purposes of the Liquidation Analysis, the Fitzgeralds Black Hawk going-concern value assigned to *Property and Equipment* is equal to the *pro rata* portion of such value (albeit adjusted downward to reflect the forced-sale conditions) but which is <u>not</u> specifically attributed to other assets (excluding *Intangible Assets*) projected to be held by BCG as of the Liquidation Date.

In addition to valuing Fitzgeralds Black Hawk's operations on a going-concern basis, BCG also retained a real estate appraiser to value the Excess Land. The appraised value of the Excess Land is approximately $2.1 million. Due to the forced-sale conditions described above, a discount of 30% (the midpoint of the assumed forced-sale discount range of 25% to 35% applicable to the Excess Land) was applied to the appraised market value in order to arrive at the liquidation value. The estimated transaction costs associated with the liquidation process were netted against the estimated liquidation value in order to arrive at the net liquidation proceeds.

Note 6 – Intercompany Receivables

The *Intercompany Receivables* category consists of the sum of the net receivable balances (if any) owing from each of the other Debtors to BCG. For purposes of the Liquidation Analysis, such receivables have been segregated based on whether the underlying intercompany transaction occurred: (i) prior to the Petition Date ("Pre-petition InterCo Transactions"); or (ii) subsequent to the Petition Date ("Post-petition InterCo Transactions"). It is assumed in the Liquidation Analysis that the Pre-petition InterCo Transactions give rise to Claims against the counterparty Debtor that are classified as *Intercompany Claims (Class H-7)* and such Claims are subordinated to all other Classes of Unsecured Claims. Accordingly, no recovery is projected to be realized from the pre-petition portion of the *Intercompany Receivables* arising from Pre-petition InterCo Transactions. With respect to *Intercompany Receivables* arising from Post-petition InterCo Transactions, it is assumed in the Liquidation Analysis that such receivables result in Claims against the counterparty Debtor which are classified as *Chapter 11 Administrative Claims* and receive the same treatment as all other *Chapter 11 Administrative Claims* against the relevant counterparty Debtor.

Note 7 – Intangible Assets

The *Intangible Assets* include value attributable to trade names and the assembled workforce utilized by BCG in connection with operating Fitzgeralds Black Hawk. Although the financial statements of BCG do not reflect a value associated with *Intangible Assets*, such items nevertheless represent assets held by the BCG estate. For purposes of the Liquidation Analysis, the going-concern value assigned to *Intangible Assets* is equal to the *pro rata* portion of the estimated going-concern value (albeit adjusted downward to reflect the forced-sale conditions) that is <u>not</u> attributed to other assets (excluding *Property and Equipment, Net*) projected to be held by BCG as of the Liquidation Date.

Note 8 – Other Assets

The *Other Assets* category consists primarily of base stock. Base stock consists primarily of uniforms, dining supplies (such as flatware and glassware) and linens that have life spans in excess of one year. The recovery is estimated to be approximately 75%.

Note 9 – Income and Related Taxes

For purposes of the Liquidation Analysis, it is assumed that BCG has been, at all times since formation, a limited liability company. It is further assumed that BCG has, at all such times, not

elected to be treated as an association taxable as a corporation for federal or state income purposes. As of the Conversion Date and continuing until BCG's assets are liquidated, BCG is assumed to have only The Majestic Star Casino, LLC ("Majestic I") as the sole holder of its Equity Interests and, as such, BCG will be disregarded for federal and state income tax purposes. Furthermore, Majestic I is assumed to have only Majestic Holdco, LLC as the sole holder of its Equity Interests and, as such, Majestic I will be disregarded for federal and state income tax purposes. Any gain or loss realized as a result of the liquidation sale to an unrelated third party will be recognized for federal and state income tax purposes, but will not be taxable to BCG and will instead be taxable to any regarded entity that owns BCG (I.e. Barden Development, Inc.). Any cancellation of indebtedness income may also be taxed at such regarded entity. Accordingly, the Liquidation Analysis does not contemplate any federal or state income tax liabilities to BCG as a result of the liquidation of its assets pursuant to Chapter 7 or any obligation to distribute funds to its owner to pay any such federal or state income tax liabilities that may be owed by a regarded entity with respect to the liquidation of BCG's assets.

For purposes of the Liquidation Analysis, it is assumed that Barden Development, Inc. is taxed as a C corporation for federal and state income tax purposes. Barden Development, Inc. is not a Debtor in the bankruptcy proceedings and, accordingly, any discussion of the federal and state income tax implication to Barden Development, Inc. is outside the scope of this disclosure. Barden Development, Inc. should consult with its own tax advisors with respect to any potential federal and state income tax matters resulting from the Liquidation Analysis.

<u>Note 10 – Allocation of Net Liquidation Proceeds to Secured, Administrative, Priority and Unsecured Claims</u>

The projected *Net Liquidation Proceeds* are reduced by 2.5% (the "Contingency Reserve") in order to arrive at the *Net Liquidation Proceeds after Contingency Reserve*. The Contingency Reserve is intended to serve as a buffer and reflects, among other things, the uncertainties inherent in: (i) implementing the liquidation process, (ii) quantifying and classifying unliquidated, contingent and/or disputed Claims, and (iii) providing for disputed Claims to the extent BCG does not ultimately prevail in defending against them. The *Net Liquidation Proceeds after Contingency Reserve* are then allocated in accordance with priorities set forth in the Bankruptcy Code.

*Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) (Class H-4)* (the "*Other Secured Claims (Class H-4)*"), if any, are assumed to be satisfied from the proceeds resulting from the sale of the underlying collateral. It is further assumed that substantially all of BCG's assets would be liquidated prior to the Secured Claim Distribution Date and that the liquidation value of the underlying collateral for the *Other Secured Claims (Class H-4)* (if any) approximates the allowed amount of the *Other Secured Claims (Class H-4)*. Accordingly, it is not anticipated that any *Other Secured Claims (Class H-4)* would remain outstanding beyond the Secured Claim Distribution Date.

The *Senior Secured Credit Facility Claims (Class H-1)* are projected to be satisfied from the net liquidation proceeds available from the sale of assets which serve as collateral for the Senior Secured Credit Facility. It is assumed that the *Senior Secured Credit Facility Claims (Class H-1)* are secured by either a first lien or junior lien on all assets in which BCG holds title with the exception of cash generated by gaming activities (and held in segregated bank accounts that are not subject to account control agreements), cage cash and cash on the casino floor, which assets management believes are unencumbered. The Allowed *Senior Secured Credit Facility Claims*, are estimated to total approximately $62.5 million as of the Conversion Date, of which $6.6 million has been allocated to BCG.

The *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* consist of all Allowed Claims against BCG arising under, or in any way related to, the 9½% Senior Secured Notes. The non-deficiency portion of such Claims are projected to be satisfied through the application of net liquidation proceeds available from the sale of assets which serve as collateral for both the *Senior Secured Credit Facility Claims (Class H-1)* and *Senior Secured Notes Indenture Guarantee Claims (Class H-2).* It is assumed that the *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* are secured by junior liens (relative to the liens securing the *Senior Secured Credit Facility Claims (Class H-1))* on all assets in which BCG holds title with the exception of cash generated by gaming activities (and held in segregated bank accounts that are not subject to account control agreements), cage cash and cash on the casino floor, which assets management believes are unencumbered. The Allowed *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* as of the Petition Date, excluding any deficiency, are estimated to total approximately $7.4 million.

It is anticipated that the net liquidation proceeds resulting from the sale of assets collateralizing the Senior Secured Notes Indenture Guarantee would be substantially less than the total amount of the associated Allowed Claims arising therefrom. Therefore, to the extent such Allowed Claims are not satisfied in full, the unsecured deficiency portion resulting from *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* are treated in the same manner as *General Unsecured Claims (Class H-6)* and *Rejection Damages Claims (Class H-6)* (collectively, the "Class H-6 Claims") and the *Senior Notes Indenture Guarantee Claims (Class H-5)* ("Class H-5 Claims"). The Allowed Claims arising from the unsecured deficiency relating to the *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* are estimated to total approximately $264.2 million.

*Chapter 7 Trustee Fees* are estimated in accordance with the upper limit established under Section 326 of the Bankruptcy Code. Accordingly, for the purposes of the Liquidation Analysis, the *Chapter 7 Trustee Fees* are equal to: 25% of the first $5,000 disbursed by the Chapter 7 Trustee to parties-in-interest; 10% on any amount distributed in excess of $5,000, but not in excess of $50,000; 5% on any amount distributed in excess of $50,000, but not in excess of $1 million; and, 3% on any amount distributed in excess of $1 million. Due to the magnitude of the estimated liquidation value of BCG's assets, the Bankruptcy Court could conclude that *Chapter 7 Trustee Fees* of an amount as determined under the algorithm described above is not reasonable and, therefore, approve *Chapter 7 Trustee Fees* of a materially lesser amount.

*Chapter 11 Professional Fees and Expenses* are estimated at approximately $455,000 per month from October 1, 2010 through the Conversion Date. *Chapter 7 Professional Fees and Expenses* are estimated at approximately $116,000 per month from the Conversion Date through the Liquidation Date and approximately $39,000 per month thereafter until the Distribution Date. For illustrative purposes only, it is assumed in the Liquidation Analysis that *Chapter 11 Professional Fees and Expenses* which are outstanding and unpaid as of the Conversion Date are not paid until the Distribution Date. Likewise, it is assumed that *Chapter 7 Professional Fees and Expenses* which are outstanding as of the Liquidation Date, or which are incurred subsequent to that date, are not paid until the Distribution Date. The outstanding *Chapter 7 Professional Fees and Expenses* and *Chapter 11 Professional Fees and Expenses* as of the Distribution Date are estimated to be approximately $535,000 and $1.1 million, respectively. In the event that the *Net Liquidation Proceeds after Secured Claims* are not sufficient to satisfy all Administrative Claims relating to professional fees and expenses (inclusive of those arising from the Chapter 7 proceedings), the outstanding *Chapter 7 Professional Fees and Expenses* amounts would be paid in full prior to distributions being made in respect of outstanding Allowed Administrative Claims relating to BCG's Chapter 11 Case.

*Chapter 7 Administrative Claims (Excluding Professional Fees)* and *Chapter 11 Administrative Claims (Excluding Professional Fees)* include unpaid post-petition liabilities incurred in the ordinary course of business (including those resulting from Post-petition InterCo Transactions). The estimated post-petition current liability balances at June 30, 2011 (excluding those Claims related to Post-petition InterCo Transactions) are believed to reflect normalized balances. In the event that the *Net Liquidation Proceeds after Secured Claims* are not sufficient to satisfy all Administrative Claims, the outstanding *Chapter 7 Administrative Claims (Excluding Professional Fees)* would be paid in full prior to any distributions being made in respect of outstanding Allowed Administrative Claims relating to BCG's Chapter 11 Case.

Certain Claims against BCG are entitled priority under the Bankruptcy Code. Such Claims consist of *Priority Tax Claims* and *Priority Non-Tax Claims (Class H-3)* (collectively, the "*Priority Claims*"). *Priority Tax Claims* consist of Allowed Claims entitled to priority of payment under Sections 502(i) and 507(a)(8) of the Bankruptcy Code. *Priority Non-Tax Claims (Class H-3)* are those Allowed Claims that are entitled to priority of payment under Section 507(a) of the Bankruptcy Code, other than *Priority Tax Claims*. *Priority Claims* are projected to be satisfied in full prior to allocating any proceeds for distribution to holders of Class H-5 Claims, Class H-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* and *Intercompany Claims (Class H-7)*.

The *Senior Notes Indenture Guarantee Claims (Class H-5)* consist of all Claims arising under, or in any way, related to, the Senior Notes Indenture Guarantee.

As described above, the Class H-6 Claims consist of *General Unsecured Claims (Class H-6),* and *Rejection Damages Claims (Class H-6)*. *General Unsecured Claims (Class H-6)* consist of, among other things, any pre-petition unsecured liabilities incurred in the ordinary course of business that are not a Priority Claim, a deficiency Claim arising from the *Senior Secured Notes Indenture Guarantee Claims (Class H-2)*, *Senior Notes Indenture Guarantee Claims (Class H-5)*, *Rejection Damages Claims (Class H-6)* or *Intercompany Claims (Class H-7)*.

*Rejection Damages Claims (Class H-6)*, if any, consist of all Claims arising from of the rejection (by BCG) of any Executory Contract or Unexpired Lease pursuant to Section 365 of the Bankruptcy Code or the repudiation of such contract or lease.

For purposes of the Liquidation Analysis, the Class H-5 Claims, the Class H-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* are all consolidated into a single "pool" of Allowed Claims. Liquidation proceeds that would be available to satisfy the Class H-5 Claims, the Class H-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* are allocated amongst the holders of such Allowed Claims on a *pari passu* basis.

*Intercompany Claims (Class H-7)* consist of the sum of the net payable balances (if any) owing by BCG to each of the other Debtors as a result of Pre-petition InterCo Transactions. The Allowed *Intercompany Claims (Class H-7)* are estimated to total approximately $11.5 million. It is assumed that in the context of a Chapter 7 liquidation, the Intercompany Claims against BCG would be subordinated to all other classes of Unsecured Claims. Due to the estimated shortfall in net liquidation proceeds available to satisfy the Class H-5 Claims, the Class H-6 Claims and the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class H-2),* it is not contemplated in the Liquidation Analysis that any distributions will be made to the holders of *Intercompany Claims (Class H-7)*.

*Intercompany Interests (Class H-8)* consist of all Intercompany Interests in BCG. Due to the estimated shortfall in net liquidation proceeds available to satisfy the Class H-5 Claims, the Class H-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class H-2)* and *Intercompany Claims (Class H-7)*, it is not contemplated in the Liquidation Analysis that any distributions will be made to the holders of *Intercompany Interests (Class H-8)*.

*Section 510(b) Claims (Class H-9)* consist of, among other things, any Allowed Claim (i) arising from rescission of a purchase or sale of a Security (including any Interest) of the Debtors; (ii) for damages arising from the purchase or sale of such a Security; or (iii) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim. Pursuant to the Bankruptcy Code, *Section 510(b) Claims (Class H-9)* are subordinated to most other Unsecured Claims including the Class H-5 Claims, the Class H-6 Claims, the deficiency portion of *Senior Secured Notes Indenture Guarantee Claims (Class H-2)*, *Intercompany Claims (Class H-7)* and *Intercompany Interests (Class H-8)*. The Debtors are not currently aware of any *Section 510(b) Claims* that are or will become Allowed Claims.

## Exhibit 2

**Disclosure Statement Marked Against Version Filed on January 7, 2011**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| THE MAJESTIC STAR CASINO, LLC, <u>et al.</u>,[1] | ) Case No. 09-14136 (KG) |
|  | ) |
|  | ) Jointly Administered |
|  | ) |

## DISCLOSURE STATEMENT FOR THE DEBTORS' SECOND AMENDED JOINT PLAN
## OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING IN EACH OF THE EXHIBITS HERETO, IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS LLP** |
|---|---|
| Laura Davis Jones, Esq. (DE Bar No. 2436) | James H.M. Sprayregen, P.C. |
| James E. O'Neill, Esq. (DE Bar No. 4042) | Edward O. Sassower, Esq. |
| Timothy P. Cairns, Esq. (DE Bar No. 4228) | Stephen E. Hessler, Esq. |
| 919 North Market Street, 17th Floor | 601 Lexington Avenue |
| Wilmington, Delaware 198999-8705 | New York, New York 10022–4611 |
| Telephone:     (302) 652-4100 | Telephone:     (212) 446–4800 |
| Facsimile:     (302) 652-4400 | Facsimile:     (212) 446–4900 |

Co-Counsel for the Debtors and Debtors in Possession

Dated:   January ~~7,~~ **12,** 2011

---

[1]  The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are:  The Majestic Star Casino, LLC (4986); The Majestic Star Casino II, Inc. (0927); The Majestic Star Casino Capital Corp. (0872); Majestic Star Casino Capital Corp. II (9309); Barden Mississippi Gaming, LLC (8783); Barden Colorado Gaming, LLC (8674); Majestic Holdco, LLC (4648); and Majestic Star Holdco, Inc. (9415).  The corporate address for the debtors is 301 Fremont Street, 12th Floor, Las Vegas, Nevada 89101.

**TABLE OF CONTENTS**

Page

Important Information About this Disclosure Statement ........................................................................ 2

Questions and Answers Regarding this Disclosure Statement and the Plan ...................................... 2

The Debtors' History and Chapter 11 Cases ........................................................................................ 2

Plan Overview ........................................................................................................................................ 2

Treatment of Claims Against and Equity Interests in the Debtors .................................................... 2

Settlements Contemplated Pursuant to the Plan ................................................................................ 2

Management of the Company ................................................................................................................ 2

Composition of Initial Board of Managers .......................................................................................... 2

Reorganized Debtors' Corporate Organizational and Ownership Structure .................................... 2

The Reorganized Debtors' Business Upon Emergence ....................................................................... 2

Description of New Membership Interests ........................................................................................... 2

Limitations on Liability and Indemnification of Managers and Officers of The Reorganized Debtors ............. 2

Summary of Gaming Regulations ......................................................................................................... 2

Summary of Legal Proceedings ............................................................................................................ 2

Projected Financial Information ........................................................................................................... 2

Risk Factors ........................................................................................................................................... 2

Confirmation of the Plan ...................................................................................................................... 2

Effect of Confirmation of the Plan ...................................................................................................... 2

Important Securities Law Disclosure ................................................................................................... 2

Voting Instructions ................................................................................................................................ 2

Certain U.S. Federal Income Tax Consequences of the Plan ............................................................ 2

Recommendation ................................................................................................................................... 2

**EXHIBITS**

EXHIBIT A      Second Amended Joint Plan of Reorganization

EXHIBIT B      Disclosure Statement Order

EXHIBIT C      Reorganized Debtors' Financial Projections

EXHIBIT D      Reorganized Debtors' Valuation Analysis

EXHIBIT E      Liquidation Analysis

**Important Information About this Disclosure Statement**

This Disclosure Statement provides information regarding the First Amended Joint Plan of Reorganization that the debtors referenced on the cover of this Disclosure Statement (collectively, the "Debtors") are seeking to have confirmed by the Bankruptcy Court. The Debtors believe the Plan is in the best interests of all creditors and urge all creditors entitled to vote on the Plan to vote in favor of the Plan.

**References to the "Plan" and the "Plan of Reorganization" are to the First Amended Joint Plan of Reorganization attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.**

**References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the District of Delaware, the court in which the Debtors filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code. References to the "Petition Date" are to November 23, 2009.**

**Unless the context requires otherwise, references to the "Company," "Majestic," "our," and "us" are to the Debtors.**

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if the Plan is confirmed, that such conditions precedent will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as Exhibit A hereto, and the section herein entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement, and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for the purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe the summaries of certain provisions of the Plan and certain other documents and the financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, including, but not limited to, the Plan and the Plan documents, are qualified in their entirety by reference to those documents. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any creditor entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The New Membership Interests described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. To the extent exemptions from registration other than section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or on registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;
- financing plans;
- projected dividends;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs;

- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing products and services;
- projected general market conditions; and
- effects of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. These risks, uncertainties, and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;
- the Debtors' ability to reduce their overall financial leverage;
- the potentially adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;
- customer response to the Chapter 11 Cases;
- inability to have claims discharged/settled during the chapter 11 proceedings;
- general economic, business and market conditions;
- interest rate fluctuations;

- a decline in the Debtors' market share due to competition;
- ability to implement cost reduction initiatives in a timely manner;
- financial conditions of the Debtors' customers;
- adverse tax changes;
- limited access to capital resources;
- changes in domestic laws and regulations;
- general market conditions;
- natural disasters; and
- geopolitical instability.

## Questions and Answers Regarding this Disclosure Statement and the Plan

**Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval for their Plan. Prior to soliciting acceptances of the proposed Plan, the Debtors are required by section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and your distribution, if any, depend on what kind of Claim or Interest you hold. The Classes of Claims and Interests and their respective voting statuses and anticipated recoveries are as follows:

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| **Claims against and Interests in Majestic Holdco, LLC** | | | | | |
| A-1 | Senior Secured Credit Facility Guarantee Claims | Impaired | Entitled to Vote | 100% | N/A |
| A-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 52% | 0% |
| A-3 | Discount Notes Indenture Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| A-4 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| A-5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in Majestic Star Holdco, Inc.** | | | | | |
| B-1 | Discount Notes Indenture Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| B-2 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| B-3 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in The Majestic Star Casino, LLC** | | | | | |
| C-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | 100% | 100% |
| C-2 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | 52% | 12% |
| C-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| C-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| C-5 | Senior Notes Indenture Claims | Impaired | Entitled to Vote | 25% | 4% |
| C-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 25% | 4% |

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| C-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| C-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| C-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in The Majestic Star Casino II, Inc.** | | | | | |
| D-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | 100% | 100% |
| D-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 52% | 8% |
| D-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| D-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| D-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 25% | 7% |
| D-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 25% | 7% |
| D-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| D-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| D-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in The Majestic Star Casino Capital Corp.** | | | | | |
| E-1 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | 52% | 0% |
| E-2 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| E-3 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in Majestic Star Casino Capital Corp. II** | | | | | |
| F-1 | Senior Secured Notes Indenture Claims | Impaired | Entitled to Vote | 52% | 0% |
| F-2 | Senior Notes Indenture Claims | Impaired | Entitled to Vote | 25% | 0% |
| F-3 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| F-4 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in Barden Mississippi Gaming, LLC** | | | | | |
| G-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | 100% | 100% |
| G-2 | Senior Secured Notes Indenture Guarantee | Impaired | Entitled to Vote | 52% | 12% |

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| | Claims | | | | |
| G-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| G-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| G-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 25% | 2% |
| G-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 25% | 2% |
| G-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| G-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| G-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in Barden Colorado Gaming, LLC** | | | | | |
| H-1 | Senior Secured Credit Facility Claims | Impaired | Entitled to Vote | 100% | 100% |
| H-2 | Senior Secured Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 52% | 2% |
| H-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| H-4 | Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 100% |
| H-5 | Senior Notes Indenture Guarantee Claims | Impaired | Entitled to Vote | 25% | 0% |
| H-6 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 25% | 0% |
| H-7 | Intercompany Claims | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| H-8 | Intercompany Interests | Impaired | Entitled to Vote on a Provisional Basis | up to 100% | 0% |
| H-9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |

For more information about the treatment of Claims and Interests see the section herein entitled "Treatment of Claims Against and Equity Interests in the Debtors," which begins on page 2.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance the Debtors will be able to reorganize their businesses. If the Plan is not confirmed or does not go effective in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. Alternatives to Confirmation and consummation of the Plan may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. Moreover, failure to confirm or consummate the Plan may result in an extended chapter 11 proceeding. For a more detailed description of the consequences of a liquidation scenario, see the section herein entitled "Confirmation of the Plan—Best Interests of Creditors/Liquidation Analysis," which begins on page 2 and the Liquidation Analysis attached as Exhibit E hereto.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "consummation?"**

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the "Effective Date" mean the date on which the Plan has been fully consummated and all conditions to the Plan have been satisfied or waived. Distributions will be made only after consummation of the Plan. See the section herein entitled "Confirmation of the Plan," which begins on page 2, for a discussion of the conditions to consummation.

**Where is the cash required to fund the Plan coming from?**

The cash distributions under the Plan shall be funded from the Reorganized Debtors' cash balances and/or cash from business operations. See the section herein entitled "Plan Overview," which begins on page 2.

**Are there risks to owning an interest in the Debtors upon emergence from bankruptcy?**

Yes, please see the section herein entitled "Risk Factors," which begins on page 2.

**Is there potential litigation related to the Plan?**

Yes, in the event it becomes necessary to confirm the Plan over the objection of certain Classes of Claims or Interests, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

In accordance with the terms of the Bankruptcy Court order approving this Disclosure Statement, all parties in interest will receive notice of the hearing on the Confirmation of the Plan. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party at: http://dm.epiq11.com/msc.

**Will the Debtors be filing reports with the SEC?**

The Debtors will not file reports with the SEC upon emergence as they will not be subject to the public reporting requirements of the Securities Exchange Act of 1934, as amended, or the regulations promulgated thereunder.

**What rights will the Debtors' new equity holders have?**

On the Effective Date, the Reorganized Debtors shall authorize and issue units of New Membership Interests in accordance with the Plan. The voting rights, restrictions on transferability, and other rights of the New Membership Interests will be set forth in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

**Will there be releases granted to parties in interest as part of the Plan?**

Yes, see the sections herein entitled "Releases by the Debtors" and "Third Party Releases," which begin on page 2.

**What is the deadline to vote on the Plan?**

5:00 p.m. (prevailing Eastern Time) on [●], 2011.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests entitled to vote on the Plan. If you are a Holder of Claims or Interests in the following Classes, you may vote for or against the Plan by completing the ballot and timely returning it in the envelope provided to you: Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8.

The Debtors have retained Epiq Bankruptcy Solutions, LLC ("Epiq") to serve as their notice, claims, and solicitation agent (the "Solicitation Agent") to oversee the voting process, provide additional copies of all materials, and answer questions. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on [●], 2011.

The following table provides basic instructions on how to vote on the Plan:

| BALLOTS |
|---|
| Ballots must be actually received by the Solicitation Agent by the<br>voting deadline of 5:00 p.m. (prevailing Eastern Time) on [●], 2011 at the following address:<br><br>**If by mail:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.: The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**FDR Station PO Box 5014**<br>**New York, New York 10150**<br><br>**If by hand delivery or overnight courier:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.: The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**757 Third Avenue, 3rd Floor**<br>**New York, New York 10017**<br><br>If you have any questions on the procedure for voting on the Plan,<br>please call the Solicitation Agent at the following telephone number: (646) 282-2400 |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed, and received by 5:00 p.m. (prevailing Eastern Time), on [●], 2011.

Any ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one ballot with respect to each such Claim held. By signing and returning a ballot, each Holder of a Claim or Interest in Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim and/or Equity Interest have been cast or, if any other ballots have been cast with respect to such Class of Claims and/or Equity Interests, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot.

**Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**When is the Confirmation Hearing scheduled to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], 2011 to take place at [ : ] (prevailing Eastern Time) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [●], 2011 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation

Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The Wall Street Journal* (national edition), *The Post-Tribune of Northwest Indiana*, *The Denver Post*, and *The Tunica Times* to provide notification to those persons who may not receive notice by mail.

**What is the purpose of the Confirmation Hearing?**

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The Confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any liability that arose prior to the Confirmation of the plan of reorganization and provides for the treatment of such liability in accordance with the terms of the confirmed plan of reorganization.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including disputes over any Claims or Interests arising in the Chapter 11 Cases. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure distributions to Holders of Claims against the Debtors are accomplished pursuant to the Plan. See the section herein entitled "Retention of Jurisdiction by the Bankruptcy Court," which begins on page 2, for a further description of the matters over which the Bankruptcy Court will retain jurisdiction following the Confirmation of the Plan.

**What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. See the section herein entitled "The Reorganized Debtors' Business Upon Emergence," beginning on page 2, for a further description of the effect of the Plan on the Debtors' ongoing business operations.

**Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

Yes. Under the Plan, the Senior Secured Noteholders and the Senior Noteholders will collectively own a significant majority of the New Membership Interests in the Reorganized Debtors, and individual Senior Secured Noteholders and Senior Noteholders will own substantial ownership stakes in the Reorganized Debtors. Further information regarding the composition of the Board of Managers of the Reorganized Debtors is set forth in the term sheet attached to the Plan as Exhibit II, and will be set forth in the Plan Supplement.

**Does the Company recommend voting in favor of the Plan?**

Yes. In the opinion of the Debtors, the Plan is preferable to the liquidation alternatives described in this Disclosure Statement because the Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. Confirmation of the Plan will also allow the Debtors to continue to operate as a going concern, which will have the effect of preserving jobs at the Debtors' gaming facilities. Accordingly, the Debtors recommend that Holders of Claims who are entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

# The Debtors' History and Chapter 11 Cases

## The Debtors' Business—Overview and History

The Majestic Star Casino, LLC ("Majestic I") was formed by Don H. Barden in December 1993 to pursue a license to operate a gaming facility at Buffington Harbor in Gary, Indiana (the "Majestic Star I"). In 1996, Majestic I and Trump Indiana, Inc. (which was not affiliated with the Debtors at that time) ("Trump Indiana") each opened a dockside gaming facility at Buffington Harbor.

In December 2001, Majestic I purchased Fitzgeralds-brand properties in Las Vegas, Nevada, Tunica County, Mississippi (30 miles south of Memphis) and Black Hawk, Colorado (35 miles west of Denver), which it owns through its wholly-owned subsidiaries Barden Nevada Gaming, LLC ("Barden Nevada," not a Debtor in these cases), Barden Mississippi Gaming, LLC ("Barden Mississippi," a Debtor in these cases), and Barden Colorado Gaming, LLC ("Barden Colorado," a Debtor in these cases), respectively. This purchase significantly expanded Majestic I's geographic reach and the scope of its gaming and hospitality operations. It also gave Majestic I proprietary rights in registered and common law trade names, trademarks and service marks used in connection with these operations, certain of which Majestic I licenses to other Fitzgeralds-brand properties.

On December 31, 2003, Majestic I spun off ownership of Barden Nevada to Barden Development Inc. ("BDI"), Majestic I's indirect parent (not a Debtor in these cases). As part of that transaction, Majestic I and Barden Nevada entered into a series of licensing, expense sharing, and other agreements.

On December 21, 2005, Majestic I acquired Trump Indiana (renamed The Majestic Star Casino II, Inc. ("Majestic II"), a Debtor in these cases), which Majestic I rebranded "Majestic Star II," and its 300 room hotel, which was renamed the "Majestic Star Hotel." As part of this transaction, Majestic I also acquired complete ownership of two other subsidiaries: Buffington Harbor Riverboats, LLC ("Buffington Riverboats"), a joint venture between Majestic I and Trump Indiana established to acquire, manage, and develop a dock, pavilion and parking facilities for gaming operations; and Buffington Harbor Parking Associates, LLC ("Buffington Parking"), a joint venture between Trump Indiana and AMB Parking, LLC (an entity owned by BDI) established to own and operate parking facilities for gaming operations.[2] Accordingly, the Debtors' Buffington Harbor operations now include both the Majestic Star I and Majestic Star II casino operations, the Majestic Star Hotel, an entertainment pavilion housing restaurants, retail outlets, an entertainment venue, a lounge and boarding access to the two casinos, and a 2,000 space parking garage. Majestic I also has 266 acres of excess and surplus land at the site, much of which is available for future expansion.[3]

## The Debtors' Organizational Structure

The following chart depicts the Debtors' current organizational and ownership structure (non-debtors are shaded):

---

[2] On or about August 4, 2006, Buffington Parking was merged into Majestic pursuant to Articles of Merger filed with the Secretaries of State for the States of Indiana and Delaware. On or about December 31, 2006, Buffington Riverboats withdrew from existence as an entity with the Secretary of State of the State of Delaware.

[3] Non-debtor Gary New Century, LLC ("GNC"), which is controlled by Don H. Barden, owns approximately six acres of land at this site. GNC also holds rights to certain improvements in the harbor and an ownership interest in those improvements. The Debtors are owners of various easements and other rights in the GNC property that permit the Debtors to perpetually operate their business at the Buffington Harbor location, subject to certain reservations, restrictions, and limitations contained in various recorded and unrecorded instruments.



**The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors' total funded debt was approximately $733.8 million, which primarily consists of the amounts outstanding under four Prepetition facilities: (a) an $80 million Senior Secured Credit Facility (the "Senior Secured Credit Facility") funded by a syndicate led by Wells Fargo Capital Finance, Inc. (f/k/a Wells Fargo Foothill, Inc.) (the "Senior Secured Credit Facility Agent"), which matured on April 15, 2010; (b) $300 million in principal amount of 9½% Senior Secured Notes (the "Senior Secured Notes"), which matured on October 15, 2010; (c) $200 million in principal amount of 9¾% Senior Notes (the "Senior Notes"), which mature on January 15, 2011; and (d) $63.5 million in principal amount at maturity of 12½% original issue discount notes (the "Discount Notes"), which mature on October 15, 2011. Each of these facilities is described in further detail below.

Senior Secured Credit Facility

On October 7, 2003, Majestic I, Barden Mississippi, and Barden Colorado entered into a Loan and Security Agreement (as amended, the "Loan and Security Agreement") with certain financial institutions party thereto as lenders and the Senior Secured Credit Facility Agent, as arranger and administrative agent for such lenders.[4] The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matured on April 15, 2010. As of August 31, 2010, the Debtors owed approximately $65.3 million under the Senior Secured Credit Facility in principal and accrued unpaid interest. Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Senior Secured Credit Facility Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%. In each case the rate is determined based on the Debtors' trailing twelve month EBITDA (defined as earnings before interest, taxes, depreciation and amortization). The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default. As noted above, the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Senior Secured Credit Facility Agent at the default rate on a current basis.

---

[4]   The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and to modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

Pursuant to certain mortgages, security agreements, and other related collateral documents, outstanding amounts under the Senior Secured Credit Facility are secured by substantially all of the assets of Majestic I, Majestic II, Barden Colorado, and Barden Mississippi, including all real property and other assets of the Debtors' casinos, all furniture, fixtures and equipment belonging to those entities, those entities' rights to the service marks "Majestic Star" and "Fitzgeralds" and other related trademarks, and the proceeds and products of each of the foregoing, as well as by a pledge by Majestic of its equity interests in Majestic II, Barden Colorado, and Barden Mississippi (collectively, the "Collateral"). Majestic Holdco, LLC ("Majestic Holdco") has also guarantied the outstanding obligations under the Senior Secured Credit Facility, although its liability is limited to its pledge of 100% of the equity of Majestic I. The Collateral does not include certain "Excluded Assets," including, among other things, cage cash (cash held at the casino properties themselves) and the Debtors' gaming licenses and other licenses that may not be encumbered under applicable law or contract.

### Senior Secured Notes

The Senior Secured Notes are $300 million in principal amount of obligations issued by Majestic I and The Majestic Star Casino Capital Corp. ("MSCC"), a non-operating, wholly-owned subsidiary of Majestic I that has no assets. The Senior Secured Notes are governed by an Indenture dated October 7, 2003, and two Supplemental Indentures each dated December 21, 2005 (collectively, the "Senior Secured Notes Indenture"), with The Bank of New York Mellon Trust Company, N.A., as trustee under each indenture (the "Senior Secured Notes Trustee"). The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes matured on October 15, 2010. As of August 31, 2010, the Debtors owed approximately $348.4 million on account of the Senior Secured Notes in principal and accrued unpaid interest.

Outstanding obligations under the Senior Secured Notes are secured by liens in favor of the Trustee on the Collateral, which are junior to the liens granted to the Senior Secured Credit Facility Agent under the Loan and Security Agreement pursuant to the Intercreditor Agreement (as defined below). Additionally, Majestic II, Barden Colorado and Barden Mississippi have each guarantied the Debtors' obligations under the Senior Secured Notes. Majestic Holdco has also guarantied those obligations, but its guaranty is limited to a pledge of its 100% equity interests in Majestic I.

### Intercreditor Agreement

In connection with the issuance of the Senior Secured Notes, the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and certain of the Debtors[5] entered into an Intercreditor and Lien Subordination Agreement, dated as of October 7, 2003 (as amended, the "Intercreditor Agreement"). The Intercreditor Agreement, among other things, subordinates the liens and security interests granted to the Senior Secured Notes Trustee to secure the Debtors' obligations under the Senior Secured Notes to the liens and security interests granted to the Senior Secured Credit Facility Agent to secure the Debtors' obligations under the Senior Secured Credit Facility, up to a maximum principal amount outstanding under the Senior Secured Credit Facility of $80 million, plus premiums, interest, fees and all other amounts payable under the Senior Secured Credit Facility (including all amounts accruing after the Debtors commence a chapter 11 case).[6] Additionally, the Intercreditor Agreement imposes up to a 180-day standstill period within which holders of the Senior Secured Notes and the Senior Secured Notes Trustee may not take enforcement action against the Collateral based on an event of default under the Senior Secured Notes Indenture,

---

[5]    The Debtors party to the Intercreditor Agreement are: (a) Majestic I, Majestic II, Barden Mississippi, and Barden Colorado, as borrowers under the Senior Secured Credit Facility, and Majestic Holdco, as guarantor under the Senior Secured Credit Facility; and (b) Majestic I and MSCC, as issuers of, Majestic II, Barden Mississippi, Barden Colorado, and MSCC II as guarantors under, and Majestic Holdco, as pledgor under, the Senior Secured Notes Indenture.

[6]    The liens and security interests granted to the Senior Secured Notes Trustee are senior and prior to the liens and security interests granted to the Senior Secured Credit Facility Agent to the extent the latter secure an amount greater than this amount.

which period is extended indefinitely with respect to Collateral against which the Senior Secured Credit Facility Agent is pursuing rights or remedies under the Senior Secured Credit Facility.

The Intercreditor Agreement also limits the Senior Secured Notes Trustee and Senior Secured Noteholders from seeking adequate protection and taking certain other actions in any chapter 11 case commenced by the Debtors. Specifically, the Intercreditor Agreement provides that, until the senior obligations under the Senior Secured Credit Facility have been satisfied, the Senior Secured Notes Trustee and the Senior Secured Noteholders (a) will not object to any use of cash collateral or Postpetition financing secured by the Debtors' assets that is consented to by the Senior Secured Credit Facility Agent, and will not seek adequate protection or any other relief based on their respective interests in the Debtors' assets;[7] (b) will subordinate the Senior Secured Notes Trustee's liens to any liens securing such Postpetition financing that are senior to or *pari passu* with the Senior Secured Credit Facility Agent's liens; (c) will not contest any request by the Senior Secured Credit Facility Agent for adequate protection (or support an objection to such request); and (d) will not seek relief from the automatic stay to pursue rights or remedies with respect to its liens and security interests. The Intercreditor Agreement expressly provides in Section 6.04 that the "provisions of this Agreement are intended to be and shall be enforceable under section 510 of [the Bankruptcy Code]."

### Senior Notes

The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic I and Majestic Star Casino Capital Corp. II ("MSCC II"), a non-operating, wholly owned subsidiary of Majestic I that has no assets. The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi. The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debenture Trust Company as successor trustee. The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005. The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year. The notes mature on January 15, 2011. As of August 31, 2010, the Debtors owed approximately $233.1 million on account of the Senior Notes in principal and accrued unpaid interest.

### Discount Notes

The Discount Notes are $63.5 million principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Holdco that has no assets. The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic I or any of its subsidiaries. The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee. The Discount Notes accrue interest at 12½% per annum, with payments due on April 15 and October 15 of each year. Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011. As of August 31, 2010, the Debtors owed approximately $72.6 million on account of the Discount Notes in principal and accrued unpaid interest.

## Events That Led to Bankruptcy

### The Debtors' Financial and Liquidity Concerns

The recent global financial crisis caused, among other things, a general tightening in the credit markets, lower levels of liquidity, lower consumer and business spending, and lower consumer net worth, all of which have had and will continue to have a negative impact on the Debtors' businesses, results of operation, financial condition, and liquidity. Gaming and other leisure activities comprise discretionary spending, and participation in such activities tend to decline in economic downturns. The recent recession was no exception.

---

[7] The Intercreditor Agreement does provide that, if the Senior Secured Credit Facility Agent is granted adequate protection in the form of liens on additional assets of the Debtors, then the Senior Secured Notes Trustee may seek adequate protection in the form of a junior lien on such additional assets.

At the same time that the Debtors confronted a decline in customer visits and spending due to economic factors, competition increased in each of the markets in which they compete. Importantly, in Indiana a number of new and renovated gaming properties have materially impacted the Debtors' Buffington Harbor operations. Specifically, in August 2007, the Four Winds Casino Resort opened with approximately 3,000 slot machines and 100 table games. This casino facility is located approximately 48 miles east of the Debtors' Buffington Harbor operations. In July 2008, Harrah's Entertainment completed a $500 million renovation and expansion of its Horseshoe Casino in Hammond, Indiana, doubling the size of its existing facility and making it the largest gaming establishment in the greater Chicago area. Also in 2008, Ameristar Casinos finished the remodeling and rebranding of its riverboat and land-based facilities located in East Chicago, Indiana, which included remodeling casino floors and restaurants and the addition of new slot machines. Boyd Gaming also recently completed a $130 million expansion of its Blue Chip Casino facility located in Michigan City, Indiana, which includes new and improved amenities.

Similar competitive pressures have been brought to bear on the Debtors' Mississippi and Colorado operations. In Tunica County, Mississippi, a competitor recently completed an extensive remodeling and re-branding of its property, and in Colorado a competitor recently completed construction of a 536-room hotel (attached to its existing casino) that has drawn patrons away from Fitzgeralds Black Hawk. In addition, the Black Hawk casino market continues to suffer the negative impacts of a smoking ban to all public areas within a casino, including the casino floor. The smoking ban went into effect on January 1, 2008.

The Debtors' declining operating results and weakening financial position due to increasing competition and adverse economic conditions, together with their significant debt service obligations, have curtailed the Debtors' ability to make the substantial and ongoing capital investments in their operations required to maintain competitiveness and the going concern value of their businesses. Accordingly, to preserve the liquidity necessary to ensure the continued competitiveness of their operations, in October 2008 the Debtors drew substantially all of the remaining availability under their Senior Secured Credit Facility and determined not to make the $24 million interest payment due to holders of their Senior Secured Notes and Senior Notes on October 15, 2008. As a result, as of November 14, 2008, the Debtors were in default under the Senior Secured Notes and Senior Notes, which in turn triggered cross-defaults under the Senior Secured Credit Facility[8] and the Discount Notes. The Debtors have continued to pay interest on the Senior Secured Credit Facility (at the default rate), but have not made any interest payments on the Senior Secured Notes or Senior Notes since April 2008, and did not make the scheduled interest payment on the Discount Notes due April 15, 2009.[9]

<u>Prepetition Negotiations with Creditors</u>

Although the Debtors' operations continued to produce positive cash flow (exclusive of debt service) prior to the defaults under their various debt facilities, the Debtors recognized that their existing capital structure and debt service obligations were depriving their businesses of the funds needed to make the substantial and ongoing capital investments required to succeed in the increasingly competitive markets in which they operate. Accordingly, the Debtors engaged XRoads Solutions Group, LLC ("<u>XRoads</u>") on or about August 7, 2008, and Goldman, Sachs & Co. ("<u>Goldman Sachs</u>") on or about November 14, 2008, to assist the Debtors in evaluating a broad range of financial and strategic alternatives aimed at addressing trends in the Debtors' operating results and financial condition.

The Debtors and their financial advisors pursued a number of financial and operational restructuring alternatives in the year leading up to the commencement of the Chapter 11 Cases, including reaching out to their principal creditor constituencies. To that end, in November 2008, the Debtors agreed to pay the reasonable professional fees and expenses for advisors to an ad hoc group holding a majority of the Senior Secured Notes (the "<u>Senior Secured Notes Committee</u>"), and in December 2008, the Debtors commenced similar agreements with an ad hoc group holding a majority of the Senior Notes (the "<u>Senior Notes Committee</u>") and the Senior Secured Credit Facility Agent, respectively. The Debtors also established a data room to provide access to detailed information regarding their operations, assets and finances, and attempted to foster negotiations with these constituencies

---

[8]   The Senior Secured Credit Facility Agent asserts that other defaults exist under the Senior Secured Credit Facility as well.

[9]   Interest accruing on the Discount Notes through October 2008 was paid in-kind.

regarding a consensual restructuring and deleveraging of the Debtors' balance sheet. Concurrently, the Debtors and their advisors investigated other potential restructuring solutions, including new money investments and sales of certain of the Debtors' businesses and assets. Although the Debtors identified several potential investors, these discussions did not progress beyond expressions of interest.

Despite the substantial efforts of the Debtors, the Senior Secured Notes Committee, and the Senior Notes Committee to reach agreement on a consensual restructuring, by October 2009, the negotiations had reached an impasse.

<u>Exercise of Creditor Remedies</u>

On December 3, 2008, after the Debtors failed to make the October 15, 2008 interest payment to holders of the Senior Secured Notes and Senior Notes, the Senior Secured Notes Trustee notified the Senior Secured Credit Facility Agent that one or more events of default had occurred under the Senior Secured Notes Indenture. The Senior Secured Credit Facility Agent responded by sending the Senior Secured Notes Trustee a "standstill notice" on December 11, 2008, which, under the Intercreditor Agreement, triggered a 180-day "standstill period" in which the Senior Secured Noteholders and Senior Secured Notes Trustee were prohibited from exercising remedies against the Debtors' assets. The Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee subsequently entered into agreements on June 10, 2009 and July 10, 2009 consensually extending the standstill period through August 10, 2009 to allow the Senior Secured Notes Committee, the Senior Notes Committee and the Debtors to continue discussing a consensual restructuring. Upon expiration of the second extension of the standstill period however, the Senior Secured Notes Trustee declined to further extend the standstill period beyond August 10, 2009.

Notwithstanding the expiration of the standstill period under the Intercreditor Agreement, the parties continued to have constructive discussions regarding a consensual restructuring of the Debtors' debt obligations. In October 2009, however, the Senior Secured Notes Trustee sent the Senior Secured Credit Facility Agent a notice of its intent to exercise remedies against the Debtors' assets, which triggered another standstill period under the Intercreditor Agreement, this time of 10 days. Upon the expiration of such 10 day period on October 30, 2009, the Senior Secured Notes Trustee and Senior Secured Noteholders became entitled under the Intercreditor Agreement to seek to enforce remedies against the Debtors' assets.

On October 30, 2009, the date the Senior Secured Noteholders' standstill period expired, the Senior Secured Credit Facility Agent sent to the Debtors a notice, among other things, terminating the Debtors' ability to borrow under the Senior Secured Credit Facility and declaring all amounts outstanding under that facility to be immediately due and payable. The notice stated that, as a result of the expiration of the applicable standstill periods under the Intercreditor Agreement and the resulting right of the Senior Secured Notes Trustee and Senior Secured Noteholders to enforce remedies against any of the Collateral that the Senior Secured Credit Facility Agent was not actively enforcing remedies against, the Senior Secured Credit Facility Agent and the lenders under the Senior Secured Credit Facility indicated they were commencing the exercise of their rights and remedies against all of the Collateral to protect their ability to control any foreclosure or similar process with respect to the Collateral.

**The Commencement of the Chapter 11 Cases**

On November 23, 2009, the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code.

The Chapter 11 Cases are being jointly administered under the caption <u>In re The Majestic Star Casino, LLC, et al.</u>, Case No. 09-14136 (KG). The Debtors continue to operate their businesses and manage their property as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

**Events During Bankruptcy**

First Day Relief

Through a careful review of their business operations and cash requirements, and following detailed preparations by management and their advisors, the Debtors entered bankruptcy with minimal impact on their day-to-day business operations. To facilitate, among other things, noticing, claims-processing and voting-related matters, the Debtors requested that the Bankruptcy Court enter an order granting certain relief including authorization for the joint administration of the Chapter 11 Cases.

On the Petition Date, the Debtors also sought and obtained several orders authorizing them to pay various Prepetition Claims. These orders were designed to ease the strain on the Debtors' relationships with employees, vendors, customers, and taxing authorities as a consequence of the commencement of the Chapter 11 Cases. Among other things, these orders authorized the Debtors to: (a) honor customer obligations and continue customer programs; (b) pay certain Prepetition employee wages and benefits; (c) maintain cash management systems; (d) use Prepetition bank accounts, checks, and other business forms; (e) make tax payments to federal, local, and state taxing authorities; (e) maintain Prepetition insurance policies and enter into new insurance policies; and (f) prohibit utility companies from discontinuing services. In addition, the Debtors engaged in an extensive communication program with vendors and customers assuring them that the transition into bankruptcy would be smooth and would not result in a discernible interruption in operations.

The Debtors have been funding their operations during the Chapter 11 Cases by using cash on hand and cash flow from operations, which the Debtors believe to be sufficient to meet projected cash needs, including the payment of normal operating costs and expenses, as they proceed with their financial restructuring. Therefore, the Debtors have not sought debtor-in-possession financing.

On the Petition Date, the Debtors sought authority to use cash collateral of their secured creditors to permit, among other things, the orderly continuation of the operation of the Debtors' businesses and to satisfy their working capital and operational needs. The final cash collateral order was entered by the Bankruptcy Court on December 17, 2009 and provides adequate protection to those secured creditors, including: (a) adequate protection payments to the Senior Secured Credit Facility lenders; (b) a section 507(b) superpriority claim to the Senior Secured Credit Facility lenders; (c) adequate protection liens to the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee; and (d) payment of reasonable professional fees to the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee.

Retention of Restructuring and Other Professionals

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors retained, as of the Petition Date, with authorization from the Bankruptcy Court, the law firms of Kirkland & Ellis LLP and Pachulski Stang Ziehl & Jones as their restructuring counsel. Additionally, pursuant to the Bankruptcy Court's approval, the Debtors retained XRoads Solutions Group LLC ("XRoads") as financial and restructuring advisors, Epiq as Solicitation Agent, Ernst & Young LLP as auditors, Deloitte Financial Advisory Services LLP as accounting services providers, and Realty Consultants, USA, Inc. d/b/a Integra Realty Resources - Chicago Metro as appraisers.

In addition to paying the fees of their own advisors, the Debtors are required to pay fees incurred by various other constituencies and their respective advisors related to the Chapter 11 Cases. On December 4, 2009, the United States Trustee appointed the official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases to represent the interests of all general unsecured creditors of the Debtors. Since the formation of the Creditors' Committee, the Debtors have kept the Creditors' Committee informed about the Debtors' business operations. Additionally, as appropriate, the Debtors have sought the concurrence of the Creditors' Committee in connection with certain actions and transactions taken by the Debtors outside of the ordinary course of business.

<u>Power of Attorney Agreement</u>

Indiana law requires all riverboat casino licensees (including Majestic I and Majestic II) to enter into a power of attorney agreement ("<u>POA</u>") that provides, in the event of revocation or nonrenewal of a casino's license or in other similar circumstances, for the temporary operation of such casino by a designated trustee. All licensees must submit an executed POA to the Indiana Gaming Commission (the "<u>IGC</u>"), the regulator with authority over the licensing and operation of riverboat casinos in Indiana. Failure to comply with the statutory POA requirement could lead to the nonrenewal of a casino operator's license. Accordingly, on February 24, 2010, the Debtors filed a motion seeking authority to execute a POA for submission to the IGC. The Court granted the Debtors' motion on March 1, 2010, and the Debtors executed and submitted a POA shortly thereafter.

<u>Unsecured Creditors' Committee's Standing Motion</u>

On March 4, 2010, the Creditors' Committee filed a motion (the "<u>Standing Motion</u>") seeking standing to pursue, and if appropriate, settle certain claims against the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee. In the Standing Motion, the Creditors' Committee requested authority to bring an adversary proceeding for (a) a declaratory judgment holding that the security interests of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee in the Debtors' Indiana riverboat casinos (the "<u>Majestic Star Casinos</u>") are unperfected, (b) an order avoiding these security interests, and (c) disallowance of the claims of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee to the extent their claims are secured by the allegedly unperfected security interests in the Majestic Star Casinos. The Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed objections to the Standing Motion, and the Debtors filed a limited response to the motion requesting that the Court defer consideration of the motion and allow the Debtors to propose a settlement of the claims raised therein as part of their Plan. As of the date of filing of this Disclosure Statement, the Court has not held a hearing on the Standing Motion, and the Debtors have proposed a settlement of the claims raised therein in the Plan.

<u>Adversary Proceeding Against the City of Gary, Indiana</u>

In 1996, Gary entered into local development agreements with Trump Indiana and Majestic I (each, a "<u>Local Development Agreement</u>"). In 2005, when Majestic II, a Debtor in these Chapter 11 Cases, acquired and began operating the riverboat casino formerly owned and operated by Trump Indiana, the Majestic I Local Development Agreement and certain other agreements related to the development of Buffington Harbor area were amended (collectively, the "<u>Amended Local Development Agreement</u>"), and the Trump Indiana Local Development Agreement was terminated. Under the Amended Local Development Agreement, Majestic I and Majestic II were to make monthly payments of three percent (3%) of the adjusted gross gaming receipts of their respective casinos ("<u>Economic Incentive Payments</u>"), and Gary agreed to make local infrastructure improvements, including construction of access roads and freeway interchange, and to conduct environmental remediation on certain property owned by Majestic I and Majestic II. In 2008, a dispute between the Debtors and Gary developed over Gary's failure to perform its development obligations, and the Debtors began depositing Economic Incentive Payments in a segregated bank account pending resolution of the dispute.

On February 11, 2008, the Debtors commenced an arbitration proceeding (the "<u>Gary Arbitration</u>") and a lawsuit in the Superior Court of Marion County, Indiana (the "<u>Marion County Lawsuit</u>") against Gary to resolve the parties' dispute over the Amended Local Development Agreement, or, if the Amended Local Development Agreement were found to be invalid, the Local Development Agreements. On December 14, 2009, upon being notified of the Debtors' chapter 11 cases, the Superior Court of Marion County stayed further proceedings in the Marion County Lawsuit. The Gary Arbitration has not been formally stayed, but the Debtors are not actively prosecuting the Gary Arbitration at this time.

On March 11, 2010, Gary filed a lawsuit in the Superior Court of Lake County, Indiana (the "<u>Lake County Lawsuit</u>") against eight current and former directors, officers, and employees of Majestic I and its affiliates (the "<u>Lake County Defendants</u>") alleging these individuals converted funds owed by the Debtors to Gary under the Amended Local Development Agreement. In response to the Lake County Lawsuit, on March 29, 2010, the Debtors instituted an adversary proceeding in this Court seeking to extend the automatic stay imposed by section 362 of the Bankruptcy Code to the Lake County Defendants, or in the alternative, requesting a preliminary injunction pursuant to section 105 of the Bankruptcy Code prohibiting Gary from prosecuting the Lake County Lawsuit. On April 15, 2010, a Joint

Notice of Removal was filed with the United State District Court for the Northern District of Indiana, Hammond Division, removing the Lake County Lawsuit from the Superior Court of Lake County, Indiana to the United States District Court for the Northern District of Indiana, Hammond Division. By memorandum order dated April 28, 2010, the Court granted the Debtors' motion seeking to extend the automatic stay to the Lake County Defendants.

