## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE MAJESTIC STAR CASINO, LLC, *et al.,* | ) | Case No. 09-14136(KG) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

The task for the Court is to determine for *ad valorem* purposes the value of two riverboat casinos located in Lake County, Indiana. The Court conducted a three day evidentiary hearing in May, 2011, at which seven witnesses testified and numerous exhibits were introduced.

## FINDINGS OF FACT

## Background

### A.     Procedural History

On November 23, 2009, each of the Debtors filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code. On March 10, 2011, the Court held a confirmation hearing at which it entered an order confirming the Debtors' Second Amended Joint Plan of Reorganization.

---

[1] This Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

The Tax Assessor for Lake County (the "County") filed the Motion of Lake County, Indiana for Allowance of Claims and Determination of Real Property Assessment and Tax Liability Pursuant to Section 502, 505(a) and 105(a) of the Bankruptcy Code [Docket No. 719], asking the Court to determine the real property tax liability of the Debtors on ten parcels of real property located in Lake County, Indiana. The Vessels constitute two of these parcels. The parties subsequently agreed to limit this proceeding to a determination of the assessed value of the Vessels for Indiana real property tax purposes as of the March 1, 2007, and March 1, 2010 assessment dates. (Am. and Restated First Stip. ¶ 2.) The parties have stipulated that these values will be used to determine the assessed values of the Vessels as of the other assessment dates in dispute, based on an agreed-upon formula. (*Id.* ¶ 3.) The other assessment dates in dispute are March 1, 2006, March 1, 2008, March 1, 2009, and March 1, 2011.

On May 11-13, 2011, the Court held a bench trial to determine the assessed values of the Vessels as of the relevant assessment dates. On June 13, 2011, the parties presented their closing arguments.

**B.     The Vessels**

At issue in this proceeding is the assessed value of two riverboat gaming vessels—the MSC I and the MSC II—that are owned and operated by two of the Debtors, The Majestic Star Casino, LLC and The Majestic Star Casino II, Inc., respectively. (Hearing Stip. ¶ 7-8.) The Vessels are moored in Lake Michigan at Buffington Harbor, which adjoins the City of

Gary, Indiana, in Calumet Township, Lake County. (*Id.*; 5/11/11 Trial Tr. 45:18-20 (Bennett).)

The MSC I was constructed in 1997. (Hearing Stip. ¶ 11; 5/11/11 Trial Tr. 44:14-15 (Bennett).) The MSC I has approximately 43,000 square feet of gaming space and a capacity of 3,500 passengers and crew. (5/11/11 Trial Tr. 44:15-17 (Bennett).) The Debtors acquired the MSC II, together with substantially all of the other real property, tangible personal property, and intangible property of Trump Indiana, Inc., (now known as The Majestic Star II, Inc.) in 2005 as part of the purchase of all of the issued and outstanding stock of Trump Indiana, Inc. (*Id.* at 46:6-16 (Bennett).) The MSC II was built in 1996 and has approximately 40,000 square feet of gaming space and a capacity of nearly 3,000 passengers and crew. (*Id.* at 44:20-24 (Bennett).)

## C.  Property Tax Assessments for the Vessels

For the March 1, 2002 through March 1, 2005 assessment dates, the Vessels were assessed at a combined value of approximately $39 million. (Hearing Stip. ¶ 19.) For the March 1, 2006 assessment date, the Calumet Township Assessor (the "Assessor") increased the combined assessed value of the Vessels to approximately $110 million. (*Id.* ¶ 20.) For the March 1, 2007, and March 1, 2010 assessment dates, the Vessels were assessed in the aggregate amounts of approximately $109 million and $100 million, respectively. (*Id.* ¶¶ 21, 24.)

The Debtors timely filed appeals contesting the assessed values of the Vessels for the March 1, 2006 through March 1, 2009 assessment dates. (*Id.* ¶ 25.) While these appeals have been pending, the Debtors have timely paid property taxes on the Vessels for such assessment dates based on the Vessels' assessed values as of the March 1, 2005 assessment date, as Indiana law permits. Ind. Code § 6-1.1-15-10(a)(2). (*Id.* ¶ 26.)

As of the date of trial, the net effective property tax rate applicable to the Vessels for the March 1, 2010 assessment date had not yet been determined by the Lake County Treasurer, and payment of property taxes arising from the March 1, 2010 assessment date had not yet become due. (*Id.* ¶ 31.)

### D.    The Indiana Gaming Market

In 1993, Indiana enacted the Riverboat Gambling Act, which allowed for gambling activities on licensed riverboat vessels in Indiana. Ind. Code § 4-33-1-1 *et seq.* The Indiana Gaming Commission, the body charged with the licensing and regulation of riverboat gaming, subsequently issued eleven riverboat gaming licenses, the maximum number allowed under Indiana law. Ind. Code § 4-33-6-1. Because the number of licenses that are available is capped, Indiana is what is known as a limited license jurisdiction. (5/11/11 Trial Tr. 45:6-8 (Bennett).) These licenses are not restricted for use on a particular vessel. (*Id.* at 46:23-25 (Bennett).) The licenses owned by the Debtors allow them to operate their casinos anywhere in Gary, Indiana, as long as they are on Lake Michigan. (*Id.* at 47:7-21 (Bennett).)

In addition to the casinos owned and operated by the Debtors, there are three other casinos that are located in Northern Indiana. (Debtors' Trial Ex. 19 at 25.) These casinos are the Horseshoe, Ameristar, and Blue Chip casinos. (*Id.* at 27.) Like the casinos operated by the Debtors, these casinos are located on Lake Michigan. (*Id.* at 25.)

Initially, all Indiana riverboats were subject to mandatory cruising requirements which required them to conduct two-hour "gaming excursions." (Hearing Stip. ¶ 6; 5/11/11 Trial Tr. 47:14-21 (Bennett).) In 2002, Indiana eliminated the cruising requirements to allow for dockside gambling. (Hearing Stip. ¶ 6; 5/11/11 Trial Tr. 48:1-9 (Bennett).) In response to these changes, Indiana gaming operators have moved away from yacht-style vessels and have begun constructing "building-on-a-barge" style casinos. (5/11/11 Trial Tr. 48:10-49:1 (Bennett).) Building-on-a-barge style casinos are essentially floating casino buildings that have the look and feel of a Las Vegas-style casino. (*Id.*)

These building-on-a-barge style casinos differ from the yacht-style vessels that the Debtors own and operate. (*Id.*) Rather than replicating gaming operations within a small amount of compartmentalized gaming space on multiple levels—which the Debtors must do on the Vessels—a building-on-a-barge style casino can place all of its gaming operations throughout large, open Las Vegas-style gaming floors. (*Id.* at 50:3-9 (Bennett).) This change in layout and design allows the building-on-a-barge style casinos to be much more efficient and attractive than the Vessels. (*Id.* at 50:1-9 (Bennett).)

In 2006, the Blue Chip Casino (the "Blue Chip") replaced its excursion riverboat with the first building-on-a-barge style casino in Indiana. (*Id.* at 49:18-50:22 (Bennett).) The Blue Chip is a massive building-on-a-barge style casino with over 160,000 square feet. (*Id.* at 50:13-15 (Bennett).) The Blue Chip is currently using 65,000 square feet for gaming (*Id.* at 50:15-16 (Bennett)), but has the capacity to expand to 150,000 square feet of gaming space. (*Id.* 50:17-18 (Bennett), 254:22-24 (Herman); Debtors' Trial Ex. 30.)

In 2008, the Horseshoe casino replaced its excursion riverboat with a building-on-a-barge style casino. (5/11/11 Trial Tr. 49:11-19, 50:1 (Bennett).) Importantly, the Horseshoe sold its excursion vessel for approximately $3 million in 2010. (*Id.* at 52:15-17 (Bennett).) This vessel was the same class vessel as the MSC II. (*Id.* at 52:20-22 (Bennett).)

The opening of the barge style Blue Chip and the Horseshoe has resulted in a decline in the Debtors' revenues. (*Id.* at 49:22-50:9 (Bennett), 208:12-17 (Herman).)

In addition to the eleven licenses granted by the Indiana Gaming Commission, in 2007, Indiana issued two gaming licenses to racetracks to allow them to operate slot machines. (5/13/11 Trial Tr. 86:13-17 (Owen).) Two racetracks—referred to as "racinos"—purchased these gaming licenses for $250 million each. *(Id.* at 86:21-24 (Owen).)

### E.    The County's Plan to Increase the
         Property Taxes of the Riverboat Vessels.

During the 2006 and 2007 time period, the homeowners in Lake County were complaining that their property taxes were too high.  (Karras Dep. Desig. 15:5-21.)  Elected officials in the County wanted to reduce homeowner property taxes.  (*Id.* at 21:3-8.)

The County made it known that it was planning on increasing the assessed values of the casino riverboats.  (*See, e.g., id.* at 28:2-29:8, 48:19-49:11 ("But anyhow, it's pretty evident here that we were on a goal to see that their taxes did go up, would go up, and we felt they should go up.").)  The township assessors "never came up with any concrete evidence" to support their beliefs that that the casino riverboats were underassessed.  (*Id.* at 53:3-11.)

By increasing the assessed values of the casino riverboats, the County hoped to be able to lower the tax rate for its homeowners.  (*Id.* at 43:3-13.)

### I.    Indiana Real Property Tax Law

### A.    Indiana Law for Determining the Value of Riverboat Vessels.

Under Indiana law, a "riverboat" is defined, in relevant part, as "[a] self-propelled excursion boat" on which gambling is authorized.  IND. CODE § 4-33-2-17(1).  Riverboats are specifically classified as real property under Indiana assessment law, and thus are subject to Indiana's *ad valorem* real property taxes.  IND. CODE § 6-1.1-1-15.

Real property is assessed in Indiana at its "true tax value," as that term is defined by applicable statutes and the rules of the Indiana Department of Local Government Finance ("DLGF").  IND. CODE § 6-1.1-31.5(a); IND. CODE § 6-1.1-31-6(c).  The "assessed value" of

real property is equal to its "true tax value."  IND. CODE § 6-1.1-1-3(a)(2).

**B.    The True Tax Value of Riverboats
       According to the "Riverboat Valuation Statute."**

Section 6-1.1-4-39.5 of the Indiana Code (the "Riverboat Valuation Statute") (IND.

CODE § 6-1.1-39.5(a)) dictates how the true tax value of riverboats (referred to in the statute

as "qualified real property") must be determined:

> [T]he true tax value of qualified real property is the lowest valuation
> determined by applying each of the following appraisal approaches:
>
> (1)    Cost approach that includes an estimate of reproduction or
>        replacement cost of buildings and land improvements as of the
>        date of valuation together with estimates of the losses in value
>        that have taken place due to wear and tear, design and plan, or
>        neighborhood influences using base prices determined under 50
>        IAC 2.3 and associated guidelines published by the department.
>
> (2)    Sales comparison approach, using data for generally comparable
>        property, excluding values attributable to licenses, fees, or
>        personal property, as determined under 50 IAC 4.2.
>
> (3)    Income capitalization approach, using an applicable
>        capitalization method and appropriate capitalization rates that
>        are developed and used in computations that lead to an
>        indication of value commensurate with the risks for the subject
>        property use.

IND. CODE § 6-1.1-4-39.5(b).

The Riverboat Valuation Statute was enacted in April 2007, but was explicitly made

retroactive to the March 1, 2006 assessment date and thus is applicable to all assessment

dates being contested in this proceeding.  Indiana Public Law 233-2007, Sec. 36.

### C. DLGF Assessment Standards and Guidance

In addition to the Riverboat Valuation Statute, there are generally applicable property valuation and assessment rules promulgated by the DLGF. The principal source of the DLGF's rules and guidance are the 2002 Real Property Assessment Manual (the "Manual") and the Real Property Assessment Guidelines for 2002 - Version A (the "Guidelines"). Both the Manual and Guidelines were in effect and must be applied subject to the Indiana Code (including the Riverboat Valuation Statute) and decisions of the Indiana courts and the Indiana Board of Tax Review ("IBTR"), for all the assessment dates at issue in this proceeding. The Manual and Guidelines are incorporated by reference in the Indiana Administrative Code. 50 IND. ADMIN. CODE tit. 50, § 2.3-1-2.

The DLGF's general rules for determining "true tax value" are published in the Manual. According to the Manual, "true tax value" means "market value-in-use of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property." (Debtors' Trial Ex. 22 at 2.)

To determine true tax value, the Manual specifically endorses the use of three approaches: the cost approach, the sales comparison approach, and the income capitalization approach. (*Id*. at 3.) "All three of these approaches, when properly processed, should produce approximately the same estimate of value." (*Id*.)

In conjunction with the Manual, the DLGF also adopted the Guidelines for use in determining the assessed value of real property, particularly within the cost approach. The

Guidelines contain (a) schedules for determining the reproduction costs of riverboats (which the Riverboat Valuation Statute states is the starting point for the analysis) (Debtors' Trial Ex. 28); (b) schedules for determining the normal depreciation of riverboats (Debtors' Trial Ex. 27 at 36); and (c) guidance for assessors and taxpayers to follow in determining additional functional and external obsolescence that is not reflected in the depreciation schedules. (Debtors' Trial Ex. 27.)

The DLGF's rules for determining true tax value of property, including riverboats, must be read in conjunction with, and subject to, the Riverboat Valuation Statute. IND. CODE § 6-1.1-31-5(a) ("*Subject to this article [i.e., 6-1.1]*, the rules adopted by the department of local government finance are the basis for determining the true tax value of tangible property.") (emphasis added)).

For Indiana property tax purposes, the reproduction cost of a riverboat is initially computed in accordance with Schedule G of the Guidelines. (IND. CODE § 6-1.1-39.5(b) (1) ("base prices" determined under the Manual "and associated [G]uidelines" to be used in cost approach for riverboats under the Riverboat Valuation Statute); Debtors' Trial Ex. 28.) According to this schedule, the base cost for a Lake Michigan riverboat vessel is $19 million. (Debtors' Trial Ex. 28.) To the extent that a vessel's capacity differs from 2,000 persons (passenger and crew), this base cost is then adjusted by $2,500 per person. (*Id.*).

The Manual defines reproduction cost new as "[t]he cost of constructing a new improvement, reasonably identical with the subject improvement, using the same materials, constructions standards, design, and quality of workmanship." (*Id.*)

The Manual defines replacement cost new as "[t]he cost, including material, labor, and overhead, which would be incurred in constructing an improvement having the same utility to its owner as a subject improvement." (Debtors' Trial Ex. 22 at 11.)

### D. Depreciation and Obsolescence Under the Guidelines.

When valuing real property improvements, there are three categories of depreciation that an assessor must consider: physical deterioration, functional obsolescence, and external obsolescence. (Debtors' Trial Ex. 27 at 4; *see also* 5/12/11 Trial Tr. 43:18-25 (Gholson).) Physical deterioration is the loss in value caused by wear and tear over time. (Debtors' Trial Ex. 27 at 4; 5/12/11 Trial Tr. 43:18-21 (Gholson).) Functional obsolescence is the loss in value "caused by inutility within the improvement" and "may be caused by defects in design, style, size, poor room layout, a deficiency, the need for modernization, a superadequacy, and/or by changes in the tastes of potential buyers." (Debtors' Trial Ex. 27 at 4.) External obsolescence is caused by "an influence outside the property's boundaries that has a negative influence on its value." (*Id.*)

Although Appendix F of the Guidelines provides a schedule to determine the normal depreciation for a riverboat based on its "actual age," this table does not account for any excessive functional and external obsolescence that affects the property. (Debtors' Trial Ex.

27 at 8; 5/12/11 Trial Tr. 43:18-25 (Gholson).) Appendix F directs that any such functional or external obsolescence must be estimated and deducted separately. (Debtors' Trial Ex. 27 at 4; *see also* 5/12/11 Trial Tr. 43:22-25 (Gholson), 201:15-19 (Kelly).) Appendix F sets forth a few methodologies for calculating functional and economic obsolescence, but makes clear that the methods listed are "not intended to be an exhaustive list," and "[t]here are numerous methodologies and as a general rule, common appraisal concepts and methods may be used to determine obsolescence under true tax value." (Debtors' Trial Ex. 27 at 8).

### E. Assessment Procedures and Valuation Dates

#### i. Assessments and Reassessments of Real Property

In Indiana, responsibility for the assessment of real property is assigned by statute to the township assessor in those townships which elect township assessors, and to the county assessor in those townships which do not. (Hearing Stip. ¶ 16.) For the March 1, 2002 through March 1, 2010 assessment dates, the Calumet Township Assessor was Booker Blumenberg and the Lake County Assessor was Paul Karras. (*Id.* ¶ 17.)

Real property in Indiana is assessed for property tax purposes as of March 1 of each year (the "assessment date") (*Id.* ¶ 1), for property taxes payable by the owner in the following year. (*Id.* ¶ 2.) For the March 1, 2006 through March 1, 2009 assessment dates, real property was valued for Indiana property tax purposes as of January 1 of the year preceding the assessment date, subject to Indiana law and regulations. (*Id.* ¶ 13.) Beginning with the March 1, 2010 assessment date, the assessment date and the valuation date for each

assessment year are identical (*i.e.*, March 1 of each year). (*Id.* ¶ 15.) Regardless of the valuation date, real property is assessed as it physically existed on the assessment date. (*Id.* ¶ 13.)