Gary filed a notice of appeal of the Court's grant of the Debtors' stay extension motion on May 12, 2010, designated the record and issues on appeal on May 26, 2010, and docketed its appeal in the United States District Court for the District of Delaware on June 20, 2010. Pursuant to a standing order of the United States District Court for the District of Delaware, all such appeals are referred to mediation, and the mediation of Gary's appeal is currently pending.

As of the date of the filing of this Disclosure Statement, the Debtors and Gary are engaged in ongoing settlement negotiations.

Key Employee Incentive Plan

Recognizing the myriad of increasingly difficult challenges facing the Debtors' thinly-staffed senior management team and the importance of the performance of the senior management team to the success of these Chapter 11 Cases, the Debtors determined it was necessary to implement a series of measures to properly incentivize the senior management team to continue to operate the Debtors' businesses as efficiently and effectively as possible to maximize the value of the Debtors' estates. To that end, on May 14, 2010, the Debtors' filed a motion (the "KEIP Motion") seeking authority to: (a) make certain outstanding payments due under The Majestic Star Casino, LLC 2009 Executive Incentive Plan (the "2009 EIP"); (b) implement The Majestic Star Casino, LLC 2010 Key Employee Incentive Plan (the "2010 KEIP"); and (c) enter into certain employment agreements. The Creditors' Committee fully supported the Debtors' KEIP Motion.

After the Debtors filed the KEIP Motion, representatives of Holders of the Senior Secured Notes suggested several revisions to the 2010 KEIP and the employment agreements submitted with the KEIP Motion, which resulted in productive discussions, and, ultimately, a revised 2010 KEIP and revised employment agreements acceptable to representatives of Holders of the Senior Secured Notes. On May 28, 2010, the Court entered an order authorizing (a) payments under the 2009 EIP, (b) implementation of the revised 2010 KEIP, and (c) execution of the revised employment agreements. The Senior Secured Credit Facility Agent, Senior Secured Notes Trustee, and the Creditors' Committee each consented to entry of the order.

In addition to the foregoing, the Board of Directors of the Debtors may develop, adopt, and implement the Pre-Effective Date Key Employee Incentive Program, subject to the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably), the terms of which shall be described on Exhibit 5 to the Plan Supplement.

Majestic II Tax Action(s)

Prior to December 21, 2005, BDI elected to be classified as an "S corporation" under subchapter S of the Internal Revenue Code (an "S Corp."). Described generally, unlike the regime applicable to a subchapter C corporation (a "C Corp."), where income generated by the corporation is taxed both when earned at the corporate level and at the shareholder level when received as part of a dividend or other distribution, the income and losses of an S Corp. are passed through to its shareholders and are reflected in such shareholders' personal tax returns, while the S Corp. itself is generally exempt from taxes imposed under chapter 1 of the Internal Revenue Code. Thus, use of an S Corp. results in only one level of taxation.

On or around December 21, 2005, Majestic I acquired Trump Indiana, Inc. (subsequently renamed The Majestic Star Casino II, Inc., a Debtor), including its dockside gaming facility at Buffington Harbor and its 300 room hotel. Upon acquiring Majestic II in this transaction, BDI elected to treat Majestic II as a "Qualified Subchapter S Subsidiary" (a "QSub"). A QSub is classified as a disregarded entity for income tax purposes and all of its income is reported on the tax return of its sole shareholder. As a result, a QSub is not liable to pay tax on such income. A

corporation can only qualify as a QSub if its ultimate parent is an S Corp. As of the Petition Date, Majestic II maintained its status as a QSub.

After the Petition Date, but at some point prior to March 16, 2010, BDI filed a notice of revocation of its S Corp. status with the Internal Revenue Service (the "<u>Revocation</u>"). The effective date of the Revocation was January 1, 2010. By operation of law, Majestic II's status as a QSub was automatically terminated as of December 31, 2009 and Majestic II became a C Corp. effective January 1, 2010.

As a result of the Revocation, Majestic II is now required to pay income tax under chapter 1 of the Internal Revenue Code and applicable state tax laws, including Indiana state tax laws, on account of MSC II's taxable income. To obviate the need for Majestic II to pay certain taxes that it was not required to pay prior to the Petition Date, has never historically been legally required to pay, and to maximize value for the Debtors' estates, the Debtors, with the support of their key stakeholders, filed a motion seeking authority to convert MSC II from a corporation to an limited liability company (the "<u>LLC Conversion Motion</u>"). On December 16, 2010, the Bankruptcy Court entered an order authorizing the Debtors to convert Majestic II from a corporation to a limited liability company.

Shortly prior to the hearing to consider the LLC Conversion Motion, the Debtors received information indicating that the conversion of Majestic II from a corporation to a limited liability company could result in a significant tax liability to Majestic II. Accordingly, the Debtors, in consultation with their creditors, determined not to effectuate the conversion prior to December 31, 2010.

On December 31, 2010, the Debtors commenced an adversary proceeding in the Bankruptcy Court against BDI, Don H. Barden, the United States of America on behalf of the Internal Revenue Service, and the Indiana Department of Revenue to restore the QSub status of Majestic II, to recover tax payments Majestic II was forced to make as a result of the unauthorized and improper disposition of estate property, to avoid any tax-related liabilities Majestic II would not owe but for the revocation of Majestic II's QSub status, and to recover the monetary damages suffered by Majestic II. A pretrial conference has been scheduled for February 17, 2011.

**Plan Overview**

On January 6, 2011, the Debtors filed their Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code. The Plan contemplates that the Debtors will retain and operate their gaming properties in the ordinary course of business after emerging from chapter 11. The most significant components of the Plan are as follows:

- The Debtors will retain and reorganize around their casino gaming properties in Gary, Indiana, Tunica County, Mississippi, and Black Hawk, Colorado, subject, in the case of the Black Hawk, Colorado gaming property, to obtaining all governmental licenses, suitability determinations, and other approvals required for such property on or prior to 240 days following the Confirmation Date (as further described in Article XII of the Plan);

- Each Holder of an Allowed Senior Secured Credit Facility Claim will receive its Pro Rata share of either (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing;

- Each Holder of an Allowed Senior Secured Notes Indenture Claim will receive its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing;

- Each Holder of an Allowed Senior Notes Indenture Claim will receive its Pro Rata share of 42 percent of the New Membership Interests; and

- Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim will receive the lesser of (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim or (ii) its pro rata share of $1,000,000.

### Treatment of Claims Against and Equity Interests in the Debtors

**Administrative and Priority Claims**

Administrative Expense Claims

Except with respect to Administrative Expense Claims that are Professional Compensation and Reimbursement Claims and except to the extent that a Holder of an allowed Administrative Expense Claim and the applicable Debtors agree to less favorable distribution to such Holder, each Holder of an allowed Administrative Expense Claim shall be paid in full in cash on the later of the distribution date under the Plan, the date such Administrative Expense Claim is allowed, and the date such allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

Professional Compensation and Reimbursement Claims

Except as provided in Article II.A of the Plan, all Entities seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (1) File, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay reasonable compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), one of the following treatments on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; (2) such other treatment as may be agreed to by such Holder and the applicable Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), or otherwise determined upon an order of the Bankruptcy Court; or (3) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**Classification and Treatment of Classified Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Pursuant to the terms of the Plan, except for Claims that are (a) expressly exempted from the discharge provisions of the Bankruptcy Code, or (b) specifically identified as being reinstated, all Claims that arose prior to the Confirmation of the Plan will be discharged.

To the extent a Class contains allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.

A.    Majestic Holdco

**1.     Class A-1:  Senior Secured Credit Facility Guarantee Claims against Majestic Holdco**

(a)    Classification.  Class A-1 consists of all Senior Secured Credit Facility Guarantee Claims against Majestic Holdco.

(b)    Impairment and Voting.  Class A-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed Senior Secured Credit Facility Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, (i) in the event no First Lien Alternative Financing is consummated, guarantees substantially similar to the terms of the Senior Secured Credit Facility Guarantee or (ii) in the event the First Lien Alternative Financing is consummated, its Pro Rata share of Cash from the proceeds of the First Lien Alternative Financing.

(d)    Estimated Allowed Amount of Claims:  $63,514,042

(e)    Projected Percentage of Recovery:  100%

**2.     Class A-2:  Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco**

(a)    Classification.  Class A-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic Holdco.

(b)    Impairment and Voting.  Class A-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic Holdco shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)    Estimated Allowed Amount of Claims:  $348,384,885

(e)    Projected Percentage of Recovery:  52%

**3.     Class A-3:  Discount Notes Indenture Claims against Majestic Holdco**

(a)    Classification.  Class A-3 consists of all Discount Notes Indenture Claims against Majestic Holdco.

(b)    Impairment and Voting.  Class A-3 is Impaired by the Plan.  Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no distribution under the Plan on account of such Claims.

(d)     Estimated Allowed Amount of Claims:  $72,631,322

(e)     Projected Percentage of Recovery:  0%

**4.     Class A-4:  Interests in Majestic Holdco**

(a)     Classification.  Class A-4 consists of all Interests in Majestic Holdco.

(b)     Impairment and Voting.  Class A-4 is Impaired by the Plan.  Each Holder of an Interest in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Interests in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Interests:  $0

(e)     Projected Percentage of Recovery:  0%

**5.     Class A-5:  Section 510(b) Claims in Majestic Holdco**

(a)     Classification.  Class A-5 consists of all Section 510(b) Claims that may exist against Majestic Holdco.

(b)     Impairment and Voting.  Class A-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Section 510(b) Claims in Majestic Holdco shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Interests:  $0

(e)     Projected Percentage of Recovery:  0%

B.     Majestic Star Holdco

**1.     Class B-1:  Discount Notes Indenture Claims against Majestic Star Holdco**

(a)     Classification.  Class B-1 consists of all Discount Notes Indenture Claims against Majestic Star Holdco.

(b)     Impairment and Voting.  Class B-1 is Impaired by the Plan.  Each Holder of an Allowed Discount Notes Indenture Claim against Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Discount Notes Indenture Claims against Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Star Holdco shall receive no distribution under the Plan on account of such Claims.

(d)     Estimated Allowed Amount of Claims:  $72,631,322

(e)     Projected Percentage of Recovery:  0%

**2.      Class B-2:  Intercompany Interests in Majestic Star Holdco**

(a)     Classification.  Class B-2 consists of all Intercompany Interests in Majestic Star Holdco.

(b)     Impairment and Voting.  Class B-2 is Impaired by the Plan.  Each Holder of an Interest in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Intercompany Interests in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Interests:  $0

(e)     Projected Percentage of Recovery:  0%

**3.      Class B-3:  Section 510(b) Claims in Majestic Star Holdco**

(a)     Classification.   Class B-3 consists of all Section 510(b) Claims that may exist against Majestic Star Holdco.

(b)     Impairment and Voting.  Class B-3 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic Star Holdco is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Section 510(b) Claims in Majestic Star Holdco shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)     Estimated Allowed Amount of Interests:  $0

(e)     Projected Percentage of Recovery:  0%

C.     Majestic I

**1.      Class C-1:  Senior Secured Credit Facility Claims against Majestic I**

(a)     Classification.   Class C-1 consists of all Senior Secured Credit Facility Claims against Majestic I.

(b)     Impairment and Voting.  Class C-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d)     Estimated Allowed Amount of Claims:  $63,514,042

(e)     Projected Percentage of Recovery:  100%

2. **Class C-2: Senior Secured Notes Indenture Claims against Majestic I**

(a) <u>Classification</u>. Class C-2 consists of all Senior Secured Notes Indenture Claims against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-2 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Secured Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d) <u>Estimated Allowed Amount of Claims</u>: $348,384,885

(e) <u>Projected Percentage of Recovery</u>: 52%

3. **Class C-3: Priority Non-Tax Claims against Majestic I**

(a) <u>Classification</u>. Class C-3 consists of all Priority Non-Tax Claims that may exist against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-3 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Priority Non-Tax Claim against Majestic I shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d) <u>Estimated Allowed Amount of Claims</u>: $0

(e) <u>Projected Percentage of Recovery</u>: 100%

4. **Class C-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I**

(a) <u>Classification</u>. Class C-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I.

(b) <u>Impairment and Voting</u>. Class C-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) against Majestic I, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured

Notes Indenture Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

      (d)    <u>Estimated Allowed Amount of Claims</u>: $2,850,000

      (e)    <u>Projected Percentage of Recovery</u>: 100%

**5.    Class C-5: Senior Notes Indenture Claims against Majestic I**

      (a)    <u>Classification</u>. Class C-5 consists of all Senior Notes Indenture Claims against Majestic I.

      (b)    <u>Impairment and Voting</u>. Class C-5 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Claim against Majestic I is entitled to vote to accept or reject the Plan.

      (c)    <u>Distributions</u>. Each Holder of an Allowed Senior Notes Indenture Claim against Majestic I shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

      (d)    <u>Estimated Allowed Amount of Claims</u>: $233,149,526

      (e)    <u>Projected Percentage of Recovery</u>: 25%

**6.    Class C-6: General Unsecured Claims and Rejection Damages Claims against Majestic I**

      (a)    <u>Classification</u>. Class C-6 consists of all General Unsecured Claims and Rejection Damages Claims against Majestic I. As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

      (b)    <u>Impairment and Voting</u>. Class C-6 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I is entitled to vote to accept or reject the Plan.

      (c)    <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic I or (ii) Cash in an amount equal to its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

      (d)    <u>Estimated Allowed Amount of Claims</u>: $1,212,309

      (e)    <u>Projected Percentage of Recovery</u>: 25%

**7.      Class C-7:  Intercompany Claims against Majestic I**

(a)      <u>Classification</u>.  Class C-7 consists of all Intercompany Claims that may exist against Majestic I.

(b)      <u>Impairment and Voting</u>.  Class C-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic I is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Allowed Intercompany Claims against Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)      <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic I will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably).

(d)      <u>Estimated Allowed Amount of Claims</u>:  $4,111,192

(e)      <u>Projected Percentage of Recovery</u>:  up to 100%

**8.      Class C-8:  Intercompany Interests in Majestic I**

(a)      <u>Classification</u>.  Class C-8 consists of all Intercompany Interests in Majestic I.

(b)      <u>Impairment and Voting</u>.  Class C-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Majestic I is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Majestic I that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)      <u>Distributions</u>.  Intercompany Interests in Majestic I, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic I, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d)      <u>Estimated Allowed Amount of Interests</u>:  $91,211,476

(e)      <u>Projected Percentage of Recovery</u>:  up to 100%

**9.      Class C-9:  Section 510(b) Claims in Majestic I**

(a)      <u>Classification</u>.  Class C-9 consists of all Section 510(b) Claims that may exist against Majestic I.

(b)      <u>Impairment and Voting</u>.  Class C-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Majestic I is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      <u>Distributions</u>.  Section 510(b) Claims in Majestic I shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)      <u>Estimated Allowed Amount of Interests</u>:  $0

(e)      <u>Projected Percentage of Recovery</u>:  0%

D.     Majestic II

   1.     **Class D-1: Senior Secured Credit Facility Claims against Majestic II**

       (a)     <u>Classification</u>.  Class D-1 consists of all Senior Secured Credit Facility Claims against Majestic II.

       (b)     <u>Impairment and Voting</u>.  Class D-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II is entitled to vote to accept or reject the Plan.

       (c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

       (d)     <u>Estimated Allowed Amount of Claims</u>:  $63,514,042

       (e)     <u>Projected Percentage of Recovery</u>: 100%

   2.     **Class D-2: Senior Secured Notes Indenture Guarantee Claims against Majestic II**

       (a)     <u>Classification</u>.  Class D-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Majestic II.

       (b)     <u>Impairment and Voting</u>.  Class D-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

       (c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

       (d)     <u>Estimated Allowed Amount of Claims</u>:  $348,384,885

       (e)     <u>Projected Percentage of Recovery</u>: 52%

   3.     **Class D-3: Priority Non-Tax Claims against Majestic II**

       (a)     <u>Classification</u>.  Class D-3 consists of all Priority Non-Tax Claims that may exist against Majestic II.

       (b)     <u>Impairment and Voting</u>.  Class D-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

       (c)     <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against Majestic II shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

       (d)     <u>Estimated Allowed Amount of Claims</u>:  $0

       (e)     <u>Projected Percentage of Recovery</u>: 100%

**4. Class D-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II**

(a) <u>Classification</u>. Class D-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II.

(b) <u>Impairment and Voting</u>. Class D-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Majestic II, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d) <u>Estimated Allowed Amount of Claims</u>: $0

(e) <u>Projected Percentage of Recovery</u>: 100%

**5. Class D-5: Senior Notes Indenture Guarantee Claims against Majestic II**

(a) <u>Classification</u>. Class D-5 consists of all Senior Notes Indenture Guarantee Claims against Majestic II.

(b) <u>Impairment and Voting</u>. Class D-5 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Majestic II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d) <u>Estimated Allowed Amount of Claims</u>: $233,149,526

(e) <u>Projected Percentage of Recovery</u>: 25%

**6. Class D-6: General Unsecured Claims and Rejection Damages Claims against Majestic II**

(a) <u>Classification</u>. Class D-6 consists of all General Unsecured Claims and Rejection Damages Claims against Majestic II. As part of the global settlement embodied in the Plan, Holders of Senior Secured

Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; provided, however, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)     Impairment and Voting.  Class D-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic II or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

(d)     Estimated Allowed Amount of Claims:  $197,893

(e)     Projected Percentage of Recovery:  25%

### 7.     Class D-7:  Intercompany Claims against Majestic II

(a)     Classification.  Class D-7 consists of all Intercompany Claims that may exist against Majestic II.

(b)     Impairment and Voting.  Class D-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Majestic II is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Allowed Intercompany Claims against Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     Distributions.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Majestic II will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consent of the Senior Secured Notes Trustee (which consent shall not be withheld unreasonably).

(d)     Estimated Allowed Amount of Claims:  $118,290,830

(e)     Projected Percentage of Recovery:  up to 100%

### 8.     Class D-8:  Intercompany Interests in Majestic II

(a)     Classification.  Class D-8 consists of all Intercompany Interests in Majestic II.

(b)     Impairment and Voting.  Class D-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Majestic II is entitled to vote to accept or reject the Plan on a provisional basis.  Holders of Intercompany Interests in Majestic II that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     Distributions.  Intercompany Interests in Majestic II, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Majestic II, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy

certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

        (d)    <u>Estimated Allowed Amount of Interests</u>: $0

        (e)    <u>Projected Percentage of Recovery</u>: up to 100%

**9.    Class D-9: Section 510(b) Claims in Majestic II**

        (a)    <u>Classification</u>. Class D-9 consists of all Section 510(b) Claims that may exist against Majestic II.

        (b)    <u>Impairment and Voting</u>. Class D-9 is Impaired by the Plan. Each Holder of a Section 510(b) Claim in Majestic II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

        (c)    <u>Distributions</u>. Section 510(b) Claims in Majestic II shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

        (d)    <u>Estimated Allowed Amount of Interests</u>: $0

        (e)    <u>Projected Percentage of Recovery</u>: 0%

E.    <u>MSCC</u>

**1.    Class E-1: Senior Secured Notes Indenture Claims against MSCC**

        (a)    <u>Classification</u>. Class E-1 consists of all Senior Secured Notes Indenture Claims against MSCC.

        (b)    <u>Impairment and Voting</u>. Class E-1 is Impaired by the Plan. Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC is entitled to vote to accept or reject the Plan.

        (c)    <u>Distributions</u>. Each Holder of an Allowed Senior Secured Notes Indenture Claim against MSCC shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

        (d)    <u>Estimated Allowed Amount of Claims</u>: $348,384,885

        (e)    <u>Projected Percentage of Recovery</u>: 52%

**2.    Class E-2: Intercompany Interests in MSCC**

        (a)    <u>Classification</u>. Class E-2 consists of all Intercompany Interests in MSCC.

        (b)    <u>Impairment and Voting</u>. Class E-2 is Impaired by the Plan. Each Holder of an Interest in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

        (c)    <u>Distributions</u>. Intercompany Interests in MSCC shall be cancelled, released, and extinguished and the Holders of such Intercompany Interests shall receive no distribution under the Plan on account thereof.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $0

(e)     <u>Projected Percentage of Recovery</u>:  0%

**3.      Class E-3:  Section 510(b) Claims in MSCC**

(a)     <u>Classification</u>.  Class E-3 consists of all Section 510(b) Claims that may exist against MSCC.

(b)     <u>Impairment and Voting</u>.  Class E-3 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in MSCC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     <u>Distributions</u>.  Section 510(b) Claims in MSCC shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $0

(e)     <u>Projected Percentage of Recovery</u>:  0%

F.     <u>MSCC II</u>

**1.      Class F-1:  Senior Secured Notes Indenture Guarantee Claims against MSCC II**

(a)     <u>Classification</u>.  Class F-1 consists of all Senior Secured Notes Indenture Guarantee Claims against MSCC II.

(b)     <u>Impairment and Voting</u>.  Class F-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $348,384,885

(e)     <u>Projected Percentage of Recovery</u>:  52%

**2.      Class F-2:  Senior Notes Indenture Claims against MSCC II**

(a)     <u>Classification</u>.  Class F-2 consists of all Senior Notes Indenture Claims against MSCC II.

(b)     <u>Impairment and Voting</u>.  Class F-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Claim against MSCC II shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $233,149,526

(e)     <u>Projected Percentage of Recovery</u>:  25%

3.      **Class F-3:  Intercompany Interests in MSCC II**

(a)      <u>Classification</u>.  Class F-3 consists of all Intercompany Interests in MSCC II.

(b)      <u>Impairment and Voting</u>.  Class F-3 is Impaired by the Plan.  Each Holder of an Interest in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      <u>Distributions</u>.  Intercompany Interests in MSCC II shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $0

(e)      <u>Projected Percentage of Recovery</u>:  0%

4.      **Class F-4:  Section 510(b) Claims in MSCC II**

(a)      <u>Classification</u>.  Class F-4 consists of all Section 510(b) Claims that may exist against MSCC II.

(b)      <u>Impairment and Voting</u>.  Class F-4 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in MSCC II is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      <u>Distributions</u>.  Section 510(b) Claims in MSCC II shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $0

(e)      <u>Projected Percentage of Recovery</u>:  0%

G.      <u>Barden Mississippi</u>

1.      **Class G-1: Senior Secured Credit Facility Claims against Barden Mississippi**

(a)      <u>Classification</u>.  Class G-1 consists of all Senior Secured Credit Facility Claims against Barden Mississippi.

(b)      <u>Impairment and Voting</u>.  Class G-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $63,514,042

(e)      <u>Projected Percentage of Recovery</u>:  100%

2.      **Class G-2:  Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi**

(a)      <u>Classification</u>.  Class G-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Mississippi.

(b)  Impairment and Voting.  Class G-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

(c)  Distributions.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)  Estimated Allowed Amount of Claims:  $348,384,885

(e)  Projected Percentage of Recovery:  52%

### 3.  Class G-3:  Priority Non-Tax Claims against Barden Mississippi

(a)  Classification.  Class G-3 consists of all Priority Non-Tax Claims that may exist against Barden Mississippi.

(b)  Impairment and Voting.  Class G-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)  Distributions.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Mississippi shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)  Estimated Allowed Amount of Claims:  $0

(e)  Projected Percentage of Recovery:  100%

### 4.  Class G-4:  Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi

(a)  Classification.  Class G-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi.

(b)  Impairment and Voting.  Class G-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)  Distributions.  Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Mississippi, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

  (d) <u>Estimated Allowed Amount of Claims</u>: $0

  (e) <u>Projected Percentage of Recovery</u>: 100%

**5. Class G-5: Senior Notes Indenture Guarantee Claims against Barden Mississippi**

  (a) <u>Classification</u>.  Class G-5 consists of all Senior Notes Indenture Guarantee Claims that may exist against Barden Mississippi.

  (b) <u>Impairment and Voting</u>.  Class G-5 is Impaired by the Plan.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

  (c) <u>Distributions</u>.  Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Mississippi shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

  (d) <u>Estimated Allowed Amount of Claims</u>: $ 233,149,526

  (e) <u>Projected Percentage of Recovery</u>: 25%

**6. Class G-6:   General Unsecured Claims and Rejection Damages Claims against Barden Mississippi**

  (a) <u>Classification</u>.  Class G-6 consists of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Mississippi.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

  (b) <u>Impairment and Voting</u>.  Class G-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi is entitled to vote to accept or reject the Plan.

  (c) <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Mississippi or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

  (d) <u>Estimated Allowed Amount of Claims</u>: $605,779

  (e) <u>Projected Percentage of Recovery</u>: 25%

7.     **Class G-7:  Intercompany Claims against Barden Mississippi**

(a)     <u>Classification</u>.  Class G-7 consists of all Intercompany Claims that may exist against Barden Mississippi.

(b)     <u>Impairment and Voting</u>.  Class G-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     <u>Distributions</u>. Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Mississippi will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

(d)     <u>Estimated Allowed Amount of Claims</u>:  $0

(e)     <u>Projected Percentage of Recovery</u>:  up to 100%

8.     **Class G-8:  Intercompany Interests in Barden Mississippi**

(a)     <u>Classification</u>.  Class G-8 consists of all Intercompany Interests in Barden Mississippi.

(b)     <u>Impairment and Voting</u>.  Class G-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Barden Mississippi is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Barden Mississippi that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)     <u>Distributions</u>.  Intercompany Interests in Barden Mississippi, at the election of the Debtors or the Reorganized Debtors, with the consent of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Mississippi, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d)     <u>Estimated Allowed Amount of Interests</u>:  $0

(e)     <u>Projected Percentage of Recovery</u>:  up to 100%

9.     **Class G-9:  Section 510(b) Claims in Barden Mississippi**

(a)     <u>Classification</u>.  Class G-9 consists of all Section 510(b) Claims that may exist against Barden Mississippi.

(b)     <u>Impairment and Voting</u>.  Class G-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Barden Mississippi is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     <u>Distributions</u>.  Section 510(b) Claims in Barden Mississippi shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)     <u>Estimated Allowed Amount of Interests</u>:  $0

(e)     <u>Projected Percentage of Recovery</u>:  0%

H.     <u>Barden Colorado</u>

**1.**     **Class H-1: Senior Secured Credit Facility Claims against Barden Colorado**

(a)     <u>Classification</u>.  Class H-1 consists of all Senior Secured Credit Facility Claims against Barden Colorado.

(b)     <u>Impairment and Voting</u>.  Class H-1 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Credit Facility Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $63,514,042

(e)     <u>Projected Percentage of Recovery</u>:  100%

**2.**     **Class H-2:  Senior Secured Notes Indenture Guarantee Claims against Barden Colorado**

(a)     <u>Classification</u>.  Class H-2 consists of all Senior Secured Notes Indenture Guarantee Claims against Barden Colorado.

(b)     <u>Impairment and Voting</u>.  Class H-2 is Impaired by the Plan.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each Holder of an Allowed Senior Secured Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $348,384,885

(e)     <u>Projected Percentage of Recovery</u>:  52%

**3.**     **Class H-3:  Priority Non-Tax Claims against Barden Colorado**

(a)     <u>Classification</u>.  Class H-3 consists of all Priority Non-Tax Claims that may exist against Barden Colorado.