For the March 1, 2007 assessment date, the true tax value of the Vessels is to be determined as of January 1, 2006, taking into account their physical condition on March 1, 2007, subject to Indiana law and regulations. (*Id.* ¶ 14.) For the March 1, 2010 assessment, the true tax value of the Vessels is to be determined as of, and taking into account their physical condition on, March 1, 2010, subject to Indiana law and regulations. (*Id.* ¶ 15.)

### ii. Trending

Effective beginning with the March 1, 2006 assessment date, assessors are required to determine annual adjustments (*i.e.,* trending) for assessed values, so that assessed values are adjusted each year to that assessment year's valuation date. IND. CODE § 6-1.1-4-4.5. The rules for calculating trending adjustments are based on a statistical analysis known as a "sales ratio study," where the ratio is determined by dividing the assessed values of properties that have sold by their sales prices. 50 IND. ADMIN. CODE tit. 50 § 21-3-1. If there are insufficient sales within a property class to determine the trending factor for that class, the assessor may use other specified methods to derive the trending factor, such as Marshall & Swift cost tables. *Id.* § 21-5-2(b). In determining whether sales "reflect the market value-in-use of the real property transferred," the regulations direct assessors to exclude sales that

include or reflect "the value of personal property, financing, leases, or other parcels of real property." *Id.* § 27-4-7(d).

## II.  Appraisals

At trial, both parties presented evidence and introduced appraisals that had been performed in the relevant time period for various purposes, none in connection with the instant litigation.  As discussed below, these appraisals varied in the purposes for which they were performed and the assets that they valued.  Of the various appraisals, the Court finds that the most probative appraisals are those that valued only the assets that are at issue here—the Vessels.

In addition, the parties also presented evidence regarding a rough internal replacement cost estimate prepared by one of the Debtors' employees.  However, this estimate is not probative because it was premised on flawed data that rendered the calculation incorrect.

### A.  Appraisals of the Vessels

The Debtors presented evidence on six vessel appraisals—three for each of the Vessels.  Although the County objected to the admission of the Vessel appraisals on the grounds of relevance, the Court finds that these appraisals are relevant because they (a) valued the Vessels alone, which are the subject property at issue in these proceedings; (b) were performed during the relevant time period; and (c) used a valuation standard comparable to market value-in-use.

The parties' experts agree that when a property is being utilized at its highest and best use, there is no distinction between its value-in-use and value-in-exchange (*i.e.,* market value). (5/11/11 Trial Tr. 308:14-18 (Herman); 5/12/11 Trial Tr. 212:24-213:23 (Kelly), 268:12-269:5 (Owen).) Value-in-exchange is the price that would be established between a willing buyer and a willing seller in an arm's length transaction. (5/12/11 Trial Tr. 213:14-18 (Kelly).) Here, because the Vessels are being utilized at their highest and best use (*id*. at 213:3-6 (Kelly), 269:4-5 (Owen)), their fair market value is synonymous with their value-in-use. (5/11/11 Trial Tr. 138:9-11 (Bennett).)

### i. Crowe Chizek Appraisals

In connection with the Debtors' purchase of Trump Indiana, Inc., the Debtors engaged Crowe Chizek to value the tangible and intangible assets of Trump Indiana, Inc. (Debtors' Trial Ex. 5; 5/11/11 Trial Tr. 55:19-56:1 (Bennett).) In preparing its appraisal, Crowe Chizek adhered to Uniform Standards of Professional Appraisal Practice ("USPAP"). (5/11/11 Trial Tr. 56:4-9 (Bennett).)

Crowe Chizek contracted with Deloitte & Touche LLP to value the real property associated with the Debtors' acquisition of Trump Indiana, Inc. (*Id*. at 56:19-22 (Bennett).) Deloitte & Touche LLP then retained Dufour Laskay and Strouse LLP ("DLS"), a marine appraisal firm, to value the MSC II vessel. (*Id*. at 56:22-24 (Bennett).)

Crowe Chizek valued the gaming license acquired from Trump Indiana, Inc. at $103.7 million. (*Id*. at 57:7-11 (Bennett; Debtors' Trial Ex. 5.), and allocated a value of $5.5 million

to the MSC II vessel based on the DLS appraisal. (5/11/11 Trial Tr. 56:13-15 (Bennett); Debtors' Trial Ex. 5.)

### ii.    DLS Appraisals

DLS performed three appraisals of the MSC II vessel and one appraisal of the MSC I vessel.  To perform each of these appraisals, DLS adhered to USPAP and utilized a fair market value standard.  (Debtors' Trial Ex. 1-3, 6; 5/11/11 Trial Tr. 62:23-63:5, 64:25-65:7, 65:25-66:5 (Bennett).)

As part of its appraisals, DLS considered the cost approach, the sales comparison approach, and the income approach.  (*Id.* at 63:6-11, 65:20-24 (Bennett).)  Although DLS considered the income approach, ultimately it concluded that the Vessels were just a platform for conducting gaming and that the total gaming revenues were not contingent upon the Vessels' operation.  (*Id.* at 66:6-18 (Bennett); Debtors' Trial Ex. 2.)  Accordingly, DLS found that applying the income approach would provide unreliable value calculations for the Vessels.  (5/11/11 Trial Tr. 66:6-18 (Bennett).)

In its first appraisal, DLS appraised the MSC II in conjunction with the fresh start accounting that Trump Indiana, Inc. was undertaking at the time.  (Debtors' Trial Ex. 6; 5/11/11 Trial Tr. 64:1-12 (Bennett).)  DLS concluded that the MSC II had a value of $4.5 million as of April 15, 2005.  (Debtors' Trial Ex. 6; 5/11/11 Trial Tr. 65:13-14 (Bennett).) In its second appraisal, DLS concluded that the MSC II had a value of $5.5 million as of December 22, 2005.  (Debtors' Trial Ex. 1; 5/11/11 Trial Tr. at 63:12-15 (Bennett).)

In its third appraisal, DLS appraised the MSC I as of December 31, 2009. (Debtors' Trial Ex. 2; 5/11/11 Trial Tr. 65:15-67:4 (Bennett).) DLS concluded that the MSC I had a value of $5.2 million. (*Id.* at 66:19-23 (Bennett).)

In its fourth appraisal, DLS appraised the MSC II as of December 31, 2009. (Debtors' Trial Ex. 3; 5/11/11 Trial Tr. 69:1-6 (Bennett).) DLS concluded that the value of the MSC II was $4,774,130. (*Id.* at 69:17-19 (Bennett).)

### iii. A3Pi Appraisals

A3Pi Services, Inc. ("A3Pi"), a marine consultant and surveyor firm, performed two appraisals of MSC I on behalf of Foothill Capital Corporation, a subsidiary of Wells Fargo, one of the Debtors' creditors. (Debtors' Trial Ex. 12; Debtors' Trial Ex. 13; 5/11/11 Trial Tr. 69:20-70:1 (Bennett), 70:14-20 (Bennett).)

A3Pi appraised the MSC I vessel as of June 4, 2004 under a fair market value standard. (Debtors' Trial Ex. 12; 5/11/11 Trial Tr. 69:20-70:3.) A3Pi concluded that the value of the MSC I was $9.5 million. (5/11/11 Trial Tr.70:7-13 (Bennett).)

A3Pi also appraised the MSC I vessel as of June 11, 2003 under a fair market value standard. (Debtors' Trial Ex. 13; 5/11/11 Trial Tr. 70:14-22 (Bennett).) A3Pi concluded that the value of the MSC I was $10 million. (5/11/11 Trial Tr. 70:23-25 (Bennett).)

### iv.    Summary Chart

The following chart summarizes the assessed values of the Vessels and the Vessels appraisals that were introduced at trial by the Debtors and their expert and the County and its expert.



### B.    Replacement Cost Estimates

In addition to the above appraisals, the parties also presented evidence of several replacement cost estimates.  The Court finds that these estimates do not provide a reliable indication of the value of the Vessels for the reasons explained below.

### i.    Replacement Cost Estimates Prepared by Manley Brothers

At trial, there was a limited discussion involving certain valuations by Manley Brothers regarding the cost to construct new yacht-style vessels to replace the Vessels.  (*Id.* at 71:7-13 (Bennett).) These estimates, which were performed for insurance purposes, do not take into account depreciation or obsolescence.  (*Id.* at 71:9-21 (Bennett).)  As discussed below, given the age of the Vessels and the changes in the gaming market, deductions for depreciation and obsolescence should be substantial.

Neither party offered these estimates into evidence.  Accordingly, the Court finds that the valuations prepared by Manley Brothers are not probative of the value of the Vessels.

### ii.    Internal Replacement Cost Estimate

Evidence was presented at trial which indicated that an employee of the Debtors had estimated the replacement cost new of the Vessels.  (County's Trial Ex. 7; 5/11/11 Trial Tr. 83:15-87:14 (Bennett).)  Under this estimate, the replacement cost new of the MSC I was $133,956,600 and the replacement cost new of the MSC II was $115,276,800.  (5/11/11 Trial Tr. 86:9-87:10.)  This calculation was flawed and not probative for at least two reasons.

First, as one of the witnesses for the Debtors explained, this calculation was based on the erroneous assumption that the cost to replace the Vessels would be $1,200 per square foot. (*Id.* at 122:2-16 (Bennett).) To calculate the $1,200 figure, the Majestic employee took $82 million—the cost to construct the entire Blue Chip casino—and divided it by the 65,000 square feet of gaming space that he believed represented the total gaming space of the Blue Chip. (*Id.*) However, as several witnesses established, the Blue Chip has potential gaming space of 150,000 square feet. (*See, e.g., id.* at 122:17-19 (Bennett), 254:22-24 (Herman).) Thus, the Majestic employee relied upon incorrect square footage when calculating the cost-per-square-foot internal estimate.

Second, the evidence shows that the employee took the $1,200 figure and multiplied it by the gross square footage of the Vessels. (*Id.* at 122:10-13 (Bennett).) Thus, in addition to using incorrect potential gaming space for the Blue Chip, the employee also improperly compared gaming space against gross square footage. Had the employee properly compared potential gaming space of the Blue Chip to potential gaming space of the Vessels the replacement cost estimate would have been dramatically lower.

Given these two substantial errors, the Court finds that the employee's estimate of replacement cost is not a reliable indicator of the value of the Vessels.

### C.    Cushman & Wakefield Appraisals

During the relevant time period, Cushman & Wakefield ("Cushman") performed several appraisals of the Debtors' entire Gary, Indiana casino enterprise. These appraisals,

which were offered by the County, were prepared for the purposes of financing at the request of one of the Debtors' creditors.  (County's Trial Ex. 4; County's Trial Ex. 5; County's Trial Ex. 6; 5/11/11 Trial Tr. 94:19-23) (Bennett).)   The appraisals were business enterprise appraisals that valued substantially all of the Debtors' assets, not simply the Vessels.  (5/11/11 Trial Tr. 72:3-10 (Bennett).)

Certain of the Cushman appraisals set forth an allocation of the overall enterprise value to personal property, business value, and real estate.  (County's Trial Ex. 4; County's Trial Ex. 5; County's Trial Ex. 6.)  The County did not introduce an appraisal by Cushman that valued all of the Debtors' real property as of December 31, 2008, which was done for purposes of an asset impairment study.  (Debtors' Trial Ex. 36.)

The evidence at trial revealed that the allocated real property value in the Cushman enterprise appraisal dated as of January 1, 2009, exceeded by $100 million the real property value determined in the Cushman real property appraisal dated as of December 31, 2008.  (5/11/11 Trial Tr. 125:6-126:10 (Bennett).)  Such a wide discrepancy between the two appraisals, which were done by the same appraiser and which purport to value the same assets only a single day apart, suggests that the appraisals were in fact valuing different assets.  In particular, it appears that the Cushman enterprise appraisals, upon which the County relies, were valuing assets beyond just the real property.

In addition, the Court finds that the consistent use of a 10% "plug" to allocate and deduct personal property value in arriving at the remaining real property value (County's Trial Ex. 4 at 63; County's Trial Ex. 5 at 74; County's Trial Ex. 6 at 83), irrespective of the year at issue or market conditions, casts doubt on the reliability of the Cushman appraisals for determining the real property or Vessel values alone for property tax purposes.

The purpose of this proceeding is to determine the true tax value of the Vessels themselves. None of the Cushman enterprise valuations provide a specific valuation of the Vessels.

Like the IBTR, this Court will not supply evidence not proffered by the parties. *French Lick Tp. Trustee Assessor v. Kimball Intern., Inc.*, 865 N.E.2d 732, 739 n.11 (Ind. Tax Ct. 2007) (noting that the party petitioning the Indiana board must walk the Indiana Board through every element of its analysis, and may not assume the evidence speaks for itself). The County's failure to relate the overall asset values in the Cushman enterprise appraisals to the value of the Vessels, the sole issue in this proceeding, negates the probative value of the appraisals.

These appraisals were not performed for *ad valorem* tax purposes or a property tax appeal. (5/11/11 Trial Tr. 126:21-23 (Bennett); 5/13/11 Trial Tr. 229:7-9 (Mellen).) Rather, they were performed for financing purposes. (5/13/11 Trial Tr. 229:3-6 (Mellen).) Given the nature and purpose of these appraisals, the Court will not rely on the Cushman appraisals

for the purposes of this proceeding. The County's expert, Ms Mellen, is of the same view that the Cushman appraisals are not probative  (*Id*. at 229:10-23 (Mellen).)

### III.    Expert Testimony

For the purposes of this proceeding, the Debtors retained two experts: Robert Herman and Jared Yerian. The County retained three expert witnesses: Frank Kelly, Nina Owen, and Suzanne Mellen. The Court will discuss their testimony in greater detail in its ruling, what immediately follows is a summary.

Mr. Kelly testified how the County reached its original assessed values for the Vessels. Mr. Herman and Ms. Owen provided affirmative conclusions of value while Mr. Yerian and Ms. Mellen were retained as rebuttal experts.

The Court finds that Mr. Herman provided the most credible and reliable conclusions of value. His methodologies and calculations were reasonable, he adhered to Indiana law, properly interpreted and applied Indiana's market value-in-use standard and, importantly, valued just the Vessels.

The Court finds that the opinion offered by Mr. Kelly was neither reliable nor credible. Mr. Kelly calculated the original assessed values using a trending factor that was based on a *single* data point—the Blue Chip construction costs. Testimony at trial revealed that Mr. Kelly (a) could not state with certainty how he calculated his trending factor; (b) could not remember a "critical component" of his analysis; and (c) used the wrong capacity in his trending factor calculations that were based on the Blue Chip.

Mr. Kelly also presented trial testimony and evidence that was materially different from what he disclosed in his report and at his deposition. As detailed below, the Court finds that Mr. Kelly's analysis was inconsistent, particularly regarding his revisions to his analysis, which were withheld until trial. These deficiencies, when coupled with evidence that he has been admonished by the Indiana Department of Local Government Finance for manipulating assessment elements in order to reach a bottom-line value (Debtors' Trial Ex. 37; 5/12/11 Trial Tr. 121:8-15 (Kelly)), also render Mr. Kelly's testimony unreliable.

Similarly, the Court finds that Ms. Owen also did not offer a reliable opinion of value relevant to the issue of the true tax value of the Vessels in this proceeding. Although she stated that she performed her appraisals in accordance with USPAP, her appraisals suffered from several methodological and mathematical errors which impacted the reliability of her opinion. Most significantly, Ms. Owen incorrectly interpreted and applied Indiana's market value-in-use standard and utilized methodologies that valued the Vessels over and above the value inherent in the Vessels alone.

Ms. Mellen provided competent and credible testimony. The Court finds, however, that Ms Mellen premised her opinion, which was largely a critique of Mr. Herman's opinion, upon a fundamental misunderstanding of Indiana's market value-in-use standard.

Mr. Yerian provided extensive criticisms of Ms. Owen's and Mr. Kelly's reports which the Court finds was highly competent.

## A.    Expert Testimony of Robert Herman - Debtors' Expert

The Debtors offered the expert testimony and report of Mr. Robert Herman.  Mr. Herman performed appraisals of the Vessels in accordance with USPAP as of the March 1, 2007 (the "2006" reports and values) and March 1, 2010 assessment dates.

Mr. Herman testified that in his expert opinion the market value-in-use of the MSC I vessel was $6,290,000 for 2006 and $3,500,000 for 2010, and the market value-in-use for the MSC II vessel was $5,580,000 for 2006 and $3,200,000 for 2010.

### i.    Mr. Herman Was Qualified to Testify as an Expert.

The County moved to exclude the evidence of Mr. Herman, both in a motion in limine and at trial, on the grounds that Mr. Herman was not qualified to offer an opinion on the value of the Vessels.

Based on Mr. Herman's impressive credentials and extensive experience, as well as the thoroughness of his work on this case, the Court found that he was qualified to testify as an expert and that his testimony would be helpful to the Court.  Accordingly, the Court denied the County's motion.