(b)     <u>Impairment and Voting</u>.  Class H-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against Barden Colorado shall be reinstated or paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)     <u>Estimated Allowed Amount of Claims</u>:  $0

(e) <u>Projected Percentage of Recovery</u>: 100%

**4. Class H-4: Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado**

(a) <u>Classification</u>. Class H-4 consists of all Secured Claims (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado.

(b) <u>Impairment and Voting</u>. Class H-4 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) against Barden Colorado, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably), shall be (i) reinstated, (ii) satisfied by the Debtors' surrender of the Collateral securing such Allowed Claim, or (iii) otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

To the extent the value of the Collateral securing any Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) is less than the amount of the Claim such Collateral secures, the resulting deficiency claim shall be treated as a General Unsecured Claim under the Plan. The Holder of a Secured Claim (other than Senior Secured Credit Facility Claims and Senior Secured Notes Indenture Guarantee Claims) may move the Bankruptcy Court to estimate the amount of such General Unsecured Claim for provisional voting purposes, which vote will only be counted if the Debtors have not agreed to reinstate or otherwise render Unimpaired the Secured Claim.

(d) <u>Estimated Allowed Amount of Claims</u>: $54,793

(e) <u>Projected Percentage of Recovery</u>: 100%

**5. Class H-5: Senior Notes Indenture Guarantee Claims against Barden Colorado**

(a) <u>Classification</u>. Class H-5 consists of all Senior Notes Indenture Guarantee Claims that may exist against Barden Colorado.

(b) <u>Impairment and Voting</u>. Class H-5 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Each Holder of an Allowed Senior Notes Indenture Guarantee Claim against Barden Colorado shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of 42 percent of the New Membership Interests.

(d) <u>Estimated Allowed Amount of Claims</u>: $233,149,526

(e) <u>Projected Percentage of Recovery</u>: 25%

6.      **Class H-6:  General Unsecured Claims and Rejection Damages Claims against Barden Colorado**

(a)      <u>Classification</u>.  Class H-6 consists of all General Unsecured Claims and Rejection Damages Claims that may exist against Barden Colorado.  As part of the global settlement embodied in the Plan, Holders of Senior Secured Notes Indenture Claims, Senior Secured Notes Indenture Guarantee Claims, Senior Notes Indenture Claims, and Senior Notes Indenture Guarantee Claims shall not participate in distributions made to this Class on account of their Unsecured Claims; <u>provided</u>, <u>however</u>, nothing in the Plan, Disclosure Statement, or otherwise shall in any way prejudice the rights of the Debtors, the Senior Secured Notes Trustee, or the Creditors' Committee to classify such Unsecured Claims together with the other Claims in this Class or any other Class of Unsecured Claims in any amended version of this Plan or any other plan of reorganization.

(b)      <u>Impairment and Voting</u>.  Class H-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado and the Debtors agree to less favorable distribution to such Holder, each Holder of an Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Barden Colorado or (ii) its Pro Rata share of the Aggregate General Unsecured Claim Recovery.

(d)      <u>Estimated Allowed Amount of Claims</u>:  $113,737

(e)      <u>Projected Percentage of Recovery</u>:  25%

7.      **Class H-7:  Intercompany Claims against Barden Colorado**

(a)      <u>Classification</u>.  Class H-7 consists of all Intercompany Claims that may exist against Barden Colorado.

(b)      <u>Impairment and Voting</u>.  Class H-7 is Impaired by the Plan.  Each Holder of an Allowed Intercompany Claim against Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Allowed Intercompany Claims against Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)      <u>Distributions</u>.  Except as otherwise provided in the Plan, all Allowed Intercompany Claims against Barden Colorado will be paid, adjusted, reinstated, or discharged to the extent reasonably determined to be appropriate by the Debtors with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably).

(d)      <u>Estimated Allowed Amount of Claims</u>:  $11,542,962

(e)      <u>Projected Percentage of Recovery</u>:  up to 100%

8.      **Class H-8:  Intercompany Interests in Barden Colorado**

(a)      <u>Classification</u>.  Class H-8 consists of all Intercompany Interests in Barden Colorado.

(b)      <u>Impairment and Voting</u>.  Class H-8 is Impaired by the Plan.  Each Holder of an Intercompany Interest in Barden Colorado is entitled to vote to accept or reject the Plan on a provisional basis. Holders of Intercompany Interests in Barden Colorado that are reinstated shall be Unimpaired by the Plan and their votes shall be disregarded.

(c)    <u>Distributions</u>.  Intercompany Interests in Barden Colorado, at the election of the Debtors or the Reorganized Debtors, with the consents of the Senior Secured Notes Trustee and the Creditors' Committee (which consents shall not be withheld unreasonably) shall be (i) reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to Holders of Claims against Barden Colorado, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors, or (ii) cancelled and reissued to a Reorganized Debtor.

(d)    <u>Estimated Allowed Amount of Interests</u>:  $0

(e)    <u>Projected Percentage of Recovery</u>:  up to 100%

**9.**    **Class H-9:  Section 510(b) Claims in Barden Colorado**

(a)    <u>Classification</u>.  Class H-9 consists of all Section 510(b) Claims that may exist against Barden Colorado.

(b)    <u>Impairment and Voting</u>.  Class H-9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim in Barden Colorado is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Section 510(b) Claims in Barden Colorado shall be cancelled, released, and extinguished and the Holders of such Section 510(b) Claims shall receive no distribution under the Plan on account thereof.

(d)    <u>Estimated Allowed Amount of Interests</u>:  $0

(e)    <u>Projected Percentage of Recovery</u>:  0%

**Settlements Contemplated Pursuant to the Plan**

<u>Overview</u>

As discussed in this Disclosure Statement, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders.  In light of the complexity and contentiousness of the issues presented by the Chapter 11 Cases, the Debtors engaged with the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, representatives of Holders of the Senior Secured Notes, and the Creditors' Committee in negotiations to reach an agreement resolving certain threshold issues discussed below, among others.  These negotiations included many meetings, the exchange of multiple term sheets or related settlement proposals, and regular correspondence and conference calls among the parties and their advisors.  The Debtors were able to reach a global settlement on a range of issues with the Senior Secured Notes Trustee and Senior Secured Noteholders holding a substantial majority of the outstanding Senior Secured Notes as well as the Creditors' Committee (the "<u>Settling Parties</u>").  The Debtors, their estates, and the Settling Parties reached an agreement on key threshold items, including the Reorganized Debtors' capital structure at emergence as reflected in the Plan, and compromised numerous other contested issues.  The settlements agreed to among the Debtors, their estates, and the Settling Parties include the Gaming License Settlement, the Cash Collateral Settlement, and the Standing Motion Settlement (all as defined below).

The Debtors believe the Plan is in the best interests of all of the Debtors' creditors and provides the Debtors the best opportunity to restructure their debt obligations in a manner that maximizes their ability to compete effectively post-emergence.  Absent the support of the Settling Parties for the Plan and the expeditious implementation of the compromises set forth therein, the Debtors believe they would face a longer, costlier, and more uncertain chapter 11 process mired with contentious litigation, which could materially delay the Debtors' emergence from chapter 11 and ultimately reduce distributions to creditors.  Accordingly, in the exercise of their business judgment, the Debtors determined the benefits of a compromised resolution of all disputed issues as part of a global settlement, including timely emergence from chapter 11, outweighed the costs of expensive and time-consuming litigation.  Further detail regarding the global settlement embodied in the Plan is provided below.

Although this Disclosure Statement addresses the key disputes being compromised as part of the global settlement individually for purposes of providing analysis and detail, it is important to note the Plan represents a global settlement of all disputed issues, each of which is a necessary component of the overall global settlement. Failure by the Court to approve any of the settlements described herein, the treatment of any Class set forth in the Plan, or any other material term of the Plan may result in the Plan not being confirmable.

<u>Governing Law</u>

The Plan constitutes a good faith compromise and settlement of all Claims and controversies resolved therein pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases, and other benefits provided under the Plan.

Compromises and settlements are "a normal part of the process of reorganization."[10]  The Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"[11]  Bankruptcy Rule 9019(a) provides in pertinent part that on "motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."[12]  The Debtors' right to settle Claims in the Plan pursuant to Bankruptcy Rule 9019 extends to causes of action brought by other constituents on behalf of the Debtors' estates.[13]

Under Bankruptcy Rule 9019, a bankruptcy court may approve a compromise or settlement if it is in the best interests of the debtor's estate.[14]  When determining whether a compromise is in the best interests of the estate, courts in the Third Circuit must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."[15]  To strike the proper balance, the Third Circuit has adopted a balancing test, under which a bankruptcy court should consider four factors to determine whether to approve a particular compromise or settlement:  (i) the probability of success in litigation;  (ii) the likely difficulties in collection;  (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors.[16]  Ultimately, a proposed settlement need not be the best result that the debtor could have achieved, but only must fall within the "reasonable range of litigation possibilities."[17]

For the reasons discussed herein and based on an analysis by the Debtors and their advisors of the arguments asserted to date by the secured creditors and the Creditors' Committee, the Debtors believe the global settlement embodied in the Plan is in the best interests of the Debtors' estates and is well within the range of reasonableness for

---

[10]  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

[11]  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).

[12]  Fed. R. Bankr. P. 9019(a).

[13]  *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del 2003) (concluding that the Bankruptcy Code "authorizes the Debtor to propose a settlement of the Creditors Committee's Adversary Proceeding in its plan"); *Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 371 B.R. 660, 669–671 (S.D.N.Y. 2007) ("A debtor-in-possession may assert control over an adversary proceeding notwithstanding a committee's derivative standing, where that standing was granted for reasons other than debtor misconduct.").

[14]  *See TMT Trailer Ferry*, 390 U.S. at 424; *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del 2005) ("Under Rule 9019(a), the bankruptcy court has a duty to make an informed, independent, judgment that the compromise is fair and equitable."); *In re Northwestern Corp.*, No. 03-12872 (KJC), 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("In exercising [its] discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[15]  *Martin*, 91 F.3d at 393; *see also Key3Media Group, Inc.*, 336 B.R. at 93.

[16]  *Martin*, 91 F.3d at 393; *see also Nutraquest, Inc.*, 434 F.3d at 645.

[17]  *In re Energy Corp.*, 886 F.2d 921, 929 (7th Cir. 1989); *In re Sea Containers Ltd.*, No. 06-11156 (KJC), 2008 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008).

settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. Because of the large number of disputed issues being compromised pursuant to the Plan and the wide range of potential outcomes of each such issue if litigated to conclusion, it is practically impossible for the Debtors to describe in detail all of the possible settlement and litigation scenarios. Pursuant to the global compromise embodied by the Plan, the Debtors are providing recoveries for unsecured Claims of approximately 25%. The foregoing estimate assumes no further diminution in the value of the Debtors' estates as a result of the extensive litigation that would be required to fully adjudicate the disputes and the attendant delay in the Debtors' emergence from bankruptcy; however, the Debtors believe that such diminution in value would be material and increase over time. The Debtors believe the recoveries on unsecured Claims provided by the Plan are in the best interests of all of the Debtors' estates and creditors and are well within the range of reasonableness required under Bankruptcy Rule 9019 and section 112 of the Bankruptcy Code.

<u>Settlement of Claims Relating to Liens on Gaming License Proceeds</u>

As described below, the Debtors, their estates, and the Settling Parties have agreed, as part of the good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code embodied in the Plan, to settle all disputes over the value of the Debtors' Gaming Licenses and the security interests of the Senior Secured Notes Trustee in the proceeds of such Gaming Licenses (the "<u>Gaming License Settlement</u>").

The Security Agreement between the Debtors and the Senior Secured Credit Facility Agent, dated as of October 7, 2003, and the Pledge and Security Agreement between the Debtors and the Senior Secured Notes Trustee, dated as of October 7, 2003 (each, a "<u>Security Agreement</u>," and collectively, the "<u>Security Agreements</u>"), provide that the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee have liens over substantially all the Debtors' assets, including deposit accounts, general intangibles, investment property, and all proceeds of the foregoing. *See* Senior Secured Credit Facility Agent's Security Agreement § 1.1; Trustee's Security Agreement § 2.1. The Security Agreements make clear that Collateral does not include Excluded Assets. *See id.* Excluded Assets include, inter alia, "all Gaming Licenses." Senior Secured Credit Facility Agent's Security Agreement § 1.1; Senior Secured Notes Indenture § 1.1. The definition of Excluded Assets, however, provides that proceeds of the Excluded Assets (including the Gaming Licenses), are expressly included as Collateral. *See* Senior Secured Credit Facility Agent's Security Agreement § 1.1 ("Excluded Assets shall not include (and, accordingly, Collateral shall include) any and all proceeds of any of such assets…."); Senior Secured Notes Indenture § 1.1 ("Excluded Assets does not include the proceeds of [Gaming Licenses]….").

Article 9 of the Uniform Commercial Code (the "<u>UCC</u>"), as adopted in Colorado, Indiana, Mississippi and Delaware (all of the potentially governing jurisdictions), defines "proceeds" as, inter alia, "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected upon, or distributed on account of, collateral; [and] (C) rights arising out of collateral. . . ." UCC. § 9-102(a)(64). The secured creditors contend that they are entitled to the economic value of the Gaming Licenses under a plan of reorganization because of their perfected liens on the proceeds of the Gaming Licenses. This argument is based on a body of case law that has held that while a licensee may be prohibited from granting a lien on a license itself, the licensee may nonetheless grant a lien over the proceeds of such license.[18]

The Creditors' Committee argued that the aforementioned cases are not applicable to the facts of this case because they concern and thus are confined to FCC licenses rather than gaming licenses. In addition, the Creditors' Committee argued that the secured creditors' liens on the proceeds of the Gaming Licenses did not attach as of the Petition Date, and as a result, such liens were terminated by operation of section 552 of the Bankruptcy Code. Section 552(a) of the Bankruptcy Code provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Section 552(b)(1), however, provides an exception to section 552(a)'s general rule where "the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property." *Id.* § 552(b)(1). Thus, section 552 provides that a creditor may have a perfected lien over post-petition proceeds of property

---

[18]  *See In re Cheskey*, 9 F.C.C.R. 986 (1994).

only if the creditor had a pre-petition lien over both the property and its proceeds. The Creditors' Committee argued that section 552(b)(1)'s exception does not apply to the proceeds of the Gaming Licenses because the secured creditors did not have Prepetition liens on the Gaming Licenses themselves.[19]

The secured creditors responded to this section 552 argument by pointing to court decisions that have held that license proceeds are "general intangibles" and that liens thereon are perfected immediately upon the filing of a financing statement regardless of when the actual sale or other disposition occurs and regardless of whether there is a lien on the license itself.[20] The Creditors' Committee argued that these decisions are distinguishable in that they relate to FCC licenses.

Even if the Bankruptcy Court were to determine that the secured creditors do not have a perfected security interest in the proceeds of the Gaming Licenses as of the Petition Date, several issues remain as to the value of the Gaming Licenses. The Creditors' Committee argued that because Indiana is a "closed" gaming jurisdiction, i.e., the number of gaming licenses is capped and the number currently issued, rather than an "open" jurisdiction like Mississippi and Colorado, the Indiana Gaming Licenses have substantial value. The Creditors' Committee could point to such facts as the Debtors' original purchase price for the Trump Indiana license to support a high value. On the other hand, the secured creditors argued that the Gaming Licenses have a low value because of, among other things, the low book value of comparable competitors' gaming licenses, the many restrictions on the Gaming Licenses imposed by the IGC, the inability to use the Indiana Gaming Licenses at another site, and the ability of the IGC to suspend, revoke, or not renew the Indiana Gaming Licenses at any time.

Based on the foregoing, the Debtors believe all parties bear material litigation risk regarding the value of the Gaming Licenses and whether the secured creditors are entitled to the value of such licenses under the Plan. The Debtors carefully weighed the relative risks and probabilities of success of the respective arguments set forth above before agreement to the global settlement embodied in the Plan. The Debtors also considered the substantial delay and cost associated with litigating these contested issues to conclusion. For these reasons, the Debtors believe the Gaming License Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

<u>Settlement of Claims Relating to Liens on Deposit Accounts and Cash</u>

The global settlement embodied in the Plan also compromises all claims and controversies between the Debtors, their estates, and the Settling Parties concerning the secured creditors' alleged liens on the Debtors' deposit accounts and cash (the "<u>Cash Collateral Settlement</u>"), as described below.

As noted above, the Security Agreements provide that the secured creditors have liens on all Collateral, which includes, among other things, money, investment related property (including deposit accounts), and proceeds of any Collateral. Pursuant to sections 9-312(b)(1) and 913-4(a) of the UCC, as enacted in Indiana, Mississippi, Colorado and Delaware, the secured creditors also have a perfected lien on all of the Debtors' deposit accounts subject to the secured creditors' "control." Pursuant to section 104 of the UCC, "control" over a deposit account is established if (i) the secured party is the bank with which the deposit account is maintained (the depository bank), (ii) the deposit account is subject to a control agreement among the applicable Debtor, the secured party, and the depository bank, or (iii) the secured party becomes the depository bank's customer with respect to the deposit account.[21]

---

[19]   *See Craner v. Marine Midland Bank, N.A.*, 110 B.R. 111, 118 (Bankr. N.D.N.Y. 1988) ("surviving security interest does not extend to the post-petition proceeds of property in which the creditor had no security interest pre-petition."); *In re Keneco Fin. Group, Inc.*, 131 B.R. 90, 93–94 (Bankr. N.D. Ill. 1991) ("Section 552(b) provides that post-petition proceeds of collateral will be subject to a creditor's security interest only if the creditor has a valid pre-petition security interest in the underlying collateral.").

[20]   *See In re Ridgley*, 139 B.R. at 379; *Urban Communicators*, 394 B.R. at 335 (even though no lien over the license itself, creditor may obtain a security interest in the proceeds of the sale of an FCC license as a "general intangible" that may be perfected prior to sale of the license).

[21]   *See* UCC § 9-104.

The secured creditors, the Creditors' Committee and the Debtors agree that Majestic's account at Harris Bank (d/b/a Mercantile National Bank of Indiana) (the "<u>Blocked Account</u>"), which had a balance of approximately $153,000 as of the Petition Date (the "<u>Encumbered Cash</u>"),[22] is encumbered by the secured creditors' liens by virtue of such account being subject to a deposit account control agreement.[23]

However, the secured creditors also asserted perfected liens over all or at least a substantial portion of the Debtors' other cash and cash equivalents on the basis that such cash constitutes identifiable proceeds of Collateral, including deposit accounts of the Debtors maintained at Wells Fargo Bank, N.A. or its affiliates. Pursuant to section 9-315 of the governing UCC, proceeds of Collateral (other than Goods) are "identifiable" to the extent they are identified "by a method of tracing, including application of equitable principles, that is permitted under law."[24]

The Creditors' Committee argued that all or substantially all of the Debtors' cash as of the Petition Date was unencumbered because, among other things, (i) the secured creditors did not have "control" or de facto "control" over any of the Wells Fargo deposit accounts, and/or (ii) the Debtors' cash (other than the Encumbered Cash) do not constitute "identifiable proceeds" of Collateral because of an inability to trace or otherwise. The Senior Secured Notes Trustee argued that even if the Court were to rule that certain cash is not subject to the secured creditors' liens, the Unsecured Classes are not entitled to the value of such cash under a plan or otherwise to the extent such cash is found to be restricted for regulatory purposes or otherwise.

Regardless of the outcome of the above issues, the secured creditors also contend they have perfected liens on all Postpetition hotel revenue of the Debtors pursuant to section 552(b)(2) of the Bankruptcy Code.[25] Because the Security Agreements provide for a security interest in hotel room revenue, the secured creditors claim their respective security interests extend to such revenue generated Postpetition. The amount of revenue generated by the Debtors' hotels (including complimentary rooms provided to guests at no charge) from the Petition Date through and including August 31, 2010 was approximately $8.4 million. The Creditors' Committee could argue that section 552(b)(2) does not apply to some or all of such Postpetition hotel revenue.

In addition to the foregoing, the secured creditors also have perfected Postpetition adequate protection liens on the Debtors' cash to the extent of any diminution in value of the Collateral during the pendency of the Chapter 11 Cases. The extent of any such diminution in value, if any, would also be the subject of litigation absent the global settlement embodied in the Plan.

Based on the foregoing, there is material litigation risk associated with how much of the Debtors' cash on hand is subject to perfected liens in favor of the secured creditors.[26] The Cash Collateral Settlement takes into account the relative risks and probabilities of success for these claims. The Debtors also considered the substantial delay and cost associated with litigating these contested issues to conclusion. The Debtors believe the Cash Collateral Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

---

[22] The last four digits of this account number are 6943.

[23] *See* Account Control Agreement between the Senior Secured Credit Facility Agent, Majestic and Mercantile National Bank of Indiana, dated October 20, 2003.

[24] UCC § 9-315(b).

[25] Section 552(b)(2) provides that "if the debtor and an entity entered into a security agreement before the commencement of the case [that] extends to . . . amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels . . . then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case . . . ." 11 U.S.C. § 552(b).

[26] Article 9 continues to recognize that a security interest may continue in a deposit account as a "proceeds" security interest and that if there is a perfected lien over the initial collateral, Article 9 expressly authorizes tracing using equitable principles to determine the extent of that security interest as proceeds in a commingled account. UCC § 9-315(b)(2).

<u>Settlement of Claims Relating to the Standing Motion</u>

As described below, the Debtors and the Settling Parties have agreed, as part of the good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code embodied in the Plan, to settle all disputes over the claims raised in the Standing Motion (the "<u>Standing Motion Settlement</u>").[27]

In the Standing Motion, the Creditors' Committee argued the security interests of the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee in the Debtors' Indiana riverboat casinos are unperfected and should be avoided. To support its assertion that the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee did not properly perfect their security interests in the Indiana casinos prior to the Petition Date, the Creditors' Committee argued, among other things, that the Indiana casino boats are fixtures rather than vessels,[28] and the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee did not effect "fixture filings" covering the Majestic Star Casinos as required by the UCC.

In response to the arguments of the Creditors' Committee, the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed objections to the Standing Motion asserting the Majestic Star Casinos are vessels within the meaning of the Commercial Instruments and Maritime Liens Act, and thus, the ship mortgages filed by the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee validly perfected their security interests in the Majestic Star Casinos.[29] In the alternative, the Senior Secured Credit Facility Agent and Senior Secured Notes Trustee argued they properly perfected their security interests in the Majestic Star Casinos as fixtures by filing UCC-1 financing statements covering the Majestic Star Casinos.[30]

After the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee filed their objections to the Standing Motion, the Creditors' Committee filed a supplemental memorandum of law in support of the Standing Motion (the "<u>Supplemental Memorandum of Law</u>"), in which it argued for the first time that the Majestic Star Casinos are real property rather than fixtures.[31] Following the submission of the Supplemental Memorandum of Law, the Senior Secured Credit Facility Agent and the Indenture Trustee filed additional objections to the Standing Motion

---

[27] Pursuant to the Cash Collateral Order, any other potential lien challenges are barred.

[28] *See* 1 U.S.C. § 3 (defining "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"); *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 494 (2005) (explaining "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement"); *RDI/Caesars Riverboat Casino, Inc. v. Conder*, 896 N.E.2d 1172, 1180 (Ind. Ct. App. 2008) (holding a riverboat casino is not a vessel under federal law where the casino's owner intends to continue to use the riverboat as an indefinitely moored stationary casino). The Creditors' Committee contends the Majestic Star Casinos are not "vessels" under federal law because they are currently moored to the shore, and the Debtors intend to continue to use them as stationary casinos.

[29] *See Stewart*, 543 U.S. at 497 ("Under [1 U.S.C.] § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."); *Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1312 (11th Cir. 2008) (concluding courts should focus on whether a boat has been rendered practically incapable of transportation on water rather than the intent of the shipowner regarding the future use of the boat when determining the status of a vessel). The Senior Secured Credit Facility Agent and Senior Secured Notes Trustee argue the Majestic Star Casinos are "vessels" under federal law because the casinos are practically capable of engaging in water transportation and could be unmoored and underway in approximately an hour.

[30] *See* 6 Del. Code § 9-501(a) ("[I]f the local law of this State governs perfection of a security interest . . . the office in which to file a financing statement to perfect the security interest . . . is: (1) the office designated for the filing or recording of a record of a mortgage on the related real property, if . . . the financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures; **or** (2) the office of the Secretary of State, in all other cases, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.") (emphasis added); Ind. Code § 26-4-9.1-501(a) (same).

[31] *See* Ind. Code § 6-1.1-1-15(5)(A) (defining "real property" to include riverboats licensed under Indiana Code section 4-33 for property tax purposes).

arguing that these new claims were barred by the Cash Collateral Order and rejecting the notion that the Majestic Star Casinos are real property in any event.[32]

The Debtors have weighed the merits of the respective arguments of the litigants, as well as the benefits of settling the claims raised in the Standing Motion against the costs of litigating such claims to conclusion. Based on the foregoing, the Debtor and the Settling Parties determined the benefits of the Standing Motion Settlement, including allowing the Debtors to focus their efforts on Confirmation, outweigh proceeding with litigation of the claims raised in the Standing Motion. Accordingly, the Standing Motion Settlement is well within the range of reasonableness for settlements pursuant to bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

## Management of the Company

Biographical information for Mr. Michael Darley, Mr. Jon Bennett, Ms. Cara Brown, Mr. Larry Buck, Mr. Dan Ihm, and Mr. Chuck Miller is set forth below:

**Michael Darley.** Michael Darley became the Executive Vice President and Chief Operating Officer of the Company effective as of September 13, 2008, with responsibility for all aspects of the Company's operating activities. Prior to becoming the Chief Operating Officer of the Company, Mr. Darley served as Senior Vice President and General Manager of Fitzgeralds Casino Hotel in Las Vegas beginning in May 2002. Mr. Darley has 28 years of gaming experience, including executive level operating positions in the Trump and Harrah's organizations.

**Jon Bennett.** Jon Bennett has been the Senior Vice President, Chief Financial Officer, and Treasurer of the Company since October 2002 with overall responsibility for all aspects of the Company's financial management, accounting and reporting processes. Prior to Mr. Bennett's appointment as Senior Vice President, Chief Financial Officer, and Treasurer, Mr. Bennett was Vice President of Finance and Administration for Fitzgeralds Casino Hotel in Tunica from its acquisition in December 2001 to his promotion in October 2002.

**Cara Brown.** Cara Brown has been a Director of the Company since 2006. Ms. Brown joined the Company in December 2001 as its Vice President and General Counsel and served in that capacity until her resignation effective May 31, 2006. After her resignation, Ms. Brown and the Company entered into a consulting agreement with a six-month term commencing June 1, 2006 and ending November 30, 2006. Ms. Brown returned as an employee of the Company on June 1, 2008 and currently serves as Senior Vice President and General Counsel.

**Larry Buck.** Larry Buck is a 26 year veteran of the gaming industry and, in December 2008, was named Senior Vice President and General Manager of Majestic Star Casinos and Hotel in Gary, Indiana. Prior to joining Majestic Star, Mr. Buck was employed by Pinnacle Entertainment, Inc. and served as President of Pinnacle's planned resort in Atlantic City, New Jersey. He was also Vice President & General Manager of Pinnacle's Belterra Casino, Resort & Spa in Florence, Indiana from 2004 to 2006. Prior to Belterra, Mr. Buck was Vice President and General Manager of Hyatt's Grand Victoria Casino Resort in Rising Sun, Indiana from 2000 to 2004. Prior to arriving in southern Indiana, Mr. Buck was also Senior Vice President and General Manager of Harrah's Reno and Vice President/General Manager of Players Island Casino in Missouri.