In qualifying Mr. Herman as an expert, the Court found it significant that:

a. Mr. Herman is a credentialed Member of the Appraisal Institute ("MAI"), the highest professional designation in the appraisal industry.  (5/11/11 Trial Tr. 185:2-5 (Herman).)

b. Mr. Herman adhered to the relevant statutes and applied those statutes to his appraisal.  (*Id.* at 185:6-9 (Herman).)

c.   Mr. Herman has over 25 years of experience valuing real estate.  (*Id.* at 143:14-146:10 (Herman).)

d.   Mr. Herman is a licensed appraiser in Indiana and Illinois.  (*Id.* at 146:5-10 (Herman).)

e.   Mr. Herman has experience working on property tax appeals and disputes for casinos and gaming facilities.  (*Id.* at 151:22-152:9 (Herman); 159:15-160:18 (Herman).)

f.   Mr. Herman has recently worked with casino companies in Indiana for real estate tax purposes.  (*Id.* at 164:17-21 (Herman).)

g.   Mr. Herman familiarized himself with and understood the applicable relevant statutes and regulations under Indiana law.  (*Id.* at 169:20-171:2 (Herman).)

h.   Mr. Herman has performed more than a thousand appraisals.  (*Id.* at 171:24-172:2 (Herman).)

### ii.   Overview of Mr. Herman's Analysis

Mr. Herman offered an appraisal that was performed in compliance with USPAP. (*Id.* at 190:1-3 (Herman).)   In accordance with USPAP, Mr. Herman identified the type of appraisal and the type of report that he performed. (*Id.* at 189:13-25 (Herman).) Mr. Herman recognized and complied with Indiana laws and regulations that apply to his appraisal assignment—valuing the Vessels for real property tax assessment purposes—as required by USPAP (County's Trial Ex. 14 at U-11 (USPAP Competency Rule).  Mr. Herman also provided sufficient information to explain his analysis and methodologies and guided the Court through each step of his analysis.

Mr. Herman's opinion as to the true tax value of the Vessels was rendered in accordance with Indiana law. (5/11/11 Trial Tr. 190:6-22 (Herman).) In particular, Mr. Herman complied with the specific provision from the Indiana Code (IND. CODE § 6-1.1-4-39.5) that provides for the valuation of riverboat vessels for assessment purposes. (5/11/11 Trial Tr. 190:23-191:6 (Herman).) Mr. Herman also adhered to the Manual and Guidelines. (5/13/11 Trial Tr. 232:14-23 (Mellen).) Given Indiana's unique statutory scheme, Mr. Herman was correct to invoke USPAP's jurisdictional exception rule and follow Indiana law. (5/11/11 Trial Tr. 194:19-195:8 (Herman); Debtors' Trial Ex. 20 at 11; *see also* County's Trial Ex. 14 at U-15 (Jurisdictional Exception Rule).)

In performing his appraisals, Mr. Herman conducted a sales comparison approach and a cost approach. (5/11/11 Trial Tr. 197:4-198:13 (Herman).) Mr. Herman considered but ultimately did not perform an income capitalization approach. (*Id.* at 197:16-18 (Herman).) Mr. Herman explained that the income capitalization approach generally uses a rental income stream to estimate the value of the property and, in this case, there was no rental market for riverboat vessels. (*Id.* at 198:10-20 (Herman); *see also* Debtors' Trial Ex. 20 at 12.) Accordingly, Mr. Herman opined that this approach was not a valid measure of value of vessels alone. (5/11/11 Trial Tr. 201:2-13 (Herman).)

If an income capitalization approach based on business revenues, rather than rental income, were used, it would have required the additional, complex task of allocating the revenues to the intangible assets, the tangible personal property, and the real property

(including the Vessels, hotel, pavilion, parking garage, etc.).  (Debtors' Trial Ex. 19 at 12-13.)  Mr. Herman explained that the process of allocating the going-concern income stream to isolate the value of discrete assets (such as the Vessels) is an "error-prone methodology that reduces the reliability of the value estimate." (*Id.* at 13.)  This is particularly true in this case where intangibles such as the gaming license represent a significant part of the overall going-concern value.  (*Id.*)

### iii.    Mr. Herman's Sales Comparison Approach.

Mr. Herman conducted a sales comparison approach in doing his appraisal.  Mr. Herman provided extensive testimony regarding the comparable sales that he identified in his 2006 and 2010 reports.  (Debtors' Trial Ex. 19 at 96; Debtors' Trial Ex. 20 at 96.)

Mr. Herman did not limit his search to a particular jurisdiction or market.  (5/11/11 Trial Tr. 218:2-5 (Herman).)  He instead looked for sales of vessels which had been previously used for gaming purposes and which were acquired for the continued use as gaming vessels.  (Debtors' Trial Ex. 19 at 96; Debtors' Trial Ex. 20 at 96.)  Mr. Herman testified, without contradiction, that the market for these types of vessels was not limited to Northwest Indiana but was national and, indeed, international in scope.  (5/12/11 Trial Tr. 18:14-17 (Herman).)

For the 2010 assessment date, Mr. Herman identified eleven comparable sales of vessels that were similar to the Vessels.  (Debtors' Trial Ex. 20 at 96.)  All eleven of these vessels had been previously used for gaming purposes (5/11/11 Trial Tr. 218:21-23

(Herman)), and nine of them were acquired for the continued use as a gaming vessel. (*Id.* at 217:1-5 (Herman).)

For the 2006 assessment date, Mr. Herman identified seven comparable sales of vessels that were similar to the Vessels. (Debtors' Trial Ex. 19 at 96.) All seven of these vessels had been previously used for gaming purposes (*Id.* at 95), and six of them were acquired for the continued use as a gaming vessel. (*Id.*) Each of these sales were sales of the vessels alone and did not include any value attributable to other property, such as gaming licenses and personal property. (5/11/11 Trial Tr. 214:18-23 (Herman).) No gambling was occurring on the boats at the time that that they were sold. (*Id.* at 319:7-9 (Herman).)

The County argued that the fact that gaming was not occurring at the time of sale rendered the vessel sales unusable for Indiana property tax purposes because they were not "in use." For the reasons detailed below in the Conclusions of Law, the Court rejects this argument. Moreover, the County did not offer any substantive evidence demonstrating that the vessel sales Mr. Herman utilized were not comparable to the Vessels, whether physically, functionally, or otherwise.

The fact that some of the vessel sales occurred outside of Indiana does not render the transactions non-comparable. The uncontroverted testimony was that Indiana gaming operators have access to a national and, indeed, international market to buy and sell gaming vessels (due to the transportable nature of this property). In fact, the County's appraiser relied upon sales of gaming properties (albeit entire business operations) that were located

throughout the United States. (County Trial Ex. 1 at 46; County Trial Ex. 2 at 46).) Sales of gaming vessels to buyers who intend to use them as gaming vessels within a gaming market are demonstrative of the value of such a vessel for use as a gaming riverboat in Indiana. The County failed to offer any relevant evidence undermining the comparability of Mr. Herman's sales, and the Court finds that Mr. Herman's sales were comparable.

Using these comparable sales, Mr. Herman then made a number of adjustments to reflect the condition of the sales and the physical characteristics of the vessels, as compared to the Debtors' Vessels. (5/11/11 Trial Tr. 229:14-233:16 (Herman); Debtors' Trial Ex. 19 at 116-118; Debtors' Trial Ex. 20 at 137-140.) Mr. Herman's adjustments were reasonable.

The County identified three sales in Indiana of what the County referred to as "active boats." (5/11/11 Trial Tr. 320:7-321:5 (Herman).) These sales, however, were sales of entire casino enterprises, not just riverboat vessels. (*Id*. at 326:11-19 (Herman).) As a result, these sales included all of the tangible and intangible assets, and do not provide a value of the vessels alone. (5/12/11 Trial Tr. 15:2-9 (Herman).) Absent evidence of a sales price for just the vessel, the asset that is at issue in this proceeding, it was appropriate for Mr. Herman not to utilize those sales of entire casino enterprises in his sales comparison approach. The more appropriate comparable sales were those sales that consisted of the gaming vessels only.

### iv.  Mr. Herman's Cost Approach.

Mr. Herman also provided extensive testimony regarding his cost approach.  At trial, he offered detailed explanations of the methodologies and calculations that he used in his cost approach.  (5/11/11 Trial Tr. 239:22-286:21 (Herman).)

To conduct his cost approach, Mr. Herman adhered to the Riverboat Valuation Statute and, as required by that statute, used the "base prices" contained in Appendix G of the Guidelines to estimate the reproduction cost new of the Vessels.  (*Id.* at 242:5-17 (Herman).) Because the base prices contained in Appendix G were from 1999, Mr. Herman then trended those costs forward to the assessment date.  (*Id.* at 245:7-12 (Herman).)  Trending is meant to capture the inflation in costs that occurred over that time period.  (*Id.* at 245:13-15 (Herman).)  Mr. Herman calculated the trending costs based on appropriate cost indexes that are widely utilized by appraisers, including, for example, the Producer Price Index for shipbuilding.  (*Id.* at 245:16-246:11 (Herman).)

Mr. Herman then developed a "replacement cost new" estimate based on research of cost data for modern building-on-a-barge style casinos.  (*Id.* at 249-266 (Herman).)  This step in Mr. Herman's analysis is meant to account for one of the forms of functional obsolescence (excess capital costs).  It takes into account the trend in the market toward building-on-a-barge style casinos as replacement for older vessels such as those owned and operated by the Debtors.  (*Id.* at 248:15-250:1 (Herman).)

Mr. Herman used construction costs from the Blue Chip and Horseshoe to verify that the cost data he received from Lay, Pitman & Associates, Inc was reasonable. (Debtors' Trial Ex. 20 at 84 ("The validity of the $562 to $627 per square foot of gaming space was independently verified by reviewing and analyzing the costs of several newer floating casino vessels such as the Blue Chip casino structure in Michigan City and Horseshoe in Hammond and adjusting for time (trending) and size (scaling exponent) and unusual construction conditions.").)

Once Mr. Herman determined the replacement cost new, he applied the Guidelines' depreciation schedules to account for normal depreciation as of the applicable dates. (*Id.* at 267:8-19 (Herman); Debtors' Trial Ex. 27 at 36.)

Finally, Mr. Herman considered remaining forms of functional and economic obsolescence. (5/11/11 Trial Tr. 268:21-23 (Herman).) To determine whether any functional or economic obsolescence existed, Mr. Herman used three generally-accepted appraisal techniques: the breakdown method, the economic age/life method, and the market extraction method. (*Id.* at 269:21-270:3 (Herman).)

These are generally accepted and recognized appraisal methodologies to estimate obsolescence. THE APPRAISAL OF REAL ESTATE (13th ed.). (5/12/11 Trial Tr. at 17:5-20 (Herman); *see also* THE APPRAISAL OF REAL ESTATE (13th ed.) ("AORE") at 416-425 (discussing all three techniques).) As a recognized text utilized by the appraisal profession, the Court took judicial notice of The Appraisal of Real Estate (13th ed.).

Mr. Herman offered extensive testimony explaining his calculation of obsolescence under each of these methods. Mr. Herman utilized the breakdown method to estimate all forms of depreciation and obsolescence in the Vessels. (Debtors' Trial Ex. 19 at 86.) This method estimates the total loss in the value of property by measuring each cause of depreciation (physical, functional, and economic/external) individually. (*Id.*) For the MSC I and MSC II, Mr. Herman identified excess operating costs and loss in revenue as forms of obsolescence. (*Id.*) To arrive at the Vessels' true tax value, Mr. Herman then quantified this obsolescence using the breakdown method. (*Id.*)

The economic age/life method looks at the service or physical lives of gaming vessels as compared to their economic lives. (*Id.* at 90.) Mr. Herman found that although gaming vessels may possess service or physical lives of approximately 35 to 40 years, the conversion to modern building-on-a-barge casinos has limited riverboat vessels to an economic life of only 15 years. (*Id.* at 90.) According to Mr. Herman, the diminished economic life of the vessels illustrates the significant obsolescence that riverboat gaming vessels have suffered. (*Id.* at 90-91.)

Finally, Mr. Herman performed the market extraction method. According to Mr. Herman, this is the most reliable approach for estimating functional and external obsolescence. (*Id.* at 91.) To perform this approach, functional and external obsolescence is extracted through either sales of comparable property or through the loss of income to a property. (*Id.*) Mr. Herman analyzed external obsolescence using both scenarios. (*Id.*) As

33

noted in the Conclusions of Law below, Indiana recognizes the loss of value as reflected in sales of comparable property as a legitimate method for calculating obsolescence. *See Stinson v. Trimas Fasteners*, 923 N.E.2d 496, 499 n.6 (Ind. Tax Ct. 2010) (noting difference between value under sales and cost approaches "is a proper way to quantify the amount of obsolescence in a property"); *Meijer Stores Ltd. Partnership v. Smith*, 926 N.E.2d 1134, 1137-39 (Ind. Tax Ct. 2010) (approving 65% obsolescence reduction in two-year old property in use by the taxpayer based on sales comparison approach utilizing vacant sales comparables).

Each of Mr. Herman's obsolescence methods reflected a similar loss of value for functional and economic obsolescence. (5/11/11 Trial Tr. 285:9-18 (Herman).)

Both the County's own assessment expert and the Chief Deputy from the Assessor's office admitted that, when obsolescence is identified, it must be accounted for. (5/12/11 201:11-19 (Kelly); 5/12/11 Trial Tr. 43:22-25 (Gholson).

In this case, it is clear that the Vessels suffered some degree of obsolescence. The shift to the building-on-a-barge style casinos establishes that the multi-level yacht style vessels are outdated in design and utility. This is evidenced by the fact that the building-on-a-barge style casinos tend to (a) have lower operating costs; (b) generate greater revenue; (c) be more popular among gaming patrons; and (d) capture more of the market share. (5/11/11 Trial Tr. 270:19-271:25 (Herman), 49:11-50:9 (Bennett).)

As Mr. Herman explained, "The Majestic Star Casino's MSC I and MSC II each incur a combined functional and economic obsolescence penalty resulting from the outdated design (functional) of the riverboat excursion vessel that has been essentially legislated (economic) into obsolescence." (Debtors' Trial Ex. 19 at 86.) The Court finds that the Debtors, through Mr. Herman, presented a prima facie case establishing the causes for and quantification of obsolescence affecting the Vessels. The Court also finds that Mr. Herman's quantification of obsolescence was credible and reasonable.

The County offered no evidence to rebut Mr. Herman's conclusion that the Vessels suffered from obsolescence, nor did the County offer any evidence suggesting a different quantification of obsolescence.

Mr. Herman concluded that the market value-in-use of the MSC I vessel under the cost approach was $6,290,000 for 2006 and $3,990,000 for 2010, and the market value-in-use of the MSC II vessel under the cost approach was $5,580,000 for 2006 and $3,780,000 for 2010.

### v. Mr. Herman's Final Value Conclusions

The values of the Vessels which Mr. Herman determined using two approaches are not materially different. Mr. Herman chose his final values by selecting the lower of his values as the Riverboat Valuation Statute directs. (5/11/11 Trial Tr. 287:9-16 (Herman).)

### B.    Testimony of Frank Kelly - County's Expert

The sole witness to testify about the Vessels' assessments for the years 2006 through 2010 was Frank Kelly. Mr. Kelly presented testimony and evidence regarding his calculation of the assessed value of the Vessels for 2006. The Court qualified Mr. Kelly as an expert in Indiana real property assessment practice (5/12/11 Trial Tr. 65:24-66:4 (Kelly)), but not as an expert in Indiana real property assessment law.

Mr. Kelly is the President of Nexus Group. (*Id.* at 53:8-9 (Kelly).) Nexus Group assists counties in Indiana in establishing assessments. (*Id.* at 53:10-13 (Kelly).) Mr. Kelly assisted Lake County and some of the townships in Lake County with the trending process in 2006. (*Id.* at 53:16-18 (Kelly).) Mr. Kelly is certified as an Indiana Level III Assessor-Appraiser and is an assessment administration specialist with the International Association of Assessing Officers. Mr. Kelly (a) teaches courses related to the Assessment Manual and Guidelines, (b) previously worked for the Indiana State Board of Tax Commissioners, and (c) has earned a Ph.D. in economics. LCX 11, pp. 8-12. Mr. Kelly is not an appraiser. (*Id.* at 62:22-23 (Kelly).)

The Court finds that Mr. Kelly's testimony was not helpful, reliable, or credible.

Mr. Kelly has, in the past, been admonished by the DLGF for intentionally and unjustifiably manipulating assessment elements in order to reach a bottom line value. (Debtors' Trial Ex. 37; 5/12/11 Trial Tr. 121:8-15 (Kelly).) After an investigation into the matter, the DLGF found that Mr. Kelly's conduct had cast serious doubt on the uniformity,

equity, accuracy, and justness of all real property assessments. (5/12/11 Trial Tr. 121:20-122:3 (Kelly).) At trial, Mr. Kelly admitted that he determined what he thought was the proper market value-in-use and then "manipulate[d] those factors in order to get to that number." (*Id*. at 123:3-16 (Kelly).) The Court has similar concerns about Mr. Kelly's work in this case.

Specifically, a document was introduced—an email from Mr. Kelly to a Calumet Township employee—which calls into question whether Mr. Kelly and the County intentionally over-assessed riverboat casinos, apparently for the purpose of pressuring riverboat owners into settling with the County at amounts above the properties' actual true tax values. (Debtors' Trial Ex. 8.) In this email, Mr. Kelly wrote: "FYI -- for the North [Township] casinos [*i.e.*, the Horseshoe and Ameristar riverboat vessels, also located in Lake County, Indiana], we ended up simply applying an override pricing to get the desired assessment (much higher than cost). They appealed of course and it was settled eventually." (*Id*.) The Court is convinced based upon the Evidence particularly Debtors' revealing impeachment of Mr. Kelly's testimony and opinion, that Mr. Kelly's conclusions were agenda driven, i.e., to dramatically drive up the property taxes on the Vessels.