**Dan Ihm.** Dan Ihm brings over 16 years of senior executive, corporate, and property-level management experience to the Company. His primary areas of expertise are operations and marketing for gaming, resorts, and entertainment. Prior to joining the Company, Mr. Ihm was the Corporate Director of Marketing for Laguna Development Corporation in Albuquerque, New Mexico. Mr. Ihm has also served as Senior Director of Marketing for Majestic Star Casino in Gary, Indiana and held the position of Vice President of Marketing for the AAA Four-Diamond Ameristar Casino

---

[32] *See Indiana Dep't of State Revenue v. Trump Indiana, Inc.*, 814 N.E.2d 1017, 1020 ("[T]he property tax definition of real property is not wholly consistent with the ordinary meaning of the term. Presumably in recognition of these somewhat artificial definitions designed to effect specific property tax policies, the first section of the chapter of the property tax statute that supplies these definitions, Indiana Code section 6-1.1-1-1, expressly provides that they apply to 'this article', i.e. to property taxes.").

Hotel in Council Bluffs, Iowa. Mr. Ihm previously held the position of Senior Vice President of Marketing and Operations for Majestic I before being named Senior Vice President and General Manager for Fitzgeralds Casino Black Hawk in October 2009.

**Chuck Miller.** Chuck Miller has over 38 years of experience in the gaming industry and was recently named Senior Vice President and General Manager of Fitzgeralds Casino and Hotel in Tunica, Mississippi. Throughout his career, Mr. Miller has gained hands-on experience in nearly every aspect of casino resort operations while working with some of the best known gaming companies and executives in established and emerging markets throughout the United States. Prior to joining Fitzgeralds Casino and Hotel in Tunica, Mr. Miller was President/CEO of Pearl River Resort in southern Mississippi. He has also served as Corporate Vice President of Development for Caesars' Entertainment, President of Tunica Operations at the Grand, Bally's, and Sheraton casinos for Park Place/Caesar's Entertainment, and General Manager of Grand Casino Tunica for Grand Casinos Inc.

<u>Management Consultant</u>

As soon as practicable following approval of the Disclosure Statement, the Debtors shall file a motion, subject to approval by the Bankruptcy Court and applicable regulatory agencies, to retain a Management Consultant that is acceptable to the Debtors, the Creditors' Committee, and the Senior Secured Notes Trustee. The Management Consultant shall be retained by the Debtors for the duration of the Chapter 11 Cases (unless otherwise determined by the Creditors' Committee and the Senior Secured Notes Trustee, in consultation with the Debtors) and may continue to be retained by the Reorganized Debtors after the Effective Date in the sole discretion of the Board of Managers.

## Composition of Initial Board of Managers

The Board of Managers of Reorganized Majestic Holdco shall be comprised of five managers appointed by the holders of New Membership Interests. On the Effective Date, the holder of New Membership Interests that, together with its affiliates, owns the largest principal amount of Senior Secured Notes, shall appoint two Managers, and the Creditors' Committee shall appoint two Managers. The fifth Manager shall be the Chief Executive Officer of Reorganized Majestic Holdco. The other Reorganized Debtors will be managed by a single managing member to be designated. Further information on the composition of the Board of Managers is set forth in the term sheet attached to the Plan as Exhibit II and in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

## Reorganized Debtors' Corporate Organizational and Ownership Structure

The following chart shows the Reorganized Debtors' contemplated corporate organizational and ownership structure immediately following the occurrence of the Effective Date:[33]

---

[33] The Senior Secured Notes Trustee reserves the right, with the consent of the Debtors (which consent shall not be withheld unreasonably), to create special purpose entities to (i) be co-issuers of the New Senior Secured Notes, and (ii) to hold each Gaming License.



**The Reorganized Debtors' Business Upon Emergence**

Upon emergence, the Reorganized Debtors' business will consist primarily of the ownership and operation of the Debtors' gaming facilities located in Gary, Indiana, Tunica County, Mississippi, and Black Hawk, Colorado, subject to the conditions to the Effective Date in the Plan, subject to Barden Colorado remaining a Debtor because of failure to obtain all governmental licenses, suitability determinations, and other approvals required for such property on or prior to 240 days following the Confirmation Date (as further described in Article XII of the Plan).

**The Company currently owns in excess of 266 acres of real property that the Debtors are not currently utilizing as part of the Debtors' core casino business. As part of the restructuring, on the Effective Date, the Debtors may effectuate the Land Transfer Transaction. To the extent the Land Transfer Transaction will occur, its terms will be set forth more fully in the Plan Supplement.**

The valuation conclusions contained below are based upon management projections provided to the Debtors' financial advisors as of August 2010 and are highly dependent upon the Reorganized Debtors' ability to meet those projections. Other key assumptions utilized by the Debtors' financial advisors include: (a) emergence of the Debtors from chapter 11 bankruptcy protection on September 30, 2011; and (b) approval of the transfer of the Debtors' gaming licenses to the Reorganized Debtors by the Debtors' gaming regulators in Indiana, Mississippi, and Colorado.

**The Reorganized Debtors' Capitalization Upon Consummation of the Plan**

The following table sets forth the Company's consolidated assets and liabilities (a) on an actual basis as of September 30, 2011 prior to consummation of the Plan and (b) on an as-adjusted basis as of September 30, 2011 to reflect the consummation of the Plan.

This table should be read together with the more detailed information contained elsewhere in this Disclosure Statement, including the section herein entitled "Treatment of Claims Against and Equity Interests in the Debtors," beginning on page 2.

| | As of 9/30/2011 (Pre-Emergence) | As of 9/30/2011 (Post-Emergence) |
|---|---|---|
| **Assets** | | |
| Cash & Cash Equivalents | $ 49.7 | $ 41.0 |
| Restricted Cash | 22.5 | 22.5 |
| Accounts Receivable, net | 1.9 | 1.9 |
| Inventories | 1.0 | 1.0 |
| Prepaid Expenses | 3.7 | 3.7 |
| Total Current Assets | 78.8 | 70.1 |
| | | |
| Property, Building and Equipment, net | 226.3 | 176.0 |
| Intangible Asset, net | 35.3 | 76.3 |
| Goodwill | 4.0 | - |
| Reorganization Value in Excess of Amounts Allocable to Identifiable Assets | - | 20.8 |
| Other Assets | 2.2 | 2.6 |
| | | |
| **Total Assets** | $ 346.6 | $ 345.8 |
| | | |
| **Liabilities and Equity** | | |
| Current Portion of Long Term Debt | $ 58.0 | $ - |
| Accounts Payable | 1.1 | 1.1 |
| Accrued Expenses | 20.4 | 20.4 |
| Other Accrued Liabilities | 25.9 | 33.7 |
| Total Current Liabilities | 105.4 | 55.2 |
| | | |
| Liabilities Subject to Compromise | 664.8 | - |
| New Senior Secured Credit Facility | - | 52.0 |
| New Senior Secured Notes | - | 100.6 |
| **Total Liabilities** | 770.2 | 207.8 |
| | | |
| **Equity** | | |
| Members' Equity | (423.6) | 138.0 |
| **Total Equity** | (423.6) | 138.0 |
| | | |
| **Total Liabilities and Equity** | $ 346.6 | $ 345.8 |

**Capital Structure and Corporate Governance of the Reorganized Debtors**

The material terms of the capital structure and corporate governance of the Reorganized Debtors are set forth in the term sheet attached to the Plan as Exhibit II and in the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement. The failure by a holder of New Membership Interests to execute the New Holdco LLC Agreement within one year of the Effective Date shall result in the forfeiture of such holder's allocation of New Membership Interests. After such date, all forfeited New Membership Interests shall revert to Reorganized Majestic Holdco, and the claims of any such holders to New Membership Interests shall be discharged and forever barred.

**New Senior Secured Credit Facility**

The New Senior Secured Credit Facility will be a $58 million senior secured credit facility with a term of three years following the substantial consummation of the Plan, with an interest rate *per annum* equal to (a) the Base Rate plus 3.50% or (b) the LIBOR Rate plus 4.75%, provided by the Senior Secured Credit Facility Agent, which shall be secured by a first lien on all of the assets of the Reorganized Debtors to the extent permitted by law.

The New Senior Secured Credit Facility will be issued pursuant to a new credit agreement, the material terms of which are set forth in the term sheet attached as Exhibit I to the Plan. The new credit agreement shall be in form and substance acceptable to the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee. A copy of either the New Senior Secured Credit Facility or a term sheet setting forth the principal terms thereof shall be attached as Exhibit 3 to the Plan Supplement.

**New Senior Secured Notes**

The New Senior Secured Notes will be senior secured 12.5% notes (or, at the election of the Senior Secured Notes Trustee, amended and restated Senior Secured Notes), dated as of the Effective Date, due on the fifth anniversary of the Effective Date that will be secured by a second lien on all of the assets of the Reorganized Debtors to the extent permitted by law.

The New Senior Secured Notes will be issued pursuant to the New Senior Secured Notes Indenture, which will be an indenture (or at the election of the Senior Secured Notes Trustee, an amended and Restated Senior Secured Notes Indenture), dated as of the Effective Date by and among the Reorganized Debtors, as obligors, and the Senior Secured Notes Trustee, as indenture trustee, which shall be qualified under the Trust Indenture Act pursuant to section 1145(d) of the Bankruptcy Code. A copy of either the New Senior Secured Notes Indenture or a term sheet setting forth the principal terms thereof shall be attached as Exhibit 4 to the Plan Supplement.

**New Intercreditor Agreement**

On the Effective Date, the Senior Secured Credit Facility Agent, on behalf of the Senior Secured Credit Facility Lenders, and the Senior Secured Notes Trustee, on behalf of the Senior Secured Noteholders, shall execute the New Intercreditor Agreement in form and substance acceptable to both the Senior Secured Credit Facility Agent and the Senior Secured Notes Trustee. A copy of either the New Intercreditor Agreement or a term sheet setting forth the principal terms thereof shall be attached as Exhibit 2 to the Plan Supplement. In the event the First Lien Alternative Financing or the Second Lien Alternative Financing is consummated, neither the Senior Secured Credit Facility Agent nor the Senior Secured Notes Trustee shall have any obligation to enter into the New Intercreditor Agreement, and the provider of any alternative financing may execute an intercreditor agreement with the Senior Secured Credit Facility Agent or the Senior Secured Notes Trustee, as applicable.

**Exit Financing**

The Creditors' Committee or the Senior Secured Notes Trustee, with the cooperation of the Debtors' management team and advisors, may conduct an exit financing process to identify First Lien Alternative Financing to replace the New Senior Secured Credit Facility.

Moreover, the Creditors' Committee, with the cooperation of the Debtors' management team and advisors, may conduct an exit financing process to identify Second Lien Alternative Financing to replace the New Senior Secured Notes. If the Creditors' Committee delivers to the Debtors and the Senior Secured Notes Trustee a Qualified Commitment Letter with respect to the Second Lien Alternative Financing on or prior to sixty (60) calendar days before the Projected Effective Date, closing of such Second Lien Alternative Financing shall be a condition precedent to the Effective Date, which condition cannot be waived without the consent of the Creditors' Committee; provided, however, that if such Second Lien Alternative Financing fails to close within fourteen (14) calendar days after the Projected Effective Date, then this condition to the Effective Date shall be deemed automatically waived by all parties.

A "Qualified Commitment Letter" means a signed commitment letter from one or more third parties unaffiliated with Senior Noteholders (unless consented to by the Senior Secured Notes Trustee) to provide, on a fully committed basis, the Second Lien Alternative Financing which meets the following criteria: (a) provides for financing on materially better terms regarding the interest rate, maturity, amortization, and all other associated costs and expenses than the New Senior Secured Notes; (b) taken as a whole, has restrictive covenants at least as favorable to the Reorganized Debtors as the New Senior Secured Notes; (c) contains closing conditions customary for a transaction of this type, including without limitation, (i) closing conditions similar to those contained in the New Senior Secured Notes Indenture and (ii) the negotiation, execution, and delivery of definitive documentation, provided, however, a

Qualified Commitment Letter shall not contain diligence or syndication conditions; (d) provides for a closing no later than the Projected Effective Date; (e) with respect to any terms and conditions that are less favorable to the Senior Secured Credit Facility Agent and/or materially different than the terms of the Senior Secured Notes, such terms and conditions shall be reasonably acceptable to the Senior Secured Credit Facility Agent; and (f) shall be subject to an intercreditor and subordination agreement which is substantially similar to the Intercreditor Agreement.

## Capital Obligations to be Satisfied or Compromised Upon Emergence

As of the date the Debtors filed the Chapter 11 Cases, the Debtors reported, on a consolidated basis, approximately $654.2 million in aggregate funded debt, primarily consisting of the Senior Secured Credit Facility, Senior Secured Notes, Senior Notes, and Discount Notes. The Debtors plan to satisfy this indebtedness, as described in greater detail below.

### Senior Secured Credit Facility

On October 7, 2003, Majestic I, Barden Mississippi, and Barden Colorado entered into the Loan and Security Agreement with certain financial institutions party thereto as lenders and the Senior Secured Credit Facility Agent, as arranger and administrative agent for such lenders.[34] The Debtors entered into the Senior Secured Credit Facility to replace two other working capital facilities and to partially finance a tender offer for certain notes.

The Senior Secured Credit Facility is a revolving credit line of up to $80 million, which matured on April 15, 2010. As of August 31, 2010, the Debtors owed approximately $65.3 million under the Senior Secured Credit Facility in principal and accrued unpaid interest. Interest on outstanding amounts under the Senior Secured Credit Facility accrues at a rate based, at the Debtors' option, on the Senior Secured Credit Facility Agent's base rate (which approximates the prime rate) plus 0% to 0.5% or LIBOR plus 2.5% to 3%. In each case the rate is determined based on the Debtors' trailing twelve month EBITDA (defined as earnings before interest, taxes, depreciation and amortization). The default rate of interest is 2% above the contract rate, payable upon the occurrence and during the continuation of an event of default. As noted above, the Debtors currently are in default under the Senior Secured Credit Facility, and are paying interest to the Senior Secured Credit Facility Agent at the default rate on a current basis.

### Senior Secured Notes

The Senior Secured Notes are $300 million in principal amount of obligations issued by Majestic I and MSCC, a non-operating, wholly-owned subsidiary of Majestic I that has no assets. The Senior Secured Notes are governed by the Senior Secured Notes Indenture. The Debtors issued $260 million principal amount of Senior Secured Notes in October 2003 to finance a cash tender for certain existing notes, and an additional $40 million principal amount in December 2005 in connection with the Debtors' purchase of Trump Indiana. The Senior Secured Notes accrue interest at 9½% per annum, with payments due April 15 and October 15 of each year. The notes matured on October 15, 2010. As of August 31, 2010, the Debtors owed approximately $348.4 million on account of the Senior Secured Notes in principal and accrued unpaid interest.

### Senior Notes

The Senior Notes are $200 million in principal amount outstanding of obligations co-issued by Majestic I and MSCC II, a non-operating, wholly owned subsidiary of Majestic that has no assets. The Senior Notes are unsecured obligations of Majestic and MSCC II, and Majestic's obligations under the Senior Notes are guarantied on an unsecured basis by Majestic II, Barden Colorado and Barden Mississippi. The Senior Notes are governed by an Indenture dated December 21, 2005, with Law Debenture Trust Company as successor trustee. The Senior Notes were issued by the Debtors in connection with their purchase of Trump Indiana in December 2005. The Senior Notes accrue interest at 9¾% per annum, with payments due April 15 and October 15 of each year. The notes mature on

---

[34] The Loan and Security Agreement has been amended numerous times to, among other things, add Majestic II as a borrower thereunder and to modify the Senior Secured Credit Facility's EBITDA and interest coverage requirements.

January 15, 2011. As of August 31, 2010, the Debtors owed approximately $233.1 million on account of the Senior Notes in principal and accrued unpaid interest.

<u>Discount Notes</u>

The Discount Notes are $63.5 million principal amount of original issue discount notes co-issued by Majestic Holdco and Majestic Star Holdco, a non-operating, wholly owned subsidiary of Majestic Holdco that has no assets. The Discount Notes are unsecured obligations of Majestic Holdco and Majestic Star Holdco, and are not guarantied by (and do not otherwise constitute obligations of) Majestic or any of its subsidiaries. The Discount Notes are governed by an Indenture dated December 21, 2005, with Wilmington Trust Company as successor trustee. The Discount Notes accrue interest at 12½% per annum, with payments due on April 15 and October 15 of each year. Interest was payable in-kind through October 15, 2008, and became payable in cash as of April 15, 2009. The notes mature on October 15, 2011. As of August 31, 2010, the Debtors owed approximately $72.6 million on account of the Discount Notes.

<u>Trade Claims and Other Unsecured Obligations</u>

In addition to its funded debt, prior to the date the Debtors filed the Chapter 11 Cases, the Company incurred debt with several creditors in the ordinary course of its business. The Claims related to these obligations are more fully described in the Plan.

**Description of New Membership Interests**

The material terms of the New Membership Interests are set forth in the term sheet attached to the Plan as Exhibit II and shall be incorporated into the New Holdco LLC Agreement, which shall be included in the Amended and Restated Operating Agreements attached as Exhibit 1 to the Plan Supplement.

<u>Information Rights Relating to New Membership Interests</u>

Reorganized Majestic Holdco will provide or make available the following reports and information to the holders of New Membership Interests:

(i)      As soon as available but in any event within one hundred twenty (120) days after the end of the fiscal year, audited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous fiscal year, all in reasonable detail, together with a copy of the audit report of Reorganized Majestic Holdco's independent public accountants and a summary "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of Reorganized Majestic Holdco and its consolidated subsidiaries.

(ii)     As soon as available but in any event within forty-five (45) days after the end of each fiscal quarter, unaudited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), all in reasonable detail, together with a summary "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of Reorganized Majestic Holdco and its consolidated subsidiaries.

(iii)    In addition, as soon as available but in any event within forty-five (45) days after the end of each month, Reorganized Majestic Holdco shall provide to all holders of New Membership Interests unaudited consolidated and consolidating financial statements and financial information (including an income statement, balance sheet and statement of cash flows), all in reasonable detail, for Reorganized Majestic Holdco and its consolidated subsidiaries.

(iv)     All current reports that would be required to be filed with the SEC on Form 8-K if Reorganized Majestic Holdco were required to file such reports, in each case, within the time periods required for filing such forms and reports as specified in the SEC's rules and regulations.

The holders of New Membership Interests may furnish copies of the foregoing reports and information to any prospective transferee that enters into a confidentiality agreement reasonably acceptable to Reorganized Majestic Holdco.

### Submission of Reports.

Reorganized Majestic Holdco will make such information and such reports available to the extent required by the terms hereof, which access may be provided by posting such information and reports on IntraLinks or a comparable password protected online data system, which will require a confidentiality acknowledgement, and will make such information and reports readily available to any prospective transferee of the New Membership Interests who (x) agrees to treat such information as confidential, and (y) accesses such information on IntraLinks or such comparable password protected online data system, which will require a confidentiality acknowledgement.

### Limitations on Liability and Indemnification of Managers and Officers of The Reorganized Debtors

The Delaware Limited Liability Company Act ("DLLCA") authorizes companies to limit or eliminate the personal liability of managers to limited liability companies and their members for monetary damages for breaches of managers' fiduciary duties. The Reorganized Debtors' Amended and Restated Operating Agreements shall provide that the Managers shall have the same fiduciary duties to the Reorganized Debtors and their members as the directors of a Delaware corporation, other than as expressly set forth in the term sheet attached as Exhibit II to the Plan. No Manager or member of the Reorganized Debtors shall have a duty to the Reorganized Debtors or their members to offer the Reorganized Debtors any business opportunity suitable for the Reorganized Debtors that may arise from time to time, which may also be suitable for the Manager, member, or any of their affiliates, nor shall any Manager or member be liable to the Reorganized Debtors or their members for offering any such business opportunity to another person. In addition, the Reorganized Debtors' Amended and Restated Operating Agreements may provide that the Reorganized Debtors must indemnify their Managers and officers to the fullest extent permitted by the DLLCA. The Reorganized Debtors' Amended and Restated Operating Agreements may include a provision that eliminates the personal liability of Managers to the Reorganized Debtors or their members for monetary damages for any breach of fiduciary duty as a manager, except to the extent such exemption from liability or limitation thereof is not permitted under the DLLCA as the same exists or hereafter may be amended.

The limitation of liability and indemnification provisions in the Reorganized Debtors' Amended and Restated Operating Agreements may discourage members from bringing a lawsuit against Managers for breach of their fiduciary duties. These provisions may also have the effect of reducing the likelihood of derivative litigation against Managers and officers, even though such an action, if successful, might otherwise benefit the Debtors or the Reorganized Debtors and their stockholders and members. In addition, the Reorganized Debtors may be adversely affected to the extent they are obligated to pay the costs of settlement and damage awards against Managers and officers pursuant to these indemnification provisions.

### Summary of Gaming Regulations

The ownership and operation of the Debtors' gaming facilities are subject to various state and local laws and regulations in the jurisdictions where they are located. The following is a summary of the provisions of the gaming laws and regulations applicable to the Debtors' operations. The summary does not purport to be a full description thereof and is qualified in its entirety by reference to such laws and regulations.

Consummation of the Plan will require prior approval of gaming authorities. Furthermore, certain persons and/or entities who will be associated with the Reorganized Debtors will be subject to a costly and time-consuming investigatory, licensing, and approval process prior to the Effective Date, and upon their licensing, such persons will be subject to the same or substantially similar gaming laws and regulations as the Debtors and their associates currently face.

Additionally, while the statutory and regulatory requirements discussed herein will apply to the Reorganized Debtors, no assurances can be provided as to the specific form of any statute or regulation that any jurisdiction may adopt or license conditions that any jurisdiction may impose in the licensing process for the restructuring, the Reorganized Debtors, or any persons associated with the Reorganized Debtors.

This summary is provided only as background information for creditors to make an informed voting decision on the Plan. All parties in interest, including creditors who may be subject to the investigatory and licensing processes described herein, are strongly urged to retain their own gaming law counsel for each jurisdiction where the Debtors currently have operations to seek advice concerning their particular circumstances and the investigatory and licensing process. It should be noted in this regard that gaming laws and regulations are often complex and have been interpreted to impose obligations that might not be apparent from an initial reading thereof. Failure to comply with applicable gaming laws and regulations will result in forfeiture of New Membership Interests under Section IX.F of the Plan and/or applicable law. Senior Noteholders with questions or who would like additional guidance on obtaining the required approvals may contact counsel to the Creditors' Committee; Senior Secured Noteholders may contact counsel to the Senior Secured Notes Trustee.

**Background on Indiana Gaming Regulations**

The acquisition, ownership, and operation of casinos in Indiana are subject to regulation by the State of Indiana primarily through the IGC. Other state agencies with limited oversight include the Indiana Alcohol and Tobacco Commission and the Indiana Department of Revenue.

The Indiana Riverboat Gambling Act (the "Indiana Act") and administrative rules promulgated thereunder (the "Indiana Rules") give the IGC extensive powers and duties in connection with regulation of casino gaming operations and enforcement of the Indiana Act and Indiana Rules. The jurisdiction of the IGC extends to all facilities, persons, associations, and practices related to casino gaming operations.

The Indiana Act specifies that it is designed to benefit Indiana citizens by promoting tourism and assisting economic development. The Indiana Act further specifies that the public's confidence can be maintained only (i) through comprehensive law enforcement supervision of gambling activities and (ii) strict regulation of facilities, persons, associations, and practices related to casino gaming operations.

The Indiana Act and Indiana Rules cover all facets of gaming operations, including, but not limited to:

- requiring a thorough background investigation to ensure unsuitable persons do not have a direct or indirect ownership interest in a riverboat casino;

- the establishment and maintenance of accounting and internal control procedures that are designed to ensure:

  - the riverboat's assets are safeguarded;

  - the riverboat's financial records are accurate and reliable;

  - the riverboat's transactions are performed in accordance with the Indiana Act and Indiana Rules;

  - the riverboat's transactions are recorded to properly account for adjusted gross receipts, admission fees, and all applicable taxes;

  - assets are maintained in accordance with generally accepted accounting principles;

  - only authorized personnel have access to assets;

- recorded assets are compared to actual assets at reasonable intervals and appropriate action is taken if discrepancies are discovered;

- there is appropriate segregation of functions, duties, and responsibilities;

- all functions, duties, and responsibilities are carried out only in accordance with sound practices and by qualified competent personnel;

- riverboat employees are not in a position to conceal errors or irregularities; and

- gambling is conducted with integrity and only in accordance with the Indiana Act and Indiana Rules.

The Indiana Act authorizes the issuance of up to 10 riverboat licenses, one operating agent license, and two licenses to conduct gambling games at pari-mutuel racetracks. Five riverboats licenses have been issued to riverboat facilities in counties contiguous to Lake Michigan. Specifically, four of these riverboats are located in Gary (the Debtors' two casinos), East Chicago, and Hammond in Lake County, and one is located in Michigan City in LaPorte County. Five additional riverboats are located in counties contiguous to the Ohio River in the southern portion of Indiana. Specifically, these five riverboats are located in Evansville (Vanderburgh County), Harrison County, Switzerland County, Rising Sun (Ohio County), and Lawrenceburg (Dearborn County). The operating agent licensee conducts gaming at a facility in French Lick, which is also in the southern portion of Indiana. Pursuant to other Indiana statutes, the two pari-mutuel racetracks have licenses to operate up to 2,000 slot machines at their facilities in Anderson and Shelbyville, which are in central Indiana.

An applicant for an Indiana gaming license must submit a comprehensive application and undergo a thorough background investigation. Additionally, any person who will, directly or indirectly, own 5% or more of a licensee must automatically submit a personal disclosure form and undergo an exhaustive background investigation. However, the IGC may investigate any person with any level of ownership interest. If a licensee is a publicly traded company, its articles of incorporation must contain language concerning transfer of ownership, suitability determinations, and possible divesture of ownership if a shareholder is deemed unsuitable by the IGC. If the IGC determines a person that holds an ownership interest in a licensee is unsuitable, the licensee: (i) may not pay a dividend to the person; (ii) may not pay any remuneration to the person; and (iii) shall not allow the person to vote on any matter. The licensee is responsible for all costs associated with the background investigation.

The Indiana Rules allow a company that qualifies as an institutional investor to exceed the 5% ownership interest threshold before requiring a background investigation. A company qualifies as an institutional investor if it (i) acquires an interest in a licensee in the ordinary course of its investment business and (ii) holds the interest for investment purposes only and not to cause, directly or indirectly, the election of a majority of the licensee's board of directors or any change in the corporate charter, bylaws, management, policies, or operation of the licensee.

An institutional investor must notify the IGC of its acquisition of 5% or more of the voting securities of a licensee within 10 business days of acquiring such securities. An institutional investor may acquire up to a 15% ownership interest in a licensee without being required to undergo a background investigation. The institutional investor must, within 45 days, complete a form to verify it qualifies as an institutional investor as defined in the Indiana Rules. The IGC reserves the right to require any company claiming institutional investor status to undergo a background investigation if the IGC deems such an investigation necessary.