### i.     Mr. Kelly's 3.45 Trending Factor

Mr. Kelly was retained by the County in 2006 to assist with the trending process. (5/12/11 Trial Tr. 53:16-18 (Kelly).) Most counties completed the trending process for commercial and industrial improvements (such as riverboats) by updating the cost schedules

in their computer systems.  (*Id.* at 83:21-84:5 (Kelly).)  The County, however, had an outdated computer system which did not allow for the implementation of updated cost schedules.  (*Id.* at 84:6-85:13 (Kelly).)  Consequently, Mr. Kelly and the County decided to use a trending factor to adjust the costs of the properties.  (*Id.* at 85:14-21 (Kelly).)

Mr. Kelly purported to use a 3.45 trending factor to calculate the assessed value of the Vessels.  It was this 3.45 trending factor that led to the 180% increase in assessed values for the Vessels in 2006, as compared to the preceding year.  (*Id.* at 116:22-25 (Kelly).)

At his deposition, however, Mr. Kelly could not specifically recall how he arrived at that 3.45 trending factor beyond what he provided in his report (*i.e.*, he divided the cost to build the Blue Chip by $23.4 million).  (*Id.* at 162:2-9 (Kelly).)  During his deposition, Mr. Kelly learned that such an analysis would lead to a capacity of the Blue Chip that he knew to be incorrect.  (*Id.* at 160:17-161:11 (Kelly).)

Mr. Kelly testified at trial that he had been able—just one week prior to trial—to reconstruct how he arrived at his 3.45 trending factor (Debtors' Trial Ex. 38; 5/12/11 Trial Tr. 192:6-8 (Kelly)), and did so in just five minutes.  (5/12/11 Trial Tr. 91:19-92:5 (Kelly).)  His new methodology did not rely on the capacity number shown to be incorrect at his deposition.

Mr. Kelly waited months after submitting his report and until one week before trial to attempt to "recreate" his calculations—calculations about which he had been questioned at his deposition almost three months prior to trial.  The County failed to update Mr. Kelly's

expert report or disclose this new information to the Debtors in advance of trial. The Debtors were entitled to this information well in advance of trial. For the reasons discussed below, the Court does not credit Mr. Kelly's testimony at trial explaining his revised methodology for arriving at his 3.45 trending factor.

To calculate the trending factor that was to be applied to riverboat casinos, Mr. Kelly utilized information that he had obtained from another county regarding the cost to construct the Blue Chip's new building-on-a-barge style casino. (5/12/11 Trial Tr. 86:20-87:8 (Kelly).) Mr. Kelly's trending factor was based solely on this single piece of data (*id.* at 144:3-7 (Kelly)), which Mr. Kelly neither verified nor determined was applicable to the Vessels. According to Mr. Kelly, the cost to construct the Blue Chip was $81,840,602. (*Id.* at 88:4-6 (Kelly).) Mr. Kelly's only source for this information was a single piece of paper attached to a personal property tax return with a single line item relating the costs to an item labeled a "vessel." (County's Trial Ex. 30; 5/12/11 Trial Tr. 144:19-23 (Kelly).)

Mr. Kelly did nothing to verify the accuracy of the cost components that comprised Blue Chip's construction costs. (5/12/11 Trial Tr. 148:9-153:13 (Kelly).) He did not speak to anyone connected to the Blue Chip's design or construction regarding the costs or their composition. (*Id.* at 150:20-25 (Kelly).) He also admitted that he did not have any knowledge regarding the scheduling or construction conditions, such as onsite shipyards or premiums, that may have contributed to the Blue Chip's costs. (*Id.* at 152:1-23 (Kelly).) This alone renders his methodology unreliable because Mr. Kelly had no way to determine the

comparability of the Blue Chip's construction costs. This problem was further exacerbated by Mr. Kelly's lack of knowledge regarding the characteristics of the Vessels. (*Id.* at 124:14-132:12 (Kelly).

When Mr. Kelly attempted to explain the calculation that he only recently remembered, the Debtors objected to the introduction of this testimony. The Debtors argued that this new calculation represented a change that had not been disclosed to the Debtors, despite the County's continuing obligation to supplement and disclose any changes to expert reports. Although the Court believed that the Debtors were entitled to the information, it overruled the Debtors' objection and allowed Mr. Kelly to proceed with his testimony. (*Id.* at 93:17-94:2 (Kelly).)

Mr. Kelly explained what he attempted to do to "recreate" his "original" calculation. The County labeled this "Correlation 1." Although not entirely clear, Mr. Kelly attempted to take the construction costs of the Blue Chip ($81.8 million), reduce that cost to a base-size boat of 2,000 people, and then compare that to the $19 million base cost in Schedule G. (*Id.* at 97:2-6 (Kelly).) In other words, Mr. Kelly was attempting to adjust Schedule G from the Guidelines to create his "own Schedule G." (*Id.* at 90:17-91:2 (Kelly).) There were several problems with Mr. Kelly's approach.

First, it was apparent that Mr. Kelly was, even at trial, not entirely certain of his calculations. (*Id.* at 96:24-97:1, 166:9-11, 188:11-189:3 (Kelly) ("And at that point, I made what I believe to be this calculation to come up with the 3.45 factor, so.").) The Court notes

40

that, at his deposition, Mr. Kelly could not explain his calculations or the adjustments that he made to create his own Schedule G. (5/12/11 Trial Tr. 91:16-18 (Kelly).) Yet, in preparation for his testimony at trial, Mr. Kelly claimed to have been able to replicate the calculation that he used "in the space of five minutes." (*Id.* at 91:19-92:5, 184:20-22 (Kelly).) The Court found Mr. Kelly's testimony to be lacking in credibility. Mr. Kelly's testimony indicated that he had, in the previous week, simply backed in to the 3.45 trending factor. *See, e.g.,* 5/12/11 Trial Tr. 91:21-92:1 (Kelly) ("And after being frustrated with a previous conversation with you, it dawned on me that, well, how you would start this is to take 81.8 million dollars for 4,500 people and then if you only had 2,000 people you would take 2,500 people, times the adjustment per person and that would be a reduction from the base cost of the vessel.")

Second, Mr. Kelly used the incorrect capacity for the Blue Chip, making his calculations flawed. In the fall of 2006, Mr. Kelly believed that the capacity of the Blue Chip was 4,500. (*Id.* at 97:11-14 (Kelly).) Evidence at trial established that the capacity of the Blue Chip was at least 6,000. (Debtors' Trial Ex. 29.) Mr. Kelly even admitted that the 4,500 figure "may have been off." (Debtors' Trial Ex. 38; 5/12/11 Trial Tr. 194:4-11 (Kelly).)

Third, Mr. Kelly made unsupported adjustments to the costs in the Guidelines' Schedule G, the cost table used in valuing Rivreboats. Mr. Kelly explained that he changed Schedule G to provide for a $6,500 per person adjustment—the Indiana Guidelines provide

for a per person adjustment of $2,500. (5/12/11 Trial Tr. 100:2-7 (Kelly).) Mr. Kelly could

not recall how he calculated his new $6,500 per person adjustment. (Debtors' Trial Ex. 38;

5/12/11 Trial Tr. 196:2-4 (Kelly).) Indeed, the County presented no objectively verifiable

data to support Mr. Kelly's new $6,500 per person adjustment, as Mr. Kelly simply testified

that the change was based on his "feeling" that the base of $2,500 was no longer an

appropriate number. (5/12/11 Trial Tr. 165:7-10 (Kelly).) This testimony is particularly

revealing given that Mr. Kelly admitted that this $6,500 per person adjustment was a "critical

component" of his calculation. (*Id.* at 195:24-196:1 (Kelly).)

Fourth, Mr. Kelly's 3.45 multiplier does not take into account any obsolescence

incurred by the Vessels even though, as described above, obsolescence clearly existed. (*Id.*

at 203:6-11 (Kelly).)

Mr. Kelly also presented testimony at trial of a separate calculation ("Correlation 2"),

which purported to use the same methodology to determine a trending factor using a capacity

of 6,000 for the Blue Chip. (*Id.* at 168:12-19 (Kelly).) But Correlation 2 did not reflect Mr.

Kelly's opinion (*id.* at 171:21-22, 172:20-22 (Kelly)), and the Court finds it was full of

errors and unreliable as an indicator of the Vessels' value. Despite these errors, it is clear

that, if a higher capacity is used, Mr. Kelly's trending factor will decrease. (*Id.* at 175:16-

176:19 (Kelly).)

Mr. Kelly's analysis is based on the assumption that Blue Chip's cost information is applicable to the Vessels without further adjustment. (*Id.* at 180:16-24 (Kelly).) However, Mr. Kelly does not have any direct or extensive knowledge of the physical differences between the Blue Chip and the Vessels. (*Id.* at 181:5-8 (Kelly.) Thus, he could not have reasonably made that assumption. The uncontroverted testimony of Mr. Herman is that the Blue Chip is a permanently-moored, box-on-a-barge style gaming vessel, whereas the Vessels are multi-deck yachts designed for gaming during excursions.

The Court finds that Mr. Kelly's 3.45 trending factor is unreliable for a host of reasons. In particular, this 3.45 trending factor (a) was derived from a single, unverified piece of data that was not proven to be comparable to the Vessels or indicative of their value; (b) utilized the wrong capacity for the Blue Chip; (c) relied upon a figure (the $6,500 per person capacity adjustment) that Mr. Kelly could not explain or support with objective evidence; and (d) did not take into account obsolescence. Most damaging to Mr. Kelly's opinion testimony is that he cannot say with certainty how he arrived at this 3.45 trending factor.

Aside from Mr. Kelly's 3.45 trending factor, the County did not present any detailed information regarding how it determined the assessed values. The County apparently did not use any additional information to determine the assessed values of the Vessels. (*Id.* at 143:13-15 (Kelly).) Curiously, a minimal amount of obsolescence was applied to the Vessels in 2006 and 2007 but no obsolescence was applied in subsequent years. (*Id.* at

203:16-204:6 (Kelly).) Neither Mr. Kelly nor the County were able to offer any evidence showing that obsolescence incurred in these years was subsequently cured. (*Id.* at 204:17-25 (Kelly).) If anything, obsolescence of the type experienced by the Vessels would tend to increase—not disappear—over time.

Given that the 3.45 multiplier is unreliable and was the sole basis presented to support the original assessed values, the Court finds that the County's original assessed values are not reliable and do not reflect the Vessels' market value-in-use. Neither the 3.45 multiplier nor Mr. Kelly's other testimony regarding the original assessments constitutes substantial evidence necessary to rebut Mr. Herman's valuation evidence.

### ii.    Mr. Kelly's Sales Comparison and Income Capitalization Approaches.

In addition to his cost approach, Mr. Kelly also testified that he performed a sales comparison and income capitalization approach. (*Id.* at 104:13-106:11 (Kelly).) For these two approaches, Mr. Kelly valued all of the Debtors' real property (*e.g.*, the Vessels, land, hotel, parking garage, pavilion) (*id.* at 133:25-134:4 (Kelly)) and concluded that the combined value of all of the real property was $400 million. (*Id.* at 105:11-20 (Kelly).) This value was a product of combining the average values generated from Mr. Kelly's sales comparison and income capitalization approaches. (*Id.* at 134:9-12 (Kelly).)

Mr. Kelly took positions that were inconsistent with the report of the County's appraiser, Ms. Owen. Specifically, Mr. Kelly asserted that it is not possible to value the Vessels alone using (a) the income capitalization approach (when using the income of the

casino operations) or (b) the sales approach (when the comparable sales are entire enterprises). (*Id.* at 210:20-211:10 (Kelly).) This is inconsistent with the opinion of the County's expert witness, Ms. Owen, who stated that the income capitalization and sales comparison approaches are the only two reliable approaches for valuing the Vessels.

The Calumet Township rejected the values that Mr. Kelly calculated under these two approaches. (*Id.* at 106:20-107:2 (Kelly).) Thus, Mr. Kelly's cost approach, which was his "fall-back" approach (*id.* at 139:17-24 (Kelly)), was the only arguable basis for the actual assessed values.

Mr. Kelly's explanation of his sales comparison and income capitalization approaches both at trial and in his report lacked support, making it difficult for the Court to evaluate them. Mr. Kelly's expert report dedicates a mere three paragraphs each to his income approach and sales comparison approach. Nonetheless, because both approaches valued all of the real property, without properly allocating the portion of value attributable to just the Vessels, they are not reliable for purposes of establishing the Vessels' values in the current proceeding.

Mr. Kelly does not believe that an assessor needs to adhere to the Riverboat Valuation Statute if the assessor believes that the assessed value under the statute does not result in the true tax value of the riverboat. (*Id.* at 207:21-208:2 (Kelly).) Mr. Kelly did not identify the circumstances or evidence that would allow an assessor to disregard the Riverboat Valuation Statute. The Court disagrees. The Riverboat Valuation Statute establishes how the true tax

value of a riverboat is to be determined and the County specifically waived any challenge to the applicability of the statute in this proceeding. (5/11/11 Trial Tr. 35:9-13 (County's opening statement).)

The County increased the assessed values of riverboats—and only riverboats—by several multiples of the increases assigned to all other property classes in the County. A document created by Mr. Kelly showed that, in 2006, as a result of Mr. Kelly's trending study for Lake County, the cost-based trending factor applied to properties throughout the County ranged from 14.8 to 32.6 percent. (Debtors' Trial Ex. 11; 5/12/11 Trial Tr. 215:6-8 (Kelly).) The sole exception was riverboat gaming vessels, where the trending factor was 245 percent (corresponding to the 3.45 multiplier). (Debtors' Trial Ex. 11; 5/12/11 Trial Tr. 216:5-7 (Kelly).)

This fact, coupled with the email from Mr. Kelly regarding the County's efforts to reach a desired assessment and his prior admonishment by the DLGF, strongly suggest to the Court that Mr. Kelly's 3.45 multiplier and resulting assessments were results-driven rather than the acceptable natural result of market-based increases.

## C.    Expert Testimony of Nina Owen - County's Expert

The County offered the expert testimony and report of Ms. Owen. Ms. Owen performed an appraisal of the Vessels for the March 1, 2007 assessment date and the March 1, 2010 assessment date. The Court qualified Ms. Owen as an expert.

Ms. Owen is a licensed appraiser who works for CB Richard Ellis. (*Id*. at 227:1-3, 229:2-4 (Owen).) CB Richard Ellis is a large real estate firm. (*Id*. at 227:4-5 (Owen).) Ms. Owen works in the firm's appraisal practice. (*Id*. at 227:12-21 (Owen).) Ms. Owen specializes in appraising casino and specialty hospitality assets. She has appraised between fifteen and twenty casinos within the last five years; six of those properties included riverboat casinos. Ms. Owen has appraised at least some portion of all four casinos located in the Northwest Indiana gaming market in Lake County. Trial Tr., 229-31 (Owen). Ms. Owen prepares approximately sixty appraisals per year, nearly all of which are appraisals of hospitality assets. Trial Tr. 235 (Owen).

Ms. Owen concluded that the combined value of the Vessels was $292,000,000 in 2006 and $190,000,000 in 2010. Ms. Owen's report is not entirely clear as to her value conclusion. In the beginning of her report she states that her "value conclusion" for the "subject property" is much higher than the value she testified to at trial. (County's Trial Ex. 1 at v; County's Trial Ex. 2 at v).

### i. Approach to Appraisal Assignment by Ms. Owen

At trial, Ms. Owen admitted that she did not follow Indiana law when she performed her appraisal. (*Id*. at 254:12-21 (Owen).) She did not follow the guidance set forth in the Manual and Guidelines (*id*. at 257:11-258:3 (Owen)), and she did not adhere to the Riverboat Valuation Statute. (*Id*. at 255:15-256:16 (Owen).) In fact, she did not even reference the

statute in her report (5/13/11 Trial Tr. 138:14-16 (Owen)) and stated that she only read the Manual "for fun."  (5/12/11 Trial Tr. 257:16-24 (Owen).)

As Ms. Owen explained, she did not follow Indiana law because she was performing an appraisal and not an assessment.  (*See, e.g., id.* at 257:6-8, 259:11-19 (Owen).)  Aside from noting the "market value-in-use" definition of value from the Manual, Ms. Owen did not read any Indiana cases, statutes, or other authorities interpreting the market value-in-use standard. (*Id.* at 139:4-140:10 (Owen).)

Ms. Owen could not say whether her appraisal was indicative of the assessed value of the Vessels for Indiana property tax purposes. (*Id.* at 138:25-139:3 (Owen) ("It may or may not [be]").)  Despite Ms. Owen's failure to follow Indiana law, she purported to utilize Indiana's market value-in-use standard when valuing the Vessels. (5/12/11 Trial Tr. 238:17-20, 239:21-25 (Owen).)

Ms. Owen testified that Indiana's market value-in-use standard allows her to attribute to the Vessels' value the vast majority of income generated from the gaming business occurring on the Vessels. (5/13/11 Trial Tr. 118:10-25 (Owen).)  By doing so, however, Ms. Owen has valued the wrong assets or, at a minimum, assigned to the Vessels substantial value that is not properly attributable to the Vessels.  Ms. Owen admitted that, if the assignment is to value the Vessels alone, she did not have the expertise.  (5/12/11 Trial Tr. 252:1-20 (Owen).)