Additionally, all key persons of a licensee must undergo a thorough investigation and be licensed. A key person is defined as an officer, director, executive, employee, trustee, substantial owner, independent contractor, or agent that has the power to exercise, alone or in conjunction with others, management or operating authority over the licensee or affiliates thereof.

A riverboat owner's license and operating contract entitle a licensee or operating agent to operate one riverboat. The Indiana Act allows a person to hold up to one hundred percent of up to two individual riverboat owner's

licenses.  The Indiana Act imposes a $2 million transfer fee on any licensee that acquires a controlling interest in a second owner's license.

An initial license runs for a period of five years.  Thereafter, a license is subject to renewal on an annual basis upon a determination by the IGC that the licensee continues to be eligible to hold a license pursuant to the Indiana Act and Indiana Rules.  Each licensee must undergo a complete reinvestigation every three years, and the IGC reserves the right to investigate a licensee at any time it deems necessary.

The licenses are transferrable only in accordance with the Indiana Act and Indiana Rules, and any proposed transfer requires approval by the IGC.  The Indiana Act specifies a license is a revocable privilege granted by the state and not a property right.  A license may not be leased, hypothecated, or serve as security for any debt obligation.  The IGC may suspend or revoke the license of a licensee or impose civil penalties, in some cases without notice or hearing, for any act in violation of the Act or for any other fraudulent act.

Pursuant to legislation enacted in 2009, licensees must execute and submit a POA and identify a person to temporarily operate the licensee's casino and related facilities (a "POA Trustee") if certain events occur, and the IGC adopts a resolution authorizing the POA Trustee to temporarily conduct the licensee's gaming operations.  Specifically, the IGC may adopt a resolution authorizing the POA Trustee to temporarily operate the licensee's facility if one of the following occurs:  (i) the IGC revokes the licensee's license; (ii) the IGC does not renew the licensee's license; (iii) a proposed transferee of the licensee's license is not approved, and the licensee is unwilling to retain ownership of the riverboat; or (iv) the licensee agrees, in writing, to relinquish control to a POA Trustee approved by the IGC. If the IGC adopts a resolution authorizing a POA Trustee to temporarily operate the casino, the licensee will have 180 days from the date the resolution is adopted to sell the riverboat to a person approved by the IGC. If the riverboat is not sold within 180 days, the POA Trustee may sell the riverboat to a person approved by the IGC.

The Indiana Rules impose restrictions on a licensee's incurrence of debt.  A licensee and its affiliates may enter into debt transactions that total $1.0 million or more only with the prior approval of the IGC.  Such approval is subject to compliance with requisite procedures and a showing that each person with whom the licensee and its affiliates enters into a debt transaction would be suitable for licensure under the Act.  Unless waived, approval of debt transactions requires consideration by the IGC at two business meetings.  The IGC, by resolution, has authorized its executive director, subject to subsequent ratification by the IGC, to approve debt transactions after a review of relevant documents and consultation with the chair of the IGC and the IGC's outside financial analyst.

All of the foregoing regulations are subject to amendment and interpretation by the IGC.   Changes in the laws, regulations, and procedures described above could adversely affect the gaming operations of the Debtors and Reorganized Debtors.

The Indiana Act and the Indiana Rules are available for review at http://www.in.gov/legislative/ic/code and http://www.in.gov/legislative/iac.

**Background on Mississippi Gaming Regulations**

The acquisition, ownership, and operation of casino gaming facilities and gaming devices in Mississippi are subject to the Mississippi Gaming Control Act (the "Mississippi Act") and regulations promulgated thereunder as well as various local regulations.  Specifically, the Debtors' Mississippi gaming operations are subject to the licensing and regulatory control of the Mississippi Gaming Commission ("MGC").

The Mississippi Act and the regulations and supervisory procedures of the MGC are based upon declarations of public policy concerning, among other things:

- the prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity;

- the establishment and maintenance of responsible accounting practices and procedures;

- the maintenance of effective controls over the financial practices of casino licensees, including the establishment of minimum procedures for internal fiscal affairs and the safeguarding of assets and revenues, providing reliable recordkeeping, and requiring the filing of periodic reports with the MGC;

- the prevention of cheating and fraudulent practices;

- providing a source of state and local revenues through taxation and licensing fees; and

- ensuring that gaming licensees, to the extent practicable, employ Mississippi residents.

Under the Mississippi Act, any person who seeks to own or operate a gaming establishment or gaming devices, or hold a direct or indirect voting ownership interest of greater than 5% therein, must be found suitable by, or obtain a gaming license from, the MGC prior to the consummation of such transaction. If such person is an entity, certain of its managers, directors, officers, key employees, and owners must also demonstrate their suitability to be affiliated with the gaming license applicant. The burden of proving suitability is on the applicant, and the applicant must pay the costs of the investigation, which can be extremely expensive and time-consuming.

Entities that engage in gaming operations generally hold the actual gaming licenses. Natural persons or entities materially associated or affiliated with such entities (such as managers, directors, or owners) must be found suitable. Also, the private or publicly-traded parent company of a gaming licensee and any intermediary holding companies must be registered with, or found suitable by, the MGC. Registration and suitability determinations are similar to licensing and involve the submission of a detailed application that allows the MGC to thoroughly investigate the applicant. An application for a determination of suitability requires the submission of detailed personal and financial information followed by a thorough investigation. Registration is similar, and upon approval, specific functional restrictions apply to the registered entity, including restrictions on any intermediary holding companies, licensed subsidiaries, and in some cases, associated shareholders.

In the licensing context, Mississippi makes little distinction between private companies and publicly-traded companies. Private operating subsidiaries of both private and publicly-traded companies must hold a gaming operator license to operate casino and gaming devices. Each privately-held or publicly-traded holding or parent company of a gaming licensee, which directly or indirectly owns, controls, or holds the power to vote greater than 5% of any class of voting equity securities in the licensee, must undergo an investigation, register with, and/or be found suitable by the MGC.

Each manager, director, officer, and investor holding voting equity in such holding company may also be subject to a personal finding of suitability by the MGC. Although the Mississippi Act mandates findings of suitability for those corporate and individual investors holding more than 10% of any class of voting equity, it has long been the practice of the MGC to require approvals of any persons or entities holding a direct or indirect voting equity interest of greater than 5% in any gaming licensee. Such voting equity ownership threshold is increased to greater than 10% in the case of institutional investors. In contrast, holders of non-voting equity in the parent company of a gaming licensee, or in any intermediary holding company, are not ordinarily subject to the mandatory finding of suitability; provided, however, that the MGC has the authority to subject any equity holder, whether such equity is voting or non-voting, to a finding of suitability.

Gaming licenses granted by the MGC are not transferable, are issued for a term not exceeding three years, and must be renewed periodically thereafter.

Any acquisition of a licensed gaming entity, including the takeover of its operating assets by a successor entity, will require similar review, approval, and licensing by the MGC. This process can be extremely lengthy, costly, onerous, and intrusive. The placing of an investigatory item on an agenda for final approval is solely in the discretion of the MGC and will not take place until the applicant has submitted all items requested by the MGC. As a general rule, the licensing process will not begin until all applications relating to a specific transaction have been submitted to the MGC.

The MGC may deny an application for any cause that it deems reasonable. Changes in licensed positions must be reported to the MGC. In addition to its authority to deny an application, the MGC can disapprove a change in a corporate position.

Furthermore, if the MGC were to find a manager, officer, director, key employee, equity holder, lender, or landlord unsuitable for licensing or unsuitable to continue having a relationship with the Debtors or the Reorganized Debtors, the Debtors or the Reorganized Debtors would have to sever all relationships with such person to retain their licenses or approvals. In addition, the MGC may require any licensed company to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or of questions pertaining to licensing are not subject to judicial review in Mississippi.

Under certain circumstances, an institutional investor who acquires more than 10% but not more than 15% of a licensed company's voting securities may apply to the MGC for a waiver of a finding of suitability if that institutional investor holds the voting securities for investment purposes only.

An institutional investor will not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held by the institutional investor in the ordinary course of its business and not for the purpose of causing, directly or indirectly, the election of a majority of the members of a licensed company's board of directors or managers, any change in the charter, bylaws, operating agreement, management, policies, or operations of a licensed company or any of its gaming affiliates, or any other action which the MGC finds to be inconsistent with holding such voting securities for investment purposes.

Activities which are deemed consistent with holding voting securities for investment purposes include:

- voting on all matters voted on by stockholders;

- making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and

- such other activities as the MGC may determine to be consistent with such investment intent.

If the beneficial owner of voting securities that must be found suitable is a corporation, partnership, or trust, it must submit detailed business and financial information to the MGC. Applicants are required to pay all costs of the investigation.

Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the MGC or after otherwise being required to do so, may be found unsuitable. The same requirements apply to a record owner of voting securities of a registered company if the record owner, after request, fails to identify the beneficial owner of such equity. Any equity holder who is found unsuitable and who holds, directly or indirectly, any beneficial ownership of voting securities of a licensed or registered company beyond the period of time proscribed by the MGC may be guilty of a misdemeanor. A licensee may become subject to disciplinary action, if, after receipt of notice that a person is unsuitable to be a stockholder or to have any other relationship with the licensee, the licensee:

- pays the unsuitable person any dividend or other distribution on such person's voting securities;

- recognizes the exercise, directly or indirectly, of any voting right conferred by securities held by that person;

- pays the unsuitable person any remuneration in any form for services rendered or otherwise, except in certain limited and specific circumstances; or

- fails to pursue all lawful efforts to require the unsuitable person to divest himself or herself of the securities, including, if necessary, the immediate purchase of the securities for cash at fair market value.

A gaming licensee may be required to disclose to the MGC the identities of all holders of its debt securities. The MGC may, in its sole discretion, require the holder of any debt security of a registered company or licensee to file applications, be investigated, and be found suitable to own the debt security of a registered company or licensee.

If the MGC determines that a person is unsuitable to own a debt security, then the licensee and/or its registered holding company can be sanctioned, which may include the loss of its approvals, if without the prior approval of the MGC, it:

- pays to the unsuitable person any dividend, interest, or any distribution whatsoever;

- recognizes any voting right by the unsuitable person in connection with the debt securities;

- pays the unsuitable person remuneration in any form; or

- makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation, or a similar transaction.

License fees and taxes, computed in various ways depending on the type of gaming activity involved, are payable to the State of Mississippi and to the counties and cities in which the Mississippi licensee's operations are conducted. The MGC also assesses fees and expenses on gaming licensees. Any taxes levied by the MGC or Mississippi taxing authorities that are not paid by Debtors, as well as unpaid gaming winnings, could be assessed against the Reorganized Debtors.

Any person who is or is required to be licensed, found suitable, or registered or is under common control with any such person, and who is or proposes to become involved in a gaming venture outside of Mississippi or in any internet gaming venture in any jurisdiction, must obtain approval or a waiver of such approval from the MGC prior to engaging in any such gaming venture outside of Mississippi; provided, however, that such a waiver is automatically granted under the MGC's regulations in connection with foreign gaming activities (except for internet gaming activities) conducted (i) within the 50 states or any territory of the United States, (ii) on board any cruise ship embarking from a port located therein, and (iii) in any other jurisdiction in which a casino operator's license or its equivalent is not required to legally conduct gaming operations. The MGC may require, among other things, that it be granted access to information concerning the out-of-state gaming operations of the licensee and its affiliates.

The MGC may limit, condition, suspend, or revoke a license, finding of suitability, registration, or other approval, subject to compliance with certain statutory and regulatory procedures if it is determined that Mississippi gaming laws or regulations were violated. The MGC may also levy substantial fines against the licensee and the individuals involved in violating any gaming laws or regulations.

Changes in laws, regulations, and procedures described above could adversely affect the gaming operations of the Debtors and the Reorganized Debtors.

Mississippi gaming laws and regulations are available for review at the website of the MGC http://www.mgc.state.ms.us.

**Background on Colorado Gaming Regulations**

The Colorado Limited Gaming Act of 1991 (as amended, the "Colorado Act"), authorizes limited gaming only in certain designated commercial districts of Central City, Black Hawk, and Cripple Creek, Colorado. Limited gaming consists of the games of poker, blackjack, craps, roulette, and slot machines, all with maximum single bets of $100. Only persons aged 21 or older may participate in limited gaming, and limited gaming may be offered by licensed casinos twenty-four hours per day, seven days per week. Limited gaming is allowed only on premises

licensed for that purpose, and the gaming-licensed premises of any building may not exceed 35% of the square footage of the building or 50% of any floor of such building. There is no limitation on the size of any structure or total square footage devoted to limited gaming. Additionally, the gaming-licensed premises of any casino must be physically located within the designated commercial districts of one of the three above-referenced cities. Limited gaming is regulated by the Colorado Limited Gaming Control Commission (the "<u>CLGC</u>") and the Colorado Division of Gaming in the Colorado Department of Revenue (the "<u>CDG</u>").

The public policy of Colorado as stated in the Colorado Act is:

- the success of limited gaming depends upon public confidence and trust that licensed limited gaming is conducted honestly and competitively, that the rights of the creditors of licensees are protected, and that gaming is free from criminal and corruptive elements;

- public confidence and trust can be maintained only by strict regulation of all persons, locations, practices, associations, and activities related to the operation of licensed gaming establishments, and the manufacture or distribution of gaming devices and equipment;

- all establishments where limited gaming is conducted and where gambling devices are operated and all manufacturers, sellers, and distributors of certain gambling devices and equipment must therefore be licensed, controlled, and assisted to protect the public health, safety, good order, and the general welfare of the inhabitants of the state to foster the stability and success of limited gaming and to preserve the economy and policies of free competition of the state of Colorado; and

- no applicant for a license or other affirmative CLGC approval has any right to a license or to the granting of the approval sought. Any license or other CLGC approval granted pursuant to the provisions of the Act is a revocable privilege, and no holder acquires any vested right therein or thereunder.

Pursuant to the Colorado Act and the rules and regulations promulgated thereunder (the "<u>Colorado Gaming Regulations</u>"), the ownership and operation of limited gaming facilities in Colorado, however acquired, are subject to extensive regulation by the CLGC and CDG. The gaming operations of licensed casino operators are also subject to the respective requirements of the three locations where limited gaming is permitted: Central City, Black Hawk, and Cripple Creek. These jurisdictions require each gaming establishment to obtain the appropriate business license, liquor license, and other licenses and permits. Licensed outlets for limited gaming are also subject to fees and taxes established by local authorities, including fees for the possession of gaming devices used in limited gaming. The three gaming jurisdictions charge annual gaming device fees on each gaming device used in limited gaming ranging from $750 in Black Hawk to $1265 in Central City.

The CLGC may issue the following gaming licenses: (1) slot machine manufacturer or distributor; (2) operator; (3) retail gaming; (4) support; and (5) key employee. These licenses require renewal every two years and are not transferable. Support and key employee licenses may also be issued and renewed by the director of the CDG on behalf of the CLGC. The CLGC has broad discretion to condition, suspend for up to six months, revoke, limit, or restrict a license at any time and also has the authority to impose fines. Disciplinary actions against a licensee's license may be brought for any violations of the Colorado Act or the Colorado Gaming Regulations or for any reason for which a license could be denied. If violations have occurred, the fines imposed by the CLGC can range up to $25,000 per violation for retail gaming (casino) licensees. A fine and license suspension or revocation may be imposed concurrently for each violation of the Colorado Act or the Colorado Gaming Regulations by a licensee.

A retail gaming (casino) license is required for all persons conducting limited gaming on their premises. In addition, an operator license is required for all persons who engage in the business of placing and operating slot machines on the premises of a retailer, or who provide goods or services in return for fees calculated upon a percentage of limited gaming revenue. However, a retailer is not required to hold an operator license. No person may have an ownership interest in more than three retail licenses.

The Colorado Act requires that an applicant for a gaming license or for approval of its acquisition of a direct or indirect interest in a gaming licensee, must demonstrate, to the CLGC's satisfaction, that such applicant is of good moral character and is suitable for participation in the gaming industry. Accordingly, the CLGC requires that every such applicant—except those individuals seeking a support license or approval as a limited owner (under 5%) of a privately-held company—undergo a full suitability investigation. Support licensees and limited owners of privately-held companies typically are subject to less comprehensive background investigations than the other categories of applicants. Notwithstanding the generally less comprehensive nature of background investigations for support licensees and limited owners of privately held companies, the CLGC and/or the CDG may, at their discretion, require a complete a full suitability investigation if they determine such an investigation is necessary.

In the case of a corporation or an entity that is a license applicant or an applicant for CLGC approval to acquire an interest in a licensee, certain distinctions are made between privately-held companies and entities and publicly-traded corporations and entities. With respect to private companies, no person may acquire any interest in a private company that holds a gaming license without the prior approval of the CLGC. Such approval will be granted only after the person seeking to acquire the interest has undergone a full suitability investigation. With respect to public companies holding gaming licenses, acquisition of an interest in such companies does not require prior CLGC approval. It may, however, require a post-acquisition suitability investigation.

Additionally, the suitability investigation of a private company differs from the investigation that is required for a public company. The suitability investigation of a private company includes an investigation of the company itself and separate suitability investigations of every officer, director, and stockholder holding an interest of 5% or more in the company. Stockholders holding an interest of less than 5% in a private company are required to submit "limited ownership" disclosure forms and are not customarily required to undergo a full suitability investigation—although the CLGC has the authority to require a suitability investigation of anyone associated with a company under review.

In the case of a public company, a suitability investigation includes an investigation of the company itself and separate suitability investigations of all officers, directors, and certain holders of the company's stock, as set forth below. Rule 4.5 of the Colorado Gaming Regulations ("Rule 4.5") applies to applicants and licensed entities that are publicly-traded, as defined therein, or which are owned 5% or more directly or indirectly by publicly-traded entities. Persons or entities owning less than 5% of a publicly-traded gaming licensee, or of the publicly-traded parent company of a gaming licensee, do not have to report their ownership interests, or apply for a suitability investigation, unless requested to do so by the CLGC or CDG. If such a request is made, the person or entity so requested to apply or report must do so or risk being found unsuitable for involvement or participation in Colorado gaming.

Persons or entities (including institutional investors as defined in Rule 4.5) who directly or indirectly beneficially own 5% or more (but less than 10%) of an interest in a gaming licensee, through their beneficial ownership of any class of such licensee's voting securities, must report their interest to the CDG within 10 days of their acquisition of such interest and may be required to provide additional information and undergo a suitability investigation. The CDG may, and often does, **require** findings of suitability for persons or entities directly or indirectly beneficially owning 5% or more of an interest in a gaming licensee, other than certain institutional investors discussed below.

A finding of suitability as an "associated person" automatically will be required of all persons or entities (other than certain institutional investors discussed below) that directly or indirectly beneficially own an interest of 10% or more in a gaming licensee. Such persons and entities (including institutional investors) must notify the CDG within ten days of their acquisition of such an interest. In addition, such persons and entities (other than certain institutional investors discussed below) must file appropriate applications within 45 days of their acquisition of such an interest.

Rule 4.5 defines an institutional investor to include certain classes of banks, insurance companies, investment companies, investment advisors, collective trust funds, employee benefit plans, pension funds, and groups composed of persons otherwise individually qualifying pursuant to the definition in the rule. If institutional investors provide specified information to the CDG within 45 days of the acquisition of a direct or indirect interest in a gaming licensee (under the current practice of Colorado gaming regulators, such disclosure is required for the acquisition of an interest of 5% or more in a gaming licensee) and hold such interest for investment purposes only, the CLGC, in its discretion,

may permit such institutional investors to own an interest of up to 15% in a gaming licensee without undergoing a full suitability investigation.

Notwithstanding the foregoing, the CLGC may require any person having or acquiring an interest, however limited or indirect, in a license or a licensee to undergo a full suitability investigation and pay the cost of the investigation in the same manner as an applicant.

Where there is a distinction between the record owner and the beneficial owner of stock or other interests in a licensee or applicant, the CDG will review the circumstances to determine, in its discretion, whether either or both must apply for a finding of suitability.

Any application for a license or for a finding of suitability can be denied by the CLGC, in its discretion, based upon any of the following criteria: (1) the failure of the applicant to prove by clear and convincing evidence that the applicant is qualified for licensure and that the applicant is of good moral character; (2) failure of the applicant to provide appropriate information, documentation, or assurances to the CLGC; (3) failure of the applicant to reveal material facts in connection with a suitability or other investigation of the applicant; (4) conviction of the applicant of certain serious criminal acts, including illegal gambling; (5) pending prosecution for certain enumerated criminal acts; (6) the identification of the applicant as a member of a career-offender cartel; (7) refusal of the applicant to cooperate with governmental investigative agencies; or (8) the identification of the applicant as an illegal professional gambler.

In addition, all persons loaning monies, goods, or real or personal property directly or indirectly to a licensee or applicant, or having any interest in a licensee or applicant, or entering into any agreement with a licensee or applicant, must provide any information requested by CLGC. At the discretion of the CLGC, these persons may be required to supply all information relevant to a suitability determination and submit to a full suitability investigation. The failure of such a person to promptly provide all information requested and submit to a suitability or background investigation could result in a finding of unsuitability, the denial of a license application, suspension or revocation of an existing license, termination of any lease, note arrangement, or agreement between the applicant or licensee and the person from whom such information is sought, or the imposition of other sanctions.

Persons found unsuitable by the CLGC may be required immediately to terminate any interest in, association or agreement with, or relationship to a licensee—regardless of any negative financial consequences to such persons. Specifically, no licensee shall, with respect to any person associated with the licensee and found unsuitable by the CLGC: (1) pay to that person any interest or dividends; (2) permit the exercise of any voting rights by such person; (3) pay any remuneration for services rendered by that person or otherwise; or (4) fail to pursue all lawful efforts to require such person to relinquish all voting securities, including the immediate purchase of such securities by the licensee. A finding of unsuitability with respect to any officer, director, employee, associate, lender, or beneficial owner of a licensee or applicant may also jeopardize the licensee's license or applicant's license application. Licenses may be conditioned upon termination of any relationship with unsuitable persons.

Although authorized pursuant to the Act, as a long-standing matter of policy and practice, the CLGC does not issue temporary licenses, and persons required to be licensed are not permitted to perform activities requiring a license prior to the issuance of the license.

The Colorado Act does not require any approvals for Colorado licensees to engage in foreign gaming activities. However, a Colorado licensee or parent or subsidiary of a licensee in Colorado must promptly report to the CLGC all gaming applications and licenses submitted or obtained in jurisdictions outside Colorado. Upon the request of the CLGC or the CDG, licensees must provide all requested information about such foreign gaming operations. Violations of the gaming or other requirements of foreign jurisdictions could result in a finding of unsuitability in Colorado.

Additional information concerning the Colorado Gaming Regulations is available on the website of the CDG at www.colorado.gov/revenue/gaming.

**Status of The Debtors Under Gaming Regulations**

Indiana

The Debtors are licensed to operate the Majestic Star Casinos in Gary, Indiana. As such, the Debtors must comply with the Indiana Act and Indiana Rules and periodically submit detailed financial, operating, and other reports to the IGC and furnish any other information that the IGC may require. The Debtors currently hold all licenses and permits necessary to operate the Majestic Star Casinos. On September 16, 2010, the IGC concluded the complete reinvestigation of Majestic I and Majestic II required every three years by the Indiana Act and renewed the licenses of Majestic I and Majestic II for one year from June 3, 2010.

If it were determined that the Debtors violated the Indiana Act or Indiana Rules, their licenses could be limited, conditioned, suspended, or revoked. Such violations could expose the Majestic Star Casinos and any person involved in any violation to a substantial fine.

Additionally, as explained above, the IGC could adopt a resolution authorizing a POA Trustee to temporarily operate one or both of the Majestic Star Casinos if (i) the IGC revoked one or both of the Debtors' Indiana licenses; (ii) the IGC did not renew one or both of the licenses; (iii) a proposed transferee of one or both of the Debtors' licenses were denied a license and the Debtors were unwilling to retain ownership of the Majestic Star Casinos; or (iv) Majestic I or Majestic II agreed, in writing, to relinquish control to a POA Trustee approved by the IGC. The POA and POA Trustee for both Majestic I and Majestic II were approved by the IGC on March 4, 2010. To date, the IGC has not exercised any of its rights under the POA.

Mississippi

Majestic I and Majestic Holdco are registered with the MGC as "publicly traded corporations" with direct and indirect interests in Barden Mississippi, the owner and operator of Fitzgeralds Tunica. Majestic Holdco has been found suitable by the MGC to own the equity securities of its subsidiary intermediary gaming company, Majestic I. Likewise, Majestic I has been found suitable by the MGC to own the equity securities of its gaming operating subsidiary, Barden Mississippi. Barden Mississippi, which owns and operates Fitzgeralds Tunica, is licensed as a casino operator under the Mississippi Act.

Majestic I and Majestic Holdco, as registered holding companies, and Barden Mississippi, as a gaming licensee, must comply with the Mississippi Act and the MGC's regulations and policies promulgated pursuant thereto, periodically submit detailed financial, operating, and other reports to the MGC, and furnish any other information that the MGC may require, including but not limited to information regarding material loans, leases, sales of securities, and similar financing transactions.

If it were determined that Majestic Holdco, Majestic I, or Barden Mississippi violated the Mississippi Act or the MGC's regulations, the licenses and registrations granted to such entities by the MGC could be limited, conditioned, suspended, or revoked. In addition, Majestic Holdco, Majestic I, and Barden Mississippi, and the persons involved therewith could be subject to substantial fines.

The MGC has renewed Barden Mississippi's license through December ~~7,~~ **6,** 2013.

Colorado

Barden Colorado is licensed in Colorado as a retail gaming licensee and operator licensee. It is wholly-owned directly by Majestic I. Majestic I is considered a publicly-traded entity under Rule 4.5 of the Colorado Gaming Regulations by the CDG. Accordingly, to the extent Majestic I continues to be considered a publicly traded entity, Rule 4.5 will apply to any acquisition of an interest in Barden Colorado through the acquisition of an interest in Majestic I.

Barden Colorado and its owners, officers, and directors have the necessary approvals from the CLGC to engage in their current gaming activities in Colorado. Barden Colorado must periodically submit detailed information

about its ownership and activities to the CLGC. This includes information concerning loans, leases, and other commercial activities. Any violation of the laws in Colorado or elsewhere by Barden Colorado or any of its affiliate may jeopardize the licenses held by Barden Colorado and may subject Barden Colorado to the imposition of fines, the cancellation of contracts, and other sanctions.

The CLGC has renewed Barden Colorado's operator and retail gaming licenses for the operation of the Fitzgeralds Casino in Black Hawk, Colorado through October 18, 2012.

**Potential Gaming Regulatory Approvals May Be Necessary For the Restructured Company**

In the event that the Debtors are successful in obtaining Confirmation of the Plan, implementation of the Plan may require the approval of state gaming regulators, as described above. Such necessary prior approvals could include approvals for issuances of equity in the Reorganized Debtors to new investors in the Reorganized Debtors, and related mandatory findings of suitability for certain equity holders as well as approval of the credit facilities notes and certain security for such credit facilities and notes of the Reorganized Debtors.