To conduct her appraisals, Ms. Owen performed the cost approach, the sales comparison approach, and the income capitalization approach. The Court finds that all three of these approaches suffer from methodological, data and mathematical errors that render her opinion of value unreliable.

###    ii.    Ms. Owen's Cost Approach

Although Ms. Owen performed a cost approach, she did not believe that it was a reliable indicator of the value of the Vessels. (5/12/11 Trial Tr. 258:18-259:10 (Owen).)

To perform her cost approach, Ms. Owen did not use the "base costs" set forth in the Guidelines (5/13/11 Trial Tr. 46:9-16 (Owen)), as required by the Riverboat Valuation Statute. IND. CODE 6-1.1-4-39.5(b)(1). Instead, Ms. Owen utilized the construction costs of three other riverboat gaming vessels. (5/12/11 Trial Tr. 284:18-285:7 (Owen).) While it was appropriate to consider other sources of cost data, in light of the statute, it was not reasonable for Ms. Owen to disregard entirely the base costs from the Guidelines.

Ms. Owen did not have a breakdown of the construction costs for any of these three vessels (5/13/11 Trial Tr. 49:10-20 (Owen)) and, as a result, did not know what costs were contained within the numbers she used. (*Id.* at 50:10-51:17 (Owen).)

As part of her cost approach, Ms. Owen determined vessel cost per square foot of gaming area and vessel cost per gaming position. (*Id.* at 54:10-13 (Owen).) The number of gaming positions in a casino is the number of slot machines and table games (5/12/11 Trial

Tr. 286:2-4 (Owen).) To calculate her ultimate value, Ms. Owen used gaming positions as opposed to square footage. (*Id.* at 285:19-287:15 (Owen).)

Ms. Owen stated that it was more appropriate to use gaming positions than square footage (*id.* at 287:6-15 (Owen)), even though gaming positions can change from day-to-day. (5/13/11 Trial Tr. 54:18-20 (Owen).) The number of gaming positions Ms. Owen applies varies in different sections of her report. (5/13/11 Trial Tr. 61:6-63:1 (Owen).)

This implies that the value of a vessel can change from day-to-day based simply on a decision by management to change the number of gaming positions. (*Id.* at 54:21-24 (Owen).) The Court does not find this to be reasonable or persuasive evidence of the Vessels' values for property tax purposes.

Although Ms. Owen attempted to argue that gaming square footage can also change day-to-day, the Court finds that it is much more likely that gaming positions would change. As a result, square footage would be a more appropriate and consistent metric to use. The Court finds that, at the very least, Ms. Owen should have reconciled the two metrics.

If Ms. Owen had used the cost per gaming square foot that she calculated, as opposed to the cost per gaming position, the value under her cost approach would have been reduced by approximately $32 million. (*Id.* at 71:3-4 (Owen).)

After calculating the cost of the Vessels based on the cost per gaming position, Ms. Owen increased her cost estimate by adding an entrepreneurial profit of 25%. (5/12/11 Trial Tr. 292:23-293:7 (Owen).) This addition increased the value by $31.1 million in each of her

appraisal reports. (County's Trial Ex. 1 at 44 (2006 Report); County's Trial Ex. 2 at 45 (2010 Report).) Aside from her testimony that entrepreneurial profit margins tend to range from 10% to 30% (5/13/11 Trial Tr. 74:4-9 (Owen)), Ms. Owen conceded that her decision to select 25% was completely subjective and that she did not perform any calculations or consider any objective criteria to arrive at this number. (*Id.* at 74:18-24 (Owen).)

Ms. Owen was unclear whether she should have included entrepreneurial profit in her analysis in this case. Although in Ms. Owen's opinion it is typical appraisal practice to do so, she conceded that in this instance she did not know whether or not the three cost comparables she used already included entrepreneurial profit. (*Id.* at 76:6-19 (Owen).) In addition, she admitted that the hypothetical developers in this case, the Debtors, would essentially be paying the "entrepreneurial profit" to themselves. (*Id.* at 73:18-23 (Owen).) This made her decision to choose a number at the higher end of the range—a decision that she admitted was completely subjective—all the more questionable. Without performing due diligence to determine the components of the cost already reflected in the cost comparables she relied upon, her decision to add entrepreneurial profit is questionable and lacking in credibility.

After calculating the replacement cost, Ms. Owen then factored in depreciation based on the age of the Vessels. (5/12/11 Trial Tr. 289:3-16 (Owen).) Ms. Owen did not include any functional or external obsolescence in her cost approach. (5/12/11 Trial Tr. 293:8-294:2 (Owen).) Although Ms. Owen was aware that some of the properties in the market had been

moving to the more modern building-on-a-barge style (5/13/11 Trial Tr. 78:9-12 (Owen)), she nevertheless believed that, because the Vessels were still generating revenue, no obsolescence existed. (*Id.* at 16:22-17:1 (Owen).) As noted above, the Court finds that the Vessels are suffering from functional and economic obsolescence as a result of their outdated design. Moreover, the Court disagrees with Ms. Owen's conclusion that simply because the Debtors' casino operations are still generating revenue the Vessels are not suffering obsolescence. As the Court understands it, property may continue in use (and may even continue to make a profit), but nevertheless suffer from flaws or faults that adversely affect its value as compared to a modern replacement property, that does not suffer such defects. Thus, even if property is still in use, it may suffer obsolescence.

Ms. Owen also added a value for the gaming licenses and furniture, fixtures, and equipment to arrive at a "going-concern" value under her cost approach, but testified that her conclusion of value for the Vessels alone was $109 million in 2006 (5/12/11 Trial Tr. 291:9-18 (Owen)) and $88 million in 2010. (5/13/11 Trial Tr. 15:12-19 (Owen).) Thus, the Court does not address Ms. Owen's determination of the value of the gaming licenses and furniture, fixtures, and equipment in this section. The Court notes, however, that her total going concern values of $120 million in 2006 and $98 million in 2010 based on her cost approach are significantly less than the going concern values determined under her income and sales approaches.

The Court finds that Ms. Owen's cost approach fails to rebut the prima facie case or valuation evidence. Ms. Owens' opinion is premised on unsupported data and questionable increase in value due to the subjective addition of entrepreneurial profit. Her failure to adequately consider and make adjustments for obsolescence, necessary steps in arriving at true tax value, materially undermines her cost approach.

### iii.    Ms. Owen's Sales Comparison Approach

To conduct her sales comparison approach, Ms. Owen compiled a list of sales of entire casino enterprises, many from outside Indiana. (5/12/11 Trial Tr. 295:6-22 (Owen).) Ms. Owen conceded that the data she found "wasn't perfect" (5/13/11 Trial Tr. 87:10-14 (Owen)), that there was "no consistency among sales" (*id.* at 88:21-23 (Owen)), and that the "subjects are considerably different." (*Id.* at 88:24-89:1 (Owen).) These statements alone cast serious doubt on the (i) comparability of the sales data she utilized, and (ii) the reliability of Ms. Owen's sales comparison approach.

Beyond the foregoing admissions, the Court finds serious flaws in Ms. Owen's sales comparison approach, including (i) the absence of stand-alone vessel sales in her analysis, (ii) the misapplication of her EBITDA analysis, and (iii) the failure to establish any comparability between the sales she relied upon and the subject Vessels.

First, Ms. Owen was asked whether she attempted to find comparable sales of vessels themselves. At one point she stated that she did not (*id.* at 87:15-17 (Owen)) and at another point she testified that she did. (*Id.* at 88:4-7 (Owen).) Nonetheless, Ms. Owen testified that

she did not find any sales of vessels alone. (*Id.* at 88:8-12 (Owen).) This is in contrast to Mr. Herman, who found a number of sales of vessels, which, as noted above, the Court finds to be comparable to the subject Vessels. Instead, Ms. Owen identified sales of casino enterprises, including all tangible and intangible assets. (County Trial Ex. 1 at 46 (2006 Report); County Trial Ex. 2 at 46 (2010 Report).)

Second, Ms. Owen utilized her sales data to derive an EBITDA multiple that she used to develop a going-concern value. (*Id.* at 90:22-91:5 (Owen).) Putting aside for the moment the questionable relevance of this exercise, Ms. Owen selected an EBITDA range that was based on trailing twelve month EBITDA (*id.* at 93:10-23) and then applied that to the Debtors' *year one* EBITDA. (*Id.* at 94:4-6 (Owen).)

Had Ms. Owen applied the trailing twelve-month EBITDA multiple from her comparables to the Debtors' trailing twelve-month EBITDA, Ms. Owen's conclusion of value based on the sales comparison approach for 2006 would have decreased by approximately $86 million. (*Id.* at 95:11-96:24, 97:13-16 (Owen).)

The Court finds that it would have been more reasonable for Ms. Owen to apply a trailing twelve-month EBITDA to a trailing twelve-month EBITDA as this would have been a so-called "apples to apples" comparison. Indeed, Ms. Owen acknowledged that this method is the currently-accepted practice. (*Id.* at 21:3-9 (Owen).)

Third, and most importantly, it is clear from Ms. Owen's reports and testimony that her sales comparison approach simply is not indicative of the value of the Vessels in this case. The sales relied upon by Ms. Owen included the purchase of substantially more than vessels. Ms. Owen did not allocate the sales prices paid among the assets purchased in those transactions, and she did not know how much of the purchase price in any of those transactions was attributable to any single asset purchased, such as the vessels, the personal property, the gaming licenses or other intangibles. (*Id.* at 103:19-104:8 (Owen).) A fundamental requirement of a sales comparison approach is the use of "comparable" sales data. *See* AORE at 301 (describing the first step of the sales comparison approach: "The goal is to find a set of comparable sales as similar as possible to the subject property to ensure they reflect the actions of similar buyers.") Ms. Owen did not, in her report or her testimony, perform any of the steps necessary to establish the portion of the sales prices attributable to the vessels nor did she establish the comparability of her sales data to the Vessels.

For the foregoing reasons, the Court finds that Ms. Owen's sales comparison approach does not impeach or rebut Mr. Herman's sales comparison approach.

### iv. Ms. Owen's Income Capitalization Approach

To perform her income capitalization approach, Ms. Owen attempted to project forward the income and expenses of the Debtors' entire gaming operations. (5/12/11 Trial Tr. 300:2-7 (Owen).) This was meant to reflect the going concern's income generating

capabilities. (County's Trial Ex. 1 at 39.) Ms. Owen utilized two techniques as part of her income capitalization approach: a discounted cash flow analysis and direct capitalization. (*Id.* at 49-71.)

Ms. Owen's discounted cash flow analysis relies on income and expense projections that she presents in her report. (*Id.* at 66.) This analysis utilizes a five-year projection period with fiscal year inflation and discounting. (*Id.*)

Ms. Owen concluded that there was insufficient data to determine a market-derived discount rate. (*Id.* at 67.) She further concluded, however, that there was ample data available to support an overall rate, and thus she derived a discount rate and a reversionary capitalization rate by adding basis points to the indicated overall rate. (*Id.*)

While Ms. Owen performed her income approach to determine a "going concern value" for the total enterprise, Ms. Owen did not determine an indication of value for just the Vessels within the income capitalization section of her reports. Instead, after determining the going concern value, she allocated a portion of the going concern value to the Vessels, and this allocation relied on a separate income analysis based on EBITDA, near the end of her report. Therefore, the Court addresses her vessel allocation methodology separately below.

Ms. Owen's income capitalization approach contains a number of methodological and mathematical errors that materially impact the reliability of her conclusions.

For instance, Ms. Owen incorrectly calculates the admission tax and the gaming tax in computing her projected expenses. (Debtors' Trial Ex. 21 at 34-35, 39.) These mistakes affect her value conclusions by millions of dollars, *see infra* Section E(i). (*Id.*)

In addition, Ms. Owen did not appropriately consider the property tax burden that would result from her conclusion of value. (5/13/11 Trial Tr. 250:2-7 (Mellen).) Even the County's own rebuttal expert, Ms. Mellen, acknowledged that the failure to utilize the proper amount of real estate taxes may have skewed Ms. Owen's discounted cash flow analysis. (*Id.*) Understating expenses by millions of dollars necessarily results in an overstatement of income and inflates the resulting value from the income approach.

In addition, as noted by Ms. Mellen, Ms. Owen also does not deduct a reserve for the replacement of furniture, fixtures, and equipment in the forecast of income and expenses. (County's Trial Ex. 3 at 27.) The Court agrees with Ms. Mellen that, given that the stated purpose of Ms. Owen's appraisal is to estimate the market value of the real property, the return on and of personal property should be eliminated from value. (*Id.*) Consequently, a deduction of a reserve for the replacement of furniture, fixtures, and equipment should have been made.

Ms. Mellen also examined the two combined operations of the Debtors (*i.e.*, the gaming operations for MSC I and MSC II), and concluded that the EBITDA levels in Ms. Owen's appraisal appeared to be "aggressive." (*Id.* at 27.) As a result, Ms. Mellen believes that Ms. Owen's 2006 income approach value conclusion is "aggressive." (*Id.* at 11.) Ms.

Mellen also concluded that Ms. Owen's forecast, which "reflects a 36% increase in EBITDA in 2010 . . . would not be considered reasonable." (*Id.* at 30.)

Even were the Court prepared to credit a "going concern analysis" as a step in this proceeding, the number of significant mathematical and methodological errors undermine the credibility and reliability of Ms. Owen's income analysis.

Moreover, as Mr. Yerian explained, *see infra* Section E(i), Ms. Owen made other material errors which rendered her income capitalization approach unreliable. The abundance and significance of errors in Ms. Owen's income capitalization approach, and their impact on Ms. Owen's conclusions of value of the Vessels, cause the Court to agree with Mr. Herman that using capitalized gaming income to value the Vessels is an "error-prone methodology that reduces the reliability of the value estimate." (Debtors' Trial Ex. 19 at 13.)

### v. Ms. Owen's Reconciliation of Value

Ms. Owen's three approaches produced a variation of more than $300 million in her 2006 report. (5/12/11 Trial Tr. 274:16275:2 (Owen).) The Manual suggests that Ms. Owen did not properly process her three approaches. (Debtors' Trial Ex. 22 at 3.) Such disparate value conclusions clearly indicate that her different approaches to value were the result of valuing different assets.

Even with the flaws noted above, Ms. Owen's cost approach was her lowest conclusion of value for both years. (5/12/11 Trial Tr. 259:6-8 (Owen).) She did not, however, select that value when she reconciled her values under the three approaches. (*Id.* at 307:12-23 (Owen).) Instead, Ms. Owen chose to rely on her sales comparison approach, which resulted in the highest conclusion of value. (5/13/11 Trial Tr. 44:7-11 (Owen).) She relied on this approach even though the sales upon which she relied were not, in fact, vessel sales—indeed, she frequently expressed doubts as to the quality of the comparability of her sales (5/12/11 Trial Tr. 307:24-308:4 (Owen). In her report, Ms. Owen stated that "gaming investors do not typically rely on the Sales Comparison Approach in estimating a specific value." (County's Trial Ex. 1 at 72.) Given these statements, it is unclear why Ms. Owen relied upon the sales comparison approach.

Ms. Owen testified that she believed that there are circumstances (*e.g.,* where there are a limited number of properties) where an investor would pay $200 million for something that the investor could build for $100 million. (5/13/11 Trial Tr. 42:9-14 (Owen).) The Court cannot imagine such circumstances exist. The Court does not agree that such circumstances exist in this case.

Ms. Owen's statement that the investor would pay $200 million for something he could build for $100 million emphasizes the fact that she is actually valuing the gaming licenses, of which there are a limited number, and not the Vessels. No evidence was elicited that demonstrates a restriction on a gaming operator's construction and replacement, or its

purchase and sale, of gaming vessels. Moreover, Ms. Owen's testimony on this point is inconsistent with the Manual, the Guidelines, and generally accepted appraisal principles. (Debtors' Trial Ex. 22 at 13 ("The cost approach to value is based on the assumption that potential buyers will pay no more for the subject property, hence they set the subject's value, than it would cost them to purchase an equally desirable substitute parcel of vacant land and construct an equally desirable substitute improvement."); County's Trial Ex. 17, Guidelines at 1 ("The calculation of cost is merely the starting point for estimating the true tax value of the improvements or structures. It sets the *upper limit* of value for the improvements) (emphasis added); AORE at 380 ("The principle of substitution is basic to the cost approach. This principle affirms that a knowledgeable buyer would pay no more for a property than the cost to acquire a similar site and construct improvements of equivalent desirability and utility without undue delay.").)

The Court finds that Ms. Owen's selection of a value conclusion based on her income or sales comparison approach, beyond the errors in each of those approaches noted above, violates the principle of substitution upon which the cost approach is based and further undermines her conclusion of value.

### vi. Ms. Owen's Allocation of Value

In arriving at her allocation of value to the real property (*i.e.,* the Vessels), Ms. Owen first calculated the value of the entire enterprise based on the highest value from her three approaches. (5/12/11 Trial Tr. 270:2-12 (Owen).) At the end of her report, she then

allocated that value to various property components of the enterprise, including the Vessels. (*Id.* at 270:13-271:13 (Owen).) Thus, Ms. Owen does not actually provide a separate conclusion of value for the Vessels under each of her three approaches.

The Court notes that Ms. Owen made statements downplaying the importance and relevance of her allocation to, and determination of, the Vessels' value. Specifically, Ms. Owen stated that she was "determining these allocations in order to comply with USPAP guidelines and *that we do not consider them relevant* in the going concern valuation of a casino facility." (County's Trial Ex. 1 at 74 (emphasis added).) Given these statements, the Court is not entirely sure whether Ms. Owen herself places much reliance upon the allocations of value.