**Summary of Legal Proceedings**

The Debtors are party to certain legal proceedings. Most of these legal proceedings have arisen in the ordinary course of the Debtors' business and involve claims for money damages. Whether these claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the claims and the debt arising therefrom. Generally, if the debt underlying such claims was incurred by one of the Debtors prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the claim is liquidated and resolved before or after the Effective Date. Claims arising from conduct occurring after the Effective Date, unless provided for under the Plan, generally are not dischargeable through bankruptcy, and will be handled by the Reorganized Debtors in the ordinary course of its business after emergence.

**Legal Proceedings in the Bankruptcy Court**

Avoidance Actions

A number of transactions occurred prior to the Petition Date that may have given rise to claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "Avoidance Actions").

Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on November 22, 2011, *i.e.,* two years after the Petition Date. To date, the Debtors have not made a determination whether they have any Avoidance Actions to prosecute. For more information, see the section herein entitled "Effect of Confirmation of the Plan," which begins on page 2.

Majestic II Tax Action(s)

On December 31, 2010, the Debtors commenced an adversary proceeding in the Bankruptcy Court against BDI, Don H. Barden, the United States of America on behalf of the Internal Revenue Service, and the Indiana Department of Revenue to restore the QSub status of Majestic II, to recover tax payments Majestic II was forced to make as a result of the unauthorized and improper disposition of estate property, to avoid any tax-related liabilities Majestic II would not owe but for the revocation of Majestic II's QSub status, and to recover the monetary damages suffered by Majestic II. A pretrial conference has been scheduled for February 17, 2011. For more information, see the section herein entitled "Majestic II Tax Action(s)," which begins on page 2.

**Pending Legal Proceedings Outside the Bankruptcy Court**

Based on a review of their pending litigations and proceedings, the Debtors are involved in the following material legal proceedings. The Debtors are vigorously defending themselves in each of these matters. Many of the proceedings set forth below are stayed under the automatic stay provisions of section 362 of the Bankruptcy Code. Claims arising from the proceedings set forth below will be treated in accordance with the Plan.

Due to the nature of the Debtors' business, they are frequently subject to various personal injury and property damage claims and suits brought by customers. With respect to each of these claims, the Debtors' maximum monetary exposure is their $250,000 insurance deductible for personal injury claims and a $100,000 deductible for property damage claims. In addition, because approximately 15% of the Debtors' workforce in Gary, Indiana is subject to certain collective bargaining agreements, relatively minor labor grievances and arbitrations are frequently filed by employees. At present, the majority of these proceedings involve monetary exposure of less than $25,000, with a total approximate exposure of $40,000. However, the Debtors are confident that they will prevail in most proceedings.

The Majestic Star Casino, LLC, et al v. Trustmark, Inc.,
Case No. 07C 2474, United States District Court for the Northern District of Illinois

Majestic I, Barden Mississippi, and Barden Colorado (the "Insurance Litigation Plaintiffs") filed suit against their previous stop-loss health insurance provider ("Insurance Provider") and the Insurance Provider's managing general underwriter seeking declaratory relief and damages for unpaid claims totaling approximately $0.7 million, punitive damages and attorneys' fees. The Insurance Provider has denied that payment on the claims is owing and filed a counter-claim seeking rescission and damages totaling $0.1 million plus prejudgment interest or, in the alternative, unspecified damages believed to total $0.3 million for its alleged losses under the contracts. The parties have completed the discovery phase of the litigation and filed cross-motions for partial summary judgment. The Insurance Litigation Plaintiffs' motion for summary judgment on certain of the Insurance Provider's counterclaims was granted. The Insurance Provider's partial motion for summary judgment was granted in part with respect to certain claims related to specified exclusions and with respect to the Insurance Litigation Plaintiffs' breach of fiduciary duty claim. All but one count of the Insurance Litigation Plaintiffs' amended complaint remain to be tried against both defendants. The parties have engaged in informal settlement discussions. Should settlement negotiations not be successful, it is anticipated that trial will begin in the fall or winter of 2010. The Insurance Litigation Plaintiffs believe they are entitled to a significant recovery on their claims, which include both contract and tort claims, and believe the Insurance Provider's counter-claim is without merit; however, the Insurance Litigation Plaintiffs cannot determine with certainty the outcome of the litigation or the likelihood or the amount of any recovery. On December 9, 2009, the Debtors filed a Notice of Bankruptcy and Motion for Stay in the insurance litigation, which was granted pending further order of the Bankruptcy Court. The parties to the Insurance Litigation are engaged in settlement discussions.

The Majestic Star Casino, LLC v. Benefit Administration Systems, LLC,
Case No. 51 293 515 09, American Arbitration Association

During the course of the Insurance Litigation, Majestic I learned of various errors and omissions by its former third-party administrator ("TPA") which administered Majestic I's health plans between October 2003 and December 2005. Majestic I believes some of these errors led to the denial of some of the stop loss insurance claims at issue in the insurance litigation described above. On April 20, 2009, Majestic I commenced an arbitration proceeding against the TPA before the American Arbitration Association. Majestic I asserts breach of contract and breach of fiduciary duty claims against the TPA and is seeking recovery of approximately $0.7 million, plus attorneys' fees and costs. Contractual damages received from the TPA, if any, are likely to offset contractual damages received from the Insurance Provider and its managing general underwriter, if any, in the insurance litigation, and vice versa. Should Majestic I not prevail in the arbitration, the TPA could recover its attorney's fees and costs from Majestic I. Discovery in the arbitration has concluded and prehearing briefs have been submitted by both parties. The parties' informal settlement discussions have not been successful to date. The arbitration is currently scheduled to begin in December 2010. Majestic I cannot determine with certainty the outcome of the arbitration or the amount of any recovery.

The Majestic Star Casino, LLC v. Indiana Department of State Revenue,
Case No. 71T10-0207-TA-84, Indiana Tax Court

Majestic I has been assessed $2.6 million of withholding tax, plus interest, for the fiscal year 1996 and the period January 1, 1998 through June 18, 2001, by the Indiana Department of Revenue ("IDR"). On September 7, 2004, the IDR assessed BDI, Majestic I's ultimate parent and member, $1.3 million of income tax, plus penalties and interest for the remainder of 2001 and all of fiscal year 2002. The IDR held a hearing on the 1996 through 2002 tax years on April 7, 2006 to consider Majestic I's and BDI's protests over the tax assessments and negligence penalties. The IDR issued rulings on January 17, 2007. In those rulings, the IDR sustained BDI's protest of the imposition of a negligence penalty, holding that BDI's failure to pay the assessed tax amount was due to reasonable cause and not due to negligence. The IDR also concurred with the position taken by Majestic I and BDI that to the extent it is ultimately determined they had net operating losses for a taxable year, those net operating losses are to be applied to offset any add-back of riverboat wagering tax for income tax purposes. The IDR denied Majestic I's protest that nonresident withholding taxes did not apply for the fiscal year 1996 and the period January 1, 1998 through 2002. Majestic I and BDI filed petitions with the Indiana Tax Court on March 19, 2007 appealing the IDR's rulings for the 1996-2002 tax years.

BDI's nonresident shareholder has been assessed $0.2 million, plus penalties and interest, for 2003. That assessment was protested by BDI's nonresident shareholder to the legal division of the IDR. The IDR held a hearing on the 2003 protest on December 5, 2006, and issued its ruling on March 14, 2007. In that ruling, the IDR sustained the shareholder's protest of the imposition of a negligence penalty. The IDR denied the protest of the amount of tax assessed. An appeal of that ruling was filed with the Indiana Tax Court on May 14, 2007.

The assessments relate to deductions for gaming taxes paid by Majestic I, which deductions were taken for Indiana income tax purposes. The IDR has taken the position that Majestic I had an obligation to add back state gaming taxes in determining Majestic I's taxable income, and to withhold and remit tax for the nonresident shareholder of BDI. On April 19, 2004, the Indiana Tax Court ruled in a similar case involving another Indiana casino, Aztar Indiana Gaming Corporation ("Aztar"), that the gross wagering tax is a tax based on or measured by income and that it must be added back to the taxable income base for the purpose of determining adjusted gross income for Indiana tax purposes. On September 28, 2004, the Indiana Supreme Court denied Aztar's request to review the Indiana Tax Court's decision, and thus, the Indiana Tax Court's opinion in the Aztar case is controlling precedent on the wagering tax add-back issue. Majestic I and BDI continue to pursue their protest with the IDR on the grounds that the assessments contain calculation errors and that their protest sets forth issues not decided in the Aztar case. No liability has been accrued in Majestic I's financial statements relating to this matter.

Should Majestic I ultimately be found liable for additional income taxes to the State of Indiana, such liabilities will be treated in accordance with the Plan.

<u>Majestic I and Majestic II Property Tax Assessment Appeals</u>

Majestic I and Majestic II are the owners of certain parcels of real property located in Gary, Lake County, Indiana. These parcels of real property include, *inter alia*, two riverboat casinos, a hotel, and a parking deck. Beginning with the 2006 tax assessment year, Majestic I and Majestic II have disputed and appealed the value of certain of these properties assessed by the Tax Assessor for Lake County, Indiana ("Lake County"). Specifically, for assessment year 2006, Majestic I and Majestic II disputed and appealed Lake County's assessments on the two riverboat casinos. For assessment year 2007, Majestic I and Majestic II disputed and appealed the assessed values of the two riverboat casinos and eight other parcels. For assessment years 2008 and 2009, Majestic I and Majestic II disputed and appealed the assessed values of the two riverboat casinos and twelve other parcels.

When a taxpayer appeals an assessment, Indiana law requires the appealing taxpayer to pay taxes based on the assessed property value at the assessment level of the last year that the taxpayer did not appeal the assessment value until the appeal is resolved. Majestic I and Majestic II have been generally paying each year's taxes on the properties in question based on either the 2005 or 2006 assessments, depending on when the respective assessment was first appealed, in accordance with Indiana law.

On November 8, 2010, Lake County filed a motion pursuant to section 505 of the Bankruptcy Code (the "505 Motion") [Docket No. 719] requesting that the Bankruptcy Court enter an order upholding Lake County's assessment value for the parcels of real property in question and deeming Lake County's claims in the amount of approximately

$25 million allowed in full (collectively, the "<u>Lake County Claims</u>").  To the extent the 505 Motion is granted and Lake County's assessments are upheld prior to confirmation of the Plan, Lake County believes the Lake County Claims should be treated as Allowed Secured Claims that are unimpaired under the Plan.  To the extent the 505 Motion is not fully adjudicated prior to confirmation of the Plan, Lake County believes the Lake County Claims should be treated as Disputed Claims under the Plan, and the Debtors should be required to place into the Disputed Claims Reserve on or before the Effective Date Cash in the amount of the Lake County Claims and maintain such reserve until the Lake County Claims are no longer Disputed Claims.

The Debtors dispute Lake County's valuation of the Lake County Claims and intend to oppose the merits of the 505 Motion in the Bankruptcy Court.  In addition, the Debtors believe the Lake County Claims are Claims which, notwithstanding their asserted status as Secured Claims, would otherwise meet the description of an Unsecured Claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code.  Pursuant to section 1129(a)(9)(D) of the Bankruptcy Code, Allowed secured claims which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of the claim, are entitled to receive on account of such claim, cash payments, in the same manner and over the same period, as unsecured priority tax claims of a kind specified under section 507(a)(8) of the Bankruptcy Code.  As a result, the Debtors believe that if the Lake County Claims are Allowed, they should be classified and treated as Allowed Priority Tax Claims pursuant to the Plan.  Because the Debtors do not believe the Lake County Claims are required to be paid in full in Cash on the Effective Date to the extent they are Allowed, the Debtors do not believe they are required to place Cash into the Disputed Claims Reserve on or before the Effective Date on account of the Lake County Claims.

<u>The Majestic Star Casino, LLC, Majestic Star Casino II, Inc., and Gary New Century, LLC v. City of Gary, Case No. 52489 Y 00091 08, American Arbitration Association</u>; and

<u>The Majestic Star Casino, LLC, Majestic Star Casino II, Inc., f/k/a/ Trump Indiana, Inc., and Gary New Century, LLC v. City of Gary and Indiana Gaming Commission, Case No. 49D13 08 02 PL 006612</u>

As discussed above, Gary entered into the Local Development Agreements with Trump Indiana and Majestic I in 1996 and the Amended Local Development Agreement with Majestic I and Majestic II in 2005.  The current mayor of the Gary, who took office on April 7, 2006, claims that the Amended Local Development Agreement, signed by the prior mayor on behalf of Gary, is not enforceable because the prior mayor lacked the authority to bind Gary.  Majestic I and Majestic II have taken the position that the Amended Local Development Agreement is valid and binding.

Given that both of the original Local Development Agreements contain mandatory arbitration provisions, on February 11, 2008, Majestic I and Majestic II commenced the Gary Arbitration before the American Arbitration Association.  In the Gary Arbitration, Majestic I and Majestic II request that the Amended Local Development Agreement be declared to be in full force and effect, and that Gary be found to be in material breach of it and that Majestic I and Majestic II be awarded damages.  In the event that the Amended Local Development Agreement is deemed not enforceable, Majestic I and Majestic II alternatively request that Gary be found in breach of the original Local Development Agreements, and that the Majestic I and Majestic II be awarded damages.

Simultaneously with the Gary Arbitration, Majestic I and Majestic II also filed the Marion County Lawsuit in Marion County Superior Court.  In the Marion County Lawsuit, Majestic I and Majestic II seek to bind the IGC to the results of the Gary Arbitration and to litigate any matters that are not covered by the parties' arbitration agreement.

Majestic I and Majestic II filed the Gary Arbitration and the Marion County Lawsuit because Gary has failed, pursuant to its obligations under either the Amended Local Development Agreement or, in the alternative, the earlier Local Development Agreements, to conduct environmental remediation of certain property owned by the Company, and to construct the required access roads and freeway interchange to the Majestic Star Casinos.  If the Amended Local Development Agreement is found not to be enforceable, then Majestic II could be required to pay Gary an additional 1% of adjusted gross gaming receipts, retroactive to December 21, 2005, which would be due under the previously terminated Local Development Agreement with Trump Indiana.  As of September 30, 2010, the additional 1% potentially due to Gary from Majestic II would equal approximately $5.2 million.

Effective for the tax period beginning January 2008, Majestic I and Majestic II began depositing the economic incentive funds payable to Gary for 2008 under the Amended Local Development Agreement into a segregated bank account. On May 2, 2008, the Marion County Superior Court denied Gary's motion for a preliminary injunction to compel Majestic I and Majestic II to resume payment to Gary of the economic incentive funds pending resolution of the case.

Gary appealed the denial of its injunction motion to the Indiana Court of Appeals (No. 49A02-0807-CV-00625), filing its appellate brief on July 30, 2008. After a stay to permit the parties to explore settlement, which expired November 30, 2008, as discussed more fully below, Majestic I and Majestic II timely filed their appellate brief with the Indiana Court of Appeals on January 20, 2009, as did the IGC (which supports the position of Majestic I and Majestic II on the proper trial court venue for the action, and has remained neutral on Gary's attempt to require Majestic I and Majestic II to resume payments of the economic incentive funds). On May 14, 2009, the Indiana Court of Appeals issued a decision affirming the trial court's denial of Gary's motion for a preliminary injunction seeking to compel Majestic I and Majestic II to resume payment to Gary during the pendency of the Marion County Lawsuit. Gary's petition for review of this decision was denied by the Indiana Supreme Court on August 20, 2009.

As of September 30, 2010, the balances in the segregated economic incentive fund and lakefront capital improvement fund bank accounts were $12.1 million and $1.2 million, respectively. It is too early to determine with certainty the outcome of the Gary Arbitration or Marion County Lawsuit or the amount or likelihood of any recovery from Gary. Both proceedings have been stayed pending further order of the Bankruptcy Court. Gary, Majestic I, and Majestic II are currently engaged in settlement discussions.

City of Gary, Indiana v. Don H. Barden, et al, Case No. 2:10-CV-00160-PPS-PRC,
United States District Court, Northern District of Indiana, Hammond Division

On March 11, 2010, Gary filed the Lake County Lawsuit in the Superior Court of Lake County, Indiana against the Lake County Defendants (eight current and former individual officers, directors, and employees of Majestic I and Majestic II and their affiliated entities). The Lake County Lawsuit alleges two causes of action against the Lake County Defendants for negligence and civil conversion related to and arising out of the segregated economic incentive funds which are the subject of the Marion County Lawsuit. Gary claims to have suffered damages based on those causes of action. Majestic I and Majestic II believe that continuation of the Lake County Lawsuit against the Lake County Defendants threatens to undermine the protection of the automatic stay, to deplete property of the estate, and to disrupt the Debtors' reorganization efforts. Accordingly, on March 29, 2010 the Debtors instituted an adversary proceeding against Gary (10-50841) in the Bankruptcy Court and filed a motion to obtain an order, pursuant to 11 U.S.C. § 362, extending the automatic stay to the Lake County Defendants with respect to the Lake County Lawsuit, or in the alternative, an order preliminarily enjoining Gary from prosecuting the Lake County Lawsuit against the Lake County Defendants. Gary filed pleadings and papers in opposition to the Debtors motion, and the Debtors timely filed their reply. A hearing on the matter was held before the Bankruptcy Court on April 27, 2010, and on April 28, 2010, the Bankruptcy Court entered a memorandum order granting the Debtors' request for the extension of the automatic stay to the Lake County Defendants pending further order of the Bankruptcy Court. On or about May 12, 2010, Gary filed a notice of appeal in the Bankruptcy Court to appeal the memorandum order to the United States District Court for the District of Delaware. The Bankruptcy Court set the pre-trial conference on the Debtors' Verified Complaint to Extend the Automatic Stay, or in the Alternative, for Injunctive Relief ("Adversarial Complaint") for May 25, 2010. The parties, by agreement, extended the deadline for Gary to respond to the Adversarial Complaint to January 21, 2011 and the pre-trial conference date to February 17, 2011.

On April 15, 2010, a Joint Notice of Removal was filed with the United States District Court for the Northern District of Indiana, Hammond Division, removing the Lake County Lawsuit from the Superior Court of Lake County, Indiana to the United States District Court for the Northern District of Indiana, Hammond Division. On or about April 19, 2010, Gary dismissed its negligence claim against the Lake County Defendants. Gary and the Company are currently engaged in settlement discussions.

## Projected Financial Information

Attached as Exhibit C are the following: (a) a consolidated projected income statement for the period from 2010 through 2015 (the "Projection Period"); (b) a consolidated projected balance sheet for the Projection Period; and (c) a consolidated projected statement of cash flow for the Projection Period.

The projections have been prepared by the Debtors' management with the assistance of the Debtors' retained financial advisors. Such projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants and the rules and regulations of the United States Securities and Exchange Commission. In assisting in the preparation, XRoads relied upon the accuracy and completeness of financial and other information furnished by the Debtors' management and third parties, as well as publicly-available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by the Debtors and third parties with respect to the anticipated future performance of the Reorganized Debtors. XRoads did not attempt to audit or verify such information independently. Neither the Debtors nor their financial advisors conducted an independent investigation into any of the legal, tax, or accounting matters affecting the Debtors or the Reorganized Debtors, and, therefore, neither makes any representation as to their impact on the Debtors or the Reorganized Debtors from a financial point of view. Further, the Debtors' independent accountants have neither examined nor compiled the accompanying actual results and projections and, accordingly, do not express an opinion or any other form of assurance with respect to the projections, assume no responsibility for the projections, and disclaim any association with the projections. Except for purposes of this Disclosure Statement, the Debtors do not publish projections of their anticipated financial position or results of operations.

The projections contain certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are and will be beyond the control of the Reorganized Debtors, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, currency exchange rate fluctuations, existing and future governmental regulations and actions of government bodies, natural disasters and unusual weather conditions and other market and competitive conditions. Holders of claims are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Debtors and the Reorganized Debtors undertake no obligation to update any such statements.

The projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which are and will be beyond the Reorganized Debtors' control. The Debtors caution that no representations can be made or are made as to the accuracy of the historical financial information or the projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions may prove to be inaccurate. Moreover, events and circumstances occurring subsequent to the date on which these projections were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and the Reorganized Debtors do not intend and undertake no obligation to update or otherwise revise the projections to reflect events or circumstances existing or arising after the date this Disclosure Statement is initially filed or to reflect the occurrence of unanticipated events. The projections, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections.

Creditors and other interested parties should see the section herein entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The projections have been prepared based on the assumptions that the Effective Date of the Plan is September 30, 2011 and the Reorganized Debtors' business plan is successfully implemented. Although the Debtors presently intend to cause the Effective Date to occur as soon as practicable following Confirmation of the Plan, there can be no

assurance as to when the Effective Date will actually occur given the conditions for the Effective Date to occur pursuant to the terms of the Plan.

The projections are based on, among other things: (a) current and projected market conditions of the Reorganized Debtors' market; (b) the ability to maintain sufficient working capital to fund operations; and (c) Confirmation of the Plan.

## Risk Factors

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to, or incorporated by reference herein, prior to voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.*

### Risks Relating to Bankruptcy

<u>The Debtors may not be able to obtain Confirmation of the Plan.</u>

To emerge successfully from the Chapter 11 Cases, the Debtors must obtain approval of the Plan from their creditors, secure Confirmation of the Plan through the Bankruptcy Court, and successfully implement the Plan as confirmed. The foregoing process requires the Debtors to (a) meet statutory requirements with respect to the adequacy of disclosures with respect to the Plan, (b) solicit and obtain creditor acceptances of the Plan, and (c) fulfill other statutory conditions with respect to Plan Confirmation.

With regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm a plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. In order to confirm a plan against a dissenting Class, the Bankruptcy Court also must find that at least one impaired Class has accepted the Plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Finally, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) the Debtors' Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, (b) Confirmation of the Debtors' Plan is not likely to be followed by a liquidation or a need for further financial reorganization, and (c) the value of distributions to non-accepting Holders of Claims within a particular Class under the Debtors' Plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court may determine that the Plan does not satisfy one or more of these requirements, in which case the Plan would not be confirmed by the Bankruptcy Court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions Holders of Claims against or Holders of the Debtors' common stock or other Equity Interests ultimately would receive with respect to their Claims or Equity Interests. There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Chapter 11 Cases that is acceptable to the Bankruptcy Court and the Debtors' creditors, equity holders, and other parties in interest. Additionally, it is possible

that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization. Finally, the Debtors' emergence from bankruptcy is not assured. While the Debtors expect to emerge from bankruptcy in the future, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur.

<u>Loss of key management and employees.</u>

The Debtors' success is largely dependent on the skills, experience, and efforts of their people. The loss of the services of one or more members of the Debtors' senior management or of numerous employees with critical skills could have a negative effect on their business, financial condition and results of operations. If the Debtors are not able to attract talented, committed individuals to fill vacant positions when the need arises, it may adversely affect their ability to fully implement their business objectives.

<u>Increases in costs could adversely affect the Debtors' operating results.</u>

The Debtors' inability to maintain their cost structure and efficiently operate their gaming facilities may reduce their operating results. In addition, increases in certain non-controllable or mandatory costs that are driven by external factors may reduce the Debtors' operating results. Examples of these costs are energy, insurance, and taxes.

<u>The conditions precedent to the Confirmation and consummation of the Plan may not occur.</u>

As more fully set forth in Exhibit A, the occurrence of Confirmation of the Plan and the Effective Date of the Plan are each subject to a number of conditions precedent. If the conditions precedent to Confirmation are not met or waived, the Plan will not be confirmed, and if the conditions precedent to the Effective Date are not met or waived, the Effective Date will not take place.

Article XII.D of the Plan provides, in relevant part, that "[i]f the Effective Date has not occurred within 270 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court." Furthermore, Article XII.C of the Plan provides that "the Debtors, or the Reorganized Debtors, as applicable, with the consents of the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee (which consents shall not be withheld unreasonably), may waive any of the conditions to Confirmation or the Effective Date at any time without any notice to parties in interest." In other words, if all conditions precedent to the Effective Date have not occurred within 270 days after Confirmation, the Debtors (or any other party-in-interest) can seek to have the Confirmation Order vacated, and the Debtors can waive the conditions precedent to Confirmation and the Effective Date (other than governmental or regulatory approvals) at any time without notice to any party (other than the Senior Secured Credit Facility Agent, the Senior Secured Notes Trustee, and the Creditors' Committee).

<u>The Plan requires certain regulatory action by The Indiana Gaming Commission, The Mississippi Gaming Commission, and The Colorado Limited Gaming Control Commission, which may delay the Debtors' emergence from these Chapter 11 Cases.</u>

For the Plan to become effective, the Debtors' state gaming regulators must license and approve the new owner(s) and operator(s) of the Debtors' gaming businesses and approve the incurrence of debt in connection with, and other aspects of, the restructuring transactions comprising the Plan. While the Debtors will actively pursue such approvals, the Debtors can make no assurances as to if and when such approvals will be granted. Failure by the Debtors' gaming regulators to grant the necessary approvals will delay and may even prevent the Debtors' emergence from Chapter 11.

<u>Creditors entitled to New Membership Interests may be required to obtain regulatory approval before receiving the New Membership Interests</u>

Creditors in classes entitled to receive distributions of New Membership Interests will not receive New Membership Interests and will receive no compensation in place of the New Membership Interests if they fail to obtain the Requisite Approvals from the three applicable state gaming authorities and no exemption from obtaining Requisite

Approvals is available to them. The cost of obtaining Requisite Approvals could be substantial to a creditor entitled to receive New Membership Interests.

> The recovery for Holders of the General Unsecured Claims against the Debtors may be diluted and the ultimate amount of Allowed Claims against the Debtors may not be finalized until after the Effective Date.

315 proofs of Claim were filed against the Debtors on or before the Bar Date in these cases. The asserted amount of such Claims is approximately $3,288,411,296.29. The Debtors have not yet completed their Claims reconciliation process and therefore have not fully analyzed these filed proofs of Claim. Through the Debtors' Claims reconciliation process, certain filed proofs of Claim may be reduced or disallowed. As a result, the Claims reconciliation process may result in changes that could affect the recovery for Holders of General Unsecured Claims under the Plan.

> Parties in interest may object to the Debtors' classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a Claim or an Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Bankruptcy Court may reach a different conclusion.

> The Debtors may object to the amount or classification of a Claim.

The Debtors reserve the right to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim whose Claim is subject to an objection. Any such Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

> The Debtors May Not Prevail in Litigation Regarding the Lake County Claims,

As described above, the Debtors dispute Lake County's valuation of the Lake County Claims and intend to oppose the merits of the 505 Motion in the Bankruptcy Court. While the Debtors are confident their arguments will ultimately prevail, they recognize there are risks associated with litigating these issues. The outcome of litigation regarding the Lake County Claims could change the valuation disclosed herein and affect distributions to holders of allowed claims under the Plan.

> The Debtors may not be able to achieve their projected financial results.

The financial projections set forth in Exhibit C to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations. The Debtors' actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, the Debtors may lack the necessary capital to continue operating as planned after the Effective Date of the Plan.

> The Holders of Senior Secured Notes Indenture Claims and Senior Notes Claims will acquire a substantial majority of the New Membership Interests upon consummation of the Plan.

Holders of Senior Secured Notes Indenture Claims and Senior Notes Claims will receive a substantial majority of the New Membership Interests, and thus will be in a position to control the outcome of actions requiring stockholder or member approval, including, among other things, election of the Board of Managers. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Debtors and, consequently, impact the value of the New Membership Interests.