The Court does not find the allocations reliable for several reasons. Ms. Owen valued the Debtors' gaming licenses at $2 million each. (5/12/11 Trial Tr. 290:9-13 (Owen).) She arrived at this number by using the license transfer fee that the Debtors paid to the State when they acquired the stock of Trump Indiana, Inc. (*Id.*; 5/13/11 Trial Tr. 80:4-10 (Owen).) The Court finds this to be unreasonable and agrees with the County's rebuttal expert, Ms. Mellen, that Ms. Owen significantly undervalued the gaming license. This finding is well-supported in light of the evidence introduced at trial which shows that Ameristar valued its license at $231,400,000 in 2007 (*id.* at 82:7-22) and that two slot machine gaming licenses sold during the relevant period to racetrack operators in Indiana for $250 million each. (*Id.* at 86:21-24 (Owen).) Ms. Owen did not reference either of these values in her report but instead claimed

that there was no established market value for gaming licenses in the Indiana market. (*Id.* at 79:20-24 (Owen).)

The Court finds that Ms. Owen's allocation of just $4 million to the Debtors' two gaming licenses significantly undervalued the gaming licenses, perhaps by as much as a few hundred million dollars if the prices paid for racino gaming licenses in Indiana are a guide. Had Ms. Owen properly valued the gaming licenses, this would have had a material effect on the other values in the allocation (5/13/11 Trial Tr. 110:15-22 (Owen).) Principally, it would have decreased the value that Ms. Owen allocated to the Vessels.

In arriving at her allocation of value to the real property (*i.e.*, the Vessels), Ms. Owen made a number of highly questionable assumptions, including, ultimately, assigning a substantial portion of gaming revenue to the Vessels.

First, Ms. Owen's overall revenue from operations was based on projections, not actual revenues from operations. (*Id.* at 112:22-113:5 (Owen).) While utilizing projections is not inherently troubling, given the significant errors in the determination of her projections, noted above, the capitalization of her projected income clearly results in material errors in her conclusion of value in this approach.

Second, in determining the portion of income allocable to the Vessels alone, Ms. Owen carved out a management fee equal to five percent (5%) of revenue from operations. (County's Trial Ex. 1 at 76; County's Trial Ex. 2 at 74). Ms. Owen admitted that there is no management fee in place for the Majestic Star Vessels. While the deduction of a portion of

62

revenues for non-realty business value attributable to "management" is not per se erroneous the Court is troubled that Ms. Owen did not explain how she arrived at her selection of the 5% management fee as appropriate for this property, beyond stating that it was selected from within a range that she claimed was typical in the "gaming industry." (5/12/11 Trial Tr. 309:6-14 (Owen).) When questioned, Ms. Owen did not point to market data or any factors applicable to the Vessels or their management in this case to explain why she selected that particular management fee percentage. (5/13/11 Trial Tr. 113:6-116:14 (Owen).)

After deducting the management fee, Ms. Owen applies all remaining EBITDA from operations to the real property (i.e., the Vessels). By way of example, for 2006, Ms. Owen constructs an EBITDA from gaming operations of $54,091,576, from which she deducts a management fee of $14,799,819 (i.e., 5% of total projected revenue of $295.9 million). Ms. Owen then allocates all remaining EBITDA, or $39,291,757, to the net operating income of the real property, to which she then applies a discount factor in arriving at a present value for that year. She repeats this approach for each of several years and then calculates and adds a reversionary value to reach a total real property value of $292 million for the Vessels for 2006. In so doing, Ms. Owen is attributing an unreasonably high percentage of earnings from gaming operations to the Vessels. Given the totality of the evidence of the components of the gaming operations contributing to the value of the overall business (including, importantly, the gaming licenses), it was not reasonable for Ms. Owen to attribute so much of the income from operations to the Vessels themselves, particularly when there was no

evidence suggesting that it was the *Vessels*—as opposed to the gaming occurring on the Vessels—that served to generate the income.

In sum, Ms. Owen's allocation of value suffers too many methodological and mathematical errors to be considered reliable.

### D. Expert Testimony of Suzanne Mellen - County's Expert

The County retained Ms. Mellen to perform review appraisals of Mr. Herman's two appraisals, Ms. Owen's two appraisals, and a Cushman appraisal. (*Id.* at 159:24-160:2, (Mellen).) The Court qualified Ms. Mellen as an expert. (*Id.* at 159:18-19 (Mellen).)

Ms. Mellen is employed by HVS Gaming Services as a Senior Managing Director. (*Id.* at 151:16-18 (Mellen).) She has been appraising real property since 1978 and has licenses in a number of states, including a temporary license in Indiana. (*Id.* at 152:5-18 (Mellen).) She studied real estate finance at Cornell University and has taken and developed real estate appraisal courses with the Appraisal Institute. Ms. Mellen received the MAI designation in 1984 and has been appraising real property since 1978. Trial Tr. 151-156 (Mellen). Ms. Mellen has appraised approximately 200 casinos throughout the United States and on three other continents.

### i. Ms. Mellen's Understanding of the Value Standards Employed by Mr. Herman and Ms. Owen.

Ms. Mellen believes that there is no significant difference in the definitions of market value-in-use that were employed by Mr. Herman and Ms. Owen. (*Id.* at 164:15-19 (Mellen).)

Instead, she believes that it was the appraisers' respective interpretations of market value-in-use that resulted in the significant difference between their value conclusions. (*Id.*)

Although Ms. Mellen understands that the interpretation of market value-in-use accounted for the significant difference between the appraisers, she not did perform any research or read any case law to determine how Indiana courts interpreted this term. (*Id.* at 223:23-2241:1 (Mellen).)

Given that Ms. Mellen's review involved the appraisers' respective interpretations of Indiana's market value-in-use standard, the Court finds that Ms. Mellen should have familiarized herself with the meaning of the term under Indiana law. (County's Trial Ex. 14 at U-11 (USPAP Competency Rule, which requires "recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.").)

Ms. Mellen believes that one can only determine market value-in-use of the Vessels when all of the components of the casino enterprise are put together. (*Id.* at 220:9-23 (Mellen).) According to Ms. Mellen, the value of the Vessels should be over and above the value of the "sticks and bricks" of the Vessels. (*Id.* at 220:24-221:5 (Mellen).) Ms. Mellen noted that she does not have the expertise to value the Vessels alone. (*Id.* at 227:8-18 (Mellen)

Ms. Mellen understands that the Vessels could be severed from the business and sold to another business for use in its own casino operations. (*Id.* at 226:15-227:1 (Mellen).) In

that situation, the value of the Vessels would not incorporate the current value of the casino operations and the license. (*Id.* at 226:22-227:1 (Mellen).)

### ii. Ms. Mellen's Review of Mr. Herman's Appraisals.

According to Ms. Mellen, Mr. Herman did not provide conclusions of value that adhered to Indiana's market value-in-use standard. (*Id.* at 166:7-10, 218:7-9 (Mellen).) For the reasons detailed above and further explained in the Conclusions of Law below, the Court disagrees. In addition to disagreeing with Mr. Herman's interpretation of Indiana's standard of value, Ms. Mellen raised a handful of other minor criticisms.

Ms. Mellen criticized the sufficiency of Mr. Herman's investigation and analysis. However, Ms. Mellen did not review all of the exhibits and appendices that were included in Mr. Herman's reports (*id.* at 230:13-18 (Mellen)), which undermined her faulting the sufficiency of Mr. Herman's investigation and analysis.

Strangely, Ms. Mellen believes that Mr. Herman erred by adhering to the Manual, the Guidelines, and the Riverboat Valuation Statute in conducting his appraisal. (*Id.* at 179:10-19, 233:21-25 (Mellen).) Given that Mr. Herman was engaged to determine the true tax value of the Vessels under Indiana law, the Court finds this is not a valid criticism.

Ms. Mellen testified that Mr. Herman should have utilized an income approach because that is the approach that is normally relied upon by investors. (*Id.* at 168:6-13 (Mellen).) Ms. Mellen also testified that it was not appropriate for Mr. Herman to exclude the income approach on the basis that it was "too complicated." (*Id.* at 168:9-169:9

(Mellen).)  On this point, the Court finds that Ms. Mellen misstated, or oversimplified at best, the reasons that Mr. Herman provided for not performing an income approach, which included: (i) the Vessels constitute a small part of the value of the overall business assets, and (ii) the Vessels themselves produced no rental income stream which could be capitalized. Although the Court agrees that it may have been appropriate for Mr. Herman to utilize an income approach had he been asked to value the entire casino enterprise, the Court disagrees that Mr. Herman was required to do so where he was valuing the Vessels alone and there was not an established rental market for gaming vessels.  *See Trimas Fasteners*, 923 N.E.2d at 499 n.4 (accepting taxpayer's appraisal which did not rely on an income approach to value manufacturing property because "the income approach was not applicable in valuing the subject property because there was insufficient data on *arms-length* lease transactions within the manufacturing building market over 100,000 square feet.").

Ms. Mellen believes that Mr. Herman's appraisals do not take into account the situs benefit that inured to the Vessels.  (*Id.* at 173:1-12 (Mellen).)  According to Ms. Mellen, the location of the Vessels is extremely valuable.  (*Id.* at 173:1-174:24 (Mellen).)  When making this statement, Ms. Mellen was operating under the assumption that gaming licenses in Indiana are specific to a location in Indiana and that they cannot be moved.  (*Id.* at 247:9-23 (Mellen).)  Ms. Mellen did not, however, do any research to confirm that this assumption was correct nor could she remember how she even reached that conclusion.  (*Id.* at 247:13-23 (Mellen).)  Nor, for that matter, did Ms. Mellen do any analysis to determine the value of any

adjustment of location or whether there should even be such an adjustment. (*Id*. at 248:25-249:9 (Mellen).)

Thus, there is no evidence in the record—from Ms. Mellen or any other witness—which attempts to quantify any alleged value associated with any "locational rights." Whether there even is such a value is questionable; Mr. Bennett testified that the Debtors can operate their Vessels anywhere in Gary as long as they are on Lake Michigan. (5/11/11 Trial Tr. 119:3-8 (Bennett).) Moreover, to the extent the location of the Vessels is dependent upon ownership of the adjoining real property parcels, the parties have stipulated that the value of those parcels are not at issue in this proceeding.

If Ms. Mellen is not confusing the value of the location with the value of the land, which is assessed to other real property parcels, then she is nevertheless confusing the value of the location with the value of the gaming licenses. Without the gaming licenses, the Vessels could not generate income. (*Id*. at 227:2-4 (Mellen).) Thus, it is not the location—Buffington Harbor in Gary, Indiana—that provides the value, it is the licenses. The value of the licenses, however, is not at issue in this proceeding, it is the value of the Vessels. *Cf*. IND. CODE 6-1.1-4-39.5(b)(2) ("Sales comparison approach, using data for generally comparable property, excluding values attributable to licenses, fees, or personal property as determined under 50 IAC 4.2.")

Ms. Mellen thought that it was inappropriate for Mr. Herman to make a deduction for obsolescence. (*Id*. at 175:12-16 (Mellen).) According to Ms. Mellen, if Mr. Herman had

conducted an income approach he would have concluded that the Vessels were generating a significant amount of income. (*Id.* at 175:22-176:6 (Mellen).) As discussed in greater detail above, the Court finds that simply because the Vessels are generating revenue does not mean that they are not suffering from obsolescence, particularly the types of obsolescence Mr. Herman identified and quantified, which relate to the physical and functional inutilities of the Vessels in comparison with the modern building-on-a-barge style casinos.

Ms. Mellen also criticized the methods that Mr. Herman used to calculate obsolescence. (*Id.* at 195:6-199:14 (Mellen).) Despite this criticism, it is clear that Ms. Mellen did not attempt to understand the causes of the Debtors' financial problems nor did she conduct any analysis to determine whether the opening of the building-on-a-barge style vessels had an impact on the Debtors' financial condition. (*Id.* at 226:1-7 (Mellen).)

The clear weight of the evidence establishes that the Vessels suffer from obsolescence, particularly in light of their outdated design. Thus, Ms. Mellen's criticisms on this point are not well-taken.

At trial, Ms. Mellen criticized Mr. Herman for invoking the jurisdictional exception rule (*id.* at 234:14-16 (Mellen)), Ms. Mellen conceded that Mr. Herman properly identified and set forth the requirements of the jurisdictional exception. (*Id.* at 237:24-238:4 (Mellen).) She also admitted that Mr. Herman was correct to follow the Riverboat Valuation Statute. (*Id.* at 238:10-12 (Mellen).)

As to Mr. Herman's sales comparison approach, Ms. Mellen stated that Mr. Herman should not have used the sales comparables that he used because Mr. Herman's use of sales of "off-line" boats was not in accordance with the market value-in-use standard.  (*Id.* at 219:3-10 (Mellen).)  She held this opinion even though the majority of comparable boats had been used as casino gaming vessels before they were sold and the buyers intended to use them as casino gaming vessels when purchasing them.  (*Id.*)

Ms. Mellen believed that the sales of vacant vessels do not reflect Indiana's interpretation of the term "value-in-use."  (*Id.* at 219:20-23 (Mellen).)  As noted above, however, Ms. Mellen did not perform any research in order to gain an understanding of Indiana's interpretation of the term value-in-use.  Moreover, Ms. Mellen admitted that if Indiana law allowed the use of vacant sales to reflect market value-in-use, then Mr. Herman's analysis of sales would be appropriate.  (*Id.* at 221:25-222:7 (Mellen).)

Ms. Mellen also agreed that "one of the best comps of value would be the sale of the subject property itself."  (*Id.* at 240:8-12 (Mellen).)  In this case, such a "comp" does exist as part of the Debtors' acquisition of Trump Indiana, Inc.  As part of that acquisition, the MSC II vessel was acquired and was valued at $5.5 million.  (*Id.* at 242:10-23 (Mellen).)

Tellingly, for the 2007 assessment date, Mr. Herman valued the MSC I at $6.3 million and the MSC II at $5.6 million while Ms. Owen valued the Vessels at $292 million.  Thus, by Ms. Mellen's own logic, Mr. Herman's appraisals are much more in line with "one of the best comps of value" for the Vessels.

### iii.    Ms. Mellen's Review of Ms. Owen's Appraisals.

As part of her review of Ms. Owen's appraisals, Ms. Mellen could not determine whether Ms. Owen complied with Indiana law.  (*Id.* at 236:10-13 (Mellen).)  If, however, Ms. Owen had been asked by the client to adhere to the Riverboat Valuation Statute, then she would have been required to invoke the jurisdictional exception rule.  She did not.  (*Id.* at 238:17-239:4 (Mellen).)  Both at trial and in her expert report, Ms. Mellen offered extensive criticisms of Ms. Owen's appraisals.  Among other things, Ms. Mellen criticized Ms. Owen for failing to provide adequate explanation on a number of important points.  According to Ms. Mellen, "Ms. Owen's report would have been more reliable if she had provided further clarification."  (*Id.* at 250:18-21 (Mellen).)

For example, Ms. Owen states that she modified her valuation techniques to account for the revenue and expenses of the Vessels only.  (County's Trial Ex. 1 at 4.)  According to Ms. Mellen, however, "[t]his is a critical factor that, in my opinion should be further explained, particularly because the appraiser relies so heavily upon the income approach to valuation."  (County's Trial Ex. 3 at 23.)  Because Ms. Owen's appraisal does not discuss the methodology employed to isolate the income attributable to the Vessels, it is impossible to evaluate whether she did so correctly.  Thus, Ms. Owen may well have attributed more income to the Vessels than was necessary and thereby overstated their value.

In addition, Ms. Mellen believed that Ms. Owen's report would benefit from further explanation regarding the allocation that Ms. Owen performed at the end of her report. (*Id.* at 21.)

Finally, Ms. Mellen criticized Ms. Owen for (1) significantly undervaluing the gaming licenses and failing to conduct a more thorough analysis of their value (*id.* at 25); (2) failing to deduct a reserve for the replacement of furniture, fixtures, and equipment (*id.* at 27); and (3) not appropriately considering the property tax burden, which may have skewed Ms. Owen's discounted cash flow analysis. (5/13/11 Trial Tr. 250:2-7 (Mellen).) The Court agrees with these criticisms of Ms. Owen's appraisal.

### iv. Ms. Mellen's Review of the Cushman Appraisal.

Although Ms. Mellen was asked to review one of the Cushman business enterprise appraisals, she agreed that "no one in this [court]room, nobody, including the Court, should rely on the Cushman appraisals as a basis for determining real property value." (*Id.* at 229:20-23 (Mellen).) The Court agrees with Ms. Mellen.

In any event, the Cushman appraisal that Ms. Mellen reviewed does not render an opinion of real property value. (*Id.* at 228:22-25 (Mellen).)

### E. Expert Testimony of Jared Yerian - Debtors' Expert

The Debtors retained Mr. Yerian to review and critique the expert reports, particularly the methodologies, of Ms. Owen and Mr. Kelly. (*Id.* at 263:11-20 (Yerian).) Mr. Yerian was

not retained to provide an opinion regarding USPAP or appraisal procedures. (*Id.* at 262:8-10 (Yerian).) The Court qualified Mr. Yerian as an expert. (*Id.* at 301:19-302:2 (Yerian).)