*Historical financial information of the Debtors may not be comparable to the financial information of the Reorganized Debtors.*

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

*Certain tax consequences of the Debtors' Plan raise unsettled and complex legal issues and involve various factual determinations.*

Some of the material consequences of the Plan regarding U.S. federal income taxes are summarized under the section herein entitled "Certain U.S. Federal Income Tax Consequences of the Plan." Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. No ruling from the U.S. Internal Revenue Service ("IRS") has been or will be sought by the Debtors regarding any of the tax consequences described in this Disclosure Statement. The IRS may challenge the various positions the Debtors have taken, or intend to take, with respect to their tax treatment, and a court may sustain such a challenge or objection by the IRS. For a more detailed discussion of risks relating to the specific positions the Debtors intend to take with respect to various tax issues, please review the section herein entitled "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 2.

*The New Holdco LLC Agreement could deter takeover attempts that some shareholders may consider desirable, which could adversely affect the value of the New Membership Interests.*

Various provisions of the New Holdco LLC Agreement and Delaware law could make acquiring control of the Reorganized Debtors without the requisite support of its Board of Managers difficult for a third party, even if the change of control would be beneficial to a recipient of New Membership Interests. The existence of these provisions could deprive certain recipients of New Membership Interests of an opportunity to sell their shares of New Membership Interests at a premium over the prevailing market price. The potential inability of holders of New Membership Interests to obtain a control premium could, in certain instances, depress any future trading prices of New Membership Interests.

*The Debtors depend on generating (and having available to the applicable obligor) sufficient cash flow to fund their debt obligations, capital expenditures, and ongoing operations. The Debtors access to additional financing may be limited, which could adversely affect the Debtors' financial condition and their ability to conduct their business.*

The Debtors' ability to service their debt and to fund their planned capital expenditures and ongoing operations will depend on both their ability to generate and grow cash flow and their access (by dividend or otherwise) to additional liquidity sources. The Debtors' ability to generate and grow cash flow is dependent on many factors, including:

- the Debtors' ability to sustain and grow revenues and cash flows from operating activities and to maintain and grow their customer base, particularly in the face of increasing competition;

- general business conditions, economic uncertainty or downturn, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the housing sector and overall economy;

- the effects of current and potential future competitors on the Debtors' business; and

- the effects of governmental regulation on the Debtors' business.

Some of these factors are beyond the Debtors' control. It is also difficult to assess the impact that the general economic downturn and recent turmoil in the credit markets will have on future operations and financial results. However, the general economic downturn has resulted in reduced spending by customers, which may have caused the

Debtors' revenues and cash flows from operating activities to differ from those that otherwise would have been generated. If the Debtors are unable to generate sufficient cash flow or are unable to access additional liquidity sources, they may not be able to service and repay their debt, operate their business, respond to competitive challenges, or fund other liquidity and capital needs. It is uncertain whether the Debtors will be able, under applicable law, to make distributions or otherwise move cash to the relevant entities for payment of interest and principal.

<u>Economic conditions, including a worsening of the current economy and other factors affecting discretionary consumer spending, may harm the Debtors' businesses, financial conditions, and results of operations.</u>

The Debtors' businesses may be adversely affected by the recession currently being experienced in the United States because the Debtors are dependent on discretionary spending by their customers. The continuation or worsening of current economic conditions could cause fewer people to spend money or cause people to spend less money at the Debtors' facility and could adversely affect the Debtors' revenues.

<u>Intense competition could result in loss of market share or profitability.</u>

The Debtors face intense competition in the market in which each gaming facility is located. The Debtors' primary facilities, The Majestic Star Casino and The Majestic Star Casino II, compete with several major casino-hotels in Indiana. Competition continues to increase in the region, with a number of the Debtors' competitors planning to build new or expanded facilities.

Some of the Debtors' competitors have significantly greater financial resources, and, as a result, the Debtors may be unable to compete successfully with them in the future. In addition, online gaming, despite its current illegality in the United States, is a growing sector in the gaming industry. Online casinos offer a variety of games, including slot machines, roulette, poker, and blackjack. Such online casinos allow individuals to participate using credit or debit cards or other forms of electronic payment. The Debtors are unable to assess the impact that online gaming will have on their business operations in the future and there is no assurance that the impact will not be materially adverse.

Competition from other casino and hotel operators involves not only the quality of casino, hotel room, restaurant, entertainment, and convention facilities, but also the pricing of such services. The Debtors' operating results may be adversely affected by significant cash outlays for advertising and promotions for complementary services to patrons. If the Debtors lack the financial resources or liquidity to match the promotions of competitors, the number of casino patrons may decline, adversely affecting the Debtors' financial performance.

The Debtors' ability to compete successfully will also depend on their ability to develop and implement effective marketing campaigns to attract customers to their facilities. To the extent that they are unable to do so, the Debtors may not be able to successfully compete in their markets, and their financial position could be adversely affected.

<u>Work stoppages, labor problems, and unexpected shutdowns may limit the Debtors' operational flexibility and negatively impact the Debtors' revenue.</u>

The Debtors are party to certain collective-bargaining agreements with labor unions. There can be no assurances that the Debtors will be able to renegotiate the labor agreements that are currently in effect without incurring significant increases in their labor costs. Changes to the collective-bargaining agreements could cause significant increases in labor costs, which could have a material adverse affect on the Debtors' businesses, financial conditions, and operations.

Moreover, the unions with which the Debtors have collective-bargaining agreements or other unions could seek to organize groups of employees that are not currently represented by a union. Union organization efforts may occur in the future, potentially causing disruptions to the Debtors' businesses and resulting in increased costs, both of which could have a material adverse effect on the Debtors' businesses, financial condition, and operations.

Lastly, if the Debtors are unable to negotiate new collective-bargaining agreements on mutually acceptable terms, aggrieved employees may engage in strikes or other forms of workplace disruptions, which could have a materially adverse effect on the Debtors' business and operations. Any unexpected work stoppage by the Debtors' employees could have an adverse effect on their businesses and operations, resulting in negative media attention and potentially discouraging customers from visiting the Debtors' facilities. There cannot be assurance that the Debtors can be adequately prepared for unexpected labor developments that may lead to a temporary or permanent shutdown of their facilities.

## Confirmation of the Plan

### The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], 2011 to take place at [ : ] (prevailing Eastern Time) before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

### Deadline to Object to Confirmation

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [●], 2011 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. **Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.**

### Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Equity Interests, or if rejected by an impaired Class, that the Plan is accepted by at least one impaired Class of Claims and "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of Holders of Claims and Equity Interests that are impaired under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of Chapter 11 of the Bankruptcy Code; (2) the Debtors have complied or will have complied with all of the necessary requirements of Chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Debtors believe the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is

reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

**Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court find, as a condition to confirmation, that a Chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a Chapter 7 trustee would generate if the debtor's Chapter 11 case were converted to a Chapter 7 case and the assets of the debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed and consummated.

To estimate what members of each impaired Class of Claims would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a Chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to Holders of General Unsecured Claims or Equity Interests would be reduced by, among other things: (a) the claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases; (c) unpaid Administrative Expense Claims of the Chapter 11 cases; and (d) Priority Claims and Priority Tax Claims. The Debtors' costs of liquidation in Chapter 7 Cases would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the operation of the Debtors during the Chapter 7 Cases, and all unpaid Administrative Expense Claims incurred by the Debtors during the Chapter 11 cases that are allowed in the Chapter 7 cases. The liquidation itself would trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate

the payment of other Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business. These Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, before the balance would be made available to pay other Claims or to make any distribution in respect of Equity Interests.

Based on the Liquidation Analyses set forth in Exhibit E of this Disclosure Statement, the Debtors believe Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a Chapter 7 liquidation. In summary, the Debtors and their management believe that Chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by Holders of General Unsecured Claims entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

- The erosion of the value of the Debtors' assets in the context of an expedited going concern sale or asset-by-asset liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail;

- The increased cost and expenses of liquidation under Chapter 7 arising from fees payable to the Chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- Additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation and from the rejection of Unexpired Leases and Executory Contracts in connection with the cessation of the Debtors' operations;

- The adverse effects on the salability of portions of the business resulting from the possible departure of key employees and the attendant loss of customers and vendors; and

- The application of the rule of absolute priority under the Bankruptcy Code to distributions made in a Chapter 7 liquidation.

Consequently, the Debtors and their management believe Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a Chapter 7 liquidation.

If the Plan is not confirmed and the Debtors fail to propose and confirm an alternative plan of reorganization, they may be liquidated pursuant to the provisions of a Chapter 11 liquidating plan. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in higher administrative costs. Because a trustee's appointment is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a Chapter 7 trustee must be appointed. Any distribution to Holders of Claims under a Chapter 11 liquidation plan probably would be delayed substantially. Most importantly, the Debtors believe any distributions to creditors in a liquidation scenario would fail to capture a significant portion of the "going concern" value of their business, which is reflected in the New Membership Interests to be distributed under the Plan. Accordingly, the Debtors believe Chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of a debtor, or any successor to a debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the projections, as set forth in Exhibit C. Based upon the projections, the Debtors believe their businesses will be viable operations following the Chapter 11 Cases, and the Plan will meet the feasibility requirements of the Bankruptcy Code.

**Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan, and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

**Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

**No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens. Alternatively, a plan is "fair and equitable" with respect to a non-accepting class of secured claims if holders of such claims will receive the "indubitable" equivalent of such claims pursuant to the plan of reorganization.

<u>Unsecured Claims</u>:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property, subject to the applicability of the "new value" exception.

<u>Equity Interests</u>:  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the Effective Date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or Schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**New Value**

A corollary to the "fair and equitable" test, the new value doctrine, permits old equity holders to keep their ownership interests even though senior dissenting creditors do not receive payment in full of their claims provided that the old equity holders make a new contribution (a) in money or money's worth, (b) that is reasonably equivalent to the value of the new equity interests being received in the reorganized debtor, and (c) that is necessary for implementation of a feasible plan of reorganization.

**Valuation of the Debtors**

In conjunction with formulating the Plan, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Reorganized Debtors.  Accordingly, such valuation is set forth in Exhibit D attached hereto.

### Effect of Confirmation of the Plan

**Preservation of Avoidance Actions**

On and after the Effective Date, actions, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "<u>Avoidance Actions</u>") will be preserved and retained by the Reorganized Debtors.  The Reorganized Debtors may offset any claim supporting an Avoidance Action against any payment due to any Holder of a Claim under the Plan.  In addition, if a distribution is made in error, the Reorganized Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such distribution.  In the event that the Plan, as proposed, is consummated, Avoidance Actions that

may potentially be brought might be waived; <u>provided</u>, <u>however</u> that such waiver will not be effective if the Plan is not effectuated.

**Retention of Jurisdiction by the Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

- Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

- Adjudicate, decide or resolve any and all matters related to Causes of Action;

- Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

- Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

- Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

- Adjudicate any and all disputes arising from or relating to distributions under the Plan;

- Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- Enforce all orders previously entered by the Bankruptcy Court; and

- Hear any other matter not inconsistent with the Bankruptcy Code.

**Releases by the Debtors**

On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including: (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; and (2) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each of the Released Parties (and each such Released Party so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Released Party in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Released Party from any Causes of Action expressly set forth in and preserved by the Plan. Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future (a) related to (i) the adversary proceeding commenced by the Debtors on December 31, 2010 regarding, inter alia, the tax status of Majestic II, and (ii) any other related Causes

of Action the Debtors or Reorganized Debtors subsequently may assert (collectively, the "Majestic II Tax Action(s)") and (b) against the non-Released Parties, including the Identified Parties.

**Third Party Releases**

On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Released Party) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents. Notwithstanding anything in the Plan to the contrary, the Released Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future (a) related to the Majestic II Tax Action(s) and (b) against the non-Released Parties, including the Identified Parties. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Released Parties.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties. This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

**Injunction**

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

**Exculpation**

The Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or Postpetition act taken or omitted to be taken in connection with, related to, or arising out of the Debtors' in or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of New Membership Interests, the entry into the New Senior Secured Credit Facility, the entry into the New Senior Secured Notes Indenture and the issuance of the New Senior Secured Notes thereunder, the entry into the First Lien Alternative Financing, if any, the entry into the Second Lien Alternative Financing, if any, or the distribution of property under the Plan or any other agreement entered into in connection therewith or any other Prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order

to have constituted gross negligence or willful misconduct; <u>provided</u>, <u>further</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; <u>provided further</u>, that the foregoing "<u>Exculpation</u>" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of the Released Parties.

## Important Securities Law Disclosure

**Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and Pursuant to Exemptions under the Securities Act of 1933, as Amended**

Under the Plan, substantially all of the units of New Membership Interests will be distributed to Holders of Allowed Senior Secured Notes Indenture Claims and Holders of Allowed Senior Notes Indenture Claims.

The Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the New Membership Interests contemplated by the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities; and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive New Membership Interests are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell the New Membership Interests without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, holders of New Membership Interests deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. As noted in this Disclosure Statement, it is not contemplated that the Reorganized Debtors will be a public reporting company and, therefore, it is unlikely in the period initially following the Effective Date that current public information will be available to permit resales pursuant to Rule 144.

**Voting Instructions**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in Classes A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, and H-8. Only the Holders of Claims in these Classes are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided.

The Debtors, with the approval of the Bankruptcy Court, have engaged Epiq to serve as the Solicitation Agent for Claims to assist in the solicitation process. The Solicitation Agent will, among other things, answer questions, provide additional copies of all solicitation materials, and generally oversee the solicitation process for their assigned Claims. The Solicitation Agent will also process and tabulate ballots for each of their respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

**The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on [●], 2011.**

| **BALLOTS** |
|---|
| Ballots must be actually received by the Solicitation Agent by the<br>voting deadline of 5:00 p.m. (prevailing Eastern Time) on [●], 2011 at the following address:<br><br>**If by mail:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.: The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**FDR Station PO Box 5014**<br>**New York, New York 10150**<br><br>**If by hand delivery or overnight courier:**<br><br>**Epiq Bankruptcy Solutions, LLC**<br>**Attn.: The Majestic Star Casino, LLC**<br>**Ballot Processing Center**<br>**757 Third Avenue, 3rd Floor**<br>**New York, New York 10017**<br><br>If you have any questions on the procedure for voting on the Plan,<br>please call the Solicitation Agent at the following telephone number: (646) 282-2400 |

**MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS AND INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN. FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED AND RECEIVED BY 5:00 P.M. (PREVAILING EASTERN TIME), ON [●], 2011.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM AND/OR INTEREST MAY CAST ONLY ONE BALLOT PER EACH SUCH CLAIM OR INTEREST HELD. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST IN CLASSES A-1, A-2, C-1, C-2, C-5, C-6, C-7, C-8, D-1, D-2, D-5, D-6, D-7, D-8, E-1, F-1, F-2, G-1, G-2, G-5, G-6, G-7, G-8, H-1, H-2, H-5, H-6, H-7, AND H-8, WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM AND/OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE**

**BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS AND/OR INTERESTS, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

### Certain U.S. Federal Income Tax Consequences of the Plan

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Interests and Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained as to any of the tax consequences of the Plan discussed below and the Debtors do not intend to seek a ruling from the Internal Revenue Service ("IRS") as to any such tax consequences and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

Except as otherwise provided below, this summary does not apply to Holders of Allowed Claims that are not "United States persons" (as such term is defined in the IRC) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that Holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the IRC. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each Holder of an Interest or a Claim. Each holder of an Interest or a Claim is urged to consult his, her, or its tax advisors with respect to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan. This discussion does not address special consideration that may be applicable to Holders holding more than one Class of Claims. Such Holders should consult their tax advisors with respect to their particular circumstances.

*IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the IRC. The tax advice contained in this Disclosure Statement was written to support the promotion or marketing of the transactions described in this Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.*

### Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors and BDI

For federal income tax purposes, the Debtors, excluding the Debtors organized as corporations, are classified as disregarded entities (the "Disregarded Debtors"). As such, all of the Disregarded Debtors' assets and liabilities are treated as assets and liabilities of BDI. Upon consummation of the Plan, BDI's direct and indirect equity interest in the Debtors will be cancelled and the New Membership Interests will be issued by Majestic Holdco and distributed to certain creditors of the Debtors, as more fully described in the Plan. The federal income tax consequences of these transactions are not entirely clear.

From BDI's perspective, the transaction will likely be characterized as a taxable transfer of the assets of the Disregarded Debtors and the equity interests of the Debtors that are classified as corporations (the "Corporate Debtors") to the creditors in partial satisfaction of their Claims against the Debtors. In that event, BDI will have taxable gain to the extent the amount of the Claims against the Disregarded Debtors exceeds the tax basis in the

Disregarded Debtors' assets. Alternatively, it is possible that the amount of taxable gain will be determined by reference to the fair value of the Disregarded Debtors' assets, rather than the amount of Claims, if the Claims are characterized as recourse obligations of BDI for federal income tax purposes. In such case, BDI could have cancellation of debt income ("COD Income") (discussed in more detail below) to the extent that Holders of Claims against the Disregarded Entities receive less than 100% recovery on their Claims. If the Claims against the Disregarded Debtors are characterized as non-recourse obligations of BDI for federal income tax purposes, BDI should not realize any COD Income; rather, the amount of such Claims will be taken into account in determining BDI's gain or loss in connection with the consummation of the Plan, as discussed above.

In general, absent an exception, a debtor realizes COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (including equity) given in satisfaction of such indebtedness at the time of the exchange. To the extent a Disregarded Debtor realizes COD Income, such income will be treated as income of BDI. Because the Plan provides that Holders of certain Allowed Claims will receive New Membership Interests, New Senior Secured Notes, and their pro rata share of the New Senior Secured Credit Facility, the amount of COD Income will depend on the fair market value of the New Membership Interests and the issue price of the New Senior Secured Notes and the New Senior Secured Credit Facility (discussed below). These amounts cannot be known with certainty until after the Effective Date and thus it is impossible to state with certainty whether CODI Income, if any, will be realized by BDI.

Neither BDI nor any Corporate Debtors will be required to include any COD Income in gross income if it is (i) under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding or (ii) insolvent on the Effective Date (in which case, the COD Income may be excluded to the extent of the insolvency). If either exclusion applies, BDI or a Corporate Debtor, as applicable, must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. BDI or the Corporate Debtors may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Any attribute reduction will be applied as of the first day following the taxable year in which COD Income is recognized.

**Certain U.S. Federal Income Tax Consequences to Certain Holders of Allowed Claims**

<u>Consequences to Holders of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims</u>

Pursuant to the Plan, each Holder of an Allowed Senior Secured Credit Facility Claim or Allowed Senior Secured Credit Facility Guarantee Claim shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) in the event no First Lien Alternative Financing is consummated, the New Senior Secured Credit Facility and the New Senior Secured Credit Facility Paydown Amount or (ii) in the event the First Lien Alternative Financing is consummated, Cash from the proceeds of the First Lien Alternative Financing.

The exchange of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims for a Pro Rata share of (x) the New Senior Secured Credit Facility Paydown Amount and the New Senior Secured Credit Facility or (y) Cash should be a taxable exchange under section 1001 of the IRC. A Holder of Senior Secured Credit Facility Claims and Senior Secured Credit Facility Guarantee Claims will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the sum of the amount of Cash received and the issue price (described below) of such Holder's share of the New Senior Secured Credit Facility, if any, and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

<u>Consequences to Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims</u>

Pursuant to the Plan, each Holder of an Allowed Senior Secured Notes Indenture Claim and Senior Secured Notes Indenture Guarantee Claim shall receive, on the Distribution Date or as soon thereafter as is practicable, its Pro Rata share of (i) 58 percent of the New Membership Interests and (ii) either (A) in the event no Second Lien Alternative Financing is consummated, the New Senior Secured Notes or (B) in the event the Second Lien Alternative Financing is consummated, Cash in the amount of $100.6 million from the proceeds of the Second Lien Alternative Financing.

The exchange of Allowed Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims for the New Membership Interests and (x) the New Senior Secured Notes or (y) Cash should be a taxable exchange under section 1001 of the IRC. A Holder of Senior Secured Notes Indenture Claims and Senior Secured Notes Indenture Guarantee Claims will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the issue price (described below) of such Holder's share of the New Senior Secured Notes and either the fair value of the Holder's share of New Membership Interests or the amount of Cash received by the Holder and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

Consequences to Senior Notes Indenture Claims against Majestic

Pursuant to the Plan, each Holder of an Allowed Senior Notes Indenture Claim shall receive its Pro Rata share of 42 percent of the New Membership Interests on the Distribution Date or as soon thereafter as is practicable (except to the extent that such Holder and the Debtors agree to less favorable distribution to such Holder).

The exchange of Allowed Senior Notes Indenture Claims for the New Membership Interests should be a taxable exchange under section 1001 of the IRC. A Holder of an exchanged Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the Holder's share of New Membership Interests and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

Consequences to General Unsecured Claims and Rejection Damages Claims against Majestic

Pursuant to the Plan, each Holder of a General Unsecured Claim and/or Rejection Damages Claim shall receive the lesser of, on the Distribution Date or as soon thereafter as is practicable, (i) Cash in an amount equal to 25 percent of its Allowed General Unsecured Claim and/or Rejection Damages Claim against Majestic or (ii) its pro rata share of the Aggregate General Unsecured Claim Recovery (except to the extent that such Holder and the Debtors agree to less favorable distribution to such Holder).

The exchange of General Unsecured Claims and/or Rejection Damages Claims for Cash should be a taxable exchange under section 1001 of the IRC. A Holder of an exchanged Claim will generally recognize income gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in its Claims surrendered therefore. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognized ordinary interest income.

Consequences to Holders of Discount Notes Indenture Claims

Pursuant to the Plan, Discount Notes Indenture Claims against Majestic Holdco shall be cancelled, released, and extinguished and the Holders of Discount Notes Indenture Claims against Majestic Holdco shall receive no

distribution under the Plan on account of such Claims. A Holder of a cancelled Claim should be entitled to claim a loss for tax purposes equal to the Holder's adjusted basis in such Claim.

**Accrued But Untaxed Interest**

A portion of the consideration received by Holders of Claims may be attributable to accrued but unpaid interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, it is possible that a Holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but is not paid in full by Debtors. The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes. The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**Market Discount**

Holders of Claims who receive consideration in exchange for their Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

**Issue Price**

For U.S. federal income tax purposes, the "issue price" of a debt instrument depends on whether such instrument is deemed to be "publicly traded." If, at any time during the 60-day period ending 30 days after the issue date of a debt instrument, a substantial amount of the debt instruments in an issue is "traded on an established market" within the meaning of the applicable Regulations, then the debt instrument will be treated as publicly traded and the issue price of the debt instrument will equal the fair market value of that debt instrument on the date of issuance. In general, a debt instrument will be treated as traded on an established securities market if it is listed on a major securities exchange, appears on a system of general circulation that provides a reasonable basis to determine fair market value or otherwise is, among other things, readily quotable by dealers, brokers or traders. For purposes of applying these rules, each tranche of new debt instruments is treated as a separate issue.

If the New Senior Secured Credit Facility or the New Senior Secured Notes, respectively, are not publicly traded and the old Claims exchanged for such debt instruments also are not publicly traded, then the issue price of the New Senior Secured Credit Facility or the New Senior Secured Notes, as applicable, generally would equal the stated principal amount of such debt instrument. Holders of Claims should consult their tax advisors regarding the issue prices for the New Senior Secured Credit Facility and the New Senior Secured Notes.

## Certain Tax Consequences of Owning New Membership Interests of Majestic Holdco

It is anticipated that Majestic Holdco will be characterized as a partnership for federal income tax purposes following the Distribution Date. As such, a Holder of Claims who receives New Membership Interests will be treated as a partner for tax purposes. The U.S. federal tax consequences of being a partner in an operating partnership are very complicated. As an example, a partnership itself does not pay U.S. federal income taxes; instead, its income and deductions are allocated to its partners, who include such amounts on their own tax returns. In addition, a partner may generally receive distributions from a partnership up to the amount of the partner's tax basis in its partnership interest without incurring additional tax. The Board of Managers of the Reorganized Debtors shall determine in its sole discretion whether to make any tax distributions, in accordance with the New Holdco LLC Agreement, and no person or entity may rely on this Disclosure Statement or the exhibits attached hereto as evidencing a right to receive any such tax distributions. Holders who will receive New Membership Interests are urged to consult with their own tax advisers regarding such consequences.

Because the Reorganized Debtors will be engaged in a U.S. trade or business for U.S. federal income tax purposes, Reorganized Majestic Holdco will be required to withhold and pay over to the U.S. tax authorities with respect to each member-partner that is not a "United States person" for federal income tax purposes (a "Foreign Member") a percentage equal to the highest applicable U.S. tax rate of each such Foreign Member's distributive share of Reorganized Majestic Holdco's income that is effectively connected with such trade or business (and withholding taxes may be imposed in other circumstances where Reorganized Majestic Holdco recognizes gain attributable to US real property). Each Foreign Member will be required to file U.S. tax returns and pay U.S. tax on its share of Reorganized Majestic Holdco's net effectively connected income (with any taxes withhold by Reorganized Majestic Holdco creditable against such tax liability). In addition, upon the taxable disposition of an interest in Reorganized Majestic Holdco, if (i) 50% or more of Reorganized Majestic Holdco's gross assets consist of "United States real property interests" and (ii) 90% or more of Reorganized Majestic Holdco's gross assets consist of "United States real property interests" and cash or cash equivalents, a purchaser will be required to withhold 10% of the amount paid for the interest pursuant to section 1445 of the IRC. Alternatively, other tax rules may apply, which could result in all or some portion of any gain recognized on a Holder's taxable disposition of an interest in Reorganized Majestic Holdco being subject to U.S. federal income tax. A tax-exempt organization will generally derive "unrelated business taxable income" from holding interests in Reorganized Majestic Holdco. Tax-exempt organizations and Foreign Members may wish to consider using a "blocker" structure to hold their interests. A discussion of all the relevant tax considerations for these types of Holders is beyond the scope of this Disclosure Statement; such Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of receiving and owning a New Membership Interest in Reorganized Majestic Holdco.

## Certain Consequences of Owning an Interest in New Senior Secured Credit Facility

Stated interest on the New Senior Secured Credit Facility will generally be taxable to the holder as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes. A holder will generally be required to report the excess, if any, of the stated principal amount of its share of the New Senior Secured Credit Facility over the issue price of its share of the New Senior Secured Credit Facility as original issue discount on a constant yield basis over the term of the New Senior Secured Credit Facility.

## Certain Consequences of Owning New Senior Secured Notes

Stated interest on the New Senior Secured Notes will generally be taxable to the holder as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes. A holder will generally be required to report the excess, if any, of the stated principal amount of its share of the New Senior Secured Notes over the issue price of its share of the New Senior Secured Notes as original issue discount on a constant yield basis over the term of the New Senior Secured Notes.

**Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; underlined provided, underlined however, that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of the Holder's circumstances and income tax situation. All Holders of Claims against the Debtors should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the restructuring, including the applicability of any state, local, or foreign tax laws, and any change in applicable tax laws.**

## Recommendation

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

The Majestic Star Casino, LLC
(for itself and on behalf of each of the Debtors)

/s/ *Jon S. Bennett*
_____
Jon S. Bennett
Senior Vice President, Chief Financial Officer, and
Treasurer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400

- and -

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Co-Counsel for the Debtors and Debtors in Possession