Mr. Yerian is a managing director at AlixPartners. (*Id.* at 260:7-13 (Yerian).) His primary practice areas include valuation, litigation support, and middle-market restructuring. (*Id.* at 260:3-6 (Yerian).) As such, he is an expert in valuation practices and methodologies, particularly business enterprise valuation. (*Id*. at 260:14-17 (Yerian).)

### i. Mr. Yerian's Review of Ms. Owen's Report and Methodology

In his review of Ms. Owen's report, Mr. Yerian identified a number of methodological and mathematical errors committed by Ms. Owen. At trial, Mr. Yerian provided an overview of his key observations and critiques. The Court found Mr. Yerian's testimony to be reliable and credible. The Court summarizes the testimony of Mr. Yerian at trial, as follows:

(a) Mr. Yerian explained the impact of Ms. Owen's calculation of the construction cost based on estimated cost per gaming position instead of gaming square footage. (*Id*. at 265:14-19 (Yerian).)

(b) Ms. Owen rounded up, without explanation or basis, from $34,157 per gaming position to $35,000 per position. (*Id*. at 265:20-23 (Yerian).)

(c) Ms. Owen incorrectly stated the number of gaming positions. (*Id.* at 265:24-266:1 (Yerian).)

(d) Ms. Owen did not provide any analysis or basis to support the inclusion of entrepreneurial profit. (*Id.* at 266:2-3 (Yerian).)

(e) Ms. Owen incorrectly calculated the cost of slot machines. (*Id.* at 266:4-5 (Yerian).)

(f) Ms. Owen failed to properly value the gaming licenses. (*Id.* at 266:6-10 (Yerian).)

(g) Ms. Owen incorrectly applied a trailing twelve-month EBITDA multiple to a projected twelve-month EBITDA amount. (*Id.* at 266:13-267:4 (Yerian).)

(h) Ms. Owen made an error calculating the admission tax which impacted her projected EBITDA. (*Id.* at 267:18-268:4 (Yerian).)

(i) Ms. Owen overstated EBITDA because she did not include the impact of the higher value and corresponding higher property taxes. (*Id.* at 268:6-271:6 (Yerian).) The higher property taxes would have significantly lowered Majestic's EBITDA as of each valuation date. (*Id.*) As a result of the lower EBITDA, Ms. Owen would have arrived at a significantly lower valuation estimate. (*Id.*)

(j) Ms. Owen overstates the 2010 EBITDA amount by underestimating the gaming tax that the Vessels would pay based on her projected 2010 gaming revenue. (*Id.* at 271:12-272:7 (Yerian).) This was the same mistake that Ms. Owen corrected in her 2006 report but failed to correct in her 2010 report. (*Id.*)

Ms. Owen failed to (a) calculate projected cash flow attributable to the Vessels and (b) adjust her EBITDA estimates for cash expenditures that are not captured by her estimate, such as capital expenditures and cash income taxes. (*Id.* at 272:10-273:18 (Yerian).)

While a number of these errors were, individually, significant enough to cause the Court concern over the reliability of Ms. Owen's conclusions of value, cumulatively, the Court agrees with Mr. Yerian that Ms. Owen's report was "unreliable, given the number and magnitude of errors" that Mr. Yerian described. (*Id.* at 275:2-6 (Yerian).) The County did not rebut Mr. Yerian's criticisms of Ms. Owen's report.

### ii. Mr. Yerian's Review of Mr. Kelly's Report and Methodology.

As a general matter, Mr. Yerian observed that Mr. Kelly's report was "relatively unintelligible" (*id.* at 275:11-24 (Yerian)) and "fail[ed] to describe adequately or provide support for his prior assessment and valuation analysis . . . ." (Debtors' Trial Ex. 21 at 45.) After reviewing Mr. Kelly's report and considering Mr. Kelly's testimony, the Court agrees with Mr. Yerian and finds that Mr. Kelly's report is inherently unreliable given the sheer lack of data or analysis contained within it. This is true for all of the approaches described in Mr. Kelly's report.

Mr. Yerian presented testimony at trial establishing that Mr. Kelly's new calculations were not only materially different than his prior report methodologically but also contained mathematical errors. (5/13/11 Trial Tr. 276:4-280:21 (Yerian).) As Mr. Yerian established, the new methodology presented by Mr. Kelly at trial flatly contradicted what he had done in his report. (*Id.* at 280:3-12 (Yerian).)

Mr. Yerian's criticisms of Mr. Kelly's reports were not rebutted or impeached at trial.

## CONCLUSIONS OF LAW

### I.      Indiana Real Property Tax Law Controls the Outcome of this Proceeding.

The purpose of this proceeding is to determine the assessed value of the Vessels under Indiana law. Under Indiana law, the assessed value of real property is equal to its true tax value. IND. CODE § 6-1.1-1-3(a)(2). Subject to other statutory guidance, true tax value means "market value-in-use of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property." (Debtors' Trial Ex. 22 at 2.) The Riverboat Valuation Statute dictates how the "true tax value" of riverboat vessels must be determined. Accordingly, it is Indiana real property tax law—specifically the Riverboat Valuation Statute—that controls the outcome of this proceeding.

### II.  The Meaning of Market Value-in-Use.

A key and preliminary issue in this case is the proper interpretation and application of Indiana's market value-in-use standard. The Indiana Tax Court recently interpreted the meaning of this term in *Stinson v. Trimas Fasteners*, 923 N.E.2d 496 (Ind. Tax Ct. 2010), a case that is analogous to the instant proceeding and forms the foundation for the Court's conclusions.

In *Trimas Fasteners*, the real property at issue was an owner-occupied and in-use manufacturing facility. In support of its appraisal, the taxpayer's expert utilized a sales comparison approach based on five similar properties, all of which were fee simple interests

and vacant at the time of sale. *Id.* at 497. The assessor, by contrast, had submitted appraisals that utilized sales of properties where there were leases in place. *Id.* at 500.

Before the Tax Court, the assessor argued that the taxpayer's value estimate "failed to comport with the legal standard of market value-in-use." *Id.* at 501. More specifically, the assessor claimed that the vacant properties did not accurately measure the market value-in-use of a property that was "in use" by its owner because such properties were vacant. *Id.* According to the assessor, the market value-in-use standard requires the valuation of more than just the "sticks and bricks" of the property, and vacant property is just the "sticks and bricks." *Id.* The Tax Court disagreed.

In characterizing the assessor's argument that something "over and above" the "sticks and bricks" must be valued, the Tax Court explained that, "as evidenced by her argument, the Assessor misunderstands the concept of market value-in-use on its most basic level. Generally speaking, market value-in-use, as determined by objectively verifiable market data, is the value of a property *for* its use, not the value *of* its use." *Id.* (emphasis in original). Notably, the Tax Court went on to observe, and to credit the testimony of the taxpayer's appraiser, that the sale properties relied upon by the Assessor's appraiser—which included leased fee interests that were in place—"reflected *more than the value of a property for its use: it reflected a property's investment value because the purchaser is looking for a return on the income stream generated by the lease in place at that time*." *Id.* at 500 n.8 (emphasis added).

The County attempts to distinguish *Trimas Fasteners* on the basis that it should not apply when there is evidence of sales of comparable properties which were in use. In *Trimas Fasteners*, however, the assessor's expert actually did utilize sales of properties that included "leased fee" interests. *Id.* at 502. Thus, the Court rejects the County's argument that *Trimas Fasteners* does not apply when there is evidence of sales of comparable properties which were in use on the date of sale.

On the same day that it decided *Trimas Fasteners*, the Tax Court decided *Meijer Stores Ltd. Partnership v. Smith*, 926 N.E.2d 1134, 1137 (Ind. Tax Ct. 2010), which held that a taxpayer's appraisal properly utilized "sale[s] of vacant and abandoned Walmart and Lowe's stores [to] secondary users [such] as Big Lots as comparables," and that it was "improper to discount the appraisal's sales comparison approach because 'secondary users' purchased vacated big-box properties instead of entities like Wal-Mart." Notably, though the sales comparables were vacant at the time of sale, the Tax Court observed, with approval, that they "were used for retail purposes both pre- and post-sale." *Meijer Stores*, 926 N.E.2d at 1137.

Taken together, *Trimas Fasteners* and *Meijer Stores* clearly direct that what matters for purposes of determining "market value-in-use" is not whether the sales comparables were in business and operating on the date of sale, but whether the properties' "use"—both before and after sale—was generally the same (*i.e.*, retail use, manufacturing use, gaming use). As noted below, this understanding of market value-in-use was reflected in Mr. Herman's

appraisals and the sales data he utilized, but was not reflected in the appraisals submitted by the County.

### III. The Constitutionality of the Riverboat Valuation Statute.

The County asserted in its opening brief that the Riverboat Valuation Statute would "appear" to be unconstitutional because it does not result in substantially uniform and equal rates of property assessment and taxation. At trial, however, the County stated that because the Calumet Township Assessor complied with the statute "by coincidence," the County would not contest the constitutionality of the statute in this proceeding. (5/11/11 Trial Tr. 35:9-13 (County's opening statement).)

In light of the County's position, and given the presumption of constitutionality afforded to statutes, *see Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind. 1996), as well as the obligation of one challenging such constitutionality to present affirmative evidence of actual nonuniformity of assessments, *see Dep't of Local Gov't Fin. v. Commonwealth Edison Co.*, 820 N.E.2d 1222, 1230 (Ind. 2005), the Court will not address the constitutionality of the Riverboat Valuation Statute.

### IV. Burden of Proof

The burden of proof applicable to the determination of tax liability in bankruptcy court pursuant to 11 U.S.C. § 505 "remains where the substantive tax law puts it." *Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 26 (2000). In Indiana, a property tax assessment is generally presumed to be correct, but a taxpayer may rebut that presumption

79

by making a prima facie case that the actual true tax value differs from that determined by the assessor. *See, e.g., Meridian Towers East & West v. Washington Twp. Assessor*, 805 N.E.2d 475, 478-79 (Ind. Tax Ct. 2003); *Lakes of the Four Seasons Property Owners' Ass'n, Inc. v. Dep't of Local Gov't Fin.,* 875 N.E.2d 833, 837 (Ind. Tax Ct. 2007).

The most effective means for a taxpayer to establish a prima facie case is to present a market value-in-use appraisal that was completed in conformance with USPAP. *Kooshtard Property VI, LLC v. White River Twp. Assessor,* 836 N.E.2d 501, 506 n.6 (Ind. Tax Ct. 2005). Once a taxpayer has established a prima facie case, the burden shifts to the assessing official to "impeach or rebut" the taxpayer's case with "substantial evidence." *Meridian Towers East & West*, 805 N.E.2d at 479-80. At that point, the assessor may not simply rely on the original assessment, but must present affirmative evidence of its own. *See, e.g., id.*; *Lakes of Four Seasons Prop. Owners' Ass'n*, 875 N.E.2d at 837. Moreover, "to the extent that assessing officials themselves utilize other market value-in-use evidence to justify their assessments, their evidence must conform to the same standards to which they would hold taxpayers' evidence." *Kooshtard Property VI, LLC*, 836 N.E.2d at 506 n.6; *see also Meijer Stores, Ltd. Partnership v. Smith*, 926 N.E.2d 1134, 1139 (Ind. Tax Ct. 2010) (holding that the assessor failed to present "market-based evidence" that impeached the taxpayer's appraisal and supported its own assessment).

Where opposing sides present competing appraisals, the IBTR and Indiana Tax Court typically evaluate the data, assumptions, and methodology used in each appraisal to

determine which one is more reliable. *See, e.g.*, *U.S. Steel Corp. v. Dep't of Local Gov't Finance*, No. 45-001-02-9-3-00036A (IBTR Apr. 1, 2005).

## V. The Debtors Established a Prima Facie Case.

To establish a prima facie case, the Debtors needed to establish that the actual true tax value of the Vessels differed from the original assessed value of the Vessels. The Debtors met this burden by (a) showing that the County's original assessment—and the County's evidence on which the assessment was based (Mr. Kelly's 3.45 trending factor)—was both unreliable and incorrect, and (b) presenting a USPAP-compliant appraisal that reflected the correct true tax value of the Vessels.

### A. The County's Original Assessment Was Incorrect.

At trial, the Debtors were able to establish that the County's original assessment was demonstrably incorrect and therefore did not reflect the true tax value of the Vessels.

The County did not adhere to the Riverboat Valuation Statute either in its original assessment or within the appraisal it submitted to the Court in this proceeding. The County and its witness, Mr. Kelly, appear to disagree over the applicability of the Riverboat Valuation Statute. While Mr. Kelly testified that an assessor may disregard the statute—and Mr. Kelly did not give any indication that he was attempting to comply with it in his analysis—the County maintains that by selecting from the lowest of Mr. Kelly's three approaches, the County inadvertently complied with it. Having considered all of the evidence submitted by the County and Mr. Kelly in support of the original assessment, the

Court disagrees that Mr. Kelly or the Assessor applied or complied with the Riverboat Valuation Statute in arriving at the true tax value of the Vessels.

Even if the Assessor applied the lowest of three approaches to value, the resulting value—which was based on Mr. Kelly's 3.45 trending factor— was so demonstrably flawed as to be unsupportable. Mr. Kelly could not state with any certainty that the methodology he described at trial was the methodology that he actually used when calculating the 3.45 trending factor. In addition, even though Mr. Kelly's trending factor was based on the Blue Chip's construction costs, Mr. Kelly never verified the accuracy and reliability of those costs and he could not establish the physical similarities or dissimilarities between the Blue Chip and the Vessels sufficient to permit Mr. Kelly or this Court to make adjustments necessary to make use of the cost data. Mr. Kelly also used the wrong capacity for the Blue Chip. Finally, although Mr. Kelly's increase of the capacity adjustment from $2,500 to $6,500 per person was a "critical component" of his analysis, he based it entirely on a "feeling" that he had. In addition, Mr. Kelly admitted that he could not remember what calculation he used and, more importantly, he could not identify any objectively verifiable data to support this increase. The foregoing errors show that Mr. Kelly's trending factor does not present the objectively verifiable and reliable data that Indiana law requires in order to ensure uniformity and equality. *Trimas Fasteners*, 923 N.E.2d at 501 (noting that market value-in-use is "determined by objectively verifiable market data"); *Westfield Golf Practice Center, LLC v. Washington Township Assessor*, 859 N.E.2d 396, 399 (Ind. Tax Ct. 2007) ("[T]he

overarching goal of Indiana's new assessment scheme is to measure a property's value using objectively verifiable data.").  Moreover, "feelings" do not constitute substantial evidence to rebut the Debtors' prima facie case.  *See Freudenberg-NOK General Partnership v. State Bd. of Tax Comm'rs*, 715 N.E.2d 1026, 1030 (Ind. Tax Ct. 1999) ("'[F]eelings' do not constitute the requisite basis required to uphold a State Board final determination, nor do they amount to substantial evidence.").

Given that the original assessed values of the Vessels were based solely on this trending factor—a factor the Court finds to be demonstrably erroneous and inapplicable to the Vessels—these assessed values cannot be correct.  Moreover, the original assessed values did not account for obsolescence, which this Court has found existed for both assessment dates.  This error, in combination with the errors in the 3.45 trending factor methodology, means that the values are not entitled to any weight and that the Debtors have met their initial burden of proving that the original assessments were incorrect.

### B.   The Debtors Presented a USPAP-Compliant Appraisal that Established the Correct True Tax Value of the Vessels.

In order to establish a prima facie case, the Debtors also needed to present an affirmative opinion of the true tax value of the Vessels.  The Debtors were able to do this through Mr. Herman's testimony and expert report.

Mr. Herman's expert report complied with USPAP.  It therefore is evidence that Indiana courts and the IBTR rely upon as the most effective means for a taxpayer to establish its prima facie case.  *Kooshtard Property VI, LLC*, 836 N.E.2d at 506 n.6.  Mr. Herman

presented reliable evidence as to the true tax value of the Vessels. Mr. Herman's evidence was particularly reliable given that he (i) recognized and complied with Indiana law, specifically Indiana's market value-in-use standard, in performing the appraisal assignment and (ii) relied upon data and generally accepted appraisal methods that most persuasively reflect the value of the assets at issue in this proceeding—the Vessels.

### i.     Mr. Herman Performed the Cost Approach in Accordance with Indiana Law.

Mr. Herman performed the cost approach consistent with the Manual and the Riverboat Valuation Statute. According to the Manual, the cost approach "estimates the value of the land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value." (Debtors' Trial Ex. 22 at 3.) This approach is based on the assumption that potential buyers will pay no more for the subject property than it would cost them to construct an equally desirable substitute. (*Id.* at 13.) To perform this approach, the appraiser starts with the replacement cost new or the reproduction cost new and then subtracts accrued depreciation. (*Id.*)

The Guidelines set forth cost schedules which contain base costs to use in estimating the initial cost new for various property classes, including riverboats. According to the Guidelines and the Riverboat Valuation Statute, these base costs must be used to determine the value of the riverboats under the cost approach. IND. CODE § 6-1.1-4-39.5(b)(1).

While consistent with generally recognized appraisal principles, Mr. Herman's cost approach also complied with Indiana law in that it followed the methods and schedules set

forth in the Riverboat Valuation Statute, the Manual, and the Guidelines. Similarly, the techniques that Mr. Herman used to calculate obsolescence were an accepted means under Indiana law. The Indiana Tax Court and IBTR—the authorities charged with interpreting the Manual and Guidelines and requirements of Indiana's assessment system—have repeatedly explained that, in calculating obsolescence, "[t]here are numerous methodologies and as a general rule, common appraisal concepts and methods may be used to determine obsolescence under true tax value." *See, e.g., Lake County Assessor v. U.S. Steel Corp.*, 901 N.E.2d 85, 87-93 (Ind. Tax Ct. 2009); *Hometowne Associates, L.P. v. Maley*, 839 N.E.2d 269, 275 (Ind. Tax Ct. 2005). These authorities have consistently held that where the value indicated by the sales comparison or income capitalization approach is less than the value indicated by the cost approach, that difference reflects, and is a proper measure of, obsolescence. *See Stinson v. Trimas Fasteners*, 923 N.E.2d 496, 499 n.6 (Ind. Tax Ct. 2010) (noting that the difference between sales and cost approaches to value "is a proper way to quantify the amount of obsolescence in a property"); *Meijer Stores Ltd. Partnership v. Smith*, 926 N.E.2d 1134, 1136-39 (Ind. Tax Ct. 2010); *Hometowne Assocs. L.P. v. Maley*, 839 N.E.2d 269, 275 (Ind. Tax Ct. 2005); *Lacy Diversified, Ltd. v. Dep't of Local Gov't Fin.*, 799 N.E.2d 1215, 1224-25 (Ind. Tax Ct. 2003); *Canal Square v. State Bd. of Tax Comm'rs*, 694 N.E.2d 801, 805-06 (Ind. Tax Ct. 1998).

To quantify obsolescence, Mr. Herman used three different techniques—the breakdown method, the economic age/life method, and the market extraction method. These

methods are generally-recognized appraisal techniques and are routinely approved by Indiana courts. *See, e.g., Trimas Fasteners*, 923 N.E.2d at 499 n.6 (comparison of value under cost and sales approaches is proper way to quantify obsolescence); *Lake County Assessor v. U.S. Steel Corp.*, 901 N.E.2d at 89-91 (quantifying obsolescence by reference to excess operating expenses and comparison of value under cost and sales approaches); *see also* Debtors' Trial Ex. 27 at 8 (stating that "common appraisal concepts and methods may be used to determine obsolescence under true tax value").

Obsolescence is a "market-based concept" that is dependent on the "overall desirability of a property within the market." *Meijer*, 926 N.E.2d at 1139. Mr. Herman's quantification of obsolescence with respect to the Vessels is in line with other cases where—as here—the market indicates a substantial loss in value. *See, e.g., Meridian Towers East & West*, 805 N.E.2d at 479 (approving 74% obsolescence adjustment for apartment building based on comparison of cost and income approaches).

In sum, in conducting his cost approach, Mr. Herman used appraisal techniques that are widely used and specifically approved of in Indiana when valuing real property.

### ii. Mr. Herman Performed His Sales Comparison Approach in Accordance with Indiana Law.

To perform his sales comparison approach, Mr. Herman relied upon comparable sales of riverboat casino vessels, the majority of which had been sold for continuation of their original, intended use as gaming vessels, and that did not include personal property or intangibles. Mr. Herman's analysis was consistent with the Riverboat Valuation Statute,

which states that the sales comparison approach must exclude "values attributable to licenses, fees, and personal property." IND. CODE § 6-1.1-4-39.5(b)(2).

In addition, Mr. Herman's interpretation and application of Indiana's market value-in-use standard was correct. The County's primary criticism of Mr. Herman's vessel sales was that they were not "in use" (*i.e.*, the gaming business was not occurring) at the time of the sale. The Court concludes, however, that the County has misinterpreted Indiana's market value-in-use standard and that it was entirely proper for Mr. Herman to utilize sales where the use, both pre- and post-sale, was for gaming, even if the properties did not have active gaming businesses in operation on the date of sale. *See Trimas Fasteners*, 923 N.E.2d at 501 (rejecting assessor's argument that the sales of vacant properties do not reflect market value-in-use); *Meijer Stores Ltd. Partnership*, 926 N.E.2d at 1137 (holding that it was improper for the Indiana Board to reject taxpayer's sales comparison approach based on the use of sales of vacant and abandoned properties to secondary users, so long as the properties were used for the same general purpose both pre- and post-sale).

The Court rejects the County's argument that Mr. Herman's sales do not meet the market value-in-use standard because they were to be moved to different sites after their sales. This argument is a variation on the "locational benefit" argument presented by Ms. Mellen, which the Court has already rejected. Importantly, the County presented no evidence indicating how the movement of the vessels impacted the market value-in-use of the vessels. As noted above, under Indiana's market value-in-use standard, what matters is how the

87

vessels were used both before and after sale. *Meijer Stores*, 926 N.E.2d at 1137 (noting that the use of vacant properties within a sales comparison approach is appropriate so long as they "were used for [the same] purposes both pre- and post-sale."). Moreover, as the Court has noted, the sales identified by Mr. Herman are comparable and are not rendered otherwise by unsupported allegations that their post-sale movement rendered them non-comparable.

Mr. Herman followed the guidance set forth by the Indiana Tax Court and determined the market value-in-use of the Vessels themselves, and not the value of the business occurring on the Vessels. The Indiana Tax Court has clearly rejected the notion that market value-in-use requires or permits the valuation of something "over and above" the Vessels. The comparable sales that Mr. Herman relied upon reflect the value of the Vessels and were valid comparables. The County offered no evidence to rebut the sales data relied upon by Mr. Herman in determining his conclusion of value under the sales comparison approach.

### iii. Mr. Herman Did Not Need To Perform An Income Capitalization Approach in Order to Comply With the Riverboat Valuation Statute.

Mr. Herman considered, but did not rely upon the income capitalization approach. As he testified, the income approach would not have produced a reliable indication of value of just the Vessels for several reasons, including the inability to use a rental income stream to estimate the value of the Vessels (5/11/11 Trial Tr. 201:2-13 (Herman)) and the difficulty of allocating a business enterprise income stream to isolate the value of discrete assets like the Vessels (*id*. at 201:14-204:4 (Herman)). *Cf. Trimas Fasteners,* 923 N.E.2d at 499 n.4 (accepting taxpayer's appraisal which did not rely on an income approach to value

88

manufacturing property because "the income approach was not applicable in valuing the subject property because there was insufficient data on *arms-length* lease transactions within the manufacturing building market over 100,000 square feet."); *Lake County Assessor v. DLGF (Ispat Inland)*, No. 45-026-02-09-3-00059A ¶¶ 191-93 (IBTR July 8, 2005) (concluding that the income approach was not appropriate because the subject and comparable properties were not rented in the marketplace, stating "[t]he Indiana Manual does not provide for any other method for applying the income approach").

In performing the cost and sales approaches, and then selecting the lowest of those valuations, Mr. Herman complied with the Riverboat Valuation Statute. *Cf. Meadow Lake of Mooresville, LLC* No. 55-005-08-I-4-00022 (IBTR Feb. 11, 2011) (applying analogous lowest-of-three-approaches statute to low-income housing, the IBTR accepted petitioner's stand-alone cost approach value, stating, "the petitioner can make his case based on whichever of those three approaches produces the lowest value."); *Kendallville Associates, LP v. Noble County Assessor*, No. 57-004-08-1-4-00003 (IBTR Jan. 24, 2011) (accepting lowest of two approaches offered by taxpayer under similar statute).

Thus, because Mr. Herman performed the cost approach and the sales comparison approach in accordance with Riverboat Valuation Statute, his analysis reflects the true tax value of the Vessels.

**VI. The County Failed to Impeach or Rebut the Debtors' Case.**

Because the Debtors were able to establish a prima facie case, the burden then shifted to the County to "impeach or rebut" the taxpayer's case with "substantial evidence." *Meridian Towers East & West*, 805 N.E.2d at 479-80. In attempting to rebut a prima facie case, the assessor may not simply rely on the original assessment, but must present affirmative, market value-in-use evidence of its own. *Id.; Kooshtard Property VI, LLC* 836 N.E.2d at 506 n.6.

The County attempted to impeach and rebut the Debtors' case through the testimony and reports of Ms. Owen and Ms. Mellen. Because the County presented competing appraisals, this Court evaluated the data, assumptions, and methodology used by Mr. Herman and Ms. Owen. Based on this evaluation, the Court finds that the appraisals offered by Mr. Herman, which complied with Indiana law and valued just the assets at issue in this proceeding (*i.e.*, the Vessels), were more reliable than the appraisals offered by Ms. Owen.

In addition, the County failed to offer objectively verifiable data sufficient to rebut the data relied upon or conclusions reached by Mr. Herman. In short, the Debtors, through Mr. Herman, established a prima facie case of the correct true tax value of the Vessels for the years at issue, and the Court concludes that the County failed to impeach or rebut the Debtors' prima facie case, and certainly not with "substantial evidence."

## A.  Mr. Herman's Appraisals Were More Reliable than the Appraisals Offered by Ms. Owen.

When comparing the appraisals and the testimony elicited at trial, it is clear that Mr. Herman utilized data and methodologies that were more reliable than those utilized by Ms. Owen.  In addition, Mr. Herman's appraisals did not suffer from the numerous mathematical and methodological errors that were contained within Ms. Owen's report.

### i.  Mr. Herman Adhered to Indiana Law While Ms. Owen Did Not.

As established at trial, Mr. Herman adhered to Indiana law while Ms. Owen did not. In doing so, Mr. Herman determined the true tax value of the Vessels.  Because that is the issue in this proceeding, Mr. Herman's expert report and hearing testimony are more relevant, reliable and credible.

Ms. Owen, on the other hand, baldly conceded that she did not adhere to the Riverboat Valuation Statute, the Manual, or the Guidelines.  The County's position is that there is a categorical difference between an assessment and an appraisal, and that Ms. Owen's fee appraisal, though performed independent of Indiana law, is applicable in this proceeding. The Court disagrees.  While it is true in a general sense that a fee appraisal is not an assessment (indeed, fee appraisals are performed for a number of purposes other than to determine assessments), the County's argument obscures the fact that, *in this proceeding*, the two are inextricably intertwined and serve the same purpose.  All parties and their appraisers were well aware that the purpose of the appraisals was, ultimately, to determine the taxable value of the Vessels.   Taxable value in Indiana is true tax value, as that term is defined in

91

Indiana statutes, regulations and case law. Indeed, Mr. Herman and Ms. Owen each acknowledged in their appraisals that they were being offered and intended for use in this proceeding to determine the taxable value of the Vessels. (*See, e.g.,* Debtors' Trial Ex. 19 at 3; Debtors' Trial Ex. 20 at 3; County's Trial Ex. 1 (Cover Letter); County's Trial Ex. 2 (Cover Letter).)

In accepting and conducting an appraisal assignment, USPAP's Competency Rule requires the appraiser to (i) have "the ability to properly identify the problem to be addressed;" and (ii) demonstrate "recognition of, and compliance with, laws and regulations that apply to the appraiser or to the appraisal assignment." (County's Trial Ex. 14 at U-11 (USPAP Competency Rule).) Furthermore, in order to comply with USPAP in identifying the problem, the appraiser is required to apprise himself or herself of all assignment elements and assignment conditions, which specifically include "laws and regulations." (County's Trial Ex. 14 at U-13-14 (Comment to "Problem Identification").

Ms. Owen agreed that these rules governed the appraisal assignment and that the failure to comply with these rules would render the appraisal non-compliant with USPAP. (5/13/11 Trial Tr. at 127:13-130:10 (Owen).) The Court agrees with Debtors that, in this particular proceeding, the resolution of the appraisal assignment required the appraisers to apprise themselves of those laws, regulations and court decisions regarding the meaning Indiana ascribes to market value-in-use. Accordingly, the Court disagrees with the County that Ms. Owen was relieved of the obligation to recognize and comply with the Riverboat

Valuation Statute or other applicable laws and regulations that bear on this assignment, particularly when Ms. Owen knew that the appraisal was going to be used to determine the true tax value of the Vessels. As detailed above and further explained below, Ms. Owen's appraisals do not reflect the true tax value of the Vessels under the Riverboat Valuation Statute and do not comport with Indiana decisions on point, such as *Trimas Fasteners* and *Meijer Stores*. Accordingly, Ms. Owen's conclusions of value are unreliable for purposes of this proceeding.

Therefore, for purposes of determining the assessed value of the Vessels, Mr. Herman's appraisals are entitled to substantially greater weight.

### ii. Mr. Herman Properly Interpreted Indiana's Market Value-in-Use Standard While Ms. Owen Did Not.

Although both Mr. Herman and Ms. Owen claim to have applied Indiana's market value-in-use standard, they have two very different interpretations of that term. Clearly, this case and the appraisal assignment turn on the definition of market value-in-use and the types of evidence Indiana authorities require or permit in conducting an appraisal of property for property tax purposes.

As discussed above, Mr. Herman properly interpreted and applied Indiana's market value-in-use standard. No doubt this was the result of the extensive research that he performed in order to understand this standard—research that neither Ms. Owen nor Ms. Mellen performed.

In contrast, Ms. Owen did not correctly interpret or apply Indiana's market value-in-use standard. Under Ms. Owen's interpretation of market value-in-use, she believed that she should attribute virtually all of the income generated from the gaming business, including from the personal property, intangibles, and gaming licenses, to the Vessels. Ms. Owen's approach would result in the taxation of intangible property, which is exempt from tax in Indiana, as well as multiple taxation of tangible personal property, which is separately assessed.

Contrary to the interpretation advanced by Ms. Owen and the County, when valuing real property, the market value-in-use standard does not permit assessors to tax non-realty income from the business operations, from intangibles, or from personal property and attribute such value to the real property. Net income and gaming revenue are taxed under the state's income tax and gaming laws, not its real property tax laws. IND. CODE § 4-33-13-1, *et seq*. The County's approach, however, would have an assessor tax revenue and income, even though those components have already been taxed.

The Indiana Tax Court has clearly rejected the position advocated by the County and its appraiser in these proceedings. *See Trimas Fasteners*, 923 N.E.2d at 501 ("Market value-in-use, as determined by objectively verifiable market data, is the value of a property *for* its use, not the value *of* its use.") (emphasis in original). In other words, Indiana has considered and rejected the argument that an appraisal of real property requires the valuation of something "over and above" the real property itself. By attributing income from the

business, personal property, and gaming licenses to the Vessels, Ms. Owen has improperly interpreted the market value-in-use standard and severely overstated the value of the Vessels.

### iii. The County Did Not Impeach or Rebut the Evidence Offered by Mr. Herman.

The evidence at trial established that Ms. Owen made a number of errors when conducting her appraisals. As detailed above, these were major methodological and mathematical errors that impacted her conclusions on value by hundreds of millions of dollars. Based on the number and magnitude of these errors alone, Ms. Owen's appraisals cannot be relied upon as an accurate indication of the true tax value of the Vessels.

In contrast, the County was unsuccessful in its efforts to impeach or rebut the evidence offered by Mr. Herman. Most of the criticisms offered by the County pertained to Mr. Herman's interpretation and application of market value-in-use, which, as discussed, conformed to Indiana law. For example, Ms. Mellen's major criticism of Mr. Herman is that his use of the sales of vacant vessels did not reflect the proper interpretation of the term market value-in-use. Ms. Mellen based her criticism of Mr. Herman on her belief that market value-in-use required Mr. Herman to value something "over and above" the value of the Vessels alone. Ms. Mellen's criticism reflects a clearly incorrect interpretation of Indiana's market value-in-use standard. Consequently, the Court rejects her corresponding criticisms. Ms. Mellen admitted that if Indiana allowed the use of vacant sales to reflect market value-in-use (which it does), then Mr. Herman's approach and methodology would be appropriate. (5/13/11 Trial Tr. 221:25-222:7 (Mellen).)

Ultimately, the Court concludes that the County's criticisms of Mr. Herman did not rebut or impeach his analysis or conclusions of value. The Court accepts Mr. Herman's analysis and value conclusions as reflective of the true tax value of the Vessels.

## **CONCLUSION**

[T]he Power to tax involves the power to destroy. . . ." *McCullouch v. Maryland*, 17 U.S. 327, 431 (1819). For that reason, courts must carefully review taxpayer challenges to property tax assessments. The Court has concluded on the bases of the facts and law that the County did not meet its burden of impeaching or rebutting the affirmative opinion of value offered by the Debtors. The evidence clearly, precisely and overwhelmingly establishes that Mr. Herman's opinion as to the true tax value of the Vessels is reliable. The evidence also establishes that the opinions of value offered by the County—through both Mr. Kelly and Ms. Owen—were not reliable and the County failed to meet its burden. Accordingly, the Court concludes that the proper assessed value for the MSC I vessel is $6,290,000 for the March 1, 2007 assessment date and $3,500,000 for the March 1, 2010 assessment date; and the proper assessed value for the MSC II vessel is $5,580,000 for the March, 2007 assessment date and $3,200,000 for the March 1, 2010 assessment date.

As set forth in the *Amended and Restated First Stipulation Regarding Determination of Debtors' Real Property Tax Liability Pursuant to Section 505 of the Bankruptcy Code*, within three business days following the issuance of these findings of fact and conclusions of law, the parties shall submit a form of order for entry by the Court setting forth (a) the stipulated final assessed values of the Vessels for the March 1, 2006 through March 1, 2011 assessment dates and (b) the amount of the stipulated tax refunds resulting from the Court's determination.

Dated: September 13, 2011

KEVIN GROSS, U.S.B.J.